**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

MICHAEL BACOTE,
HAROLD CUNNINGHAM,
JOHN W. NARDUCCI, JR.,
JEREMY PINSON, and
ERNEST NORMAN SHAIFER,

Each individually and on behalf of all others similarly situated,

Plaintiffs,

vs.

FEDERAL BUREAU OF PRISONS,
CHARLES E. SAMUELS, JR.
NEWTON E. KENDIG,
PAUL M. LAIRD,
BLAKE R. DAVIS, and
DAVID A. BERKABILE,

Defendants.

---

**COMPLAINT**

---

Plaintiffs Michael Bacote, Harold Cunningham, John W. Narducci, Jr., Jeremy Pinson,

and Ernest Norman Shaifer (collectively, "Plaintiffs"), each individually and on behalf of all

others similarly situated, respectfully complain as follows against defendants the Federal Bureau

of Prisons, Charles E. Samuels, Jr., Newton E. Kendig, Paul M. Laird, Blake R. Davis, and

David A. Berkabile (collectively, "Defendants").

**TABLE OF CONTENTS**

Page

I. NATURE OF THE ACTION .......................................................................................... 4

II. JURISDICTION ........................................................................................................... 7

III. VENUE ........................................................................................................................ 8

IV. PARTIES ..................................................................................................................... 8

V. GENERAL ALLEGATIONS ....................................................................................... 9

   A.   Background and Operation of ADX ..................................................................... 9

   B.   Extended Confinement in Isolation Can and Often Does Have a Devastating
        Effect on Prisoners' Mental Health ...................................................................... 17

   C.   The BOP Violates Its Own Written Policies Concerning Evaluating, Housing
        and Treating Mentally Ill Prisoners at ADX ........................................................ 19

   D.   ADX Houses Seriously Mentally Ill Prisoners Who Are Dangerous to
        Themselves and Others ........................................................................................ 23

   E.   Mental Health Care Treatment at ADX is Woefully and Constitutionally
        Inadequate ........................................................................................................... 29

   F.   Defendants Have Displayed Sustained Deliberate Indifference to The Plight
        and Needs of Mentally Ill Prisoners at ADX ....................................................... 35

        (1)   The illnesses of Plaintiffs and their peers are obvious. ........................................ 35

        (2)   At least fourteen separate pro se lawsuits filed by ADX prisoners in the past
              nine years have put Defendants on notice of the catastrophic deficiencies in
              the ADX mental health care system. ................................................................. 35

        (3)   A series of suicides by mentally ill prisoners have demonstrated in tragic
              and permanent terms the deficiencies in the ADX mental health system. ........... 38

   G.   Defendants Have Retaliated Against and Interfered With Plaintiffs and Other
        ADX Prisoners Who Have Tried to Assert Their Constitutional and Other
        Legal Rights to Mental Health Treatment. .......................................................... 41

        (1)   ADX staff have interfered with Legal Mail and confiscation of Attorney-
              Client Privileged Materials. .............................................................................. 42

        (2)   ADX staff have interfered with the attorney-client relationship and
              retaliated against prisoners by threatening, antagonizing, and punishing
              prisoners who communicate with counsel. ......................................................... 44

VI.    ALLEGATIONS RELATING SPECIFICALLY TO PLAINTIFFS ............................... 46

    A.    Michael Bacote .................................................................................................. 46

    B.    Harold Cunningham .......................................................................................... 50

    C.    Ernest Norman Shaifer ..................................................................................... 55

    D.    Jeremy Pinson ................................................................................................... 59

    E.    John W. Narducci, Jr......................................................................................... 62

VII.   ALLEGATIONS RELATING SPECIFICALLY TO THE INTERESTED
        INDIVIDUALS.......................................................................................................... 66

    A.    John Jay Powers ............................................................................................... 69

    B.    Marcellus Washington ...................................................................................... 74

    C.    William Concepcion Sablan .............................................................................. 78

    D.    Jaison Leggett ................................................................................................... 83

    E.    David Shelby...................................................................................................... 87

    F.    Herbert Isaac Perkins ....................................................................................... 93

VIII.  CLASS ACTION ALLEGATIONS ............................................................................ 97

    A.    Prisoner Class.................................................................................................... 98

    B.    Serious Mental Illness Subclass....................................................................... 100

IX.    CLAIMS FOR RELIEF ........................................................................................... 102

X.     PRAYER FOR RELIEF ........................................................................................... 103

## I.   NATURE OF THE ACTION

1.      This class action lawsuit concerns the treatment of prisoners at the United States Penitentiary Administrative Maximum facility in Florence, Colorado ("ADX") who suffer from serious mental illness.  It seeks declaratory and injunctive relief requiring the Federal Bureau of Prisons ("BOP") to comply with its existing policies regarding the treatment of mentally ill prisoners, and with the requirements of the Eighth Amendment regarding medical treatment for United States citizens and others who have been committed to its custody.  Currently, the BOP turns a blind eye to the needs of the mentally ill at ADX and to deplorable conditions of confinement that are inhumane to these prisoners.  No civilized society treats its mentally ill citizens with such deliberate indifference to their plight.

2.      ADX is the most secure federal penitentiary in the United States.  It currently houses approximately 450 men.  Staff at ADX often refer to it as the "Alcatraz of the Rockies." ADX was built to house prisoners whom the BOP believes present the greatest threats to the correctional staff or to other prisoners.  Prisoners spend at least 20 and as many as 24 hours per day locked alone in isolated cells, and are subject to a harsh and unforgiving disciplinary regimen.  Such isolation and brutal discipline are inappropriate for prisoners who are seriously mentally ill.

3.      According to the BOP's own policies, prisoners with serious mental illnesses should not be assigned to ADX.  Upon information and belief, those policies reflect the BOP's recognition that extended confinement in isolation and the institution's disciplinary practices pose substantial risks to prisoners' mental health, and can be particularly harmful for prisoners who had mental health problems before being confined in such conditions.

- 4 -

4.      Despite its policies, the BOP regularly assigns prisoners with serious mental illnesses to ADX.  That fact results from the BOP's routine disregard of its own prior mental health evaluations of prisoners it wishes to send to ADX and its woefully inadequate mental health screening evaluations when prisoners are transferred to ADX.  The BOP also fails to monitor ADX prisoners for mental health problems that arise after they arrive at the facility and fails to provide mentally ill prisoners at ADX with adequate mental health care.  The conditions of confinement at ADX and Defendants' failure to properly diagnose and treat mental illness combine to worsen the conditions of prisoners who were mentally ill when they arrived at ADX, and cause some other prisoners to develop serious mental illness.

5.      The BOP's deliberate indifference to the proper diagnosis and treatment of ADX prisoners with serious mental illnesses has resulted in horrible consequences.  Many prisoners at ADX interminably wail, scream, and bang on the walls of their cells.  Some mutilate their bodies with razors, shards of glass, sharpened chicken bones, writing utensils, and whatever other objects they can obtain.  A number swallow razor blades, nail clippers, parts of radios and televisions, broken glass, and other dangerous objects.  Others carry on delusional conversations with voices they hear in their heads, oblivious to reality and to the danger that such behavior might pose to themselves and anyone who interacts with them.  Still others spread feces and other human waste and body fluids throughout their cells, throw it at the correctional staff and otherwise create health hazards at ADX.  Suicide attempts are common; many have been successful.

6.      The Eighth Amendment to the United States Constitution guarantees to every person imprisoned at ADX adequate medical care, including care for mental illnesses.  That

guarantee includes access to an adequate process for assessing the need for mental health care, and access to necessary care itself.  If the BOP chooses, despite its policies, to assign or house at ADX prisoners with serious mental illness, it must provide adequate mental health screening and treatment, taking into account the isolated conditions of confinement and harsh disciplinary regime of ADX.  The BOP falls woefully short of providing this constitutionally-guaranteed level of care.

7.     Plaintiffs are five seriously mentally ill men currently incarcerated at ADX.  This Complaint also names as "Interested Individuals" six other current ADX prisoners with serious mental illnesses:  Jaison Leggett, Herbert Perkins, John Jay Powers, William Concepcion Sablan and Marcellus Washington.[1]  Many of these men also suffer severe functional impairment of their ability to attend to their own personal needs or even to exist in a world with other people.  Several of them are mentally retarded, and at least one is functionally illiterate.  The brutality and deliberate indifference to human rights that the BOP exhibits toward Plaintiffs and the Interested Individuals also exists with respect to many of the other prisoners held at ADX, including the members of the class and subclass that Plaintiffs represent in this case.

8.     Defendants are the BOP and several of its senior officials.  Defendants are responsible for operating ADX and for ensuring that Plaintiffs' constitutional and other legal rights are respected.  Defendants have failed to meet those obligations to Plaintiffs, the Interested Individuals, and the members of the class and subclass.

---

[1] For reasons discussed in section VII below, counsel has not yet been able to ascertain the status of  the Interested Individuals' efforts to exhaust administrative remedies.  Once exhaustion is confirmed, they will be added as plaintiffs.

9.     Defendants' constitutional violations have repercussions beyond the harm caused to Plaintiffs, Interested Individuals, the class, and the subclass.  Many ADX prisoners who suffer from untreated or poorly treated mental illness pose a constant and sometimes deadly threat to BOP personnel.  Although ADX programs are designed to isolate prisoners from other prisoners, they cannot isolate prisoners from BOP staff charged with providing basic services on a daily basis and conducting security checks required in all correctional settings.  The extreme isolation and the lack of adequate mental health treatment only serve to increase the risk of assaults to the staff assigned these duties.

10.     Although some ADX prisoners will never be released from prison, many, including several of the Plaintiffs and a number of other ADX prisoners, will be released into the community when their sentences expire in the next few years.  After years of confinement in isolation without proper treatment for serious mental illness, these men will have a very, very difficult time reentering society safely and successfully.

11.     This class action lawsuit seeks to remedy the deficient mental health system at ADX by means of a permanent injunction, requiring the BOP to honor its own policies and the constitutional rights of ADX prisoners by providing mental health diagnostic and treatment services.

## II.   JURISDICTION

12.     This Court's subject matter jurisdiction over the allegations in this Complaint is based on 28 U.S.C. § 1331, in that the claims for injunctive relief arise under the United States Constitution and federal statutes.  The request for declaratory relief is based upon 28 U.S.C.

§ 2201, in that an actual controversy exists between Defendants and each Plaintiff over the denial of services that are guaranteed by the United States Constitution.

### III.  VENUE

13.     Venue is proper in the District of Colorado under 28 U.S.C. § 1391(b), because a substantial part of the acts or omissions that give rise to Plaintiffs' claims occurred or will occur in the District of Colorado.

### IV.  PARTIES

14.     Plaintiffs Michael Bacote, Harold Cunningham, Jeremy Pinson, John Narducci, Jr., and Ernest Norman Shaifer are currently housed at ADX.  Each Plaintiff suffers from a serious mental illness.  The care that each Plaintiff has received and continues to receive at ADX for his mental illness is constitutionally deficient and otherwise fails to satisfy Defendants' legal obligations to Plaintiffs.  Plaintiff-specific facts are set forth in Section VI of this Complaint, below.

15.     Defendant BOP is a federal law enforcement agency subdivision of the United States Department of Justice, and is responsible for the administration of federal prisons, including ADX.  The BOP maintains physical custody of Plaintiffs and class members.  The BOP is charged with establishing policies and regulations that are safe, humane, and secure for all federal penitentiaries and other prison facilities.

16.     Defendant Charles E. Samuels, Jr. is the Director of the BOP.  He is sued herein in his official capacity.

17.      Defendant Newton E. Kendig is the Medical Director and Assistant Director of the Health Services Division of the BOP.  He is sued herein in his official capacity.

- 8 -

18.     Defendant Paul M. Laird is the Regional Director of the North Central Region of the BOP, which includes this District.  He is sued herein in his official capacity.

19.     Defendant Blake R. Davis is the Assistant Director of the Correctional Programs Division of the BOP.  He is sued herein in his official capacity.

20.     Defendant David A. Berkabile is the current Warden at ADX.  He is sued herein in his official capacity.

## V.   GENERAL ALLEGATIONS

### A.   Background and Operation of ADX

21.     At any given time, between 400 and 500 prisoners are housed at ADX in nine different maximum-security housing units, which are divided into six security levels:  the Control Unit (or "Bravo" Unit); the disciplinary Special Housing Unit (also called "Zulu" Unit, the "SHU," or the "Hole"); so-called "Range 13," an ultra secure and isolated four-cell wing of Zulu Unit in which the BOP houses prisoners it thinks require confinement with virtually no human contact; four so-called "General Population" Units ("Delta," "Echo," "Fox," and "Golf" Units), the Special Security Unit (also called the "SAMs" Unit or "H Unit"); and two units ("Joker" Unit and "Kilo" Unit) that in recent years have been used as transitional housing units for prisoners who have entered the so-called "Step-Down Program," in which they can earn their way out of ADX and into a lower security classification. Photographs of the prison's exterior are attached hereto as Exhibit 1.

22.     Depending on which unit they are in, prisoners spend at least 20, and as much as 24, hours per day locked alone in their cells.  The cells measure approximately 12 feet by 7 feet, and have solid walls that prevent prisoners from viewing the interiors of other cells or having

direct contact with prisoners in adjacent cells.  All ADX cells have solid doors with a small

closable slot.  Cells in all units other than H, J, and K units also have an interior barred wall with

a sliding door, which together with the exterior door forms a sally port in each cell.  Each cell is

furnished with a concrete bed, desk, and stool, and a stainless steel combination sink and toilet.

Cells in all units other than H, J, and K units include a shower with an automatic shut-off valve.

The beds are usually dressed with a thin mattress and blankets over the concrete.  Each cell

contains a single window, approximately 42 inches tall and 4 inches wide, which allows entry of

some natural light but which is designed to ensure that prisoners cannot see anything outside of

their cells other than the building and sky.  Many cells, except those in the SHU, are equipped

with a radio and black and white television that offers religious and educational programming,

along with some general interest and recreational programming.  Televisions often are withheld

from prisoners as punishment.  Meals are delivered three times a day.  With few exceptions,

prisoners in most ADX units are allowed out of their cells only for limited social or legal visits,

some forms of medical treatment, visits to the "law library" (essentially a cell with a specialized

computer terminal that provides access to a limited range of federal legal materials) and a few

hours a week of indoor or outdoor recreation.  Otherwise they remain locked in their cells.

Photos of a standard ADX cell are collected in Exhibit 2 hereto.

        23.     The Control Unit is the most secure and isolated unit currently in use at ADX.

Prisoners in the Control Unit are isolated from the other prisoners at all times, even during

recreation, for extended terms often lasting six years or more.  Their only meaningful contact

with other humans is with ADX staff members.  The compliance of Control Unit prisoners with

institutional rules is assessed monthly; a prisoner is given "credit" for serving a month of his

Control Unit time only if he maintains clear conduct for the entire month.  As detailed below, Defendants provide no mental health care or psychotropic medication to Control Unit prisoners. Given their complete lack of access to mental health care, seriously mentally ill prisoners confined in the Control Unit frequently have behavioral issues caused by their mental illness. Such conduct often results in the loss of credit for Control Unit time served, thus extending the prisoner's time in the extreme isolation of the Control Unit, sometimes for years.  For example, Interested Individual John Powers entered the ADX Control Unit in 2001 with a 60-month sentence, but as a result of disciplinary incidents (including a number of instances of extreme self-mutilation) was not released into the ADX General Population until March 2011, after more than 120 months in the Control Unit.  During that time he received no meaningful mental health care at ADX.

24.     Prisoners confined to the SHU live in similar isolation.  They are continuously segregated from other prisoners, even during recreation.  Unlike other ADX prisoners, those in the SHU generally are denied access to televisions and radios, and sometimes are confined with nothing in their cells but a mattress and minimal clothing (for example, a t-shirt and boxer shorts).  ADX prisoners are housed in the SHU in several circumstances.  Most ADX prisoners spend at least a few days in the SHU upon their arrival at the institution.  Others are moved to the SHU pending investigation of incidents such as fights that occur from time to time elsewhere in the institution.  Prisoners who receive disciplinary incident reports (or "shots" in the ADX vernacular), and who as a result are sentenced to a term of punitive segregation, serve that time in the SHU.  Like Control Unit prisoners, many prisoners confined to the SHU are serving a specified term of disciplinary detention, but that time may be extended by further shots.  As in

the Control Unit, seriously mentally ill prisoners held in the extreme isolation and sensory deprivation of the SHU frequently receive additional shots.  As a result, many seriously mentally ill prisoners have lived in the ADX SHU for many months, and some have lived there for years.

25.     In the four "General Population" units, prisoners also are isolated from one another, spending at least 22 hours per day alone in their cells.  A few days a week, they may be able to see and speak with a limited number of other prisoners during shared recreation periods lasting two hours, but only while all are confined in separate outdoor cages of the kind depicted in Exhibit 3.  A photograph of individual outdoor recreation enclosures of the sort used by Control Unit and SHU inmates is attached as Exhibit 4.  A few days a week, prisoners in most ADX units also have a few hours of access, one at a time, to individual inside recreation rooms of the sort depicted in Exhibit 5.

26.     The ADX step-down program is a series of three transitional housing units in which prisoners are afforded direct, although still extremely limited, contact with other prisoners. The step-down units represent a type of halfway house on the path to being allowed to leave ADX for another prison.  Still, prisoners who reside in the step-down units are confined to their cells for all but a few hours a day.  Because of the erratic way that the ADX step-down program operates, the step-down units are particularly dangerous for prisoners with mental illnesses who are trying to "earn" their way to a lower security classification.

27.     Every prisoner intent on earning his way out of ADX is required to pass through Joker Unit, the first stage in the step-down program, which is designed to house up to 64 prisoners.  Prisoners are eligible for transfer to Joker Unit only after completing an extended period of clear conduct.  Prisoners who avoid trouble in Joker Unit are eligible to move, after a

time, to the second phase of step-down, where they have more freedom.  If they succeed there they move to the final step-down phase, which provides even more freedom and a pathway to a transfer to a regular maximum security federal penitentiary.  Successful completion of the step-down program can take years, even if a prisoner behaves perfectly.  But any transgression, however minor, can and often does result in the prisoner's removal from the program, placement back in the ADX SHU, and a restarting of the good-conduct clock.  Many ADX prisoners have made it partway through the step-down program several times, only to be returned to the SHU or general population based on a small, or imaginary, transgression.

28.     Unlike other ADX cells, the individual cells in the step-down units at ADX have no interior bars.  Accordingly, only one sliding solid steel door separates prisoners from the open day room at the center of the unit.  Joker Unit prisoners are part of a "Recreation Group" of up to seven other prisoners housed on the same tier.  Each Recreation Group is released at once into the day room or outside recreation yard, where they have unrestrained access to one another.  Exhibit 6 includes several photographs of Joker and Kilo Units, which in recent years have had a nearly identical configuration.

29.     For most ADX prisoners, being transferred into Joker Unit is a disorienting and dangerous experience.  After years of isolation, with no direct, unrestrained contact with other human beings, many prisoners experience a fundamental loss of even basic social skills and adaptive behaviors, and predictably find themselves paranoid about the motives and intentions of others.  Once placed into unrestrained contact with other, similarly impaired and paranoid men, the stress on prisoners -- even those with no mental illness -- can be extreme.  Assaults and stabbings are common.  In 2005, two ADX prisoners in Kilo Unit slowly beat and stomped a

third prisoner to death over a period of many minutes in full view of ADX staff members, who made no effort to intervene until the victim was lying still, either dead or near death, in a pool of blood.

30.     Recreation Groups are formed, in part, by the need to separate prisoners who are not supposed to be housed together or allowed contact with one another.  For example, members of rival gangs would not be placed in the same Recreation Group.  Similar "separations" can result from past conflicts between particular prisoners, or situations in which one prisoner has testified against another prisoner.

31.     When members of one Joker Unit Recreation Group are out of their cells, the other Recreation Groups in the unit are supposed to be securely locked in their cells.  However, that objective is not always met at ADX.  In addition, because cells in Joker Unit lack an internal barred wall, prisoners housed in Joker Unit who have separations often are separated from their separatees only by a single steel door.

