**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 12-cv-01570-RPM

HAROLD CUNNINGHAM,
CARLTON DUNBAR,
JOHN W. NARDUCCI, JR.,
JEREMY PINSON,
JOHN J. POWERS,
ERNEST NORMAN SHAIFER,
and MARCELLUS WASHINGTON,

each individually and on behalf of all others similarly situated,

and

CENTER FOR LEGAL ADVOCACY
D.B.A. THE LEGAL CENTER FOR PEOPLE
WITH DISABILITIES AND OLDER PEOPLE,
COLORADO'S PROTECTION AND ADVOCACY
SYSTEM,

Plaintiffs,

vs.

FEDERAL BUREAU OF PRISONS.

Defendant.

---

**FIRST AMENDED COMPLAINT**

---

Plaintiffs Harold Cunningham, Carlton Dunbar, John W. Narducci, Jr., Jeremy Pinson,

John J. Powers, Ernest Norman Shaifer and Marcellus Washington (collectively, "Class

Plaintiffs"), each individually and on behalf of all others similarly situated, and Plaintiff  The

Center for Legal Advocacy ("CLA") d.b.a. The Legal Center for People With Disabilities And

Older People, respectfully complain as follows against defendant the Federal Bureau of Prisons.

Where appropriate, Class Plaintiffs and CLA are collectively referred to herein as "Plaintiffs."

## TABLE OF CONTENTS

Page

**I.** NATURE OF THE ACTION .................................................................................... 4

**II.** OBJECTIVES OF THIS LITIGATION ................................................................ 8

**III.** JURISDICTION ...................................................................................................... 14

**IV.** VENUE ...................................................................................................................... 15

**V.** PARTIES ................................................................................................................... 15

**VI.** GENERAL ALLEGATIONS................................................................................. 16

    **A.**    Background and Operation of ADX ...................................................... 16

    **B.**    Extended Confinement in Isolation Can and Often Does Have a Devastating Effect on Prisoners' Mental Health ..................................................... 25

    **C.**    The BOP Violates Its Own Written Policies Concerning Evaluating, Housing and Treating Mentally Ill Prisoners at ADX ......................................... 26

    **D.**    ADX Houses Seriously Mentally Ill Prisoners Who Are Dangerous to Themselves and Others. ........................................................................... 30

    **E.**    Mental Health Care Treatment at ADX is Woefully and Constitutionally Inadequate. ................................................................................................ 37

    **F.**    Defendants Have Displayed Sustained Deliberate Indifference to the Plight and Needs of Mentally Ill Prisoners at ADX. ........................................ 44

        **(1)**    The illnesses of Plaintiffs and their peers are obvious. ..................... 44

        **(2)**    At least fourteen separate pro se lawsuits filed by ADX prisoners in the past nine years have put Defendants on notice of the catastrophic deficiencies in the ADX mental health care system. ................................................ 44

        **(3)**    A series of suicides by mentally ill prisoners have demonstrated in tragic and permanent terms the deficiencies in the ADX mental health system. .......... 47

**G.**     Defendants Have Retaliated Against and Interfered With Plaintiffs and Other ADX Prisoners Who Have Tried to Assert Their Constitutional and Other Legal Rights to Mental Health Treatment. ..........................................................51

    **(1)**     ADX staff members have interfered with legal mail and confiscated attorney-client privileged materials. ................................................................51

    **(2)**     ADX staff have interfered with the attorney-client relationship and retaliated against prisoners by threatening, antagonizing, and punishing prisoners who communicate with counsel...........................................................54

**VII.** ALLEGATIONS RELATING SPECIFICALLY TO PLAINTIFFS .................................. 55

    **A.**     Harold Cunningham ............................................................................................ 56

    **B.**     Carlton Dunbar................................................................................................... 61

    **C.**     John Jay Powers ................................................................................................. 66

    **D.**     Ernest Norman Shaifer ....................................................................................... 71

    **E.**     Jeremy Pinson .................................................................................................... 76

    **F.**     John W. Narducci, Jr. ......................................................................................... 78

    **G.**     Marcellus Washington......................................................................................... 82

**VIII.** ALLEGATIONS RELATING SPECIFICALLY TO THE INTERESTED INDIVIDUALS ............................................................................................................................... 85

    **A.**     Jaison Leggett .................................................................................................... 89

    **B.**     David Shelby....................................................................................................... 92

    **C.**     Herbert Isaac Perkins......................................................................................... 98

**IX.** ALLEGATIONS RELATING TO THE LEGAL CENTER FOR PEOPLE WITH DISABILITIES AND OLDER PEOPLE ...................................................................... 102

**X.** ALLEGATIONS RELATING TO SOME OF CLA's CONSTITUENTS............................ 107

    **A.**     James Cole ........................................................................................................ 107

    **B.**     Jonathan Francisco ............................................................................................ 108

    **C.**     William Harris..................................................................................................... 109

    **D.**     David Hearne ..................................................................................................... 111

    **E.**     William Concepcion Sablan ................................................................................ 118

    **F.**     James Van Noy .................................................................................................. 124

**XI.** CLASS ACTION ALLEGATIONS ................................................................................ 126

**A.**   Prisoner Class..................................................................................128

**B.**   Serious Mental Illness Subclass.......................................................129

**XII.** CLAIMS FOR RELIEF ................................................................. 131

**XIII.** PRAYER FOR RELIEF ................................................................. 132

## I.   NATURE OF THE ACTION

1.      This class action lawsuit concerns the treatment of prisoners at the United States Penitentiary Administrative Maximum facility in Florence, Colorado ("ADX") who suffer from serious mental illness.  It seeks declaratory and injunctive relief requiring the Federal Bureau of Prisons ("BOP") to comply with its existing policies regarding the treatment of mentally ill prisoners, and with the requirements of the Eighth Amendment regarding medical treatment for United States citizens and others who have been committed to its custody.  Currently, the BOP turns a blind eye to the needs of the mentally ill at ADX and to deplorable conditions of confinement that are inhumane to these prisoners.  No civilized society treats its mentally ill citizens with such deliberate indifference to their plight.

2.      ADX is the most secure federal penitentiary in the United States.  It currently houses approximately 450 men.  Staff at ADX often refer to it as the "Alcatraz of the Rockies." ADX was built to house prisoners whom the BOP believes present the greatest threats to the correctional staff or to other prisoners.  Prisoners spend at least 20 and as many as 24 hours per day locked alone in isolated cells, and are subject to a harsh and unforgiving disciplinary regimen.  Such isolation and brutal discipline are inappropriate for prisoners who are seriously mentally ill.

3.      According to the BOP's own policies, prisoners with serious mental illnesses should not be assigned to ADX.  Upon information and belief, those policies reflect the BOP's recognition that extended confinement in isolation and the institution's disciplinary practices pose substantial risks to prisoners' mental health, and can be particularly harmful for prisoners who had mental health problems before being confined in such conditions.

4.      Despite its policies, the BOP regularly assigns prisoners with serious mental illnesses to ADX.  That fact results from the BOP's routine disregard of its own prior mental health evaluations of prisoners it wishes to send to ADX and its woefully inadequate mental health screening evaluations when prisoners are transferred to ADX.  The BOP also fails to monitor ADX prisoners for mental health problems that arise after they arrive at the facility and fails to provide mentally ill prisoners at ADX with adequate mental health care.  The conditions of confinement at ADX and Defendants' failure to properly diagnose and treat mental illness combine to worsen the conditions of prisoners who were mentally ill when they arrived at ADX, and cause some other prisoners to develop serious mental illness.

5.      The BOP's deliberate indifference to the proper diagnosis and treatment of ADX prisoners with serious mental illnesses has resulted in horrible consequences.  Many prisoners at ADX interminably wail, scream, and bang on the walls of their cells.  Some mutilate their bodies with razors, shards of glass, sharpened chicken bones, writing utensils, and whatever other objects they can obtain.  A number swallow razor blades, nail clippers, parts of radios and televisions, broken glass, and other dangerous objects.  Others carry on delusional conversations with voices they hear in their heads, oblivious to reality and to the danger that such behavior might pose to themselves and anyone who interacts with them.  Still others spread feces and

other human waste and body fluids throughout their cells, throw it at the correctional staff and otherwise create health hazards at ADX.  Suicide attempts are common; many have been successful.

6.     The Eighth Amendment to the United States Constitution guarantees to every person imprisoned at ADX adequate medical care, including care for mental illnesses.  That guarantee includes access to an adequate process for assessing the need for mental health care, and access to necessary care itself.  If the BOP chooses, despite its policies, to assign or house at ADX prisoners with serious mental illness, it must provide adequate mental health screening and treatment, taking into account the isolated conditions of confinement and harsh disciplinary regime of ADX.  The BOP falls woefully short of providing this constitutionally-guaranteed level of care.

7.     Class Plaintiffs are seven seriously mentally ill men currently incarcerated at ADX.  This Complaint also names as "Interested Individuals" two other current ADX prisoners with serious mental illnesses:  Jaison Leggett and Herbert Perkins.  Many of these men also suffer severe functional impairment of their ability to attend to their own personal needs or even to exist in a world with other people.  Several of them are mentally disabled.  Plaintiff CLA operates Colorado's "Protection and Advocacy System," working to ensure the safety, well-being, and dignity of people with disabilities in, among other places, jail or prison.  In this case CLA is advocating on behalf of all ADX prisoners with serious mental illness, including those who cannot, because of mental illness and/or mental disability, advocate for themselves.

8.     The brutality and deliberate indifference to human rights that the BOP exhibits toward Plaintiffs and the Interested Individuals also exists with respect to many of the other

prisoners held at ADX, including the members of the class and subclass that Plaintiffs represent in this case.

9.      Defendant BOP is responsible for operating ADX and for ensuring that Plaintiffs' constitutional and other legal rights are respected.  Defendant has failed to meet those obligations to Class Plaintiffs, the Interested Individuals, and the members of the class and subclass.

10.     Defendant's constitutional violations have repercussions beyond the harm caused to Class Plaintiffs, Interested Individuals, the class, and the subclass.  Many ADX prisoners who suffer from untreated or poorly treated mental illness pose a constant and sometimes deadly threat to BOP personnel.  Although ADX programs are designed to isolate prisoners from other prisoners, they cannot isolate prisoners from BOP staff charged with providing basic services on a daily basis and conducting security checks required in all correctional settings.  The extreme isolation and the lack of adequate mental health treatment only serve to increase the risk of assaults to the staff assigned these duties.

11.     Although some ADX prisoners will never be released from prison, many, including several of the Class Plaintiffs and a number of other ADX prisoners, will be released into the community when their sentences expire in the next few years.  After years of confinement in isolation without proper treatment for serious mental illness, these men will have a  difficult time reentering society safely and successfully.

12.     This lawsuit seeks to remedy the deficient mental health system at ADX by means of a permanent injunction, requiring the BOP to honor its own policies and the constitutional rights of ADX prisoners by providing mental health diagnostic and treatment services.

## II.  OBJECTIVES OF THIS LITIGATION

13.     As detailed below, when this lawsuit was filed, the ADX delivered almost no mental health diagnostic or treatment services to prisoners held there.   In response to the lawsuit, the BOP has taken some preliminary steps to improve the mental health services available to ADX prisoners, as discussed below.  Plaintiffs are as yet unaware of the details of many of these steps, and cannot determine at this time their potential effectiveness.  Moreover, many of the constitutional violations in this case arise from the BOP's failure to comply with regulations and protocols that already are in place, so the implementation of new regulations and protocols cannot necessarily be trusted to cure the pervasive constitutional violations detailed below.  In addition, although the preliminary changes are welcome, even after they are implemented the mental health services available to ADX prisoners will remain constitutionally deficient.  In particular, there is no  constitutionally adequate mental health system in place or planned for ADX prisoners.  Rather, even as slated for improvement, mental health care at ADX is and will remain a small Band-Aid on a gaping wound.

14.     To satisfy the requirements of the Eighth Amendment, an institutional mental health system in a facility such as ADX must provide care consistent with contemporary community standards and evolving standards of decency.   Whether in the community or in a prison, any comprehensive system of mental health services provides care in different treatment settings, or levels of care: outpatient treatment services, crisis intervention services, a residential program, and a psychiatric inpatient program, all as follows:

        (a)     Crisis Level of Care: Suicide attempts and other acts of self-harm are far more common in segregation facilities such as ADX than in any other type of facility operated

by the BOP.  Given the risk of suicide, self harm and other mental health crises resulting from

the extreme isolation imposed by ADX, the constitution requires the timely provision of mental

health services to ADX prisoners who are suicidal or otherwise are experiencing an acute mental

health crisis.  Such services may need to be provided in an infirmary setting for short-term

stabilization and/or diagnostic treatment purposes, and generally involve a length of stay less

than 10 days.  As detailed below, crisis care at ADX has been and remains woefully inadequate.

For example, as recently as February 2013, a chronically and severely mentally ill ADX prisoner

named Percy Barron -- who at the time was being medicated by the BOP for severe depression --

sought emergency psychology services precisely as mandated by BOP policy.  Mr. Barron was

ignored for hours, attempted suicide, was belatedly discovered in the act, and later was issued a

disciplinary incident report for attempting to kill himself when his pleas for assistance were

ignored.

       (b)    <u>Inpatient Level of Care</u>:  The constitution requires that ADX prisoners

suffering from mental illness so severe that it requires inpatient mental health treatment be timely

provided such treatment, either at the ADX or at another suitable facility.  Given the attributes of

ADX, including its physical design and operational priorities, it may well be impossible for the

BOP to provide such treatment within the confines of ADX to prisoners who require it.  Indeed,

the BOP typically provides inpatient care at a BOP medical facility.  In any case,  the

constitution requires that the BOP either provide such treatment at ADX when medically

necessary or ensure that ADX prisoners requiring inpatient mental health care are timely

identified, transferred to a suitable facility and given such care.  As detailed below, many

prisoners remain at ADX despite their obvious need for inpatient mental health care, as

evidenced by horrendous self-mutilation, chronic wailing, wallowing in one's own body waste, and/or a complete loss of communication, orientation as to time and space, and the ability to maintain even basic levels of hygiene and self-control.  One such prisoner, Jonathan Francisco, has not spoken an intelligible word in the 17 months he has been at ADX and frequently exists in a cell completely bare of any property and, at times, lacking even a mattress, caked in his own feces, staring blankly at the wall of his cell.

(c)     <u>Residential Level of Care</u>: The constitution requires that ADX prisoners suffering from mental illness so severe that it requires treatment in residential mental health treatment unit be provided such treatment, either at the ADX or at another suitable facility. Prisoners appropriate for these units generally have had significant difficulty functioning in a general population environment due to symptoms related to their serious mental disorders. Correctional residential mental health programs are designed to provide supportive housing and a psychosocial rehabilitative treatment approach. Successful implementation of a residential treatment level of care will reduce the need for inpatient psychiatric beds and the number of admissions to a crisis bed level of care.

(d)     <u>Outpatient Level of Care</u>:  The constitution requires that ADX prisoners suffering from mental illness that requires outpatient treatment be provided such treatment, either at the ADX or at another suitable facility. Objective community-based standards establish that patients requiring outpatient mental health care have access to, among other things: appropriate ongoing diagnostic and assessment services, to ensure that services and medications are adjusted in accordance with changes in the prisoner's mental health; medically indicated psychotropic medications administered as and when medically appropriate; medically necessary scheduled and

unscheduled confidential mental health counseling; structured and unstructured out of cell recreation opportunities; and constitutionally adequate mental health crisis intervention.  Despite some positive changes in the outpatient mental health care provided to ADX prisoners, services that are fundamental to a constitutionally adequate outpatient level of care remain chronically deficient, in that medically necessary medications are commonly withheld or improperly administered, counseling is frequently delayed or unavailable, and established diagnoses are ignored for "security" reasons, among other things.

15.     In addition, because an accurate diagnosis is essential to the delivery of constitutionally adequate mental health care, and also because of the unique dangers to mental health that are posed by the conditions of confinement at ADX, the Eighth Amendment requires that prisoners designated for confinement at ADX receive a thorough psychological evaluation either before their transfer to ADX or immediately after their arrival there, and that prisoners receive periodic psychological evaluations after their arrival at ADX to identify signs and symptoms of developing or worsening mental illness and facilitate appropriate treatment.  This evaluation process, too, must meet the contemporary community standards utilized by mental health professionals evaluating and diagnosing patients with mental illnesses.

16.     Certain operational procedures and practices at ADX disproportionately and unconstitutionally impact prisoners with serious mental illness ("SMI").  In particular, as detailed below the most common (and for many prisoners the only) way to leave the ADX is to complete a "Step-Down" program in which prisoners work their way through a series of successively lower security levels and thereby have the ability, by maintaining perfect conduct for several years, to earn their way to a placement at a lower security prison (often a maximum security

United States Penitentiary, albeit one offering much more freedom than ADX).  It is unrealistic to expect many chronically and severely mentally ill prisoners to avoid any disciplinary infraction for several years.  Accordingly, many such prisoners are extremely unlikely to complete the Step-Down Program, because the manifestations of their mental illness, even if non-violent, frequently violate some BOP discipline standard.   As a result, chronically and seriously mentally ill prisoners end up in a seemingly endless cycle, doing their best to maintain clear conduct for months or years, then getting returned to the starting line for a transgression. The constitution and other applicable law requires the modification of policies or procedures to provide the severely mentally ill a reasonable opportunity to program their way out of the ADX, lest they be sentenced de facto to life imprisonment there by reason only of their mental illness.

17.     In addition to the foregoing diagnostic and treatment imperatives, given the extreme isolation and sensory deprivation inflicted on prisoners confined at ADX, the constitution requires  the implementation of a preventative mental health program.  To meet this constitutional standard, the BOP must implement primary and secondary efforts to mitigate the effects of confinement in isolation on both prisoners who have or who develop diagnosed serious mental illness and prisoners who do not have a diagnosed serious mental illness but who are exposed to the risk of, or experience, signs and symptoms of mental illness or disturbance associated with confinement in isolation, such as anxiety, memory loss, loss of the ability to concentrate, and situational depression, and chronic insomnia, among others.   A constitutionally adequate program of preventative care includes, among other things enhanced training for correctional staff assigned to segregation units, enhanced training for medical and mental health staff members working in such facilities, modification of operational and physical attributes of

such units to reduce the risk they pose to mental health without impacting security, and educational or other programming for prisoners, to help them understand risks to their mental health arising from confinement in isolation, and address those risks.  In addition, meaningful mental health rounds, by an appropriately trained clinician, should occur on at least a weekly basis for purposes of identifying inmates in need of mental health intervention and to facilitate timely mental health interventions as clinically indicated.

18.    Prevention efforts must also include excluding inmates with serious mental illness from being housed in the ADX if the current conditions of confinement at the ADX are not significantly changed, or, if an "exclusion policy /order" is not implemented, changing the conditions of confinement for ADX prisoners with serious mental illness to include adequate out of cell structured therapeutic activity and adequate out of cell outdoor unstructured recreational time.  Out of cell individual counseling offered in a confidential setting a on a regular basis as clinically indicated should also be available. These prevention interventions will decrease the risk that an inmate with a SMI will have his symptoms of his mental illness exacerbated by the conditions of confinement and should also help to improve his clinical condition.  Upon information and belief these prevention interventions will also increase security at the ADX and decrease both operating costs and the risk of injury to staff and prisoners.

19.    This lawsuit does not seek a declaration that the conditions of confinement at ADX are unconstitutional for all prisoners.  Rather, this lawsuit seeks a court order that will fundamentally and irrevocably reform the provision of mental health care at ADX by:

(a)      requiring the BOP to provide prisoners designated to ADX with the diagnostic services and four levels of mental health care appropriate to the seriousness of their illness, as identified above;

(b)      requiring the BOP to provide all such diagnostic and treatment services either on-site at the ADX or at another facility, and requiring that if the BOP elects to provide some such services outside the ADX, it ensures that all prisoners requiring levels of mental health care that are unavailable at ADX be promptly identified, transferred, and treated;

(c)      requiring the modification of ADX's operating policies to ensure prisoners with severe mental illness have a reasonable opportunity to complete a transitional program and earn a transfer out of ADX despite the periodic manifestation of their mental illness in a manner that violated BOP conduct standards;

(d)      requiring the implementation of constitutionally adequate programming for the prevention of mental illness and mental impairments caused or contributed to by the extremely isolated conditions of confinement imposed on all ADX prisoners; and

(e)      providing for Court-supervised monitoring of compliance with the order for long enough to ensure that operational and programming changes mandated by the Court are sufficiently institutionalized to ensure that the BOP will not, for want of will or oversight, allow conditions to deteriorate and revert to the situation that existed when this case was filed.

### III.  JURISDICTION

20.      This Court's subject matter jurisdiction over the allegations in this Complaint is based on 28 U.S.C. § 1331, in that the claims for injunctive relief arise under the United States Constitution and federal statutes.  The request for declaratory relief is based upon 28 U.S.C.

§ 2201, in that an actual controversy exists between Defendants and each Plaintiff over the denial of services that are guaranteed by the United States Constitution.

## IV.  VENUE

21.    Venue is proper in the District of Colorado under 28 U.S.C. § 1391(b), because a substantial part of the acts or omissions that give rise to Plaintiffs' claims occurred or will occur in the District of Colorado.

## V.  PARTIES

22.    Class Plaintiffs Harold Cunningham, Carlton Dunbar, Jeremy Pinson, John J. Powers, John Narducci, Jr., Ernest Norman Shaifer and Marcellus Washington are currently housed at ADX.  Each Plaintiff suffers from a serious mental illness.  The care that each Class Plaintiff has received and continues to receive at ADX for his mental illness is constitutionally deficient and otherwise fails to satisfy Defendants' legal obligations to Plaintiffs.  Specific facts relating to each Class Plaintiff are set forth in Section VII of this Complaint, below.

23.    Plaintiff CLA operates Colorado's "Protection and Advocacy System," seeking to ensure the safety, well-being, and dignity of people with disabilities in group homes, people with disabilities in jail or prison, people confined in mental health facilities, and elderly people in long-term care.  As detailed in Section IX, below, CLA has a federal statutory mandate to advocate on behalf of people with disabilities, including ADX prisoners with serious mental illness.

24.    Defendant BOP is a federal law enforcement agency subdivision of the United States Department of Justice, and is responsible for the administration of federal prisons, including ADX.  The BOP maintains physical custody of Plaintiffs and class members.  The

BOP is charged with establishing policies and regulations that are safe, humane, and secure for all federal penitentiaries and other prison facilities.

## VI.   GENERAL ALLEGATIONS

### A.   Background and Operation of ADX

25.     At any given time, between 400 and 500 prisoners are housed at ADX in nine different maximum-security housing units, which are divided into six security levels:  the Control Unit (or "Bravo" Unit); the disciplinary Special Housing Unit (also called "Charlie Unit," "Zulu" Unit, the "SHU," or the "Hole"); so-called "Range 13," an ultra secure and isolated four-cell wing of Charlie Unit in which the BOP houses prisoners it thinks require confinement with virtually no human contact; four so-called "General Population" Units ("Delta," "Echo," "Fox," and "Golf" Units), the Special Security Unit (also called the "SAMs" Unit or "Hotel Unit"); and two units ("Joker" Unit and "Kilo" Unit) that in recent years have been used as transitional housing units for prisoners who have entered the so-called "Step-Down Program," in which they can earn their way out of ADX and into a lower security classification. Photographs of the prison's exterior are attached hereto as Exhibit 1.  At some point one side of Joker Unit was converted into an extension of ADX's Special Security Unit for prisoners under Special Administrative Measures ("SAMs").  Accordingly, as of the time of this filing only one side of Joker Unit, comprising 32 cells, houses prisoners in the first stage of the Step-Down Program.  Kilo Unit was recently converted into the SHU, to enable the expansion of the Control Unit to encompass both Bravo Unit and Charlie/Zulu Unit.  As detailed below, the conversion of Kilo Unit into the SHU has dramatically worsened the fate of prisoners housed there, especially those who have serious mental illness.

26.     Depending on which unit they are in, prisoners spend at least 20, and as much as 24, hours per day locked alone in their cells.  The cells measure approximately 12 feet by 7 feet, and have solid walls that prevent prisoners from viewing the interiors of other cells or having direct contact with prisoners in adjacent cells.  All ADX cells have solid doors with a small closable slot.  Cells in all units other than Hotel, Joker, and Kilo Units also have an interior barred wall with a sliding door, which together with the exterior door forms a sally port in each cell.  Each cell is furnished with a concrete bed, desk, and stool, and a stainless steel combination sink and toilet.  Cells in all units other than Hotel, Joker, and Kilo Units include a shower with an automatic shut-off valve.  The beds are usually dressed with a thin mattress and blankets over the concrete.  Each cell contains a single window, approximately 42 inches tall and 4 inches wide, which allows entry of some natural light but which is designed to ensure that prisoners cannot see anything outside of their cells other than the building and sky.  Many cells, except those in the SHU, are equipped with a radio and black and white television that offers religious and educational programming, along with some general interest and recreational programming. Televisions often are withheld from prisoners as punishment.  Meals are delivered three times a day.  With few exceptions, prisoners in most ADX units are allowed out of their cells only for limited social or legal visits, some forms of medical treatment, visits to the "law library" (essentially a cell with a specialized computer terminal that provides access to a limited range of federal legal materials) and a few hours a week of indoor or outdoor recreation.  Otherwise they remain locked in their cells.  Photos of a standard ADX cell are collected in Exhibit 2 hereto.

27.     The Control Unit is the most secure and isolated unit currently in use at ADX. Prisoners in the Control Unit are isolated from the other prisoners at all times, even during

recreation, for extended terms often lasting six years or more.  Their only meaningful contact

with other humans is with ADX staff members.  The compliance of Control Unit prisoners with

institutional rules is assessed monthly; a prisoner is given "credit" for serving a month of his

Control Unit time only if he maintains clear conduct for the entire month.  As detailed below,

Defendants provide no mental health care or psychotropic medication to Control Unit prisoners.

