IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

HAROLD CUNNINGHAM, ET AL,          )
                                   )
              Plaintiffs,          )
                                   )
       vs.                         )     1:12-cv-01570-RPM
                                   )
FEDERAL BUREAU OF PRISONS, ET AL.,)
                                   )
              Defendants.          )
_____

                FURTHER SCHEDULING CONFERENCE
                  TRANSCRIPT OF PROCEEDINGS
_____

             Proceedings held before the HONORABLE RICHARD P.

MATSCH, U.S. District Judge for the District of Colorado,

beginning at 2:00 p.m. on the 1st day of October, 2013, in

Courtroom A, the States Courthouse, Denver, Colorado.


                          APPEARANCES

For the Plaintiffs:        Edwin Packard Aro, Esq.
                           Arnold & Porter LLP-Denver
                           370 Seventeenth Street
                           Suite 4400
                           Denver, CO  80202-1370

                           Maurice Abraham Leiter, Esq.
                           Arnold & Porter LLP-Los Angeles
                           777 South Figueroa Street
                           44th Floor
                           Los Angeles, CA  90017-5844



       Proceedings recorded by electronic sound recording;
         transcript produced by transcription service.

APPEARANCES (Continued)

For the Plaintiffs:          Robert Paul Taylor, Esq.
                             Meredith Esser, Esq.
                             Arnold & Porter LLP-San Francisco
                             Three Embarcadero Center
                             7th Floor
                             San Francisco, CA  94111-4024

                             Deborah Maxine Golden, Esq.
                             Washington Lawyers Committee
                             11 Dupont Circle, N.W., Suite 400
                             Washington, DC  20036

                             Chester R. Chapman, Esq.
                             Legal Center for People with
                             Disabilities
                             455 Sherman Street, Suite 130
                             Denver, CO  80203

                             Mark Ivandick, Esq.
                             Legal Center for People with
                             Disabilities
                             455 Sherman Street, Suite 130
                             Denver, CO  80203

For the Defendants:          Amy L. Padden, Esq.
                             U.S. Attorney's Office-Denver
                             1225 17th Street East
                             Suite 700
                             Denver, CO  80202

                             Marcy Elizabeth Cook, Esq.
                             U.S. Attorney's Office-Denver
                             1225 17th Street East
                             Suite 700
                             Denver, CO  80202

P R O C E E D I N G S

1

2     (At 2:00 p.m. on October 1, 2013, in the United States

3  District Court at Denver, Colorado, before the HONORABLE

4  RICHARD P. MATSCH, U.S. District Judge, with counsel for the

5  parties present, the following proceedings were had:)

6     SPEAKER:  Good afternoon, Your Honor.

7     THE COURT:  Good afternoon.

8     SPEAKER:  Good afternoon, Your Honor.

9     THE COURT:  Come in.  Good afternoon.

10     MR. ARO:  You were allowed to come to work today?

11     THE COURT:  Allowed?  Oh, yeah.  Actually, it's is Amy

12  Padden allowed to come to work.

13     MS. PADDEN:  (Inaudible.)

14     THE COURT:  So we have some new appearances?

15     MR. ARO:  We do.  You know Bob Taylor.  You know Maury

16  Leiter.  Deborah Golden is with the Washington Lawyers

17  Committee.  Meredith Esser is one of our associates from New

18  York.  Randy Chapman is the--the CLA, the--P&A.  And Mark

19  Ivandick is the staff attorney for the CLA.

20     THE COURT:  Okay.  So what about the motion for a

21  preliminary injunction?

22     MS. PADDEN:  We do have an update on that, Your Honor.

23  Mr. Aro and I had spoken about Mr. Francisco about three

24  weeks ago, and I didn't realize he was filing a motion last

25  night until I saw it.  I spoke to both of Mr. Francisco's

```
1    psychologists today, I spoke to the warden, and a 770, which
2    is a medical transfer form, has been signed by psychology,
3    medical, and the warden to transfer him to Springfield.
4         THE COURT:  Okay.
5         MS. PADDEN:  So the next step is, it has to go to the
6    Designation and Computation Center in Texas; and once it's
7    signed there, he will be scheduled to be moved.
8         THE COURT:  Is there anybody there to sign it?
9         MS. PADDEN:  There is.  They are accepted, is my
10   understanding.  So we're optimistic maybe by the end of next
11   week he could be in Springfield.
12        THE COURT:  Why does it have to take that long?
13        MS. PADDEN:  Well, it has to be signed, and then he has
14   to be scheduled for a flight.  They're usually flown there.
15        MR. ARO:  That, to me, is acceptable so long as they're
16   watching him carefully to make sure there is not a further
17   deterioration in the interim.  Mr. Hill, who--if you've had a
18   chance to look at the motion--
19        THE COURT:  I did read the motion.
20        MR. ARO:  There was about a month lag between when the
21   770 was signed and when he was moved; and by the time he got
22   there, he was in very desperate straits, so--
23        THE COURT:  His name is familiar to me.
24        MR. ARO:  You presided--
25        THE COURT:  Did I preside--
```

1     MR. ARO:  You did.  He has two cases.  You presided over

2   the second case.  It was a homicide warrant.

