## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.  1:12-cv-01570

HAROLD CUNNINGHAM,
CARLTON DUNBAR,
JOHN W. NARDUCCI, JR.,
JEREMY PINSON,
JOHN J. POWERS,
ERNEST NORMAN SHAIFER,
and MARCELLUS WASHINGTON,

each individually and on behalf of all others similarly situated,

and

CENTER FOR LEGAL ADVOCACY
D.B.A. THE LEGAL CENTER FOR PEOPLE
WITH DISABILITIES AND OLDER PEOPLE,
COLORADO'S PROTECTION AND ADVOCACY
SYSTEM,

      Plaintiffs,

vs.

FEDERAL BUREAU OF PRISONS,

      Defendant.

## PLAINTIFFS' MOTION FOR CERTIFICATION
## OF A CLASS FOR SCREENING AND DIAGNOSIS OF MENTAL ILLNESS

## TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 2

A.   Defendant's Policies Require it to Exclude Mentally Ill Prisoners from ADX,
     and to Screen for and Diagnose Mental Illness at ADX ....................................2

     1.   Defendant's Policies Exclude Mentally Ill Prisoners from ADX ...........3

     2.   Defendant's Screening Policies ..............................................................4

B.   Despite its Policies, Defendant Transfers Mentally Ill Prisoners to ADX, and
     Fails to Adequately Screen for and Diagnose Mental Illness .............................6

     1.   Dr. Gundersen's Analysis .......................................................................6

     2.   Testimony from Named Plaintiffs and Class Members ...........................8

C.   Constitutionally Adequate Programs to Screen and Diagnose Mental Illness
     can be Implemented .........................................................................................11

ARGUMENT .......................................................................................................... 14

A.   Class Certification Requirements ....................................................................14

B.   Proposed Class Structure ................................................................................15

C.   The Proposed Class Meets the Prerequisites of Rule 23(a) .............................17

     1.   The Numerosity Requirement of Rule 23(a)(1) is Satisfied ..................17

     2.   The Commonality Requirement of Rule 23(a)(2) is Satisfied ...............18

     3.   The Typicality Requirement of Rule 23(a)(2) is Satisfied.....................22

D.   Class Plaintiffs and Plaintiffs' Counsel Fairly and Adequately Protect the
     Interests of the Class .......................................................................................23

E.   The Proposed Class may be Maintained Under Rule 23(b)(2) Because
     Defendant has Acted or Refused to Act on Grounds Generally Applicable to
     the Proposed Class ..........................................................................................25

CONCLUSION........................................................................................................ 28

i

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Adamson v. Bowen*,
  55 F.2d 668 (10th Cir. 1988) .........................................................14, 23, 26, 27

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................................24, 26

*A–W Land Co. v. Anadarko E & P Co.*,
  No. 09–cv–02293–MSK–MJW, 2012 WL 4463869 (D. Colo. Sept. 27, 2012)...............17

*Brown v. Plata*,
  —U.S.—, 131 S. Ct. 1910 (2011)....................................................................21

*Butler v. Suffolk Cnty.*,
  289 F.R.D. 80 (E.D.N.Y. 2013) .......................................................................22

*Cherokee Nation of Okla. v. United States*,
  199 F.R.D. 357 (E.D. Okla. 2001) ...................................................................18

*Chief Goes Out v. Missoula Cnty.*,
  No. cv-12-155-M-DWM, 2013 WL 139938 (D. Mont. Jan. 10, 2013)............................22

*Clarkson v. Coughlin*,
  145 F.R.D. 339 (S.D.N.Y. 1993) .................................................................14, 16

*Clay v. Pelle*,
  No. 10–cv–01840-WYD-BNB, 2011 WL 843920 (D. Colo. Mar. 8, 2011) ....................16

*Coley v. Clinton*,
  635 F.2d 1364 (8th Cir. 1980) .......................................................................14

*Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co.*,
  No. 09-cv-02757-WYD-KMT, 2013 WL 856510 (D. Colo. Mar 7, 2013)...........14, 15, 26

*DG ex. rel. Stricklin v. Devaughn*,
  594 F.3d 1188 (10th Cir. 2010) ............................................................... passim

*Dubin v. Miller*,
  132 F.R.D. 269 (D. Colo.1990) .......................................................................22

*Farmer v. Brennan*,
  511 U.S. 825, 114 S. Ct. 1970, 128 L.Ed.2d 811 (1994).................................21

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982).......................................................................................15

ii

*Gwiazdowski v. Cnty. Of Chester*,
    263 F.R.D. 178 (E.D. Pa. 2009) ........................................................................19

*Hassine v. Jeffes*,
    846 F.2d 169 (3d Cir. 1988) ...........................................................................14

*Henderson v. Thomas*,
    289 F.R.D. 506 (M.D. Ala. 2012) ...............................................................19, 21

*Hughes v. Judd*,
    No. 8:12-cv-568-T-23MAP, 2013 WL 1821077 (M.D. Fla. Mar. 27, 2013) ...................22

*Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r*,
    No. 1:08-cv-01317-TWP-MJD, 2012 WL 6738517 (S.D. Ind. Dec. 31, 2012) ..............22

*Inmates of Lycoming Cnty. Prison v. Strode*,
    79 F.R.D. 228 (M.D.Pa.1978) .........................................................................16

*In re Intelcom Grp., Inc. v. Sec. Litig.*,
    169 F.R.D. 142 (D. Colo.1996) .......................................................................22

*Jones v. Gusman*,
    Nos. 12-859, 12-138, 2013 WL 2458817 (E.D. La. June 6, 2013).......................21

*Jones v. Smith*,
    784 F.2d 149 (2d Cir. 1986) ...........................................................................14

*Lucas v. Kmart Corp.*,
    No. 99–CV–01923–JLK, 2005 WL 1648182 (D. Colo. Jul. 13, 2005) .........................14

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    672 F.3d 482 (7th Cir.), *cert denied*, --U.S.--, 133 S. Ct. 388 (2012) ..............18

*Milonas v. Williams*,
    691 F.2d 931 (10th Cir.1982) .........................................................................23

*Monreal v. Potter*,
    367 F.3d 1224 (10th Cir. 2004) ......................................................................15

*Neiberger v. Hawkins*,
    208 F.R.D. 301 (D. Colo. 2002) .....................................................................17

*Nicodemus v. Union Pac. Corp.*,
    204 F.R.D. 479 (D. Wyo. 2001) *aff'd*,
    318 F.3d 1231 (10th Cir. 2003), *reversed on other grounds*,
    440 F.3d 1227 (10th Cir. 2006) ......................................................................17

*Olson v. Brown*,
    284 F.R.D. 398 (N.D. Ind. 2012) ....................................................................22

*Peterson v. Okla. City Housing Auth.*,
    545 F.2d 1270 (10th Cir. 1976) ......................................................................17

*Powell v. Ward*,
    487 F. Supp. 917 (S.D.N.Y.1980) ................................................................16

*Rich v. Martin Marietta Corp.*,
    522 F.2d 333 (10th Cir.1975) ...................................................................23

*Rosas v. Baca*,
    No. CV-12-00428 DPP (SHx), 2012 WL 2061694 (C.D. Cal. June 7, 2012).................22

*Rutter & Wilbanks Corp. v. Shell Oil Co.*,
    314 F.3d 1180 (10th Cir. 2002) .................................................................23

*Shook v. Bd. of Cnty. Comm'rs ("Shook II")*,
    543 F.3d 597 (10th Cir. 2008) ............................................................16, 28

*Shook v. El Paso Cnty.*,
    386 F.3d 963 (10th Cir. 2004) ............................................................16, 26

*Skinner v. Uphoff*,
    209 F.R.D. 484 (D. Wyo. 2002) ...............................................................19

*Tabor v. Hilti, Inc.*,
    703 F.3d 1206 (10th Cir. 2013) .................................................................18

*Trevizo v. Adams*,
    455 F.3d 1155 (10th Cir. 2006) .................................................................17

*Wal-Mart Stores, Inc. v. Dukes*,
    —U.S.—, 131 S. Ct. 2541 (2011).............................................2, 15, 18, 21, 26