32.     That fact creates extreme danger and stress for Joker Unit prisoners, because ADX staff members frequently open the doors of Joker Unit cells unexpectedly, giving prisoners direct and potentially lethal access to one another.  For prisoners with personal protection concerns arising from health problems, age, or past cooperation with law enforcement officials, the potential that his cell door will open suddenly and unexpectedly turns every moment that another Recreation Group spends in the Joker Unit day room into a life or death moment.  In November 2011, two Caucasian Joker Unit prisoners stabbed and severely injured an African American prisoner in Joker Unit.  Several days later, a mentally ill class member was awakened early in the morning when ADX staff "accidentally" opened his cell door with no warning and

for no reason.  In his doorway stood a raving Caucasian prisoner.  Fortunately, the "accident" did

not result in a physical confrontation.  But it did result in the mentally ill prisoner's transfer to

the SHU and removal from the step-down program even though he had no role in the "mistaken"

opening of his cell door and even though he did nothing wrong.

33.     The dangers of Joker Unit, and in particular the risk of physical confrontation

because of a staff member's "mistake," are widely known to ADX prisoners, increasing the

stress they experience upon entry into the step-down program.  When combined with the ravages

of untreated or inadequately treated mental illness, those stresses make it virtually impossible for

most severely mentally ill prisoners to earn their way out of ADX by completing the step-down

program.  Thus, even in the unlikely event that a severely mentally ill prisoner -- despite

inadequate mental health care -- can maintain clear conduct long enough to qualify for the step-

down program, very few can hold it together long enough to complete that program.  Instead,

they frequently succumb to the behavior caused by their illness, are removed from step-down

and transferred back to the SHU and then "general population," all the while being denied the

mental health care they need to have any realistic chance to get better, succeed in conforming

their behavior to institutional norms, and qualify for transfer to less secure prisons.  As a result,

upon information and belief, the percentage of the prisoner population at ADX with serious

mental illness has risen steadily in recent years, and will continue doing so until the BOP reforms

the mental health care system at ADX.

34.     In all units at ADX Defendants make a determined and calculated effort to

dominate prisoners through the use of punitive techniques that include the use of extended

periods of isolated confinement in the Control Unit or SHU and threats of other punitive

measures such as the withholding of privileges (such as access to a television set, access to the in-house "commissary" where prisoners can purchase food and other items, access to the telephone, and prompt delivery of inbound mail).  ADX programs are designed based upon a punishment philosophy rather than a control philosophy.  The behavior of mentally ill prisoners, in particular, deteriorates very rapidly when they are placed into programs designed to punish rather than to control unacceptable behaviors.

35.     Consistent with ADX's punishment-focused correctional model, certain members of the correctional staff at ADX routinely use physical abuse of unruly or merely assertive prisoners to create fear and to demonstrate the dominance of the correctional staff.  The harsh and unforgiving disciplinary philosophy employed at ADX is inappropriate for seriously mentally ill prisoners, particularly those who are not only mentally ill but whose minds also are dulled by confinement in sustained isolation.  For example, certain prisoners are required to stand with their backs to the door and hands on the wall when their meals are delivered.  If a prisoner fails instantly to comply, officers often depart without leaving a food tray.  As a result, psychotic or deeply depressed prisoners, including those whose conditions are exacerbated by Defendants' failure to provide required medications and other mental health care, frequently go without food on the ostensible basis that they defied an officer's order, when in fact the prisoner's only failing was a failure to understand the order or instantaneously clear his mind of fog induced by untreated mental illness and sustained isolation.

36.     Plaintiffs do not dispute the need for security at ADX, and acknowledge that unruly or violent prisoners may sometimes require physical restraint.  But as applied to seriously mentally ill prisoners, the brutal disciplinary model employed by the staff at ADX is often an

instrument of terror and abuse, deployed by staff members who sometimes provoke the very

conduct they punish, and many of whom lack the training and skills necessary to manage

mentally ill prisoners safely and effectively.

**B.    Extended Confinement in Isolation Can and Often Does Have a Devastating Effect on Prisoners' Mental Health.**

37.    Correctional officials and mental health professionals have known for more than

200 years that extended periods of confinement in isolation can be psychologically damaging,

and can be particularly harmful to individuals with pre-existing mental illness.  Beginning in

1790, when sixteen isolation cells were constructed at Philadelphia's Walnut Street Jail,

correctional officials and mental health professionals have regularly studied and acknowledged

the dangers of prolonged confinement in isolation.  It is well understood that extreme isolation

for even a few weeks can result in psychosis, social withdrawal, insomnia, depression,

hallucinations, rage, aggression, self-mutilation, and contemplation of suicide.

38.    In early America, confinement in isolation was viewed as a more humane

alternative to corporal punishment; its proponents thought it would inspire "penitence" through

self-reflection.  In 1829, Eastern State Penitentiary in Philadelphia opened, employing the

"Pennsylvania model" of almost complete isolation:  it sought to prohibit all contact between

prisoners, utilizing cells with individual exercise yards and solid doors that were primitive

versions of those now inhabited at ADX.

39.    The detrimental effects of extreme isolation under the Pennsylvania model soon

became apparent.  Following his 1842 visit to Eastern State Penitentiary, for example, Charles

Dickens expressed concern about the facility and the extreme isolation of its prisoners, noting

that "this slow and daily tampering with the mysteries of the brain [was] immeasurably worse

than any torture of the body."  America's first experiment with extended confinement in isolation

was declared by contemporary observers such as Alexander de Tocqueville as "fatal" for most

prisoners because "[i]t devours the victim incessantly and unmercifully," did not successfully

reform prisoners, and caused "[t]he unfortunate creatures submitted to this experiment [to]

wast[e] away."

40.     Because of its adverse effects on prisoners, the Pennsylvania model was quickly

abandoned by many states during the nineteenth century.  In 1890, one hundred years after the

first isolation cells were constructed at the Walnut Street Jail, the Supreme Court concluded:

> [E]xperience demonstrated that there were serious objections to [extended
> confinement in isolation].  A considerable number of the prisoners fell,
> after even a short confinement, into a semi-fatuous condition, from which
> it was next to impossible to arouse them, and others became violently
> insane; others still, committed suicide; while those who stood the ordeal
> better were not generally reformed, and in most cases did not recover
> sufficient mental activity to be of any subsequent service to the
> community.  It became evident that some changes must be made in the
> system.

*In re Medley*, 134 U.S. 160, 168 (1890).

41.     In 1913, Eastern State Penitentiary at long last abandoned its system of complete

isolation and allowed prisoners at least some regular human interaction.  Shortly thereafter, in

*Commonwealth ex rel. Elliott v. Francies*, 58 Pa. Super. 270 (Pa. Super. Ct. 1914), a

Pennsylvania court ordered that individuals who had been incarcerated at Eastern State

Penitentiary in error were to be "absolutely" rather than "conditionally" discharged before the

end of their sentences, due to the severity of the punishment and based upon "just and humane

principles."  In 1933, the warden at Eastern State Penitentiary called for the facility's closure,

noting that the system utilized at Eastern State could not effectively reform the prisoners incarcerated there.

42.     The anecdotal observations of the past have been confirmed by modern science. For example, as early as the 1960s electroencephalography (EEG) examinations demonstrated the slowing of brain waves of prisoners confined in isolation for longer than a week.  A landmark study in the 1970s showed that subjects in solitary confinement often experienced impaired functioning of the brain waves associated with the ability to control emotions and key cognitive functions.  Similarly, a 2011 study demonstrated that after only a week of solitary confinement, prisoners showed decreased EEG activity, indicative of increased stress, anxiety, and depression.

43.     Despite the mountains of anecdotal and empirical data confirming the impact on mental health of extended isolated confinement, the BOP regularly assigns to ADX prisoners who suffer from serious mental illnesses, and fails to maintain an adequate program to diagnose and treat the serious mental illnesses created and exacerbated by the conditions of confinement there.

**C.   The BOP Violates Its Own Written Policies Concerning Evaluating, Housing and Treating Mentally Ill Prisoners at ADX.**

44.     The BOP's written procedures for transferring prisoners to ADX state that prisoners "currently diagnosed as suffering from serious psychiatric illnesses should not be referred for placement at … ADX."  BOP Program Statement 5100.08, "Prisoner Security Designation and Custody Clarification," Chapter 7, p.18.  This prohibition is widely ignored by Defendants.  The BOP regularly assigns prisoners to ADX even though they have well-documented histories of serious mental illnesses, and in many cases histories showing that their mental illnesses can be controlled with proper treatment.

- 19 -

45.     BOP policies also require that all prisoners are to be given psychiatric screening upon arrival at ADX.  For example, BOP policies require the prison staff to "ensure that assessment and treatment planning procedures exist to identify all prisoners entering the institution with either a recent history or current symptoms of significant mental illnesses and/or risk of suicide."  BOP Program Statement 5310.13, "Institution Management of Mentally Ill Prisoners," p.4.  During the intake screening, prisoners with any of the following must be referred immediately to the Mental Health Program Coordinator for a more thorough assessment:

- Recent history or current symptoms of significant mental illness;

- Signs or symptoms consistent with a possible mental disorder;

- Use of medication for treatment of a mental illness or disorder;

- Documented mental health designation;

- Risk of suicide.

*Id.*; BOP Program Statement 6340.04, "Psychiatric Services," § 9(a).

46.     In reality, incoming prisoners at ADX generally are given only perfunctory interviews that are wholly inadequate as a form of screening or diagnosis.  The mental health "screening" provided by the facility typically consists of a few questions asked in a minute or two, often at a time when the prisoner has just completed a lengthy cross-country trip while tightly chained, and is apprehensive about his arrival at ADX.  Follow-up monitoring and screening is virtually nonexistent.  Even when the BOP does carry out the psychological or psychiatric screening of a new arrival, it often ignores key factors indicating mental illness, such as, for example, the fact that the prisoner was taking medication for a serious mental illness immediately before arriving at ADX.

47.     Even where prisoners at ADX are properly identified as having a serious mental illness, many are not given appropriate treatment, including either counseling or medication.  If a prisoner is referred to the mental health Program Coordinator, BOP policies require adherence to the BOP's minimum criteria for follow up assessment and treatment planning.  BOP Program Statement 5310.13, "Institution Management of Mentally Ill Prisoners," p.4.  The Program Coordinator is required to complete a screening report on all referred prisoners, and to forward the prisoner's mental health information to relevant members of the prison staff.  *Id*. at 5.  If the prisoner has extensive treatment needs, the Program Coordinator must schedule additional sessions and establish a treatment plan.  *Id*.  Defendants routinely ignore these requirements by, among other things, rarely establishing meaningful treatment plans even for prisoners who are chronically and obviously seriously mentally ill, and failing even to establish at ADX a mechanism for delivering elementary mental health services, such as private counseling, which would be a necessary element of any meaningful treatment plan for most of the seriously mentally ill prisoners at ADX.

48.     Because of the particularly severe conditions of confinement in the ADX Control Unit, federal regulations require the BOP to adhere to an especially detailed set of mental health standards, including:

> The Warden may not refer an inmate for placement in a control unit … [i]f the inmate shows evidence of significant mental disorder or major physical disabilities as documented in a mental health evaluation or a physical examination. 28 CFR §541.41(c)(1).

> *Mental health services.*  During the first 30-day period in a control unit, staff shall schedule the control unit prisoner for a psychological evaluation conducted by a psychologist.  Additional individual evaluations shall occur every 30 days.  The psychologist shall perform and/or supervise needed psychological services.  Psychiatric

services will be provided when necessary.  *Prisoners requiring prescribed psychotropic medication are not ordinarily housed in a control unit.*  28 C.F.R. §541.46(i) (Emphasis added.)

49.     Defendants regularly violate every major requirement of these regulations.  As detailed below, several of the Plaintiffs are currently or have been assigned to the ADX Control Unit in violation of  section 541.41(c)(1).  Moreover, it is common for the BOP to place an incoming prisoner with an existing prescription for psychotropic medication in the Control Unit, where the BOP refuses to administer such medication in violation of section 541.46(i).  The BOP justifies this in Orwellian fashion:  it discontinues the prisoner's medication, thereby making the now non-medicated prisoner "eligible" for placement in the Control Unit.  Then, when this newly "eligible" prisoner requests medication needed to treat his serious mental illness, he is told that BOP policy prohibits the administration of psychotropic medication to him so he should develop "coping skills" as a substitute for the medication being withheld.  Instructing a prisoner confined in long-term segregation and who has Schizophrenia or Bipolar Illness to self-treat his disease with coping skills is like demanding that a diabetic prisoner learn to "cope" without insulin.  Likewise, the required 30 day "individual evaluations" are in actuality rarely performed on inmates in the Control Unit.  Indeed, and as an example, upon information and belief, one obviously and seriously mentally ill inmate in the ADX Control Unit who habitually resides in a cell reserved for the seriously mentally ill which is fitted with, among other things, Plexiglas sheets over the internal barred grill, was not out of his cell at any point between November 2011 and May 2012 and during that time had no substantive communications whatsoever with any BOP mental health professional.

50.     BOP policies require that mentally ill prisoners be monitored on an ongoing basis

to assess treatment compliance.  BOP Program Statement 5310.13, "Institution Management of

Mentally Ill Prisoners," at 5.  For certain prisoners, including those receiving psychotropic

medication and those segregated for mental health reasons, mental health staff must, at a

minimum, conduct a monthly interview to assess the prisoner's treatment strategy.  *Id*.  As with

other applicable policies, ADX staff routinely ignore this written monitoring requirement.  Some

prisoners never leave their cells or speak with staff for months.  Many such prisoners live for

extended periods in squalor, in cells caked with their own feces and bodily fluids, without

bathing, and in some cases without even getting out of bed.  Any meaningful "monitoring"

would identify and trigger intervention for such prisoners, but rarely, if ever, does ADX staff

seek to remedy the fetid and unsafe living conditions of many of the mentally ill people in their

custody.

**D.    ADX Houses Seriously Mentally Ill Prisoners Who Are Dangerous to Themselves and Others.**

51.     Plaintiffs, together with other class members, suffer from various forms of serious

mental illness, including Major Depression, Schizophrenia, Bipolar Illness, Schizoaffective

Disorder, various personality disorders with significant functional impairments, Post-Traumatic

Stress Disorder, mental retardation, and other chronic and serious mental conditions.  These

mental conditions are described and defined more completely in the Diagnostic and Statistical

Manual of Mental Disorders, Fourth Edition ("DSM-IV").

52.     Prisoners with serious mental illnesses are sometimes confined at ADX for

months or years without adequate mental health treatment, with predictably devastating results.

These conditions exacerbate their mental illness, making them increasingly dangerous to

themselves and others.  Their inadequately treated illnesses often lead to aggressive and violent behavior which is in turn used by the correctional staff as justification (if not pretext) for further acts of extreme isolation and violence directed at the prisoner, thereby establishing a vicious cycle in which anger begets a violent response that begets more anger.

53.     Many of those prisoners housed in the SHU, particularly on A Range in the SHU, suffer from serious, chronic mental illness.  Some of them have been housed in the SHU for years.  Some routinely smear themselves and their cells with their own feces.  Some howl or shriek continuously, or bang their metal showers at all hours of the day or night.  Some speak to themselves continuously.  One carries on conversations with himself virtually every day, using multiple voices.  Another, who recently arrived at ADX and spent weeks in the SHU before being moved to a General Population Unit, laid for weeks in his cell, caked with feces.  He was rarely fed, and the ADX staff responsible for his care tormented him by yelling at him and antagonizing him as if he were a reviled animal.

54.     Two Plaintiffs, Messrs. Shaifer and Cunningham, and one Interested Individual, Mr. Washington, are currently assigned to the Control Unit despite histories of serious mental illness requiring medication and treatment, which are being denied to them.  Another Interested Individual, Jack Powers, spent nearly ten years in the Control Unit before he was moved to the ADX general population in early 2011.  During his time in the Control Unit, Mr. Powers slowly descended into madness, horribly mutilating himself as a result of his serious mental illness, repeatedly ramming his head into a metal door frame, amputating two fingers, a testicle, and his scrotum, tattooing his entire body with a razor blade and carbon paper dust, trying to inject bacteria into his own brain, and slashing his wrist severely enough that he lost consciousness.

All of this occurred after the BOP itself diagnosed Mr. Powers with a serious mental illness and all of it happened while he was being "monitored" by Defendants and their agents.  Although he was referred for treatment three times at a BOP medical facility while confined in the Control Unit, and received prescribed medication for his serious mental illness during two of those visits, each time he was returned to ADX his treatment ceased, and his symptoms and mutilations escalated.

55.      Seriously mentally ill prisoners also are housed throughout ADX's General Population Units, and inhabit most of the 12 housing ranges that comprise those units.  Such prisoners range from recluses who literally have not left their cells in months or years, to more boisterous prisoners who bang on their cell bars, or their showers, day and night, talk to themselves, wail and scream, and otherwise express their indeterminate suffering to the great disruption and discomfort of other nearby prisoners.

56.      The prison's "General Population" Units currently are home to at least two prisoners who are so chronically mentally ill that the Department of Justice itself has repeatedly gone to court to have each of them involuntarily committed or forcibly medicated.  Both have been diagnosed by the BOP as suffering from Schizophrenia, both have repeatedly been treated by the BOP for that illness and both exhibit chronic and obvious psychosis.  And yet both currently reside at ADX and, upon information and belief, currently are receiving no mental health care whatsoever.

57.      The first of these prisoners is 40 years old and was initially transferred to ADX at some point before 2002.  The BOP has diagnosed him on multiple occasions as suffering from Schizophrenia, Paranoid Type, Psychotic Disorder Not Otherwise Specified ("NOS") and/or

Antisocial Personality Disorder.  In 2002, this prisoner was transferred from ADX to the U.S. Medical Center for Federal Prisoners in Springfield, Missouri ("MCFP Springfield"), where a BOP psychologist diagnosed him with Schizophrenia, Paranoid Type and noted that "[h]e endorses bizarre delusional beliefs" and suffered from auditory hallucinations.  Although suffering from these illnesses, the inmate refused psychiatric treatment.  In 2003, pursuant to 18 U.S.C. § 4245, the BOP involuntarily committed this inmate for treatment.  In 2004, the BOP involuntarily medicated him with anti-psychotic medication.  Thereafter, a BOP clinician inexplicably determined that the prisoner was feigning mental illness despite his significant, documented psychiatric history and the prior involuntary commitment initiated by the very same federal agency that now decided he was pretending to be mentally ill.  He was eventually transferred back to ADX.  The following year in 2005, the BOP again reversed course, transferring the prisoner back to MCFP Springfield, where he was again involuntarily medicated after a BOP psychiatrist noted that "[p]sychotropic medication is the treatment of choice for [his] mental illness."  In 2006, he was returned to ADX, where, upon information and belief, he has remained since.  He is scheduled for release in October 2012, and, upon information and belief, will have had no mental health treatment in more than six years when he is released directly from ADX to the community.

58.      The second such prisoner is 46 years old and has been diagnosed by the BOP as suffering from Paranoid Schizophrenia and Antisocial Personality Disorder.  The BOP sought to have him involuntarily committed on three separate occasions between 1998 and 2007.  The first involuntary commitment petition, filed in 1998, resulted in a psychiatric evaluation noting "[w]hile awaiting a decision from the court, [the prisoner's] condition worsened . . . . [and]

escalated to the point that he was difficult to manage."  In 2001, the BOP filed a second

involuntary commitment petition, arguing that "there is reasonable cause to believe that [the

prisoner] is presently suffering from a mental disease or defect (paranoid Schizophrenia and

Antisocial personality disorder), for which he requires care and treatment in a suitable facility."

At a hearing on the 2001 petition, the prisoner opposed commitment, arguing that he could

adequately cope in the general prison population and involuntary commitment was not

warranted.  Nonetheless, at the BOP's urging, the court found that the prisoner "suffers from a

mental disease or defect, and is in need of care and treatment in a suitable facility" and granted

the BOP's petition.  Most recently, in 2007, the BOP filed another petition regarding this

prisoner, which the prisoner again objected to, and the court again granted, involuntarily

committing the prisoner for a third time for mental health care and treatment.  Yet, upon

information and belief, he continues today to reside at ADX, with no psychiatric care

whatsoever.