Given their complete lack of access to mental health care, seriously mentally ill prisoners

confined in the Control Unit frequently have behavioral issues caused by their mental illness.

Such conduct often results in the loss of credit for Control Unit time served, thus extending the

prisoner's time in the extreme isolation of the Control Unit, sometimes for years.  For example,

Plaintiff John Powers entered the ADX Control Unit in 2001 with a 60-month sentence, but as a

result of disciplinary incidents (including a number of instances of extreme self-mutilation) was

not released into the ADX General Population until March 2011, after more than 120 months in

the Control Unit.  During that time he received no meaningful mental health care at ADX.

28.     Prisoners confined to the SHU live in similar isolation.  They are continuously

segregated from other prisoners, even during recreation.  Unlike other ADX prisoners, those in

the SHU generally are denied access to televisions and radios, and sometimes are confined with

nothing in their cells but a mattress and minimal clothing (for example, a t-shirt and boxer

shorts).  ADX prisoners are housed in the SHU in several circumstances.  Most ADX prisoners

spend at least a few days in the SHU upon their arrival at the institution.  Others are moved to the

SHU pending investigation of incidents such as fights that occur from time to time elsewhere in

the institution.  Prisoners who receive disciplinary incident reports (or "shots" in the ADX

vernacular), and who, as a result, are sentenced to a term of punitive segregation, serve that time

in the SHU.  Like Control Unit prisoners, many prisoners confined to the SHU are serving a specified term of disciplinary detention, but that time may be extended by further shots.  As in the Control Unit, seriously mentally ill prisoners held in the extreme isolation and sensory deprivation of the SHU frequently receive additional shots.  As a result, many seriously mentally ill prisoners have lived in the ADX SHU for many months, and some have lived there for years.

29.     In the four "General Population" units, prisoners also are isolated from one another, spending at least 22 hours per day alone in their cells.  One or two days a week they are allowed outside recreation time, during which they may able to see and speak with a limited number of other prisoners while all are confined in separate outdoor cages of the kind depicted in Exhibit 3.  A photograph of individual outdoor recreation enclosures of the sort used by Control Unit and SHU inmates is attached as Exhibit 4.  One or two days a week, prisoners in most ADX units also have a few hours of access, one at a time, to individual indoor recreation rooms of the sort depicted in Exhibit 5.

30.     The ADX Step-Down Program is a series of three transitional housing units in which prisoners are afforded direct, although still extremely limited, contact with other prisoners. The step-down units represent a type of halfway house on the path to being allowed to leave ADX for another prison.  Still, prisoners who reside in the step-down units are confined to their cells for all but a few hours a day.  Because of the erratic way that the ADX Step-Down Program operates, the step-down units are particularly dangerous for prisoners with mental illnesses who are trying to "earn" their way to a lower security classification.

31.     Every prisoner intent on earning his way out of ADX is required to pass through Joker Unit, one side of which, comprising 32 cells, houses the first stage in the Step-Down

Program.  Prisoners are eligible for transfer to Joker Unit only after completing an extended period of clear conduct.  Prisoners who avoid trouble in Joker Unit are eligible to move, after a time, to the second phase of step-down, where they have more freedom.  The second phase is housed in "DB Unit" at the Florence USP, which lies directly across the street from ADX.  Prisoners who successfully complete the second step-down phase are eligible to move to the final step-down phase (also housed at Florence USP), which provides even more freedom and a pathway to a transfer to a regular maximum security federal penitentiary.  Successful completion of the Step-Down Program can take years, even if a prisoner behaves perfectly.  But any transgression, however minor, can and often does result in the prisoner's removal from the program, placement back in the ADX SHU, and a restarting of the good-conduct clock.  Many ADX prisoners have made it partway through the Step-Down Program several times, only to be returned to the SHU or general population based on a small, or fabricated, transgression.

32.     For example, as of early 2013, Percy Barron, who currently suffers from a serious mental illness and is therefore a member of the treatment subclass, was assigned to the second phase of the ADX Step-Down Program.  In January 2013, Barron was issued an incident report for a minor rules infraction and returned to the ADX SHU.  There, on February 22, 2013, Barron attempted suicide after waiting for hours for a psychologist to respond to his request for help with acute major depression precipitated by a medical condition and the recent death of his mother.  The suicide attempt  resulted in the issuance of  another disciplinary incident report, this time for  "tattooing or self-mutilation."  Only after plaintiffs' counsel complained to the ADX Warden was that incident report "expunged."  Nevertheless, Barron remains at the ADX, and has

again started trying to accrue the sustained period of "clean conduct" necessary to qualify, again, for the Step-Down Program.

33.     Unlike other ADX cells, the individual cells in the step-down units at ADX have no interior bars.  Accordingly, only one sliding solid steel door separates prisoners from the open day room at the center of the unit.  Joker Unit prisoners are part of a "Recreation Group" of up to seven other prisoners housed on the same tier.  Each Recreation Group is released at once into the day room or outside recreation yard, where they have unrestrained access to one another. Exhibit 6 includes several photographs of Joker and Kilo Units, which in recent years have had a nearly identical configuration, as well as a Kilo Unit cell showing the door and the absence of an internal grill.

34.     For most ADX prisoners, being transferred into Joker Unit is a disorienting and dangerous experience.  After years of isolation, with no direct, unrestrained contact with other human beings, many prisoners experience a fundamental loss of even basic social skills and adaptive behaviors, and predictably find themselves paranoid about the motives and intentions of other prisoners, as well as staff members.  Once placed into unrestrained contact with other, similarly impaired and paranoid men, the stress on prisoners -- even those with no mental illness -- can be extreme.  Assaults and stabbings are common.  In 2005, two ADX prisoners in Kilo Unit slowly beat and stomped a third prisoner to death over a period of many minutes in full view of ADX staff members, who made no effort to intervene until the victim was lying still, either dead or near death, in a pool of blood.  Two serious stabbings occurred in Joker Unit between November 2011 and September 2012.  More recently, on April 4, 2013, plaintiff Carlton Dunbar was attacked in Joker Unit and stabbed in the head by another prisoner even though the

ADX staff was well aware that Dunbar was going to be attacked and knew everything it needed to know to prevent the attack.  The staff took no action and, as a result, Mr. Dunbar was injured, both by the stabbing and by exposure to the feces and blood of the other prisoner, who has Hepatitis C.  In addition, after leaving the unarmed M. Dunbar to defend himself against an armed attacker for almost 15 minutes, the ADX staff finally intervened, and when they did they aggressively pinned Mr. Dunbar to the ground, injuring his calf.  They then applied hand and leg restraints so tightly that Mr. Dunbar lost feeling in his hand and ankles.  Although Dunbar, who has a serious mental illness, survived the attack and is recovering, the recent attack on him, and other attacks on prisoners in Joker and Kilo Units, clearly illustrate the systemic failure of the ADX Step Down Program, particularly for prisoners with serious mental illness.

35.     Recreation Groups are formed, in part, by the need to separate prisoners who are not supposed to be housed together or allowed contact with one another.  For example, members of rival gangs would not be placed in the same Recreation Group.  Similar "separations" can result from past conflicts between particular prisoners, or situations in which one prisoner has testified against another prisoner.

36.     When members of one Joker Unit Recreation Group are out of their cells, the other Recreation Groups in the unit are supposed to be securely locked in their cells.  However, that objective is not always met at ADX.  In addition, because cells in Joker Unit lack an internal barred wall, prisoners housed in Joker Unit who have separations often are separated from their separatees only by a single steel door.

37.     That fact creates extreme danger and stress for Joker Unit prisoners, because ADX staff members frequently open the doors of Joker Unit cells unexpectedly, giving prisoners

direct and potentially lethal access to one another.  For prisoners with personal protection

concerns arising from health problems, age, or past cooperation with law enforcement officials,

the potential that his cell door will open suddenly and unexpectedly turns every moment that

another Recreation Group spends in the Joker Unit day room into a life or death moment.

38.     The dangers of Joker Unit, and in particular the risk of physical confrontation

because of a staff member's "mistake," are widely known to ADX prisoners, increasing the

stress they experience upon entry into the Step-Down Program.  When combined with the

ravages of untreated or inadequately treated mental illness, those stresses make it virtually

impossible for most severely mentally ill prisoners to earn their way out of ADX by completing

the Step-Down Program.  Thus, even in the unlikely event that a severely mentally ill prisoner --

despite inadequate mental health care -- can maintain clear conduct long enough to qualify for

the Step-Down Program, very few can hold themselves together long enough to complete that

program.  Instead, they frequently succumb to the behavior caused by their illness, are removed

from step-down and transferred back to the SHU and then "general population," all the while

being denied the mental health care they need to have any realistic chance to get better, succeed

in conforming their behavior to institutional norms, and qualify for transfer to less secure

prisons.  In part because of this cycle, the number of prisoners at ADX with serious mental

illness has risen steadily in recent years, and will continue doing so until the BOP reforms the

mental health care system at ADX and addresses the patent deficiencies in the ADX Step-Down

Program.

39.     In all units at ADX, Defendants make a determined and calculated effort to

dominate prisoners through the use of punitive techniques that include the use of extended

periods of isolated confinement in the Control Unit or SHU and threats of other punitive measures such as the withholding of privileges (such as access to a television set, access to the in-house "commissary" where prisoners can purchase food and other items, access to the telephone, and prompt delivery of inbound mail).  ADX programs are designed based upon a punishment philosophy rather than a control philosophy.  The behavior of mentally ill prisoners, in particular, deteriorates very rapidly when they are placed into programs designed to punish rather than to control unacceptable behaviors.

40.    Consistent with ADX's punishment-focused correctional model, certain members of the correctional staff at ADX routinely use physical abuse of unruly or merely assertive prisoners to create fear and to demonstrate the dominance of the correctional staff.  The harsh and unforgiving disciplinary philosophy employed at ADX is inappropriate for seriously mentally ill prisoners, particularly those who are not only mentally ill but whose minds also are dulled by confinement in sustained isolation.  For example, certain prisoners are required to stand with their backs to the door and hands on the wall when their meals are delivered.  If a prisoner fails to instantly comply, officers often depart without leaving a food tray.  As a result, psychotic or deeply depressed prisoners, including those whose conditions are exacerbated by Defendants' failure to provide required medications and other mental health care, frequently go without food on the ostensible basis that they defied an officer's order, when in fact the prisoner's only failing was a failure to understand the order or instantaneously clear his mind of fog induced by untreated mental illness and sustained isolation.

41.    Plaintiffs do not dispute the need for security at ADX, and acknowledge that unruly or violent prisoners may sometimes require physical restraint.  But as applied to seriously

mentally ill prisoners, the brutal disciplinary model employed by the staff at ADX is often an instrument of terror and abuse, deployed by staff members, many of whom lack the training and skills necessary to manage mentally ill prisoners safely and effectively, and some of whom provoke and aggravate the very conduct they punish.

**B. Extended Confinement in Isolation Can and Often Does Have a Devastating Effect on Prisoners' Mental Health.**

42.     As early as the 1960s, electroencephalography (EEG) examinations demonstrated the slowing of brain waves of prisoners confined in isolation for longer than a week.

43.     A landmark study in the 1970s showed that subjects in solitary confinement often experienced impaired functioning of the brain waves associated with the ability to control emotions and key cognitive functions.

44.     Similarly, a 2011 study demonstrated that after only a week of solitary confinement, prisoners showed decreased EEG activity, indicative of increased stress, anxiety, and depression.

45.     The BOP has known since at least 1999 that extended periods of confinement in isolation can be psychologically damaging to any prisoner and can be particularly harmful to individuals with pre-existing mental illness.  Specifically, a 1999 study conducted under the auspices of the United States Department of Justice and the National Institute of Corrections concluded:

> Insofar as possible, mentally ill inmates should be excluded from extended control facilities. Each inmate being considered for such a facility should have a mental health evaluation. Although some mentally ill offenders are assaultive and require control measures, much of the regime common to extended control facilities may be unnecessary, and even counterproductive, for this population.

46.     Despite the foregoing, and mountains of anecdotal and empirical data confirming the impact on mental health of extended isolated confinement, the BOP regularly assigns to ADX prisoners who suffer from serious mental illnesses, and fails to maintain an adequate program to diagnose and treat the serious mental illnesses created and exacerbated by the conditions of confinement there.

**C.     The BOP Violates Its Own Written Policies Concerning Evaluating, Housing and Treating Mentally Ill Prisoners at ADX.**

47.     The BOP's written procedures for transferring prisoners to ADX state that prisoners "currently diagnosed as suffering from serious psychiatric illnesses should not be referred for placement at … ADX." BOP Program Statement 5100.08, "Prisoner Security Designation and Custody Clarification," Chapter 7, p.18. This prohibition is widely ignored by Defendants. The BOP regularly assigns prisoners to ADX even though they have well-documented histories of serious mental illnesses, and in many cases, histories showing that their mental illnesses can be controlled with proper treatment.

48.     BOP policies also require that all prisoners are to be given psychiatric screening upon arrival at ADX. For example, BOP policies require the prison staff to "ensure that assessment and treatment planning procedures exist to identify all prisoners entering the institution with either a recent history or current symptoms of significant mental illnesses and/or risk of suicide." BOP Program Statement 5310.13, "Institution Management of Mentally Ill Prisoners," p.4. During the intake screening, prisoners with any of the following must be referred immediately to the Mental Health Program Coordinator for a more thorough assessment:

- Recent history or current symptoms of significant mental illness;

- Signs or symptoms consistent with a possible mental disorder;

- Use of medication for treatment of a mental illness or disorder;

- Documented mental health designation;

- Risk of suicide.

*Id.*; BOP Program Statement 6340.04, "Psychiatric Services," § 9(a).

49.     In reality, incoming prisoners at ADX generally are given only perfunctory interviews that are wholly inadequate as a form of screening or diagnosis.  The mental health "screening" provided by the facility typically consists of a few questions asked in a minute or two, often at a time when the prisoner has just completed a lengthy cross-country trip while tightly chained, and is apprehensive about his arrival at ADX.  Follow-up monitoring and screening is virtually nonexistent.  Even when the BOP does carry out the psychological or psychiatric screening of a new arrival, it often ignores key factors indicating mental illness, such as, for example, the fact that the prisoner was taking medication for a serious mental illness immediately before arriving at ADX.

50.     Even when the BOP correctly identifies  prisoners at ADX who have a serious mental illness, many are not given appropriate treatment, including either counseling or medication.  If a prisoner is referred to the Mental Health Program Coordinator, BOP policies require adherence to the BOP's minimum criteria for follow up assessment and treatment planning.  BOP Program Statement 5310.13, "Institution Management of Mentally Ill Prisoners," p.4.  The Program Coordinator is required to complete a screening report on all referred prisoners, and to forward the prisoner's mental health information to relevant members of the prison staff.  *Id*. at 5.  If the prisoner has extensive treatment needs, the Program Coordinator must schedule additional sessions and establish a treatment plan.  *Id*.  Defendants routinely

ignore these requirements by, among other things, rarely establishing meaningful treatment plans even for prisoners who are chronically and obviously seriously mentally ill, and failing even to establish at ADX a mechanism for delivering elementary mental health services, such as private counseling, which would be a necessary element of any meaningful treatment plan for most of the seriously mentally ill prisoners at ADX.

    51.    Because of the particularly severe conditions of confinement in the ADX Control Unit, federal regulations require the BOP to adhere to an especially detailed set of mental health standards, including:

> The Warden may not refer an inmate for placement in a control unit … [i]f the inmate shows evidence of significant mental disorder or major physical disabilities as documented in a mental health evaluation or a physical examination. 28 C.F.R. §541.41(c)(1).

> *Mental health services.* During the first 30-day period in a control unit, staff shall schedule the control unit prisoner for a psychological evaluation conducted by a psychologist. Additional individual evaluations shall occur every 30 days. The psychologist shall perform and/or supervise needed psychological services. Psychiatric services will be provided when necessary. *Prisoners requiring prescribed psychotropic medication are not ordinarily housed in a control unit.* 28 C.F.R. §541.46(i) (Emphasis added.)

    52.    Defendants regularly violate every major requirement of these regulations. As detailed below, several of the Plaintiffs are currently or have been assigned to the ADX Control Unit in violation of  section 541.41(c)(1). Moreover, it is common for the BOP to place an incoming prisoner with an existing prescription for psychotropic medication in the Control Unit, where the BOP refuses to administer such medication in violation of section 541.46(i). The BOP justifies this in Orwellian fashion:  it discontinues the prisoner's medication, thereby making the now non-medicated prisoner "eligible" for placement in the Control Unit. Then, when this

newly "eligible" prisoner requests medication needed to treat his serious mental illness, he is told that BOP policy prohibits the administration of psychotropic medication to him so he should develop "coping skills" as a substitute for the medication being withheld.  Instructing a prisoner confined in long-term segregation and who has Schizophrenia or Bipolar Illness to self-treat his disease with coping skills is like demanding that a diabetic prisoner learn to "cope" without insulin.  Likewise, the required 30 day "individual evaluations" are in actuality rarely performed on inmates in the Control Unit.

53.     As an example, Raheem Davis is, upon information and belief, an obviously and seriously mentally ill prisoner who currently resides in the ADX Control Unit.  Since at least November 2011, Davis has resided mostly in a cell reserved for the seriously mentally ill prisoners at the ADX Control Unit.  The cell is fitted with, among other things, Plexiglas sheets over the internal barred grill.  Davis was not out of his cell at any point between November 2011 and May 2012 and during that time had no substantive communications whatsoever with any BOP mental health professional.  He is disheveled, unable to maintain personal hygiene, and habitually bangs his shower so loudly that other prisoners have developed ear infections from a combination of the noise and cramming makeshift overused and dirty earplugs into their ears in a vain effort to sleep.  Davis's condition has been repeatedly brought to the attention of the BOP staff by Plaintiffs' counsel and other prisoners.  Although he has been moved within the Control Unit several times in response to these complaints, he remains in the ADX Control Unit, in obvious and severe psychiatric distress, and upon information and belief, without any meaningful form of mental health care.

54. BOP policies require that mentally ill prisoners be monitored on an ongoing basis to assess treatment compliance. BOP Program Statement 5310.13, "Institution Management of Mentally Ill Prisoners," at 5. For certain prisoners, including those receiving psychotropic medication and those segregated for mental health reasons, mental health staff must, at a minimum, conduct a monthly interview to assess the prisoner's treatment strategy. *Id.* As with other applicable policies, ADX staff routinely ignore this written monitoring requirement. Some prisoners never leave their cells or speak with staff for months. Many such prisoners live for extended periods in squalor, in cells caked with their own feces and bodily fluids, without bathing, and in some cases without even getting out of bed. Any meaningful "monitoring" would identify and trigger intervention for such prisoners, but rarely, if ever, does ADX staff seek to remedy the fetid and unsafe living conditions of many of the mentally ill people in their custody.

## D. ADX Houses Seriously Mentally Ill Prisoners Who Are Dangerous to Themselves and Others.

55. Plaintiffs, together with other class members, suffer from various forms of serious mental illness, including Major Depression, Schizophrenia, Bipolar Illness, Schizoaffective Disorder, various personality disorders with significant functional impairments, Post-Traumatic Stress Disorder, severe developmental or other mental disabilities, and other chronic and serious mental conditions. These mental conditions are described and defined more completely in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV").

56. Prisoners with serious mental illnesses are sometimes confined at ADX for months or years without adequate mental health treatment, with predictably devastating results. These conditions exacerbate their mental illness, making them increasingly dangerous to

themselves and others.  Their inadequately treated illnesses often lead to aggressive and violent

behavior which is in turn used by the correctional staff as justification (if not pretext) for further

acts of extreme isolation and violence directed at the prisoner, thereby establishing a vicious

cycle in which anger begets a violent response that begets more anger.

57.     Many of those prisoners housed in the SHU suffer from serious, chronic mental

illness.  Some of them have been housed in the SHU for years.  Some routinely smear

themselves and their cells with their own feces.  Some howl or shriek continuously, or bang their

metal showers at all hours of the day or night.  Some speak to themselves continuously.  One

longtime SHU resident carried on conversations with himself virtually every day, using multiple

voices.  Another, Jonathan Francisco, has not spoken an intelligible word to anyone in the

roughly 18 months since he arrived at the prison arrived at the prison in late 2011.  He spends

most of his time staring blankly at a wall in his cell and is frequently caked with his own feces.

Members of the ADX staff responsible for his care intermittently torment him by yelling at him

and antagonizing him as if he is a reviled animal.

58.     Two Plaintiffs, Messrs. Shaifer and Cunningham, are currently assigned to the

ADX Control Unit despite histories of serious mental illness requiring medication and treatment,

which are being denied to them.  A third plaintiff, Marcellus Washington, spent more than 8

years in the Control Unit before his release to the ADX general population in mid-2012.  Yet

another plaintiff, Jack Powers, spent nearly ten years in the Control Unit before he was moved to

the ADX general population in early 2011.  During his time in the Control Unit, Mr. Powers

slowly descended into madness, horribly mutilating himself as a result of his serious mental

illness, repeatedly ramming his head into a metal door frame, amputating two fingers, a testicle,

and his scrotum, tattooing his entire body with a razor blade and carbon paper dust, trying to inject bacteria into his own brain, and slashing his wrist severely enough that he lost consciousness.  All of this occurred after the BOP itself diagnosed Mr. Powers with a serious mental illness and all of it happened while he was being "monitored" by Defendants and their agents.  Although he was referred for treatment three times at a BOP medical facility while confined in the Control Unit, and received prescribed medication for his serious mental illness during two of those visits, each time he was returned to ADX his treatment ceased, and his symptoms and mutilations escalated.

59.     Seriously mentally ill prisoners also are housed throughout ADX's General Population Units, and inhabit most of the 12 housing ranges that comprise those units.  Such prisoners range from recluses who literally have not left their cells in months or years, to more boisterous prisoners who bang on their cell bars, or their showers, day and night, talk to themselves, wail and scream, and otherwise express their indeterminate suffering to the great disruption and discomfort of other nearby prisoners.

60.     Until recently the prison's "General Population" Units currently was home to at least two prisoners who are so chronically mentally ill that the Department of Justice itself has repeatedly gone to court to have each of them involuntarily committed or forcibly medicated.  Both have been diagnosed by the BOP as suffering from Schizophrenia, both have repeatedly been treated by the BOP for that illness and both exhibit chronic and obvious psychosis.  And yet both were longtime residents of ADX and, upon information and belief, during their time at ADX received no meaningful mental health care whatsoever.

61.     The first of these prisoners, Ken Kenyatta Wilson, is 41 years old.  He initially

was transferred to ADX at some point before 2002.  The BOP has diagnosed him on multiple

occasions as suffering from Schizophrenia, Paranoid Type, Psychotic Disorder Not Otherwise

Specified ("NOS") and/or Antisocial Personality Disorder.  In 2002, Wilson was transferred

from ADX to the U.S. Medical Center for Federal Prisoners in Springfield, Missouri

("Springfield MCFP"), where a BOP psychologist diagnosed him with Schizophrenia, Paranoid

Type and noted that "[h]e endorses bizarre delusional beliefs" and suffered from auditory

hallucinations.  Although suffering from these illnesses, the inmate refused psychiatric treatment.

In 2003, pursuant to 18 U.S.C. § 4245, the BOP involuntarily committed this inmate for

treatment.  In 2004, the BOP involuntarily medicated him with anti-psychotic medication.

Thereafter, a BOP clinician inexplicably determined that the prisoner was feigning mental illness

despite his significant, documented psychiatric history and the prior involuntary commitment

initiated by the very same federal agency that now decided he was pretending to be mentally ill.

He was eventually transferred back to ADX.  The following year in 2005, the BOP again

reversed course, transferring the prisoner back to MCFP Springfield, where he was again

involuntarily medicated after a BOP psychiatrist noted that "[p]sychotropic medication is the

treatment of choice for [his] mental illness."  In 2006, he was returned to ADX, where, upon

information and belief, he has remained since.  At the time this action was originally filed,

Wilson remained at ADX, was scheduled for release in October 2012, and had received no

meaningful mental health care for more than six years.  In the fall of 2012, approximately three

months after this lawsuit was filed, the BOP moved Wilson to another facility.  As of the date of

this filing he remains in BOP custody but currently is housed at the Federal Medical Center in Butner, North Carolina ("Butner FMC").

62.     The second such prisoner, Victor Alvarez, is 47 years old and has been diagnosed by the BOP as suffering from Paranoid Schizophrenia and Antisocial Personality Disorder. The BOP sought to have him involuntarily committed on three separate occasions between 1998 and 2007. The first involuntary commitment petition, filed in 1998, resulted in a psychiatric evaluation noting "[w]hile awaiting a decision from the court, [the prisoner's] condition worsened . . . . [and] escalated to the point that he was difficult to manage." In 2001, the BOP filed a second involuntary commitment petition, arguing that "there is reasonable cause to believe that [the prisoner] is presently suffering from a mental disease or defect (paranoid Schizophrenia and Antisocial personality disorder), for which he requires care and treatment in a suitable facility." At a hearing on the 2001 petition, the prisoner opposed commitment, arguing that he could adequately cope in the general prison population and involuntary commitment was not warranted. Nonetheless, at the BOP's urging, the court found that the prisoner "suffers from a mental disease or defect, and is in need of care and treatment in a suitable facility" and granted the BOP's petition. Most recently, in 2007, the BOP filed another petition regarding Mr. Alvarez, to which he again objected. The court again granted the requested relief, involuntarily committing Mr. Alvarez for a third time for mental health care and treatment. Following that treatment he again was returned to ADX, and his mental health care was again discontinued. At one point during his incarceration at ADX, Alvarez clawed an open wound on the side of his head in an effort to remove a chip he believed was implanted in his brain. He is habitually

disheveled, delusional and in obvious psychiatric distress.  And yet he continues today to reside at ADX.  Upon information and belief, he currently is receiving no psychiatric care whatsoever.