3     THE COURT:  Yeah.

4     MR. ARO:  This was in 2003 you sentenced him.

5     THE COURT:  Okay.

6     MS. PADDEN:  And he was also a witness in the McKinney

7   case that we were going to charge him for, Your Honor.

8     THE COURT:  Okay.  I knew--

9     MS. PADDEN:  It was a while ago.

10    THE COURT:  I have encountered his name before.

11        Well, what about this in terms of monitoring him?

12    MS. PADDEN:  The psychologist went down again and saw

13  him after I spoke with him this morning, so we'll be sure

14  he's monitored.

15    THE COURT:  Okay.  You know, if he isn't we can hold a

16  hearing.

17    MS. PADDEN:  Uh-huh.

18    THE COURT:  So we'll hold off on that until you have an

19  opportunity to get him transferred by the end of next week;

20  is that what you're saying?

21    MS. PADDEN:  That's--I'm hopeful.  So if Your Honor

22  likes, I can file a status report with the Court once it's

23  been approved.

24    THE COURT:  Yes, I would like.  I want to keep the heat

25  on for that.  Okay.

1          And I suppose we're going to see some litigation on

2     behalf of Robert Knott.

3          MR. ARO:  Perhaps.  We have located his sister, and we

4     spent most of the weekend down there this weekend looking at

5     the circumstances of his suicide, and that's going to be an

6     early subject of some discovery we're going to want to do

7     here.  We have the prisoner's side of the story.  We don't

8     have the BOP's side of the story, but that certainly is a

9     possibility.

10          THE COURT:  Well, we'll see what develops.

11          I had hoped to have something to say to you about

12     the CLA and my view of the issues that have been briefed, but

13     I find the issues more difficult than I expected and the

14     Government's position.  So I don't know whether counsel for

15     the CLA need to comment on that.

16          You know, we've got to do something about this

17     class action certification, or not, very soon.

18          MR. LEITER:  Your Honor--

19          MR. ARO:  (Inaudible.)

20          MR. LEITER:  I'm sorry.  Would it be helpful--you had

21     ordered, when you first asked for a briefing on these--

22          THE COURT:  Yeah.

23          MR. LEITER:  --issues that we not file a reply brief.

24          THE COURT:  Yeah.

25          MR. LEITER:  Would it be helpful for us to file a reply

1    brief and respond to--

2        THE COURT:  Well, would it be helpful to what you were

3    going to say?

4        MR. LEITER:  We think it would--we obviously disagree

5    with some of the positions that the Government articulated,

6    and it might be--we think it might be helpful to Your Honor

7    if we had a chance to respond to some of those.

8        THE COURT:  Okay.  Well, you know, one of the sticking

9    points, I guess, is this language that says you can sue

10   states--well, the distinction being made with the Ninth

11   Circuit that you can sue states but you can't sue us, what

12   Congress has said, I guess; right?

13       MR. LEITER:  And that's one of the issues that we'd like

14   to talk about, the case where that came up, whether the

15   federal government could be sued simply wasn't an issue in

16   the case.  It just happens to be--

17       THE COURT:  Yes, I understand.

18       MR. LEITER:  --a state organization.  So it's a separate

19   and, I think we would agree, new question as to whether there

20   are any limits when a P&A association is suing the federal

21   government.  Our position is that there are not--

22       THE COURT:  Well, there is statutory language that

23   certainly suggests that.

24       MR. LEITER:  And that's one of the issues we'd like to

25   talk further about.  We think the statutory language is in

1   the section dealing with allotment of funds.

2       THE COURT:  Yeah.

3       MR. LEITER:  It's how the funds can be used.  It's not a

4   limitation on the authority of the CLA, and it's not Congress

5   taking away the prudential standing issues in connection with

6   associational standing.

7       THE COURT:  I see.  Okay.  Well, when will you file?

8       MR. LEITER:  If we could get two weeks, Your Honor?

9       THE COURT:  Okay, that's fine.  I am concerned about

10  getting moving and whether moving is a class action or not is

11  pretty significant procedurally here.