*Yaffe v. Powers*,
    454 F.2d 1362 (1st Cir.1972) ...................................................................26

## STATUTES AND RULES

28 C.F.R. § 541.41(c)(1)..........................................................................3

Fed. R. Civ. P. 23 ...............................................................................23

Fed. R. Civ. P. 23(a) ......................................................................... passim

Fed. R. Civ. P. 23(a)(1).........................................................................17

Fed. R. Civ. P. 23(a)(1)-(4).....................................................................17

Fed. R. Civ. P. 23(a)(2)......................................................................18, 22

Fed. R. Civ. P. 23(a)(3).........................................................................22

Fed. R. Civ. P. 23(a)(4)......................................................................23, 24

Fed. R. Civ. P. 23(b) ...........................................................................28

Fed. R. Civ. P. 23(b)(2)......................................................................................... passim

Fed. R. Civ. P. 65(d) ...........................................................................................26, 27

## OTHER AUTHORITIES

1 H. Newberg, *Newberg on Class Actions* ("*Newberg*")
     §3.22, at 199 (2d ed. 1985) .........................................................................23, 26

5 James Wm. Moore *et al.*, *Moore's Federal Practice*
     §23.22[2] (3d ed. 1999) ....................................................................................17

**INTRODUCTION**

Defendant Bureau of Prisons does not and cannot dispute the need to provide constitutionally adequate mental health care at ADX.  Defendant houses between 400 and 500 men there under conditions that dramatically increase the risk of mental illness.  They spend at least 20 and as many as 24 hours per day in solitary confinement, with little or no human contact, in some cases for years on end.  They are subject to a strict and relentless disciplinary regimen under which even acts of self-mutilation or suicide attempts can be reason for enhanced punishment.  These conditions place the entire population at ADX at substantially greater risk of mental deterioration.

A first step in providing mental health care, of course, is determining who needs help and what help is needed.  Defendant purports to have policies and institution-wide programs to screen for and diagnose mental illness at ADX.  But in practice, mental health evaluations for these prisoners are perfunctory at best, and often non-existent, both when an individual arrives at ADX and thereafter while he is incarcerated there.  Men with pre-existing mental illness often are transferred to ADX despite Defendant's policy against doing so.  Once there, "screening" is done more for institutional purposes, such as justifying placement in the General Population, than for determining what mental health treatment the prisoner needs.  Prisoners with mental illness are often left untreated and denied psychotropic medications previously prescribed by a doctor at one of Defendant's other prison facilities.  Requests for mental health evaluations are routinely ignored.

Defendant's failure to implement an effective screening and diagnostic program has allowed an epidemic of mental illness to spread throughout ADX.  Scores of mentally ill people are there, and Defendant has failed in its constitutional obligation to determine who needs help and what help is needed.

1

This Motion seeks to take a first step in that direction: Plaintiffs seek certification of a class of all present and future prisoners at ADX for purposes of screening and diagnosis of mental illness.  The class will demonstrate at trial that Defendant's longstanding practices for screening and diagnosing at ADX violate the United States Constitution.  The class will ask the Court to order Defendant to establish and maintain effective programs to screen for and diagnose mental illnesses when prisoners arrive at ADX, and periodically thereafter while they are housed in ADX.

As we show below, this prisoner class, seeking declaratory and injunctive relief, fits squarely within the requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(2).  Class certification is a well-established means of efficiently addressing constitutional violations in cases like this one, where injunctive relief is necessary to foreclose the strong likelihood of ongoing and future harm.  Because the risk created by constitutionally inadequate screening and diagnosis protocols and the relief the class will seek are common to all class members, this problem is "capable of classwide resolution."  *Wal-Mart Stores, Inc. v. Dukes*, —U.S.—, 131 S. Ct. 2541, 2551 (2011).

## STATEMENT OF FACTS

### A.    Defendant's Policies Require it to Exclude Mentally Ill Prisoners from ADX, and to Screen for and Diagnose Mental Illness at ADX.

It has long been known that extended periods of solitary confinement can be psychologically damaging.  For example, a 1999 study conducted under the auspices of the Department of Justice and the National Institute of Corrections concluded:

> Insofar as possible, mentally ill inmates should be excluded from extended control facilities.  Each inmate being considered for such a facility should have a mental health evaluation.  Although some mentally ill offenders are assaultive and require control measures, much of the regime common to extended control facilities may be unnecessary, and even counterproductive, for this population.

2

(First Am. Compl. ¶ 45; Declaration of Alicia W. Macklin in Support of Plaintiffs' Motion for Class Certification ("Macklin Decl."), Ex. N at 12.)  Indeed, the consensus view within the forensic psychology and psychiatric communities is that solitary confinement and other aspects of harsh discipline are likely to exacerbate pre-existing mental illness and to cause new cases of mental illness.  (Declaration of Doris C. Gundersen, M.D. in Support of Plaintiffs' Motion for Class Certification ("Gundersen Dec."), ¶ 7.)

Defendant's own policies acknowledge this risk.  In its PS Manual, Defendant states: "The Bureau of Prisons recognizes that extended periods of confinement in Administrative Detention or Disciplinary Segregation Status may have an adverse effect on the overall mental status of some individuals."  (Macklin Decl., Ex. E at 57.)  Some of the regulations promulgated by Defendant also are guided by this principle.  For example, "[t]he Warden may not refer an inmate for placement in a control unit …[i]f the inmate shows evidence of significant mental disorder or major physical disabilities as documented in a mental health evaluation or physical examination."  28 C.F.R. § 541.41(c)(1).

### 1.    Defendant's Policies Exclude Mentally Ill Prisoners from ADX.

In light of this acknowledged scientific consensus, Defendant's written policy is to exclude mentally ill prisoners from the harsh conditions and universal use of solitary confinement at ADX.  Defendant's policy states that:  "Inmates currently diagnosed as suffering from serious psychiatric illnesses should not be referred for placement at either USP Marion or ADX Florence."  (Macklin Decl., Ex. I at 93.)

Defendant's director, Charles Samuels, testified about this policy before a congressional committee shortly after this lawsuit was filed.  (*See id.*, Ex. A.)  He recognized that "[a]t the ADX, inmates are housed in single cells and have very limited contact with other inmates."  (*See id.*, Ex. A at 5.)  He claimed that "[e]xtensive safeguards are in place to ensure we continue to

3

provide security and a high level of care for medical and mental health for all inmates, regardless of where they are housed." (*Id.*, Ex. A at 5.)  And when asked to confirm that Defendant's policy precludes assigning prisoners with serious mental illnesses to ADX, given the increased risk of mental illness in solitary confinement, Director Samuels testified, under oath:  "You are correct.  *Our policy prohibits any inmate who suffers from a serious psychiatric illness to be placed in that confinement.*" (*Id.*, Ex. A at 8 (emphasis added).)

### 2.    Defendant's Screening Policies.

Defendant's policies also require screening for and diagnosing mental illness at ADX. Those policies specify what types of assessment should be performed, when they should be performed, and what their purposes are.  The policies admit, as Defendant must, that the purpose of screening and diagnosis is to determine who needs help and what treatment is needed.

For example, Defendant's Psychology Services Manual ("PS Manual") admits that "Psychological intake screenings" are conducted for the following purposes, among others:

(1)     To identify emotional, intellectual, and/or behavioral problems;

(2)     To identify specialized treatment needs (e.g., suicide watch, drug abuse treatment, psychotropic medication monitoring, etc.).

(Macklin Decl., Ex. E at 54.)

Similarly, BOP Program Statement 5310.13 provides that "[a]ll inmates arriving at an institution will be screened within specified time frames to determine presence and degree of mental impairments and/or suicidal tendencies." (*Id.*, Ex. G at 1.)  It requires that, "[f]or each inmate identified as needing treatment services, a treatment plan outlining needs, goals, and periodic progress notes (at least monthly) will be developed." (*Id.*, Ex. G at 2.)