59.    Upon information and belief, certain ADX staff members use mentally ill

prisoners as weapons against other, particularly disfavored prisoners.  For example, prisoners at

ADX periodically rotate cells, ostensibly for security reasons.  For most prisoners, a cell rotation

means moving into the next cell on the same range.  When a prisoner is "behind" a mentally ill

prisoner in the cell rotation pattern, at each cell rotation he may find himself forced to move into

a cell that is coated with dried human waste, semen, urine and sometimes blood.  Because many

ADX prisoners suffer from contagious blood-borne diseases, such as hepatitis C, exposure in this

manner to another prisoner's waste carries with it an immediate and dire risk of infection with a

serious and sometimes fatal illness.  Nevertheless, ADX prisoners are routinely forced into

waste-caked cells left behind by an obviously mentally ill fellow prisoner.  The new inhabitant must then clean the cell himself -- often with few if any cleaning supplies -- and then await the next rotation, when the process will be repeated.  Upon information and belief, certain ADX staff members deliberately place disfavored prisoners behind unsanitary mentally ill prisoners in the cell rotation pattern for the intended purpose of exposing the unfortunates to the constant noise and harassment supplied by a mentally ill neighbor and to ensure that after every cell rotation the disfavored prisoner will have to clean another filthy cell.

60.     Likewise, in 2010 a severely and chronically depressed prisoner who had attempted to kill himself a few months earlier was escorted to the ADX SHU after throwing milk at a corrections officer.  He was placed in a cell from which the BOP had just removed another chronically and notoriously mentally ill prisoner who had smeared the cell's floors, walls, bed and mattress with feces.  The prisoner arriving was given no cleaning supplies, and was not issued a blanket, towel, or sheet.  He used the roll of toilet paper in the cell to try to wipe the feces off of a spot on the bare concrete floor that was large enough to enable him to lie down. For two days, he remained lying on that single "clean" space.  When he had not been issued cleaning supplies, a towel, sheet or blanket after two days, he covered the Plexiglas wall in his cell with newspapers to block the view from the hallway and then prepared to hang himself with his shoelaces.  Before he succeeded in doing so an "emergency response team" assembled because of the newspaper on his cell windows, forcibly entered the cell, restrained the inmate, and moved him to another cell where he was handcuffed hand and foot to a concrete pedestal for another day, during which he was unable to reach the food left for him on the desk in the cell.

61.     The BOP maintains separate facilities in other locations for dealing with prisoners who are severely mentally ill, including MCFP Springfield, the Federal Medical Center in Butner, North Carolina ("FMC Butner"), the Federal Medical Center in Rochester, Minnesota ("FMC Rochester"), and the Federal Medical Center in Devens, Massachusetts ("FMC Devens"). MCFP Springfield is an administrative facility that provides medical, mental health, and dental services to male offenders of all security levels, including prisoners classified for confinement at ADX.  FMC Butner is an administrative facility that houses male prisoners of all security levels, including prisoners classified for confinement at ADX.  FMC Rochester and FMC Devens are administrative facilities providing specialized medical and mental health services to male offenders.

62.     Plaintiffs and all other ADX prisoners with serious mental illnesses could be safely and securely housed at MCFP Springfield or FMC Butner for treatment of their mental illnesses.  In fact, many of Plaintiffs and a large number of other ADX prisoners have been hospitalized at MCFP Springfield and/or FMC Butner while designated for confinement at ADX. Upon information and belief, certain ADX prisoners could safely and securely be housed at FMC Rochester or FMC Devens for treatment of their mental illnesses.

**E.    Mental Health Care Treatment at ADX is Woefully and Constitutionally Inadequate.**

63.     The BOP does not provide adequate mental health staffing at ADX.  Upon information and belief, only two mental health professionals -- both psychologists -- are responsible for the mental health of the approximately 450 prisoners housed at ADX, many of whom have serious chronic mental illnesses or other mental health issues, and many others of whom experience periodic acute mental health crises.  These health care professionals are

assisted by a psychiatrist who spends only approximately one-half day per week at ADX, a period that is grossly inadequate given the substantial number of prisoners at ADX who require psychotropic medications.  As a result of inadequate staffing by mental health professionals, ADX prisoners, including Plaintiffs and class members, do not have timely access to mental health professionals, particularly in times of crisis.  This leads to prisoners becoming involved in escalating conflicts and violence that would be avoided if adequate mental health staffing were provided at the facility.  The consequences of inadequate mental health staffing include a risk of physical harm to Plaintiffs, class members, and other prisoners, and a risk of harm to staff.

64.     ADX provides psychotropic medication to some, but not all, of the seriously mentally ill prisoners housed at the facility.  Furthermore, although the efficacy of many psychotropic drugs may be affected by the time of administration and by such considerations as proximity of the administration to a meal, ADX staff distributes medications on an irregular schedule that is often inconsistent with the instructions for consumption of the medication.  Staff members responsible for distributing medications also frequently make mistakes by distributing the incorrect medication to prisoners, or incorrect dosages of the correct medication.  The haphazard and sometimes reckless distribution of medications substantially interferes with the benefits the medications provide to those ADX prisoners lucky enough to be authorized to receive needed psychotropic medications.

65.     Many prisoners at ADX receive their psychotropic medication through a "pill line" procedure in which the medication is crushed and given to them at their cell door in a cup. Many of the seriously mentally ill prisoners at ADX are severely paranoid as a result of their illness, and generally believe that the staff providing medication is either providing the wrong

medication or, in some cases, affirmatively attempting to poison them.  In such circumstances,
prisoners sometimes ask to receive whole pills that they can recognize (based on extended
histories of taking the same medication), or for staff to show them the pills they are being given
before grinding them up.  Staff members routinely refuse these requests, leaving severely
mentally ill and in some cases psychotic prisoners to choose between declining needed
medication or consuming a substance they genuinely (even if erroneously) believe will harm or
kill them.

66.     ADX provides no meaningful mental health counseling to prisoners.  Rather,
"psychology programming" consists of distributing to prisoners books with such titles as "Anger
Management for Dummies," " Choose Forgiveness - Your Journey to Freedom," and "Why
Zebras Don't Get Ulcers."  Staff award certificates to prisoners diligent and literate enough to
self-treat their serious mental illnesses by completing elementary workbooks.  Illiterate
prisoners, including Plaintiff Michael Bacote, have no meaningful access to the negligible
therapeutic information distributed by ADX in written form.

67.     Some repetitive and elementary psychology programming is also available to the
segment of the ADX prisoner population with access to a television.  The information provided
in this manner is of little if any use to severely mentally ill or psychotic inmates.  Moreover,
many of ADX's most chronically and devastatingly mentally ill prisoners are housed for months
or years in the SHU, where prisoners are denied access to all television programming, including
even the meager televised mental health programming provided to other prisoners.

68.     Members of ADX mental health staff occasionally talk to prisoners, but even
those occasional "counseling" sessions are almost invariably conducted through the bars of the

prisoner's cell, in the immediate presence of a correctional offer and within earshot of other prisoners housed on the same range. This process turns psychological counseling into a farce. Few people, in or out of prison, are comfortable discussing intensely personal matters in a highly public environment that renders them subject to ridicule. The same is true for ADX prisoners, who also are forced by ADX's approach to mental health "counseling" to choose between forgoing that counseling or exposing themselves to violent assault or death based on events or concerns that they would discuss with a mental health professional and are forced to discuss within easy earshot of other prisoners. Although a safe, secure and private room for psychology counseling is available within steps of virtually every cell at ADX, staff members routinely ignore prisoner requests to discuss psychological problems in private.

69.     Suicide and mental health crisis services at ADX also are systematically deficient. Mentally ill prisoners threatening suicide are often goaded by ADX staff members to kill themselves. Prisoners who take steps to slash their wrists or hang themselves generally receive only minimal medical treatment for acute injuries. And instead of receiving mental health intervention, they are punished: they receive a disciplinary incident report that sometimes results in a trip to the SHU and loss of privileges. An ADX prisoner who recently attempted to hang himself in the SHU was violently removed from the room where he tried to commit suicide by a team of correctional officers in riot gear. Incredibly, an ADX psychologist in full riot gear participated in the violent extraction. After a short stay in a "strip cell," a nearly empty cell in which the prisoner is clothed what is essentially a paper robe, he was returned to the disciplinary segregation cell that precipitated his despair and suicide attempt only days earlier.

70.     Upon information and belief, the BOP provides grossly inadequate training to the staff at ADX, including in particular the corrections staff, regarding mental illnesses and the safe and humane management of mentally ill prisoners.  As a result, staff members routinely resort to unnecessary violence and disciplinary actions when an inadequately treated mentally ill prisoner acts out.  Thus, mentally ill prisoners, including those in the throes of a psychotic episode, frequently are subjected to barbaric treatment more suited to the dungeons of medieval Europe than to a modern American prison.  For example, mentally ill prisoners are routinely "four pointed" -- chained by the wrists and ankles in either a prone or supine position on top of a concrete platform -- often for extended periods.  While chained, mentally ill prisoners sometimes are left to urinate and defecate on themselves, and sometimes are denied basic nutrition.

71.     In some cases, ADX staff turn the simple (although cruel and unconstitutional) refusal to feed a prisoner into a deceptive hoax.  ADX prisoners, including those in four point restraints, sometimes are put on a disciplinary "sack lunch" nutrition program in which they are fed not standard prison trays but a paper bag containing a sandwich or two and a piece of fruit. Many mentally ill prisoners at ADX who are placed on sack lunch restriction have received their sack (suitably videotaped) being delivered to their cells.  But when they open the bags (off camera) they sometimes are empty.  Through this ruse ADX staff produce false video evidence of feeding, raise (if only for a minute) the prisoner's hope for basic nutrition, then smash the often-chained and always hungry prisoner's hopes with a bag of air.  Severely mentally ill prisoners at ADX often live near the edge of their emotional endurance, and the empty sack lunch is one of many cruel ploys that, upon information and belief, are used by certain ADX staff

members to torture and provoke such prisoners into outbursts that then are used to justify even

harsher discipline.

72.     As a result of this type of abuse, other prisoners in nearby cells and ranges are

often subject to the shrieking and suffering of prisoners undergoing such abuse.  Upon

information and belief, such abuses are caused and/or exacerbated by inadequate staff treatment

and a general failure of supervision.

73.     Upon information and belief, the BOP requires or encourages members of the

mental health staff at ADX to perform correctional functions.  Upon information and belief, such

staff members have:  performed prisoner escort duty within the prison while armed with

weapons, openly brandishing those weapons in the presence of prisoners; worked shifts in the

prison's gun towers; appeared at the doorways of prisoners brandishing clubs in an aggressive

fashion; and participated in violent acts toward prisoners, including on at least one instance,

participating in a violent cell extraction while wearing riot police protective gear.  The

performance of correctional functions by mental health professionals in the presence of or with

the knowledge of prisoners blurs the line between the mental health profession and the

correctional profession, and destroys whatever trust might otherwise develop among prisoners

and the mental health professionals who are their only source of treatment for their mental

illnesses.  In the absence of some measure of trust, no mental health clinician can effectively

treat a prisoner's mental illness.

74.     As described above and, with respect to Plaintiffs and Interested Individuals

below, Defendants' failure to diagnose and treat serious mental illness has devastating

consequences.  With utter disdain for human dignity and decency and disregard for the

- 34 -

requirements of the Eighth Amendment, Defendants repeatedly have violated the constitutional

rights of Plaintiffs, Interested Individuals, the class, and the subclass.

**F.    Defendants Have Displayed Sustained Deliberate Indifference to The Plight and Needs of Mentally Ill Prisoners at ADX.**

75.    Defendants are, and have been for years, on actual notice of the unmet mental

health needs at ADX, but have demonstrated sustained and deliberate indifference to those

needs.  Defendants' actual knowledge of the unmet mental health needs of ADX prisoners has

come from a variety of sources, including without limitation medical records of Plaintiffs and

other prisoners, direct observation of Plaintiffs and other obviously mentally ill prisoners,

administrative remedy requests filed by Plaintiffs and other prisoners, past litigation challenging

the ADX mental health system, and suicides of mentally ill prisoners.

**(1)    The illnesses of Plaintiffs and their peers are obvious.**

76.    As described in this Complaint, many of the seriously mentally ill prisoners at

ADX do not and cannot hide their conditions.  They scream, howl, mutilate themselves, smear

their waste, and beg for help.  Many have long, documented histories of serious mental illness.

Many have filed dozens of written requests for mental health intervention, to little or no avail.

**(2)    At least fourteen separate pro se lawsuits filed by ADX prisoners in the past nine years have put Defendants on notice of the catastrophic deficiencies in the ADX mental health care system.**

77.    In the past nine years, prisoners at ADX have filed at least fourteen separate

lawsuits against various BOP officials that sought, in whole or part, treatment for serious mental

illnesses.  For example, current ADX prisoner Dawane Mallett has alleged in at least four

separate lawsuits that he is mentally ill and that mentally ill prisoners housed at ADX are

deprived of proper treatment.  *See Mallett v. Davis*, No. 11-01567 (D. Colo. 2011) (dismissed for

lack of prosecution); *Mallett v. Davis*, No. 10-00085 (D. Colo. 2010) (two claims were dismissed

as repetitive of 09-03013, and the remaining claim was dismissed as an improper claim under §

2241 and for lack of standing); *Mallett v. Davis*, No. 09-03013 (D. Colo. 2009) (dismissed for

failure to exhaust BOP administrative-remedy procedure); *Mallett v. Davis*, No. 09-01823 (D.

Colo. 2009) (dismissed for failure to cure deficiencies, in particular to submit a Prisoner's

Motion and Affidavit for Leave to Proceed Pursuant to 28 U.S.C. § 1915).

78.     Former ADX prisoner Peter Georgacarakos filed three separate lawsuits raising

similar issues, including a claim that ADX's Control Unit conditions violate the Eighth

Amendment because the facility houses prisoners without regard for their psychological health.

*See Georgacarakos v. Wiley*, No. 05-02207 (D. Colo. 2005) (dismissed for failure to pay filing

fee); *Georgacarakos v. Watts, et al.*, No. 09-01648 (D. Colo. 2009) (dismissed for failure to file

an amended pleading on the Court's Prisoner Complaint form); *see also Georgacarakos v. Wiley,*

*et al.*, No. 07-01712 (D. Colo. 2007) (claiming that ADX prisoners in isolation are denied the

prescription and administration of psychotropic drugs, and that isolation causes such mental

illness).

79.     In *Thirkield v. No Defendants Named*, No. 10-02193 (D. Colo. 2010), ADX

prisoner DeAndre Thirkield's allegations included apparent delusions that he is being subjected

to psychological torture of the brain by electronic sources.  Upon information and belief,

Mr. Thirkield is actively and chronically psychotic and his medical condition is or should be

obvious to anyone who spends more than a few minutes with him.

80.     Likewise, in *Baxter v. Manspeaker, et al.*, No. 10-01086 (D. Colo. 2010), current

ADX prisoner David Baxter (whose legal name is Richie Hill) noted several times that he is

mentally ill.  He also alleged that he was refused a mental health evaluation and repeatedly attempted suicide and self-mutilated.  Like Mr. Thirkield, Mr. Baxter is, upon information and belief, severely mentally ill.  He has resided in the ADX SHU for years, and has engaged in horrific self-harm, including slashing himself with sharp objects, swallowing razor blades and sharp pieces of metal, and carving a large circular design covering most of the left side of his face, apparently using a staple or other sharp object to gouge out pieces of skin.

81.     Current ADX Control Unit resident Raheem Davis filed at least three lawsuits pleading for help with his untreated serious mental illness.  *See Davis v. Warden Daniel, et al.*, 10-cv-00395 (D. Colo., filed Feb. 23, 2010); *Davis v. United States of America*, 11-cv-00429 (D. Colo., filed Feb. 17, 2011); and *Davis v. No Defendant Named*, 11-cv-02249-LTB (D. Colo., filed Sept. 21, 2011).  Upon information and belief, Mr. Davis is obviously psychotic.  He has been housed in the ADX Control Unit for several years.  Although BOP policies mandate that Control Unit prisoners meet monthly with a team of institution staff personnel, including a member of the psychology department, upon information and belief, between October 2011 and May 2012 Mr. Davis never left his cell.  During that time he did, however, rant, rave, bang on his cell walls, and generally live in squalor.

82.     Current ADX prisoner Mikeal Stine sued a member of the ADX staff in 2009 for, among other things, denying him mental health treatment.  *See Stine v. Blanke,* 09-cv-01527 (D. Colo., filed June 30, 2009).

83.     In 2003, current ADX Control Unit Resident and Plaintiff Ernest Shaifer sued the BOP and a number of its employees, including members of the medical staff at ADX, for failing to treat his Bipolar Illness.  *See Brown v. Federal Bureau of Prisons,*03-ES-1648 (D. Colo., filed

October 17, 2003).  On July 20, 2005, the complaint was dismissed for failure to exhaust administrative remedies.  As alleged below, Mr. Shaifer has since exhausted his administrative remedies several times, and yet he still sits in the ADX Control Unit waiting to receive the medication necessary to treat his serious mental illness.

84.     Even though the foregoing fourteen lawsuits and, upon information and belief, a number of others, alleged persistent deficiencies in the ADX mental health system, no meaningful changes have been made to that system.  Instead, each time the BOP was sued, it merely set out only to defeat the prisoners' legal claims, generally on procedural grounds.  The BOP failed to address and remedy the substantive issues raised by the lawsuits or to respond to the cries for help from its population of mentally ill charges, whose conditions continued to deteriorate as the BOP focused on ways to dismiss their complaints.

> **(3)     A series of suicides by mentally ill prisoners have demonstrated in tragic and permanent terms the deficiencies in the ADX mental health system.**

85.     Since ADX opened in 1994, at least six ADX prisoners have committed suicide there:

(a)     On June 17, 1999, Kevin Wilson hanged himself in his cell with a bedsheet;

(b)     On December 9, 1999, Gregory Britt hanged himself in a recreation cage;

(c)     On November 18, 2002, Lawrence Klaker hanged himself in his cell with shoelaces;

(d)     On April 17, 2006, Lance Vanderstappen hanged himself in his cell with a bedsheet;

(e)     On May 27, 2008, John Frierson hanged himself in his cell with a braided bedsheet; and

(f)     On May 1, 2010, Jose Martin Vega hanged himself in his cell with a bedsheet.

86.     Upon information and belief, most if not all of these prisoners were suffering from a mental illness at the time they took their own lives.

87.     The death of Mr. Vega is perhaps the best illustration, among these suicides, of Defendants' utter and persistent failure to address the proliferation of serious mental illness at ADX.  As described below, ADX's mental health system failed to screen, monitor, or treat Mr. Vega's mental illnesses, first diagnosed by the BOP in 2004.  Instead, Defendants placed Mr. Vega in ADX's Control Unit, deprived him of necessary psychiatric medications, and otherwise abused and tortured him over a period of years.  These actions had devastating consequences.

88.     In 1995, at the age of 20, Mr. Vega was sentenced to life in prison and committed to the custody of the BOP.  Mr. Vega was confined at two facilities before he was transferred to ADX.

89.     Upon his arrival at ADX on April 5, 2004, Mr. Vega was placed in the Control Unit.  Although the details of Mr. Vega's health care screening upon his arrival at ADX are presently unknown, the screening, such that it was, apparently failed to reveal that he had a serious mental illness.  However, upon information and belief, in December 2004, approximately eight months after Mr. Vega arrived at ADX, BOP psychologist Marie Bailey diagnosed Mr. Vega with Paranoid Schizophrenia.

- 39 -

90.     In March 2005, Mr. Vega was referred to MCFP Springfield for a mental health evaluation, which revealed that Mr. Vega had "a history of depression and antisocial personality disorder."  Mr. Vega remained at MCFP Springfield for approximately one year.  Upon information and belief, the BOP only allows prisoners with Mr. Vega's security classification to remain at MCFP Springfield for as long as a year of mental health treatment only in cases of severe mental illness.

91.     In 2006, the BOP transferred Mr. Vega back to ADX, in violation of the BOP's written procedures which clearly state that "prisoners currently diagnosed as suffering from serious psychiatric illnesses should not be referred for placement at … ADX."  BOP Program Statement 5100.08, "Prisoner Security Designation and Custody Clarification," Chapter 7, p.18.