63.     Upon information and belief, certain ADX staff members use mentally ill prisoners as weapons against other, particularly disfavored prisoners.  For example, prisoners at ADX periodically rotate cells, ostensibly for security reasons.  For most prisoners, a cell rotation means moving into the next cell on the same range.  When a prisoner is "behind" a mentally ill prisoner in the cell rotation pattern, at each cell rotation he may find himself forced to move into a cell that is coated with dried human waste, semen, urine and sometimes blood.  Because many ADX prisoners suffer from contagious blood-borne diseases, such as hepatitis C, exposure in this manner to another prisoner's waste carries with it an immediate and dire risk of infection with a serious and sometimes fatal illness.  Nevertheless, ADX prisoners are routinely forced into waste-caked cells left behind by an obviously mentally ill fellow prisoner. Prisoners who refuse to enter contaminated cells are punished, taken to the SHU and denied privileges.   Anyone who accepts assignment to a filthy cell left behind by a mentally ill prisoner must then clean the cell himself -- often with few if any cleaning supplies -- and then await the next rotation, when the process will be repeated.  Upon information and belief, certain ADX staff members deliberately place disfavored prisoners behind unsanitary mentally ill prisoners in the cell rotation pattern for the intended purpose of exposing the unfortunates to the constant noise and harassment supplied by a mentally ill neighbor and to ensure that after every cell rotation the disfavored prisoner will have to clean another filthy cell.

64.     Likewise, in 2010 a severely and chronically depressed prisoner who had attempted to kill himself a few months earlier was escorted to the ADX SHU after throwing milk

at a corrections officer.  He was placed in a cell from which the BOP had just removed another chronically and notoriously mentally ill prisoner who had smeared the cell's floors, walls, bed and mattress with feces.  The prisoner arriving was given no cleaning supplies, and was not issued a blanket, towel, or sheet.  He used the roll of toilet paper in the cell to try to wipe the feces off of a spot on the bare concrete floor that was large enough to enable him to lie down.  For two days, he remained lying on that single "clean" space.  When he had not been issued cleaning supplies, a towel, sheet or blanket after two days, he covered the Plexiglas wall in his cell with newspapers to block the view from the hallway and then prepared to hang himself with his shoelaces.  Before he succeeded in doing so an "emergency response team," assembled because of the newspaper on his cell windows, forcibly entered the cell, restrained the inmate, and moved him to another cell where he was handcuffed hand and foot to a concrete pedestal for another day, during which he was unable to reach the food left for him on the desk in the cell.

65.     The BOP maintains separate facilities in other locations for dealing with prisoners who are severely mentally ill, including Springfield MCFP, Butner FMC, the Federal Medical Center in Rochester, Minnesota ("Rochester FMC"), and the Federal Medical Center in Devens, Massachusetts ("Devens FMC").  Springfield MCFP is an administrative facility that provides medical, mental health, and dental services to male offenders of all security levels, including prisoners classified for confinement at ADX.  Butner FMC is an administrative facility that houses male prisoners of all security levels, including prisoners classified for confinement at ADX.  Rochester FMC and Devens FMC are administrative facilities providing specialized medical and mental health services to male offenders.

66.     Plaintiffs and all other ADX prisoners with serious mental illnesses could be safely and securely housed at Springfield MCFP or Butner FMC for treatment of their mental illnesses.  In fact, many of Plaintiffs and a large number of other ADX prisoners have been hospitalized at Springfield MCFP and/or Butner FMC while designated for confinement at ADX.  Upon information and belief, certain ADX prisoners could safely and securely be housed at Rochester FMC and/or Devens FMC for treatment of their mental illnesses.

E.     **Mental Health Care Treatment at ADX is Woefully and Constitutionally Inadequate.**

67.     The BOP does not provide adequate mental health staffing at ADX.  At the time this action was filed, only two mental health professionals -- both psychologists -- were responsible for the mental health of the approximately 450 prisoners housed at ADX, many of whom have serious chronic mental illnesses or other mental health issues, and many others of whom experience periodic acute mental health crises.  As of June 2012 these health care professionals are assisted by a psychiatrist who spent only approximately one day per week at ADX, a period that was grossly inadequate given the substantial number of prisoners at ADX who require psychotropic medications.  Since this action was filed, and upon information and belief, because this action was filed, the BOP has increased from two to four the number of full time psychologists serving prisoners at ADX, and has also added to the ADX mental health staff a part time psychiatric nurse and a psychology technician.

68.     The FCC Florence psychiatrist who served ADX prisoners in June 2012 has since resigned, and has not been replaced.  Instead, prisoners rely on "telepsychiatry" services provided by videoconference.  During their habitually short (15 minutes) telepsychiatry sessions, prisoners remain chained hand and foot and are surrounded by corrections officers wielding

batons.  Under such circumstances, few prisoners are able to communicate effectively with the telepsychiatrist, and almost none receive effective psychiatry help.

69.     Even though BOP has taken some steps to address the gross mental health staffing shortage that existed when this action was filed, the mental health staff remains grossly inadequate to serve the needs of the large number of ADX prisoners who require mental health services to address chronic serious mental illness, acute mental health crises, and the damaging long-term impact that confinement in isolation has even on relatively healthy minds.   As a result of inadequate staffing by mental health professionals, ADX prisoners, including Plaintiffs and class members, do not have timely access to mental health professionals, particularly in times of crisis.  This leads to prisoners becoming involved in escalating conflicts and violence that would be avoided if adequate mental health staffing were provided at the facility.  The consequences of inadequate mental health staffing include a risk of physical harm to Plaintiffs, class members, and other prisoners, and a risk of harm to staff.

70.     The BOP provides psychotropic medication to some, but not all, of the seriously mentally ill prisoners housed at ADX.  Furthermore, although the efficacy of many psychotropic drugs may be affected by the time of administration and by such considerations as proximity of the administration to a meal, ADX staff distributes medications on an irregular schedule that is often inconsistent with the instructions for consumption of the medication.  Staff members responsible for distributing medications also frequently make mistakes by distributing the incorrect medication to prisoners, or incorrect dosages of the correct medication.  The haphazard and sometimes reckless distribution of medications substantially interferes with the benefits the

medications provide to those ADX prisoners lucky enough to be authorized to receive needed psychotropic medications.

71.     Many prisoners at ADX receive their psychotropic medication through a "pill line" procedure in which the medication is crushed and given to them at their cell door in a cup. Many of the seriously mentally ill prisoners at ADX are severely paranoid as a result of their illness, and generally believe that the staff providing medication is either providing the wrong medication or, in some cases, affirmatively attempting to poison them.  In such circumstances, prisoners sometimes ask to receive whole pills that they can recognize (based on extended histories of taking the same medication), or for staff to show them the pills they are being given before grinding them up.  Staff members routinely refuse these requests, leaving severely mentally ill and in some cases psychotic prisoners to choose between declining needed medication or consuming a substance they genuinely (even if erroneously) believe will harm or kill them.

72.     ADX provides inadequate mental health counseling to prisoners.  Rather, most of the "psychology programming" consists of distributing to prisoners books with such titles as "Anger Management for Dummies," " Choose Forgiveness - Your Journey to Freedom," and "Why Zebras Don't Get Ulcers."  Staff award certificates to prisoners diligent and literate enough to self-treat their serious mental illnesses by completing elementary workbooks. Illiterate prisoners have no meaningful access to the negligible therapeutic information distributed by ADX in written form.

73.     Some repetitive and elementary psychology programming is also available to the segment of the ADX prisoner population with access to a television.  The information provided

in this manner is of little if any use to severely mentally ill or psychotic inmates.  Moreover, many of ADX's most chronically and devastatingly mentally ill prisoners are housed for months or years in the SHU, where prisoners are denied access to all television programming, including even the meager televised mental health programming provided to other prisoners.

74.     Members of ADX mental health staff occasionally talk to prisoners.  As of the time this lawsuit was filed, those occasional "counseling" sessions were almost invariably conducted through the bars of the prisoner's cell, in the immediate presence of a correctional offer and within earshot of other prisoners housed on the same range.  That process turned psychological counseling into a farce.  Few people, in or out of prison, are comfortable discussing intensely personal matters in a highly public environment that renders them subject to ridicule, discrimination or even violence.  The same is true for ADX prisoners, who before this lawsuit was filed were forced by ADX's approach to mental health "counseling" to choose between forgoing that counseling or exposing themselves to violent assault or death based on events or concerns that they would discuss with a mental health professional and are forced to discuss within easy earshot of other prisoners.  Since this lawsuit was filed, the BOP has established a private space in most if not all of ADX's housing units that is suitable for safe, secure and private psychology counseling sessions.  However, because of the large population at ADX with serious mental illness and the small number of staff members and counseling facilities, "talk therapy" at ADX remains grossly inadequate.

75.     Suicide and mental health crisis services at ADX also are systematically deficient.  Mentally ill prisoners threatening suicide are often goaded by ADX staff members to kill themselves.  Prisoners who take steps to slash their wrists or hang themselves generally receive

only minimal medical treatment for acute injuries.  And instead of receiving mental health

intervention, they are punished:  they receive a disciplinary incident report that sometimes results

in a trip to the SHU and loss of privileges.  In 2012 an ADX prisoner attempted to hang himself

in a recreation enclosure in the SHU was violently removed from the enclosure by a team of

correctional officers in riot gear.  Incredibly, an ADX psychologist participated in the violent

extraction.  After a short stay in a "strip cell," a nearly empty cell in which the prisoner is clothed

what is essentially a paper robe, he was returned to the disciplinary segregation cell that

precipitated his despair and suicide attempt only days earlier.

76.     Similarly, in February 2013, nine months after this lawsuit was filed and thus

after the BOP was sued for wrongfully disciplining suicidal prisoners, Percy Barron received a

disciplinary incident report for trying to kill himself.

77.     Upon information and belief, the BOP provides grossly inadequate training to the

staff at ADX, including in particular the corrections staff, regarding mental illnesses and the safe

and humane management of mentally ill prisoners.  As a result, staff members routinely resort to

unnecessary violence and disciplinary actions when an inadequately treated mentally ill prisoner

acts out.  Thus, mentally ill prisoners, including those in the throes of a psychotic episode,

frequently are subjected to barbaric treatment more suited to the dungeons of medieval Europe

than to a modern American prison.  For example, mentally ill prisoners are routinely "four

pointed" -- chained by the wrists and ankles in either a prone or supine position on top of a

concrete platform -- often for extended periods.  A photograph of an ADX cell with a concrete

platform bed fitted with rings for four-pointing is attached as Exhibit 7.  While chained, mentally

ill prisoners sometimes are left to urinate and defecate on themselves, and sometimes are denied basic nutrition.

78.      In some cases, ADX staff turn the simple (although cruel and unconstitutional) refusal to feed a prisoner into a deceptive hoax.  ADX prisoners, including those in four point restraints, sometimes are put on a disciplinary "sack lunch" nutrition program in which they are fed not standard prison trays but a paper bag containing a sandwich or two and a piece of fruit. Many mentally ill prisoners at ADX who are placed on sack lunch restriction have received their sack (suitably videotaped) being delivered to their cells.  But when they open the bags (off camera) they sometimes are empty.  Through this ruse ADX staff produce false video evidence of feeding, raise (if only for a minute) the prisoner's hope for basic nutrition, then smash the often-chained and always hungry prisoner's hopes with a bag of air.  Severely mentally ill prisoners at ADX often live near the edge of their emotional endurance, and the empty sack lunch is one of many cruel ploys that, upon information and belief, are used by certain ADX staff members to torture and provoke such prisoners into outbursts that then are used to justify even harsher discipline.

79.      Upon information and belief, as a result of this lawsuit, in early 2013 ADX for the first time included in its annual staff training program a module relating to mental illness.  That training may be a suitable first step, though Plaintiffs have not been provided with information concerning the module.  Even after receiving the training some ADX staff members continue to neglect, abuse and torment prisoners with serious mental illness in many if not all of the respects identified in this complaint.

80.     As a result of this type of abuse, other prisoners in nearby cells and ranges are often subject to the shrieking and suffering of prisoners undergoing such abuse.  Upon information and belief, such abuses are caused and/or exacerbated by inadequate staff treatment and a general failure of supervision.

81.     Upon information and belief, the BOP requires or encourages members of the mental health staff at ADX to perform correctional functions.  In fact, BOP policy requires psychologists to serve as corrections officers first, and only secondarily as healthcare providers.  In this respect psychologists are distinguished in a critical way from chaplains and physicians, who are exempt under BOP policy from performing correctional functions.  As a result of this BOP policy, and upon information and belief, ADX psychologists have:  performed prisoner escort duty within the prison while armed with weapons, openly brandishing those weapons in the presence of prisoners; worked shifts in the prison's gun towers; appeared at the doorways of prisoners brandishing clubs in an aggressive fashion; and participated in violent acts toward prisoners, including on at least one instance, participating in a violent cell extraction.  The performance of correctional functions by mental health professionals in the presence of or with the knowledge of prisoners blurs the line between the mental health profession and the correctional profession, and destroys whatever trust might otherwise develop among prisoners and the mental health professionals who are their only source of treatment for their mental illnesses.  In the absence of some measure of trust, no mental health clinician can effectively treat a prisoner's mental illness.

82.     As described above and, with respect to Plaintiffs and Interested Individuals below, Defendants' failure to diagnose and treat serious mental illness has devastating

consequences.  With utter disdain for human dignity and decency and disregard for the requirements of the Eighth Amendment, Defendants repeatedly have violated the constitutional rights of Plaintiffs, Interested Individuals, the class, and the subclass.

**F.   Defendants Have Displayed Sustained Deliberate Indifference to the Plight and Needs of Mentally Ill Prisoners at ADX.**

83.   Defendants are, and have been for years, on actual notice of the unmet mental health needs at ADX, but have demonstrated sustained and deliberate indifference to those needs.  Defendants' actual knowledge of the unmet mental health needs of ADX prisoners has come from a variety of sources, including without limitation medical records of Plaintiffs and other prisoners, direct observation of Plaintiffs and other obviously mentally ill prisoners, administrative remedy requests filed by Plaintiffs and other prisoners, past litigation challenging the ADX mental health system, and suicides of mentally ill prisoners.

**(1)   The illnesses of Plaintiffs and their peers are obvious.**

84.   As described in this Complaint, many of the seriously mentally ill prisoners at ADX do not and cannot hide their conditions.  They scream, howl, mutilate themselves, smear their waste, and beg for help.  Many have long, documented histories of serious mental illness.  Many have filed dozens of written requests for mental health intervention, to little or no avail.

**(2)   At least fourteen separate pro se lawsuits filed by ADX prisoners in the past nine years have put Defendants on notice of the catastrophic deficiencies in the ADX mental health care system.**

85.   Since 2003, prisoners at ADX have filed at least fourteen separate lawsuits against various BOP officials that sought, in whole or part, treatment for serious mental illnesses.  For example, current ADX prisoner Dawane Mallett has alleged in at least four separate lawsuits that he is mentally ill and that mentally ill prisoners housed at ADX are deprived of proper

treatment.  *See Mallett v. Davis*, No. 11-01567 (D. Colo. 2011) (dismissed for lack of prosecution); *Mallett v. Davis*, No. 10-00085 (D. Colo. 2010) (two claims were dismissed as repetitive of 09-03013, and the remaining claim was dismissed as an improper claim under § 2241 and for lack of standing); *Mallett v. Davis*, No. 09-03013 (D. Colo. 2009) (dismissed for failure to exhaust BOP administrative-remedy procedure); *Mallett v. Davis*, No. 09-01823 (D. Colo. 2009) (dismissed for failure to cure deficiencies, in particular to submit a Prisoner's Motion and Affidavit for Leave to Proceed Pursuant to 28 U.S.C. § 1915).

86.     Former ADX prisoner Peter Georgacarakos filed three separate lawsuits raising similar issues, including a claim that ADX's Control Unit conditions violate the Eighth Amendment because the facility houses prisoners without regard for their psychological health. *See Georgacarakos v. Wiley*, No. 05-02207 (D. Colo. 2005) (dismissed for failure to pay filing fee); *Georgacarakos v. Watts, et al.*, No. 09-01648 (D. Colo. 2009) (dismissed for failure to file an amended pleading on the Court's Prisoner Complaint form); *see also Georgacarakos v. Wiley, et al.*, No. 07-01712 (D. Colo. 2007) (claiming that ADX prisoners in isolation are denied the prescription and administration of psychotropic drugs, and that isolation causes such mental illness).

87.     In *Thirkield v. No Defendants Named*, No. 10-02193 (D. Colo. 2010), ADX prisoner DeAndre Thirkield's allegations included apparent delusions that he is being subjected to psychological torture of the brain by electronic sources.  Upon information and belief, Mr. Thirkield is actively and chronically psychotic and his medical condition is or should be obvious to anyone who spends more than a few minutes with him.

88.     Likewise, in *Baxter v. Manspeaker, et al.*, No. 10-01086 (D. Colo. 2010), ADX prisoner David Baxter (whose legal name is Richie Hill) noted several times that he is mentally ill.  He also alleged that he was refused a mental health evaluation and repeatedly attempted suicide and self-mutilated.  Like Mr. Thirkield, Mr. Baxter is, upon information and belief, severely mentally ill.  He resided in the ADX SHU for years, and has engaged in horrific self-harm, including slashing himself with sharp objects, swallowing razor blades and sharp pieces of metal, and carving a large circular design covering most of the left side of his face, apparently using a staple or other sharp object to gouge out pieces of skin.  The BOP moved Mr. Hill to Springfield MCFP in late 2012 where for the first time in years he is receiving some mental health care.  Whether he will remain at Springfield MCFP or be returned to ADX (like Messers. Wilson and Alvarez, among others) remains to be seen.

89.     Current ADX Control Unit resident Raheem Davis filed at least three lawsuits pleading for help with his untreated serious mental illness.  *See Davis v. Warden Daniel, et al.*, 10-cv-00395 (D. Colo., filed Feb. 23, 2010); *Davis v. United States of America*, 11-cv-00429 (D. Colo., filed Feb. 17, 2011); and *Davis v. No Defendant Named*, 11-cv-02249-LTB (D. Colo., filed Sept. 21, 2011).  Upon information and belief, Mr. Davis is obviously psychotic.  He has been housed in the ADX Control Unit for several years.  Although BOP policies mandate that Control Unit prisoners meet monthly with a team of institution staff personnel, including a member of the psychology department, upon information and belief, between October 2011 and May 2012 Mr. Davis never left his cell.  During that time he did, however, rant, rave, bang on his cell walls, and generally live in squalor.

90.     Current ADX prisoner Mikeal Stine sued a member of the ADX staff in 2009 for, among other things, denying him mental health treatment.  *See Stine v. Blanke,* 09-cv-01527 (D. Colo., filed June 30, 2009).

91.     In 2003, current ADX Control Unit Resident and Plaintiff Ernest Shaifer sued the BOP and a number of its employees, including members of the medical staff at ADX, for failing to treat his Bipolar Illness.  *See Brown v. Federal Bureau of Prisons,* 03-ES-1648 (D. Colo., filed October 17, 2003).  On July 20, 2005, the complaint was dismissed for failure to exhaust administrative remedies.  As alleged below, Mr. Shaifer has since exhausted his administrative remedies several times, and yet he still sits in the ADX Control Unit waiting to receive the medication necessary to treat his serious mental illness.

92.     Even though the foregoing fourteen lawsuits and, upon information and belief, a number of others, alleged persistent deficiencies in the ADX mental health system, no meaningful changes have been made to that system.  Instead, each time the BOP was sued, it merely set out only to defeat the prisoners' legal claims, generally on procedural grounds.  The BOP failed to address and remedy the substantive issues raised by the lawsuits or to respond to the cries for help from its population of mentally ill charges, whose conditions continued to deteriorate as the BOP focused on ways to dismiss their complaints.

> **(3)     A series of suicides by mentally ill prisoners have demonstrated in tragic and permanent terms the deficiencies in the ADX mental health system.**

93.     Since ADX opened in 1994, at least six ADX prisoners have committed suicide there:

       (a)     On June 17, 1999, Kevin Wilson hanged himself in his cell with a bedsheet;

       (b)     On December 9, 1999, Gregory Britt hanged himself in a recreation cage;

       (c)     On November 18, 2002, Lawrence Klaker hanged himself in his cell with shoelaces;

       (d)     On April 17, 2006, Lance Vanderstappen hanged himself in his cell with a bedsheet;

       (e)     On May 27, 2008, John Frierson hanged himself in his cell with a braided bedsheet; and

       (f)     On May 1, 2010, Jose Martin Vega hanged himself in his cell with a bedsheet.

94.     Upon information and belief, most if not all of these prisoners were suffering from a mental illness at the time they took their own lives.

95.     The death of Mr. Vega is perhaps the best illustration, among these suicides, of Defendants' utter and persistent failure to address the proliferation of serious mental illness at ADX.  As described below, ADX's mental health system failed to screen, monitor, or treat Mr. Vega's mental illnesses, first diagnosed by the BOP in 2004.  Instead, Defendants placed Mr. Vega in ADX's Control Unit, deprived him of necessary psychiatric medications, and otherwise abused and tortured him over a period of years.  These actions had devastating consequences.

96.     In 1995, at the age of 20, Mr. Vega was sentenced to life in prison and committed to the custody of the BOP.  Mr. Vega was confined at two facilities before he was transferred to

ADX.

97.     Upon his arrival at ADX on April 5, 2004, Mr. Vega was placed in the Control

Unit.  Although the details of Mr. Vega's health care screening upon his arrival at ADX are

presently unknown, the screening, such that it was, apparently failed to reveal that he had a

serious mental illness.  However, upon information and belief, in December 2004, approximately

eight months after Mr. Vega arrived at ADX, BOP psychologist Marie Bailey diagnosed

Mr. Vega with Paranoid Schizophrenia.

98.     In March 2005, Mr. Vega was referred to MCFP Springfield for a mental health

evaluation, which revealed that Mr. Vega had "a history of depression and antisocial personality

disorder."  Mr. Vega remained at MCFP Springfield for approximately one year.  Upon

information and belief, the BOP only allows prisoners with Mr. Vega's security classification to

remain at MCFP Springfield for as long as a year of mental health treatment only in cases of

severe mental illness.

99.     In 2006, the BOP transferred Mr. Vega back to ADX, in violation of the BOP's

written procedures which clearly state that "prisoners currently diagnosed as suffering from

serious psychiatric illnesses should not be referred for placement at … ADX."  BOP Program

Statement 5100.08, "Prisoner Security Designation and Custody Clarification," Chapter 7, p.18.

100.     Upon information and belief, Defendants did not send Mr. Vega to the Mental

Health Program Coordinator for a thorough assessment of his mental health, as required under

BOP regulations.  BOP Program Statement 6340.04, "Psychiatric Services," § 9(a).  Such a

review would have shown that Mr. Vega needed mental health treatment.

101.    Instead, upon Mr. Vega's return to ADX, Defendants placed Mr. Vega back in the Control Unit, and prevented him from receiving medication or other treatment for his serious mental illness.

102.    Upon information and belief, ADX staff members repeatedly chained Mr. Vega unnecessarily, sometimes for periods of ten days or more, to control behavior provoked by Mr. Vega's untreated mental illness.

103.    Upon information and belief, Mr. Vega told other prisoners that he believed the ADX correctional officers were poisoning his food and spraying things into his vents.  Upon information and belief, certain ADX correctional officers frequently taunted and provoked Mr. Vega, and then punished him when he responded.

104.    On May 1, 2010, Mr. Vega was found dead in his cell in the Control Unit at ADX.  The coroner's report summarizing Mr. Vega's autopsy reports that Mr. Vega died as a result of hanging.  It also states that information received from the ADX health administrator indicated that Mr. Vega "had a long psychiatric history."

105.    Upon information and belief, ADX staff failed to prevent the abuse of Mr. Vega by certain ADX staff members, failed to ensure that Mr. Vega was adequate fed and safely housed, failed to implement adequate suicide prevention programs at ADX, and otherwise failed to address Mr. Vega's serious, chronic and growing mental illness.  As a result, Mr. Vega's mental deterioration continued, and ultimately resulted in his death.

106.    As illustrated by facts set forth in this Complaint, and others to be proven at trial, Defendants have long been aware of the systematic failures in the ADX mental health system,

but have done little or nothing to correct those failures.  Defendants have shown deliberate indifference to the needs of ADX prisoners who have serious mental illnesses.

**G.   Defendants Have Retaliated Against and Interfered With Plaintiffs and Other ADX Prisoners Who Have Tried to Assert Their Constitutional and Other Legal Rights to Mental Health Treatment.**

107.   Counsel for Plaintiffs began communicating with ADX prisoners in the summer of 2011.  After ADX prisoners began meeting with counsel, ADX staff began a campaign of interference and retaliation against those prisoners.

108.   The interference and retaliation has included a range of behaviors, including procedural and legal improprieties, verbal abuse, actual physical harm, and overt threats of future retaliation.  ADX staff members have directed these improper actions not only against Plaintiffs, but also against the dozens of other prisoners at ADX who regularly communicate with counsel about the subject matter of this lawsuit, conditions at ADX, and the BOP's treatment of mentally ill prisoners at ADX.

109.   Upon information and belief, the actions by certain ADX staff members are designed to obstruct the access of Plaintiffs and class members to a judicial forum for the resolution of the constitutional claims asserted in this case by discouraging prisoners from talking with counsel, intimidating prisoners into withdrawing from participation in this lawsuit, and retaliating against prisoners for their efforts to work with counsel to improve mental health care conditions at ADX through this lawsuit.

**(1)   ADX staff members have interfered with legal mail and confiscated attorney-client privileged materials.**

110.   Pursuant to BOP regulations, legal mail is special mail that must only be opened in the presence of prisoners.  *See* Program Statement 5265.14 (April 5, 2011) § 540.18(a).