12          But I'll just ask the CLA folks here directly, are

13  you concerned about your relationship with the federal

14  government, particularly in this time when they seem to be--

15  what shall I say--careful with grant money?

16      MR. IVANDICK:  Well, Your Honor, we gave that some

17  thought, and I think it's a pretty efficient use of our grant

18  money--

19      THE COURT:  Okay.

20      MR. IVANDICK:  --to team up as plaintiff with the

21  existing litigation.  It really took a financial burden off

22  of us and then added the strength of a fine law firm and many

23  law firms that are participating.  I agree with Mr. Leiter

24  that, you know, the--of 4(b) is more of an allotment

25  regulator rather than an authorization to--well, not an

1    authorization to sue the federal government.

2         THE COURT:  Okay.  Well, I just want to--the reason I

3    asked you is I want to be comfortable--I want to make sure

4    that you are comfortable, the CLA, with the position being

5    taken here.  And if you are, that's fine.  So--

6         MR. ARO:  Would it make sense to--when this briefing was

7    originally done, it was sort of not in the context of motions

8    practice.  It's the advisory--

9         THE COURT:  Right.

10        MR. ARO:  --that was the question that came up.  And so

11   we don't really have a motion for anything pending.  Would it

12   be helpful to think about this in terms of a motion for

13   partial summary judgment on those legal issues to have a

14   reply brief submitted and then come back and see you in the

15   courtroom to answer questions you have and to allow you to

16   sort of take the issue up in that context?

17        THE COURT:  Well, we can deem the filing already filed

18   as a motion for partial summary judgment.

19             Agreed, Ms. Padden?

20        MS. PADDEN:  That's fine, Your Honor.  There are some

21   fact questions that I outlined in the brief, so I just

22   wouldn't want that to preclude a subsequent motion for

23   summary judgment on some of these issues that we may file.

24        THE COURT:  Well, you know, the obvious concern we all

25   have is that if I am agreeing with the plaintiffs and

1    disagreeing with the Government, and we go forward, and I

2    refuse to do a 54(b) on that issue, and we spend a lot of

3    blood, sweat, and tears and the Circuit decides I was wrong,

4    that's obviously the problem we face.

5            And if we go and I do a 54(b), then we're at the

6    mercy of the molasses effect of the Tenth Circuit Court of

7    Appeals where I have things that have been pending for three

8    years up there.

9        MR. ARO:  Although in that circumstance we don't

10   necessarily also have to have--in other proceedings, and a

11   lot of the things--

12       THE COURT:  No.

13       MR. ARO:  --that we would be doing on the CLA things

14   would also--

15       THE COURT:  Yeah, I mean, it's a risk if you're willing

16   to risk it.

17           And I'm not suggesting I'm going to rule against

18   you, Ms. Padden.  I think the issue is one on which

19   reasonable minds may differ for sure.

20           But, okay, so what's a date two weeks from now?

21       SPEAKER:  The 15th.

22       THE COURT:  What?

23       SPEAKER:  15th.

24       THE COURT:  15th?

25       MR. LEITER:  Yes, Your Honor.  We'll file October 15th.

1      THE COURT:  So we're going to--why don't you with the

2   filing of the reply also--well, maybe we can just file a

3   stipulation that the previous filing has been pursuant to

4   Rule 56.

5      SPEAKER:  That's fine with us.

6      THE COURT:  Is that okay?

7      MS. PADDEN:  That's fine, Your Honor.

8      THE COURT:  Yeah.  I think we'd better do it that way

9   than simply reflecting it in minutes of this meeting.  Okay.

10  And then we can deal with it, and I will anticipate oral

11  argument on it.

12     MR. ARO:  Would it be useful to set that oral argument

13  at this point?

14     THE COURT:  I think we'd better, yeah.  I need your

15  calendars.  We maybe ought to set a trial date, too, if

16  you're talking about a 30-day trial.

17     MR. ARO:  We ought to set a--

18     THE COURT:  I said we maybe should set a trial date,

19  too, to try to get some sort of rhythm in here, because right

20  now we're just sort of floating.

21     (Pause.)

22         So how about Friday, November 1st?

23     MS. PADDEN:  Works for me, Your Honor.

24     MR. LEITER:  That's fine, Your Honor.

25     THE COURT:  Okay.  Friday, November 1st.

1       MR. ARO:  That's fine with us as well.

2       THE COURT:  2:00 o'clock, hearing, summary judgment.

3           Okay.  Now, are you going to meet with Magistrate

4   Judge Hegarty tomorrow apparently?

5       MS. PADDEN:  Correct.

6       THE COURT:  Okay, well, that's none of my business, so I

7   stay clear of that.