Defendant's programs and policies also establish procedures for conducting these screenings.  The PS Manual sets forth "psychological intake screening procedures," including an

initial screen for all prisoners by a Physician's Assistant trained to detect signs of mental illness, followed by referral to Psychology Services for follow-up as necessary. (*Id.*, Ex. E at 54.) In addition, prisoners designated to higher security institutions are to be screened in a more rigorous fashion, including a prisoner questionnaire, an interview by Psychology Services, and psychological testing as staff deems necessary. (*Id.*, Ex. E at 54-55.)

For those prisoners confined to detention/segregation units, Defendant's policies require that Psychology Services personnel make weekly visits. "The purpose of these visits is to be available to SHU inmates and staff regularly in the event relevant questions or concerns need attention," and "to ensure that inmates needing detention/segregation psychological reviews are identified and scheduled for assessment in a timely manner." (*Id.*, Ex. E at 57.)

As noted above, Defendant's policies prohibit placement in a Control Unit of prisoners who show evidence of a significant mental illness. To ensure prompt attention to a mental illness that may develop there, Defendant's rules require psychological evaluations every thirty days: "The psychologist shall perform and/or supervise needed psychological services. Psychiatric services will be provided when necessary." (*Id.*, Ex. H at 14.) And the rules clearly declare: "Inmates requiring prescribed psychotropic medication are not ordinarily housed in a control unit." (*Id.*, Ex. H at 14.)

The existence of these policies concedes, as Defendant must, that the conditions of confinement at ADX substantially increase the risk of mental illness, and that effective, institution-wide policies must be in place to screen for and diagnose mental illness. The practices actually in place at ADX, however, are woefully inadequate.

**B.      Despite its Policies, Defendant Transfers Mentally Ill Prisoners to ADX, and Fails to Adequately Screen for and Diagnose Mental Illness.**

Despite the acknowledged, increased risk of mental illness at ADX, despite Defendant's written policies reflecting that risk, and despite Director Samuels' testimony to Congress, many prisoners with long histories of serious mental illness are indeed transferred to ADX.  Other prisoners, whose mental illness — often equally severe — becomes manifest during confinement, also are housed there.  Defendant systematically fails to determine who needs mental health treatment, and what treatment is needed.

Defendant now admits as much, albeit with remarkable sterility.  In its discovery responses in this case, Defendant states:  "ADX houses individuals diagnosed with a mental disorder pursuant to the Diagnostic and Statistical Manual of Mental Disorders."  (Macklin Decl., Ex. B at 3.)  The gravity of the problem of serious mental illness at ADX is hardly reflected in such a bland understatement.  As set forth in detail in the First Amended Complaint, the named Plaintiffs and other class members have undergone horrific instances of self-mutilation and attempted and successful suicide.  ADX houses men who speak to themselves continuously, or refuse to communicate at all, and some who traverse a descent into madness that is palpable and obvious.

**1.      Dr. Gundersen's Analysis.**

We submit with this motion the Declaration of Dr. Doris Gundersen, a medical doctor and psychiatrist with extensive experience conducting psychiatric assessments of the mental stability of prisoners.  Dr. Gundersen has met with thirty-eight ADX prisoners at various times, has conducted forensic evaluations with respect to most of those she has interviewed, has reviewed many of their records, and has reviewed the Declarations of named Plaintiffs and other class members also submitted with this motion.  (Gundersen Decl. ¶¶ 4-5.)

Dr. Gundersen concludes that, despite Defendant's unequivocal statement of policy, "BOP routinely assigns people with serious mental illness to ADX.  All of the prisoners" whose Declarations are submitted with this motion and to whom she refers in her Declaration "are suffering from one or more forms of serious mental illness."  (*Id.* ¶ 7.)

Dr. Gundersen also concludes that intake and screening practices at ADX fail to identify prisoners with mental health needs and, indeed, are implemented more for the protection of the correctional staff and the other prisoners.  (*Id.* ¶ 9.)  BOP's Program Statement 5290.15, entitled "Intake Screening," supports this conclusion:

> When an inmate is received, as a new commitment, in transfer from another institution, as a court return, as a return from a writ, or as a holdover, it is possible that information regarding that inmate is inaccurate, incomplete, or unavailable during the pre-arrival screening process.  Therefore, before placing that inmate in the institution's general population, staff shall ensure that health, safety and security standards delineated in this Program Statement are met.

(Macklin Decl., Ex. F at 2 (emphasis removed).)

Dr. Gundersen's review of intake forms produced by Defendant in this lawsuit, for the years 2007 through 2013, likewise supports her conclusion.  Although most of the forms have the names redacted, it is apparent from the perfunctory nature of what is recorded that little or no effort to identify mental illness takes place.  For example, many forms reflect psychotropic medications that the prisoner was taking before coming to ADX, but there is no evidence of a serious inquiry into the illness that prompted the prescription.  "Taken as a whole," Dr. Gundersen concludes, "the intake forms read as if most were done on a word processor, each one in large part essentially a replica of the one before it.  With a few exceptions, the focus is not on the mental condition of the new arrival but on the safety and security of the institution and the

prisoner's suitability for placement in the General Population section of the prison." (Gundersen Decl. ¶ 15.)

Dr. Gundersen notes as well practices that are wholly inconsistent with a screening process designed to determine the mental health needs of the prisoners. For example, a number of her interviews have revealed situations where men who were taking psychotropic medications before coming to ADX were denied those medications when they arrived, which is risky both to the individual and those around him. (*See id.* ¶ 16.) Many of those she has interviewed with prior histories of mental illness have been dismissed as malingerers. (*See id.* ¶ 19.) While there is a higher rate of malingered illness in forensic settings, this diagnosis cannot be accurately established without a more comprehensive analysis of an individual's symptoms and history. (*Id.*) And for many, the only psychological screening that appears to have taken place is a brief, public "cell front" interview in which the interviewer reports that the prisoner denied any history of mental illness and declined psychological or psychiatric services. (*Id.* ¶¶ 20-22.) Such cell front interviews, Dr. Gundersen states, are inadequate to determine mental health needs, and are designed to fail. (*Id.*)

### 2.      Testimony from Named Plaintiffs and Class Members.

The declarations from men housed at ADX, submitted with this motion, further demonstrate the severity of the problem and the commonality of the issues here.[1] Taken as a whole, they show that, despite its policies, Defendant transfers mentally ill prisoners to ADX,

---

[1] Among the evidence attached to this Motion are the declarations of five of the Named Plaintiffs (Harold Cunningham, Carlton Dunbar, John Narducci, Ernest Norman Shaifer and Marcellus Washington) and four putative class members (Herbert Perkins, Brian Richardson, Kenneth Morris, and John Lamb), as well excerpts from depositions of a Named Plaintiff (John J. Powers) and a putative class member (Richie Hill). Dr. Gunderson's declaration also discusses facts concerning three additional prisoners (James Van Noy, William Harris, and William Sablan). While not every prisoner declaration is specifically discussed in the brief, the facts contained in those declarations are relied upon and incorporated in this motion.

conducts perfunctory (at best) mental health screening upon their arrival, fails to determine what mental health treatment is needed, and fails to identify serious mental illness that develops among this population in long-term solitary confinement.  Some examples that illustrate these common issues are below; additional examples can be found in the other declarations, records, and excerpts of testimony incorporated in this Motion:

- Carlton Dunbar has been treated for various forms of mental illness since he was 12 years old, including Bipolar Disorder and Schizophrenia.  This history is well known to Defendant as a result of his placement in other BOP facilities before being assigned to ADX.  His intake form at ADX, however, shows that, because he had not experienced psychotic episodes "in the last two weeks," he had "no discernible psychiatric problems," and no psychiatric follow-up even was necessary.  (Gundersen Decl. ¶ 11.)