92.     Upon information and belief, Defendants did not send Mr. Vega to the Mental Health Program Coordinator for a thorough assessment of his mental health, as required under BOP regulations.  BOP Program Statement 6340.04, "Psychiatric Services," § 9(a).  Such a review would have shown that Mr. Vega needed mental health treatment.

93.     Instead, upon Mr. Vega's return to ADX, Defendants placed Mr. Vega back in the Control Unit, and prevented him from receiving medication or other treatment for his serious mental illness.

94.     Upon information and belief, ADX staff members repeatedly chained Mr. Vega unnecessarily, sometimes for periods of ten days or more, to control behavior provoked by Mr. Vega's untreated mental illness.

95.     Upon information and belief, Mr. Vega told other prisoners that he believed the ADX correctional officers were poisoning his food and spraying things into his vents.  Upon

information and belief, certain ADX correctional officers frequently taunted and provoked Mr. Vega, and then punished him when he responded.

96.     On May 1, 2010, Mr. Vega was found dead in his cell in the Control Unit at ADX.  The coroner's report summarizing Mr. Vega's autopsy reports that Mr. Vega died as a result of hanging.  It also states that information received from the ADX health administrator indicated that Mr. Vega "had a long psychiatric history."

97.     Upon information and belief, ADX staff failed to prevent the abuse of Mr. Vega by certain ADX staff members, failed to ensure that Mr. Vega was adequate fed and safely housed, failed to implement adequate suicide prevention programs at ADX, and otherwise failed to address Mr. Vega's serious, chronic and growing mental illness.  As a result, Mr. Vega's mental deterioration continued, and ultimately resulted in his death.

98.     As illustrated by facts set forth in this Complaint, and others to be proven at trial, Defendants have long been aware of the systematic failures in the ADX mental health system, but have done little or nothing to correct those failures.  Defendants have shown deliberate indifference to the needs of ADX prisoners who have serious mental illnesses.

### G. Defendants Have Retaliated Against and Interfered With Plaintiffs and Other ADX Prisoners Who Have Tried to Assert Their Constitutional and Other Legal Rights to Mental Health Treatment.

99.     Counsel for Plaintiffs began communicating with ADX prisoners in the summer of 2011.  After ADX prisoners began meeting with counsel, ADX staff began a campaign of interference and retaliation against those prisoners.

100.    The interference and retaliation has included a range of behaviors, including procedural and legal improprieties, verbal abuse, actual physical harm, and overt threats of future

retaliation. ADX staff members have directed these improper actions not only against Plaintiffs, but also against the dozens of other prisoners at ADX who regularly communicate with counsel about the subject matter of this lawsuit, conditions at ADX, and the BOP's treatment of mentally ill prisoners at ADX.

101.    Upon information and belief, the actions by certain ADX staff members are designed to obstruct the access of Plaintiffs and class members to a judicial forum for the resolution of the constitutional claims asserted in this case by discouraging prisoners from talking with counsel, intimidating prisoners into withdrawing from participation in this lawsuit, and retaliating against prisoners for their efforts to work with counsel to improve mental health care conditions at ADX through this lawsuit.

(1)    <b>ADX staff have interfered with Legal Mail and confiscation of<br>Attorney-Client Privileged Materials.</b>

102.    Pursuant to BOP regulations, legal mail is special mail that must only be opened in the presence of prisoners. *See* Program Statement 5265.14 (April 5, 2011) § 540.18(a). Additionally, prisoners have a constitutional right to counsel and confidential communications with their attorneys, and the United States Supreme Court has repeatedly recognized and upheld the importance of the attorney-client privilege. *See, e.g.,* U.S. Const. Art. VI; *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); *Trammel v. United States*, 445 U.S. 40, 51 (1980); *Fisher v. United States*, 425 U.S. 391, 403 (1976). This attorney-client privilege is equally important and guaranteed between prisoners and their attorneys. *See, e.g., Gomez v. Vernon,* 255 F.3d 1118, 1135 (9th Cir. 2001), *cert. denied*, 70 U.S.L.W. 3291 (December 10, 2001) (affirming monetary sanctions imposed on assistant attorneys general who acquired and read privileged communications from prisoners' attorneys).

103.     Since the investigation for this lawsuit began, ADX staff members have routinely opened legal mail outside the presence of prisoners, in violation of BOP policies and the attorney-client privilege.  By opening the legal mail outside the presence of prisoners and in violation of BOP procedures, ADX staff members improperly gain access to privileged attorney-client communications regarding this lawsuit and other matters that are confidential.

104.     Upon information and belief, by opening the legal mail outside the presence of prisoners, ADX staff also intends to send a "message" to the prisoners:  ADX staff members know the nature of the confidential communications and will actively interfere with the prisoner's rights.  At the same time, ADX staff conveys the message that, even in this constitutionally protected area, prisoners shall be denied privacy and confidentiality.

105.     ADX staff members also have confiscated the legal mail of prisoners who have corresponded with counsel, in an attempt to interfere with the prisoners' ability to share information with counsel and assist in the investigation and development of this lawsuit.

106.     When searching prisoners' cells for proscribed items, ADX staff members have purposely "lost" or destroyed legal mail and legal documents, rendering it impossible for the prisoners to replace certain documents.

107.     Confiscated letters have included sealed envelopes addressed to counsel and properly labeled as legal mail.  In one instance, a senior corrections official and an SIS staff member searched a the cell of a mentally ill prisoner, opened properly labeled legal mail he was prepared to send out, and confiscated over 100 written requests ("Cop-Outs") that the prisoner had written to the psychology department, together with extensive notes the prisoner had made on staff misconduct. The confiscated records are not contraband and were properly included in

- 43 -

the prisoner's legal materials.  In another instance, ADX staff opened a prisoner's sealed legal mail to Plaintiffs' counsel, which contained, among other things, medical records reflecting the prisoner's medical treatment following a suicide attempt, which the prisoner had properly received from ADX staff a few days earlier.  ADX staff confiscated some of the medical records, including in particular records containing information that will be embarrassing to the BOP when it surfaces in this lawsuit.  The records were not contraband and were confiscated without any legal cause or justification.

108.    Other prisoners have had their correspondence and legal materials confiscated after communicating with counsel.  One ADX staff member told a prisoner that the prisoner would never get his documents back and that this "was just the beginning."

109.    Certain ADX staff members also have confiscated the pens, paper, envelopes, and stamps of some prisoners to prevent them from documenting abuses and corresponding with counsel.

110.    Moreover, certain ADX staff members purposefully delay or refuse entirely to pick up and process prisoner legal mail, hindering or preventing prisoner correspondence with counsel.

111.    Other legal mail, after being picked up for processing by ADX staff, has been improperly opened and then returned, unsent, to the prisoner.

> **(2)     ADX staff have interfered with the attorney-client relationship and retaliated against prisoners by threatening, antagonizing, and punishing prisoners who communicate with counsel.**

112.    ADX staff members have threatened prisoners who communicate with counsel.

113.     After meeting or corresponding with counsel, prisoners have been told by ADX staff that the prisoner's efforts would make things harder on the prisoner and that the BOP will never change ADX.

114.     An ADX staff member told a prisoner that, unless he stops communicating with counsel, he will be relocated to cells near other prisoners so as to compromise protective custody order measures.  As an ADX staff member told one prisoner, "You make it hard, we make it hard."

115.     An ADX staff member told a prisoner who is in communication with Plaintiffs' counsel, "If you don't drop this lawsuit they will fuck you over, trust me on this."

116.     ADX staff members have threatened prisoners in communication with counsel with a suspension of their privileges or write-ups for minor or nonexistent violations of rules. ADX staff has threatened, and followed up on threats, to send prisoners to the SHU in such instances.

117.     Prisoners who have been moved to the SHU under these circumstances have returned to the regular cells to find that their legal mail and personal property has been confiscated.

118.     ADX staff members have told prisoners that, if they continued to be involved with this investigation, they would be sent to SHU again and their property would again be "lost."

119.     ADX staff purposefully antagonizes prisoners by calling prisoners by abusive and insulting names, including racial slurs and vulgar terms.  By antagonizing prisoners, ADX staff members induce prisoners into behavior that then nominally provides a basis for punishing the prisoners by placement in the SHU or by suspending privileges.

120.     When one prisoner complained to an ADX staff member that the staff was taking actions that would get him killed, the staff member replied that the prisoner "should have considered that before inviting all those lawyers up here."

121.     ADX staff members have accused prisoners involved in this lawsuit of being an "instigator" and of "rocking the boat."

122.     Upon information and belief, ADX staff members have attempted to dissuade prisoners from communicating with counsel by spreading false rumors that undersigned counsel is working with the government in an attempt to gain incriminating information about various prisoners.

### VI.   ALLEGATIONS RELATING SPECIFICALLY TO PLAINTIFFS

123.     Plaintiffs are currently incarcerated at ADX and each suffers from a serious mental illness.  Several also suffer from severe functional impairments connected to their mental illnesses, which severely limits their ability to attend to their personal needs.  ADX's failure to implement adequate programs of mental health screening and treatment has violated their constitutional rights, exacerbated their serious mental illnesses, and subjected them to harm and injury, and serious risk of future harm.

124.     Plaintiffs have exhausted all required conditions precedent to the commencement of this lawsuit, including their available administrative remedies pursuant to the Prison Litigation Reform Act ("PLRA"),  42 U.S.C. § 1997e(a).

#### A.   Michael Bacote

125.     Michael Bacote (pronounced "Bay-coat") is 37 years old, and grew up in Washington, D.C.  He is currently serving a 28-year sentence at ADX, with a scheduled release

date of September 7, 2034.  Mr. Bacote suffers from severe Major Depressive Disorder with

Psychotic Features and also exhibits some symptoms of PTSD.  He is also mentally retarded,

functionally illiterate, and may be suffering the long-term effects of a serious closed head injury.

A photograph of Mr. Bacote is attached as Exhibit 7.

126.    Mr. Bacote has suffered serious mental disabilities throughout his life.  While in

primary school, he repeated kindergarten and the first grade twice, and repeated the second grade

three times.  Tests conducted while Mr. Bacote was in the second grade found his reading levels

to be at a pre-kindergarten level.  At age twelve, he was still in the fourth grade.  He stopped

going to school when he was thirteen.

127.    Psychiatric and mental tests performed on Mr. Bacote as a teenager confirmed

that he is a non-reader, and he tested far below his age group in every tested subject.  As a twelve

year old, Mr. Bacote scored a language age equivalent of 7 years, 3 months on the Utah Tested

Language Development exam.  In the Wide Range Achievement Test - Revised (WRAT-R), also

at age twelve, he scored in the first percentile in spelling, the 0.1 percentile in reading, and the

0.04 percentile in arithmetic.

128.    Mr. Bacote was prescribed medication for psychiatric problems at an early age,

including the antipsychotic Mellaril; he began taking Adderall for attention deficit disorder at

age 12.

129.    In connection with his prosecution for his role in a murder that occurred at USP

Beaumont, psychologist Dr. Ray Coxe conducted an evaluation of Mr. Bacote's mental

functioning.  Dr. Coxe's tests found that Mr. Bacote had a Full Scale IQ in the mildly impaired

range of 61, and Verbal and Performance IQs in the first percentile.  Mr. Bacote tested at the

second grade level for reading and spelling, and at the third grade level for arithmetic.  Based on these results, his personal interaction with Mr. Bacote, and prior examination results from earlier in Mr. Bacote's life, Dr. Coxe diagnosed Mr. Bacote as suffering from mild mental retardation.

130.    In 2003 or thereafter, Mr. Bacote was diagnosed by BOP psychiatrists as having recurrent Major Depressive Disorder.  Since that time, Mr. Bacote has been prescribed medication to treat this condition.

131.    Mr. Bacote also has been observed by BOP psychiatrists as displaying severe Paranoid Ideation.  At USP Beaumont, Mr. Bacote was prescribed the antipsychotic Risperdal to treat his paranoid behavior.  At ADX, Mr. Bacote has been observed by BOP staff as displaying Paranoid Ideation since at least August 2008.  In particular, Mr. Bacote has repeatedly alleged that there is a staff conspiracy to kill him.

132.    At USP Beaumont, Mr. Bacote repeatedly alleged that the staff was planning to hang him in recreational cell #6, claiming that he had already informed his family and attorney of his impending murder, and advising his BOP psychiatrist to skip their next scheduled session so that the psychiatrist would not "get caught up" in the legal troubles surrounding Mr. Bacote's murder.

133.    At various times, Mr. Bacote has alleged that he has a list of the addresses of BOP staff members who seek to kill him, and that staff members have passed him "street knives" hidden in his food.

134.    Mr. Bacote has accused staff psychiatrists of diagnosing him with bipolar disorder as an attempt to make his eventual murder appear to be a suicide.

135. One of Mr. Bacote's most persistent delusions is that the BOP is trying to kill him by tampering with his food or with his medication. As a result, he eats very little food, and the food he eats consists mostly of items purchased from the prison commissary.

136. Mr. Bacote's paranoia also strongly affects his willingness to take medication. In the past, Mr. Bacote has alleged that the pills he is prescribed change in shape and color every day. He sees this as evidence that the medication is being tampered with in an attempt to kill him. He has claimed that certain pills he has received make him feel "intoxicated."

137. Defendants are aware that Mr. Bacote suffers from Major Depressive Disorder and Paranoid Ideation; Mr. Bacote received these diagnoses from BOP psychiatrists. Defendants also are aware that Mr. Bacote suffers from mild mental retardation, because he has shown Dr. Coxe's report, which diagnoses him with mild mental retardation, to Dr. Clemmer at ADX. However, Defendants have refused Mr. Bacote's repeated requests for mental health assistance.

138. In August 2009, Mr. Bacote requested treatment for his mental illness and mental retardation and to be transferred from ADX. That request was denied; Defendants stated that "a review of your file does not indicate you are mentally ill or mentally retarded."

139. In April 2011, Mr. Bacote requested treatment for his mental retardation, and transfer to another facility. That request was denied. Defendants claimed that Mr. Bacote did not meet their criteria for a diagnosis of mental retardation.

140. On or around July 26, 2011, July 31, 2011, August 7, 2011, and August 8, 2011, Mr. Bacote filed Cop-Outs to ADX prison officials, requesting treatment for his mental illness and mental retardation. These requests were denied. Mr. Bacote is illiterate. However, he

managed to complete this paperwork with the assistance of other prisoners, who wrote out the words for Mr. Bacote, who then copied them on the required forms.

141.    A BOP physician has prescribed psychotropic medication for Mr. Bacote's serious mental illness.  Mr. Bacote wants and needs that medication.  However, Mr. Bacote is extremely paranoid and fearful that the physician assistant responsible for delivering his medication will intentionally or accidentally give him the incorrect medication.  The BOP currently insists that Mr. Bacote receive his medication crushed up in a cup.  Mr. Bacote has repeatedly asked to receive his medication, which he recognizes, in solid pill form, or alternatively that he be allowed to see the mediation in whole pill form before it is crushed.  The BOP has refused both requests.  As a result, Mr. Bacote has been forced to chose between foregoing needed medication or consuming an unknown crushed substance he genuinely (rightly or wrongly) believes will make him sick or kill him.  As of the time of this complaint, he was electing the former course and thus is struggling to cope with his severe depression and paranoia without his medication.

## B.  Harold Cunningham

142.    Harold Cunningham is 41 years old.  Before his incarceration, he lived in the Washington, D.C. area.  Mr. Cunningham has been housed in the Control Unit at ADX since 2001 and is serving a life sentence plus 380 years.  Mr. Cunningham suffers from a serious mental illness that has been variously diagnosed as Paranoid Schizophrenia, Psychotic Disorder NOS and Personality Disorder NOS.  A photograph of Mr. Cunningham is attached hereto as Exhibit 8.

143.   Mr. Cunningham has been incarcerated on and off since he was 11 years old.  He was admitted to a juvenile facility in Washington, D.C. at age 16 for assault with a dangerous weapon.  Within five months, he attempted suicide.  Thereafter, he was transferred to St. Elizabeth's Hospital in Washington, D.C., a public psychiatric hospital for residents of Washington, D.C.  At the time, Dr. James Smith diagnosed Mr. Cunningham with Conduct Disorder, Under Socialized Aggressive Needs, and Major Depression.

144.   In 1988, Mr. Cunningham, then 17 years old, was arrested for cocaine possession, sentenced to five years, and sent to Maryland's high security prison in Baltimore.  At the time, he refused all psychological and psychiatric treatment because he was told by other prisoners that if he received any mental health treatment or accepted any psychotropic medication, the Department of Corrections could keep him past his release date.

145.   Mr. Cunningham was released in 1993.  Within months, he and two other men (including one with a serious mental illness who is also currently housed at ADX) committed a series of crimes in Washington, D.C. and Maryland.  At his trial, Mr. Cunningham chose to represent himself.  On July 15, 1996, Mr. Cunningham attacked and stabbed a witness with a homemade knife as she was leaving the witness stand and while in full view of the judge and jury.  After the judge denied a mistrial, Mr. Cunningham was convicted and sentenced to a term of life in prison plus 380 years.

146.   Mr. Cunningham subsequently was indicted for attempted murder based on the courtroom stabbing.  He asserted an insanity defense and was examined by Dr. Carol Kleinman, who was board-certified in psychiatry and a member of the American Board of Psychiatry and Neurology, in connection with that defense.  Dr. Kleinman diagnosed Mr. Cunningham with the

following psychiatric disorders:  Paranoid Schizophrenia, Antisocial Personality Disorder, Borderline Intellectual Functioning, History of Attention Deficit Disorder with Hyperactivity, along with various forms of drug and alcohol abuse.  She opined that Mr. Cunningham was not competent to stand trial and recommended that he be placed on appropriate psychotropic medications.

147.    In early 1999, a hearing was conducted to determine whether Mr. Cunningham was competent to stand trial.  Dr. Kleinman, however, revised her diagnosis at the hearing, and the Court found that Mr. Cunningham was competent to stand trial.  A few months later, the government dismissed all charges against Mr. Cunningham without explanation.  He was sent to the USP Marion, Illinois, and placed in long-term isolation.

148.    At USP Marion, Dr. Ray Anderson conducted a mental status examination of Mr. Cunningham and concluded that he suffered from Psychotic Disorder NOS and the effects of hallucinogen abuse.  Mr. Cunningham was given antidepressants and antipsychotic drug therapy. He claimed he heard voices and saw things that were not there.

149.    While imprisoned at USP Marion, Mr. Cunningham was examined about once a month to coordinate psychological counseling with psychiatric treatment.  A consulting psychiatrist met with Mr. Cunningham to monitor his medications and to identify potential issues that might aggravate or modify the severity of his symptoms.

150.    In May 1999, as part of this process, Dr. James E. Adams conducted a mental status examination of Mr. Cunningham.  Dr. Adams diagnosed Mr. Cunningham as suffering from Psychotic Disorder NOS, in full remission, and Personality Disorder NOS.  He prescribed the antipsychotic medication Risperdal and antidepressant Prozac for Mr. Cunningham.

151.    On June 2, 2000, Mr. Cunningham was examined by Dr. Richard Urbanik, chief psychologist at Marion.  Dr. Urbanik found that "Cunningham's current mental status, emotional expression, and behavior suggest significant mental health problems."  Dr. Urbanik noted that, based on Mr. Cunningham's history, existing conditions, and other information available at the time of review, the current potential for Mr. Cunningham to harm others was high.  Dr. Urbanik further noted that Mr. Cunningham was refusing all psychotropic medication.

152.    In fact, Mr. Cunningham told the staff that he could not digest the medication when it was in liquid form, because it made him sick.  Additionally, Mr. Cunningham was concerned that the cups of liquid had materials floating on the surface, for which no explanation was given to him.

153.    Dr. Urbanik conducted another examination of Mr. Cunningham on June 30, 2000.  Again, Dr. Urbanik concluded that Mr. Cunningham's current mental status, emotional expression, and behavior suggested significant mental problems, and Mr. Cunningham's potential to harm others was high.  Dr. Urbanik further noted that Mr. Cunningham complained about the form of his medication (liquid), and was noncompliant.