- 51 -

Additionally, prisoners have a constitutional right to counsel and confidential communications with their attorneys, and the United States Supreme Court has repeatedly recognized and upheld the importance of the attorney-client privilege.  *See, e.g.,* U.S. Const. Art. VI; *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); *Trammel v. United States*, 445 U.S. 40, 51 (1980); *Fisher v. United States*, 425 U.S. 391, 403 (1976).  This attorney-client privilege is equally important and guaranteed between prisoners and their attorneys.  *See, e.g., Gomez v. Vernon,* 255 F.3d 1118, 1135 (9th Cir. 2001), *cert. denied*, 70 U.S.L.W. 3291 (December 10, 2001) (affirming monetary sanctions imposed on assistant attorneys general who acquired and read privileged communications from prisoners' attorneys).

111.    Since the investigation for this lawsuit began, ADX staff members have routinely opened legal mail outside the presence of prisoners, in violation of BOP policies and the attorney-client privilege.  By opening the legal mail outside the presence of prisoners and in violation of BOP procedures, ADX staff members improperly gain access to privileged attorney-client communications regarding this lawsuit and other matters that are confidential.

112.    Upon information and belief, by opening the legal mail outside the presence of prisoners, ADX staff also intends to send a "message" to the prisoners:  ADX staff members know the nature of the confidential communications and will actively interfere with the prisoner's rights.  At the same time, ADX staff conveys the message that, even in this constitutionally protected area, prisoners shall be denied privacy and confidentiality.

113.    ADX staff members also have confiscated the legal mail of prisoners who have corresponded with counsel, in an attempt to interfere with the prisoners' ability to share information with counsel and assist in the investigation and development of this lawsuit.

114.    When searching prisoners' cells for proscribed items, ADX staff members have purposely "lost" or destroyed legal mail and legal documents, rendering it impossible for the prisoners to replace certain documents.

115.    Confiscated letters have included sealed envelopes addressed to counsel and properly labeled as legal mail.  In one instance, a senior corrections official and an SIS staff member searched a the cell of a mentally ill prisoner, opened properly labeled legal mail he was prepared to send out, and confiscated over 100 written requests ("Cop-Outs") that the prisoner had written to the psychology department, together with extensive notes the prisoner had made on staff misconduct. The confiscated records are not contraband and were properly included in the prisoner's legal materials.  In another instance, ADX staff opened a prisoner's sealed legal mail to Plaintiffs' counsel, which contained, among other things, medical records reflecting the prisoner's medical treatment following a suicide attempt, which the prisoner had properly received from ADX staff a few days earlier.  ADX staff confiscated some of the medical records, including in particular records containing information that will be embarrassing to the BOP when it surfaces in this lawsuit.  The records were not contraband and were confiscated without any legal cause or justification.

116.    Other prisoners have had their correspondence and legal materials confiscated after communicating with counsel.  One ADX staff member told a prisoner that the prisoner would never get his documents back and that this "was just the beginning."

117.    Certain ADX staff members also have confiscated the pens, paper, envelopes, and stamps of some prisoners to prevent them from documenting abuses and corresponding with counsel.

118.   Moreover, certain ADX staff members purposefully delay or refuse entirely to pick up and process prisoner legal mail, hindering or preventing prisoner correspondence with counsel.

119.   Other legal mail, after being picked up for processing by ADX staff, has been improperly opened and then returned, unsent, to the prisoner.

> **(2)   ADX staff have interfered with the attorney-client relationship and retaliated against prisoners by threatening, antagonizing, and punishing prisoners who communicate with counsel.**

120.   ADX staff members have threatened prisoners who communicate with counsel.

121.   After meeting or corresponding with counsel, prisoners have been told by ADX staff that the prisoner's efforts would make things harder on the prisoner and that the BOP will never change ADX.

122.   An ADX staff member told a prisoner that, unless he stops communicating with counsel, he will be relocated to cells near other prisoners so as to compromise protective custody order measures.  As an ADX staff member told one prisoner, "You make it hard, we make it hard."

123.   An ADX staff member told a prisoner who is in communication with Plaintiffs' counsel, "If you don't drop this lawsuit they will fuck you over, trust me on this."

124.   ADX staff members have threatened prisoners in communication with counsel with a suspension of their privileges or write-ups for minor or nonexistent violations of rules. ADX staff has threatened, and followed up on threats, to send prisoners to the SHU in such instances.

125.    Prisoners who have been moved to the SHU under these circumstances have returned to the regular cells to find that their legal mail and personal property have been confiscated.

126.    ADX staff members have told prisoners that, if they continued to be involved with this investigation, they would be sent to SHU again and their property would again be "lost."

127.    ADX staff purposefully antagonizes prisoners by calling prisoners by abusive and insulting names, including racial slurs and vulgar terms.  By antagonizing prisoners, ADX staff members induce prisoners into behavior that then nominally provides a basis for punishing the prisoners by placement in the SHU or by suspending privileges.

128.    When one prisoner complained to an ADX staff member that the staff was taking actions that would get him killed, the staff member replied that the prisoner "should have considered that before inviting all those lawyers up here."

129.    ADX staff members have accused prisoners involved in this lawsuit of being "instigator[s]" and of "rocking the boat."

130.    Upon information and belief, ADX staff members have attempted to dissuade prisoners from communicating with counsel by spreading false rumors that undersigned counsel is working with the government in an attempt to gain incriminating information about various prisoners.

## VII.   ALLEGATIONS RELATING SPECIFICALLY TO PLAINTIFFS

131.    Plaintiffs are currently incarcerated at ADX and each suffers from a serious mental illness.  Several also suffer from severe functional impairments connected to their mental illnesses, which severely limits their ability to attend to their personal needs.  ADX's failure to

implement adequate programs of mental health screening and treatment has violated their constitutional rights, exacerbated their serious mental illnesses, and subjected them to harm and injury, and serious risk of future harm.

132.

**A.   Harold Cunningham**

133.    Harold Cunningham is 41 years old.  Before his incarceration, he lived in the Washington, D.C. area.  Mr. Cunningham has been housed in the Control Unit at ADX since 2001 and is serving a life sentence plus 380 years.  Mr. Cunningham suffers from a serious mental illness that has been variously diagnosed as Paranoid Schizophrenia, Psychotic Disorder NOS and Personality Disorder NOS.  A photograph of Mr. Cunningham is attached hereto as Exhibit 8.

134.    Mr. Cunningham has been incarcerated on and off since he was 11 years old.  He was admitted to a juvenile facility in Washington, D.C. at age 16 for assault with a dangerous weapon.  Within five months, he attempted suicide.  Thereafter, he was transferred to St. Elizabeth's Hospital in Washington, D.C., a public psychiatric hospital for residents of Washington, D.C.  At the time, Dr. James Smith diagnosed Mr. Cunningham with Conduct Disorder, Under Socialized Aggressive Needs, and Major Depression.

135.    In 1988, Mr. Cunningham, then 17 years old, was arrested for cocaine possession, sentenced to five years, and sent to Maryland's high security prison in Baltimore.  At the time, he refused all psychological and psychiatric treatment because he was told by other prisoners that if he received any mental health treatment or accepted any psychotropic medication, the Department of Corrections could keep him past his release date.

136.    Mr. Cunningham was released in 1993.  Within months, he and two other men (including one with a serious mental illness who is also currently housed at ADX) committed a series of crimes in Washington, D.C. and Maryland.  At his trial, Mr. Cunningham chose to represent himself.  On July 15, 1996, Mr. Cunningham attacked and stabbed a witness with a homemade knife as she was leaving the witness stand and while in full view of the judge and jury.  After the judge denied a mistrial, Mr. Cunningham was convicted and sentenced to a term of life in prison plus 380 years.

137.    Mr. Cunningham subsequently was indicted for attempted murder based on the courtroom stabbing.  He asserted an insanity defense and was examined by Dr. Carol Kleinman, who was board-certified in psychiatry and a member of the American Board of Psychiatry and Neurology, in connection with that defense.  Dr. Kleinman diagnosed Mr. Cunningham with the following psychiatric disorders:  Paranoid Schizophrenia, Antisocial Personality Disorder, Borderline Intellectual Functioning, History of Attention Deficit Disorder with Hyperactivity, along with various forms of drug and alcohol abuse.  She opined that Mr. Cunningham was not competent to stand trial and recommended that he be placed on appropriate psychotropic medications.

138.    In early 1999, a hearing was conducted to determine whether Mr. Cunningham was competent to stand trial.  Dr. Kleinman, however, revised her diagnosis at the hearing, and the Court found that Mr. Cunningham was competent to stand trial.  A few months later, the government dismissed all charges against Mr. Cunningham without explanation.  He was sent to the Marion USP and placed in long-term isolation.

139.     At Marion USP, Dr. Ray Anderson conducted a mental status examination of Mr. Cunningham and concluded that he suffered from Psychotic Disorder NOS and the effects of hallucinogen abuse.  Mr. Cunningham was given antidepressants and antipsychotic drug therapy. He claimed he heard voices and saw things that were not there.

140.     While imprisoned at Marion USP, Mr. Cunningham was examined about once a month to coordinate psychological counseling with psychiatric treatment.  A consulting psychiatrist met with Mr. Cunningham to monitor his medications and to identify potential issues that might aggravate or modify the severity of his symptoms.

141.     In May 1999, as part of this process, Dr. James E. Adams conducted a mental status examination of Mr. Cunningham.  Dr. Adams diagnosed Mr. Cunningham as suffering from Psychotic Disorder NOS, in full remission, and Personality Disorder NOS.  He prescribed the antipsychotic medication Risperdal and antidepressant Prozac for Mr. Cunningham.

142.     On June 2, 2000, Mr. Cunningham was examined by Dr. Richard Urbanik, chief psychologist at Marion.  Dr. Urbanik found that "Cunningham's current mental status, emotional expression, and behavior suggest significant mental health problems."  Dr. Urbanik noted that, based on Mr. Cunningham's history, existing conditions, and other information available at the time of review, the current potential for Mr. Cunningham to harm others was high.  Dr. Urbanik further noted that Mr. Cunningham was refusing all psychotropic medication.

143.     In fact, Mr. Cunningham told the staff that he could not digest the medication when it was in liquid form, because it made him sick.  Additionally, Mr. Cunningham was concerned that the cups of liquid had materials floating on the surface, for which no explanation was given to him.

144.    Dr. Urbanik conducted another examination of Mr. Cunningham on June 30, 2000.  Again, Dr. Urbanik concluded that Mr. Cunningham's current mental status, emotional expression, and behavior suggested significant mental problems, and Mr. Cunningham's potential to harm others was high.  Dr. Urbanik further noted that Mr. Cunningham complained about the form of his medication (liquid), and was noncompliant.

145.    Mr. Cunningham was transferred to ADX in December 2001.  His initial psychological assessment at ADX stated that he was a "very antisocial individual who is probably prone to misinterpret the actions and motivations of staff members . . . ."  The staff psychologists (Dr. Watterson and Dr. Morrison) concluded that "mental illness . . . can certainly not be conclusively ruled out at this point."  Nevertheless, Dr. Morrison suggested that Mr. Cunningham try to go without his medication (Risperdal and Prozac), and promised that if he did so and experienced any problems Dr. Morrison would put him back on better psychotropic medication.  Upon information and belief, Dr. Morrison intentionally tricked Mr. Cunningham into giving up his medication so that Mr. Cunningham could be placed in the ADX Control Unit, where such medication cannot be administered.  After accomplishing that goal Dr. Morrison abandoned Mr. Cunningham, who since December 2001 has been denied any form of psychiatric medication for his mental illness.

146.    Without his medications, Mr. Cunningham's behavior predictably worsened over the next several years.  Mr. Cunningham was cited for, among other things, refusing to leave his cell, refusing to submit to restraints, possession of weapons, and assault on corrections officers.  Mr. Cunningham was held in an isolation cell in the Control Unit from 2002 to 2007.  During

this time, he was assaulted by corrections officers and frequently shackled to his bed, sometimes for days or weeks at a time.

147.     Mr. Cunningham has received no mental health treatment at ADX, even though he has repeatedly requested it.  In fact, during his time at ADX, Mr. Cunningham has formally requested mental health treatment no less than eight times.

148.     On March 23, 2004, Cunningham filed a Central Office Administrative Remedy Appeal for a request for psychiatric treatment.  On April 30, 2004, the Central Office responded that an examination via telepsychiatry indicated no mental illness.  For this putative psychiatric evaluation, Mr. Cunningham was placed in a room, handcuffed from behind with shackles on his legs, and surrounded by correction officers.  A psychiatrist from MCFP Springfield, viewing him through a make-shift video screen, asked Mr. Cunningham questions about his mental health issues, as if the answers received in such an environment were open and adequate to gauge a psychological or psychiatric problem.  On June 15, 2004, Mr. Cunningham filed a Central Office Administrative Remedy Appeal for, among other things, denial of psychiatric treatment.  His appeal was denied.

149.     On August 10, 2004, Mr. Cunningham filed another Central Office Administrative Remedy Appeal for being denied mental health medication.  Mr. Cunningham specifically requested an investigation into why he was taken off Risperdal and Prozac.  In his appeal, Cunningham wrote "I am in pain everyday that makes me act out in uncontrollable [sic] ways . . . . Records show that when I'm taking my medication I can function without pain or suffering or incident."  In response, the BOP argued, among other things, that "[i]t is evident you

have received prompt, professional medical care consistent with reasonable community standards and Bureau of Prisons' policy." Mr. Cunningham's appeal was denied yet again.

150.     The extent of Mr. Cunningham's treatment for his mental illness during his 11 years at ADX has consisted of therapy classes on an educational channel on television, and two workbooks: "Breaking Barriers" and "Cage Your Rage."

## B.  Carlton Dunbar

151.     Plaintiff Carlton Dunbar is 29 years old.  Before his incarceration, he lived in Arlington, Virginia.  He is currently imprisoned at ADX and is serving a sentence of over 18 years for carrying a pistol without a license, voluntary manslaughter, escape, and assaulting a correctional officer.  Mr. Dunbar currently suffers from a serious mental illness, which has been variously diagnosed as Schizophrenia, Bipolar Disorder, and Major Depressive Disorder, Recurrent with Paranoid Features.  A photograph of Mr. Dunbar is attached hereto as Exhibit 9.

152.     Mr. Dunbar was born in Arlington, Virginia on October 30, 1983.  His childhood was marked with depression and mental illness.  At the age of four, Mr. Dunbar received his first outpatient mental health treatment for depression and hyperactivity.  In April 1996, when he was twelve, Mr. Dunbar was committed to a mental hospital in Virginia.  His records reflect, as follows, the reason for the commitment:

> Carlton is a 12-year-old male admitted for his first psychiatric hospitalization for acute suicidal ideation with plan and gestures.  He is depressed and wants to die.  He has threatened to kill himself several times over the past three weeks.  He tried to jump out of a window at school two times, he put a plastic bag over his head in the school nurse's office, and he put a plastic strap around his neck.  He has been asking his grandmother if he died would he go to heaven.  He has been particularly depressed over the past three months.  At school, he put a boy's belt around his neck.

During his hospitalization he told the doctors he heard voices arguing in his head.  The attending psychiatrist diagnosed Mr. Dunbar with Major Depression.  Sometime after his discharge, he was removed from public school and placed in an alternative therapeutic school for seriously disturbed children.

153.    Depression and mental instability carried over into adulthood.  In 2003, Mr. Dunbar was detained in Virginia pending prosecution in the District of Columbia. He spent much of his pretrial incarceration in a locked psychiatric unit.  While there, a doctor with the Virginia Department of Corrections diagnosed Mr. Dunbar with Major Depression and gave him a treatment plan that included counseling and a heavy regimen of psychotropic drugs that included Depakote, Risperdal, Paxil, Haldol, Ativan, Trazodone and Buspar.  In addition to Major Depression, Mr. Dunbar also complained of auditory hallucinations and sleeplessness.

154.    In 2005, Mr. Dunbar pleaded guilty to voluntary manslaughter and carrying a pistol without a license.  During pretrial, the court placed Mr. Dunbar in a halfway house, Hope Village in Southeast D.C.  On November 25, 2004, Thanksgiving Day, Mr. Dunbar left the facility without permission and checked himself into a hospital in Arlington, Virginia.  At the hospital, Mr. Dunbar complained of severe Depression.  Because he was suicidal, the hospital admitted him for inpatient psychiatric treatment.  He was hospitalized for one week, during which time he was prescribed Wellbutrin, Risperdal and Trazodone.  His attending doctor diagnosed him with Major Depressive Disorder, Recurrent with Paranoid Features.  On the day the hospital discharged him, Mr. Dunbar turned himself in to the authorities at the D.C. Jail.  As a result of his leaving the halfway house, Mr. Dunbar received an additional charge of and pleaded guilty to escape.

155.    The resulting presentence report highlighted Mr. Dunbar's struggles with depression and mental instability, and recommended that he receive mental health counseling. The court sentenced Mr. Dunbar to 10 and a half years imprisonment.

156.    The BOP is very familiar with Mr. Dunbar's serious mental health issues.  Before being transferred to ADX, BOP psychologists and psychiatrists met with Mr. Dunbar numerous times.  During these visits, Mr. Dunbar repeatedly complained that he heard voices and that a foul odor emanated from his face.  He told one psychologist that he had not slept for years, that his mind just races and that his mental condition was getting to him.  He also repeatedly spoke of staff "playing mind games" with him and trying to contaminate his food and medications.

157.    Mr. Dunbar also made numerous threats against staff, and also repeatedly threatened to take his own life.  In 2006, for instance, he complained that he worried about death "all day long."  That same year, he attempted suicide by ingesting over 30 aspirin.

158.    BOP records describe Mr. Dunbar as exhibiting "significant mental health problems," displaying psychotic symptoms, and suffering from paranoia, depression and panic attacks.  BOP psychiatrists and psychologists offered a litany of working diagnoses for Mr. Dunbar, including Schizoaffective Disorder, Bipolar Disorder, Psychotic Disorder Not Otherwise Specified ("NOS"), Major Depressive Disorder With Psychotic Features, and Anxiety Disorder NOS.

159.    Suffering from untreated depression, psychosis, paranoia and anxiety, Mr. Dunbar has engaged in numerous violent acts while in BOP custody.  In January 2007, Mr. Dunbar assaulted another inmate, and then the following month he assaulted a corrections officer.  Both incidents occurred at Big Sandy USP.  Rather than treat Mr. Dunbar's underlying mental health

issues, BOP chose to transfer him to Allenwood USP.  In October 2007, he assaulted his new

cellmate.  BOP responded again by transferring Mr. Dunbar to another penitentiary, this time to

Lewisburg USP.

160.    Predictably, given the BOP's decision to designate Mr. Dunbar to a mainline USP

rather than a facility that could provide him with needed mental health treatment, trouble

continued to find Mr. Dunbar.  Most notably, in March 2008 he was involved in an incident that

added yet more time to his sentence and resulted in his transfer to ADX.  On March 19, 2008, he

was walking with a Lieutenant at Lewisburg to the Lieutenant's office.  When he asked the

Lieutenant to stop disrespecting him by cursing at him, the Lieutenant intensified his cursing and

was soon joined by another officer.  When the two officers advanced in a manner that Mr.

Dunbar felt was threatening, he punched the Lieutenant in the head, knocking him unconscious.

When the other officer intervened, Mr. Dunbar punched him as well.   Eventually Mr. Dunbar

was subdued, restrained and taken to the Lieutenant's officer, where out of view of surveillance

cameras staff members viciously beat him while he was still wearing restraints.  He was later

charged with assaulting the Lieutenant.  He was convicted and sentenced to an additional 96

months.  Thereafter, the BOP referred him for placement at ADX.

161.    In July 2008, in the course of the process for determining whether to transfer Mr.

Dunbar to ADX, he was examined by a BOP psychiatrist.  Mr. Dunbar related the same

symptoms he had experienced most of his life - severe depression, auditory hallucinations,

paranoia, anxiety and sleep disturbance.  Even though he had experienced and complained of

these symptoms since adolescence and had been treated for them while in BOP custody, the

psychiatrist questioned the authenticity of the reported symptoms because Mr. Dunbar's

presentation was "immature."  The psychiatrist thus concluded that Mr. Dunbar did not suffer

from a mental disorder that would preclude his referral to ADX.

162.    On January 7, 2009, BOP held a hearing on whether to transfer Mr. Dunbar to

ADX.  The hearing officer asked Mr. Dunbar if he considered himself dangerous.  He responded

that he was not but that he had "psychological problems."  Disregarding his nearly lifelong

history of serious mental illness -- which had been repeatedly been diagnosed and treated by the

BOP -- the BOP transferred Mr. Dunbar to ADX on February 25, 2009.

163.    Since then, Mr. Dunbar's mental health has deteriorated due to both the lack of

adequate treatment and the conditions of confinement at ADX.  He has filed multiple Central

Office Administrative Remedies appealing his placement at ADX and the BOP's failure to

provide him adequate mental health treatment.  Despite his appeals, Mr. Dunbar remains at ADX

where he continues to receive inadequate mental health treatment.

164.    As alleged above, in early April 2013 a knife wielding prisoner attacked Mr.

Dunbar in Joker Unit at the ADX.  Mr. Dunbar defended himself, in the process nearly beating

the other prisoner to death with his hands.  As of the date of this filing, he sits in the SHU, facing

administrative sanctions and possible prosecution for defending himself against an attack that the

ADX staff knew about in advance, failed to prevent, and then prolonged for nearly 15 minutes by

standing behind bars watching as Mr. Dunbar literally fought for his life against a larger man

armed with a knife.  As is true for all SHU residents, he spends his time sitting in an empty cell

with nothing to occupy his time, smelling the feces other prisoners have smeared on their walls.

He also is haunted by his chronic and severe mental illness, and by the dark, persistent trauma of

being subjected to an unprovoked and potentially fatal attack, and by being forced to nearly kill another man with his bare hands merely to save his own life.

### C.   John Jay Powers

165.    Plaintiff John Jay ("Jack") Powers is 50 years old.  He grew up in upstate New York and lived in Florida immediately before his incarceration.  Mr. Powers is serving a sentence for bank robbery and a prison escape, with a release date of May 2, 2030.  Mr. Powers currently resides in the "General Population" Unit at ADX after being held in the Control Unit for nearly ten years.  A photograph of Mr. Powers is attached as Exhibit 10.

166.    Mr. Powers suffers from serious mental illness, including severe Complex PTSD and a Personality Disorder with Narcissistic, Borderline and Antisocial Features.  While in the custody of the BOP, Mr. Powers has engaged in severe self-mutilation over the past 10 years, amputating his own fingers, testicle, scrotum and earlobes, cutting his Achilles tendon, and trying to kill himself on several occasions.  He has not been provided with proper medication or treatment for his serious mental illnesses despite the obvious physical harm Mr. Powers has inflicted upon himself.

167.    Mr. Powers entered the custody of the BOP in 1990.  At that time, he had never exhibited or been treated for serious mental illness.

168.    On July 21, 1994, Mr. Powers witnessed the murder of Eddie Wong, another prisoner at Atlanta USP.  Three prisoners, whom Mr. Powers believed were members of a prison gang known as the Aryan Brotherhood, stabbed the victim thirteen times.  After the attackers left the victim's cell, Mr. Powers sought to assist him, carrying him down a flight of stairs to the ground floor of the prison.  The victim was taken to the hospital but died as the result of his

injuries. Following this murder, Mr. Powers was moved to USP Atlanta's segregation unit because, as a witness to the attack, prison officials determined that his safety was compromised. While in segregation, Mr. Powers was threatened by a prisoner he believed to be a senior Aryan Brotherhood member.

169. Mr. Powers subsequently agreed to testify against the three men who had been charged with killing Mr. Wong. He testified twice (the first trial resulted in a hung jury), and the prisoners were convicted. Mr. Powers was transferred to FCI Allenwood, where he was threatened periodically by members of the Aryan Brotherhood as a result of his testimony. Because of the threats, Mr. Powers was placed in protective custody to segregate him from those threatening to kill him. At around the same time, he began to experience symptoms of PTSD, a severe anxiety disorder that can develop after exposure to an event that results in psychological trauma. Mr. Power's initial symptoms included insomnia and anxiety attacks.

170. In 1997, a BOP psychologist determined that Mr. Powers was suffering from PTSD. Thereafter, in January 1999, Mr. Powers was transferred to a medium security prison, where he remained in protective custody. Shortly after his transfer to that facility, Mr. Powers learned that the BOP planned to move him from segregated housing to a general population unit where he was more likely to encounter prisoners who would seek to harm him as a result of his 1995 testimony. He also learned that the U.S. Attorney's Office would not seek to obtain the sentence reduction as promised in exchange for his testimony. In May 1999, fearful for his own life and safety and suffering increasingly from PTSD, Mr. Powers escaped. After two days he was apprehended and returned to prison. In June 2001, Mr. Powers was tried and convicted of escaping and sentenced to additional imprisonment.

171.     In October 2001, Mr. Powers was transferred to ADX and placed in the Control Unit, where he had been ordered to serve a 60-month term as a result of the escape.  Upon entering the ADX Control Unit, Mr. Powers was immediately threatened by individuals he believes to be members of the Aryan Brotherhood, many of whom are housed at ADX.  Those threats, and the continuing effects of his untreated PTSD, caused Mr. Powers to slowly descend into madness and horrific self-harm.

172.     In July 2002, seven months after arriving at ADX, Mr. Powers rammed his head into the metal door jamb of his cell.  Two weeks later, he was transferred to MCFP Springfield for a psychiatric evaluation.  BOP records relating to that transfer confirm the belief by clinicians at ADX that while at ADX Mr. Powers "has experienced a great deal of verbal abuse and threats from inmates in adjacent cells due to their belief that he is an informant."  Mr. Powers spent a month at MCFP Springfield, during which time his PTSD diagnosis was reaffirmed, and he was treated with medication.  However, upon his return to the ADX Control Unit in August 2002, his medication was suddenly discontinued.  Almost immediately, his self-harm and mutilation began, resulting in disciplinary incident reports for self-mutilation in October 2002, October 2004, and February 2005.