8           And the 26 disclosures, have they now been made to

9   the extent that you can?

10      MR. ARO:  They have.

11      MS. PADDEN:  Yes, Your Honor.

12      THE COURT:  Okay.  So tell me what we need to talk

13  about.

14      MR. ARO:  Scheduling order.

15      THE COURT:  Yeah, I've got it in front of me.

16      MR. ARO:  I think the only area of dispute at this

17  point--correct me if I'm missing something--is, there is a

18  bit of a squabble over the number of depositions that are to

19  be allowed and the duration of those depositions.

20      THE COURT:  Yeah.

21      MR. ARO:  Our side is--we'd like a limit of 50 non-

22  expert depositions without a time limit as to any of them.

23      THE COURT:  And whose depositions are you thinking

24  about?

25      MR. ARO:  We've got a list of six categories of folks at

1   this point, though we expect to start with former medical

2   providers and--

3         THE COURT:  You've got a whole bunch of names here, but

4   they don't mean anything to me.

5         MR. ARO:  Right.  So there are a group of seven or eight

6   former psychologists and physicians who worked at the ADX

7   during the period that we're concerned about here, who no

8   longer work there, and we think that we probably will start

9   with them and work through that entire list.

10        THE COURT:  That seems reasonable.

11            Do you agree with that?

12        MS. PADDEN:  Yes.

13        THE COURT:  Okay.

14        MR. ARO:  We expect there is going to be some deposition

15   discovery about Mr. Knott's situation that will focus--we're

16   going to have to do some document work first, because we

17   don't know who some of the people that were involved in his

18   care and the staff members were.

19        THE COURT:  Why is that in this case?

20        MR. ARO:  Well, the position, as we understand it, of

21   the Government is that--well, let me back up.  You told us at

22   our conference back in May that from your perspective the

23   case was going to be determined based on the facts that

24   existed as of the day of the complaints filed, what the

25   situation was, what the policies were, what the deficiencies

1    were--

2        THE COURT:  Yeah, that's been my impression of what we

3    should be doing.

4        MR. ARO:  Right.  And so--

5        THE COURT:  So that these new remedial measures that

6    have been adopted since may be relevant to remedy but not to

7    liability.  That's been my view of it.

8        MR. ARO:  I think that that is right, but I also think

9    that they have raised a very strident (phonetic) view that

10   the PLI limits the Court's jurisdiction to the minimum scope

11   of injunction that is necessary.  They say that they have a

12   suicide prevention policy that was in effect at the time the

13   case was filed that in their view was adequate.  I don't want

14   to put words in their mouth, but I believe that that is so.

15        We believe that the events that have happened both

16   before and after the case was filed go directly to the

17   question of how broad a remedy is necessary when it comes to

18   how you shape these policies.  And to the extent that they

19   have a policy that they say worked before that they've shored

20   up and yet it still is not constitutionally adequate, we

21   think that fact bears on how broadly the Court's hand should

22   be deployed in fixing the problem.

23        THE COURT:  Well, I'm a little hesitant to agree with

24   you about Knott, because I think that may be the subject of a

25   separate litigation, and I wouldn't want to blur it.  I don't

1  know who may be representing his family.

2      MR. ARO:  There are all sorts of issues that may be the

3  subject of litigation both in this case and separate cases,

4  Mr. Vega's case being a great example.

5      THE COURT:  Yeah, where does that stand in the circuit?

6      MR. ARO:  They submitted their brief.  We're on the

7  clock.  Our brief is due in three weeks.  I don't have it

8  memorized but in about three weeks.  And then it falls into

9  the hole that you just described a moment ago.

10      THE COURT:  Yeah.  Does that type of thing also have to

11  go to the mediation office or whatever they call that?

12      MR. ARO:  I don't think it's mandatory, but David Amer

13  (phonetic) calls everybody who is an appeal, so I'm sure

14  we'll be hearing from them once the case is drawn.

15      MS. PADDEN:  In my experience, they haven't been calling

16  in all cases now, so--

17      THE COURT:  Yeah, well, it isn't going to work in this

18  case, so I hate to see a delay because they tried to duck it.

19      MR. ARO:  Right.

20      MS. PADDEN:  We have not received a referral for that

21  case, so--

22      MR. ARO:  That is clearly a case that has its own

23  independent--

24      THE COURT:  Yeah.  And you don't know whether there will

25  be oral argument or not.