- Harold Cunningham arrived at ADX in December 2001 with a long history of treatment for mental illness.  Dr. Gundersen has diagnosed him as suffering from Post Traumatic Stress Disorder and recurrent episodes of Major Depression with Psychotic Features.  Prior to his assignment at ADX, BOP medical personnel diagnosed Mr. Cunningham as having one or more forms of mental illness and prescribed various medications.  At the time of his assignment to ADX, Mr. Cunningham was taking Risperdal and Prozac, both potent psychotropic drugs.  His intake form at ADX, however, is remarkably terse, noting only that he was uncooperative and exhibiting a "maladaptive personality style."  No recommendations were made for follow-up or treatment.  In fact, he was taken off his medications and assigned to the Control Unit, in violation of the policy precluding transfer of prisoners with mental illness to that unit.  (*Id*. ¶ 12.)

- Marcellus Washington has a history of self-harm and suicide attempts.  Dr. Gundersen has examined him and concludes that he suffers from Post Traumatic Stress Disorder, precipitated by documented abuse and neglect in his childhood, as well as Bipolar Disorder.  Prior to being transferred to ADX, Mr. Washington tried to hang himself.  While incarcerated at ADX, he cut his wrists on two occasions with a razorblade.  He was punished for this with a seven-day loss of television and radio privileges.  The longest conversation he has ever had with a health care professional ADX was five or ten minutes.  That happened once. (*See* Declaration of Marcellus Washington ("Washington Decl.") ¶¶ 10-17; *see also* Gunderson Decl. ¶ 18.)

- Ernest Shaifer has been diagnosed with Bipolar Disorder.  In a 2003 sentencing hearing, the Court acknowledged that diagnosis and recommended that he be placed in treatment.  Defendant ignored that recommendation and returned him to ADX.  He was placed in the Control Unit, with a recommendation in his file that staff "remain extra vigilant…to ensure there are no indications that his mental

health condition is deteriorating." He has repeatedly requested mental health treatment at ADX, but has never received it. (*See* Declaration of Ernest Shaifer ("Shaifer Decl.") ¶¶ 8-19.)

- At the time of his transfer to ADX, Herbert Perkins had been prescribed Vistaril for anxiety and Wellbutrin for depression. When he arrived at ADX, he was told there was no record of his prescription on file, and so was not given any medication. About a week after he arrived at ADX he had a five-minute visit with a prison psychologist. He still was not given any medication. Shortly thereafter, Mr. Perkins attempted suicide by cutting himself in the neck with a razor. (*See* Declaration of Herbert Perkins ("Perkins Decl.") ¶¶ 6-9.)

- Brian Richardson had been treated for mental illness in state prisons in Alabama and California. At Atlanta USP he met with a psychiatrist who, after trying different medications, began to treat Mr. Richardson with shots of Prolixin. When he first arrived at ADX he did not see anyone from Psychology Services. A few days later, a psychologist visited him, and he subsequently received a shot of Prolixin. Without a visit with a psychiatrist, his medication thereafter was changed from Prolixin to Haldol, because, he was told, there was a shortage of Prolixin. Haldol is not as effective for him. A few days after his initial visit, he met another psychologist, who told him she would see him once a month. (He saw a psychologist once a week in Atlanta.) She has not seen him since. The longest amount of time he has spoken with anyone from psychology since arriving at ADX is ten minutes. He has not had any kind of mental health evaluation at ADX. (*See* Declaration of Brian Richardson ("Richardson Decl.") ¶¶ 4-16.)

- Defendant first diagnosed John Lamb with depression in 2007, while he was housed at Victorville USP. After trying several medications, he was prescribed Wellbutrin, which helped his symptoms. This medication was discontinued when Defendant was evaluating him for placement at ADX. When he arrived at ADX he had no discussion with anyone at psychology; he was placed in Z-Unit. A few weeks later he requested Wellbutrin. A psychologist came to see him in the recreation cage, and told him he could not have psychotropic medication at ADX. He offered to send Mr. Lamb a book instead. Between 2011 and 2013 Mr. Lamb requested Wellbutrin at least 6 times. Every time, he was refused. He has had one telepsychiatry session since his arrival at ADX. That took place after this lawsuit was filed. (*See* Declaration of John Lamb ("Lamb Decl.") ¶¶ 3-17.)

- William Sablan had a long history of psychiatric diagnoses and medications before being transferred to ADX. As early as 1997, BOP medical personnel diagnosed Mr. Sablan with mental illness. After his involvement in a prison homicide, Mr. Sablan was transferred from USP Florence to ADX. At his trial for the homicide in 2005, the court recommended that "the Bureau of Prisons continue, on an uninterrupted basis, with a regimen of medicines (previously referred to as psychotropic medications) and other therapeutic treatment (including art supplies) currently in place to provide the defendant with the maximum ability to serve his life sentence with minimal disruptions to himself or

10

others."  Following his return to ADX, the BOP failed to honor all of the court's recommendations concerning Mr. Sablan's mental health care. (Gundersen Decl. ¶¶ 31-38.)

- William J. "Billy" Harris has been at ADX since 2011.  He has been previously diagnosed with Schizophrenia.  He also has significant cognitive impairment, including brain damage caused by years of substance abuse.  Before being sent to ADX, a court filing described him as "incompetent and psychotic."  His initial psychiatric visit at ADX lasted five minutes.  During that visit he was not asked about suicide, sexual assault, or his psychotropic medications.  Other than receiving daily medication, he receives no other meaningful health care at ADX.  He has had almost no contact with psychiatrists or psychologists while at ADX.  He is only periodically lucid, persistently rocking back and forth, and incapable of advocating for himself.  (*See* Gundersen Decl. ¶¶ 39-43.)

At trial, Plaintiffs will prove that Defendant's systematic failure to screen for and diagnose mental illness at ADX violates the Constitution.  The issue before the Court in this motion, however, is whether this institution-wide failure can be addressed on a class-wide basis. The answer to that question is demonstrably yes.

### C.     Constitutionally Adequate Programs to Screen and Diagnose Mental Illness can be Implemented.

Plaintiffs also submit with this motion the Declaration of Jeffrey L. Metzner, M.D. in Support of Plaintiffs' Motion for Class Certification ("Metzner Decl.").  Dr. Metzner is a medical doctor specializing in forensic psychiatry with a subspecialty in correctional psychiatry. (Metzner Decl. ¶ 1.)  He has extensive experience in designing and studying procedures and systems for delivering mental health screening, diagnosis and treatment in penal institutions.  (*Id*. ¶¶ 1-3.)  He has been appointed as a court monitor or consultant for correctional psychiatry programs by seven courts, and has served on the court-appointed monitoring team in several other matters.  (*Id*. ¶ 3.)  He has been qualified as an expert witness in numerous cases involving delivery of mental health services in penal institutions, and specifically is familiar with the standards applied by the forensic psychiatric community in developing programs that comply

11

with legal decisions.  (*Id*. ¶ 5.)  He has published widely in the area of correctional mental health services.  (*Id*. ¶ 4.)

Dr. Metzner concurs with Dr. Gundersen that "the intake screening and diagnostic processes in place at ADX for the identification of serious mental illness requiring treatment – either initially or as part of periodic psychology visits thereafter – fall short of the standard that is used in prisons throughout the United States to comply with constitutional requirements articulated by the courts."  (*Id*. ¶ 9.)  Dr. Metzner concludes that "[t]he Declarations offered in support of this motion, especially when juxtaposed with the intake documentation recorded by BOP and assessments by Dr. Gundersen, demonstrate the intake screening and diagnostic processes in place at ADX are seriously flawed."  (*Id*.)

As Dr. Metzner notes, "the collective group of declarants constitutes a representative cross-section of those prisoners who are victims of the deficiencies in the intake and screening process as well as the mental health treatment program.  Each demonstrates the failure of BOP to observe its own policies regarding mentally ill prisoners.  Collectively, they cover a wide variety of the illnesses that most commonly occur (*i.e.*, Bipolar Disorder, Schizophrenia, Major Depression, Psychosis, Posttraumatic Stress Disorder, etc).  Many, particularly those in the control unit at ADX, reflect the anxiety, pain and subsequent deterioration fostered by such assignments."  (*Id*. ¶ 22.)

Dr. Metzner states that "[d]esigning and administering a proper intake procedure is a manageable task.  The community of forensic psychiatrists and psychologists (of which I am a part) has been engaged for more than 30 years in designing and studying procedures and systems that are manageably implemented and that comply with court orders addressing constitutional issues in connection with incarceration."  (*Id*. ¶ 13.)