154.    Mr. Cunningham was transferred to ADX in December 2001.  His initial psychological assessment at ADX stated that he was a "very antisocial individual who is probably prone to misinterpret the actions and motivations of staff members . . . ."  The staff psychologists (Dr. Watterson and Dr. Morrison) concluded that "mental illness . . . can certainly not be conclusively ruled out at this point."  Nevertheless, Dr. Morrison suggested that Mr. Cunningham try to go without his medication (Risperdal and Prozac), and promised that if he did so and experienced any problems Dr. Morrison would put him back on better psychotropic

medication.  Upon information and belief, Dr. Morrison intentionally tricked Mr. Cunningham into giving up his medication so that Mr. Cunningham could be placed in the ADX Control Unit, where such medication cannot be administered.  After accomplishing that goal Dr. Morrison abandoned Mr. Cunningham, who since December 2001 has been denied any form of psychiatric medication for his mental illness.

155.    Without his medications, Mr. Cunningham's behavior predictably worsened over the next several years.  Mr. Cunningham was cited for, among other things, refusing to leave his cell, refusing to submit to restraints, possession of weapons, and assault on corrections officers. Mr. Cunningham was held in an isolation cell in the Control Unit from 2002 to 2007.  During this time, he was assaulted by corrections officers and frequently shackled to his bed, sometimes for days or weeks at a time.

156.    Mr. Cunningham has received no mental health treatment at ADX, even though he has repeatedly requested it.  In fact, during his time at ADX, Mr. Cunningham has formally requested mental health treatment no less than eight times.

157.    On March 23, 2004, Cunningham filed a Central Office Administrative Remedy Appeal for a request for psychiatric treatment.  On April 30, 2004, the Central Office responded that an examination via "telepsychiatry" (a video conference between a prisoner in one location and a remote psychiatrist) indicated no mental illness.  For this putative psychiatric evaluation, Mr. Cunningham was placed in a room, handcuffed from behind with shackles on his legs, and surrounded by correction officers.  A psychiatrist from MCFP Springfield, viewing him through a make-shift video screen, asked Mr. Cunningham questions about his mental health issues, as if the answers received in such an environment were open and adequate to gauge a psychological

or psychiatric problem.  On June 15, 2004, Mr. Cunningham filed a Central Office

Administrative Remedy Appeal for, among other things, denial of psychiatric treatment.  His

appeal was denied.

158.    On August 10, 2004, Mr. Cunningham filed another Central Office

Administrative Remedy Appeal for being denied mental health medication.  Mr. Cunningham

specifically requested an investigation into why he was taken off Risperdal and Prozac.  In his

appeal, Cunningham wrote "I am in pain everyday that makes me act out in uncontrollable [sic]

ways . . . . Records show that when I'm taking my medication I can function without pain or

suffering or incident."  In response, the BOP argued, among other things, that "[i]t is evident you

have received prompt, professional medical care consistent with reasonable community

standards and Bureau of Prisons' policy."  Mr. Cunningham's appeal was denied yet again.

159.    The extent of Mr. Cunningham's treatment for his mental illness during his 11

years at ADX has consisted of therapy classes on an educational channel on television, and two

workbooks:  "Breaking Barriers" and "Cage Your Rage."

**C.    Ernest Norman Shaifer**

160.    Ernest Norman Shaifer, sometimes known as Ernest Norman Brown, is 49 years

old.  Before his incarceration, Mr. Shaifer was a resident of Washington, D.C.  He has a release

date of July 6, 2014.  Mr. Shaifer suffers from a serious mental illness, Bipolar Disorder.  He has

not been provided with proper medication or treatment for this illness.  A photograph of

Mr. Shaifer is attached hereto as Exhibit 9.

161.    Mr. Shaifer was brought up by a mother who was, herself, severely mentally ill.

Marion Shaifer was diagnosed with Schizophrenia two years before Mr. Shaifer's birth.  Almost

all of Mr. Shaifer's seven siblings – and several of his siblings' children – have been diagnosed with and treated for mental illness, including Schizophrenia, Bipolar Disorder and Anxiety Disorder.  Several of Mr. Shaifer's siblings have been prescribed medication to treat their mental illness.  Mr. Shaifer's sister Valera has attempted suicide.  In 1996, Mr. Shaifer's brother Terry discontinued his medication and committed suicide after murdering his wife and her lover in front of their children's elementary school.

162.    Mr. Shaifer has been in and out of the prison system since the early 1980s.  He has been incarcerated by the BOP continuously since 1995 and served time at a number of BOP facilities prior until his transfer to USP Florence in June 1999.

163.    The BOP has failed to provide psychiatric counseling and medication for Mr. Shaifer's mental condition while at ADX, despite his repeated requests that they do so. Mr. Shaifer continued to suffer severe problems of behavior control.

164.    In January 2002, encouraged by a phone call with his father, Mr. Shaifer attempted to enroll in a BOP anger management program.  In response, the BOP informed him that the anger management program enrollment was full and that it could not provide him with assistance.  A few days later, Mr. Shaifer assaulted a BOP chaplain.

165.    Mr. Shaifer was transferred to FCI Englewood for trial on the assault charge. While at FCI Englewood, BOP officials continued to disregard Mr. Shaifer's requests for psychiatric treatment.  Despite his many complaints and behavioral issues predating his assault charge, a BOP psychologist concluded that Mr. Shaifer was merely attempting to "fabricate symptoms."

166.    Mr. Shaifer's defense counsel sought an independent evaluation of Mr. Shaifer's mental condition.  In July 2002, Dr. William D. Hansen rendered a tentative diagnosis that Mr. Shaifer suffered from Bipolar Disorder.  Dr. Hansen recommended a mood-stabilizing medication, noting that without such treatment, there was no clinical way to verify his diagnosis or whether Mr. Shaifer's behavioral problems were treatable.

167.    In December 2002, Dr. Doris C. Gundersen, a private psychiatrist hired by Mr. Shaifer's counsel, also evaluated Mr. Shaifer.  Dr. Gundersen saw Mr. Shaifer on three separate occasions between December 2002 and February 2003.  In March 2003, Dr. Gundersen wrote to Dr. Richard Rewey, a BOP official, with her diagnosis that Mr. Shaifer suffered from a bipolar spectrum disorder.  Dr. Gundersen "strongly recommend[ed] that Mr. Shaifer be provided a trial of a mood stabilizer" and warned of her "concern[] that without a mood stabilizer, Mr. Shaifer's behavior will continue to deteriorate."  In March 2003, Dr. Gundersen also stated in her report to Mr. Shaifer's counsel that there was "compelling evidence to support the existence of a serious untreated mental illness, namely Bipolar Disorder."

168.    In May 2003, following Mr. Shaifer's guilty plea on the assault charge, Mr. Shaifer's counsel moved for a reduction in his sentence, *i.e.*, a "downward departure" from the Federal Sentencing Guidelines, based on Mr. Shaifer's mental condition.  The evaluations by Drs. Hansen and Gundersen were included as support for the motion.  Dr. Gundersen also testified regarding her evaluation and conclusions.  The Court acknowledged that Mr. Shaifer's Bipolar Disorder had "more likely than not" contributed to the assault, but it denied the motion and sentenced Mr. Shaifer to 96 months for the assault.  Mr. Shaifer was transferred back to ADX.

169. Defendants are aware of Mr. Shaifer's severely troubled family history of mental illness. For example, the letter written by Dr. Gundersen to Dr. Rewey in March 2003 disclosed the hospitalization of Mr. Shaifer's mother for Schizoaffective Disorder. In July 2003, BOP clinical psychologist Robert L. Krick wrote in Mr. Shaifer's medical records that his maternal grandmother suffered from mental illness. Dr. Gundersen's report for Mr. Shaifer's sentencing appeal made clear that several of Mr. Shaifer's siblings have been treated for major mental illness. In October 2003, a BOP psychologist took note of the suicide of Mr. Shaifer's brother, but assigned it no significance other than possibly an impetus for Mr. Shaifer to fabricate symptoms.

170. After he was returned to ADX Florence in late 2003, Mr. Shaifer filed a lawsuit against the BOP and several of its officials for their continued failure to provide him with adequate mental health treatment. Rather than responding to his suit on the merits, the BOP moved to dismiss the suit for failure to exhaust administrative remedies against each of the named defendants. Ultimately, the court dismissed Mr. Shaifer's claims without prejudice on the ground that he was asserting a mixture of exhausted and non-exhausted claims.

171. In January 2004, the ADX Florence Discipline Hearing Officer directed that Mr. Shaifer be moved into the Control Unit. In September 2010, the Control Unit Executive Panel ignored pleas by Mr. Shaifer for mental health care and decided to keep him in the Control Unit, where such care is not provided to prisoners. Due to ADX's policy prohibiting prisoners in the Control Unit from receiving psychotropic medication and the isolated conditions of confinement in the unit, Mr. Shaifer's mental illness will remain untreated and it is likely that his behavior, as a result, will continue to deteriorate. As of September 2010, when the Control Unit

Executive Panel determined that Mr. Shaifer would remain in the Control Unit, he had only received credit for 44 of the 78 months that he had been in that unit, and was still required to spend 56 more months there.  In other words, Mr. Shaifer will remain in the Control Unit until he completes his current prison sentence in July 2014.

172.    Mr. Shaifer continues to request assistance for his mental illness.  On or about October 13, 2011, Mr. Shaifer requested medication for his mental illness from Dr. Severn, a BOP staff psychologist.  That request was denied -- again because "those prisoners housed in the Control Unit are not allowed to be on psychotropic medication per Bureau Policy."  Mr. Shaifer again renewed his request in December 2011.  Despite Mr. Shaifer's prior requests for treatment, which included a federal court lawsuit against the BOP seeking mental health care, the BOP's response falsely asserted that Mr. Shaifer "ha[d] never requested any psychology attention about [his] issues."

173.    In early 2012, a few months after Mr. Shaifer began meeting with his undersigned counsel, Mr. Shaifer eventually was evaluated by two BOP psychologists.  But rather than receive a proper evaluation in an appropriate setting, Mr. Shaifer was evaluated in his cell with the cell door open, allowing other prisoners in the vicinity to overhear the discussion.  Shortly after the session began, the head BOP psychologist at ADX announced that Mr. Shaifer appeared to have developed "good coping skills" and dismissed Mr. Shaifer's protestations that he suffered from a serious mental illness.

### D.  Jeremy Pinson

174.    Jeremy Pinson is 26 years old.  Before his incarceration, he lived in Oklahoma City, Oklahoma.  Mr. Pinson is serving a 22-year sentence for letters he sent threatening the

President of the United States, a federal judge, a Secret Service Agent, and a juror.  His projected release date is October 3, 2025.  Mr. Pinson has a serious mental illness that has at various points been diagnosed as Bipolar Disorder, Schizophrenia, and Severe and Chronic PTSD.  He also has Epilepsy and experiences frequent seizures.  A photograph of Mr. Pinson is attached as Exhibit 10.

175.     Several members of Mr. Pinson's close family have long suffered from mental illness.  Both of his maternal grandparents were diagnosed with Schizophrenia, and his maternal grandmother committed suicide after a long struggle with Depression.  His mother has been diagnosed with and medicated for Depression throughout most of her adult life.

176.     Mr. Pinson's childhood was marked by psychotic episodes.  He began hearing voices and having visual hallucinations around the age of 7.  He began receiving psychological treatment by age 8 and received his first inpatient psychiatric treatment by age 10.  When he was 13, he sent threatening letters to both his mother and to the President of the United States, he stabbed a classmate with a pen, and threatened to blow up his school.  He received inpatient treatment for suicide attempts and psychotic symptoms at the ages of 12, 15 and 16.

177.     In 2005, prior to his trial on charges of threatening the President of the United States, Mr. Pinson underwent a court-ordered psychological evaluation to assess his competency.  While being held for the evaluation, Mr. Pinson tried several times to kill himself.  According to the forensic report, "Mr. Pinson had not experienced any significant period of effective psychological functioning since early childhood [and o]nly with long-term psychiatric and psychotherapeutic intervention [would he] have any hope of developing into a mature and

psychologically healthy individual."  Nevertheless, the report found him competent to stand trial; he was convicted.

178.    On April 2, 2007, Mr. Pinson was sentenced to 240 months imprisonment.  The Court recommended that he serve his sentence at FMC Butner, which includes the BOP's largest psychological treatment complex.  The BOP rejected that recommendation, and instead sent Mr. Pinson to USP Victorville and then to FDC Houston.

179.    While at FDC Houston, Mr. Pinson wrote another letter, this time threatening to kill a Secret Service Agent who testified at his sentencing.  This letter resulted in another conviction.

180.     At his sentencing for this conviction, the sentencing judge "strongly recommended" that the BOP conduct a "full-blown" evaluation of Mr. Pinson's "mental and physical needs and the drugs required to deal with both" at a capable facility, identifying the MCFP Springfield and the FMC Butner as appropriate facilities.  Again rejecting the Court's recommendation, the BOP placed Mr. Pinson at USP Coleman II, where his mental health problems continued.

181.    Since then, Mr. Pinson has attempted suicide multiple times, including an attempted drug overdose and two incidents where he tried to hang himself.  He continues to suffer from severe depression and suicidal ideation, and has sought treatment for both.  The BOP has conducted more than 12 suicide risk assessments on Mr. Pinson and placed him on suicide watch at least 9 times.

182.    The BOP is well aware that Mr. Pinson is mentally ill and in need of intense counseling and therapy.  A January 2011 BOP Progress Report notes that Mr. Pinson has a

history of mental health diagnoses prior to incarceration, that he has been hospitalized for mental disorders and attempted suicide, that he suffers from Schizophrenia and other Psychotic Disorders, and that he needs further mental health treatment.  While in the BOP's custody, Mr. Pinson has been prescribed a litany of psychotropic medications, including the antipsychotics Olanzapine, Quietapine, Risperidone, Fluphenazine, Haldol and Perphenazine, antidepressants Amitriptyline, Bupropion, Mirtazapine and Sertraline, antimanic Depakote, and the anti-anxiety medication Buspirone.

183.    Nonetheless, in February 2011, the BOP transferred Mr. Pinson to ADX, where he was placed in the SHU.  Mr. Pinson challenged this transfer on a variety of grounds, including that his PTSD, Bipolar Disorder, and Epilepsy made him an inappropriate candidate for placement at ADX.  Mr. Pinson complained that at ADX he could not receive proper mental health treatment, including the ability to participate in mental health programs.  In a July 2011 response, the BOP informed Mr. Pinson that ADX was "providing [mental health] programs consistent with [his] security needs."  In or around June 2011, Mr. Pinson was transferred to an ADX General Population unit.

184.    In December 2011, Mr. Pinson asked Dr. Severn, an ADX staff psychiatrist, for a referral to the BOP's Habilitation Treatment Program.  Mr. Pinson has received no such referral.

**E.   John W. Narducci, Jr.**

185.    John W. Narducci, Jr. is 43 years old and grew up in Connecticut.  Mr. Narducci is serving a 211 month sentence at ADX.  He has been in federal custody since 1999 and has a release date of February 15, 2015.  Mr. Narducci suffers from a serious mental illness, including a Mood Disorder as well as a Mixed Personality Disorder with Antisocial and Borderline

Features.  He also exhibits symptoms of complex PTSD.  Mr. Narducci exhibits signs and

symptoms of a Gender Identity Disorder in that he frequently wears his long hair in a feminine

style, shaves his body, and wears makeup that he makes using colored pencils.  Mr. Narducci's

gender identity and sexual orientation, while comfortable to him, exacerbate difficulties that he

experiences dealing with other prisoners in violent, high security environments, particularly

given his severe and chronic mental illness.  A photograph of Mr. Narducci is attached as Exhibit

11.

186.    When Mr. Narducci was 4 years old, his father was shot while Mr. Narducci was

present in the family home; his father subsequently died from the wound.  His mother later

remarried, but when Mr. Narducci was 11, his mother suffered a heart attack and died suddenly

in his sole presence.  After the death of his mother, Mr. Narducci lived with his stepfather and

siblings.  When Mr. Narducci was 16, he discovered that his stepfather had molested his younger

brother.  Days later, Mr. Narducci's stepfather committed suicide.

187.    Mr. Narducci was first treated for mental illness as a teenager.  At age 16, he

admitted to a hospital for inpatient treatment because "the failure of out-patient therapy and

John's increasingly aggressive behavior indicated the need for inpatient evaluation and

treatment."  At that time, the psychiatric staff at the hospital stated that "continued

psychotherapy within a structured milieu is essential for John's well-being."

188.    From the late 1980s through December 1998, Mr. Narducci was in and out of the

state prison system in Connecticut and Oklahoma.  During a 10-year period of incarceration,

Mr. Narducci spent much of his time in extended isolation, though he did receive mental health

treatment for multiple disorders, including Major Depression and a Personality Disorder.  As part

of his treatment, Mr. Narducci was prescribed psychotropic medications including Depakote, Thorazine, Zoloft, Wellbutrin, and Atavan.

189.    Prior to his release from state custody, Mr. Narducci requested that he be enrolled in a mental health follow-on care program that would continue to provide him essential mental health services.  This request was not granted, and on December 3, 1998, Mr. Narducci was released from the Connecticut state "supermax" facility in Somers, Connecticut, directly to the street, with no transitional services or provision made for any psychiatric or other mental health services.  Within months, he was back in custody.  In April 1999, while Mr. Narducci was in the custody of the Connecticut Department of Correction pending sentencing, the mental health staff identified him as suffering from multiple mental health disorders and prescribed treatment and medication.  In November 1999, he pled guilty to four counts of bank robbery.

190.    On November 15, 1999, the court ordered that Mr. Narducci undergo psychological evaluation and testing prior to sentencing in light of his mental health history. Mr. Narducci was sent to USP Atlanta where BOP staff conducted the evaluation.  The BOP evaluation found that Mr. Narducci suffered from several mental disorders, but also concluded that he was malingering and that psychotherapy was contraindicated.

191.    A private psychiatric evaluation conducted following the BOP report concluded that "[t]he evaluation done at USP Atlanta of John Narducci [was] not a valid assessment of his mental condition."

192.    The sentencing court reviewed Mr. Narducci's mental health history, the BOP evaluation, and the private evaluation.  At the sentencing hearing, the court stated "it is my conclusion that Mr. Narducci does suffer from serious psychological and emotional

problems….”  On October 26, 2000, the court entered its judgment in Mr. Narducci's case, ordering a term of imprisonment of 150 months and recommending to the BOP "(1) that the defendant be designated to a facility which has programs sufficient to deal with his mental, emotional, and psychological problems, and (2) that the defendant receive intensive psychological testing and treatment throughout his term of incarceration."

193.    Following sentencing, Mr. Narducci remained at USP Atlanta.  Contrary to the recommendation of the sentencing court, the BOP did not provide adequate treatment for Mr. Narducci's mental illness.  In or around November 2000, the BOP transferred Mr. Narducci to FCI Otisville, and again failed to provide adequate treatment for Mr. Narducci's mental illness as had been recommended by the sentencing court.  On October 1, 2003, Mr. Narducci assaulted and seriously injured another prisoner.

194.    In or around March 2004, the BOP transferred Mr. Narducci to USP Allenwood, but again the BOP failed to provide adequate mental health care as recommended by the sentencing court.  On August 10, 2005, Mr. Narducci assaulted a BOP corrections officer at USP Allenwood.

195.    In or around July 2007, the BOP transferred Mr. Narducci to ADX.  Since his incarceration at ADX, Mr. Narducci has been punished for multiple acts of violence. Mr. Narducci has requested mental health treatment from BOP staff at ADX on numerous occasions.  The BOP has failed to provide Mr. Narducci with appropriate mental health care consistent with the recommendations of the sentencing court more than ten years ago.

196.     Mr. Narducci is scheduled to be released into the community in 2015.  Without adequate mental health care, when his sentence expires Mr. Narducci will have a very, very difficult time returning to society safely and successfully.

## VII.   ALLEGATIONS RELATING SPECIFICALLY TO THE INTERESTED INDIVIDUALS

197.     Interested Individuals Jaison Leggett, Herbert Perkins, John J. "Jack" Powers, William Sablan, David Shelby and Marcellus Washington are currently incarcerated at ADX. Each suffers from a serious mental illness.  Several also suffer from severe functional impairments connected to their mental illnesses, which severely limits their ability to attend to their personal needs.  ADX's failure to implement adequate programs of mental health screening and treatment has violated their constitutional rights, exacerbated their serious mental illnesses, and subjected them to harm and injury, and serious risk of future harm.