173.     On October 13, 2005, he was again transferred to MCFP Springfield after severely lacerating his scrotum with a piece of sharp plastic.  His PTSD diagnosis was again confirmed by BOP doctors, and he was again stabilized with medication.  But in December 2005 the BOP again returned him to the ADX Control Unit and again abruptly discontinued his medication.

174.    In April 2006, following a meeting with a BOP psychologist, Mr. Powers returned to his cell to discover that his possessions had been moved to a new cell located on a different range.  The new range housed Aryan Brotherhood members, who immediately began to threaten Mr. Powers.  Mr. Powers broke the glass on his television set, which he used to cut himself. Defendant's "response team" intervened and placed Mr. Powers in leg irons, handcuffs and a belly chain, which he wore in his cell for several days.

175.    On July 18, 2006, Mr. Powers amputated his testicle.

176.    In or around 2006, Mr. Powers attempted to commit suicide by ingesting a large quantity of aspirin.

177.    On September 6, 2007, Mr. Powers bit off his finger.

178.    On April 1, 2008, Mr. Powers inserted a staple into his forehead.

179.    In December 2008 he amputated one of his fingers, tore out the stitches used to close the wound, and then swallowed a toothbrush.

180.    On February 2, 2009, Mr. Powers cut a triangular flap of skin out of his face and inserted several staples into it.

181.    On July 6, 2009, Mr. Powers cut his wrist, bled all over his cell, and was found unconscious and unresponsive by ADX staff members.  Several weeks after the suicide attempt, in July 2009, the BOP again transferred Mr. Powers to MCFP Springfield.  This time, however, he was not medicated.  Rather, despite the BOP's own multiple prior diagnoses of serious mental illness and the manifest physical evidence of profound mental illness reflected in Mr. Power's disfigured body, a BOP psychologist determined:

> "Inmate is not in need of custody for care or treatment.  He does not have an active mental disorder.  He does not require any further evaluation in an inpatient psychiatric

facility.  Considerations that he has some form of psychosis, thought disorder, or mental illness are unfounded."

182.    Accordingly, in August 2009 Mr. Powers was again returned to ADX and again placed in the Control Unit with no mental health treatment.

183.    Four months later, on December 3, 2009, Mr. Powers bit off his pinkie.

184.    In 2009 and 2010 Mr. Powers covered most of his body with tattoos that he calls "Avatar Stripes," which are visible in the photograph attached as Exhibit 10.  He created his tattoos by slicing thousands of tiny slits into his skin with a razor blade and rubbing carbon paper dust into the slits.

185.    On December 20, 2010, Mr. Powers amputated his scrotum and attempted to suture the wound himself.

186.    In March 2011, Mr. Powers completed his term in the Control Unit.  Although his original 60-month Control Unit term would have expired in 2006 had he earned credit for each month he served there, because of his serious mental illness he was unable to comply with the strict requirements governing earning credit for time served in the Control Unit.  In many instances, he was denied credit for time served because he had mutilated himself.  Thus, the ravages of his untreated serious mental illness both caused his permanent disfigurement and extended his term in the Control Unit, where he was housed among and tormented by members of the gang he testified against, pursuant to the directive of the same Department of Justice for which he provided that testimony.

187.    Following his transfer from the Control Unit into the ADX general population, Mr. Powers continued to receive no meaningful mental health care and continued to suffer the grotesque symptoms of his mental illness.

188.     On January 12, 2012, Mr. Powers sliced off his earlobes, using pencils as tourniquets.

189.     On March 21, 2012, Mr. Powers sawed through his Achilles tendon with a sharp piece of metal, nearly severing it.  The injury was surgically repaired and covered with a hard cast.  Mr. Powers soon removed the cast and began supporting the injured ankle with a splint he made from a sock.

190.     In May 2012, after Mr. Powers had again mutilated his genitals, and only a few weeks after the BOP became aware that he was being evaluated by a psychiatrist retained by his counsel, the BOP began treating him with the powerful antipsychotic medication Haldol.  However, he still has no access to psychological counseling or other mental health care, and still remains at ADX, rarely leaving his cell, thinking of suicide daily, and often slashing or cutting himself.

191.     In early 2013, Mr. Powers further mutilated his face.

192.     As of May 2013 Mr. Powers is being held at Springfield MCFP for evaluation, but upon information and belief he will be returned to ADX in the near future.

**D.   Ernest Norman Shaifer**

193.     Ernest Norman Shaifer, sometimes known as Ernest Norman Brown, is 49 years old.  Before his incarceration, Mr. Shaifer was a resident of Washington, D.C.  He has a release date of July 6, 2014.  Mr. Shaifer suffers from a serious mental illness, Bipolar Disorder.  He has not been provided with proper medication or treatment for this illness.  A photograph of Mr. Shaifer is attached hereto as Exhibit 11.

194.    Mr. Shaifer was brought up by a mother who was, herself, severely mentally ill. Marion Shaifer was diagnosed with Schizophrenia two years before Mr. Shaifer's birth.  Almost all of Mr. Shaifer's seven siblings – and several of his siblings' children – have been diagnosed with and treated for mental illness, including Schizophrenia, Bipolar Disorder and Anxiety Disorder.  Several of Mr. Shaifer's siblings have been prescribed medication to treat their mental illness.  Mr. Shaifer's sister Valera has attempted suicide.  In 1996, Mr. Shaifer's brother Terry discontinued his medication and committed suicide after murdering his wife and her lover in front of their children's elementary school.

195.    Mr. Shaifer has been in and out of the prison system since the early 1980s.  He has been incarcerated by the BOP continuously since 1995 and served time at a number of BOP facilities prior until his transfer to Florence USP in June 1999.

196.    The BOP has failed to provide psychiatric counseling and medication for Mr. Shaifer's mental condition while at ADX, despite his repeated requests that they do so. Mr. Shaifer continued to suffer severe problems of behavior control.

197.    In January 2002, encouraged by a phone call with his father, Mr. Shaifer attempted to enroll in a BOP anger management program.  In response, the BOP informed him that the anger management program enrollment was full and that it could not provide him with assistance.  A few days later, Mr. Shaifer assaulted a BOP chaplain.

198.    Mr. Shaifer was transferred to FCI Englewood for trial on the assault charge. While at FCI Englewood, BOP officials continued to disregard Mr. Shaifer's requests for psychiatric treatment.  Despite his many complaints and behavioral issues predating his assault

charge, a BOP psychologist concluded that Mr. Shaifer was merely attempting to "fabricate symptoms."

199.    Mr. Shaifer's defense counsel sought an independent evaluation of Mr. Shaifer's mental condition.  In July 2002, Dr. William D. Hansen rendered a tentative diagnosis that Mr. Shaifer suffered from Bipolar Disorder.  Dr. Hansen recommended a mood-stabilizing medication, noting that without such treatment, there was no clinical way to verify his diagnosis or whether Mr. Shaifer's behavioral problems were treatable.

200.    In December 2002, Dr. Doris C. Gundersen, a private psychiatrist hired by Mr. Shaifer's counsel, also evaluated Mr. Shaifer.  Dr. Gundersen saw Mr. Shaifer on three separate occasions between December 2002 and February 2003.  In March 2003, Dr. Gundersen wrote to Dr. Richard Rewey, a BOP official, with her diagnosis that Mr. Shaifer suffered from a bipolar spectrum disorder.  Dr. Gundersen "strongly recommend[ed] that Mr. Shaifer be provided a trial of a mood stabilizer" and warned of her "concern[] that without a mood stabilizer, Mr. Shaifer's behavior will continue to deteriorate."  In March 2003, Dr. Gundersen also stated in her report to Mr. Shaifer's counsel that there was "compelling evidence to support the existence of a serious untreated mental illness, namely Bipolar Disorder."

201.    In May 2003, following Mr. Shaifer's guilty plea on the assault charge, Mr. Shaifer's counsel moved for a reduction in his sentence, *i.e.*, a "downward departure" from the Federal Sentencing Guidelines, based on Mr. Shaifer's mental condition.  The evaluations by Drs. Hansen and Gundersen were included as support for the motion.  Dr. Gundersen also testified regarding her evaluation and conclusions.  The Court acknowledged that Mr. Shaifer's Bipolar Disorder had "more likely than not" contributed to the assault, but it denied the motion

and sentenced Mr. Shaifer to 96 months for the assault.  Mr. Shaifer was transferred back to ADX.

202.    Defendants are aware of Mr. Shaifer's severely troubled family history of mental illness.  For example, the letter written by Dr. Gundersen to Dr. Rewey in March 2003 disclosed the hospitalization of Mr. Shaifer's mother for Schizoaffective Disorder.  In July 2003, BOP clinical psychologist Robert L. Krick wrote in Mr. Shaifer's medical records that his maternal grandmother suffered from mental illness.  Dr. Gundersen's report for Mr. Shaifer's sentencing appeal made clear that several of Mr. Shaifer's siblings have been treated for major mental illness.  In October 2003, a BOP psychologist took note of the suicide of Mr. Shaifer's brother, but assigned it no significance other than possibly an impetus for Mr. Shaifer to fabricate symptoms.

203.    After he was returned to ADX Florence in late 2003, Mr. Shaifer filed a lawsuit against the BOP and several of its officials for their continued failure to provide him with adequate mental health treatment.  Rather than responding to his suit on the merits, the BOP moved to dismiss the suit for failure to exhaust administrative remedies against each of the named defendants.  Ultimately, the court dismissed Mr. Shaifer's claims without prejudice on the ground that he was asserting a mixture of exhausted and non-exhausted claims, a legal outcome that the United States Supreme Court has since rejected as improper.

204.    In January 2004, the ADX Florence Discipline Hearing Officer directed that Mr. Shaifer be moved into the Control Unit.  In September 2010, the Control Unit Executive Panel ignored pleas by Mr. Shaifer for mental health care and decided to keep him in the Control Unit, where such care is not provided to prisoners.  Due to ADX's policy prohibiting prisoners in

the Control Unit from receiving psychotropic medication and the isolated conditions of confinement in the unit, Mr. Shaifer's mental illness will remain untreated and it is likely that his behavior, as a result, will continue to deteriorate.  As of September 2010, when the Control Unit Executive Panel determined that Mr. Shaifer would remain in the Control Unit, he had only received credit for 44 of the 78 months that he had been in that unit, and was still required to spend 56 more months there.  In other words, Mr. Shaifer will remain in the Control Unit until he completes his current prison sentence in July 2014.

205.    Mr. Shaifer continues to request assistance for his mental illness.  On or about October 13, 2011, Mr. Shaifer requested medication for his mental illness from Dr. Severn, a BOP staff psychologist.  That request was denied -- again because "those prisoners housed in the Control Unit are not allowed to be on psychotropic medication per Bureau Policy."  Mr. Shaifer again renewed his request in December 2011.  Despite Mr. Shaifer's prior requests for treatment, which included a federal court lawsuit against the BOP seeking mental health care, the BOP's response falsely asserted that Mr. Shaifer "ha[d] never requested any psychology attention about [his] issues."

206.    In early 2012, a few months after Mr. Shaifer began meeting with his undersigned counsel, Mr. Shaifer eventually was evaluated by two BOP psychologists.  But rather than receive a proper evaluation in an appropriate setting, Mr. Shaifer was evaluated in his cell with the cell door open, allowing other prisoners in the vicinity to overhear the discussion.  Shortly after the session began, the head BOP psychologist at ADX announced that Mr. Shaifer appeared to have developed "good coping skills" and dismissed Mr. Shaifer's protestations that he suffered from a serious mental illness.

**E.   Jeremy Pinson**

207.    Jeremy Pinson is 26 years old.  Before his incarceration, he lived in Oklahoma

City, Oklahoma.  Mr. Pinson is serving a 22-year sentence for letters he sent threatening the

President of the United States, a federal judge, a Secret Service Agent, and a juror.  His projected

release date is October 3, 2025.  Mr. Pinson has a serious mental illness that has at various points

been diagnosed as Bipolar Disorder, Schizophrenia, and Severe and Chronic PTSD.  He also has

Epilepsy and experiences frequent seizures.  A photograph of Mr. Pinson is attached as Exhibit

12.

208.    Several members of Mr. Pinson's close family have long suffered from mental

illness.  Both of his maternal grandparents were diagnosed with Schizophrenia, and his maternal

grandmother committed suicide after a long struggle with Depression.  His mother has been

diagnosed with and medicated for Depression throughout most of her adult life.

209.    Mr. Pinson's childhood was marked by psychotic episodes.  He began hearing

voices and having visual hallucinations around the age of 7.  He began receiving psychological

treatment by age 8 and received his first inpatient psychiatric treatment by age 10.  When he was

13, he sent threatening letters to both his mother and to the President of the United States, he

stabbed a classmate with a pen, and threatened to blow up his school.  He received inpatient

treatment for suicide attempts and psychotic symptoms at the ages of 12, 15 and 16.

210.    In 2005, prior to his trial on charges of threatening the President of the United

States, Mr. Pinson underwent a court-ordered psychological evaluation to assess his competency.

While being held for the evaluation, Mr. Pinson tried several times to kill himself.  According to

the forensic report, "Mr. Pinson had not experienced any significant period of effective

psychological functioning since early childhood [and o]nly with long-term psychiatric and psychotherapeutic intervention [would he] have any hope of developing into a mature and psychologically healthy individual."  Nevertheless, the report found him competent to stand trial; he was convicted.

211.    On April 2, 2007, Mr. Pinson was sentenced to 240 months imprisonment.  The Court recommended that he serve his sentence at Butner FMC, which includes the BOP's largest psychological treatment complex.  The BOP rejected that recommendation, and instead sent Mr. Pinson to Victorville USP and then to Houston FDC.

212.    While at Houston FDC, Mr. Pinson wrote another letter, this time threatening to kill a Secret Service Agent who testified at his sentencing.  This letter resulted in another conviction.

213.     At his sentencing for this conviction, the sentencing judge "strongly recommended" that the BOP conduct a "full-blown" evaluation of Mr. Pinson's "mental and physical needs and the drugs required to deal with both" at a capable facility, identifying the MCFP Springfield and the Butner FMC as appropriate facilities.  Again rejecting the Court's recommendation, the BOP placed Mr. Pinson at Coleman II USP, where his mental health problems continued.

214.    Since then, Mr. Pinson has attempted suicide multiple times, including an attempted drug overdose and two incidents where he tried to hang himself.  He continues to suffer from severe depression and suicidal ideation, and has sought treatment for both.  The BOP has conducted more than 12 suicide risk assessments on Mr. Pinson and placed him on suicide watch at least 9 times.

215.    The BOP is well aware that Mr. Pinson is mentally ill and in need of intense counseling and therapy.  A January 2011 BOP Progress Report notes that Mr. Pinson has a history of mental health diagnoses prior to incarceration, that he has been hospitalized for mental disorders and attempted suicide, that he suffers from Schizophrenia and other Psychotic Disorders, and that he needs further mental health treatment.  While in the BOP's custody, Mr. Pinson has been prescribed a litany of psychotropic medications, including the antipsychotics Olanzapine, Quietapine, Risperidone, Fluphenazine, Haldol and Perphenazine, antidepressants Amitriptyline, Bupropion, Mirtazapine and Sertraline, antimanic Depakote, and the anti-anxiety medication Buspirone.

216.    Nonetheless, in February 2011, the BOP transferred Mr. Pinson to ADX, where he was placed in the SHU.  Mr. Pinson challenged this transfer on a variety of grounds, including that his PTSD, Bipolar Disorder, and Epilepsy made him an inappropriate candidate for placement at ADX.  Mr. Pinson complained that at ADX he could not receive proper mental health treatment, including the ability to participate in mental health programs.  In a July 2011 response, the BOP informed Mr. Pinson that ADX was "providing [mental health] programs consistent with [his] security needs."  In or around June 2011, Mr. Pinson was transferred to an ADX General Population unit.

217.    In December 2011, Mr. Pinson asked Dr. Severn, an ADX staff psychiatrist, for a referral to the BOP's Habilitation Treatment Program.  Mr. Pinson has received no such referral.

**F.   John W. Narducci, Jr.**

218.    John W. Narducci, Jr. is 43 years old and grew up in Connecticut.  Mr. Narducci is serving a 211 month sentence at ADX.  He has been in federal custody since 1999 and has a

release date of February 15, 2015.  Mr. Narducci suffers from a serious mental illness, including a Mood Disorder as well as a Mixed Personality Disorder with Antisocial and Borderline Features.  He also exhibits symptoms of complex PTSD.  Mr. Narducci exhibits signs and symptoms of a Gender Identity Disorder in that he frequently wears his long hair in a feminine style, shaves his body, and wears makeup that he makes using colored pencils.  Mr. Narducci's gender identity and sexual orientation, while comfortable to him, exacerbate difficulties that he experiences dealing with other prisoners in violent, high security environments, particularly given his severe and chronic mental illness.  A photograph of Mr. Narducci is attached as Exhibit 13.

219.    When Mr. Narducci was 4 years old, his father was shot while Mr. Narducci was present in the family home; his father subsequently died from the wound.  His mother later remarried, but when Mr. Narducci was 11, his mother suffered a heart attack and died suddenly in his sole presence.  After the death of his mother, Mr. Narducci lived with his stepfather and siblings.  When Mr. Narducci was 16, he discovered that his stepfather had molested his younger brother.  Days later, Mr. Narducci's stepfather committed suicide.

220.    Mr. Narducci was first treated for mental illness as a teenager.  At age 16, he was admitted to a hospital for inpatient treatment because "the failure of out-patient therapy and John's increasingly aggressive behavior indicated the need for inpatient evaluation and treatment."  At that time, the psychiatric staff at the hospital stated that "continued psychotherapy within a structured milieu is essential for John's well-being."

221.    From the late 1980s through December 1998, Mr. Narducci was in and out of the state prison system in Connecticut and Oklahoma.  During a 10-year period of incarceration,

Mr. Narducci spent much of his time in extended isolation, though he did receive mental health treatment for multiple disorders, including Major Depression and a Personality Disorder.  As part of his treatment, Mr. Narducci was prescribed psychotropic medications including Depakote, Thorazine, Zoloft, Wellbutrin, and Ativan.

222.    Prior to his release from state custody, Mr. Narducci requested that he be enrolled in a mental health follow-on care program that would continue to provide him essential mental health services.  This request was not granted, and on December 3, 1998, Mr. Narducci was released from the Connecticut state "supermax" facility in Somers, Connecticut, directly to the street, with no transitional services or provision made for any psychiatric or other mental health services.  Within months, he was back in custody.  In April 1999, while Mr. Narducci was in the custody of the Connecticut Department of Correction pending sentencing, the mental health staff identified him as suffering from multiple mental health disorders and prescribed treatment and medication.  In November 1999, he pled guilty to four counts of bank robbery.

223.    On November 15, 1999, the court ordered that Mr. Narducci undergo psychological evaluation and testing prior to sentencing in light of his mental health history.  Mr. Narducci was sent to Atlanta USP where BOP staff conducted the evaluation.  The BOP evaluation found that Mr. Narducci suffered from several mental disorders, but also concluded that he was malingering and that psychotherapy was contraindicated.

224.    A private psychiatric evaluation conducted following the BOP report concluded that "[t]he evaluation done at USP Atlanta of John Narducci [was] not a valid assessment of his mental condition."

225.   The sentencing court reviewed Mr. Narducci's mental health history, the BOP evaluation, and the private evaluation.  At the sentencing hearing, the court stated "it is my conclusion that Mr. Narducci does suffer from serious psychological and emotional problems…."  On October 26, 2000, the court entered its judgment in Mr. Narducci's case, ordering a term of imprisonment of 150 months and recommending to the BOP "(1) that the defendant be designated to a facility which has programs sufficient to deal with his mental, emotional, and psychological problems, and (2) that the defendant receive intensive psychological testing and treatment throughout his term of incarceration."

226.   Following sentencing, Mr. Narducci remained at Atlanta USP.  Contrary to the recommendation of the sentencing court, the BOP did not provide adequate treatment for Mr. Narducci's mental illness.  In or around November 2000, the BOP transferred Mr. Narducci to FCI Otisville, and again failed to provide adequate treatment for Mr. Narducci's mental illness as had been recommended by the sentencing court.  On October 1, 2003, Mr. Narducci assaulted and seriously injured another prisoner.

227.   In or around March 2004, the BOP transferred Mr. Narducci to Allenwood USP, but again the BOP failed to provide adequate mental health care as recommended by the sentencing court.  On August 10, 2005, Mr. Narducci assaulted a BOP corrections officer at Allenwood USP.

228.   In or around July 2007, the BOP transferred Mr. Narducci to ADX.  Since his incarceration at ADX, Mr. Narducci has been punished for multiple acts of violence.  Mr. Narducci has requested mental health treatment from BOP staff at ADX on numerous

occasions.  The BOP has failed to provide Mr. Narducci with appropriate mental health care consistent with the recommendations of the sentencing court more than ten years ago.

229.    Mr. Narducci is scheduled to be released into the community in 2015.  Without adequate mental health care, when his sentence expires Mr. Narducci will have a very, very difficult time returning to society safely and successfully.

### G.    Marcellus Washington

230.    Marcellus Washington is 39 years old.  He spent most of his youth in New Jersey. He is serving a life sentence at ADX and is currently housed in the Control Unit.  Mr. Washington suffers from a serious mental illness, including a severe Mood Disorder and a Mixed Personality Disorder with Borderline and Antisocial Features.  He also exhibits signs and symptoms of PTSD and is mentally disabled and functionally illiterate.  A photograph of Mr. Washington is attached as Exhibit 14.

231.    Since childhood, Mr. Washington has been treated on multiple occasions for mental illness.  During the late 1970s and/or early 1980s, Mr. Washington was treated with Thorazine and Mellaril, two powerful antipsychotic medications.  Early psychiatric and psychological evaluations showed that Mr. Washington had mood swings which stemmed, at least in part, from mental disability and massive parental deprivation.  Mr. Washington was placed in his first group home when he was seven years old, because his severely mentally ill mother could not care for him.  He subsequently lived in, and ran away from, various foster homes, group homes, and residential facilities.  In 1982, when he was ten, Mr. Washington was returned briefly to the care of his mother, who soon abandoned him with his siblings on a New York City park bench.  Between 1977 and 1985, various child study teams affiliated with the

New Jersey Board of Education and its school districts found deficiencies in Mr. Washington's

emotional, social, and academic functioning.  Specifically, these teams found that

Mr. Washington has a neurological impairment, suffers from environmental deprivation, and

exhibits mood swings that ranged from a manic hyperactivity to a depressed lethargic mood.

Prior to the age of 13, Mr. Washington spent time at the Jersey City Medical Center Community

Mental Health Clinic and the Arthur Brisbane Child Treatment Clinic, a public psychiatric

hospital for children.

232.    In 1996, during his trial for armed robbery and carjacking, Mr. Washington was

housed in the Office of Interstate Services in New Jersey and was treated with high dosages of

the antidepressant Sinequan.  Upon his conviction, Mr. Washington was transferred to Lompoc

USP and, in October 2001, to Pollock USP.  Based on his intake processing at Pollock USP, the

BOP recognized that Mr. Washington experienced symptoms of depression and had suicidal

tendencies.  In 2001 and 2002, Mr. Washington received psychotherapy sessions for his

depression.

233.    On April 8, 2002, Mr. Washington visited the psychology unit at Pollock USP and

requested care urgently.  He met with Dr. Gallagher, a BOP staff psychologist, and requested

treatment for mental illness based primarily on his stress levels and his contemplation of suicide.

Mr. Washington showed Dr. Gallagher five or six superficial cuts around his wrist and informed

Dr. Gallagher that he did not think he was capable of killing himself, but he was considering

provoking someone else to kill him.  Dr. Gallagher did not conduct a full suicide assessment or

psychological workup, but merely scheduled an appointment with Mr. Washington for the

following week.  Dr. Gallagher also failed to place Mr. Washington on suicide watch or refer

him for a more complete psychiatric evaluation. Two days later, Mr. Washington assaulted a BOP administrator.

234. In November 2002, in connection with his trial for the assault, Mr. Washington was evaluated by Drs. Kevin J. McBride and Anthony A. Jimenez at Butner FMC. This evaluation concluded that Mr. Washington suffers from severe Antisocial Personality Disorder, has a mental disability, and has moderate congenital brain impairment. The report noted that Mr. Washington's prior records reveal that he has trouble adapting to the prison environment, is functionally illiterate, suffers from emotional, social, and academic deficits, and had been treated with various antipsychotic medications and antidepressants prior to his incarceration with the BOP. A second evaluation was conducted in June 2003 by Dr. Thomas Fain at Pollock USP, during which Dr. Fain conducted various mental assessments of Mr. Washington. In the spelling and reading subscales of the Wide Range Achievement Test-3, Mr. Washington performed in the 0.02 percentile. The Wechsler Adult Intelligence Scale-III indicated that Mr. Washington was mentally disabled, and various other tests indicated the presence of a congenital brain impairment.

235. Since at least 2002, Mr. Washington has been observed engaging in self-harm, often by cutting himself. Prior to his transfer to ADX, Mr. Washington attempted to commit suicide by trying to hang himself in the Pollack USP SHU. The BOP staff took him to an observation cell, where he was visited by Dr. Gallagher. Upon obtaining a promise from Mr. Washington that he would not attempt to kill himself, Dr. Gallagher had Mr. Washington returned to the SHU without further treatment. Following his transfer to ADX, an ADX employee reported observing that Mr. Washington twice cut his wrist with a razor blade. The

Operations Lieutenant was notified of Mr. Washington's behavior, and Mr. Washington was punished for his suicide attempt with a seven-day loss of his television and radio privileges. He did not receive any treatment for mental illness.

236.    In November 2011, Mr. Washington filed a Request for an Administrative Remedy, complaining that the BOP ignored evidence of his mental illness, his history of depression and his suicidal tendencies when it referred him for placement in the Control Unit. He also complained that he has never received adequate treatment for these conditions. His request was denied, as were his appeals from that denial.