1       MR. ARO:  Right.  But the facts of that case also are in
2   the middle of our case, and so--
3       THE COURT:  Yeah, for sure.
4       MR. ARO:  --to the extent that we have the potential for
5   litigation in Mr. Knott's circumstance, in our view that
6   doesn't necessarily mean that that issue is completely
7   excised from this case.  Mr. Hill could file a lawsuit, or
8   Mr. Powers could file a lawsuit, or any of these guys could.
9       THE COURT:  Any of them.
10      MR. ARO:  And so, to the extent that the Knott
11  circumstance or the Hill circumstance is illustrative of the
12  need for the kind of remedy that we're talking about, we
13  think we ought to be able to do discovery on it and argue
14  that point to the Court.
15      MS. PADDEN:  Your Honor, may I respond?
16      THE COURT:  Sure.
17      MS. PADDEN:  For Mr. Vega and Mr. Knott, they are not
18  going to be members of this class.  They are not a party in
19  this case.  And any litigation about them can, you know,
20  continue separately.
21      THE COURT:  No, but insofar as adjudicating the issues
22  that are unique to them, the question is the conditions.  So,
23  I don't know, this is difficult.  I would prefer that we--I
24  think in this--we're going to have phase this anyway and that
25  we go in phases.  And I think the suicides ought to be

1   deferred.  So--

2       MR. ARO:  If that's what the Court prefers, that's what

3   we'll do.

4       THE COURT:  That's my present view.  I'm just trying to

5   look at this as manageable.  And, you know, I don't know

6   where--I'm going to disregard the problem at the moment, but

7   I don't know where your lack of funding is going to crop up

8   in terms of your ability to work on the case or do anything

9   else.  And you don't know either--

10      MS. PADDEN:  Right.

11      THE COURT:   --at this point who does.  But today we're

12  going to assume that somewhere rationality will return to

13  Washington, DC, and something will happen.

14      MR. ARO:  In the absence of any evidence supporting that

15  assumption.

16      THE COURT:  Yeah, there is no evidentiary support, I

17  agree.

18      MR. ARO:  So we can defer that with the following worry

19  on my part, Your Honor.  We have done as much work as we can

20  do without the rights of discovery concerning Mr. Vega.  And

21  memories fade in that place.  And I am very concerned that

22  very small details are going to get lost to the mists of time

23  unless we get them locked down soon.  That doesn't mean we

24  have to adjudicate it, but it's a genuine concern certainly

25  and particularly among the prisoners, but I think among the

1   staff members as well.

2           I've talked to, I think it's now, eleven prisoners

3   who live on that range and who were there the day that this

4   happened.  And they already, two weeks after the fact, get

5   fuzzy on things that, when they're prompted, it kind of comes

6   back to them.  But this is a world where things get lost

7   pretty quickly and to the extent that I want to, just as one

8   example, take the deposition of the two staff members who

9   discovered Mr. Knott hanging in his cell.

10          THE COURT:  Well, let me interrupt you to say this.

11  This is very difficult for me to say what is the correct

12  number of depositions, what should be the length of

13  depositions.  I think what we need is a plan in some detail.

14  You said there are six categories.

15          MR. ARO:  Yup.

16          THE COURT:  Set those out as to what they are and what

17  your view of the priorities may be and the need for

18  depositions in--the inmate depositions are not going to take

19  seven hours, I would assume.

20          MR. ARO:  In very few of the cases are we expecting to

21  need to take those depositions unless there is a circumstance

22  where we feel somebody is going to be released and disappear

23  into the mist, as they're hard to keep track of after they've

24  been out.

25          THE COURT:  Yes.  I was responding to what you were

1   saying about memory phase, you know.

2         What I am suggesting is that you work together to

3   identify what the plaintiff wants to do, what the defendant

4   objects to, chart it out so that I have an actual plan to

5   develop with you.

6         MR. ARO:  May we use the time after the summary judgment

7   hearing on the 1st to talk about that plan and have it

8   submitted to you in anticipation of that?

9         THE COURT:  That's fine.

10        MR. ARO:  Okay.

11        THE COURT:  That gives time--I don't know--I assume what

12   you're addressing with the Magistrate Judge is going to be

13   whether there can be a consent remedy as opposed to some of

14   these things.

15        MR. ARO:  That is true.  Both sides have addressed him

16   at a high level sort of concept.

17        THE COURT:  Yeah, okay.  So we're not going to get him

18   involved with all of this.  I'm going to manage the discovery

19   phases of the case myself.  Okay.