12

As Dr. Metzner explains in his declaration, a commonly used example of such procedures is contained in a task force report published by the American Psychiatric Association entitled "Psychiatric Services in Jails and Prisons." (*Id.* ¶ 14.) This report sets forth appropriate procedural steps for identifying prisoners in need of mental health treatment upon arrival at prisons. (*See* Macklin Decl., Ex. J. at 40.) It describes in detail the standard procedures that can be employed to make an initial assessment of mental health needs. (*Id.*, Ex. J. at 40-41.) It then describes in greater detail the specific inquiries that should be made and documented, and the need for immediate attention to prisoners who are acutely ill. (*Id.*)

There are other, similar examples of proper standards for screening and diagnosis that can be implemented successfully on a prison-wide basis. The National Commission on Correctional Health standards proposes "[r]eceiving screening…to ensure that emergent and urgent health needs are met." (*Id.*, Ex. K at 52.) A 2007 study by Ford, Trestman, Wiesbrock, *et al.*, supported by the Department of Justice, National Institute of Justice, suggests an initial screening procedure that is brief, has explicit decision criteria, and a low false-negative rate —that is, the system does not miss prisoners who have a serious mental disorder. (*See id.*, Ex. L.)

Dr. Metzner concludes that "[a]lthough the intake process at ADX bears a superficial resemblance to the various iterations of constitutionally adequate intake procedures, the procedures clearly fail to identify and address the needs of a very large proportion of those prisoners who need mental health care, some of them (as in the case of Mr. Perkins and Mr. Powers) with considerable urgency. Proper management of mental illness in the prison system begins with a proper screening and diagnosis process that is designed actually to identify those needing treatment and to plan a treatment program." (Metzner Decl. ¶ 20.) The flawed

13

screening and diagnosis practices at ADX can be addressed by implementing well-established, institution-wide procedures and systems.

## ARGUMENT

The proposed screening and diagnosis class is a "paradigm for class certification." Defendant has acted on grounds applicable to the hundreds of men in the putative class, and the declaratory and injunctive relief sought will remedy violations of the civil rights of these putative class members. *See Lucas v. Kmart Corp.*, No. 99–CV–01923–JLK, 2005 WL 1648182, at *2 (D. Colo. Jul. 13, 2005); *Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co.*, No. 09-cv-02757-WYD-KMT, 2013 WL 856510, at *2 (D. Colo. Mar 7, 2013); Fed. R. Civ. P. 23(b)(2), Advisory Committee Notes on 1966 Amendment ("Illustrative [of Rule 23(b)(2) actions] are various actions in the civil rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration.").

Class certification is "especially appropriate" in a prison reform case like this, which seeks remedies to rectify institution-wide practices that are applicable to all class members, practices that have violated their constitutional and civil rights. *Hassine v. Jeffes*, 846 F.2d 169, 180 (3d Cir. 1988) (class certification "is an especially appropriate vehicle for actions seeking prison reform") (*citing Coley v. Clinton*, 635 F.2d 1364, 1378 (8th Cir. 1980). Indeed, class actions "tend to be the norm" in prison condition cases. *Clarkson v. Coughlin*, 145 F.R.D. 339, 346 (S.D.N.Y. 1993), *citing Jones v. Smith*, 784 F.2d 149, 151 (2d Cir. 1986) (suggesting the appropriateness of class actions in challenges to prison rules).

### A.    Class Certification Requirements.

The proposed class here readily satisfies the requirements of Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure. *See Adamson v. Bowen*, 55 F.2d 668, 675 (10th Cir. 1988). Rule 23(a) permits class certification where: "(1) the class is so numerous that joinder of all

members is impracticable; (2) there are questions of law or fact common to [all members of] the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." *See* Fed. R. Civ. P. 23(a).  Plaintiffs are entitled to class certification under  Rule 23(b)(2) where Defendant has "acted or refused to act on grounds that apply generally to the class" such that injunctive or declaratory relief is appropriate "respecting the class as a whole." *See* Fed. R. Civ. P. 23(b)(2).

The Court has broad discretion in determining whether a suit should proceed as a class action.  *See Colorado Cross-Disability Coal.*, 2013 WL 856510, at *2; *Monreal v. Potter*, 367 F.3d 1224, 1235 (10th Cir. 2004).  In exercising its sound discretion, the Court must accept the allegations pleaded in the Complaint as true.  *DG ex. rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010).  In determining whether there are in fact sufficiently numerous parties, common questions of law or fact, etc., the Court may need to explore merits of a plaintiff's claims.  *Wal–Mart Stores, Inc. v. Dukes*, 131 S. Ct. at 2551.  Certification is then appropriate if the Court is content, "after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982).

### B.    Proposed Class Structure.

Class Plaintiffs Harold Cunningham, Carlton Dunbar, Ernest Norman Shaifer, John J. Powers, and Marcellus Washington, all incarcerated at ADX at the time of filing the Complaint, seek to represent a class of persons seeking injunctive and declaratory relief, defined as follows:

> All persons who are now, or will be in the future, confined to the custody of the United States Bureau of Prisons at the United States Penitentiary Administrative Maximum in Florence, Colorado.

(First Am. Compl. ¶ 385.)

15

The scope of the proposed Class is appropriate because all current and future inmates housed in the facilities, not only those individuals who already have been harmed by the BOP's failure to establish and maintain programs and/or practices to adequately screen and diagnose serious mental illnesses, have a common interest in constitutionally adequate mental health screening, particularly in an institution with an acknowledged increased risk of mental illness. *See Clay v. Pelle*, No. 10–cv–01840-WYD-BNB, 2011 WL 843920, at \*\*7-8 (D. Colo. Mar. 8, 2011) (certifying a prison class including "all current and future" prisoners at the Boulder County Jail); *Shook v. El Paso Cnty.*, 386 F.3d 963, 972 (10th Cir. 2004) (noting that class treatment for plaintiffs seeking injunctive relief is "well suited" to cases in which the exact composition of a class is not readily ascertainable, such as where "plaintiffs attempt to bring suit on behalf of a shifting prison population").[2]  *See also, e.g., Inmates of Lycoming Cnty. Prison v. Strode*, 79 F.R.D. 228, 231 (M.D.Pa.1978) ("In the context of challenging prison conditions any action taken or not taken will, of course, have an effect on those who are incarcerated at the prison in the future.  The use of the class form is a desirable and logical way to challenge prison conditions and it only make sense to include future inmates."); *Clarkson v. Coughlin*, 145 F.R.D. 339, 346–47 (S.D.N.Y.1993) (defining classes to include all present and future inmates); *Powell v. Ward*, 487 F. Supp. 917, 921 (S.D.N.Y.1980), *aff'd, & modified, 643*

---

[2] The factual situation here is distinguishable from the situation in *Shook II*, in which the Tenth Circuit affirmed the denial of certification of a class of all "current and future" prisoners. In *Shook II*, the plaintiffs sought, among other things, an injunction aimed at ensuring "adequate" staffing levels and medication delivery procedures for inmates.  *Shook v. Bd. of Cnty. Comm'rs ("Shook II")*, 543 F.3d 597, 605 (10th Cir. 2008).  The court reasoned that enforcing an injunction aimed at "adequate" staffing levels required "a wealth of information about the class not necessary in many other Rule 23(b)(2) class actions."  *Id.* at 606.  Here, the size of the prisoner population at ADX is relatively constant.  Moreover, creating an effective program to screen and diagnose mental illness has successfully been accomplished at other institutions and does not pose challenges analogous to those present in *Shook*.

F.2d 924 (2d Cir. 1981) (certifying class of "all persons who are now and who may be incarcerated in Bedford Hills Correctional Facility").

### C.      The Proposed Class Meets the Prerequisites of Rule 23(a).

Rule 23(a) requires numerosity of class members, commonality of at least one question of fact or law among the class, typicality of named plaintiffs' claims or defenses to the class's claims or defenses, and adequacy of the named plaintiffs and their attorneys as class representatives. *See* Fed. R. Civ. P. 23(a)(1)-(4); *Stricklin*, 594 F.3d at 1194.  Plaintiffs satisfy each of these requirements.