198.     Each Interested Individual has requested, in various ways, mental health care at ADX.  Counsel have been unable to ascertain whether the Interested Individuals have taken every action necessary to exhaust administrative remedies to the extent required by the PLRA. Once counsel confirms that exhaustion is complete, each will be added as a Plaintiff.

199.     Counsel's inability to ascertain the Interested Individual's exhaustion status stems from several factors.  First, each Interested Individual is mentally ill, and at least one is mentally retarded.  Those limitations impair their ability to recall and report every effort they may have made to exhaust administrative remedies.  Some also require assistance of counsel in completing the exhaustion process.

200.     Second, although counsel have submitted to the BOP almost 60 Freedom of Information Act ("FOIA") requests for BOP files relating to ADX prisoners, the BOP has yet to

produce a single file relating to any current ADX prisoner.  Counsel submitted proper FOIA requests for Mr. Sablan's file on August 3, 2011, Mr. Leggett's on September 7, 2011, Mr. Powers' on November 10, 2011, and Mr. Washington's and Mr. Perkins' on January 5, 2011. None has been provided.  As a result of those failures and the BOP's refusal to produce dozens of other files, on June 11, 2011, counsel for Plaintiffs sued the BOP in the United States District Court for the District of Columbia to enforce the BOP's obligations under FOIA.  Once the BOP complies with its FOIA obligations, counsel will be better able to assess the extent of the Interested Individual's exhaustion efforts.

201.    Third, and most importantly, the BOP's mismanagement of the care and custody of seriously mentally ill prisoners at ADX is exacerbated by the absence of any effective mechanism for those prisoners to address concerns or complaints they have about inadequate medical treatment or staff misconduct towards mentally ill prisoners and others.  Although the BOP ostensibly maintains an "administrative remedy" process that allows prisoners to complain about various issues, the administrative remedy process is itself a kangaroo court that throws bureaucratic roadblocks at prisoners' feet and that is wholly inadequate as a means of addressing serious concerns, including complaints about constitutionally inadequate mental health care services at ADX.

202.    Upon information and belief, and by way of illustration only, ADX staff members deny prisoners access to forms that the BOP requires prisoners to use to submit complaints, "lose" administrative remedy paperwork or delay its submission so that prisoner appeals are deemed "untimely," fail to adequately investigate prisoner complaints, and fail to remedy

obvious problems brought to the BOP's attention by means of those prisoner complaints that do evade the impediments imposed by the BOP itself.

203.    In addition, prisoners have no effective access to a "watchdog" to investigate and address misconduct by correctional staff.  Specifically, all corrections functions at ADX are the responsibility of Captain Russell Krist, a veteran BOP correctional officer.  Like most other BOP facilities, ADX also employs a Special Investigative Agent ("SIA") whose responsibilities include investigating allegations of misconduct by ADX staff.  Accordingly, at least in theory, the SIA's presence at ADX gives prisoners on-site access to a BOP official with the power to investigate and initiate remedies for staff mistreatment of prisoners, including the mentally ill. At ADX, that theoretical access is a cruel hoax.

204.    Specifically, the BOP has destroyed any semblance of an effective watchdog function at ADX by assigning the SIA role to Dianna Krist, who is the wife of Captain Russell Krist.  Thus, at ADX, the watchdog is married to the person whose staff the watchdog is responsible for investigating.

205.    The BOP's own written policy specifically prohibits its employees from involvement in "situations where their official actions affect or appear to affect their private interests, financial or non-financial."  BOP Program Statement OCG 3420.09 § 20.  The same policy prohibits BOP employees from "taking official action on matters that affect the financial interests of the employee [or] a spouse."  BOP's employment of Mrs. Krist as ADX's SIA violates the letter and spirit of Program Statement OCG 3420-09 and fatally compromises the ADX process for resolving the staff misconduct alleged in this lawsuit.

206.    Particularly when considered in combination with the wholly ineffective administrative remedy process described above, the patent conflict of interest created by the duties and relationship of Russell Krist and Dianna Krist contributes substantially to an atmosphere in which ADX staff can and do abuse and neglect mentally ill ADX prisoners, including the Interested Individuals, without any effective oversight or prisoner recourse.

207.    As detailed above, for years ADX prisoners have been begging for adequate mental health treatment, through administrative filings and lawsuits, among other means.  That the ADX mental health system remain in shambles is plain evidence that no real remedy is available through further administrative filings.

**A.    John Jay Powers**

208.    John Jay ("Jack") Powers is 50 years old.  He grew up in upstate New York and lived in Florida immediately before his incarceration.  Mr. Powers is serving a sentence for bank robbery and a prison escape, with a release date of May 2, 2030.  Mr. Powers currently resides in the "General Population" Unit at ADX after being held in the Control Unit for nearly ten years. A photograph of Mr. Powers is attached as Exhibit 12.

209.    Mr. Powers suffers from serious mental illness, including severe Complex PTSD and a Personality Disorder with Narcissistic, Borderline and Antisocial Features.  While in the custody of the BOP, Mr. Powers has engaged in severe self-mutilation over the past 10 years, amputating his own fingers, testicle, scrotum and earlobes, cutting his Achilles tendon, and trying to kill himself on several occasions.  He has not been provided with proper medication or treatment for his serious mental illnesses despite the obvious physical harm Mr. Powers has inflicted upon himself.

210.     Mr. Powers entered the custody of the BOP in 1990.  At that time, he had never exhibited or been treated for serious mental illness.

211.     On July 21, 1994, Mr. Powers witnessed the murder of Eddie Wong, another prisoner at USP Atlanta.  Three prisoners, whom Mr. Powers believed were members of a prison gang known as the Aryan Brotherhood, stabbed the victim thirteen times.  After the attackers left the victim's cell, Mr. Powers sought to assist him, carrying him down a flight of stairs to the ground floor of the prison.  The victim was taken to the hospital but died as the result of his injuries.  Following this murder, Mr. Powers was moved to USP Atlanta's segregation unit because, as a witness to the attack, prison officials determined that his safety was compromised.  While in segregation, Mr. Powers was threatened by a prisoner he believed to be a senior Aryan Brotherhood member.

212.     Mr. Powers subsequently agreed to testify against the three men who had been charged with killing Mr. Wong.  He testified twice (the first trial resulted in a hung jury), and the prisoners were convicted.  Mr. Powers was transferred to FCI Allenwood, where he was threatened periodically by members of the Aryan Brotherhood as a result of his testimony.  Because of the threats, Mr. Powers was placed in protective custody to segregate him from those threatening to kill him.  At around the same time, he began to experience symptoms of PTSD, a severe anxiety disorder that can develop after exposure to an event that results in psychological trauma.  Mr. Power's initial symptoms included insomnia and anxiety attacks.

213.     In 1997, a BOP psychologist determined that Mr. Powers was suffering from PTSD.  Thereafter, in January 1999, Mr. Powers was transferred to a medium security prison, where he remained in protective custody.  Shortly after his transfer to that facility, Mr. Powers

- 70 -

learned that the BOP planned to move him from segregated housing to a general population unit where he was more likely to encounter prisoners who would seek to harm him as a result of his 1995 testimony.  He also learned that the U.S. Attorney's Office would not seek to obtain the sentence reduction as promised in exchange for his testimony.  In May 1999, fearful for his own life and safety and suffering increasingly from PTSD, Mr. Powers escaped.  After two days he was apprehended and returned to prison.  In June 2001, Mr. Powers was tried and convicted of escaping and sentenced to additional imprisonment.

214.    In October 2001, Mr. Powers was transferred to ADX and placed in the Control Unit, where he had been ordered to serve a 60-month term as a result of the escape.  Upon entering the ADX Control Unit, Mr. Powers was immediately threatened by individuals he believes to be members of the Aryan Brotherhood, many of whom are housed at ADX.  Those threats, and the continuing effects of his untreated PTSD, caused Mr. Powers to slowly descend into madness and horrific self-harm.

215.    In July 2002, seven months after arriving at ADX, Mr. Powers rammed his head into the metal door jamb of his cell.  Two weeks later, he was transferred to MCFP Springfield for a psychiatric evaluation.  BOP records relating to that transfer confirm the belief by clinicians at ADX that while at ADX Mr. Powers "has experienced a great deal of verbal abuse and threats from inmates in adjacent cells due to their belief that he is an informant."  Mr. Powers spent a month at MCFP Springfield, during which time his PTSD diagnosis was reaffirmed, and he was treated with medication.  However, upon his return to the ADX Control Unit in August 2002, his medication was suddenly discontinued.  Almost immediately, his self-harm and mutilation

began, resulting in disciplinary incident reports for self-mutilation in October 2002, October 2004, and February 2005.

216.     On October 13, 2005, he was again transferred to MCFP Springfield after severely lacerating his scrotum with a piece of sharp plastic.  His PTSD diagnosis was again confirmed by BOP doctors, and he was again stabilized with medication.  But in December 2005 the BOP again returned him to the ADX Control Unit and again abruptly discontinued his medication.

217.     In April 2006, following a meeting with a BOP psychologist, Mr. Powers returned to his cell to discover that his possessions had been moved to a new cell located on a different range.  The new range housed Aryan Brotherhood members, who immediately began to threaten Mr. Powers.  Mr. Powers broke the glass on his television set, which he used to cut himself.  Defendant's "response team" intervened and placed Mr. Powers in leg irons, handcuffs and a belly chain, which he wore in his cell for several days.

218.     On July 18, 2006, Mr. Powers amputated his testicle.

219.     In or around 2006, Mr. Powers attempted to commit suicide by ingesting a large quantity of aspirin.

220.     On September 6, 2007, Mr. Powers bit off his finger.

221.     On April 1, 2008, Mr. Powers inserted a staple into his forehead.

222.     In December 2008 he amputated one of his fingers, tore out the stitches used to close the wound, and then swallowed a toothbrush.

223.     On February 2, 2009, Mr. Powers cut a triangular flap of skin out of his face and inserted several staples into it.

224.     On July 6, 2009, Mr. Powers cut his wrist, bled all over his cell, and was found unconscious and unresponsive by ADX staff members.  Several weeks after the suicide attempt, in July 2009, the BOP again transferred Mr. Powers to MCFP Springfield.  This time, however, he was not medicated.  Rather, despite the BOP's own multiple prior diagnoses of serious mental illness and the manifest physical evidence of profound mental illness reflected in Mr. Power's disfigured body, a BOP psychologist determined:

> "Inmate is not in need of custody for care or treatment.  He does not have an active mental disorder.  He does not require any further evaluation in an inpatient psychiatric facility.  Considerations that he has some form of psychosis, thought disorder, or mental illness are unfounded."

225.     Accordingly, in August 2009 Mr. Powers was again returned to ADX and again placed in the Control Unit with no mental health treatment.

226.     Four months later, on December 3, 2009, Mr. Powers bit off his pinkie.

227.     In 2009 and 2010 Mr. Powers covered most of his body with tattoos that he calls "Avatar Stripes," which are visible in the photograph attached as Exhibit 7.  He created his tattoos by slicing thousands of tiny slits into his skin with a razor blade and rubbing carbon paper dust into the slits.

228.     On December 20, 2010, Mr. Powers amputated his scrotum and attempted to suture the wound himself.

229.     In March 2011, Mr. Powers completed his term in the Control Unit.  Although his original 60-month Control Unit term would have expired in 2006 had he earned credit for each month he served there, because of his serious mental illness he was unable to comply with the strict requirements governing earning credit for time served in the Control Unit.  In many instances, he was denied credit for time served because he had mutilated himself.  Thus, the

ravages of his untreated serious mental illness both caused his permanent disfigurement and extended his term in the Control Unit, where he was housed among and tormented by members of the gang he testified against, pursuant to the directive of the same Department of Justice for which he provided that testimony.

230. Following his transfer from the Control Unit into the ADX general population, Mr. Powers continued to receive no mental health care in the ADX general population and continued to suffer the grotesque symptoms of his mental illness.

231. On January 12, 2012, Mr. Powers sliced off his earlobes, using pencils as tourniquets.

232. On March 21, 2012, Mr. Powers sawed through his Achilles tendon with a sharp piece of metal, nearly severing it. The injury was surgically repaired and covered with a hard cast. Mr. Powers soon removed the cast and began supporting the injured ankle with a splint he made from a sock.

233. In May 2012, after Mr. Powers had again mutilated his genitals, and only a few weeks after the BOP became aware that he was being evaluated by a psychiatrist retained by his counsel, the BOP began treating him with the powerful antipsychotic medication Haldol. However, he still has no access to psychological counseling or other mental health care, and still remains at ADX, rarely leaving his cell, thinking of suicide daily, and often slashing or cutting himself.

## B. Marcellus Washington

234. Marcellus Washington is 39 years old. He spent most of his youth in New Jersey. He is serving a life sentence at ADX and is currently housed in the Control Unit. Mr.

Washington suffers from a serious mental illness, including a severe Mood Disorder and a Mixed Personality Disorder with Borderline and Antisocial Features.  He also exhibits signs and symptoms of PTSD and is mentally retarded and functionally illiterate.  A photograph of Mr. Washington is attached as Exhibit 13.

235.    Since childhood, Mr. Washington has been treated on multiple occasions for mental illness.  During the late 1970s and/or early 1980s, Mr. Washington was treated with Thorazine and Mellaril, two powerful antipsychotic medications.  Early psychiatric and psychological evaluations showed that Mr. Washington had mood swings which stemmed, at least in part, from mental retardation and massive parental deprivation.  Mr. Washington was placed in his first group home when he was seven years old, because his severely mentally ill mother could not care for him.  He subsequently lived in, and ran away from, various foster homes, group homes, and residential facilities.  In 1982, when he was ten, Mr. Washington was returned briefly to the care of his mother, who soon abandoned him with his siblings on a New York City park bench.  Between 1977 and 1985, various child study teams affiliated with the New Jersey Board of Education and its school districts found deficiencies in Mr. Washington's emotional, social, and academic functioning.  Specifically, these teams found that Mr. Washington has a neurological impairment, suffers from environmental deprivation, and exhibits mood swings that ranged from a manic hyperactivity to a depressed lethargic mood.  Prior to the age of 13, Mr. Washington spent time at the Jersey City Medical Center Community Mental Health Clinic and the Arthur Brisbane Child Treatment Clinic, a public psychiatric hospital for children.

236.     In 1996, during his trial for armed robbery and carjacking, Mr. Washington was housed in the Office of Interstate Services in New Jersey and was treated with high dosages of the antidepressant Sinequan.  Upon his conviction, Mr. Washington was transferred to USP Lompoc and, in October 2001, to USP Pollock.  Based on his intake processing at USP Pollock, the BOP recognized that Mr. Washington experienced symptoms of depression and had suicidal tendencies.  In 2001 and 2002, Mr. Washington received psychotherapy sessions for his depression.

237.     On April 8, 2002, Mr. Washington visited the psychology unit at USP Pollock and requested care urgently.  He met with Dr. Gallagher, a BOP staff psychologist, and requested treatment for mental illness based primarily on his stress levels and his contemplation of suicide.  Mr. Washington showed Dr. Gallagher five or six superficial cuts around his wrist and informed Dr. Gallagher that he did not think he was capable of killing himself, but he was considering provoking someone else to kill him.  Dr. Gallagher did not conduct a full suicide assessment or psychological workup, but merely scheduled an appointment with Mr. Washington for the following week.  Dr. Gallagher also failed to place Mr. Washington on suicide watch or refer him for a more complete psychiatric evaluation.  Two days later, Mr. Washington assaulted a BOP administrator.

238.     In November 2002, in connection with his trial for the assault, Mr. Washington was evaluated by Drs. Kevin J. McBride and Anthony A. Jimenez at FMC Butner.  This evaluation concluded that Mr. Washington suffers from severe Antisocial Personality Disorder, is mentally retarded, and has moderate congenital brain impairment.  The report noted that Mr. Washington's prior records reveal that he has trouble adapting to the prison environment, is

functionally illiterate, suffers from emotional, social, and academic deficits, and had been treated with various antipsychotic medications and antidepressants prior to his incarceration with the BOP. A second evaluation was conducted in June 2003 by Dr. Thomas Fain at USP Pollock, during which Dr. Fain conducted various mental assessments of Mr. Washington. In the spelling and reading subscales of the Wide Range Achievement Test-3, Mr. Washington performed in the 0.02 percentile. The Wechsler Adult Intelligence Scale-III indicated that Mr. Washington was mentally retarded, and various other tests indicated the presence of a congenital brain impairment.

239. Since at least 2002, Mr. Washington has been observed engaging in self harm, often by cutting himself. Prior to his transfer to ADX, Mr. Washington attempted to commit suicide by trying to hang himself in the USP Pollack SHU. The BOP staff took him to an observation cell, where he was visited by Dr. Gallagher. Upon obtaining a promise from Mr. Washington that he would not attempt to kill himself, Dr. Gallagher had Mr. Washington returned to the SHU without further treatment. Following his transfer to ADX, an ADX employee reported observing that Mr. Washington twice cut his wrist with a razor blade. The Operations Lieutenant was notified of Mr. Washington's behavior, and Mr. Washington was punished for his suicide attempt with a seven-day loss of his television and radio privileges. He did not receive any treatment for mental illness.

240. In November 2011, Mr. Washington filed a Request for an Administrative Remedy, complaining that the BOP ignored evidence of his mental illness, his history of depression and his suicidal tendencies when it referred him for placement in the Control Unit.

He also complained that he has never received adequate treatment for these conditions.  His request was denied, as were his appeals from that denial.

### C.   William Concepcion Sablan

241.     William Concepcion Sablan is 47 years old.  He is originally from Saipan, in the United States Commonwealth of the Northern Mariana Islands.  He is currently serving a sentence of life without the possibility of parole at ADX.  Mr. Sablan suffers from a serious mental illness that has been diagnosed at various points as Psychotic Disorder NOS, Major Depressive Disorder, PTSD, Cognitive Disorder NOS, Posttraumatic Brain Injury, and severe Personality Disorder.  A photograph of Mr. Sablan is attached as Exhibit 14.

242.     Mr. Sablan was the thirteenth of fifteen children.  As a child, Mr. Sablan and his siblings were subject to harsh and frequent beatings from their father.  They were kicked, slammed into walls, beaten with fan belts, and choked.  Mr. Sablan manifested anti-social behavior while in middle school, including excessive absenteeism, failing school work, and suspensions.  Mr. Sablan never completed the eighth grade, dropping out of school in 1979, when he was fifteen.  At a young age, he began abusing drugs, including methamphetamine, marijuana, and alcohol.

243.     Mr. Sablan has been in and out of prisons since 1984. Between 1984 and 1997, Mr. Sablan pleaded guilty or was convicted of six felonies and was arrested at least fifteen other times.

244.     Two incidents in 1995 precipitated the serious deterioration of Mr. Sablan's mental health.  His daughter Mae was killed in a hit and run accident and the perpetrator was never caught.  Mr. Sablan, traumatized by her death, became intensely paranoid and obsessed

with finding the driver.  He disappeared into the jungle for days at a time, claiming to be looking for her killer.  Mr. Sablan claimed to see his dead daughter walking around his house.  In public, he became extremely aggressive when he saw adults being mean to children.

245.    In September 1995 Mr. Sablan suffered serious head trauma after being attacked by several men, one of whom hit Mr. Sablan in the head with a machete.  He received a five centimeter laceration of the posterior scalp that shaved off a three centimeter disc of the external table of his skull, and another five centimeter laceration on his right anterior scalp.  After the machete attack, Mr. Sablan's demeanor and mood changed.  He began to misunderstand events and lose track of conversations, but would become furious if anyone asked him about his changed behavior.  Mr. Sablan began harboring delusions that the someone was after him and would burst into flight when he thought someone was pursuing him.  He would climb coconut trees and stare into the jungle all night, looking for his imaginary pursuers.

246.    While in custody in 1997, prison medical officials prescribed Mr. Sablan the antimanic agent Depakote and the powerful antipsychotic medication Haldol.  He also received a mental health screening on these occasions from Dr. Marc Herbst.  Though Mr. Sablan denied any history of psychotic symptoms, Dr. Herbst diagnosed him with PTSD and post-traumatic brain injury, possibly temporal lobe epilepsy.

247.    While incarcerated in 1999, Mr. Sablan and others participated in a prison riot and escape.  For his role in these actions, Mr. Sablan was sentenced to 252 months imprisonment and transferred to prison in the continental United States.