## VIII.   ALLEGATIONS RELATING SPECIFICALLY TO THE INTERESTED INDIVIDUALS

237.    Interested Individuals Jaison Leggett, Herbert Perkins and David Shelby are currently incarcerated at ADX. Each suffers from a serious mental illness. Several also suffer from severe functional impairments connected to their mental illnesses, which severely limits their ability to attend to their personal needs. ADX's failure to implement adequate programs of mental health screening and treatment has violated their constitutional rights, exacerbated their serious mental illnesses, and subjected them to harm and injury, and serious risk of future harm.

238.    Each Interested Individual has requested, in various ways, mental health care at ADX. Counsel have been unable to ascertain whether the Interested Individuals have taken every action necessary to exhaust administrative remedies to the extent required by the PLRA. Once counsel confirms that exhaustion is complete, each will be added as a Plaintiff.

239.    Counsel's inability to ascertain the Interested Individual's exhaustion status stems from several factors. First, each Interested Individual is mentally ill, and at least one is mentally disabled. Those limitations impair their ability to recall and report every effort they may have

made to exhaust administrative remedies.  Some also require assistance of counsel in completing the exhaustion process.

240.    Second, the BOP's mismanagement of the care and custody of seriously mentally ill prisoners at ADX is exacerbated by the absence of any effective mechanism for those prisoners to address concerns or complaints they have about inadequate medical treatment or staff misconduct towards mentally ill prisoners and others.  Although the BOP ostensibly maintains an "administrative remedy" process that allows prisoners to complain about various issues, the administrative remedy process is itself a kangaroo court that throws bureaucratic roadblocks at prisoners' feet and that is wholly inadequate as a means of addressing serious concerns, including complaints about constitutionally inadequate mental health care services at ADX.

241.    Upon information and belief, and by way of illustration only, ADX staff members deny prisoners access to forms that the BOP requires prisoners to use to submit complaints, "lose" administrative remedy paperwork or delay its submission so that prisoner appeals are deemed "untimely," fail to adequately investigate prisoner complaints, and fail to remedy obvious problems brought to the BOP's attention by means of those prisoner complaints that do evade the impediments imposed by the BOP itself.

242.    In addition, prisoners have no effective access to a "watchdog" to investigate and address misconduct by correctional staff.  Specifically, at the time this action was filed all corrections functions at ADX were the responsibility of Captain Russell Krist, a veteran BOP correctional officer.  Like most other BOP facilities, ADX also employs a Special Investigative Agent ("SIA") whose responsibilities include investigating allegations of misconduct by ADX

staff.  Accordingly, at least in theory, the SIA's presence at ADX gives prisoners on-site access to a BOP official with the power to investigate and initiate remedies for staff mistreatment of prisoners, including the mentally ill.  As of the time this action was filed, that theoretical access was, for ADX prisoners,  a cruel hoax.

243.    Specifically, the BOP destroyed any semblance of an effective watchdog function at ADX by assigning the SIA role to Dianna Krist, who is the wife of Captain Russell Krist.  Thus, at ADX, the watchdog was married to the person whose staff the watchdog is responsible for investigating.

244.    The BOP's own written policy specifically prohibits its employees from involvement in "situations where their official actions affect or appear to affect their private interests, financial or non-financial."  BOP Program Statement OCG 3420.09 § 20.  The same policy prohibits BOP employees from "taking official action on matters that affect the financial interests of the employee [or] a spouse."  BOP's employment of Mrs. Krist as ADX's SIA violated the letter and spirit of Program Statement OCG 3420-09 and fatally compromised the ADX process for resolving the staff misconduct alleged in this lawsuit.

245.    In December 2012, approximately 7 months after this lawsuit was filed, Capt. Krist and Mrs. Krist were both removed from their positions at ADX.  Upon information and belief, their removal resulted from the exposure of the conflict of interest identified in the Complaint.  Although the Krists have both been replaced, too little time has passed to determine whether their removal has restored any effective watchdog function to the ADX.  And, more importantly, the corrupt legacy of their tenure has significantly impaired the ability of Class

Plaintiffs and other ADX prisoners to utilize the SIA's watchdog process to remedy staff misconduct.

246.     Particularly when considered in combination with the wholly ineffective administrative remedy process described above, the ineffective SIA function at ADX contributes substantially to an atmosphere in which ADX staff can and do abuse and neglect mentally ill ADX prisoners, including the Interested Individuals, without any effective oversight or prisoner recourse.

247.     As detailed above, for years ADX prisoners have been begging for adequate mental health treatment, through administrative filings and lawsuits, among other means.  That the ADX mental health system remains in shambles is plain evidence that no real remedy is available through further administrative filings.

248.     A third reason that Plaintiffs' counsel has been unable to ascertain the exhaustion status of the Interested Individuals is that despite counsel's best efforts to assist these prisoners to exhaust available remedies, the conduct of certain ADX staff members has made it virtually if not actually impossible for the Interested Individuals to complete the process.  For example, Mr. Perkins has repeatedly been denied required administrative remedy forms.  Mr. Shelby was talked into signing some sort of agreement (he is not sure what it was) that allegedly resolves his administrative remedy request. It remains unclear what he signed or who talked him into signing it, but the circumstances strongly suggest the imposition of undue influence on a profoundly damaged person, and in any event Mr. Shelby apparently has not yet completed the administrative remedy process.

249.   Whether or not they exhaust available remedies, the Interested Individuals will remain involved in this case in some capacity, either as Plaintiffs or as witnesses.

## A.   Jaison Leggett

250.   Jaison E. Leggett is 41 years old.  He grew up in Washington D.C.  Mr. Leggett is currently serving a life sentence at ADX.  Mr. Leggett suffers from a serious mental illness that has been variously diagnosed as Schizophrenia, Bipolar Illness, Major Depression and Borderline Personality Disorder.  A photograph of Mr. Leggett is attached as Exhibit 15.

251.   Starting when he was still a teenager, Mr. Leggett was admitted six times to St. Elizabeth's Hospital.  Many of these admissions followed a suicide attempt.  During his stays at St. Elizabeth's, psychiatrists' records repeatedly noted that Mr. Leggett may suffer from Schizophrenia, Antisocial Personality Disorder, Borderline Personality Disorder, and Major Depression.  Psychiatrists noted that Mr. Leggett mutilates himself and exhibits suicidal ideation. During one of his stays at St. Elizabeth's he attempted suicide and started a fire.  His records also indicate that outside of the hospital his behavior included setting fires, animal cruelty, and drug abuse.

252.   Mr. Leggett has been in custody since August 1996, and has been confined at ADX since August 22, 2002, following a transfer from Leavenworth USP.

253.   At ADX Mr. Leggett has complained of pain in his right leg that he attributed to a 1991 gunshot wound. Mr. Leggett regularly sought treatment, and even requested that BOP medical staff order his leg to be amputated.  The BOP staff acknowledged that Mr. Leggett suffered from osteomyelitis in his leg, but refused to approve the amputation.  In response to

intense pain, on August 15, 2003, Mr. Leggett cut himself with a razor blade and then swallowed the razor blade.

254.    In November 2003, Mr. Leggett again used a razor blade to cut an artery in his leg, in an effort to cut out the infection himself.  When BOP staff attempted to stop him from cutting his leg any further, Mr. Leggett swallowed the razor blade.  He was subsequently transferred to the MCFP Springfield, where his leg was amputated.  BOP psychology staff then placed Mr. Leggett on suicide watch.

255.    After BOP medical staff amputated Mr. Leggett's leg, he was fitted with a prosthetic.  Shortly after receiving his prosthetic, Mr. Leggett began complaining to the BOP that the prosthetic did not fit properly and was causing him pain.  He repeatedly requested medical attention from the BOP related to this pain.

256.     Mr. Leggett's pain was so severe while using the prosthetic, that he was unable and unwilling to use it.  In a desperate attempt to receive medical attention for the pain he was experiencing, on July 30, 2005 Mr. Leggett again used a razor blade to cut his leg.  He did so once again on November 29, 2006, and after he cut his leg he swallowed the razor blade. In addition, Mr. Leggett swallowed a razor blade and finger nail clippers on both September 8, 2007 and January 24, 2009.

257.    Several years ago, out of frustration with his lack of medical treatment and because of continuing pain caused by the improperly fitted prosthetic, Mr. Leggett damaged his prosthetic leg and swallowed some of its metal parts.  The BOP has refused to replace Mr. Leggett's prosthetic leg, instead forcing him to crawl around on the floor of his cell.  Indeed, on or about September 23, 2009 correctional officers at ADX forced Mr. Leggett to hop on one

leg up the stairs in his unit.  On or around September 30, 2009, officers forced him to hop on one leg to get from one cell to another on A Range in the ADX SHU.  On or about August 28, 2010 officers forced Mr. Leggett to crawl up and down unit stairs to get to recreation, then forced him to sit on the ground in the recreation yard.  On or about July 8, 2011, officers simply dragged him out of his cell because his wheelchair did not fit into the range.

258.    On or about November 11, 2011, BOP staff witnessed Mr. Leggett consuming a plastic bag of ibuprofen and aspirin.

259.    Despite repeated complaints filed by Mr. Leggett, for years the BOP failed to provide adequate safety bars to accommodate Mr. Leggett's disability while in the shower.  As a result, Mr. Leggett was forced to sit on the floor of the shower while bathing, for fear of falling.

260.    For years, the BOP refused to provide Mr. Leggett with a prosthetic leg until he paid for it at a cost of $4,250.77.  He is indigent, but over several years his family was able to pay off a small portion of that cost.  Until Mr. Leggett began communicating with his undersigned counsel the BOP continued to insist that he or his family would have to pay the entire cost of the prosthetic leg before one would be provided.  Only in January 2012, after Mr. Leggett engaged his undersigned counsel, did the BOP finally change course and approve his transfer to Springfield MCFP for fitting of a new prosthetic.  More than 6 months later Mr. Leggett was transferred to Springfield  MFCP, fitted with a new prosthetic, and then returned to ADX, where he remains, now with a leg, but still without constitutionally adequate care for his chronic and severe mental illness.

261.    The pain, frustration and humiliation associated with being housed at ADX without a prosthetic, cane, or crutches, and forced to crawl around his cell and recreation

enclosure like an animal has substantially aggravated Mr. Leggett's preexisting serious mental illness, which the BOP has likewise failed and refused to adequately treat.

262.     As early as February 9, 2003, according to Mr. Leggett's medical records, a BOP physician acknowledged that Mr. Leggett suffers from a mental disorder.  During his time at ADX, Mr. Leggett repeatedly has attempted suicide.  On or about November 21, 2002, BOP staff found Mr. Leggett non-responsive in his cell with bags of medicine near him.  On August 14, 2003, BOP medical staff noted that Mr. Leggett threatened suicide.  BOP medical staff indicated that BOP psychology staff had been notified.

263.     Upon information and belief, Mr. Leggett has not been on any psychotropic medication since 2005.  Before 2005, Mr. Leggett was treated with Thorazine, Haldol, and antidepressants.

264.     Upon information and belief, Mr. Leggett filed a written request sometime before October 31, 2007, requesting psychotropic medication, but changed his mind on October 31, 2007 because the side effects of his medication caused him to be increasingly violent or alternatively caused him to sleep all day.

265.     Mr. Leggett fears taking any medication as he believes that BOP staff will attempt to poison him with that medication.  This fear has been exacerbated by BOP staff's continued mistreatment related to Mr. Leggett's physical disability.

**B.   David Shelby**

266.     David Shane Shelby is 47 years old.  He was born in Benton, Kentucky, and raised in Indiana.  Immediately before his incarceration he lived in Utah.  Mr. Shelby suffers

from a serious mental illness, Bipolar Disorder.  A photograph of Mr. Shelby is attached as

Exhibit 16.

267.    Mr. Shelby has been housed at ADX since October 2000.  He currently is serving

a 24-year sentence for a 1996 conviction for making threats against the President, in addition to

other felonies, and a consecutive 80-month sentence resulting from his 1997 attempted "suicide

by officer."

268.    Mr. Shelby was raised in a family wracked by extreme poverty and mental illness.

He was raised by his mother, who suffered from serious mental illness.  When Mr. Shelby was

16 years old, he attempted suicide through an overdose of sleeping pills and whiskey.

269.    In 1989, Mr. Shelby was sentenced to imprisonment at the Westville Correctional

Center in Indiana.  During his incarceration, Mr. Shelby attempted to burn another prisoner with

a torch constructed from a mop stick.  Mr. Shelby claimed that God had directed him to make the

torch and burn the other prisoner.

270.    As a result of the incident, a mental status examination was performed in

September 1989, during which Mr. Shelby stated that "he did not exactly hear voices; but more

like -- heard feelings."  The mental health examiner concluded that Mr. Shelby may have

suffered an acute psychotic episode -- Schizophreniform Disorder in remission.

271.    Mr. Shelby was released on parole in 1992.  In December 1994, Mr. Shelby

mailed threatening letters to the President of the United States as part of a plan by Mr. Shelby to

secure the release of Charles Manson from prison.  A few weeks later, in January 1995, he was

arrested in Ogden, Utah, while attempting to mail several packages.  One of the packages was

addressed to the President of the United States and contained a modified light bulb that had been

filled with smokeless gunpowder, a pocket knife, and a note reading, "I think you are doing a good job and I am sending you the pocket knife as a gift and a light bulb so that you won't strain your eyes."  A second package, addressed to Charles Manson, contained a revolver with a fork affixed to its end to be used as a bayonet, a straight razor, and two explosive devices.

272.    Mr. Shelby was charged with making threats against the President of the United States, illegal possession of firearms/destructive devices, and possession of a firearm.  In a mental health evaluation conducted while at the Salt Lake County Jail, Mr. Shelby described how "voices" had instructed him to "Help Charlie [Manson]" and that "if Charlie was President, he could set me free."

273.    In connection with his prosecution and court-ordered mental health evaluation, Mr. Shelby was sent to MCFP Springfield, where he underwent a psychiatric evaluation for a period of approximately three months.  While at MCFP Springfield, Mr. Shelby attempted to commit suicide by ingesting a mouthful of Lysol and later by ingesting a mouthful of Bon Ami cleanser.  He stated that he attempted suicide because he "began to be concerned he might actually be mentally ill" and also reportedly stated that he "did not want to die, but if God wants me to do it, it's like a commandment."  According to the subsequent forensic report, Mr. Shelby was treated with an antipsychotic medication and was diagnosed with alcohol abuse and Schizotypal Personality Disorder that is "not regarded as a mental disease or defect by most authorities."

274.    After Mr. Shelby returned to Salt Lake County Jail in August 1995, he voluntarily surrendered a knife constructed of wire and wrapped with a leather shoelace and reported to jail personnel that he had impulses to murder another prisoner.  He reportedly told a mental health

worker that "they tell me I'm not crazy . . . then the voice of God I hear, telling me to kill all the baby rapers, must be real. God told me to kill Ryan because he is the lowest of them all."

275.    In January 1996, Mr. Shelby was ordered to undergo a second mental health evaluation. The second evaluation concurred with the prior diagnosis of Schizotypal Personality Disorder, noting that much of Mr. Shelby's psychotic illness "appears to be controlled with the medication."

276.    Mr. Shelby pled guilty to charges relating to his January 1995 arrest, and was sentenced to 288 months in the custody of the BOP. At his sentencing hearing, Mr. Shelby reportedly stated, "For quite some time in my life, I have been listening to voices in my head that I thought came from God . . . .  The terrible crimes I have committed were because I believed they were commandments of God."

277.    Mr. Shelby spent approximately one year of his sentence as an prisoner at Florence USP. In June 1996, Mr. Shelby requested discontinuation of his medication, which at the time included the antipsychotic Navane and Cogentin, which helps reduce certain side effects of Navane. After his medication was discontinued, Mr. Shelby was given no other psychiatric or mental health treatment.

278.    In early 1997, Mr. Shelby was transferred to Atlanta USP. A few months after his arrival, Mr. Shelby took a staff member hostage in the institution's kitchen with a homemade knife, in an effort to provoke the prison staff to kill him -- a scenario known as "suicide by officer." Mr. Shelby was not killed in the incident, but rather was subdued and charged with assault of a U.S. penitentiary employee with a dangerous weapon. In a statement about the incident, Mr. Shelby reported:

> On July 23, 1997, while I was a prisoner at the United States
> Penitentiary in Atlanta, I held Ms. Ross, a prison staff person,
> hostage with a knife.  It was never my intention to harm anyone.
> This was a suicide attempt.  I did this in hopes that the staff would
> shoot me.  I have problems with depression and I was not receiving
> the proper medication at the time of this incident.

279.    In May 1998, during his prosecution for assault of a U.S. penitentiary employee,

the Court ordered a psychiatric evaluation of Mr. Shelby at Talladega USP.  Upon information

and belief, at the time of his evaluation, Mr. Shelby continued to suffer from severe, chronic and

untreated Bipolar Disorder.  In the BOP evaluation, Mr. Shelby was diagnosed with the major

Depressive Disorder, currently in remission; Alcohol Dependence in sustained, full remission in

controlled environment; history of hallucinogen abuse; Personality Disorder NOS (schizotypal

and antisocial traits); and history of head injury.  Mr. Shelby was found competent to stand trial.

280.    Mr. Shelby also later again was evaluated at Springfield MCFP.  At Springfield

MCFP, Mr. Shelby was diagnosed with Major Depression, in full remission; Alcohol

Dependence; Personality Disorder NOS (schizotypal and antisocial traits); and post mild closed

head injury.  Thereafter, Mr. Shelby pled guilty to charges stemming from his attempted "suicide

by officer" and was sentenced to 80 months of confinement in BOP custody, to run consecutive

to his original federal sentence.  As part of the sentence, the court recommended that Mr. Shelby

participate in a mental health treatment program during his incarceration.

281.    Mr. Shelby was transferred to ADX in 2000 and placed in the ADX general

population.  Since his arrival at ADX, Mr. Shelby has suffered from continuing symptoms of

Bipolar Disorder, as a result of which he is engaged in a pattern of bizarre, erratic, and harmful

behavior.

282.     In or about 2009, Mr. Shelby attempted suicide.  Upon information and belief, at the time of this suicide attempt, Mr. Shelby was in the throes of psychosis caused by his as-yet untreated Bipolar Disorder.  Mr. Shelby heard the Bob Dylan song "Knocking On Heaven's Door" playing on the radio and understood the song to be a message "calling him home."  He responded by sitting down in a shower and severely cutting both arms, both legs, and his belly using glass from a broken television.  Sometime later, ADX staff discovered him bleeding and in a semi-coherent state.  His wounds were bandaged at the ADX medical facility and he was returned to a standard ADX cell.

283.     After his suicide attempt, a BOP psychologist diagnosed Mr. Shelby as suffering from Bipolar Disorder.  He was thereafter prescribed the anti-manic medication Depakote and the antidepressant Zoloft.  Although the medications have helped Mr. Shelby cope with his serious mental illness, they have not resolved his periodic psychotic episodes and his hallucinations.

284.     For example, later in 2009, Mr. Shelby heard a voice, which he took to be God's voice, commanding him to eat his finger.  In response, Mr. Shelby amputated his left pinky finger approximately 1/2 inch from where the pinky joined his hand, and cut the finger into small pieces, which he added to a bowl of ramen soup and ate.  ADX staff discovered him bleeding in his cell, and one ADX staff member asked him how his finger tasted.

285.     In early 2010, Mr. Shelby was transferred to the ADX Step-Down Program.  He maintained clear conduct during stays in the Joker Unit and Kilo Unit, and was transferred to the final stage of the Step-Down Program, which is located at the Florence USP.  In September 2011, while looking at a friend largely confined to a wheelchair, Mr. Shelby inexplicably saw

what he believed to be "devil horns" on his friend's forehead.  Mr. Shelby began choking his

friend, and was subdued, restrained, and returned to ADX.  After spending several months in

disciplinary segregation in the SHU, Mr. Shelby returned to the General Population Unit, where

he resides today.

### C.   Herbert Isaac Perkins

286.    Herbert Isaac Perkins, also known as "Pee Wee" or "Hokie," is 36 years old.

Before his incarceration he lived in Albuquerque, New Mexico.  Mr. Perkins is serving a life

sentence for armed robbery.  Mr. Perkins suffers from serious mental illness, including severe

Major Depression and Antisocial Personality Disorder.  He also exhibits signs and symptoms of

PTSD and may be suffering from the long term effects of serious closed head injuries.  During

his incarceration at ADX, Mr. Perkins has twice attempted to kill himself.  A photograph of

Mr. Perkins is attached as Exhibit 17.

287.    Mr. Perkins grew up in Albuquerque, New Mexico, in a poor Latino

neighborhood known locally as "the War Zone."  He was recruited into a gang at the age of nine.

His mother abused drugs, and shared cocaine with him repeatedly from the time he was twelve

years old.  When he was fourteen or fifteen years old, his father committed suicide by shooting

himself in the head while on the telephone with Mr. Perkins.  As a teenager, Mr. Perkins was

frequently in juvenile detention, and he did not finish high school.  It was during this period that

he first was treated for mental illness.

288.    When properly treated, Mr. Perkins' Major Depression is controllable and

relatively benign.  While in federal custody before his 2008 arrival at ADX, Mr. Perkins received

regular psychotropic medication.  He was largely asymptomatic during this period.

289.    Mr. Perkins' transfer to ADX triggered his mental illness.  He was unable to receive any treatment for his mental illness.  Although he had been medicated for depression and anxiety prior to the transfer, and asked to be continued on his medication when he arrived at ADX, he was told there was no prescription on file.  He informed BOP officials at ADX that he was suffering from depression and asked to see a psychologist or psychiatrist.  Upon information and belief, an ADX corrections officer also reported his depressed state and sought psychological intervention.  BOP officials, however, refused to take action.

290.    Upon information and belief, in August 2008, about a month after Mr. Perkins arrived at ADX, an ADX correctional officer noted his extreme depression and sought intervention by a psychologist, but was ignored.  A day or two later, Mr. Perkins used the razor provided by ADX officials with other grooming supplies to slice open a blood vessel in his neck. He was taken to Parkview Hospital in Pueblo, Colorado, where medical personnel performed an emergency surgery to stop the bleeding and repair the blood vessel in his neck.

291.    When the BOP returned Mr. Perkins from the hospital to ADX, he was weak and disoriented from blood loss and the stress of surgery.  Upon his arrival at the prison, a BOP psychologist told him that he was being placed back in the same cell in which he had just attempted to kill himself.  Mr. Perkins responded that he would not be there long, because he was going to kill himself.  Rather than placing him on suicide watch or transferring him to a BOP medical center, ADX officials returned Mr. Perkins to his normal cell, which was still awash with his own blood from the suicide attempt; the razor he had used to slash his throat was still sitting on his sink.  While most of the inmates on the tier (a "range," in ADX parlance) objected loudly that Mr. Perkins should be sent to MCFP Springfield, ADX staff expressed amusement at

Mr. Perkins' suicide attempt, brought him a pail of plain water to clean up the blood in his cell, and later removed the razor.  The following day, Mr. Perkins made good on what he told a BOP psychologist upon his return the previous day from the hospital.  Specifically, he smashed the television in his cell, swallowed some of the broken glass, slashed his wrist, and attempted to tear open the earlier wound on his neck.  Again, his bodily wounds were dressed, and again he was returned to his cell.

292.    Belatedly, Mr. Perkins was treated with Zoloft; ADX personnel later withdrew these medications without explanation.  After that, Mr. Perkins received no meaningful mental health care at ADX until late 2011 or early 2012, when BOP officials finally prescribed Prozac and Sinequan for Mr. Perkins' depression.  At no time has Mr. Perkins been provided with regular psychiatric visits or other counseling for depression.  Although his mood and physical health have improved somewhat since he finally began receiving medication, he remains clinically depressed and at risk of suicide.

293.    Since he began communicating with his undersigned counsel, Mr. Perkins has been subjected to a pattern of harassment and retaliation by BOP officials.  In late 2011, shortly after his first meeting with lawyers from Arnold & Porter, LLP, an ADX staff member made disparaging remarks to Mr. Perkins about his decision to become involved in the case.  A few weeks later, an ADX staff member falsely accused Mr. Perkins of spitting on another prisoner in the recreation yard.  The BOP's investigation of this allegations was cursory and inadequate, and Mr. Perkins was not afforded a hearing for this incident.  Instead, he was transferred to the SHU and held there for over a month.

294.    While in the SHU, Mr. Perkins was informed that his clothes, shoes, family photographs, and other belongings had been "lost."  Only some of his legal paperwork was located; some more legal paperwork and his family photographs were later returned to him.  An ADX staff member told Mr. Perkins that if he continued to be involved in the investigation of problems with the ADX mental health care system, he should expect to be returned to the SHU and have his property "lost" again.

295.    Since his first meeting with Arnold & Porter, Mr. Perkins' mail has frequently been delayed, lost, or otherwise misdirected.  He writes regularly to his nieces and sister, but many of the letters he has sent them over the last several months have never arrived, and others have been delayed for a week or more.

296.    On several occasions, Mr. Perkins' outgoing legal mail has also gone missing.  Three of these letters were sent by Certified Mail to his lawyers at Arnold & Porter months ago, but those letters have not been received.

297.    ADX staff members have insinuated to Mr. Perkins that they have taken or will take revenge on him for his involvement in this litigation by, for example, contaminating his food trays, spreading rumors among other prisoners that he is a "rat," and otherwise compromising his well-being.  As a result of these veiled threats and the BOP's prior disregard for his safety, Mr. Perkins fears for his life.

298.    ADX staff members recently opened sealed and clearly marked legal mail that Mr. Perkins had addressed and planned to send to his undersigned counsel.  Staff confiscated medical records relating to Mr. Perkins's 2008 suicide attempt, which Mr. Perkins had properly requested from ADX staff and received a few days earlier.  The confiscated records were not

contraband.  Upon information and belief, they were confiscated merely because they contain

information that will embarrass the BOP when it surfaces in this lawsuit.