20        MR. ARO:  Another dimension of what we need to do soon

21   is start to get various categories of documents.  Some of

22   those are just grievance-specific to individual things.

23        THE COURT:  Right.

24        MR. ARO:  Some of them are broader.  And the Court will

25   recall back in--I think it was in our May status conference

1    we went through a couple of categories of things that were

2    intended to help us identify class members.  And you directed

3    the BOP to begin to collect information about things like

4    what kind of videotapes were available, who is taking

5    medications, those kinds of things.  We haven't seen that

6    stuff, and that certainly a place we need to start.

7          But there is a very expansive list of other things

8    that are basic things that we are going to need ranging from

9    updated records for all prisoners in this case for whom we've

10   already received FOIA responses, but the FOIA records stopped

11   a year and a half ago, so we don't have more current records

12   on them, to policy and procedure information to more

13   information about administrative remedies, you know, the

14   things, frankly, that we put in the original document request

15   that we submitted for the Court's consideration before our

16   first status conference.

17         And we would like, while we're planning on the

18   depositions, to start working on that document production

19   process, which is going to be significant.  We'd like to be

20   able to serve those document requests.  If they've got

21   problems or if they want to phase them, we'll talk to them

22   about phasing them--

23         THE COURT:  Yeah.  So--

24         MR. ARO:  --and figuring out a way to make it work.

25         THE COURT:  Okay.

1      MR. ARO:  But we'd like to get them on the clock soon

2   and be in a position if they object expansively to come back

3   and see you in 30 days and say, "This is the stuff that we

4   can produce; this is the stuff we don't have the resources."

5   Would that be acceptable to the Court?

6      MS. PADDEN:  Your Honor, we'd like to have that document

7   discovery phase as well.  Again, you know, I think there

8   needs to be a primary focus on the policies that are at

9   issue, and that should be the first subject matter of any

10   discovery.  A lot of the stuff I've already disclosed in my

11   Rule 26 disclosures and won't produce them without a document

12   request such as updated medical records and updated

13   psychology records.

14         We think it would probably be best to meet first

15   before they serve document requests (inaudible).  The

16   original document requests they were going to serve were very

17   burdensome and especially in these economic times, which

18   takes quite a bit of time to respond to.

19      THE COURT:  Well, have you given a proposed document

20   request?

21      MR. ARO:  Yes, back in May.  And all we've heard is that

22   it's too big.  We've never heard an objection to any specific

23   category of it.  And I don't--I'm not unmindful of the

24   concerns that they have, but I am very mindful of the fact

25   that the case is a year and a half old.

1        THE COURT:  Yeah.

2        MR. ARO:  And, as you said, it's kind of adrift, and

3    it's time to get busy.  And we know it's a big case and it's

4    going to be burdensome, but it's a big case.  And we're

5    prepared to do what we have to do to do it, and we don't

6    think it's unreasonable to expect that they do the same

7    thing.

8            So my suggestion would be that we be allowed to--

9    we've revisited that original document request.  We're trying

10   to trim it and focus it a little bit--

11       THE COURT:  Well, file a motion to--

12       MR. ARO:  --(inaudible) if that's what you've been

13   concerned about, I'd like to serve it.  If they have

14   objections, we can meet and talk to the Court about it, but

15   I'd like to get a clock running somehow.

16       THE COURT:  Go ahead.  And we'll see.  And, you know,

17   you can file a motion to compel.

18       MR. ARO:  Fair enough.

19       THE COURT:  And I'll deal with it.

20       MR. ARO:  So, just so I've got the list straight, we can

21   serve our document request.  We'll deal with that in the

22   ordinary course.

23       THE COURT:  Yeah.

24       MR. ARO:  You expect us to put together a sort of

25   bilateral deposition plan for submission to the Court and to

1   pass on, if you will, at the November 1st hearing.

2        THE COURT:  Right.

3        MR. ARO:  What about third-party discovery?  There are,

4   for example, some hospitals that have hospital records that

5   relate to some of our plaintiffs that we are very concerned

6   about losing through document destruction policies.

7        THE COURT:  Private hospitals?

8        MR. ARO:  Yeah.  Just as long as they--one of our

9   clients attempted suicide some time ago--he's one of the main

10  clients in the case--by slashing his neck.  He was taken to

11  an outside hospital.  About nine months ago some medical

12  records from that hospital that were quite damning to the BOP

13  were given to him by the ADX staff, and he tried to send them

14  to me, but they were confiscated by the staff and not allowed

15  to be sent out.