### 1.      The Numerosity Requirement of Rule 23(a)(1) is Satisfied.

In order to meet Rule 23(a)(1)'s numerosity requirement, plaintiffs seeking to represent a class must demonstrate "that the class is so numerous as to make joinder impracticable." *Peterson v. Okla. City Housing Auth.*, 545 F.2d 1270, 1273 (10th Cir. 1976).  Class size is "the most important factor in determining impracticability of joinder."  *Neiberger v. Hawkins*, 208 F.R.D. 301, 313-14 (D. Colo. 2002) (citations omitted).  And although there is no specific threshold number of plaintiffs needed to satisfy the numerosity requirement, *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006), "100 potential class members . . . certainly prevents effective joinder[.]"  *A–W Land Co. v. Anadarko E & P Co.*, No. 09–cv–02293–MSK–MJW, 2012 WL 4463869, at *5 (D. Colo. Sept. 27, 2012).  Here, with a proposed class of at least 400 prisoners, joinder would clearly be impracticable.

In addition to class size, courts considering whether joinder is impracticable also look to (1) judicial economy, (2) the financial resources of the class members and (3) requests for prospective and injunctive relief that could affect future class members.  *See Neiberger v. Hawkins*, 208 F.R.D. at 313  (citing 5 James Wm. Moore *et al.*, *Moore's Federal Practice* §23.22[2] (3d ed. 1999); *Nicodemus v. Union Pac. Corp.*, 204 F.R.D. 479, 489 (D. Wyo. 2001)

*aff'd,* 318 F.3d 1231 (10th Cir. 2003), *reversed on other grounds,* 440 F.3d 1227 (10th Cir. 2006); *Cherokee Nation of Okla. v. United States,* 199 F.R.D. 357 (E.D. Okla. 2001)).

Here, each of those factors points to granting class certification. First, judicial economy is best served by addressing the constitutional infirmities in Defendant's ADX screening and diagnosis programs in a single, collective lawsuit, with a single, enforceable judgment. Second, Plaintiffs obviously do not have the financial resources to maintain individual suits, and it would be impracticable to expect that they could afford to pursue individual suits. Finally, this case seeks prospective and injunctive relief, which affects future class members. The potential class is not a static population. It would be impracticable to institute a new lawsuit each time a prisoner is transferred to ADX, and the future population of ADX has just as much a constitutional right to adequate mental health treatment as any prisoner currently incarcerated there. Class certification ensures that the rights of future ADX prisoners will be protected by this litigation without the need for duplicating efforts.

The number of plaintiffs, their limited financial means, and the changing composition of the plaintiff class strongly support class certification.

### 2.    The Commonality Requirement of Rule 23(a)(2) is Satisfied.

The proposed class also satisfies the requirement of commonality under Rule 23(a)(2) – that there be at least one "question of law or fact common to the entire class." *Stricklin v. Devaughn,* 594 F.3d at 1195. Under Rule 23(a)(2)'s commonality requirement, a plaintiff must show that class members "have suffered the same injury;" *Tabor v. Hilti, Inc.,* 703 F.3d 1206, 1228 (10th Cir. 2013) (citation omitted); *see also Dukes,* 131 S. Ct. at 2551 (internal citation and quotation marks omitted), and that the plaintiffs' claims "present a common issue that could be resolved efficiently in a single proceeding." *Tabor,* 703 F.3d at 1228 (quoting *McReynolds v.*

*Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 488 (7th Cir.), *cert denied*, --U.S.--, 133 S. Ct. 388 (2012)).

As noted above, Defendant maintains policies and procedures for providing mental health screening and diagnosis at ADX.  Whether Defendant's policies and procedures are constitutionally adequate, whether Defendant follows those policies at ADX, and whether the practices being implemented are adequate to determine who needs mental health treatment and what treatment is needed, are all questions common to the members of the proposed class. Plaintiffs' common experiences and Defendant's records will establish that screening and diagnosis practices at ADX are constitutionally deficient.  As discussed above and in the attached evidentiary material, those practices include perfunctory or nonexistent screenings upon arrival, discontinuation of prescribed medications, and failure to adequately screen and diagnose prisoners whose conditions deteriorate after being housed at ADX, all of which are commonly and routinely occurring throughout ADX.

Courts routinely certify classes in prison settings where prisoners seek to challenge institution-wide policies, procedures or practices that violate their constitutional rights.  *See, e.g.*, *Skinner v. Uphoff*, 209 F.R.D. 484, 488 (D. Wyo. 2002) ("Under the liberal commonality standard as stated above, the Court finds that the Plaintiff has demonstrated that this case revolves around a common nucleus of operative facts, namely the policies and customs of the prison regarding inmate-on-inmate violence."); *Gwiazdowski v. Cnty. Of Chester*, 263 F.R.D. 178, 187 (E.D. Pa. 2009) ("Plaintiff has put forth questions of law and fact common to all class members: whether Defendant employs a blanket strip search policy through its delousing procedure, whether Defendant's policy violates the Fourth Amendment, and whether Defendant is responsible for the alleged violations."); *Henderson v. Thomas*, 289 F.R.D. 506, 511 (M.D.

19

Ala. 2012) (HIV-positive state prisoners, as named plaintiffs in putative class action against prison officials, met commonality and typicality requirements for certification of their claim that prison's policy of segregating HIV-positive prisoners from general prison population was discrimination on basis of disability, in violation of ADA and Rehabilitation Act).

In *Stricklin*, the Tenth Circuit affirmed the certification of a class of foster children, ranging in age from infants to teenagers, who sought to challenge the Oklahoma Commission for Human Services' and the Director of the Oklahoma Department of Human Services' ("OKDHS") agency-wide foster care policies and practices which, they alleged, exposed all class members to an impermissible risk of harm.  Despite the varied ages of the children, and despite the fact that the children entered the system for many different reasons and had varying needs and goals, the district court found that the plaintiffs had at least one common issue of fact sufficient to certify a class:  "[w]hether [OK]DHS has a policy or practice of failing to adequately monitor the safety of plaintiff children causing significant harm and risk of harm to [their] safety, health and wellbeing."  *Stricklin*, 594 F.3d at 1193.  Stricklin's analysis is directly applicable to the facts here:  despite many differences in the needs of the various prisoners at ADX, every member of the proposed class is placed at risk by Defendant's inadequate mental health screening and diagnostic process.  Even though some of the children in the *Stricklin* case may not have been injured by the defendant's failure to monitor, all the children were exposed to the risks it created.  The same is true here – every prisoner is vulnerable to injury from Defendant's failures in screening and diagnosis.

Defendant has systematically disregarded its own policies and procedures by transferring prisoners to ADX with known serious mental illnesses.  As noted, Defendant does not deny that it routinely disregards its policy against such transfers.  (*See* Macklin Decl., Ex. B at 3.)  Once

20

inmates arrive at ADX, Defendant conducts only perfunctory screenings — often for institutional, not treatment purposes — and often disregards court recommendations or the diagnoses and recommendations of other mental health professionals in favor of its own inadequate practices.  (*See, e.g.*, Washington Decl. ¶ 13; Cunningham Decl. ¶ 28; Dunbar Decl. ¶9; Lamb Decl. ¶¶ 8,12; *see also* Gundersen Decl. ¶¶ 40-42.)  These common, routine practices are reflected in the chronically undiagnosed, untreated or inadequately treated serious mental illnesses among the ADX inmate population.