248.    Despite his psychiatric diagnoses and history of medication, as well as transfer paperwork that suggested a detailed psychiatric examination be conducted upon arrival,

Mr. Sablan was only given a perfunctory screening when he arrived at USP Florence.  The entire examination consisted of the physician's assistant merely asking Mr. Sablan if he had any mental issues.  The BOP also failed to review his psychotropic medication upon his arrival, despite a written BOP file entry directing such a review.  Mr. Sablan then was placed in a two person cell with his distant cousin Rudy Sablan and a third prisoner, Joey Estrella.  Under the BOP's own rules, the mental health staff at ADX should have followed up his initial processing with an evaluation within 24 hours of Mr. Sablan's arrival.  The staff at USP Florence failed to do so.  The staff also failed to provide Mr. Sablan with his psychotropic medication.

249.   On October 10, 1999, only three days after arriving at ADX, Mr. Sablan and his cousin killed Mr. Estrella.  Mr. Sablan was charged with murder and his defense counsel sought to have him found incompetent to stand trial due to his psychiatric illnesses.  The BOP claimed, however, that Mr. Sablan was not mentally ill and was merely malingering.

250.   In July 2001, Dr. Laura Post examined Mr. Sablan, and diagnosed him with PTSD and a Psychotic Disorder Due to Manic Episode.  She prescribed him the potent antipsychotic Haldol.  Also in July 2001, Dr. Rose Manguso conducted a neuropsychological evaluation of Mr. Sablan.  She concluded that he suffered from neuropsychological deficits which stemmed from the brain damage caused by prior head trauma and prior emotional or psychological disturbances.  She concluded that these neuropsychological deficits could easily exacerbate the symptoms of Mr. Sablan's PTSD and his Mood Disorder with Psychotic Features.

251.   In September 2001, Drs. James Jacobson and Todd Robert Poch evaluated Mr. Sablan for over twenty-five hours, and concluded that he suffered from an Anxiety and Mood Disorder with Psychotic Features.  They suggested that Mr. Sablan receive the antimanic

drug Tegretol and the antipsychotic drug Risperdal. Dr. Poch noted Mr. Sablan's fanciful delusions, including claims that he was the chief of the Chamorros (his indigenous tribe on Saipan), that had the psychic ability to determine the outcome of his own trial, and that he knew the location of Amelia Earhart's plane. Dr. Poch also reported that Mr. Sablan had received a Full Scale IQ of 77 on the intelligence test he had been administered.

252.    In September 2003, psychiatrist Dr. Frank G. Fortunati examined Mr. Sablan. Dr. Fortunati observed Mr. Sablan experiencing auditory hallucinations of three different people talking to each other, that Mr. Sablan claimed he could hear via a satellite connection and a computer located in his brain. Mr. Sablan also claimed that the government could hear all the thoughts of everyone in the world through the use of satellite connections. Dr. Fortunati concluded that Mr. Sablan was in a floridly psychotic state.

253.    In May 2004, Dr. Ruben Gur conducted a Quantitative Functional Brain Imaging Consultation based on MRI images of Mr. Sablan's brain. Dr. Gur indicated that the abnormalities in low grey matter were consistent with parenchymal loss caused by head injury, and that the behavioral consequences of such abnormalities could be severe, potentially causing intensified aggressive urges and an impaired ability to control emotional output.

254.    Based on these findings, on June 10, 2004, Judge Wiley Y. Daniel found that Mr. Sablan was suffering from a mental disease or defect rendering him mentally incompetent to assist properly in his defense. Judge Daniel ordered that Mr. Sablan be hospitalized and treated for up to four months to determine whether he could attain the capacity for the trial to proceed. Mr. Sablan was transferred to FMC Butner.

255.     While at FMC Butner, Mr. Sablan was floridly delusional.  He made a series of claims about Amelia Earhart and her plane, including that he found her plane 20 years ago and that Earhart's spirit had been pursuing him ever since, trying to get him to solve the mystery.  He relayed his claim in a letter to the Amelia Earhart Foundation.  Mr. Sablan also spoke frequently about brain interference from satellites and his continuing frustration that his daughter's killer had never been caught.  BOP physicians Drs. Byron Herbel and Robert Cochrane expressed doubt that Mr. Sablan's condition was the result of malingering, and hypothesized that he could be suffering from Delusional Disorder or Late Onset Schizophrenia.  They prescribed him a cocktail of drugs consisting of antimanic drug Depakene, antipsychotic drug Risperdal and antidepressant Remeron.

256.     BOP officials were unable to render Mr. Sablan competent for trial within the four month time limit ordered by Judge Daniel.  Upon the BOP's request, Judge Daniel ordered an additional 120 days of attempts to render Mr. Sablan competent.

257.     In January 2005, after many months of this extensive regimen of psychotropic drugs and constant psychiatric treatment and therapy, the evaluators at FMC Butner concluded that Mr. Sablan was competent to stand trial.  Nonetheless, Mr. Sablan continued to endorse the same delusions, only slightly diminished, and with a sense of embarrassment.  In April 2005, Mr. Sablan was still claiming that he had found Amelia Earhart's plane, but admitted that the plane he found would require verification to prove its origin.  He also admitted that he was still receiving interference from the satellites, but said that watching television helped him ignore it.

258.     Dr. Herbel's final report at FMC Butner diagnosed Mr. Sablan with Psychotic Disorder NOS; Major Depressive Disorder, Single Episode, Moderate; Cognitive Disorder NOS;

Antisocial Personality Disorder; and addictions to various illicit drugs.  Dr. Herbel also noted

that Mr. Sablan's increased depression was a common outcome after patients with Schizophrenia

become medicated and become aware that their beliefs are merely delusions.

259.    In April 2005, Judge Daniel found that Mr. Sablan had recovered sufficiently to

stand trial.  At trial, the issue of Mr. Sablan's mental competence was extensively litigated.  Dr.

Gur testified that scans of Mr. Sablan's brain showed that even the least damaged areas were

abnormal.  Dr. David Lovejoy, a neuropsychologist, testified that Mr. Sablan suffered from

Traumatic Brain Injury, Psychotic Disorder, and PTSD.

260.    The jury found Mr. Sablan guilty of murder.  Judge Daniel thereafter sentenced

Mr. Sablan to life imprisonment without the possibility of parole.  Judge Daniel also

recommended that "the Bureau of Prisons continue, on an uninterrupted basis, with a regimen of

medicines (previously referred to as psychotropic medications) and other therapeutic treatment

(including art supplies) currently in place to provide the defendant with the maximum ability to

serve his life sentence with minimal disruptions to himself or others."

261.    Mr. Sablan was thereafter returned to ADX.  Since Mr. Sablan's arrival at ADX,

the BOP has completely ignored Judge Daniel's recommendations concerning Mr. Sablan's

mental health care.  Although Mr. Sablan receives psychotropic medication, the BOP refuses to

give Mr. Sablan any psychological or other therapeutic treatment in accordance with Judge

Daniel's sentencing order.

**D.   Jaison Leggett**

262.    Jaison E. Leggett is 41 years old.  He grew up in Washington D.C.  Mr. Leggett is

currently serving a life sentence at ADX.  Mr. Leggett suffers from a serious mental illness that

has been variously diagnosed as Schizophrenia, Bipolar Illness, Major Depression and

Borderline Personality Disorder.  A photograph of Mr. Leggett is attached as Exhibit 15.

263.    Starting when he was still a teenager, Mr. Leggett was admitted six times to St.

Elizabeth's Hospital.  Many of these admissions followed a suicide attempt.  During his stays at

St. Elizabeth's, psychiatrists' records repeatedly noted that Mr. Leggett may suffer from

Schizophrenia, Antisocial Personality Disorder, Borderline Personality Disorder, and Major

Depression.  Psychiatrists noted that Mr. Leggett mutilates himself and exhibits suicidal ideation.

During one of his stays at St. Elizabeth's he attempted suicide and started a fire.  His records also

indicate that outside of the hospital his behavior included setting fires, animal cruelty, and drug

abuse.

264.    Mr. Leggett has been in custody since August 1996, and has been confined at

ADX since August 22, 2002, following a transfer from USP Leavenworth.

265.    At ADX Mr. Leggett has complained of pain in his right leg that he attributed to a

1991 gunshot wound. Mr. Leggett regularly sought treatment, and even requested that BOP

medical staff order his leg to be amputated.  The BOP staff acknowledged that Mr. Leggett

suffered from osteomyelitis in his leg, but refused to approve the amputation.  In response to

intense pain, on August 15, 2003, Mr. Leggett cut himself with a razor blade and then swallowed

the razor blade.

266.    In November 2003, Mr. Leggett again used a razor blade to cut an artery in his

leg, in an effort to cut out the infection himself.  When BOP staff attempted to stop him from

cutting his leg any further, Mr. Leggett swallowed the razor blade.  He was subsequently

transferred to the MCFP Springfield, where his leg was amputated.  BOP psychology staff then placed Mr. Leggett on suicide watch.

267.    After BOP medical staff amputated Mr. Leggett's leg, he was fitted with a prosthetic.  Shortly after receiving his prosthetic, Mr. Leggett began complaining to the BOP that the prosthetic did not fit properly and was causing him pain.  He repeatedly requested medical attention from the BOP related to this pain.

268.    Mr. Leggett's pain was so severe while using the prosthetic, that he was unable and unwilling to use it.  In a desperate attempt to receive medical attention for the pain he was experiencing, on July 30, 2005 Mr. Leggett again used a razor blade to cut his leg.  He did so once again on November 29, 2006, and after he cut his leg he swallowed the razor blade. In addition, Mr. Leggett swallowed a razor blade and finger nail clippers on both September 8, 2007 and January 24, 2009.

269.    Several years ago, out of frustration with his lack of medical treatment and because of continuing pain caused by the improperly fitted prosthetic, Mr. Leggett damaged his prosthetic leg and swallowed some of its metal parts.  The BOP has refused to replace Mr. Leggett's prosthetic leg, instead forcing him to crawl around on the floor of his cell.  Indeed, on or about September 23, 2009 correctional officers at ADX forced Mr. Leggett to hop on one leg up the stairs in his unit.  On or around September 30, 2009, officers forced him to hop on one leg to get from one cell to another on A Range in the ADX SHU.  On or about August 28, 2010 officers forced Mr. Leggett to crawl up and down unit stairs to get to recreation, then forced him to sit on the ground in the recreation yard.  On or about July 8, 2011, officers simply dragged him out of his cell because his wheelchair did not fit into the range.

270.    On or about November 11, 2011, BOP staff witnessed Mr. Leggett consuming a plastic bag of Ibuprofen and Aspirin.

271.    Despite repeated complaints filed by Mr. Leggett, for years the BOP failed to provide adequate safety bars to accommodate Mr. Leggett's disability while in the shower.  As a result, Mr. Leggett was forced to sit on the floor of the shower while bathing, for fear of falling.

272.    For years, the BOP refused to provide Mr. Leggett with a prosthetic leg until he paid for it at a cost of $4,250.77.  He is indigent, but over several years his family was able to pay off a small portion of that cost.  Until Mr. Leggett began communicating with his undersigned counsel the BOP continued to insist that he or his family would have to pay the entire cost of the prosthetic leg before one would be provided.  Only in January 2012, after Mr. Leggett engaged his undersigned counsel, did the BOP finally change course and approve his transfer to MCFP for fitting of a new prosthetic.  In the five months since, however, he has remained at ADX with no prosthetic leg and no word about when he will receive one.  The BOP has also stated that once he receives his new prosthetic he is scheduled to be returned to ADX.

273.    The pain, frustration and humiliation associated with being housed at ADX without a prosthetic, cane, or crutches, and forced to crawl around his cell and recreation enclosure like an animal has substantially aggravated Mr. Leggett's preexisting serious mental illness, which the BOP has likewise failed and refused to adequately treat.

274.    As early as February 9, 2003, according to Mr. Leggett's medical records, a BOP physician acknowledged that Mr. Leggett suffers from a mental disorder.  During his time at ADX, Mr. Leggett repeatedly has attempted suicide.  On or about November 21, 2002, BOP staff found Mr. Leggett non-responsive in his cell with bags of medicine near him.  On August 14,

2003, BOP medical staff noted that Mr. Leggett threatened suicide.  BOP medical staff indicated that BOP psychology staff had been notified.

275.    Upon information and belief, Mr. Leggett has not been on any psychotropic medication since 2005.  Before 2005, Mr. Leggett was treated with Thorazine, Haldol, and antidepressants.

276.    Upon information and belief, Mr. Leggett filed a written request sometime before October 31, 2007, requesting psychotropic medication, but changed his mind on October 31, 2007 because the side effects of his medication caused him to be increasingly violent or alternatively caused him to sleep all day.

277.    Mr. Leggett fears taking any medication as he believes that BOP staff will attempt to poison him with that medication.  This fear has been exacerbated by BOP staff's continued mistreatment related to Mr. Leggett's physical disability.

**E.    David Shelby**

278.    David Shane Shelby is 47 years old.  He was born in Benton, Kentucky, and raised in Indiana.  Immediately before his incarceration he lived in Utah.  Mr. Shelby suffers from a serious mental illness, Bipolar Disorder.  A photograph of Mr. Shelby is attached as Exhibit 16.

279.    Mr. Shelby has been housed at ADX since October 2000.  He currently is serving a 24-year sentence for a 1996 conviction for making threats against the President, in addition to other felonies, and a consecutive 80-month sentence resulting from his 1997 attempted "suicide by officer."

280.    Mr. Shelby was raised in a family wracked by extreme poverty and mental illness. He was raised by his mother, who suffered from serious mental illness.  When Mr. Shelby was 16 years old, he attempted suicide through an overdose of sleeping pills and whiskey.

281.    In 1989, Mr. Shelby was sentenced to imprisonment at the Westville Correctional Center in Indiana.  During his incarceration, Mr. Shelby attempted to burn another prisoner with a torch constructed from a mop stick.  Mr. Shelby claimed that God had directed him to make the torch and burn the other prisoner.

282.    As a result of the incident, a mental status examination was performed in September 1989, during which Mr. Shelby stated that "he did not exactly hear voices; but more like -- heard feelings."  The mental health examiner concluded that Mr. Shelby may have suffered an acute psychotic episode -- Schizophreniform Disorder in remission.

283.    Mr. Shelby was released on parole in 1992.  In December 1994, Mr. Shelby mailed threatening letters to the President of the United States as part of a plan by Mr. Shelby to secure the release of Charles Manson from prison.  A few weeks later, in January 1995, he was arrested in Ogden, Utah, while attempting to mail several packages.  One of the packages was addressed to the President of the United States and contained a modified light bulb that had been filled with smokeless gunpowder, a pocket knife, and a note reading, "I think you are doing a good job and I am sending you the pocket knife as a gift and a light bulb so that you won't strain your eyes."  A second package, addressed to Charles Manson, contained a revolver with a fork affixed to its end to be used as a bayonet, a straight razor, and two explosive devices.

284.    Mr. Shelby was charged with making threats against the President of the United States, illegal possession of firearms/destructive devices, and possession of a firearm.  In a

mental health evaluation conducted while at the Salt Lake County Jail, Mr. Shelby described

how "voices" had instructed him to "Help Charlie [Manson]" and that "if Charlie was President,

he could set me free."

285.    In connection with his prosecution and court-ordered mental health evaluation,

Mr. Shelby was sent to MCFP Springfield, where he underwent a psychiatric evaluation for a

period of approximately three months.  While at MCFP Springfield, Mr. Shelby attempted to

commit suicide by ingesting a mouthful of Lysol and later by ingesting a mouthful of Bon Ami

cleanser.  He stated that he attempted suicide because he "began to be concerned he might

actually be mentally ill" and also reportedly stated that he "did not want to die, but if God wants

me to do it, it's like a commandment."  According to the subsequent forensic report, Mr. Shelby

was treated with an antipsychotic medication and was diagnosed with alcohol abuse and

Schizotypal Personality Disorder that is "not regarded as a mental disease or defect by most

authorities."

286.    After Mr. Shelby returned to Salt Lake County Jail in August 1995, he voluntarily

surrendered a knife constructed of wire and wrapped with a leather shoelace and reported to jail

personnel that he had impulses to murder another prisoner.  He reportedly told a mental health

worker that "they tell me I'm not crazy . . . then the voice of God I hear, telling me to kill all the

baby rapers, must be real.  God told me to kill Ryan because he is the lowest of them all."

287.    In January 1996, Mr. Shelby was ordered to undergo a second mental health

evaluation.  The second evaluation concurred with the prior diagnosis of Schizotypal Personality

Disorder, noting that much of Mr. Shelby's psychotic illness "appears to be controlled with the

medication."

288.    Mr. Shelby pled guilty to charges relating to his January 1995 arrest, and was sentenced to 288 months in the custody of the BOP.  At his sentencing hearing, Mr. Shelby reportedly stated, "For quite some time in my life, I have been listening to voices in my head that I thought came from God . . . .  The terrible crimes I have committed were because I believed they were commandments of God."

289.    Mr. Shelby spent approximately one year of his sentence as an prisoner at USP Florence, Colorado.  In June 1996, Mr. Shelby requested discontinuation of his medication, which at the time included the antipsychotic Navane and Cogentin, which helps reduce certain side effects of Navane.  After his medication was discontinued, Mr. Shelby was given no other psychiatric or mental health treatment.

290.    In early 1997, Mr. Shelby was transferred to USP Atlanta.  A few months after his arrival, Mr. Shelby took a staff member hostage in the institution's kitchen with a homemade knife, in an effort to provoke the prison staff to kill him -- a scenario known as "suicide by officer."  Mr. Shelby was not killed in the incident, but rather was subdued and charged with assault of a U.S. penitentiary employee with a dangerous weapon.  In a statement about the incident, Mr. Shelby reported:

> On July 23, 1997, while I was a prisoner at the United States Penitentiary in Atlanta, I held Ms. Ross, a prison staff person, hostage with a knife.  It was never my intention to harm anyone. This was a suicide attempt.  I did this in hopes that the staff would shoot me.  I have problems with depression and I was not receiving the proper medication at the time of this incident.

291.    In May 1998, during his prosecution for assault of a U.S. penitentiary employee, the Court ordered a psychiatric evaluation of Mr. Shelby at USP Talladega in Alabama.  Upon information and belief, at the time of his evaluation, Mr. Shelby continued to suffer from severe,

chronic and untreated Bipolar Disorder.  In the BOP evaluation, Mr. Shelby was diagnosed with

the major Depressive Disorder, currently in remission; Alcohol Dependence in sustained, full

remission in controlled environment; history of hallucinogen abuse; Personality Disorder NOS

(schizotypal and antisocial traits); and history of head injury.  Mr. Shelby was found competent

to stand trial.

293.     Mr. Shelby also later again was evaluated at MCFP Springfield.  At MCFP

Springfield, Mr. Shelby was diagnosed with Major Depression, in full remission; Alcohol

Dependence; Personality Disorder NOS (schizotypal and antisocial traits); and post mild closed

head injury.  Thereafter, Mr. Shelby pled guilty to charges stemming from his attempted "suicide

by officer" and was sentenced to 80 months of confinement in BOP custody, to run consecutive

to his original federal sentence.  As part of the sentence, the court recommended that Mr. Shelby

participate in a mental health treatment program during his incarceration.

293.     Mr. Shelby was transferred to ADX in 2000 and placed in the ADX general

population.  Since his arrival at ADX, Mr. Shelby has suffered from continuing symptoms of

bipolar illness, as a result of which he is engaged in a pattern of bizarre, erratic, and harmful

behavior.

294.     In or about 2009, Mr. Shelby attempted suicide.  Upon information and belief, at

the time of this suicide attempt, Mr. Shelby was in the throes of psychosis caused by his as-yet

untreated Bipolar Disorder.  Mr. Shelby heard the Bob Dylan song "Knocking On Heaven's

Door" playing on the radio and understood the song to be a message "calling him home."  He

responded by sitting down in a shower and severely cutting both arms, both legs, and his belly

using glass from a broken television.  Sometime later, ADX staff discovered him bleeding and in

a semi-coherent state.  His wounds were bandaged at the ADX medical facility and he was returned to a standard ADX cell.