### IX.   ALLEGATIONS RELATING TO THE LEGAL CENTER FOR PEOPLE WITH DISABILITIES AND OLDER PEOPLE

299.    CLA is a non-profit corporation headquartered in Denver, Colorado.  CLA was

designated in 1977 by Governor Richard Lamm as Colorado's protection and advocacy system

("P&A System") to protect and advocate for the rights of persons with developmental disabilities

under subtitle C [of title I] of the Developmental Disabilities Assistance and Bill of Rights Act of

2000 [42 U.S.C. §§ 15041 *et seq.*].  Since 1986, CLA has received federal allotments [grants] on

an annual basis, and has established and administered a P &A System in Colorado for individuals

with mental illness pursuant to 42 U.S.C. §§ 10803 and 10805 of the Protection and Advocacy

for Individuals with Mental Illness Act, ("PAIMI Act").  Since 1986, CLA has been and is

currently the eligible P&A System for individuals with mental illness in Colorado as defined at

42 U.S.C. § 10802(2).

300.    CLA has associational standing to bring this lawsuit.  CLA's is the functional

equivalent of a voluntary membership organization that was created by Congress to protect and

advocate for its Colorado Constituents, which include ADX prisoners with significant mental

illness or emotional impairment who are being abused, neglected and being denied necessary and

appropriate mental health treatment.  CLA's Colorado Constituents possess many indicia of

membership, which are alleged in the following paragraphs.

301.    CLA publishes the annual PAIMI Program Priorities and Objectives on its

website and invites Constituents to comment on the relative importance of the PAIMI Program

Priorities and Objectives to CLA's statutory charge to protect and advocate for individuals with mental illness.

302.    CLA has a governing board of directors, which is composed of members who broadly represent and who are knowledgeable about the needs of individuals with mental illness. CLA's board of directors includes members who have received or are receiving mental health services or family members of directors who have received or are receiving mental health services.

303.    CLA has established a PAIMI Advisory Council which advises the P&A System on the policies and priorities designed to protect and advocate for the rights of CLA's Constituents:  individuals with a significant mental illness or emotional impairment.

304.    The PAIMI Advisory Council includes attorneys, mental health professionals, members of the public who are knowledgeable about mental illness, a provider of mental health services, and individuals who have received or are receiving mental health services or who have family members who have received or are receiving mental health services.  Over sixty percent (60%) of CLA's PAIMI Advisory Council consists of members who have received or are receiving mental health services or who have family members who have received or are receiving mental health services.

305.    CLA's PAIMI Advisory Council is chaired by an individual who has a family member who has received or is receiving mental health services.  CLA's PAIMI Advisory Council chairperson  and one council member are also members of CLA's governing board of directors.  Together, CLA's governing board and  PAIMI Advisory Council with assistance of PAIMI program staff develop the annual priorities and objectives of the P&A System.

306.    CLA's PAIMI Advisory Council meets six times per year.  At these meetings, the Advisory Council discusses issues that concern abuse, neglect, and rights violations, as well as the delivery of mental health treatment, to CLA's Constituents throughout Colorado.  These meetings are attended by members of the public who are interested in mental health issues, CLA's PAIMI program staff, its Legal Director, and Executive Director.  At these meetings PAIMI program staff report on priority casework and recent developments concerning abuse, neglect, and rights violations involving CLA's Constituents.

307.    Prior to the April 2013 PAIMI Advisory Council meeting, a meeting reminder notice was sent to interested members of the public and all council members that included links to the "Supermax ADX" litigation.  Everyone who received the notice was encouraged to read the information provided at these websites to facilitate discussions at the Council meeting.

308.    At the April 2013 PAIMI Advisory Council meeting PAIMI staff reported on the lack of mental health treatment for prisoners at the U.S. Bureau of Prison's ADX facility in Florence, Colorado.  It was reported to attendees and the PAIMI Advisory Council that the denial of necessary mental health treatment to a federal prisoner diagnosed with a significant mental illness or emotional impairment can be a violation of the Eighth Amendment's cruel and unusual punishment clause, a serious matter that CLA needed to address.  The council members and attendees were also informed by PAIMI staff that reports had been received about prisoners with mental illness who had committed suicide, engaged in self-harming behaviors, were catatonic in their cell, were smearing feces about themselves and their cells and some were screaming out at all hours of the day and night.  The PAIMI Advisory Council determined that something should be done to remedy the situation.

309.     Following the April 2013 PAIMI Council meeting, a new PAIMI Program Priority was circulated to and adopted by both the PAIMI Advisory Council and CLA's governing board.  Program Priority 4 directs CLA to investigate and monitor complaints and reports of abuse, neglect, and rights violations from PAIMI eligible individuals confined at ADX.  Program Priority 4 further directs CLA to take appropriate action including litigation, to correct any abuse, neglect, or rights violations, involving ADX prisoners.

310.     As of May 17, 2013, CLA has received requests for representation from or on behalf of six current ADX prisoners.  Four of those prisoners, James Cole, William Harris, William Sablan and James Van Noy, have personally requested CLA's assistance.  The mother of ADX prisoner Jonathan Francisco requested assistance on his behalf, as his attorney in fact. David Hearne's counsel requested CLA's assistance on his behalf.  Together, these individuals are among  CLA's Constituents.

311.     Each ADX Constituent's request for representation indicates that the Constituent has a significant mental illness or emotional impairment and calls upon CLA to take action to ensure these prisoners receive necessary and appropriate mental health treatment.

312.     CLA has established a grievance procedure for Constituents and prospective Constituents, which allows individuals with mental illness and family members of such individuals to assure themselves that CLA and the PAIMI Program are operating in compliance with the provisions of the PAIMI Act.  The Legal Services Committee of CLA's governing board makes the final decision on Constituent grievances.

313.     CLA is sufficiently identified with its Constituents and subject to their influence, which is demonstrated by CLA's actions, after receiving reports of abuse, neglect, and rights

violations at ADX.  CLA adopted a new PAIMI Program Priority by joint action of the PAIMI

Advisory Council and governing board to address the reports of abuse, neglect, rights violations

occurring at ADX.  CLA has allocated its limited resources, both personnel and financial, to

investigate and file this lawsuit to stop the abuse, neglect, and rights violations experienced by

all PAIMI eligible ADX prisoners.  CLA staff have traveled from Denver to Florence, Colorado,

spending two days interviewing Constituents at the ADX.  CLA staff have also spent numerous

hours reviewing the pleadings in the *Cunningham* and *Vega* cases; attending conferences where

prisoner complaints are discussed; reviewing prisoner letters reporting or complaining about

ongoing abuse, neglect, and rights violations at ADX; reviewing media reports about ADX's

treatment of prisoners with significant mental illness or emotional impairment; conducting legal

research; and drafting portions of the amended complaint.

314.    When CLA's Constituents are abused, neglected, and their right to receive

necessary and appropriate mental health treatment is violated, CLA has the authority to pursue

administrative, legal, and other appropriate remedies to ensure the protection of these vulnerable

individuals.  This lawsuit seeks to remedy the abuse, neglect, and rights violations inflicted on

CLA's Constituents at the ADX facility by agents of the U.S. Bureau of Prisons.  Specifically,

CLA's authority to sue the U.S. Bureau of Prisons for the relief sought is conferred by federal

law.  *See* 42 U.S.C. § 10804(c); 42 U.S.C. § 10805(a)(1)(A) & (B); and 42 U.S.C. § 10807.

315.    Because CLA has authority to represent all inmates at ADX with serious mental

illnesses or emotional impairment, certification of a class and/or subclasses may not be necessary

to remedy the constitutionally inadequate mental health services at ADX.

## X.   ALLEGATIONS RELATING TO SOME OF CLA's CONSTITUENTS.

### A.   James Cole

316.    James Cole is 34 years old.  He has a seventh grade education.  Before Mr. Cole's incarceration, he lived in Mississippi.  Currently, Mr. Cole is serving a 151 month sentence for assaulting a staff member at the United States penitentiary in Pollack, Louisiana.  He has been at ADX since August 2011 and has a scheduled release date of January 11, 2047.  Mr. Cole suffers from a severe mental illness that has been diagnosed as schizophrenia.  He also has significant cognitive impairments and may be mentally disabled.  A photograph of Mr. Cole is attached as Exhibit 18.

317.    Mr. Cole has been treated for severe mental illness since he was a child.  Among other mental health facilities, he has resided at East Mississippi State Hospital, a state mental hospital in Meridian Mississippi, a mental health unit at the East Mississippi Correctional Center, and (twice) at Springfield MCFP.

318.    The signs and symptoms of Mr. Cole's mental illness and developmental disabilities are profound and obvious.  He freely expresses wild delusions about people he knows and places he has been.  During normal conversation, he frequently (and completely unconsciously) begins speaking in tongues, and then just as abruptly returns to normal speech.  He has great difficulty understanding and following simple instructions.  Not even a cursory mental health examination would fail to detect his mental illness.

319.    The BOP is currently treating Mr. Cole's schizophrenia with periodic injections of a powerful antipsychotic medication, but otherwise is not providing him with any meaningful mental health treatment.

320.    Mr. Cole lacks the mental capacity to even attempt to advocate for himself through the ADX administrative remedy process, and as a result is largely ignored by the ADX medical and mental health staff.

**B.    Jonathan Francisco**

321.    Jonathan Francisco is 29 years old.  Before Mr. Francisco's incarceration he lived in Tennessee.  He is currently serving extended sentences for unlawful weapons possession and murdering a fellow prisoner at the United States Penitentiary in Pollack, Louisiana.  He has a release date of May 29, 2040.  Mr. Francisco currently suffers from a serious mental illness. Because of the circumstances described below, his current diagnosis is unknown to Plaintiffs' counsel.  A photograph of Mr. Francisco is attached as Exhibit 19.

322.    Mr. Francisco arrived at ADX in late 2011.  Shortly after his arrival, other prisoners in the ADX SHU began to notice his bizarre behavior.  Among other things, he has not spoken a word to anyone in the nearly 18 months since arriving at ADX; rather, he spends all day, every day, staring at the wall of his cell.  He frequently defecates on the floor of his cell or on a food tray, and smears his feces on himself, his cell or his other surroundings.  He ignores other prisoners' attempts to help him, does not communicate with staff, and makes no effort to maintain his health or hygiene.  As a result, he lives in squalor, rarely eats and is showered only when ADX staff members force him into a shower enclosure.

323.    Plaintiffs' counsel learned about Mr. Francisco from other prisoners  in late 2011, and began investigating his background.  A review of court filings revealed a letter that his mother sent to his original sentencing judge in 2010 noting that when she visited Mr. Francisco on March 7, 2010,  his hair was matted, he was "very underweight," he appeared to be "over

medicated," he "couldn't talk," his balance was "unstable," and he "appeared unable to recognize [his mother] and his little sister[S]halina."   When contacted by Plaintiffs' counsel, Mr. Francisco's mother provided a power of attorney signed by Mr. Francisco before his incarceration, and pursuant to that power of attorney signed an engagement letter with Plaintiffs' counsel's firm and a Privacy Act waiver authorizing counsel to request a copy of Mr. Francisco's BOP file pursuant to the Freedom of Information Act ("FOIA").  Counsel repeatedly requested that file, but BOP initially refused to acknowledge Mr. Francisco's power of attorney and has as-yet refused to produce his file.

324.    Mr. Francisco has also failed to respond to counsel's requests for an interview, upon information and belief because he no longer comprehends even simple correspondence.

325.    Under the circumstances, although the overwhelming evidence suggests that Mr. Francisco is in profound and obvious psychiatric distress that is being completely ignored by the BOP and ADX staff, Plaintiffs' counsel has not, as yet, secured access to the records necessary to assist him, other than to put BOP on notice of his obvious distress.

326.    Upon information and belief, Mr. Francisco lacks the mental capacity to even attempt to advocate for himself through the ADX administrative remedy process.  Upon information and belief is currently receiving no mental health care of any kind.

**C.  William Harris**

327.    William J. "Billy" Harris is 37 years old.  Before his incarceration he lived in the Phoenix, Arizona area.  He is a member of Salt River Pima-Maricopa Indian Community, a Native American sovereign tribe located in the metropolitan Phoenix area.  He is currently serving a 188 month sentence for assaulting a federal officer, in addition to a 108 month sentence

for Assault Resulting in Serious Bodily Injury. He has been at ADX since 2011. He currently has a serious mental illness, which has been diagnosed as Schizophrenia. He also has significant cognitive impairments, including brain damage caused by years of substance abuse, including huffing paint.

328.     Mr. Harris reports experiencing significant psychiatric and cognitive symptoms since at least early in his teenage years. At this time, Plaintiffs' counsel does not have access to most of Mr. Harris' records. But the records of his prosecution for a 2004 homicide provide significant indicia of his profound mental illness. Specifically, in 2005 and 2006 he was evaluated and treated at least twice at Butner FMC. A March 16, 2006 filing by his attorney reflects that before that date he had been evaluated and treated at Butner FMC and found incompetent to stand trial. His BOP treating physician requested four months to attempt to restore him to competency, as the treating physician's efforts to that time had been unsuccessful.

329.     Thereafter, and apparently before competency was restored, Mr. Harris was transported back to Arizona, where he was held in a private prison in Florence, Arizona, operated by the Corrections Corporation of America ("CCA Florence"). Before arriving at CCA Florence, Mr. Harris was receiving daily doses of the potent antipsychotic medication Risperdal, but during his return trip to Arizona he received only one or two doses of his medication, and after he arrived at  CCA Florence he was given an entirely different antipsychotic, Thorazine. As a result, the court filing describes him as "incompetent and psychotic." His lawyer also noted that one clear physical manifestation of Mr. Harris' mental illness and brain damage -- habitual rocking back and forth -- was worse than before his initial transport to Butner FMC.

330.    Mr. Harris was later returned to Butner FMC and after extended treatment was restored to competency.  He then pleaded guilty to assault and was sentenced to 108 months. The BOP them promptly shipped him to ADX, where he remains today, only periodically lucid, persistently rocking back and forth, and deteriorating due to the extreme isolation in which he exists.   Although he receives daily psychotropic medication at the ADX, he receives no other meaningful mental health care.  Because of his mental illness and cognitive issues, he is incapable of advocating for himself generally, or of requesting the care his condition requires.

**D.   David Hearne**

331.    David Hearne is 34 years old.  He has a seventh grade education.  Before Mr. Hearne's incarceration, he was a resident of Washington, D.C.  Currently, Mr. Hearne is serving a fifteen year sentence for assaulting two corrections officers.  He has a release date of April 2025.  Mr. Hearne suffers from a serious mental illness that has been diagnosed at various points as Bipolar Disorder, Conduct Disorder, Manic Episodes, Depression, Anti-Social Personality Disorder, and Borderline Intellectual Functioning.  A photograph of Mr. Hearne is attached as Exhibit 20.

332.    Mental illness runs in Mr. Hearne's family.  When Mr. Hearne was six months old, his father, a paranoid schizophrenic, killed his wife (not Mr. Hearne's mother) by stabbing her sixteen times.  Subsequently, Mr. Hearne's father was institutionalized at St. Elizabeth's Mental Hospital in Washington, D.C.  After his release from St. Elizabeth's, Mr. Hearne's father stabbed a man in a wheelchair.  He was then sent back to St. Elizabeth's.

333.    As a child, Mr. Hearne was extraordinarily aggressive and physically abused his mother.  At age six, Mr. Hearne began exhibiting symptoms of Paranoid Schizophrenia.  Since

1992, from approximately age 13, Mr. Hearne has resided almost continuously in restrictive mental hospitals or correctional facilities.

334.   In 1992, Mr. Hearne was institutionalized at St. Elizabeth's, the same facility where his father had been institutionalized.  At St. Elizabeth's, Mr. Hearne was diagnosed with Major Depressive Episode With Psychotic Features, Brief Reactive Psychosis, Bipolar Disorder, And Attention Deficit/Hyperactivity Disorder.  Mr. Hearne spent approximately one year at St. Elizabeth's Mental Hospital before he jumped out of a window and escaped.  In 1993, Mr. Hearne was again hospitalized at St. Elizabeth's where he was, at that time, diagnosed with Bipolar Disorder.  In December of 1994, after his mother passed away, Mr. Hearne was seen at Greensville Emporia Counseling Services in Virginia and diagnosed with Conduct Disorder.

335.   Due to aggressive behavior, most of Mr. Hearne's teenage years were spent at Beaumont Learning Center.  Mr. Hearne was also hospitalized at Popular Spring Hospital and Central State Hospital and diagnosed with Bipolar Disorder at both facilities.  While at Popular Spring Hospital in February 1995, Mr. Hearne underwent intelligence testing and achieved a full-scale I.Q. score of 66, placing him in the mentally disabled range.  Subsequently, Mr. Hearne was hospitalized in 1996 and again in 1997 at Central State Hospital after being involved in detention center assaults.  During his hospitalizations at Central State Hospital, Mr. Hearne was diagnosed each time with Bipolar Disorder.  Later, in March of 2000, Mr. Hearne underwent intelligence testing through the Marion Correctional Treatment Center in Marion, Virginia, and received a full-scale I.Q. score of 72, placing him in the "borderline" range.

336.   After being released from a Washington, D.C. detention center in January 2003, Mr. Hearne became affiliated with Green Door, a community agency providing regular

psychiatric examinations and medications.  By February of 2004, however, Mr. Hearne started refusing medications and had a verbal altercation with a staff member.  Mr. Hearne was then asked to leave the facility.

337.    On February 8, 2004, Mr. Hearne was arrested on federal firearms charges after boarding a city bus in Washington, D.C. with a gun.  Believing that people were following and trying to kill him, Mr. Hearne fired the gun out of the moving bus.  He did not hit anyone.

338.    After Mr. Hearne's arrest, Dr. Janet Fay-Dumaine, a clinical psychologist, evaluated Mr. Hearne while he was incarcerated at FCI Butner awaiting trial and concluded that "mental health factors substantially impair Mr. Hearnes' [sic] factual and rational understanding of the proceedings against him . . . ."  Dr. Fay-Dumaine recommended that Mr. Hearne be "transferred to a mental hospital for further examination and treatment."

339.    Shortly thereafter, in May of 2004, Mr. Hearne was remanded to a Washington, D.C. jail.  There, Dr. Lawrence Oliver, another clinical psychologist, examined Mr. Hearne and noted that Mr. Hearne's condition was "deteriorating from what it was when he left" FCI Butner, where Mr. Hearne had been diagnosed with "Bipolar Disorder, Manic without Psychotic Features, Cannabis Abuse, Anti-social Personality Disorder, Borderline Intellectual Functioning, and Borderline Hypertension."  Dr. Oliver made the following observation: "Although it was recommended by the staff at Butner FCI that Mr. Hearne[] continue on his medication regimen to assure continued competency, according to Mr. Hearne[], this apparently did not happened [sic].  This may be the reason why his condition has deteriorated since his return to the District."  Dr. Oliver concluded that Mr. Hearne was "not mentally competent to understand the

proceedings against him or to assist in the preparation of his defense. Mr. Hearne[] should be transferred to a mental hospital for further examination and treatment."

340. Notwithstanding the conclusions of two separate clinical psychologists that Mr. Hearne was incapable of understanding the proceedings against him, Mr. Hearne was permitted to enter a guilty plea to the federal firearms charges only three months later on August 3, 2004. The Court sentenced Mr. Hearne to 100 months (over 8 years) incarceration on one count and 5 years incarceration on the second count, to be served concurrently. After sentencing Mr. Hearne, the Court ordered that he "be transported forthwith to the Correction Treatment Facility and . . . receive the psychotropic medications he was prescribed by [sic] treatment team at the D.C. Department of Mental Health."

341. After his conviction on federal firearms charges, Mr. Hearne displayed agitation, hyperactivity, pressure of speech, and bizarre and assaultive behavior while housed in a penitentiary in Coleman, Florida. In October of 2005, Mr. Hearne was transferred to a medical center, where he was diagnosed with Bipolar Disorder and treated with antipsychotic medications (Seroquel, Haldol, and Cogentin). In April 2006, Mr. Hearne was discharged and reportedly doing well on a locked unit. Later, however, while at Victorville USP, Mr. Hearne was again referred to a medical center and admitted to in-patient treatment in January and May of 2007. In July 2007, Mr. Hearne was discharged from treatment and thereafter received out-patient treatment at Big Sandy USP and later at Terre Haute USP. During this time, Mr. Hearne was periodically non-compliant with his medication.

342. Despite Mr. Hearne's well-documented and extended history of mental illness, the chief psychologist at Terre Haute USP concluded that Mr. Hearne was "not considered to have

problems that require chronic care."  Nevertheless, Mr. Hearne was put on "psych alert" at Terre Haute USP, which is a designation made to put psychologists on guard for disruptive behavior.

343.    On November 7, 2008, while at Terre Haute USP, Mr. Hearne assaulted two correctional officers.  At the time of these assaults, Mr. Hearne was not being provided his proper medications.  As a result of this incident, Mr. Hearne was charged with two counts of assaulting a federal officer.

344.    In April 2009, Mr. Hearne's attorney filed a motion to determine Mr. Hearne's mental competency after he began manifesting symptoms of severe psychosis.  The Court granted the motion and later found that Mr. Hearne was "suffering from a mental disease or defect rendering him mentally incompetent" to stand trial.  The Court ordered that Mr. Hearne be hospitalized for treatment.

345.    In January 2010, doctors at Springfield MCFP performed a psychiatric evaluation of Mr. Hearne, after which they prescribed him psychotropic medications including Haldol Deconate, Haloperidol Lactate, Ranitidien, Trazodone, and Trihexphenidyl.  After receiving the prescribed treatment, Mr. Hearne's condition improved dramatically.  Doctors at Springfield MCFP reported that Mr. Hearne was alert and fully oriented, able to stay on topic and provide appropriate responses, and had thoughts that were clear, rational, and organized.  Reports from Springfield MCFP also indicated that Mr. Hearne's previous manic behavior seemed resolved, he did not present with pressured speech, no delusional ideation was evident, he denied suicidal and homicidal ideation or intent, and he was not judged to be at risk for imminent self-harm.

346.    In March 2010, after Mr. Hearne had received the prescribed medication, the Court found Mr. Hearne mentally competent to stand trial, and in June of 2010, Mr. Hearne pled

guilty to charges arising from his assault of two correctional officers at Terre Haute USP.  The court sentenced Mr. Hearne to fifteen years imprisonment, but recommended that Mr. Hearne "be designated to a medical facility."

347.    Despite the sentencing Court's recommendation that Mr. Hearne be designated to a medical facility, Mr. Hearne was transferred to ADX Florence sometime in 2010.  On March 14, 2011, Mr. Hearne filed a handwritten document entitled "Suggestion Of Death Upon The Record Under Rule 25(a)(1)" and dated December 10, 2010, in the court where he pled guilty to the federal assault charges.  In the document, Mr. Hearne stated that he would commit suicide by January 1, 2011 "in a private location outside the view of 'normal vision' only in the eyes of (GOD) [sic] I shall be set free with all liberties restored."

348.    Despite his extended history of mental illness, Mr. Hearne, upon arriving at ADX, received palpably inadequate and perfunctory mental health screening.  When Mr. Hearne arrived at ADX, he ran into a staff psychologist and staff psychiatrist in the hallway.  They asked Mr. Hearne if he took any over the counter medications, but failed to ask whether Mr. Hearne took any other medications.  Mr. Hearne was then placed in a suicide cell with no mattress.  From approximately March 2011 to January 2012, Mr. Hearne did not receive any medication at ADX.  He has experienced 10-11 month periods at ADX where doctors did not visit him.

349.    On or around January 6, 2011, Mr. Hearne filed a Cop-Out to ADX prison officials stating that he was being held at ADX without a hearing or psychiatric meeting (the form he submitted actually says: "Why am I over here at the ADX with out a hearing or psy meat ton").  The BOP's response asserted that Mr. Hearne had made "no specific request for relief."

350.    On or around February 16, 2011, during an ADX General Population Hearing, Mr. Hearne told the hearing administrator that he was "not getting the medical care and medication I want."  The hearing administrator responded by stating that the hearing "was not the appropriate avenue for [Mr. Hearne] to address this subject and [Mr. Hearne] should contact his Unit Team or Medical Services."

351.    On or around July 19, 2012, Mr. Hearne again submitted a Cop-Out to ADX prison officials requesting treatment for his mental illness.  The BOP did not provide treatment.

352.    Subsequently, on or around August 16, 2012, Mr. Hearne submitted a Request For Administrative Remedy to ADX prison officials requesting treatment for his mental illness.  The BOP's response (which, curiously, refers to an Administrative Remedy dated September 25, 2012) stated that "there is no evidence to support [Mr. Hearne's] contention that [he] ha[s] a serious mental illness."

353.    Mr. Hearne submitted a Regional Administrative Remedy Appeal to ADX prison officials on or around December 4, 2012, again requesting treatment for his mental illness.  The BOP did not provide treatment.

354.    On or around March 5, 2013, Mr. Hearne submitted a Central Office Administrative Remedy Appeal to the BOP's central office in Washington, D.C., requesting treatment for his mental illness.  The BOP rejected Mr. Hearne's appeal.

355.    Mr. Hearne's sister died unexpectedly in early 2013.  Since her death, Mr. Hearn's condition has rapidly deteriorated, as has his conduct.   After an extended period of good conduct in 2012, he has spent most of the last two months in the SHU and is descending rapidly into florid psychosis, and yet is being largely ignored by the BOP's medical and mental health

staff.  In the absence of prompt and effective treatment, upon information and belief he is at high risk for self-harm or possibly suicide.

356.     Mr. Hearne is a current client of Arnold & Porter LLP, which requested CLA's assistance on his behalf on May 16, 2013, after the ADX staff denied counsel's request to visit Mr. Hearne because he was in psychiatric crisis and had been approved for emergency transport to Springfield MCFP.

## E.   William Concepcion Sablan

357.     William Concepcion Sablan is 47 years old.  He is originally from Saipan, in the United States Commonwealth of the Northern Mariana Islands.  He is currently serving a sentence of life without the possibility of parole at ADX.  Mr. Sablan suffers from a serious mental illness that has been diagnosed at various points as Psychotic Disorder NOS, Major Depressive Disorder, PTSD, Cognitive Disorder NOS, Posttraumatic Brain Injury, and severe Personality Disorder.  A photograph of Mr. Sablan is attached as Exhibit 21.