16        I want to go to that hospital and subpoena their

17  records to make sure we get whatever they get before they

18  destroy stuff, because this incident happened in December of

19  2008, and that's five years ago.  I'm not talking about

20  depositions at this point.  I'm talking about purely give us

21  your documents--

22        THE COURT:  Yeah.

23        MR. ARO:  --and show up to authenticate them, sort of

24  events.  Maybe where we are dealing with events where there

25  is a real risk of loss of information, go ahead with those

1   subpoenas.

2       THE COURT:  Sure.  I don't know what--you know, they're

3   going to raise a HIPAA response, I assume.

4       MR. ARO:  We have a release from him--

5       THE COURT:  You do?

6       MR. ARO:  --so we could go to them for that.

7       THE COURT:  All right, sure.

8       MS. PADDEN:  And I don't think we need an

9   authentication, a deposition.  I mean, I think if they just

10  send--

11      THE COURT:  Yeah, get the records.

12      MS. PADDEN:  --(inaudible) for the records and then

13  (inaudible) that.

14      MR. ARO:  We have that pesky rule that says we can't do

15  document subpoenas without a deposition notice, so we'll

16  figure out how to make that work.

17          That's what we'd like to accomplish in the next 30

18  days, some of that third-party discovery, getting a document

19  request out, and getting a depo plan in place.

20      THE COURT:  I'm with you on that, sure.

21      MR. ARO:  Is there anything else I'm missing that's

22  important enough to talk about?

23      MS. PADDEN:  Your Honor, as far as phasing, is Your

24  Honor prepared to set deadlines for class certification?  I

25  mean, one class is going to have to be certified regardless

1   of the P&A's involvement for the screening class.

2       THE COURT:  The screening class?

3       MS. PADDEN:  Yes.  And it seems that should be set

4   sooner rather than later so that we know what the scope of

5   the claims are.

6       THE COURT:  Well, what's wrong with the screening class?

7   Why shouldn't that be a class?

8       MS. PADDEN:  Well, I think we have issues on the four

9   prongs as well as the b(2) issues.  I think they'll need to

10  be briefed.

11      THE COURT:  What do you think?

12      MR. ARO:  We actually had a sort of radical idea this

13  morning about this topic that we only got to take halfway, so

14  don't hold me to this.  But one of the struggles that we had

15  in thinking about the separation of the merits issues from

16  the class issues is that so many of the facts in this case

17  end up on both sides.

18      THE COURT:  Right.

19      MR. ARO:  And because it's a bench trial and you

20  ultimately have to determine the whole thing, it occurred to

21  us that it may be best to brief the class certification

22  issues in anticipation of the trial and have the Court

23  determine the class certification issues after hearing the

24  trial evidence as opposed to taking the time to try

25  two-thirds of the case for class certification purposes and

1   then turn around and try another two-thirds for merits

2   purposes.

3        MR. LEITER:  If I can just add a point, I think there

4   might be a slightly different point.  Your Honor was asking

5   about the screening class.

6        THE COURT:  Right.

7        MR. LEITER:  That's a much more straightforward

8   analysis, and we think there should be little or nothing for

9   us to disagree about.  And we were actually hoping that at

10  some point we might stipulate--

11       THE COURT:  Yeah, well, that's why I just asked this

12  question:  What's wrong with it?

13       MR. LEITER:  Right.  I think what Mr. Aro is referring

14  to is, if we have to move forward on a treatment class,

15  that's a separate issue.  But I think on the screening class,

16  we think that's a very, very straightforward analysis under

17  Rule 23 and should be certified without a contested motion--

18       THE COURT:  Well, go ahead and file a motion.

19       MR. LEITER:  --if we can do that.

20       THE COURT:  One of the things--following up on what Mr.

21  Aro just said here is that it is, I think, doable that there

22  be a trial and then a remedy class and a certification for a

23  remedy class.  I haven't done that, but there are a lot of

24  things that I haven't done that I'm capable of doing, I

25  think.  I think that can as well.

1        MS. PADDEN:  Well, Your Honor, the way it's been pled is

2   the class bringing the claims, and Rule 23 provides that

3   needs to be resolved--

4        THE COURT:  Why?

5        MS. PADDEN:  --as soon as practicable.

6        THE COURT:  Why?

7        MS. PADDEN:  Pardon?

8        THE COURT:  Why for this case?

9        MS. PADDEN:  That's what the rule says, as soon as

10   practicable.

11        THE COURT:  Why for this case does it have to be?

12        MS. PADDEN:  That's what our position is what the rule

13   says.

14        THE COURT:  Okay, well, I don't agree with you.

15        MS. PADDEN:  And I think it will affect the scope of

16   discovery is the other issue.