The Supreme Court recently emphasized that commonality under 23(a)(2) requires not merely common questions but problems that are capable of common answers.  *Dukes*, 131 S. Ct. at 2553.  The relief Plaintiffs seek here consists of institution-wide solutions for common application to all the proposed class members, consistent with that requirement.  Plaintiffs seek to require Defendant to revise its current common policies and practices and to create policies and practices that provide constitutionally adequate mental health screening and diagnosis throughout ADX.  These are precisely the type of remedies the Supreme Court has recognized are appropriate for systemic class-wide application.  As the Supreme Court explained in *Brown v. Plata*, decided in the same term as *Dukes*:

> Plaintiffs rely on systemwide deficiencies in the provision of medical and mental health care that, taken as a whole, subject sick and mentally ill prisoners in California to "substantial risk of serious harm" and cause the delivery of care in the prisons to fall below the evolving standards of decency that mark the progress of a maturing society.  *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L.Ed.2d 811 (1994).

*Brown v. Plata*, —U.S.—, 131 S. Ct. 1910, 1926 n.3 (2011).[3]  *See also Henderson v. Thomas*, 289 F.R.D. 506 (M.D. Ala. 2012) (granting class certification for prisoners claiming violations of

---

[3] Courts continue to apply a "common question of fact" standard to class certification after *Dukes*.  *See, e.g., Jones v. Gusman*, Nos. 12-859, 12-138, 2013 WL 2458817 (E.D. La. June 6,

Footnote continued on next page

the Americans With Disabilities Act); *Olson v. Brown*, 284 F.R.D. 398 (N.D. Ind. 2012) (same with respect to prisoners alleging First Amendment violations).

This case alleges systemwide deficiencies, the identification of which and solutions to which are common across the proposed class.

### 3.  The Typicality Requirement of Rule 23(a)(2) is Satisfied.

Rule 23(a)(3) requires that the claims of the class representatives be typical of those of the class as a whole.  Here, the named plaintiffs have suffered and will continue to suffer harm from the same systemic inadequacies as the proposed class as a whole, and they seek the same injunctive relief to remedy Defendant's unconstitutional policies and practices.  *See Stricklin*, 594 F.3d at 1199 ("like commonality, typicality exists where, as here, all class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances").

"Typicality insures that the class representative's claims resemble the class's claims to an extent that adequate representation can be expected."  *In re Intelcom Grp., Inc. v. Sec. Litig.*, 169 F.R.D. 142, 149 (D. Colo.1996).  "The rationale behind the requirement that the class representative's claims be typical of the class claims is recognition that a plaintiff with claims typical of the class will, in pursuing and defending his own self interest in the litigation, be concomitantly advancing or defending the interests of the class."  *Dubin v. Miller*, 132 F.R.D.

---

Footnote continued from previous page
2013); *Hughes v. Judd*, No. 8:12-cv-568-T-23MAP, 2013 WL 1821077 (M.D. Fla. Mar. 27, 2013); *Butler v. Suffolk Cnty.*, 289 F.R.D. 80 (E.D.N.Y. 2013); *Chief Goes Out v. Missoula Cnty.*, No. cv-12-155-M-DWM, 2013 WL 139938 (D. Mont. Jan. 10, 2013); *Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r*, No. 1:08-cv-01317-TWP-MJD, 2012 WL 6738517 (S.D. Ind. Dec. 31, 2012); *Rosas v. Baca*, No. CV-12-00428 DPP (SHx), 2012 WL 2061694 (C.D. Cal. June 7, 2012).

269, 274 (D. Colo.1990) (citing 1 H. Newberg, *Newberg on Class Actions* ("*Newberg*") §3.22, at 199 (2d ed. 1985)).

All the men at ADX are at significantly increased risk of mental illness. The Named Plaintiffs, like the other class members, received at best perfunctory mental health screening upon arrival and little or no periodic screening while incarcerated at ADX. Even if the particulars of each plaintiff's story differs in parts, each plaintiff is a victim of the same, institution-wide failure by Defendant to implement constitutionally adequate screening and diagnosis programs. "[E]very member of the class need not be in a situation identical to that of the named plaintiff" to meet Rule 23(a)'s commonality or typicality requirements. *Milonas v. Williams*, 691 F.2d 931, 938 (10th Cir. 1982) (citing *Rich v. Martin Marietta Corp.*, 522 F.2d 333, 340 (10th Cir. 1975)). "Provided the claims of Named Plaintiffs and class members are based on the same legal or remedial theory, differing fact situations of the class members do not defeat typicality." *Stricklin*, 594 F.3d at 1198-99 (citing *Adamson*, 855 F.2d at 676). Typicality exists where, as here, all class members "are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances." *Id.* at 1199.

As is Rule 23's commonality requirement, the requirement for typicality is satisfied in this case.

> **D.    Class Plaintiffs and Plaintiffs' Counsel Fairly and Adequately Protect the Interests of the Class.**

Rule 23(a)(4) requires both Class Plaintiffs and Plaintiffs' counsel to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *See Rutter & Wilbanks Corp. v. Shell Oil*

*Co.*, 314 F.3d 1180, 1187-88 (10th Cir. 2002) (internal citations omitted). The adequacy-of-representation requirement serves to prevent conflicts of interest between named parties and the class they seek to represent. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997).

As to the first prong of Rule 23(a)(4), there is no conflict of interest between the proposed class representatives and the putative class members. The Named Plaintiffs, like the members of the proposed class, seek remedies for constitutionally inadequate mental health screening and diagnosis. No class member has an interest in maintaining the current, inadequate mental health screening and diagnostic practices, and all are at increased risk of mental illness due to the conditions of confinement at ADX. (*See, e.g.*, Washington Decl. ¶¶ 15-16; Cunningham Decl. ¶¶ 30-34; Dunbar Decl. ¶¶ 12-13; Lamb Decl. ¶¶ 8, 12-15; Shaifer Decl. ¶¶ 14-20.) There are no unique facts or defenses relevant to the Named Plaintiffs' claims that would create a conflict here. Similarly, Plaintiffs' counsel has no conflicts with any of the class members.

Turning to the second prong of Rule 23(a)(4), the adequacy of class counsel and their ability to prosecute the action vigorously on behalf of the class cannot reasonably be questioned. *See* Fed. R. Civ. P. 23(a)(4) (permitting class representation where, *inter alia*, "the representative parties will fairly and adequately protect the interests of the class"). Plaintiffs are represented by Arnold & Porter LLP and the Washington Lawyer's Committee ("WLC"), both of which are unquestionably qualified to litigate this case. (*See* Declaration of Edwin Aro ("Aro Decl."), ¶¶ 3-7; Declaration of Maurice Leiter ("Leiter Decl."), ¶¶ 4-9; Declaration of Robert Taylor ("Taylor Decl."), ¶¶ 4-6; Declaration of Deborah Golden ("Golden Decl.") ¶¶ 5-9.) Arnold & Porter brings a wealth of relevant experience to this litigation and is well-acquainted with complex federal litigation and class actions. The firm has successfully represented clients and

classes of clients on a variety of constitutional matters and has established one of the world's

leading law firm pro bono programs.  (*See* Leiter Decl. ¶¶ 1, 3.)  Specifically, Mr. Aro,

Mr. Leiter, and Mr. Taylor each has substantial experience litigating large complex matters in

federal court, as first-chair trial attorneys, and handling complex class actions.  (*See* Leiter Decl.

¶¶ 6-9; Aro Decl. ¶¶ 5-6; Taylor Decl. ¶ 6.)

In addition to Arnold & Porter's vast experience, WLC is wholly qualified to represent

Plaintiffs here.  WLC is a non-profit organization founded in 1968 to provide pro bono legal

services to address discrimination and entrenched poverty in the Washington, D.C. community.

(Golden Decl. ¶ 3.)  Over the past 45 years, WLC's efforts and programs have expanded from a

small staff focused primarily on issues of racial discrimination into a far larger organization

providing pro bono representation in a broad range of civil rights and related poverty issues

impacting every group protected by our federal, state and local civil rights laws.  Today, WLC's

active litigation docket of more than 100 matters includes individual cases and class actions, as

well as other larger law reform cases.  (*See id.* ¶ 5.)  Ms. Golden, at WLC, has extensive

experience litigating constitutional claims, very much like the ones at issue in the present case,

on behalf of prisoners in both federal and state courts in several jurisdictions.  (*See id.* ¶ 8.)