295.    After his suicide attempt, a BOP psychologist diagnosed Mr. Shelby as suffering from Bipolar Disorder.  He was thereafter prescribed the anti-manic medication Depakote and the antidepressant Zoloft.  Although the medications have helped Mr. Shelby cope with his serious mental illness, they have not resolved his periodic psychotic episodes and his hallucinations.

296.    For example, later in 2009, Mr. Shelby heard a voice, which he took to be God's voice, commanding him to eat his finger.  In response, Mr. Shelby amputated his left pinky finger approximately 1/2 inch from where the pinky joined his hand, and cut the finger into small pieces, which he added to a bowl of ramen soup and ate.  ADX staff discovered him bleeding in his cell, and one ADX staff member asked him how his finger tasted.

297.    In early 2010, Mr. Shelby was transferred to the ADX step-down program.  He maintained clear conduct during stays in the Joker Unit and Kilo Unit, and was transferred to the final stage of the step-down program, which is located at the USP Florence.  In September 2011, while looking at a friend largely confined to a wheelchair, Mr. Shelby inexplicably saw what he believed to be "devil horns" on his friend's forehead.  Mr. Shelby began choking his friend, and was subdued, restrained, and returned to ADX.  After spending several months in disciplinary segregation in the SHU, Mr. Shelby returned to the General Population Unit, where he resides today.

F.   **Herbert Isaac Perkins**

298.   Herbert Isaac Perkins, also known as "Pee Wee" or "Hokie," is 36 years old. Before his incarceration he lived in Albuquerque, New Mexico.  Mr. Perkins is serving a life sentence for armed robbery.  Mr. Perkins suffers from serious mental illness, including severe Major Depression and Antisocial Personality Disorder.  He also exhibits signs and symptoms of PTSD and may be suffering from the long term effects of serious closed head injuries.  During his incarceration at ADX, Mr. Perkins has twice attempted to kill himself.  A photograph of Mr. Perkins is attached as Exhibit 17.

299.   Mr. Perkins grew up in Albuquerque, New Mexico, in a poor Latino neighborhood known locally as "the War Zone."  He was recruited into a gang at the age of nine. His mother abused drugs, and shared cocaine with him repeatedly from the time he was twelve years old.  When he was fourteen or fifteen years old, his father committed suicide by shooting himself in the head while on the telephone with Mr. Perkins.  As a teenager, Mr. Perkins was frequently in juvenile detention, and he did not finish high school.  It was during this period that he first was treated for mental illness.

300.   When properly treated, Mr. Perkins' Major Depression is controllable and relatively benign.  While in federal custody before his 2008 arrival at ADX, Mr. Perkins received regular psychotropic medication.  He was largely asymptomatic during this period.

301.   Mr. Perkins' transfer to ADX triggered his mental illness.  He was unable to receive any treatment for his mental illness.  Although he had been medicated for depression and anxiety prior to the transfer, and asked to be continued on his medication when he arrived at ADX, he was told there was no prescription on file.  He informed BOP officials at ADX that he

was suffering from depression and asked to see a psychologist or psychiatrist.  Upon information and belief, an ADX corrections officer also reported his depressed state and sought psychology intervention.  BOP officials, however, refused to take action.

302.    Upon information and belief, in August 2008, about a month after Mr. Perkins arrived at ADX, an ADX correctional officer noted his extreme depression and sought intervention by a psychologist, but was ignored.  A day or two later, Mr. Perkins used the razor provided by ADX officials with other grooming supplies to slice open a blood vessel in his neck.  He was taken to Parkview Hospital in Pueblo, Colorado, where medical personnel performed an emergency surgery to stop the bleeding and repair the blood vessel in his neck.

303.    When the BOP returned Mr. Perkins from the hospital to ADX, he was weak and disoriented from blood loss and the stress of surgery.  Upon his arrival at the prison, a BOP psychologist told him that he was being placed back in the same cell in which he had just attempted to kill himself.  Mr. Perkins responded that he would not be there long, because he was going to kill himself.  Rather than placing him on suicide watch or transferring him to a BOP medical center, ADX officials returned Mr. Perkins to his normal cell, which was still awash with his own blood from the suicide attempt; the razor he had used to slash his throat was still sitting on his sink.  While most of the inmates on the tier (a "range," in ADX parlance) objected loudly that Mr. Perkins should be sent to MCFP Springfield, ADX staff expressed amusement at Mr. Perkins' suicide attempt, brought him a pail of plain water to clean up the blood in his cell, and later removed the razor.  The following day, Mr. Perkins made good on what he told a BOP psychologist upon his return the previous day from the hospital.  Specifically, he smashed the television in his cell, swallowed some of the broken glass, slashed his wrist, and attempted to

tear open the earlier wound on his neck.  Again, his bodily wounds were dressed, and again he was returned to his cell.

304.    Belatedly, Mr. Perkins was treated with Zoloft; ADX personnel later withdrew these medications without explanation.  After that, Mr. Perkins received no meaningful mental health care at ADX until late 2011 or early 2012, when BOP officials finally prescribed Prozac and Sinequan for Mr. Perkins' depression.  At no time has Mr. Perkins been provided with regular psychiatric visits or other counseling for depression.  Although his mood and physical health have improved somewhat since he finally began receiving medication, he remains clinically depressed and at risk of suicide.

305.    Since he began communicating with his undersigned counsel, Mr. Perkins has been subjected to a pattern of harassment and retaliation by BOP officials.  In late 2011, shortly after his first meeting with lawyers from Arnold & Porter, an ADX staff member made disparaging remarks to Mr. Perkins about his decision to become involved in the case.  A few weeks later, an ADX staff member falsely accused Mr. Perkins of spitting on another prisoner in the recreation yard.  The BOP's investigation of this allegations was cursory and inadequate, and Mr. Perkins was not afforded a hearing for this incident.  Instead, he was transferred to the SHU and held there for over a month.

306.    While in the SHU, Mr. Perkins was informed that his clothes, shoes, family photographs, and other belongings had been "lost."  Only some of his legal paperwork was located; some more legal paperwork and his family photographs were later returned to him.  An ADX staff member told Mr. Perkins that if he continued to be involved in the investigation of

problems with the ADX mental health care system, he should expect to be returned to the SHU and have his property "lost" again.

307.    Since his first meeting with Arnold & Porter, Mr. Perkins' mail has frequently been delayed, lost, or otherwise misdirected.  He writes regularly to his nieces and sister, but many of the letters he has sent them over the last several months have never arrived, and others have been delayed for a week or more.

308.    On several occasions, Mr. Perkins' outgoing legal mail has also gone missing. Three of these letters were sent by Certified Mail to his lawyers at Arnold & Porter months ago, but those letters have not been received.

309.    ADX staff members have insinuated to Mr. Perkins that they have taken or will take revenge on him for his involvement in the instant litigation by, for example, contaminating his food trays, spreading rumors among other prisoners that he is a "rat," and otherwise compromising his well-being.  As a result of these veiled threats and the BOP's prior disregard for his safety, Mr. Perkins fears for his life.

310.    ADX staff members recently opened sealed and clearly marked legal mail that Mr. Perkins had addressed and planned to send to his undersigned counsel.  Staff confiscated medical records relating to Mr. Perkins's 2008 suicide attempt, which Mr. Perkins had properly requested from ADX staff and received a few days earlier.  The confiscated records were not contraband.  Upon information and belief, they were confiscated merely because they contain information that will embarrass the BOP when it surfaces in this lawsuit.

## VIII.   CLASS ACTION ALLEGATIONS

311.     Plaintiffs Bacote, Cunningham, Narducci, Pinson, and Shaifer bring the causes of action identified below on behalf of themselves and all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23.  For those causes of action, Plaintiffs seek injunctive and declaratory relief applicable to members of the Class and Subclass, as defined below.

312.     Plaintiffs bring this action on behalf of the following class and subclass:

Prisoner Class

> All persons who are now, or will be in the future, confined to the custody of the United States Bureau of Prisons at the United States Penitentiary Administrative Maximum in Florence, Colorado.

Serious Mental Illness Subclass

> All persons who are now, or will be in the future, confined to the custody of the United States Bureau of Prisons in the United States Penitentiary Administrative Maximum in Florence, Colorado and have been diagnosed by the United States Bureau of Prisons or its representative personnel with one or more of the following forms of "Serious Mental Illness":

(a)     Prisoners determined by the BOP or its mental health vendor as having a diagnosis or a significant history of any of the following disorders, as defined in the most current version of the Diagnostic and Statistical Manual of Mental Disorders ("DSM"):

> (1)     Schizophrenia (all sub-types)
>
> (2)     Delusional Disorder
>
> (3)     Schizophreniform Disorder

- 97 -

(4)     Schizoaffective Disorder

(5)     Brief Psychotic Disorder

(6)     Substance-Induced Psychotic Disorder (excluding intoxication and withdrawal)

(7)     Psychotic Disorder Not Otherwise Specified

(8)     Major Depressive Disorder (all types)

(9)     Bipolar Disorder I and II;

(b)     Prisoners diagnosed by the BOP or its mental health vendor with Post-Traumatic Stress Disorder or another Anxiety Disorder that results in a significant functional impairment;

(c)     Prisoners diagnosed by the BOP or its medical or mental health vendor with a development disability, a dementia, or other cognitive disorders that results in a significant functional impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical health; or

(d)     Prisoners diagnosed by the BOP or its mental health vendor with a severe personality disorder that is manifested by episodes of psychosis or depression and results in significant functional impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical health.

**A.     Prisoner Class**

313.     Class action status for the Prisoner Class in this litigation is proper because:

(a)     The Prisoner Class is so numerous that joinder of all members is impractical.  Upon information and belief, the total number of class members is more than four

- 98 -

hundred men currently confined at ADX and an unknowable number of current and future BOP prisoners who are designated for confinement at ADX;

(b)     There are questions of law and fact common to the class, including without limitation:  whether class members are subject to harm as a result of Defendants' practices that fail to provide initial and periodic mental health evaluations at ADX; whether Defendants violate their own written policies and procedures by refusing to provide initial and periodic mental health evaluations to class members at ADX; whether Defendants' failure to maintain an adequate program for initial and periodic mental health evaluations at ADX leads to a failure to properly diagnose prisoners who suffer from serious mental illness, and whether Defendants' failure to maintain an adequate program for initial and periodic mental health evaluations at ADX leads to a failure to provide constitutionally adequate mental health treatment to seriously mentally ill prisoners;

(c)     Plaintiffs' claims are typical of the claims of the class, in that each Plaintiff is incarcerated at ADX, did not receive a prompt mental health evaluation upon transfer to ADX, has not received continued periodic mental health evaluations during the time they have been incarcerated at ADX, and currently has claims that, like the claims of the class, arise from the same policies, practices, and procedures implemented by Defendants at ADX;

(d)     Plaintiffs and all members of the class have been similarly affected by Defendants' common course of conduct;

(e)     Plaintiffs will fairly and adequately protect the interests of the class as there is no conflict between Named Plaintiffs and the other class members; and

- 99 -

(f)     Plaintiffs can adequately represent the interests of the class members and have retained counsel experienced in class action litigation.

314.     Defendants have acted and/or refused to act on grounds generally applicable to the class, thereby making final declaratory and injunctive relief appropriate with respect to the class as a whole under Federal Rule of Civil Procedure 23(b)(2).

### B.   Serious Mental Illness Subclass

315.     Class action status for the Serious Mental Illness Subclass in this litigation is proper because:

(a)     The Serious Mental Illness Subclass is so numerous that joinder of all members is impractical.  Due to the nature of the facility at issue and the mental health afflictions known to Plaintiffs and their counsel, upon information and belief, the total number of subclass members is dozens, if not more than one hundred men;

(b)     There are questions of law and fact common to the subclass, including without limitation:  whether Defendants' failure to maintain an adequate program for appropriate mental health evaluations at ADX leads to a failure to provide constitutionally adequate mental health treatment to seriously mentally ill prisoners; whether Defendants violate their own written policies and procedures by a practice of placing seriously mentally ill prisoners at ADX, and within the Control Unit and SHU at ADX; whether Defendants violate their own written policies and procedures by failing to adequately instruct unit officers and detail supervisors in recognizing and reporting symptoms of mental illness; whether Defendants violate their own written policies by a practice of taking inappropriate disciplinary actions against seriously mentally ill prisoners; whether Defendants violate their own written policies by failing to

maintain an adequate program to diagnose seriously mentally ill prisoners at ADX; whether subclass members are subject to harm as a result of Defendants' practices that fail to provide adequate treatment for serious mental illness; and whether Defendants' repeated violations of numerous mental health policies has placed members of the subclass at risk for increased psychological and/or physical harm;

(c)     Plaintiffs' claims are typical of the claims of the subclass, in that each Named Plaintiff suffers from at least one serious mental illness for which he has not received appropriate treatment, and Plaintiffs' claims and the claims of the subclass arise from the same policies, practices, and procedures implemented by Defendants at ADX;

(d)     Plaintiffs and all members of the subclass have been similarly affected by Defendants' common course of conduct;

(e)     Plaintiffs will fairly and adequately protect the interests of the subclass as there is no conflict between Plaintiffs and the other subclass members; and

(f)     Plaintiffs can adequately represent the interests of the subclass members and have retained counsel experienced in class action litigation.

316.    Defendants have acted and/or refused to act on grounds generally applicable to the subclass, thereby making final declaratory and injunctive relief appropriate with respect to the class as a whole under Federal Rule of Civil Procedure 23(b)(2).

## IX.   CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Violation of the Eight Amendment to the United States Constitution - Failure to Diagnose**
**(Asserted by Plaintiff Prisoner Class Against All Defendants)**

317.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

318.     As described herein, by their policies and practices, Defendants subject Plaintiffs and class members to a substantial risk of serious harm and injury by failing to establish and maintain a program and/or practices to adequately screen and diagnose prisoners at ADX for serious mental illnesses, both during their initial assignment to ADX and periodically thereafter. Defendants have been deliberately indifferent to this substantial risk of serious harm to Plaintiffs and class members.

319.     Defendants have been and are aware of all the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct, and to Plaintiffs' and class members' serious medical needs.

320.     Defendants' policies and practices are the proximate cause of the Plaintiffs' and class members' deprivation of rights under the Eighth Amendment.

**SECOND CLAIM FOR RELIEF**
**Violation of the Eighth Amendment of the United States Constitution - Failure to Treat**
**(Asserted by Plaintiff Serious Mental Illness Subclass Against All Defendants)**

321.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

322.     As described herein, by their policies and practices, Defendants subject Plaintiffs and subclass members to a substantial risk of serious harm and injury by failing to establish and

maintain a program to provide adequate mental health treatment to Plaintiffs and subclass members.

323.    Defendants have been and are aware of all the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct, and continue to exhibit deliberate indifference to Plaintiffs' and subclass members' serious medical needs.

324.    Defendants' policies and practices are the proximate cause of the Plaintiffs' and subclass members' ongoing deprivation of rights under the Eighth Amendment.

## X.   PRAYER FOR RELIEF

Plaintiffs therefore respectfully request that this Court grant the following relief:

1.    Certify the proposed class and subclass;

2.    Enter an injunction directing that Defendants implement a program of mental health screening and diagnosis for the benefit of all Prisoner Class members.  This program shall include the staffing of mental health professionals at ADX to provide the screening and diagnosis services required hereby.  The program shall provide, at a minimum, the following:

(a)    a mental health examination prior to transfer to ADX or immediately upon arrival at ADX, to determine the presence or absence of a Serious Mental Illness, as defined in this Complaint;

(b)    an annual mental health examination, and regular mental health rounds by a mental health professional, to facilitate early detection and treatment of a Serious Mental Illness as defined in this Complaint;

(c)    a program of training ADX staff members on detection of symptoms of Serious Mental Illness; and

(d)     a procedure for plaintiff class members who dispute the diagnosis by the BOP or its representative personnel for review of that diagnosis by a mental health provider independent of the BOP.

3.     Enter an injunction directing that Defendants implement a program of treatment for each Serious Mental Illness for the benefit of members of the Serious Mental Illness Subclass.  That program shall contain a level of care appropriate for a confined individual for each Serious Mental Illness, and shall include, at a minimum, the following:

(a)     staffing of mental health professionals at ADX to administer the program of mental health treatment;

(b)     bi-weekly access to out-of-cell private psychotherapy;

(c)     monthly access to confidential psychiatry sessions;

(d)     access to at least 5-10 hours per week of out-of-cell therapeutic activity;

(e)     access to at least 10 hours per week of out-of-cell recreational activity that allows for socialization with other prisoners;

(f)     regular and scheduled receipt of all prescribed medication;

(g)     not housing prisoners who are prescribed medication in Control Units, or in any unit in which medications are not provided; and

(h)     treatment planning team meetings three times annually.

4.     Enter an injunction directing that Defendants implement a program of suicide and self-harm prevention, including at a minimum, regular and reliable access for Serious Mental Illness Subclass members to suicide prevention and mental health crisis intervention services with trained professionals.

5.      Enter an injunction directing that Defendants implement a program of placement of Serious Mental Illness Subclass members at ADX including, at a minimum, making available to all Serious Mental Illness Subclass members the option of housing in a unit dedicated to prisoners with serious mental illnesses that is segregated from other prisoners, staffed by medical and correctional officers specially trained to deal with mental health issues, and operated so that prisoners with serious mental illnesses may receive consistent and accurate doses of prescribed psychotropic medication together with other psychiatric and psychological care;

6.      Enter an injunction directing that Defendants adopt and comply with written policies on the safe and humane treatment of Serious Mental Illness Subclass members who become disruptive.

7.      Declare that the diagnosis and treatment of seriously mentally ill prisoners at ADX violates the standards set by the federal government and the BOP in their own regulations, as well as the Eighth Amendment and to the United States Constitution;

8.      Grant an award of attorneys' fees; and

9.      Grant such other relief as this Court deems just and proper.

Dated: June 18, 2012                    Respectfully submitted,

                                        **ARNOLD & PORTER LLP**


By    /s/ Edwin P. Aro
        Edwin P. Aro
        James E. Scarboro
        370 Seventeenth Street
        Suite 4400
        Denver, CO  80202-1370
        Telephone:  +1 303.863.1000
        ed.aro@aporter.com
        james.scarboro@aporter.com

        Maurice A. Leiter
        777 S. Figueroa Street
        44th Floor
        Los Angeles, CA  90017
        Telephone:  +1 213.243.4000
        maury.leiter@aporter.com

        Robert P. Taylor
        Jerome B. Falk, Jr.
        Three Embarcadero Center
        7th Floor
        San Francisco, CA  94111
        Telephone:  +1 415.471.3100
        robert.taylor@aporter.com
        jerome.falk@aporter.com

        Veronica E. Rendon
        Keri L. Arnold
        399 Park Avenue
        New York, NY  10022
        Telephone:  +1 212.715.1000
        veronica.rendon@aporter.com
        keri.arnold@aporter.com

        Nancy L. Perkins
        555 Twelfth Street, NW
        Washington, D.C.  20004
        Telephone:  +1 202.942.5000
        nancy.perkins@aporter.com

**WASHINGTON LAWYERS' COMMITTEE
FOR CIVIL RIGHTS AND URBAN AFFAIRS**


By     /s/  Deborah Golden
        Deborah Golden
        Philip Fornaci
        11 Dupont Circle, NW
        Suite 400
        Washington, D.C.  20036
        Telephone:  +1 202.319.1000
        deborah_golden@washlaw.org
        philip_fornaci@washlaw.org

        Attorneys for Plaintiffs


Plaintiffs' Address:

United States Penitentiary Administrative
Maximum - ADX
P. O. Box 8500
Florence, CO  81226

**Index of Photographic Exhibits
to Plaintiffs' Complaint,
<u>Bacote, et al. v. United States Bureau of Prisons, et. al.</u>**

1.   ADX exterior

2.   ADX general population cell

3.   ADX outdoor recreation cages (general populations units)

4.   ADX individual outdoor recreation enclosure (Control Unit or SHU)

5.   ADX individual indoor recreation enclosure

6.   ADX Kilo and Joker Units

7.   Michael Bacote

8.   Harold Cunningham

9.   Ernest Shaifer

10.  Jeremy Pinson

11.  John "Keli" Narducci

12.  John "Jack" Powers

13.  Marcellus Washington

14.  William Sablan

15.  Jaison Leggett

16.  David Shelby

17.  Herbert Perkins