358.     Mr. Sablan was the thirteenth of fifteen children.  As a child, Mr. Sablan and his siblings were subject to harsh and frequent beatings from their father.  They were kicked, slammed into walls, beaten with fan belts, and choked.  Mr. Sablan manifested anti-social behavior while in middle school, including excessive absenteeism, failing school work, and suspensions.  Mr. Sablan never completed the eighth grade, dropping out of school in 1979, when he was fifteen.  At a young age, he began abusing drugs, including methamphetamine, marijuana, and alcohol.

359.     Mr. Sablan has been in and out of prisons since 1984. Between 1984 and 1997, Mr. Sablan pleaded guilty or was convicted of six felonies and was arrested at least fifteen other times.

360.     Two incidents in 1995 precipitated the serious deterioration of Mr. Sablan's mental health.  His daughter Mae was killed in a hit and run accident and the perpetrator was never caught.  Mr. Sablan, traumatized by her death, became intensely paranoid and obsessed with finding the driver.  He disappeared into the jungle for days at a time, claiming to be looking for her killer.  Mr. Sablan claimed to see his dead daughter walking around his house.  In public, he became extremely aggressive when he saw adults being mean to children.

361.     In September 1995 Mr. Sablan suffered serious head trauma after being attacked by several men, one of whom hit Mr. Sablan in the head with a machete.  He received a five centimeter laceration of the posterior scalp that shaved off a three centimeter disc of the external table of his skull, and another five centimeter laceration on his right anterior scalp.  After the machete attack, Mr. Sablan's demeanor and mood changed.  He began to misunderstand events and lose track of conversations, but would become furious if anyone asked him about his changed behavior.  Mr. Sablan began harboring delusions that the someone was after him and would burst into flight when he thought someone was pursuing him.  He would climb coconut trees and stare into the jungle all night, looking for his imaginary pursuers.

362.     While in custody in 1997, prison medical officials prescribed Mr. Sablan the antimanic agent Depakote and the powerful antipsychotic medication Haldol.  He also received a mental health screening on these occasions from Dr. Marc Herbst.  Though Mr. Sablan denied

any history of psychotic symptoms, Dr. Herbst diagnosed him with PTSD and Post-Traumatic Brain Injury, possibly temporal lobe Epilepsy.

363.    While incarcerated in 1999, Mr. Sablan and others participated in a prison riot and escape.  For his role in these actions, Mr. Sablan was sentenced to 252 months imprisonment and transferred to prison in the continental United States.

364.    Despite his psychiatric diagnoses and history of medication, as well as transfer paperwork that suggested a detailed psychiatric examination be conducted upon arrival, Mr. Sablan was only given a perfunctory screening when he arrived at Florence USP.  The entire examination consisted of the physician's assistant merely asking Mr. Sablan if he had any mental issues.  The BOP also failed to review his psychotropic medication upon his arrival, despite a written BOP file entry directing such a review.  Mr. Sablan then was placed in a two person cell with his distant cousin Rudy Sablan and a third prisoner, Joey Estrella.  Under the BOP's own rules, the mental health staff at ADX should have followed up his initial processing with an evaluation within 24 hours of Mr. Sablan's arrival.  The staff at Florence USP failed to do so. The staff also failed to provide Mr. Sablan with his psychotropic medication.

365.    On October 10, 1999, only three days after arriving at ADX, Mr. Sablan and his cousin killed Mr. Estrella.  Mr. Sablan was charged with murder and his defense counsel sought to have him found incompetent to stand trial due to his psychiatric illnesses.  The BOP claimed, however, that Mr. Sablan was not mentally ill and was merely malingering.

366.    In July 2001, Dr. Laura Post examined Mr. Sablan, and diagnosed him with PTSD and a Psychotic Disorder Due to Manic Episode.  She prescribed him the potent antipsychotic Haldol.  Also in July 2001, Dr. Rose Manguso conducted a neuropsychological evaluation of

Mr. Sablan.  She concluded that he suffered from neuropsychological deficits which stemmed from the brain damage caused by prior head trauma and prior emotional or psychological disturbances.  She concluded that these neuropsychological deficits could easily exacerbate the symptoms of Mr. Sablan's PTSD and his Mood Disorder with Psychotic Features.

367.    In September 2001, Drs. James Jacobson and Todd Robert Poch evaluated Mr. Sablan for over twenty-five hours, and concluded that he suffered from an Anxiety and Mood Disorder with Psychotic Features.  They suggested that Mr. Sablan receive the antimanic drug Tegretol and the antipsychotic drug Risperdal.  Dr. Poch noted Mr. Sablan's fanciful delusions, including claims that he was the chief of the Chamorros (his indigenous tribe on Saipan), that had the psychic ability to determine the outcome of his own trial, and that he knew the location of Amelia Earhart's plane.  Dr. Poch also reported that Mr. Sablan had received a Full Scale IQ of 77 on the intelligence test he had been administered.

368.    In September 2003, psychiatrist Dr. Frank G. Fortunati examined Mr. Sablan.  Dr. Fortunati observed Mr. Sablan experiencing auditory hallucinations of three different people talking to each other, that Mr. Sablan claimed he could hear via a satellite connection and a computer located in his brain.  Mr. Sablan also claimed that the government could hear all the thoughts of everyone in the world through the use of satellite connections.  Dr. Fortunati concluded that Mr. Sablan was in a floridly psychotic state.

369.    In May 2004, Dr. Ruben Gur conducted a Quantitative Functional Brain Imaging Consultation based on MRI images of Mr. Sablan's brain.  Dr. Gur indicated that the abnormalities in low grey matter were consistent with parenchymal loss caused by head injury,

and that the behavioral consequences of such abnormalities could be severe, potentially causing intensified aggressive urges and an impaired ability to control emotional output.

370.     Based on these findings, on June 10, 2004, Judge Wiley Y. Daniel found that Mr. Sablan was suffering from a mental disease or defect rendering him mentally incompetent to assist properly in his defense.  Judge Daniel ordered that Mr. Sablan be hospitalized and treated for up to four months to determine whether he could attain the capacity for the trial to proceed. Mr. Sablan was transferred to Butner FMC.

371.     While at Butner FMC, Mr. Sablan was floridly delusional.  He made a series of claims about Amelia Earhart and her plane, including that he found her plane 20 years ago and that Earhart's spirit had been pursuing him ever since, trying to get him to solve the mystery.  He relayed his claim in a letter to the Amelia Earhart Foundation.  Mr. Sablan also spoke frequently about brain interference from satellites and his continuing frustration that his daughter's killer had never been caught.  BOP physicians Drs. Byron Herbel and Robert Cochrane expressed doubt that Mr. Sablan's condition was the result of malingering, and hypothesized that he could be suffering from Delusional Disorder or Late Onset Schizophrenia.  They prescribed him a cocktail of drugs consisting of antimanic drug Depakene, antipsychotic drug Risperdal and antidepressant Remeron.

372.     BOP officials were unable to render Mr. Sablan competent for trial within the four month time limit ordered by Judge Daniel.  Upon the BOP's request, Judge Daniel ordered an additional 120 days of attempts to render Mr. Sablan competent.

373.     In January 2005, after many months of this extensive regimen of psychotropic drugs and constant psychiatric treatment and therapy, the evaluators at Butner FMC concluded

that Mr. Sablan was competent to stand trial. Nonetheless, Mr. Sablan continued to endorse the same delusions, only slightly diminished, and with a sense of embarrassment. In April 2005, Mr. Sablan was still claiming that he had found Amelia Earhart's plane, but admitted that the plane he found would require verification to prove its origin. He also admitted that he was still receiving interference from the satellites, but said that watching television helped him ignore it.

374.    Dr. Herbel's final report at Butner FMC diagnosed Mr. Sablan with Psychotic Disorder NOS; Major Depressive Disorder, Single Episode, Moderate; Cognitive Disorder NOS; Antisocial Personality Disorder; and addictions to various illicit drugs. Dr. Herbel also noted that Mr. Sablan's increased depression was a common outcome after patients with Schizophrenia become medicated and become aware that their beliefs are merely delusions.

375.    In April 2005, Judge Daniel found that Mr. Sablan had recovered sufficiently to stand trial. At trial, the issue of Mr. Sablan's mental competence was extensively litigated. Dr. Gur testified that scans of Mr. Sablan's brain showed that even the least damaged areas were abnormal. Dr. David Lovejoy, a neuropsychologist, testified that Mr. Sablan suffered from Traumatic Brain Injury, Psychotic Disorder, and PTSD.

376.    The jury found Mr. Sablan guilty of murder. Judge Daniel thereafter sentenced Mr. Sablan to life imprisonment without the possibility of parole. Judge Daniel also recommended that "the Bureau of Prisons continue, on an uninterrupted basis, with a regimen of medicines (previously referred to as psychotropic medications) and other therapeutic treatment (including art supplies) currently in place to provide the defendant with the maximum ability to serve his life sentence with minimal disruptions to himself or others."

377.    Mr. Sablan was thereafter returned to ADX.  Since Mr. Sablan's arrival at ADX, the BOP has completely ignored Judge Daniel's recommendations concerning Mr. Sablan's mental health care.  Although Mr. Sablan receives psychotropic medication, the BOP refuses to give Mr. Sablan any psychological or other therapeutic treatment in accordance with Judge Daniel's sentencing order.

378.     Mr. Sablan has attempted to exhaust administrative remedies concerning his access to mental health care at ADX, but despite the active involvement of counsel in that process had been unable to complete the process due to his severe mental illness and cognitive issues.  No administrative remedy is, therefore, available to him.

**F.   James Van Noy**

379.    James Van Noy is 49 years old.  Before his incarceration he lived in Alabama.  He has been incarcerated continuously since 1985.  He is currently serving a 63 month sentence for making threats against the President of the United States while incarcerated in Alabama, and a consecutive 51 month sentence for biting a BOP correctional officer.  He currently has a serious mental illness, for which he has received a variety of diagnoses.  He is currently being treated with anti-depressant medication.  He also exhibits obvious signs and symptoms of serious and debilitating cognitive problems.   A photograph of Mr. Van Noy is attached as Exhibit 22.

380.    Mr. Van Noy, has a fourth grade education.  At this time, Plaintiffs' counsel does not have access to most of Mr. Van Noy's records.  But the records of his two prosecutions for federal offenses provide significant indicia of his profound mental illness.

381.    In September 2004, while Mr. Van Noy was incarcerated in a state facility in Alabama, he wrote a letter threatening then-President George W. Bush, for which he was

prosecuted.  Information developed during the course of that prosecution revealed that in approximately 1975, at the age of 10, Mr. Van Noy was committed to the Searcy State Mental Hospital, an Alabama residential state mental health facility.  He remained there until approximately 1986, when he was 22 or 23 years old.  Since then, he has been confined in jails and prisons almost continuously.   A forensic psychologist who examined Mr. Van Noy in the course of his prosecution for threatening the president concluded that he was suffering from a serious mental illness that is manifested by severe impairments in impulse control, attention problems, mood variability and periods of psychosis.  Based on those findings, the court determined that before it could complete a competency determination more intensive examination and evaluation was required.  After a series of examinations by various government doctors, Mr. Van Noy was found mentally ill but competent to stand trial.  Shortly thereafter, he pleaded guilty to both counts of his indictment.  On January 17, 2007, he was sentenced to 63 months in federal custody.   In sentencing Mr. Van Noy, the court recommended to the BOP that Mr. Van Noy be placed "in a facility where [he] can receive appropriate mental health treatment and therapy."  The BOP ignored this recommendation, instead assigning Mr. Van Noy to a Federal Correctional Institute and then, following a series of incidents between Mr. Van Noy and other prisoners, to a succession of mainline United States Penitentiaries.

382.    Two and a half years later, in September 2009, Mr. Van Noy was confined in the SHU of a Unites States Penitentiary.  A corrections officer noticed an object in Mr. Van Noy's hand and attempted to retrieve it, resulting in a scuffle during which Mr. Van Now bit the officer's arm.  He was indicted for assaulting the officer.  Again, his competency was assessed.  Again, he was found mentally ill but competent.  Again, he pleaded guilty, this time receiving a

sentence of 51 months, to run consecutively to his earlier federal sentence.  Again, his order of judgment and commitment reflects his mental illness, this time requiring him to complete a mental health treatment program following his release from prison.  And again, rather than sending Mr. Van Noy to a facility that designed and operated to accommodate the seriously mentally ill, the BOP designated him to a facility -- this time ADX -- that lacks the capacity to do so.

383.    Mr. Van Noy remains at ADX today.  He receives antidepressant medication but is given no other meaningful mental health care.

## XI.  CLASS ACTION ALLEGATIONS

384.     Class Plaintiffs bring the causes of action identified below on behalf of themselves and all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23.  For those causes of action, Plaintiffs seek injunctive and declaratory relief applicable to members of the Class and Subclass, as defined below.

385.    Plaintiffs bring this action on behalf of the following class and subclass:

Prisoner Class

All persons who are now, or will be in the future, confined to the custody of the United States Bureau of Prisons at the United States Penitentiary Administrative Maximum in Florence, Colorado.

Serious Mental Illness Subclass

All persons who are now, or will be in the future, confined to the custody of the United States Bureau of Prisons in the United States Penitentiary Administrative Maximum in Florence, Colorado and have been diagnosed by the United States

Bureau of Prisons or its representative personnel with one or more of the following forms of "Serious Mental Illness":

(a)    Prisoners determined by the BOP or its mental health vendor as having a diagnosis or a significant history of any of the following disorders, as defined in the most current version of the Diagnostic and Statistical Manual of Mental Disorders ("DSM"):

(1)    Schizophrenia (all sub-types)

(2)    Delusional Disorder

(3)    Schizophreniform Disorder

(4)    Schizoaffective Disorder

(5)    Brief Psychotic Disorder

(6)    Substance-Induced Psychotic Disorder (excluding intoxication and withdrawal)

(7)    Psychotic Disorder Not Otherwise Specified

(8)    Major Depressive Disorder (all types)

(9)    Bipolar Disorder I and II;

(b)    Prisoners diagnosed by the BOP or its mental health vendor with Post-Traumatic Stress Disorder or another Anxiety Disorder that results in a significant functional impairment;

(c)    Prisoners diagnosed by the BOP or its medical or mental health vendor with a development disability, a dementia, or another cognitive disorder that results in a significant functional impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical health; or

(d)    Prisoners diagnosed by the BOP or its mental health vendor with a severe personality disorder that is manifested by episodes of psychosis or depression and results in significant functional impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical health.

**A.    Prisoner Class**

386.    Class action status for the Prisoner Class in this litigation is proper because:

(a)    The Prisoner Class is so numerous that joinder of all members is impractical.  Upon information and belief, the total number of class members is more than four hundred men currently confined at ADX and an unknowable number of current and future BOP prisoners who are designated for confinement at ADX;

(b)    There are questions of law and fact common to the class, including without limitation:  whether class members are subject to harm as a result of Defendants' practices that fail to provide initial and periodic mental health evaluations at ADX; whether Defendants violate their own written policies and procedures by refusing to provide initial and periodic mental health evaluations to class members at ADX; whether Defendants' failure to maintain an adequate program for initial and periodic mental health evaluations at ADX leads to a failure to properly diagnose prisoners who suffer from serious mental illness, and whether Defendants' failure to maintain an adequate program for initial and periodic mental health evaluations at ADX leads to a failure to provide constitutionally adequate mental health treatment to seriously mentally ill prisoners;

(c)    Plaintiffs' claims are typical of the claims of the class, in that each Plaintiff is incarcerated at ADX, did not receive a prompt mental health evaluation upon transfer

- 128 -

to ADX, has not received continued periodic mental health evaluations during the time they have

been incarcerated at ADX, and currently has claims that, like the claims of the class, arise from

the same policies, practices, and procedures implemented by Defendants at ADX;

      (d)     Plaintiffs and all members of the class have been similarly affected by

Defendants' common course of conduct;

      (e)     Plaintiffs will fairly and adequately protect the interests of the class as

there is no conflict between Named Plaintiffs and the other class members; and

      (f)     Plaintiffs can adequately represent the interests of the class members and

have retained counsel experienced in class action litigation.

     387.    Defendants have acted and/or refused to act on grounds generally applicable to

the class, thereby making final declaratory and injunctive relief appropriate with respect to the

class as a whole under Federal Rule of Civil Procedure 23(b)(2).

    **B.**   **Serious Mental Illness Subclass**

     388.    Class action status for the Serious Mental Illness Subclass in this litigation is

proper because:

      (a)     The Serious Mental Illness Subclass is so numerous that joinder of all

members is impractical.  Due to the nature of the facility at issue and the mental health afflictions

known to Plaintiffs and their counsel, upon information and belief, the total number of subclass

members is dozens, if not more than one hundred men;

      (b)     There are questions of law and fact common to the subclass, including

without limitation:  whether Defendants' failure to maintain an adequate program for appropriate

mental health evaluations at ADX leads to a failure to provide constitutionally adequate mental

health treatment to seriously mentally ill prisoners; whether Defendants violate their own written policies and procedures by a practice of placing seriously mentally ill prisoners at ADX, and within the Control Unit and SHU at ADX; whether Defendants violate their own written policies and procedures by failing to adequately instruct unit officers and detail supervisors in recognizing and reporting symptoms of mental illness; whether Defendants violate their own written policies by a practice of taking inappropriate disciplinary actions against seriously mentally ill prisoners; whether Defendants violate their own written policies by failing to maintain an adequate program to diagnose seriously mentally ill prisoners at ADX; whether subclass members are subject to harm as a result of Defendants' practices that fail to provide adequate treatment for serious mental illness; and whether Defendants' repeated violations of numerous mental health policies has placed members of the subclass at risk for increased psychological and/or physical harm;

(c)     Plaintiffs' claims are typical of the claims of the subclass, in that each Named Plaintiff suffers from at least one serious mental illness for which he has not received appropriate treatment, and Plaintiffs' claims and the claims of the subclass arise from the same policies, practices, and procedures implemented by Defendants at ADX;

(d)     Plaintiffs and all members of the subclass have been similarly affected by Defendants' common course of conduct;

(e)     Plaintiffs will fairly and adequately protect the interests of the subclass as there is no conflict between Plaintiffs and the other subclass members; and

(f)     Plaintiffs can adequately represent the interests of the subclass members and have retained counsel experienced in class action litigation.

389.    Defendants have acted and/or refused to act on grounds generally applicable to the subclass, thereby making final declaratory and injunctive relief appropriate with respect to the class as a whole under Federal Rule of Civil Procedure 23(b)(2).

## XII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of the Eight Amendment to the United States Constitution - Failure to Diagnose
(Asserted by Plaintiff Prisoner Class Against All Defendants)**

390.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

391.    As described herein, by their policies and practices, Defendants subject Plaintiffs and class members to a substantial risk of serious harm and injury by failing to establish and maintain a program and/or practices to adequately screen and diagnose prisoners at ADX for serious mental illnesses, both during their initial assignment to ADX and periodically thereafter. Defendants have been deliberately indifferent to this substantial risk of serious harm to Plaintiffs and class members.

392.    Defendants have been and are aware of all the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct, and to Plaintiffs' and class members' serious medical needs.

393.    Defendants' policies and practices are the proximate cause of the Plaintiffs' and class members' deprivation of rights under the Eighth Amendment.

**SECOND CLAIM FOR RELIEF**
**Violation of the Eighth Amendment of the United States Constitution - Failure to Treat**
**(Asserted by Plaintiff Serious Mental Illness Subclass Against All Defendants)**

394.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

395.    As described herein, by their policies and practices, Defendants subject Plaintiffs and subclass members to a substantial risk of serious harm and injury by failing to establish and maintain a program to provide adequate mental health treatment to Plaintiffs and subclass members.

396.    Defendants have been and are aware of all the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct, and continue to exhibit deliberate indifference to Plaintiffs' and subclass members' serious medical needs.

397.    Defendants' policies and practices are the proximate cause of the Plaintiffs' and subclass members' ongoing deprivation of rights under the Eighth Amendment.

## XIII.   PRAYER FOR RELIEF

Plaintiffs therefore respectfully request that this Court grant the following relief:

1.      Certify the proposed class and subclass;

2.      Enter an injunction directing that Defendants implement a program of mental health screening and diagnosis for the benefit of all Prisoner Class members.  This program shall include the staffing of mental health professionals at ADX to provide the screening and diagnosis services required hereby.  The program shall provide, at a minimum, the following:

(a)      a mental health examination prior to transfer to ADX or immediately upon arrival at ADX, to determine the presence or absence of a Serious Mental Illness, as defined in this Complaint;

(b)      an annual mental health examination, and regular mental health rounds by a mental health professional, to facilitate early detection and treatment of a Serious Mental Illness as defined in this Complaint;

(c)      a program of training ADX staff members on detection of symptoms of Serious Mental Illness; and

(d)      a procedure for plaintiff class members who dispute the diagnosis by the BOP or its representative personnel for review of that diagnosis by a mental health provider independent of the BOP.

3.      Enter an injunction directing that Defendants implement a program of treatment for each Serious Mental Illness for the benefit of members of the Serious Mental Illness Subclass.  That program shall provide treatment at the various treatment settings, or levels of care, described in Paragraph 14, above, and shall require that, to the extent a level of care cannot be provided at ADX, a subclass member requiring such a level of care be timely transferred to a facility where such care can be provided.  The program of treatment also shall include, at a minimum, the following:

(a)      staffing of mental health professionals at ADX to administer the program of mental health treatment;

(b)      bi-weekly access to out-of-cell private psychotherapy;

(c)      monthly access to confidential psychiatry sessions;

(d)      access to at least 5-10 hours per week of out-of-cell therapeutic activity;

(e)      access to at least 10 hours per week of out-of-cell recreational activity that allows for socialization with other prisoners;

(f)      regular and scheduled receipt of all prescribed medication;

(g)      not housing prisoners who are prescribed medication in Control Units, or in any unit in which medications are not provided;

(h)      treatment planning team meetings three times annually; and

(i)      implementation of policies and procedures to provide Subclass members a reasonable opportunity to program their way out of the ADX.

4.      Enter an injunction directing that Defendants implement a program of suicide and self-harm prevention, including at a minimum, regular and reliable access for Serious Mental Illness Subclass members to suicide prevention and mental health crisis intervention services with trained professionals.

5.      Enter an injunction directing that Defendants implement a program of placement of Serious Mental Illness Subclass members at ADX including, at a minimum, making available to all Serious Mental Illness Subclass members the option of housing in a unit dedicated to prisoners with serious mental illnesses that is segregated from other prisoners, staffed by medical and correctional officers specially trained to deal with mental health issues, and operated so that prisoners with serious mental illnesses may receive consistent and accurate doses of prescribed psychotropic medication together with other psychiatric and psychological care;

6.      Enter an injunction directing that Defendants adopt and comply with written policies on the safe and humane treatment of Serious Mental Illness Subclass members who become disruptive.

7.      Enter an injunction directing the implementation of a program of preventative care to prevent the development of mental illness as a result of housing prisoners in the unique conditions at ADX, including the elements set forth in Paragraph 17, above, and ensure that signs and symptoms of mental illness that do develop are timely identified and addressed.

8.      Declare that the diagnosis and treatment of seriously mentally ill prisoners at ADX violates the standards set by the federal government and the BOP in their own regulations, as well as the Eighth Amendment and to the United States Constitution;

9.      Grant an award of attorneys' fees; and

10.     Grant such other relief as this Court deems just and proper.

Dated: May 24, 2013                    Respectfully submitted,

                                       **ARNOLD & PORTER LLP**


By ____/s/ Edwin P. Aro_____
        Edwin P. Aro
        James E. Scarboro
        370 Seventeenth Street
        Suite 4400
        Denver, CO  80202-1370
        Telephone:  +1 303.863.1000
        ed.aro@aporter.com
        james.scarboro@aporter.com

        Maurice A. Leiter
        777 S. Figueroa Street
        44th Floor
        Los Angeles, CA  90017
        Telephone:  +1 213.243.4000
        maury.leiter@aporter.com

        Robert P. Taylor
        Three Embarcadero Center
        7th Floor
        San Francisco, CA  94111
        Telephone:  +1 415.471.3100
        robert.taylor@aporter.com

        Veronica E. Rendon
        Keri L. Arnold
        399 Park Avenue
        New York, NY  10022
        Telephone:  +1 212.715.1000
        veronica.rendon@aporter.com
        keri.arnold@aporter.com

        Nancy L. Perkins
        555 Twelfth Street, NW
        Washington, D.C.  20004
        Telephone:  +1 202.942.5000
        nancy.perkins@aporter.com

**WASHINGTON LAWYERS' COMMITTEE
FOR CIVIL RIGHTS AND URBAN AFFAIRS**


By    /s/  Deborah Golden
          Deborah Golden
          11 Dupont Circle, NW
          Suite 400
          Washington, D.C.  20036
          Telephone:  +1 202.319.1000
          deborah_golden@washlaw.org
          philip_fornaci@washlaw.org


Attorneys for Plaintiffs


Address of Prisoner Plaintiffs:

United States Penitentiary Administrative
Maximum - ADX
P. O. Box 8500
Florence, CO  81226


Address of Plaintiff  The Center for Legal
Advocacy, d.b.a. The Legal Center for
People With Disabilities And Older
People :

455 Sherman Street
Denver, CO 80203

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 24th day of May, 2013, the foregoing **FIRST AMENDED COMPLAINT** was filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record as follows:

Amy L. Padden
U.S. Attorney's Office - Denver
1225 Seventeenth Street, Suite 700
Denver, CO  80202
amy.padden@usdoj.gov

Marcy E. Cook
U.S. Attorney's Office - Denver
1225 Seventeenth Street, Suite 700
Denver, CO  80202
Marcy.cook@usdoj.gov

/s/ Linda J. Teater