17        THE COURT:  I don't think it will.

18            File the motion for the diagnostic class, and we'll

19   resolve that.  With respect to the remedy, I think there is

20   some merit to the suggestion that the issues that would be

21   resolvable under 23 depend upon the facts that are developed

22   in the case.

23            So I am not going to require a filing with respect

24   to the treatment class at this time.  Also depends, of

25   course, on the outcome of the issues that are being briefed

1   with respect to the CLA.  I don't know that it's helpful to

2   sign the scheduling order, but I can--

3        MR. ARO:  I think--

4        THE COURT:  --so we have one in place to satisfy the

5   computer.

6        MR. ARO:  We would be happy to--the only place where the

7   scheduling orders says, "Here is plaintiffs' position, here

8   is defendants' position," deals with depositions.  If you

9   would not be adverse to leaving that issue unresolved in the

10   order, then you can sign it as is.  We've got one in place,

11   and you can deal with that as necessary when you see the

12   deposition schedule or if there are motions for protective

13   order in the future.

14        THE COURT:  Okay.

15        MR. ARO:  Our basic premise around the depositions is

16   we're not getting paid, so we don't have an incentive to

17   string things out or take unnecessary depositions--we're

18   paying for this out of our pocket--and that if we abuse

19   anything, Ms. Padden will be the first to let me know.  That

20   would be our preference throughout this trial.

21        THE COURT:  What do you think?

22        MS. PADDEN:  That's fine with me, Your Honor.

23        THE COURT:  Okay.

24        (Pause.)

25             All right.  Anything else for the good of the

1  Republic at the moment--

2      MR. LEITER:  Your Honor--

3      THE COURT:  --that's within my jurisdiction?

4      MR. LEITER:  If I may, I would go back to one scheduling

5  issue.  I apologize but I spoke a little too quickly about

6  November 1st.

7      THE COURT:  All right.

8      MR. LEITER:  And I'm wondering if it's possible to have

9  that hearing sometime on the week of the 4th.

10     THE COURT:  The trouble is, I've got a trial.  It's

11 really going to be difficult to do this on the 8th.  I've got

12 a trial starting on the 4th.

13     MR. LEITER:  Okay.  Then let's leave it at the 1st, and

14 I'll make that happen.

15     THE COURT:  Yeah, I hope you can because--

16     MR. LEITER:  Okay, thank you, Your Honor.

17     MR. ARO:  Would the 30th be an option for you or the

18 Court?

19     MR. LEITER:  No, it's that week that's at issue, but

20 I'll work it out.  I'll make it happen.

21     THE COURT:  I appreciate your doing so.  I'm struggling

22 to keep things going myself.  When I said floating, I mean

23 it.  I'm homeless.

24     MS. PADDEN:  I understand, Your Honor.

25     THE COURT:  So such is life.  Okay?

1       MS. PADDEN:  And just quickly, Your Honor, is there a

2   deadline for the certification briefing on the screening

3   class?

4       THE COURT:  Well, they will file the motion, and then

5   we'll go according to the Rules of Civil Procedure on the

6   times for responding to the motion instead of setting up a

7   different time schedule.  Okay?

8       MR. ARO:  45 days okay with the Court?

9       THE COURT:  Pardon?

10      MR. ARO:  45 days okay with the Court to get that

11  together?  I just don't want you to be upset if it hadn't

12  been done before that hearing.  We've got a lot to do in the

13  next 30 days, and these guys--we don't know how much work

14  we're going to be able to do in that time, so--

15      THE COURT:  That's true, yeah.  Okay.

16      MR. ARO:  Thank you.

17      THE COURT:  45 days to file the motion.

18      MR. ARO:  Okay.

19      THE COURT:  All right.  I guess that's it for the

20  moment.

21      MR. ARO:  Thank you, Your Honor.  We'll see you on the

22  1st.

23      THE COURT:  I hope so.

24      (2:37 p.m. - Whereupon, the proceedings were concluded.)

25

1                       TRANSCRIBER'S CERTIFICATE

2              I hereby certify that the foregoing has been

3     transcribed by me to the best of my ability, and constitutes

4     a true and accurate transcript of the mechanically recorded

5     proceedings in the above matter.

6              Dated at Aurora, Colorado, this 28th day of

7     October, 2013.

8

9

10                              /s/ Sylvia Besel

11                              Sylvia Besel

12                              Federal Reporting Service, Inc.

13                              17454 East Asbury Place

14                              Aurora, Colorado  80013

15                              (303) 751-2777

16

17

18

19

20

21

22

23

24

25