Plaintiffs' counsel have invested thousands of hours into this representation, and will

continue diligently and vigorously to pursue all rights and interests of the Class Plaintiffs and the

putative class members.  We respectfully submit that Plaintiffs' counsel have the interest, ability,

and resources to adequately represent the classes.

### E.    The Proposed Class may be Maintained Under Rule 23(b)(2) Because Defendant has Acted or Refused to Act on Grounds Generally Applicable to the Proposed Class.

In addition to satisfying the prerequisites of Rule 23(a), the Proposed Class may properly

be maintained under Rule 23(b)(2).  Indeed, Rule 23(b)(2) provides an ideal basis for certifying a

25

class in actions such as this, as the BOP has demonstrably "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief...respecting to the class as a whole." Fed. R. Civ. Pro. 23(b)(2).  The rule was designed especially for civil rights cases like this one, where broad declaratory or injunctive relief is sought for a large class of persons, including in particular with respect to prison conditions.[4]  *See* Fed. R. Civ. P. 23(b)(2) Advisory Committee Notes on the 1966 Amendment; *Amchem Prods., Inc.*, 521 U.S. at 614 ("Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of Rule 23(b)(2) classes. (quoting Advisory Committee Notes on Fed. R. Civ. P. 23, 28 U.S.C. App., at 697)); *Dukes*, 131 S. Ct. at 2558 (Rule 23(b)(2) "reflects a series of decisions involving challenges to racial segregation—conduct that was remedied by a single classwide order"); *Newberg* §4.11.  *See also Colo. Cross-Disability*, 2013 WL 856510.

Under Tenth Circuit precedent, Rule 23(b)(2) imposes two independent but related requirements on those seeking class certification.  *See Stricklin* 594 F.3d at 1199 (internal citations and quotations omitted).  "First, plaintiffs must demonstrate defendants' actions or inactions are based on grounds generally applicable to all class members.  Second, plaintiffs must also establish the injunctive relief they have requested is appropriate for *the class as a whole*." *Id.* (internal citations and quotations omitted) (emphasis in original).

These two independent requirements demand cohesiveness among class members with respect to their injuries, and the requirement of cohesiveness itself has two elements:

> First, plaintiffs must illustrate the class is "sufficiently cohesive
> that any classwide injunctive relief" satisfies Rule 65(d)'s

---

[4] In addition, "many courts have found Rule 23(b)(2) well suited for cases where the composition of a class is not readily ascertainable; for instance, in a case where the plaintiffs attempt to bring suit on behalf of a shifting prison population."  *Shook v. El Paso Cnty.*, 386 F.3d 963, 972 (10th Cir. 2004) (citing *Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir.1972)); *see also Adamson*, 855 F.2d at 676 (citing *Yaffe* with approval).

26

> requirement that every injunction "'state its terms specifically; and
> describe in reasonable detail . . . the act or acts restrained or
> required.'"  Second, cohesiveness also requires
> that class members' injuries are "sufficiently similar" that they can
> be remedied in a single injunction without differentiating
> between class members.  Rule 23(b)(2)'s bottom line, therefore,
> demands at the class certification stage plaintiffs describe in
> reasonably particular detail the injunctive relief they seek "such
> that the district court can at least 'conceive of an injunction that
> would satisfy [Rule 65(d)'s] requirements,' as well as the
> requirements of Rule 23(b)(2)."

*Stricklin*, 594 F.3d at 1199-1200 (internal citations omitted).

Plaintiffs here have satisfied these requirements.  The Complaint challenges BOP's

constitutionally inadequate policies and practices that apply to all prisoners at the ADX, have

generated identical injuries against each class member (*i.e.*, harm from practices that fail to

provide constitutionally adequate initial and periodic mental health screenings and diagnoses),

and call for the same injunctive and declaratory remedies.  Those remedies include development

and implementation of a program of mental health screening and diagnosis.[5]  (*See* First Am.

Compl., Prayer for Relief ¶ 2.)  This injunctive and declaratory relief would remedy all class

members' injuries and satisfy Federal Rule of Procedure 65(d).

Finally, the relief sought by Plaintiffs here applies to the proposed class as a whole and

does not require differentiation between class members; it is not necessary to inquire into each

class member's individual circumstances or characteristics, as all class members are subject to

the same types of mental health examination and screening procedures at issue.  That some of

Plaintiffs' claims may differ somewhat factually is not a bar to certification given the common

policies and practices applied to all prisoners.  *See Adamson*, 855 F.2d at 676 ("That the claims

---

[5] Such a program necessarily shall provide, at a minimum, an adequate mental health
examination prior to transfer to ADX or immediately upon arrival at ADX, an annual mental
health examination, and regular mental health rounds by a mental health professional.  (*See* First
Am. Compl., Prayer for Relief ¶ 2.)

of individual class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy.").

The relevant point here is that the injunction Plaintiffs seek would apply to all ADX prisoners alike because it would require prison officials to perform constitutionally adequate mental health examinations and periodic screenings for *all* prisoners.  Unlike in *Shook II*, the relief sought here does not "require the district court to craft an injunction that distinguishes based on individual characteristics and circumstances <u>between</u> how prison officials may treat class members...."  *Shook II*, 543 F. 3d at 605 (emphasis in original).  Plaintiffs here seek an order proscribing a change in policies and practices applicable to all ADX inmates.

This case squarely falls within the requirements for class certification under Rule 23(b)(2). Defendant has "acted or refused to act on grounds that apply generally [applicable] to the class," thereby rendering this type of suit appropriate to pursue "final injunctive relief or corresponding declaratory relief . . . respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2); *Stricklin*, 594 F.3d at 1199.  Indeed, injunctive relief is particularly necessary here because of the strong likelihood of ongoing and future harm.  Certification under Rule 23(b)(2) is the most efficient and effective way to uphold the rights of all current and future prisoners subjected to the inhumane conditions in the ADX.

## <u>CONCLUSION</u>

The proposed class meets the requirements for certification under Rule 23(a) and (b).  For the foregoing reasons, Plaintiffs respectfully request that the Court grant this motion for class certification.

Dated:  December 20, 2013.                  Respectfully submitted,


                                            **For Plaintiffs:**

                                            **ARNOLD & PORTER LLP**


                                             /s/ Edwin P. Aro
                                            Edwin P. Aro
                                            370 Seventeenth Street
                                            Suite 4400
                                            Denver, CO 80202
                                            (303) 863-1000
                                            ed.aro@aporter.com

                                            Maurice A. Leiter
                                            777 S. Figueroa Street
                                            44th Floor
                                            Los Angeles, CA 90017
                                            (213) 243-4000
                                            maury.leiter@aporter.com

                                            Robert P. Taylor
                                            Three Embarcadero Center
                                            10th Floor
                                            San Francisco, CA 94111
                                            (415) 471-3100
                                            robert.taylor@aporter.com

                                            Veronica E. Rendon
                                            Keri L. Arnold
                                            399 Park Avenue
                                            New York, NY 10022
                                            (212) 715-1000
                                            veronica.rendon@aporter.com
                                            keri.arnold@aporter.com

                                            Nancy L. Perkins
                                            555 Twelfth Street, NW
                                            Washington, D.C. 20004
                                            (202) 942-5000
                                            nancy.perkins@aporter.com

**WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL
RIGHTS AND URBAN AFFAIRS**

 /s/ Deborah Golden
Deborah Golden
11 Dupont Circle, NW
 Suite 400
Washington, D.C. 20036
 (202) 319-1000
deborah_golden@washlaw.org

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 20th day of December, 2013, the foregoing **PLAINTIFFS' MOTION FOR CERTIFICATION OF A CLASS FOR SCREENING AND DIAGNOSIS OF MENTAL ILLNESS** was filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record as follows:

        Amy L. Padden
        U.S. Attorney's Office - Denver
        1225 Seventeenth Street, Suite 700
        Denver, CO  80202
        amy.padden@usdoj.gov

        Marcy E. Cook
        U.S. Attorney's Office - Denver
        1225 Seventeenth Street, Suite 700
        Denver, CO  80202
        Marcy.cook@usdoj.gov

                                         /s/ Linda J. Teater