# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-01570-RPM

HAROLD CUNNINGHAM,
PERCY BARRON,
ALPHONSO BLAKE,
JABBAR CURRENCE,
CARLTON DUNBAR,
SCOTT FOUNTAIN,
SEAN GILLESPIE,
CHARLES HIPPS
RONNIE HOUSTON,
JOHN LAMB,
HERBERT PERKINS,
JOHN J. POWERS,
ARNELL SHELTON,
and MARCELLUS WASHINGTON,

each individually and on behalf of all others similarly situated,

and

CENTER FOR LEGAL ADVOCACY,
D.B.A. DISABILITY LAW COLORADO

Plaintiffs,

vs.

FEDERAL BUREAU OF PRISONS,

Defendant.

---

## SECOND AMENDED COMPLAINT

---

Plaintiffs Harold Cunningham, Percy Barron, Alphonso Blake, Jabbar Currence, Carlton

Dunbar, Scott Fountain, Sean Gillespie, Charles Hipps, Ronnie Houston, John Lamb, Herbert

Perkins, John J. Powers, Arnell Shelton, and Marcellus Washington (collectively, "Class

Plaintiffs"), each individually and on behalf of all others similarly situated, and Plaintiff Center

for Legal Advocacy ("CLA"), respectfully complain as follows against Defendant the Federal

Bureau of Prisons ("BOP"). Where appropriate, Class Plaintiffs and CLA are collectively

referred to herein as "Plaintiffs."

## TABLE OF CONTENTS

Page

I. NATURE OF THE ACTION ................................................................................ 5

II. OBJECTIVES OF THIS LITIGATION ........................................................... 12

III. JURISDICTION ............................................................................................... 21

IV. VENUE ............................................................................................................ 21

V. PARTIES ......................................................................................................... 21

VI. GENERAL ALLEGATIONS .......................................................................... 22

    A. Background and Operation of ADX ...................................................... 22

    B. Extended Confinement in Isolation Can and Often Does Have a
        Devastating Effect on Prisoners' Mental Health .................................. 31

    C. BOP Has a Documented History of Violating Its Own Written Policies
        Concerning Evaluating, Housing, and Treating Prisoners With Mental
        Illness at ADX ...................................................................................... 33

    D. ADX Continues to House Prisoners With Serious Mental Illness Who Are
        Dangerous to Themselves and Others .................................................... 37

    E. Mental Health Care Treatment at ADX Was and Remains Woefully and
        Constitutionally Inadequate .................................................................. 41

    F. Defendant Has Displayed Sustained Deliberate Indifference to the Plight
        and Needs of Prisoners With Mental Illness at ADX ........................... 49

        (1) The Illnesses of Plaintiffs and Their Peers are Obvious ........................... 49

(2)    A Series of Suicides by Prisoners with Mental Illness Have Demonstrated in Tragic and Permanent Terms the Past and Continued Deficiencies in the ADX Mental Health System ...................................... 53

(3)    At least 14 Separate Pro Se Lawsuits Filed by ADX Prisoners in the Nine Years Prior to this Lawsuit Put Defendant on Notice of the Catastrophic Deficiencies in the ADX Mental Health Care System ........ 60

G.    Defendant's Actions to Date Relating to Claims Raised in This Lawsuit Are Insufficient to Fully Address Plaintiffs' Claims of Constitutionally Inadequate Mental Health Care .............................................................. 63

(1)    Defendant Has Instituted Three New Policies Relating to Some of Plaintiffs' Claims ...................................................................... 64

(2)    Defendant's New Policies Are Insufficient On Their Own to Provide Constitutionally Adequate Mental Health Care to Plaintiffs ................... 65

(3)    Defendant Has a Documented History of Ignoring and Violating Its Own Policies Relating to Treatment of Prisoners With Mental Illness and Has Begun to Repeat This Pattern with Its New Policies ................. 66

(4)    Defendant's Decision to Exclude Prisoners With Serious Mental Illness from ADX Does Not Absolve Defendant of the Responsibility to Provide Those Prisoners With Constitutionally Adequate Mental Health Care ............................................................................. 68

VII.    ALLEGATIONS RELATING SPECIFICALLY TO PLAINTIFFS .............................. 69

A.    Harold Cunningham ................................................................... 69

B.    Percy Barron ............................................................................ 75

C.    Alphonso Blake ........................................................................ 81

D.    Jabbar Currence ....................................................................... 86

E.    Carlton Dunbar ........................................................................ 95

F.    Scott Fountain ......................................................................... 100

G.    Sean Gillespie ......................................................................... 106

H.    Charles Hipps ......................................................................... 111

I.    Ronnie Houston ...................................................................... 118

J.      John Lamb........................................................................................... 122

K.      Herbert Isaac Perkins ....................................................................... 128

L.      John Jay Powers ................................................................................ 134

M.      Arnell Shelton ................................................................................... 142

N.      Marcellus Washington ...................................................................... 148

VIII.   ALLEGATIONS RELATING SPECIFICALLY TO THE INTERESTED
        INDIVIDUAL ........................................................................................ 152

IX.     ALLEGATIONS RELATING TO THE CENTER FOR LEGAL ADVOCACY.......... 161

X.      ALLEGATIONS RELATING TO SOME OF CLA's CONSTITUENTS.................... 167

A.      James Cole ........................................................................................ 167

B.      Jonathan Francisco............................................................................ 168

C.      William Harris .................................................................................. 170

D.      David Hearne .................................................................................... 172

E.      William Concepcion Sablan ............................................................. 179

F.      James Van Noy .................................................................................. 185

XI.     CLASS ACTION ALLEGATIONS .............................................................. 187

A.      Prisoner Class.................................................................................... 190

B.      Mental Illness Subclass..................................................................... 191

XII.    CLAIMS FOR RELIEF ............................................................................ 193

XIII.   PRAYER FOR RELIEF ............................................................................ 194

## I.     <u>NATURE OF THE ACTION</u>

1.      This class action lawsuit concerns the treatment of prisoners at the United States Penitentiary Administrative Maximum facility in Florence, Colorado ("ADX") who have mental illness. It seeks declaratory and injunctive relief requiring the BOP to comply with its policies regarding the treatment of prisoners with mental illness, and to provide mental health diagnosis and treatment consistent with the requirements of the Eighth Amendment for people who have been committed to its custody.

2.      ADX is the most secure federal penitentiary in the United States. It currently houses approximately 425 men. Staff at ADX often refer to it as the "Alcatraz of the Rockies." ADX was built to house prisoners whom the BOP believes present the greatest threats to the correctional staff or to other prisoners. Prisoners spend at least 20 and as many as 24 hours per day locked alone in isolated cells, and are subject to a harsh and unforgiving disciplinary regimen. Such isolation and brutal discipline are inappropriate for prisoners who have mental illness.

3.      Even before the filing of this lawsuit, the BOP's own policies stated that men with serious mental illnesses should not be assigned to ADX. Upon information and belief, those policies reflect the BOP's recognition that extended confinement in isolation and the institution's disciplinary practices pose substantial risks to prisoners' mental health, and can be particularly harmful for men who had mental health problems before being confined in such conditions. The severe and isolating conditions at ADX also pose a substantial risk to the mental health of prisoners housed at ADX who have a mental illness that has not yet developed into what is classified under the law as a serious mental illness.

4.      Despite its policies, before the filing of this lawsuit the BOP housed dozens of men with mental illness, often serious mental illness, at ADX. That fact resulted from the BOP's routine disregard of its own prior mental health evaluations of prisoners it decided to send to ADX, the BOP's manipulation of evaluations to justify placement or continued placement of prisoners with mental illness at ADX, and the BOP's constitutionally inadequate mental health screening evaluations before prisoners are transferred to ADX. The BOP also failed to adequately monitor ADX prisoners for mental health problems that arose after they arrived at the facility, and failed to provide prisoners with mental illness at ADX with adequate mental health care. The conditions of confinement at ADX and the BOP's failure to properly diagnose and treat mental illness combined to worsen the conditions of prisoners who had mental illness when they arrived at ADX, and caused some other prisoners to develop mental illness.

5.      The BOP's deliberate indifference to the proper diagnosis and treatment of ADX prisoners with mental illness resulted in horrible consequences. Many prisoners at ADX interminably wailed, screamed, and banged on the walls of their cells. Some mutilated their bodies with razors, shards of glass, sharpened chicken bones, writing utensils, and whatever other objects they could obtain. A number swallowed razor blades, nail clippers, parts of radios and televisions, broken glass, and other dangerous objects. Others carried on delusional conversations with voices they heard in their heads, oblivious to reality and to the danger that such behavior might pose to themselves and anyone who interacts with them. Still others spread feces and other human waste and body fluids throughout their cells, threw it at the correctional staff, and otherwise created health hazards at ADX. Suicide attempts were common; many have been successful.

6.      In short, the BOP turned a blind eye to the needs of prisoners with mentally illness at ADX, and to deplorable conditions of confinement that are inhumane to these prisoners. No civilized society treats its citizens who have mental illness with such deliberate indifference to their plight.

7.      This lawsuit was originally filed on June 18, 2012. See Dkt 1. An Amended Complaint was filed on May 24, 2013. See Dkt 67. Since Plaintiffs filed their original complaint, the BOP has taken some steps to address the rampant constitutional violations in mental health care at ADX. Those steps have included:

(a)      Screening prisoners at ADX and identifying dozens of prisoners with a serious mental illness or a mental illness requiring treatment;

(b)      Enacting a revised policy for the care and treatment of prisoners with mental illness, which like the BOP's prior policies explicitly excludes from ADX prisoners diagnosed with a serious mental illness;

(c)      Enacting a policy of treatment "care levels," providing for treatment of prisoners diagnosed with a mental illness or serious mental illness;

(d)      Creating new secure facilities for treatment of prisoners with serious mental illness, and transferring some ADX prisoners with serious mental illness to those facilities;

(e)      Enacting a new suicide prevention policy at ADX; and

(f)      Revising certain policies at ADX that fundamentally interfered with delivery of mental health treatment, such as a policy previously interpreted by the BOP to

prohibit the administration of psychotropic medications to prisoners housed in the ADX Control Unit.

8.     These enhanced policies and actions have been steps in the right direction, and they confirm that the BOP can create policies and programs to provide classwide relief to ADX prisoners having mental illness, including serious mental illness. But they have failed to resolve BOP's constitutional violations. For example:

(a)     The BOP has failed to follow in all cases its recently enacted mental health-related policies. In particular, but not by way of limitation, having enacted a revised policy that (like prior policies) excludes prisoners with serious mental illness from ADX, and having diagnosed certain ADX prisoners with serious mental illness that requires their transfer to a suitable residential mental health facility, the BOP has failed to complete mandatory transfers in a timely manner, manipulated diagnoses to avoid the exclusionary consequences of an initial, correct diagnosis, and otherwise undermined the implementation of and compliance with the very policies that the BOP enacted in response to the serious constitutional violations that originally precipitated the filing of this lawsuit;

(b)     Those prisoners diagnosed by the BOP with serious mental illness who remain housed at ADX still do not receive constitutionally adequate mental health care;

(c)     ADX prisoners with serious mental illness who were transferred to the newly-created mental health treatment units, created specifically to treat them, still do not receive constitutionally adequate mental health care at those facilities, because of the BOP's continuing deliberate indifference to their treatment needs; and

(d)     The BOP has failed to adequately address the mental health needs of those prisoners at ADX who have been diagnosed by the BOP with a mental illness requiring treatment (but not a serious mental illness requiring exclusion from ADX), and has not enacted and implemented programs to ensure that these prisoners receive constitutionally-adequate treatment, and to reduce the risks that their mental illness will further deteriorate into a more serious mental illness.

9.     Defendant BOP is responsible for operating ADX and for ensuring that Plaintiffs' constitutional and other legal rights are respected. Defendant has failed to meet those obligations to Class Plaintiffs, the Interested Individual, and the members of the class and subclass. To the extent the BOP has enacted new policies, and temporarily improved in some areas, it still has not resolved its constitutional violations. Nor may BOP evade its responsibility to provide adequate mental health care to ADX prisoners by transferring them out of ADX but then failing to provide such adequate mental health care at another institution. Moreover, the BOP's history of ignoring its own policies concerning mental health care prior to the filing of this lawsuit highlights the risk that the BOP can regress as easily, if not more easily, than this case has forced it to progress. Even those constitutional violations that the BOP can argue have been ameliorated are not moot, both under the doctrine of voluntary cessation and because they are capable of repetition and run the risk of evading judicial review in the absence of the relief sought in this case.

10.     The Eighth Amendment to the United States Constitution guarantees to every person imprisoned at ADX adequate medical care, including care for mental illness. That guarantee includes access to an adequate process for assessing the need for mental health care, and access to necessary care itself. Notwithstanding the changes made since this action was

initiated, the BOP falls woefully short of providing this constitutionally-guaranteed level of care. It still fails to provide constitutionally-adequate mental health treatment to individuals it has diagnosed with a serious mental illness. It denies that individuals it has diagnosed with other mental illnesses, and who under BOP's own policies must receive treatment, are entitled to treatment under the Constitution. If the BOP chooses to assign or house at ADX prisoners with mental illness, it must provide constitutionally adequate mental health screening and treatment, taking into account the isolated conditions of confinement and harsh disciplinary regime of ADX.

11.    Class Plaintiffs are all men with mental illness incarcerated at ADX either when the case was filed or at present and who are all currently in the custody of the BOP. This Second Amended Complaint also names as an "Interested Individual" one other prisoner with serious mental illness who was housed at ADX at the time the lawsuit was filed and remains incarcerated by the BOP. Many of these men also have severe functional impairment of their ability to attend to their own personal needs or even to exist in a world with other people. Several of them are cognitively disabled. Plaintiff CLA operates Colorado's "Protection and Advocacy System," working to ensure the safety, well-being, and dignity of people with disabilities in, among other places, jail or prison. In this case CLA is advocating on behalf of all ADX prisoners with mental illness, including those who cannot, because of mental illness and/or mental disability, advocate for themselves.

12.    The brutality and deliberate indifference to human rights that the BOP exhibits toward Plaintiffs and the Interested Individual also exists with respect to many of the other

prisoners held at ADX, including the members of the class and subclass that Plaintiffs represent in this case.

13.     Defendant's constitutional violations have repercussions beyond the harm caused to Class Plaintiffs, the Interested Individual, the class, and the subclass. Many ADX prisoners who have untreated or poorly treated mental illness pose a constant and sometimes deadly threat to BOP personnel. Although ADX programs are designed to isolate prisoners from other prisoners, they cannot isolate prisoners from BOP staff charged with providing basic services on a daily basis and conducting security checks required in all correctional settings. The extreme isolation and the lack of adequate mental health treatment only serve to increase the risk of assaults to the staff assigned these duties.

14.     Although some ADX prisoners will never be released from prison, many of them, including several of the Class Plaintiffs, will be released into the community when their sentences expire in the next few years. After years of confinement in isolation without proper treatment for mental illness, these men will have a difficult time reentering society safely and successfully. In one regrettable example of the predictable consequences of the BOP's deliberate indifference to the needs to prisoners with serious mental illness, a former Plaintiff released from custody in July 2014 currently is in state custody in Florida, charged with a violent assault.

15.     This lawsuit seeks to remedy the deficient mental health system at ADX by means of a permanent injunction, consistent with the requirements of the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626, requiring the BOP to honor its own policies and the constitutional rights of ADX prisoners by providing mental health diagnostic and treatment services.

## II.      <u>OBJECTIVES OF THIS LITIGATION</u>

16.      As detailed below, when this lawsuit was filed, the ADX delivered almost no mental health diagnostic or treatment services to prisoners held there. In response to the lawsuit, the BOP has taken some preliminary steps to improve the mental health services available to ADX prisoners, as discussed below. Although Plaintiffs support these steps and BOP's preliminary efforts to improve mental health treatment at ADX since the initiation of this lawsuit, the handful of new policies recently enacted by BOP are insufficient on their own to remedy the constitutionally inadequate mental health treatment of class members and the BOP's deliberate indifference to these violations. Many of the constitutional violations in this case arise from the BOP's failure to comply with regulations and protocols that already were in place before the lawsuit was filed, so the BOP's implementation of new regulations and protocols cannot, by itself, be trusted to cure the pervasive constitutional violations detailed below. In addition, although the preliminary changes are a step in the right direction, even after they were implemented, the mental health services available to ADX prisoners remain constitutionally deficient, and there remain troubling instances suggesting efforts to evade the newly-implemented policies within months after those policies went into effect. In addition, there is no constitutionally adequate mental health system in place for ADX prisoners. Rather, even the "improved" version of mental health care at ADX is a still a small Band-Aid on a gaping wound.

17.      To satisfy the requirements of the Eighth Amendment, an institutional mental health system in a facility such as ADX must provide care consistent with contemporary community standards and evolving standards of decency. Whether in the community or in a prison, any comprehensive system of mental health services provides care in different treatment

settings, or levels of care: outpatient treatment services, crisis intervention services, a residential

program, and a psychiatric inpatient program, all as follows:

(a)      <u>Crisis Level of Care</u>: Suicide attempts and other acts of self-harm are far

more common in segregation facilities such as ADX than in any other type of facility operated

by the BOP. Given the risk of suicide, self-harm, and other mental health crises resulting from

the extreme isolation imposed by ADX, the Constitution requires the timely provision of mental

health services to ADX prisoners who are suicidal or otherwise are experiencing an acute mental

health crisis. Such services may need to be provided in an infirmary setting for short-term

stabilization and/or diagnostic treatment purposes, and generally involve a length of stay less

than ten days. As detailed below, crisis care at ADX has been and remains woefully inadequate.

For example, almost a year after this lawsuit was filed, a prisoner with chronic and severe mental

illness ADX prisoner named Percy Barron -- who at the time was being medicated by the BOP

for severe depression and who is now named as a plaintiff in this Second Amended Complaint --

sought emergency psychology services precisely as mandated by BOP policy, and precisely as

encouraged by a July 20, 2012, memorandum signed by BOP Director Charles Samuels and

circulated to all ADX prisoners a few weeks after this lawsuit was filed. Entitled "Suicide

Prevention," Director Samuels' memorandum explains his understanding that "[a]t times, you

may feel hopeless about your future and your thoughts may turn to suicide." He goes on to tell

prisoners that "Bureau staff are a key resource available to you," and promises that "[a]nytime

you want to speak with a psychologist, let staff know and they will contact Psychology Services

to make the necessary arrangements." "Help," he continued, "is available." Despite these

assurances from Director Samuels, after requesting emergency psychology services Mr. Barron

was ignored for hours, attempted suicide, was belatedly discovered in the act, and later was issued a disciplinary incident report for attempting to kill himself after his pleas for assistance were ignored. Upon information and belief, BOP conducted no investigation into the staff failures and policy violations that resulted in Mr. Barron's suicide attempt, and has taken no actions in response to those failures aside from dismissing the incident report at the request of Plaintiffs' Counsel.

(b)      Inpatient Level of Care: The Constitution requires that ADX prisoners having mental illness so severe that it requires inpatient mental health treatment be timely provided such treatment, either at the ADX or at another suitable facility. Given the attributes of ADX, including its physical design and operational priorities, it may well be impossible for the BOP to provide such treatment within the confines of ADX to prisoners who require it. Indeed, the BOP typically provides inpatient care at a BOP medical facility. In any case, the Constitution requires that BOP either provide such treatment at ADX when medically necessary or ensure that ADX prisoners requiring inpatient mental health care are timely identified, transferred to a suitable facility and given such care. The BOP's May 1, 2014 Program Statement entitled "Treatment and Care of Inmates with Mental Illness" ("Program Statement") acknowledges the need for inpatient care, which it designates as treatment under level CARE4-MH, and generally requires exclusion of prisoners designated as CARE4-MH from ADX. However, as detailed below, some such prisoners remain at ADX despite their obvious need for inpatient mental health care, as evidenced by horrendous self-mutilation, chronic wailing, wallowing in one's own body waste, and/or a complete loss of communication, orientation as to time and space, and the ability to maintain even basic levels of hygiene and self-control.

(c)     Residential Level of Care: The Constitution requires that ADX prisoners having mental illness so severe that it requires treatment in a residential mental health treatment unit be provided such treatment, either at the ADX or at another suitable facility. Prisoners appropriate for these units generally have had, and may always have, significant difficulty functioning in a general population environment due to symptoms related to their serious mental disorders. Correctional residential mental health programs are designed to provide supportive housing and a psychosocial rehabilitative treatment approach. Successful implementation of a residential treatment level of care will reduce the need for inpatient psychiatric beds and the number of admissions to a crisis bed level of care. The May 2014 Program Statement addresses the need for residential care of prisoners meeting the BOP's level CARE3-MH criteria and outlines policies for providing it. Nonetheless, subclass members still do not receive the residential level mental health care mandated by the Program Statement or the Constitution.

(d)     Outpatient Level of Care: The Constitution requires that ADX prisoners having mental illness that requires outpatient treatment be provided such treatment, either at the ADX or at another suitable facility. Objective community-based standards establish that patients requiring outpatient mental health care have access to, among other things: appropriate ongoing diagnostic and assessment services, to ensure that services and medications are adjusted in accordance with changes in the prisoner's mental health; medically indicated psychotropic medications administered as and when medically appropriate; medically necessary scheduled and unscheduled confidential mental health counseling; structured and unstructured out of cell recreation opportunities; and constitutionally adequate mental health crisis intervention. Despite some positive changes in the outpatient mental health care provided to ADX prisoners, including

15

the BOP's recognition in the May 1, 2014 Program Statement that prisoners designated levels CARE2-MH and CARE3-MH require varying degrees of outpatient mental health treatment, services that are fundamental to a constitutionally adequate outpatient level of care remain chronically deficient, in that medically necessary medications are still commonly withheld or improperly administered, counseling is frequently delayed or unavailable, and established diagnoses continue to be ignored for "security" reasons, among other things.

18.     In addition, because an accurate diagnosis is essential to the delivery of constitutionally adequate mental health care, and also because of the unique dangers to mental health that are posed by the conditions of confinement at ADX, the Eighth Amendment requires that prisoners designated for confinement at ADX receive a thorough psychological evaluation either before their transfer to ADX or immediately after their arrival there, and that prisoners receive periodic psychological evaluations after their arrival at ADX to identify signs and symptoms of developing or worsening mental illness and facilitate appropriate treatment. This evaluation process, too, must meet the contemporary community standards utilized by mental health professionals evaluating and diagnosing patients with mental illnesses. In conjunction with its May 1, 2014 Program Statement, in the summer of 2014 the BOP undertook to screen for mental illness all prisoners at the ADX. This initial step identified dozens of men having mental illnesses, despite Defendant's sworn assurance to Congress, after the initiation of this lawsuit, that its policies would preclude housing of prisoners with mental illness at ADX. However, since that screening, upon information and belief, additional men have been transferred to the ADX without a mental health screening, and no further update screening has been undertaken or planned for the rest of the facility. A reasonable and constitutionally

adequate screening program will need to continue for all new prisoners and must be scheduled to periodically re-occur for current prisoners.

19.     Certain operational procedures and practices at ADX disproportionately and unconstitutionally impact prisoners with mental illness. In particular, as detailed below the most common (and for many prisoners the only) way to leave the ADX is to complete a "Step-Down" program in which prisoners work their way through a series of successively lower security levels and thereby have the ability, by maintaining perfect conduct for several years, to earn their way to a placement at a lower security prison (often a maximum security United States Penitentiary, albeit one offering much more freedom than ADX). It is unrealistic to expect many prisoners with chronic mental illness to avoid any disciplinary infraction for several years. Accordingly, many such prisoners are extremely unlikely to complete the Step-Down Program, because the manifestations of their mental illness, even if non-violent, frequently violate some BOP discipline standard. For example, a single instance of being observed masturbating in one's cell can and frequently does result in the expulsion of a prisoner from the Step-Down program. As a result, prisoners with chronic mental illness end up in a seemingly endless cycle, doing their best to maintain clear conduct for months or years, then getting returned to the starting line for a transgression. The Constitution and other applicable laws require the modification of policies or procedures to provide prisoners with mental illness a reasonable opportunity to program their way out of the ADX, lest they be sentenced de facto to life imprisonment there by reason of their mental illness only.

20.     The BOP enacted an institutional supplement for USP Florence on November 10, 2014, entitled "Secure Steps Towards Awareness Growth and Emotional Strength (STAGES)

Program," which begins to address some of the difficulties inherent in the standard ADX Step-Down Program. Even with this revised policy, the Step-Down Program continues to disproportionately and unconstitutionally affect the ability of prisoners with mental illness to maintain appropriate access to mental health care while working their way out of the ADX.

21.     In addition to the foregoing diagnostic and treatment imperatives, given the extreme isolation and sensory deprivation inflicted on prisoners confined at ADX, the Constitution requires the implementation of a preventative mental health program. To meet this constitutional standard, the BOP must implement primary and secondary efforts to mitigate the effects of confinement in isolation on both prisoners who have or who develop diagnosed mental illness, and prisoners who do not have a diagnosed mental illness but who are exposed to the risk of, or experience, signs and symptoms of mental disturbance associated with confinement in isolation, such as anxiety, memory loss, loss of the ability to concentrate, situational depression, and chronic insomnia, among others. A constitutionally adequate program of preventative care includes, among other things enhanced training for correctional staff assigned to segregation units, enhanced training for medical and mental health staff members working in such facilities, modification of operational and physical attributes of such units to reduce the risk they pose to mental health without impacting security, and educational or other programming for prisoners, to help them understand and address the risks to their mental health arising from confinement in isolation. In addition, meaningful mental health rounds, by an appropriately trained clinician, should occur at least weekly for purposes of identifying prisoners in need of mental health intervention and to facilitate timely mental health interventions as clinically indicated.

22.     Prevention and treatment efforts also must include excluding prisoners with serious mental illness from being housed in the ADX if the current conditions of confinement at the ADX are not significantly changed, or, if an "exclusion policy /order" is not implemented and complied with, changing the conditions of confinement for ADX prisoners with mental illness, to include adequate out of cell structured therapeutic activity and adequate out of cell outdoor unstructured recreational time. Out of cell individual counseling offered in a confidential setting a on a regular basis as clinically indicated should also be available. These prevention interventions will decrease the risk that a prisoner with mental illness will have the symptoms of his mental illness exacerbated by the conditions of confinement and should also help to improve his clinical condition. Upon information and belief these prevention interventions will also increase security at the ADX and decrease both operating costs and the risk of injury to staff and prisoners.

23.     The BOP's voluntary decision to exclude certain prisoners, including certain class representatives, from confinement at ADX following the initiation of this litigation does not render the claims of those prisoners moot and does not limit the requirement that the BOP provide these individuals with constitutionally adequate mental health treatment. Plaintiffs seek, through this lawsuit, to ensure that all prisoners with mental illness detained at ADX for any period of time receive constitutionally adequate mental health diagnosis and treatment. The BOP's decisions on the day-to-day locations of Plaintiffs in their custody do not alter BOP's constitutionally-mandated responsibilities, nor do they defeat the court's authority here.

24.     This lawsuit does not seek a declaration that the conditions of confinement at ADX are unconstitutional for all prisoners. Rather, this lawsuit seeks a court order that will fundamentally and irrevocably reform the provision of mental health care at ADX by:

(a)     requiring the BOP to provide prisoners designated to ADX with the diagnostic services and four levels of mental health care appropriate to the seriousness of their mental illness, as identified above;

(b)     requiring the BOP to provide all such diagnostic and treatment services either on-site at the ADX or at another facility, and requiring that if the BOP elects to provide some such services outside the ADX, it ensures that all Plaintiffs, Interested Persons, class, and subclass members receive such diagnostic and treatment services at such facilities;

(c)     requiring the modification of ADX's operating policies to ensure prisoners with mental illness have a reasonable opportunity to complete a transitional program and earn a transfer out of ADX despite the periodic manifestation of their mental illness in a manner that violated BOP conduct standards;

(d)     requiring the implementation of constitutionally adequate programming for the prevention of mental illness and mental impairments caused or contributed to by the extremely isolated conditions of confinement imposed on all ADX prisoners; and

(e)     providing for Court-supervised monitoring of compliance with the order for long enough to ensure that Plaintiffs, Interested Parties, class, and subclass members receive adequate mental health treatment services at whatever location the BOP chooses to house them, and that operational and programming changes mandated by the Court are sufficiently

institutionalized to ensure that the BOP will not, for want of will or oversight, allow conditions to deteriorate and revert to the situation that existed when this case was filed.

### III.    JURISDICTION

25.    This Court's subject matter jurisdiction over the allegations in this Second Amended Complaint is based on 28 U.S.C. § 1331, in that the claims for injunctive relief arise under the United States Constitution and federal statutes. The request for declaratory relief is based upon 28 U.S.C. § 2201, in that an actual controversy exists between Defendant and each Plaintiff over the denial of services that are guaranteed by the United States Constitution.

### IV.    VENUE

26.    Venue is proper in the District of Colorado under 28 U.S.C. § 1391(b), because a substantial part of the acts or omissions that give rise to Plaintiffs' claims occurred or will occur in the District of Colorado.

### V.    PARTIES

27.    Class Plaintiffs Harold Cunningham, Percy Barron, Alphonso Blake, Jabbar Currence, Carlton Dunbar, Scott Fountain, Sean Gillespie, Charles Hipps, Ronnie Houston, John Lamb, Herbert Perkins, Arnell Shelton, John J. Powers, and Marcellus Washington are either currently housed at ADX or were housed at ADX at the time the Complaint and Amended Complaint were filed. Each Plaintiff has a mental illness, and in many cases a serious mental illness. The care that each Class Plaintiff received or is receiving at ADX for his mental illness is constitutionally deficient and otherwise fails to satisfy Defendant's legal obligations to Plaintiffs. Specific facts relating to each Class Plaintiff are set forth in Section VII of this Second Amended Complaint, below.

28.     Plaintiff CLA operates Colorado's "Protection and Advocacy System," seeking to ensure the safety, well-being, and dignity of people with disabilities in group homes, people with disabilities in jail or prison, people confined in mental health facilities, and elderly people in long-term care. As detailed in Section IX, below, CLA has a federal statutory mandate to advocate on behalf of people with disabilities, including ADX prisoners with mental illness.

29.     Defendant BOP is a federal law enforcement agency subdivision of the United States Department of Justice ("DOJ"), and is responsible for the administration of federal prisons, including ADX. The BOP maintains physical custody of Plaintiffs and class members. The BOP is charged with establishing policies and regulations that are safe, humane, and secure for all federal penitentiaries and other prison facilities.

## VI.     GENERAL ALLEGATIONS

### A.     Background and Operation of ADX

30.     At any given time, between 400 and 500 prisoners are housed at ADX in nine different maximum-security housing units, which are divided into six security levels: the Control Unit (or "Bravo" Unit); the disciplinary Special Housing Unit (also called "Charlie" Unit, "Zulu" Unit, the "SHU," or the "Hole"); so-called "Range 13," an ultra secure and isolated four-cell wing of Charlie Unit in which the BOP houses prisoners it thinks require confinement with virtually no human contact; four so-called "General Population" Units ("Delta," "Echo," "Fox," and "Golf" Units), the Special Security Unit (also called the "SAMs" Unit or "Hotel" Unit); and two units ("Joker" Unit and "Kilo" Unit) that in recent years have been used as transitional housing units for prisoners who have entered the so-called "Step-Down Program," in which they can earn their way out of ADX and into a lower security classification. Photographs of the

prison's exterior are attached hereto as Exhibit 1. At some point one side of Joker Unit was converted into an extension of ADX's Special Security Unit for prisoners under Special Administrative Measures ("SAMs"). Accordingly, as of the time of this filing, only one side of Joker Unit, comprising 32 cells, houses prisoners in the first stage of the Step-Down Program.

31.     Depending on which unit they are in, prisoners spend at least 20, and as much as 24, hours per day locked alone in their cells. The cells measure approximately 12 feet by 7 feet, and have solid walls that prevent prisoners from viewing the interiors of other cells or having direct contact with prisoners in adjacent cells. All ADX cells have solid doors with a small closable slot. Cells in all units other than Hotel, Joker, and Kilo Units also have an interior barred wall with a sliding door, which together with the exterior door forms a sally port in each cell. Each cell is furnished with a concrete bed, desk, and stool, and a stainless steel combination sink and toilet. Cells in all units other than Hotel, Joker, and Kilo Units include a shower with an automatic shut-off valve. The beds are usually dressed with a thin mattress and blankets over the concrete. Each cell contains a single window, approximately 42 inches tall and four inches wide, which allows entry of some natural light but which is designed to ensure that prisoners cannot see anything outside of their cells other than the building and sky. Many cells, except those in the SHU, are equipped with a radio and black and white television that offers religious and educational programming, along with some general interest and recreational programming. Televisions often are withheld from prisoners as punishment. Meals are delivered three times a day. With few exceptions, prisoners in most ADX units are allowed out of their cells only for limited social or legal visits, some forms of medical treatment, visits to the "law library" (essentially a cell with a specialized computer terminal that provides access to a limited range of

federal legal materials), and a few hours a week of indoor or outdoor recreation. Otherwise they remain locked in their cells. Photos of a standard ADX cell are collected in Exhibit 2 hereto.

32.     The Control Unit is among the most secure and isolated units currently in use at ADX. Prisoners in the Control Unit are isolated from the other prisoners at all times, even during recreation, for extended terms often lasting six years or more. Their only meaningful contact with other humans is with ADX staff members. The compliance of Control Unit prisoners with institutional rules is assessed monthly; a prisoner is given "credit" for serving a month of his Control Unit time only if he maintains clear conduct for the entire month. As detailed below, Defendant historically provided no mental health care or psychotropic medication to Control Unit prisoners, and upon information and belief, continues those practices with respect to some prisoners, despite Defendant's revised policies that require these services be provided to prisoners housed in the Control Unit. Given their complete lack of access to mental health care, prisoners with serious mental illness confined in the Control Unit frequently have behavioral issues caused by their mental illness. Such conduct often results in the loss of credit for Control Unit time served, thus extending the prisoner's time in the extreme isolation of the Control Unit, sometimes for years. For example, Plaintiff John Powers entered the ADX Control Unit in 2001 with a 60-month sentence, but as a result of disciplinary incidents (including a number of instances of extreme self-mutilation) was not released into the ADX General Population until March 2011, after more than 120 months in the Control Unit. During that time he received no meaningful mental health care at ADX.

33.     Prisoners confined to the SHU live in similar isolation. They are continuously segregated from other prisoners, even during recreation. Unlike other ADX prisoners, those in

the SHU are frequently denied access to televisions and radios, and sometimes are confined with nothing in their cells but a mattress and minimal clothing (for example, a t-shirt and boxer shorts). ADX prisoners are housed in the SHU in several circumstances. Most ADX prisoners spend at least a few days in the SHU upon their arrival at the institution. Others are moved to the SHU pending investigation of incidents such as fights that occur from time to time elsewhere in the institution. Prisoners who receive disciplinary incident reports (or "shots" in the ADX vernacular), and who, as a result, are sentenced to a term of punitive segregation, serve that time in the SHU. Like Control Unit prisoners, many prisoners confined to the SHU are serving a specified term of disciplinary detention, but that time may be extended by further shots. As in the Control Unit, prisoners with mental illness held in the extreme isolation and sensory deprivation of the SHU frequently receive additional shots. As a result, many prisoners with serious mental illness have lived in the ADX SHU for many months, and some have lived there for years.

34.      In the four "General Population" units, prisoners also are isolated from one another, spending at least 22 hours per day alone in their cells. One or two days a week they are allowed outside recreation time, during which they may able to see and speak with a limited number of other prisoners while all are confined in separate outdoor cages of the kind depicted in Exhibit 3. A photograph of individual outdoor recreation enclosures of the sort used by Control Unit and SHU prisoners is attached as Exhibit 4. One or two days a week, prisoners in most ADX units also have a few hours of access, one at a time, to individual indoor recreation rooms of the sort depicted in Exhibit 5.

35.      The ADX Step-Down Program is a series of three transitional housing units in which prisoners are afforded direct, although still extremely limited, contact with other prisoners.

The step-down units represent a type of halfway house on the path to being allowed to leave ADX for another prison. Still, prisoners who reside in the step-down units are confined to their cells for all but a few hours a day. Because of the erratic way that the ADX Step-Down Program operates, the step-down units are particularly dangerous for prisoners with mental illnesses who are trying to "earn" their way to a lower security classification.

36.     Every prisoner intent on earning his way out of ADX is required to pass through Joker Unit, one side of which, comprising 32 cells, houses the first stage in the Step-Down Program. Prisoners are eligible for transfer to Joker Unit only after completing an extended period of clear conduct. Prisoners who avoid trouble in Joker Unit are eligible to move, after a time, to the second phase of step-down, where they have more freedom. The second phase is housed at USP Florence, which lies directly across the street from ADX. Prisoners who successfully complete the second step-down phase are eligible to move to the final step-down phase (also housed at USP Florence), which provides even more freedom and a pathway to a transfer to a regular maximum security federal penitentiary. Successful completion of the Step-Down Program can take years, even if a prisoner behaves perfectly. But any transgression, however minor, can and often does result in the prisoner's removal from the program, placement back in the ADX SHU, and a restarting of the good-conduct clock. Many ADX prisoners have made it partway through the Step-Down Program several times, only to be returned to the SHU or general population based on a small, or fabricated, transgression.

37.     Unlike other ADX cells, the individual cells in the step-down units at ADX have no interior bars. Accordingly, only one sliding solid steel door separates prisoners from the open day room at the center of the unit. Joker Unit prisoners are part of a "Recreation Group" of up to

seven other prisoners housed on the same tier. Each Recreation Group is released at once into the day room or outside recreation yard, where they have unrestrained access to one another. Exhibit 6 includes several photographs of Joker and Kilo Units, which in recent years have had a nearly identical configuration, as well as a Kilo Unit cell showing the door and the absence of an internal grill.

38.     For most ADX prisoners, being transferred into Joker Unit is a disorienting and dangerous experience. After years of isolation, with no direct, unrestrained contact with other human beings, many prisoners experience a fundamental loss of even basic social skills and adaptive behaviors, and predictably find themselves paranoid about the motives and intentions of other prisoners, as well as staff members. Once placed into unrestrained contact with other, similarly impaired and paranoid men, the stress on prisoners -- even those with no mental illness -- can be extreme. Assaults and stabbings are common. In 2005, two ADX prisoners in Kilo Unit slowly beat and stomped a third prisoner to death over a period of many minutes in full view of ADX staff members, who made no effort to intervene until the victim was lying still, either dead or near death, in a pool of blood. Two serious stabbings occurred in Joker Unit between November 2011 and September 2012. More recently, on April 4, 2013, plaintiff Carlton Dunbar was attacked in Joker Unit and stabbed in the head by another prisoner. The staff took no action and, as a result, Mr. Dunbar was injured, both by the stabbing and by exposure to the feces and blood of the other prisoner, who has Hepatitis C. In addition, after leaving the unarmed Mr. Dunbar to defend himself against an armed attacker for almost 15 minutes, the ADX staff finally intervened, and when they did they aggressively pinned Mr. Dunbar to the ground, injuring his calf. They then applied hand and leg restraints so tightly that Mr. Dunbar lost feeling in his hand

and ankles. Although Dunbar, who has a serious mental illness, survived the attack, the attack on him, and other attacks on prisoners in Joker and Kilo Units, clearly illustrate the systemic failure of the ADX Step-Down Program, particularly for prisoners with mental illness.

39.     Recreation Groups are formed, in part, by the need to separate prisoners who are not supposed to be housed together or allowed contact with one another. For example, members of rival gangs would not be placed in the same Recreation Group. Similar "separations" can result from past conflicts between particular prisoners, or situations in which one prisoner has testified against another prisoner.

40.     When members of one Joker Unit Recreation Group are out of their cells, the other Recreation Groups in the unit are supposed to be securely locked in their cells. However, that objective is not always met at ADX. In addition, because cells in Joker Unit lack an internal barred wall, prisoners housed in Joker Unit who have separations often are separated from their separatees only by a single steel door.

41.     That fact creates extreme danger and stress for Joker Unit prisoners, because ADX staff members frequently open the doors of Joker Unit cells unexpectedly, giving prisoners direct and potentially lethal access to one another. For prisoners with personal protection concerns arising from health problems, age, or past cooperation with law enforcement officials, the potential that his cell door will open suddenly and unexpectedly turns every moment that another Recreation Group spends in the Joker Unit day room into a life or death moment.

42.     The dangers of Joker Unit, and in particular the risk of physical confrontation because of a staff member's actions, are widely known to ADX prisoners, increasing the stress they experience upon entry into the Step-Down Program. When combined with the ravages of

untreated or inadequately treated mental illness, those stresses make it virtually impossible for many prisoners with mental illness to earn their way out of ADX by completing the Step-Down Program. Thus, even in the unlikely event that a prisoner with mental illness -- despite inadequate mental health care -- can maintain clear conduct long enough to qualify for the Step-Down Program, very few can hold themselves together long enough to complete that program. Instead, they frequently succumb to the behavior caused by their illness, are removed from step-down and transferred back to the SHU and then "general population," all the while being denied the mental health care they need to have any realistic chance to get better, succeed in conforming their behavior to institutional norms, and qualify for transfer to less secure prisons. In part because of this cycle, the number of prisoners at ADX with mental illness, including serious mental illness, has risen steadily in recent years, and will continue doing so until the BOP reforms the mental health care system at ADX and addresses the patent deficiencies in the ADX Step-Down Program.

43.     In all units at ADX, Defendant makes a determined and calculated effort to dominate prisoners through the use of punitive techniques that include the use of extended periods of isolated confinement in the Control Unit or SHU and threats of other punitive measures such as the withholding of privileges (such as access to a television set, access to the in-house "commissary" where prisoners can purchase food and other items, access to the telephone, and prompt delivery of inbound mail). ADX programs are designed based upon a punishment philosophy rather than a control philosophy. The behavior of prisoners with mental illness, in particular, deteriorates very rapidly when they are placed into programs designed to punish rather than to control unacceptable behaviors.

44.     Consistent with ADX's punishment-focused correctional model, certain members of the correctional staff at ADX routinely use physical abuse of unruly or merely assertive prisoners to create fear and to demonstrate the dominance of the correctional staff. The harsh and rigid disciplinary philosophy employed at ADX is inappropriate for prisoners with serious mental illness, particularly those who not only have mental illness but whose minds also are dulled by confinement in sustained isolation. For example, certain prisoners are required to stand with their backs to the door and hands on the wall when their meals are delivered. If a prisoner fails to instantly comply, officers often depart without leaving a food tray. As a result, prisoners with psychosis or deep depression, including those whose conditions are exacerbated by Defendant's failure to provide required medications and other mental health care, frequently go without food on the ostensible basis that they defied an officer's order, when in fact the prisoner's only failing was a failure to understand the order or instantaneously clear his mind of fog induced by untreated mental illness and sustained isolation.

45.     Plaintiffs do not dispute the need for security at ADX, and acknowledge that unruly or violent prisoners may sometimes require physical restraint. But as applied to prisoners with mental illness, the brutal disciplinary model employed by the staff at ADX is often an instrument of terror and abuse, deployed by staff members, many of whom lack the training and skills necessary to manage prisoners with mental illness safely and effectively, and some of whom provoke and aggravate the very conduct they punish.

**B.      Extended Confinement in Isolation Can and Often Does Have a Devastating Effect on Prisoners' Mental Health**

46.      As early as the 1960s, electroencephalography ("EEG") examinations demonstrated the slowing of brain waves of prisoners confined in isolation for longer than a week.

47.      A landmark study in the 1970s showed that subjects in solitary confinement often experienced impaired functioning of the brain waves associated with the ability to control emotions and key cognitive functions.

48.      Similarly, a 2011 study demonstrated that after only a week of solitary confinement, prisoners showed decreased EEG activity, indicative of increased stress, anxiety, and depression.

49.      The BOP has known since at least 1999 that extended periods of confinement in isolation can be psychologically damaging to any prisoner and can be particularly harmful to individuals with pre-existing mental illness. Specifically, a 1999 study conducted under the auspices of the DOJ and the National Institute of Corrections concluded:

> Insofar as possible, mentally ill inmates should be excluded from extended control facilities. Each inmate being considered for such a facility should have a mental health evaluation. Although some mentally ill offenders are assaultive and require control measures, much of the regime common to extended control facilities may be unnecessary, and even counterproductive, for this population.

50.      In May 2013, the same month that Plaintiffs filed their Amended Complaint, the United States Government Accountability Office ("GAO") issued a detailed report entitled "Bureau Of Prisons: Improvements Needed in Bureau of Prisons' Monitoring and Evaluation of Impact of Segregated Housing." That report includes many troubling findings concerning the BOP's operation of ADX, including one making clear that the BOP's publication of policies

does not even begin to address the problems at which the policies are aimed, because the BOP

does not monitor compliance with its policies at ADX:

> While BOP has a mechanism to centrally monitor many of its segregated housing unit policies, BOP does not centrally monitor the policies specific to its most restrictive segregated prison, the ADX facility. As a result, BOP has less assurance that ADX staff consistently follows ADX-specific policies to the same degree that these requirements are followed for [Special Housing Units] and [Special Management Units].

51.     The GAO also found:

> While most BOP officials told us there was little or no clear evidence of mental health impacts from long-term segregation, BOP's Psychology Services Manual explicitly acknowledges the potential mental health risks of inmates placed in long-term segregation. Specifically, it states that BOP "recognizes that extended periods of confinement in Administrative Detention or Disciplinary Segregation Status may have an adverse effect on the overall mental status of some individuals."

52.     Following a June 2012 oversight hearing in the United States Senate during which

the Director of the BOP admitted that the BOP has never evaluated the impact of solitary

confinement on prisoners, the BOP commissioned an independent study on that issue. The study

culminated with a 242 page report issued in December 2014. Among many other BOP failings,

that report detailed, as follows, the mismanagement of mental illness in segregation units such as

ADX:

> (a)     A large number of prisoners in solitary confinement need mental health treatment, but are not receiving it;
>
> (b)     No protocol exists to identify prisoners with mental illness who should be kept out of solitary confinement;
>
> (c)     Inmates often receive a mental health diagnosis by medical students or interns who are not trained in psychiatry, and once diagnosed, they rarely receive follow-up reassessments or proper medication;
>
> (d)     No reentry programs or means of tracking for prisoners coming out of segregation exist.

53.     Despite the foregoing and mountains of anecdotal and empirical data confirming the impact on mental health of extended isolated confinement, and even though this case has been pending for three years, the BOP still assigns to ADX prisoners who have mental illness, including serious mental illness, still fails to maintain an adequate program to diagnose and treat the mental illnesses created and exacerbated by the conditions of confinement there, and still fails to prepare prisoners with mental illness from release to society or to less restrictive housing units.

**C.      BOP Has a Documented History of Violating Its Own Written Policies Concerning Evaluating, Housing, and Treating Prisoners With Mental Illness at ADX**

54.     The BOP's written procedures for transferring prisoners to ADX state that prisoners "currently diagnosed as suffering from serious psychiatric illnesses should not be referred for placement at … ADX." BOP Program Statement 5100.08, "Prisoner Security Designation and Custody Clarification," Chapter 7, p.18. The BOP has widely ignored this prohibition, both before and since this lawsuit was filed. The BOP regularly assigns prisoners to ADX even though they have well-documented histories of mental illness, and in many cases, histories showing that their mental illnesses can be controlled with proper treatment.

55.     BOP policies also have consistently required that all prisoners are given a psychiatric screening upon arrival at ADX. For example, the BOP's pre-lawsuit policies require the prison staff to "ensure that assessment and treatment planning procedures exist to identify all prisoners entering the institution with either a recent history or current symptoms of significant mental illnesses and/or risk of suicide." BOP Program Statement 5310.13, "Institution Management of Mentally Ill Prisoners," p.4. The May 1, 2014 Program Statement supplements these policies and provides from more explicit levels of screening for mental illness, including

pre-designation screening, initial care level assignment, and psychology intake screening. During

the facility intake screening, prisoners with any of the following must be referred immediately to

the Mental Health Program Coordinator for a more thorough assessment:

- Recent history or current symptoms of significant mental illness;

- Signs or symptoms consistent with a possible mental disorder;

- Use of medication for treatment of a mental illness or disorder;

- Documented mental health designation;

- Risk of suicide.

*Id.*; BOP Program Statement 6340.04, "Psychiatric Services," § 9(a).

56.   In reality, incoming prisoners at ADX generally have been given only perfunctory

interviews that are wholly inadequate as a form of screening or diagnosis. The mental health

"screening" provided by the facility typically consisted of a few questions asked in a minute or

two, often at a time when the prisoner had just completed a lengthy cross-country trip while

tightly chained and shackled, and was apprehensive about his arrival at ADX. Follow-up

monitoring and screening was and is virtually nonexistent. Even when the BOP did carry out the

psychological or psychiatric screening of a new arrival, it often ignored key factors indicating

mental illness, such as, for example, the fact that the prisoner was taking medication for a serious

mental illness immediately before arriving at ADX. Plaintiffs allege, on information and belief,

that despite the new policies in the May 1, 2014 Program Statement, the BOP still does not

provide all incoming ADX prisoners with the evaluations required by policy and the

Constitution.

57.     Even when the BOP correctly identifies prisoners at ADX who have a mental illness, many are not given appropriate treatment, including either counseling or medication. Despite the BOP's updated policies concerning the development of treatment plans and delivery of mental health services, the BOP still regularly is failing to develop meaningful treatment plans even for prisoners who have chronic and obvious mental illness, and failing even to establish at ADX a reliable mechanism for delivering elementary mental health services, such as timely access to psychiatry services for prisoners who have been prescribed psychotropic medications, timely access to crisis counseling, and counseling in both individual and group settings that is delivered in a consistent fashion and includes plans for continuity of care from one provider to another when staffing changes occur.

58.     Because of the particularly severe conditions of confinement in the ADX Control Unit, federal regulations require the BOP to adhere to an especially detailed set of mental health standards, including:

> The Warden may not refer an inmate for placement in a control unit … [i]f the inmate shows evidence of significant mental disorder or major physical disabilities as documented in a mental health evaluation or a physical examination. 28 C.F.R. §541.41(c)(1).

> *Mental health services.* During the first 30-day period in a control unit, staff shall schedule the control unit inmate for a psychological evaluation conducted by a psychologist. Additional individual evaluations shall occur every 30 days. The psychologist shall perform and/or supervise needed psychological services. Psychiatric services will be provided when necessary. *Inmates requiring prescribed psychotropic medication are not ordinarily housed in a control unit.* 28 C.F.R. §541.46(i) (Emphasis added.)

59.     Both before and since this lawsuit was filed, BOP has repeatedly violated every major requirement of these regulations. As detailed below, several of the Plaintiffs are currently

are or during the relevant period have been assigned to the ADX Control Unit in violation of

section 541.41(c)(1). Moreover, at various relevant times the BOP has placed incoming prisoners

with an existing prescription for psychotropic medication in the Control Unit, where the BOP

refuses to administer such medication in violation of section 541.46(i). The BOP has justified

this in Orwellian fashion: it discontinued the prisoner's medication, thereby making the now

non-medicated prisoner "eligible" for placement in the Control Unit. Then, when this newly

"eligible" prisoner requested medication needed to treat his serious mental illness, he was told

that BOP policy prohibits the administration of psychotropic medication to him so he should

develop "coping skills" as a substitute for the medication being withheld. Instructing a prisoner

confined in long-term segregation and who has Schizophrenia or Bipolar Disorder to self-treat

his disease with coping skills is like demanding that a diabetic prisoner learn to "cope" without

insulin. Likewise, the required 30 day "individual evaluations" are in actuality rarely performed

on prisoners in the Control Unit.

60. Both the former and as-revised BOP policies require that prisoners with mental

illness be monitored on an ongoing basis to assess treatment compliance. BOP Program

Statement 5310.13, "Institution Management of Mentally Ill Prisoners," at 5; May 1, 2014

Program Statement at 10-11. Under the BOP's former policies, for certain prisoners, including

those receiving psychotropic medication and those segregated for mental health reasons, mental

health staff must, at a minimum, conduct a monthly interview to assess the prisoner's treatment

strategy. Program Statement 5310.13 at 5. Under the BOP's revised May 1, 2014 Program

Statement psychosocial interventions are required on an even more regular basis: monthly for

prisoners designated CARE2-MH and weekly for prisoners designated CARE3-MH and CARE

4-MH. Program Statement 5310.16 at 10-11. As with other applicable policies, ADX staff routinely ignore this written monitoring requirement. Some prisoners never leave their cells or speak with staff for months. Some lived for extended periods in squalor, in cells caked with their own feces and bodily fluids, without bathing, and in some cases without even getting out of bed. Any meaningful "monitoring" would identify and trigger intervention for such prisoners, but rarely, if ever, does ADX staff seek to remedy the fetid and unsafe living conditions of many of the people in their custody who have mental illness.

**D.     ADX Continues to House Prisoners With Serious Mental Illness Who Are Dangerous to Themselves and Others**

61.     Plaintiffs, together with other class members, have various forms of mental illness, including Major Depression, Schizophrenia, Bipolar Illness, Schizoaffective Disorder, various personality disorders with significant functional impairments, Post-Traumatic Stress Disorder, severe developmental or other mental disabilities, and other chronic and serious mental conditions. These mental conditions are described and defined more completely in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-V").

62.     Prisoners with mental illness, including "serious" mental illnesses, are sometimes confined at ADX for months or years without adequate mental health treatment, with predictably devastating results. These conditions exacerbate their mental illness, making them increasingly dangerous to themselves and others. Their inadequately treated illnesses often lead to aggressive and violent behavior which is in turn used by the correctional staff as justification (if not pretext) for further acts of extreme isolation and violence directed at the prisoner, thereby establishing a vicious cycle in which anger begets a violent response that begets more anger.

63.     During the relevant time period, many prisoners housed in the SHU have chronic mental illness. Some of them have been housed in the SHU more or less continuously for years. Some routinely smeared themselves and their cells with their own feces. Some howled or shrieked continuously, or banged their metal showers at all hours of the day or night. Some spoke to themselves continuously. One longtime SHU resident carried on conversations with himself virtually every day, using multiple voices. Another, Jonathan Francisco, did not speak an intelligible word to anyone in the roughly two years between his arrival at the prison in late 2011 and his eventual transfer to a BOP medical facility, in 2013, following Plaintiffs' filing of an emergency motion in this case, which the BOP did not contest. During his time at ADX he spent most of his time staring blankly at a wall in his cell and was frequently caked with his own feces. Members of the ADX staff responsible for his care intermittently tormented him by yelling at him and antagonizing him as if he was a reviled animal.

64.     Plaintiffs Sean Gillespie and Ronnie Houston currently are assigned to the ADX Control Unit despite histories of serious mental illness requiring medication and treatment, which are being denied to them. Plaintiff Marcellus Washington spent more than eight years in the Control Unit before his release to the ADX general population in mid-2012, where he remains, and where he receives no meaningful treatment. Yet another plaintiff, Jack Powers, spent nearly ten years in the Control Unit before he was moved to the ADX general population in early 2011. During his time in the Control Unit, Mr. Powers slowly descended into madness, horribly mutilating himself as a result of his serious mental illness, repeatedly ramming his head into a metal door frame, amputating two fingers, a testicle, and his scrotum, tattooing his entire body with a razor blade and carbon paper dust, trying to inject bacteria into his own brain, and

slashing his wrist severely enough that he lost consciousness. All of this occurred after the BOP itself diagnosed Mr. Powers with a serious mental illness and all of it happened while he was being "monitored" by Defendant and its agents. Although he was referred for treatment three times at a BOP medical facility while confined in the Control Unit, and received prescribed medication for his serious mental illness during two of those visits, each time he was returned to ADX his treatment ceased, and his symptoms and mutilations escalated.

65.     Prisoners with mental illness, including those with serious mental illnesses, also are housed throughout ADX's General Population Units, and inhabit most of the 12 housing ranges that comprise those units. Such prisoners range from recluses who literally have not left their cells in months or years, to more boisterous prisoners who bang on their cell bars, or their showers, day and night, talk to themselves, wail and scream, and otherwise express their indeterminate suffering to the great disruption and discomfort of other nearby prisoners.

66.     During the relevant period the prison's "General Population" Units and SHU were home to a significant number of prisoners with such chronic and obvious mental illness that the DOJ itself has gone to court to have them involuntarily committed to treatment programs or forcibly medicated. These prisoners have mostly been diagnosed with Schizophrenia, and many have repeatedly been treated by the BOP for that illness and both exhibit chronic and obvious psychosis. And yet they all were longtime residents of ADX and, upon information and belief, during their time at ADX received no meaningful mental health care whatsoever.

67.     Upon information and belief, certain ADX staff members have sometimes used prisoners with mental illness as weapons against other, particularly disfavored prisoners. For example, prisoners at ADX periodically rotate cells, ostensibly for security reasons. For most

prisoners, a cell rotation means moving into the next cell on the same range. When a prisoner is "behind" a prisoner with serious mental illness in the cell rotation pattern, at each cell rotation he may find himself forced to move into a cell that is coated with dried human waste, semen, urine, and sometimes blood. Because many ADX prisoners have contagious blood-borne diseases, such as hepatitis C, exposure in this manner to another prisoner's waste carries with it an immediate and dire risk of infection with a serious and sometimes fatal illness. Nevertheless, ADX prisoners are routinely forced into waste-caked cells left behind by a fellow prisoner with obvious mental illness. Prisoners who refuse to enter contaminated cells are punished, taken to the SHU and denied privileges. Anyone who accepts assignment to a filthy cell left behind by a prisoner with mental illness must then clean the cell himself -- often with few if any cleaning supplies -- and then await the next rotation, when the process will be repeated. Upon information and belief, certain ADX staff members deliberately place disfavored prisoners behind unsanitary prisoners with mental illness in the cell rotation pattern for the intended purpose of exposing the unfortunates to the constant noise and harassment supplied by a neighbor with mental illness and to ensure that after every cell rotation the disfavored prisoner will have to clean another filthy cell.

68.     The BOP maintains separate facilities in other locations for dealing with prisoners who have mental illness, including severe mental illness, including the Medical Center for Federal Prisoners in Springfield, Missouri ("MCFP Springfield"), the Federal Medical Center in Butner, North Carolina ("FMC Butner"), the Federal Medical Center in Rochester, Minnesota ("FMC Rochester"), the Federal Medical Center in Devens, Massachusetts ("FMC Devens"), the High Security Mental Health Step-Down Unit at USP Atlanta, and the High Security STAGES

Program at USP Florence. MCFP Springfield is an administrative facility that provides medical, mental health, and dental services to male offenders of all security levels, including prisoners classified for confinement at ADX. It now houses many former ADX prisoners transferred from ADX as a result of this lawsuit. FMC Butner is an administrative facility that houses male prisoners of all security levels, including prisoners classified for confinement at ADX. FMC Rochester and FMC Devens are administrative facilities providing specialized medical and mental health services to male offenders. The High Security Mental Health Step-Down Unit at USP Atlanta and the High Security STAGES Program at USP Florence were created in specific response to this lawsuit, for the purpose of housing prisoners with mental illness transferred from ADX due to this lawsuit.

69.     Plaintiffs and all other ADX prisoners with mental illness including serious mental illness could be safely and securely housed at any of the facilities referred to in the preceding paragraph for treatment of their mental illnesses. In fact, many of Plaintiffs and a large number of other ADX prisoners have been hospitalized at MCFP Springfield and/or FMC Butner while designated for confinement at ADX.

**E.     Mental Health Care Treatment at ADX Was and Remains Woefully and Constitutionally Inadequate**

70.     The BOP does not provide adequate mental health staffing at ADX. At the time this action was filed, only two mental health professionals -- both psychologists -- were responsible for the mental health of the approximately 420 prisoners housed at ADX, many of whom have chronic mental illnesses or other mental health issues, and many others of whom experience periodic acute mental health crises. As of June 2012 these health care professionals were assisted by a psychiatrist who spent only approximately one day per week at ADX, a period

that was grossly inadequate given the substantial number of prisoners at ADX who require psychotropic medications.

71.     Since this action was filed, and upon information and belief, because this action was filed, the BOP has increased from two to four the number of full time psychologists serving prisoners at ADX, and has also added to the ADX mental health staff a part time psychiatric nurse and a psychology technician. However, turnover among the psychologists is rampant, resulting in extended periods during which one or more of the four authorized positions remains vacant, as well as serious problems with continuity of care, which the BOP has done little if anything to address.

72.     The FCC Florence psychiatrist who served ADX prisoners as of June 2012 resigned in mid-2012, and has not been replaced. Although a contract psychiatrist was on staff for a few months in 2014 and various other psychiatrists have occasionally provided in-person services at ADX in the past few years, since the summer of 2012 ADX prisoners have been forced to rely primarily on "telepsychiatry" services provided by videoconference. During their habitually short (15 minutes) telepsychiatry sessions, prisoners often remain chained hand and foot, and have at various relevant times been surrounded by corrections officers wielding batons. Under such circumstances, few prisoners are able to communicate effectively with the telepsychiatrist, and almost none receive effective psychiatry help. Moreover, it frequently takes months for prisoners to see a psychiatrist either in person or by telepsychiatry.

73.     Even though the BOP has taken some steps to address the gross mental health staffing shortage that existed when this action was filed, the mental health staff remains grossly inadequate to serve the needs of the large number of ADX prisoners who require mental health

services to address chronic mental illness, acute mental health crises, and the damaging long-term impact that confinement in isolation has even on relatively healthy minds. As a result of inadequate staffing by mental health professionals, ADX prisoners, including Plaintiffs and class members, do not have timely access to mental health professionals, particularly in times of crisis. This leads to prisoners becoming involved in escalating conflicts and violence that would be avoided if adequate mental health staffing were provided at the facility. The consequences of inadequate mental health staffing include a risk of physical harm to Plaintiffs, class members, and other prisoners, and a risk of harm to staff.

74.     The BOP provides psychotropic medication to some, but not all, of the prisoners with mental illness who are housed at ADX. Furthermore, although the efficacy of many psychotropic drugs may be affected by the time of administration and by such considerations as proximity of the administration to a meal, ADX staff distributes medications on an irregular schedule that is often inconsistent with the instructions for consumption of the medication. Staff members responsible for distributing medications also frequently make mistakes by distributing the incorrect medication to prisoners, or incorrect dosages of the correct medication. Other medications that are supposed to be taken with food are delivered when no food is available. And the time of day when medications are available to prisoners varies significantly from day to day, which causes problematic and sometimes dangerous fluctuations in prisoners' medication regimens. In addition, medications formulated to be administered as a solid tablet are frequently delivered in crushed form, which negatively impacts their effectiveness. The haphazard and sometimes reckless distribution of medications substantially interferes with the benefits the

medications provide to those ADX prisoners lucky enough to be authorized to receive needed psychotropic medications.

75.     Many prisoners at ADX receive their psychotropic medication through a "pill line" procedure in which the medication is crushed and given to them at their cell door in a cup. Many of the prisoners at ADX with serious mental illness are severely paranoid as a result of their illness, and generally believe that the staff providing medication is either providing the wrong medication or, in some cases, affirmatively attempting to poison them. In such circumstances, prisoners sometimes ask to receive whole pills that they can recognize (based on extended histories of taking the same medication), or for staff to show them the pills they are being given before grinding them up. Staff members have routinely refused these requests, leaving prisoners with severe mental illness and in some cases psychosis to choose between declining needed medication or consuming a substance they genuinely (even if erroneously) believe will harm or kill them.

76.     ADX provides inadequate mental health counseling to prisoners. At various relevant times, most of the "psychology programming" consists of distributing to prisoners books with such titles as "Anger Management for Dummies," "Choose Forgiveness - Your Journey to Freedom," and "Why Zebras Don't Get Ulcers." Staff award certificates to prisoners diligent and literate enough to self-treat their serious mental illnesses by completing elementary workbooks. Illiterate prisoners have no meaningful access to the negligible therapeutic information distributed by ADX in written form.

77.     Some repetitive and elementary psychology programming is also available to the segment of the ADX prisoner population with access to a television. The information provided in

this manner is of little if any use to many prisoners with mental illness or psychosis. Moreover, many of ADX's prisoners with the most chronic and devastating mental illnesses have been housed for months or years in the SHU, where many prisoners are denied access to all television programming, including even the meager televised mental health programming provided to other prisoners.

78.     Members of ADX mental health staff occasionally talk to prisoners. At various relevant times, those occasional "counseling" sessions were almost invariably conducted through the bars of the prisoner's cell, in the immediate presence of a correctional officer and within earshot of other prisoners housed on the same range. That process turned psychological counseling into a farce. Few people, in or out of prison, are comfortable discussing intensely personal matters in a highly public environment that renders them subject to ridicule, discrimination, or even violence. The same is true for ADX prisoners, who before this lawsuit was filed were forced by ADX's approach to mental health "counseling" to choose between forgoing that counseling or exposing themselves to violent assault or death based on events or concerns that they would discuss with a mental health professional and were forced to discuss within easy earshot of other prisoners. Since this lawsuit was filed, the BOP has established a private space in most if not all of ADX's housing units that is suitable for safe, secure, and private psychology counseling sessions. However, because of the large population at ADX with serious mental illness and the small number of staff members and counseling facilities, "talk therapy" at ADX remains grossly inadequate.

79.     Suicide and mental health crisis services at ADX also are systematically deficient. Prisoners with mental illness who threaten suicide have often been goaded by ADX staff

members to kill themselves. Prisoners who take steps to slash their wrists or hang themselves generally receive only minimal medical treatment for acute injuries. And instead of receiving mental health intervention, they are punished: they receive a disciplinary incident report that sometimes results in a trip to the SHU and loss of privileges. In 2012 an ADX prisoner who attempted to hang himself in a recreation enclosure in the SHU was violently removed from the enclosure by a team of correctional officers in riot gear. Incredibly, an ADX psychologist participated in the violent extraction. After a short stay in a "strip cell," a nearly empty cell in which the prisoner is clothed in what is essentially a paper robe, he was returned to the disciplinary segregation cell that precipitated his despair and suicide attempt only days earlier.

80.     Similarly, in February 2013, nine months after this lawsuit was filed and thus after the BOP was sued for wrongfully disciplining suicidal prisoners, Plaintiff Percy Barron received a disciplinary incident report for trying to kill himself.

81.     Upon information and belief, at various relevant times the BOP provided only grossly inadequate training to the staff at ADX, including in particular the corrections staff, regarding mental illnesses and the safe and humane management of prisoners with mental illness. As a result, staff members have routinely resorted to unnecessary violence and disciplinary actions when an inadequately treated prisoner with mental illness acts out. Thus, prisoners who have mental illness, including those in the throes of a psychotic episode, frequently were subjected to barbaric treatment more suited to the dungeons of medieval Europe than to a modern American prison. For example, prisoners with mental illness were routinely "four pointed" -- chained by the wrists and ankles in either a prone or supine position on top of a concrete platform -- often for extended periods. A photograph of an ADX cell with a concrete

platform bed fitted with rings for four-pointing is attached as Exhibit 7. While chained, prisoners with mental illness sometimes were left to urinate and defecate on themselves, and sometimes were denied basic nutrition.

82.     In some cases during relevant periods, ADX staff have turned the simple (although cruel and unconstitutional) refusal to feed a prisoner into a deceptive hoax. ADX prisoners, including those in four point restraints, sometimes have been put on a disciplinary "sack lunch" nutrition program in which they are fed not standard prison trays but a paper bag containing a sandwich or two and a piece of fruit. Many prisoners with mental illness at ADX who are placed on sack lunch restriction have received their sack (suitably videotaped) being delivered to their cells. But when they open the bags (off camera) they sometimes have been empty. Through this ruse ADX staff have produced false video evidence of feeding, raising (if only for a minute) the prisoner's hope for basic nutrition, then smashing the often-chained and always hungry prisoner's hopes with a bag of air. Prisoners at ADX who have mental illness often live near the edge of their emotional endurance, and the empty sack lunch is one of many cruel ploys that, upon information and belief, have been used by certain ADX staff members to torture and provoke such prisoners into outbursts that then are used to justify even harsher discipline.

83.     Upon information and belief, as a result of this lawsuit, in early 2013 ADX for the first time included in its annual staff training program a module relating to mental illness. That training may be a suitable first step, though Plaintiffs been provided with little information concerning the module. Even after receiving the training some ADX staff members continue to

neglect, abuse, and torment prisoners with serious mental illness in many if not all of the respects identified in this Second Amended Complaint.

84. As a result of this type of abuse, other prisoners in nearby cells and ranges have been subject to the shrieking and suffering of prisoners undergoing such abuse. Upon information and belief, such abuses were caused and/or exacerbated by inadequate staff treatment and a general failure of supervision.

85. Upon information and belief, the BOP requires or encourages members of the mental health staff at ADX to perform correctional functions. In fact, BOP policy requires psychologists to serve as corrections officers first, and only secondarily as healthcare providers. In this respect psychologists are distinguished in a critical way from chaplains and physicians, who are exempt under BOP policy from performing correctional functions. As a result of this BOP policy, and upon information and belief, at various relevant times ADX psychologists have: performed prisoner escort duty within the prison while armed with weapons, openly brandishing those weapons in the presence of prisoners; worked shifts in the prison's gun towers; appeared at the doorways of prisoners brandishing clubs in an aggressive fashion; and participated in violent acts toward prisoners, including on at least one instance, participating in a violent cell extraction. The performance of correctional functions by mental health professionals in the presence of or with the knowledge of prisoners blurs the line between the mental health profession and the correctional profession, and destroys whatever trust might otherwise develop among prisoners and the mental health professionals who are the only source of treatment for their mental illnesses. In the absence of some measure of trust, no mental health clinician can effectively treat a prisoner's mental illness.

86.     As described above and, with respect to Plaintiffs and the Interested Individual below, Defendant's failure to diagnose and treat serious mental illness has devastating consequences. With utter disdain for human dignity and decency and disregard for the requirements of the Eighth Amendment, Defendant repeatedly has violated the constitutional rights of Plaintiffs, Interested Individuals, the class, and the subclass.

**F.      Defendant Has Displayed Sustained Deliberate Indifference to the Plight and Needs of Prisoners With Mental Illness at ADX**

87.     Defendant is, and has been for years, on actual notice of the unmet mental health needs at ADX, but has demonstrated sustained and deliberate indifference to those needs. Defendant's actual knowledge of the unmet mental health needs of ADX prisoners has come from a variety of sources, including without limitation medical records of Plaintiffs and other prisoners, direct observation of Plaintiffs and other prisoners with obvious mental illness, administrative remedy requests filed by Plaintiffs and other prisoners, past litigation challenging the ADX mental health system, and suicides of prisoners with mental illness.

**(1)      The Illnesses of Plaintiffs and Their Peers are Obvious**

88.     As described in this Second Amended Complaint, many of the prisoners at ADX with mental illness do not and cannot hide their conditions. They have screamed, howled, mutilated themselves, smeared their waste, and begged for help. Many have long, documented histories of serious mental illness. Many have filed dozens of written requests for mental health intervention, to little or no avail.

89.     Even after this lawsuit was filed, and even in cases of prisoners having obvious catastrophic mental illness and related physical illnesses, BOP staff members, including psychologists, have displayed shocking indifference to prisoners' needs. For example, a prisoner

named Richie Hill was held at ADX in isolation for many years, including an unbroken period of over six years before he was evacuated on an emergency basis from ADX to MCFP Springfield on November 28, 2012. For years, Mr. Hill exhibited obvious symptoms of severe mental illness that were ignored by ADX staff. He swallowed objects including rocks, Styrofoam, and radio parts, and was frequently observed eating balls of his own feces. He attempted suicide approximately ten times while at ADX, including once by placing pencil lead, rocks, and pencil particles up his penis. He mutilated his forehead and face by carving pitchforks and "cannibal marks" into it, and also cut his lips open with staples and put flies into the wounds. He also attempted to gouge out his own left eyeball "about six times," often by pushing rocks into it.

90.     While at the ADX, Mr. Hill repeatedly begged the staff for help with his mental issues, and repeatedly asked to be transferred to a mental hospital. In response, in one instance the head psychologist at the ADX, who remains employed by BOP to this day, bribed him to withdraw his transfer request by giving him a radio, which Hill later smashed and ate. In other instances, the BOP responded to his pleas with bureaucratic gobbledygook about his supposed failure to attempt informal resolution of his issues, his violation of a technicality requiring prisoners to confine their administrative remedy forms to a single issue, and his supposedly untimely submission of his requests. His allegedly inadequate paperwork practices generally coincided with periods during which he was acutely psychotic and sitting in his feces-smeared cell without a pencil, complaint form, or any other means to communicate in writing that the BOP was slowly killing him.

91.     Mr. Hill's illness was obvious. Any BOP observer could have seen, and in fact BOP psychology staff *did* see, Hill smearing feces on the wall and on himself, as well as eating

his feces. Likewise, the BOP staff would have been easily able to see blood smeared on Mr. Hill's walls and body. And yet the BOP did nothing until he was very nearly dead.

92.     In 2012, Mr. Hill's legs became infected after he was overcome with a persistent delusion that diamond rings were embedded inside his legs. In an effort to remove the rings, he began digging holes in them with his fingers. The wounds became severely infected and fetid; at one point, a worm emerged from one of Mr. Hill's wounds. Although Mr. Hill repeatedly asked for medical assistance for his legs, little was done. One member of the medical staff who was aware of his swollen legs told Hill that the swelling would eventually subside. Other staff members stopped by his cell and remarked about his swollen legs, but did nothing.

93.     At the same time he was developing what turned out to be a life-threatening staph infection in his legs, Mr. Hill also developed what the BOP's own clinicians ultimately determined to be "severe malnutrition." As a result of the ADX staff's refusal to feed him, he lost 50 pounds in six months and experienced starvation so severe that he resorted to eating rocks. BOP records from the time document staff members refusing to feed him. Mr. Hill also filed at least two administrative remedy requests asking for supplemental food, because he knew he was slowly starving to death. In one of those requests Mr. Hill also again asked for mental health treatment, including psychotropic medication.

94.     The BOP's rejection of Mr. Hill's request for desperately needed food and mental health care is straight out of Kafka, citing five bureaucratic reasons for refusing to give food and medicine to a man who was obviously starving and experiencing psychosis:

```
TO  : RICHIE ANTONIO HILL, 20689-018
      FLORENCE ADMAX USP   UNT: F   QTR: Z04-210LDS
      PO BOX 8500
      FLORENCE, CO 81226


FOR THE REASONS LISTED BELOW, THIS ADMINISTRATIVE REMEDY REQUEST
IS BEING REJECTED AND RETURNED TO YOU. YOU SHOULD INCLUDE A COPY
OF THIS NOTICE WITH ANY FUTURE CORRESPONDENCE REGARDING THE REJECTION.

REMEDY ID      : 690098-F1       ADMINISTRATIVE REMEDY REQUEST
DATE RECEIVED  : MAY 25, 2012
SUBJECT 1      : FOOD - (EXCEPT DIETS & RLGS FOOD/MEALS)
SUBJECT 2      : OTHER COMPLAINT AGAINST STAFF
INCIDENT RPT NO:

REJECT REASON 1: THE ISSUE YOU RAISED IS NOT SENSITIVE. HOWEVER,
                 WE RETAINED YOUR REQUEST/APPEAL ACCORDING TO
                 POLICY.  YOU SHOULD FILE A REQUEST OR APPEAL AT
                 THE APPROPRIATE LEVEL VIA REGULAR PROCEDURES.

REJECT REASON 2: YOU RAISE MORE THAN ONE ISSUE/RELATED ISSUE OR APPEAL MORE
                 THAN ONE INCIDENT REPORT (INCIDENT NUMBER).   YOU MUST
                 FILE A SEPARATE REQUEST/APPEAL FOR EACH UNRELATED ISSUE
                 OR INCIDENT REPORT YOU WANT ADDRESSED.

REJECT REASON 3: YOU MAY ONLY SUBMIT ONE CONTINUATION PAGE, EQUIV. OF ONE
                 LETTER-SIZE (8.5 X 11) PAPER.  TEXT ON ONE SIDE.  THE
                 TEXT MUST BE LEGIBLE.

REJECT REASON 4: YOU DID NOT ATTEMPT INFORMAL RESOLUTION PRIOR TO SUBMISSION
                 OF ADMINISTRATIVE REMEDY, OR YOU DID NOT PROVIDE THE
                 NECESSARY EVIDENCE OF YOUR ATTEMPT AT INFORMAL RESOLUTION.

REJECT REASON 5: YOU MAY RESUBMIT YOUR REQUEST IN PROPER FORM WITHIN
                 5 DAYS OF THE DATE OF THIS REJECTION NOTICE.
```

95.     In October 2012 ADX staff members finally determined that Mr. Hill required an "emergency" medical evacuation to MCFP Springfield, because his legs were completely swollen and he was reduced to crawling around his cell, naked, in a pool of his waste, and rolling up and eating balls of his own feces. Despite recognizing that Mr. Hill required "emergency" treatment in a medical center, it took BOP a month to move him, by which point he was all but dead. Upon his arrival at MCFP Springfield a BOP physician observed that Mr. Hill had severe multiple systemic infections, appeared to be chronically and acutely septic, and had multiple draining deep sores. The physician informed Mr. Hill that his legs might require amputation, and, in fact, that the infection was so severe that his life was in danger. He ultimately was diagnosed with a severe staph infection, in addition to active psychosis.

96.     It took BOP medical personnel and outside doctors more than three months to restore Mr. Hill to some semblance of stability. He later was transferred to a residential BOP

mental health unit. That the foregoing events occurred at any time in any BOP facility reflects callous institutional indifference to prisoners with mental illness. That it happened at ADX, which houses fewer than 500 of the most closely monitored prisoners on the planet, reflects the depth and breadth of the mental health catastrophe that precipitated this lawsuit. The fact that it happened during the pendency of this case reflects a deliberate disregard of the rights, health, and safety of Plaintiffs and the other members of the class and subclass that demand the remedies sought in this case. And the fact that most of the BOP staff members who neglected Mr. Hill are still employed by the BOP and none has have suffered any ramifications as a result of the deliberate indifference to Mr. Hill's obvious serious medical needs confirms that the BOP is either disinterested in or incapable of fully addressing the systemic problems at ADX without close and continuing court supervision.

> **(2)** **A Series of Suicides by Prisoners with Mental Illness Have Demonstrated in Tragic and Permanent Terms the Past and Continued Deficiencies in the ADX Mental Health System**

97.     Since ADX opened in 1994, at least seven ADX prisoners have committed suicide there:

(a)     On June 17, 1999, Kevin Wilson hanged himself in his cell with a bedsheet;

(b)     On December 9, 1999, Gregory Britt hanged himself in a recreation cage;

(c)     On November 18, 2002, Lawrence Klaker hanged himself in his cell with shoelaces;

(d)     On April 17, 2006, Lance Vanderstappen hanged himself in his cell with a bedsheet;

(e)     On May 27, 2008, John Frierson hanged himself in his cell with a braided bedsheet;

(f)     On May 1, 2010, Jose Martin Vega hanged himself in his cell with a bedsheet; and

(g)     On September 7, 2013 -- several months after this lawsuit was filed -- Robert Knott hanged himself in his cell with a bedsheet.

98.     Upon information and belief, most if not all of these prisoners had a mental illness at the time they took their own lives.

99.     The deaths of Mr. Vega and Mr. Knott are perhaps the best illustrations, among these suicides, of Defendant's utter and persistent failure to address the proliferation of serious mental illness at ADX. As described below, ADX's mental health system failed to screen, monitor, or treat Mr. Vega's mental illnesses, first diagnosed by the BOP in 2004. Instead, Defendant placed Mr. Vega in ADX's Control Unit, deprived him of necessary psychiatric medications, and otherwise abused and tortured him over a period of years. These actions had devastating consequences.

100.     In 1995, at the age of 20, Mr. Vega was sentenced to life in prison and committed to the custody of the BOP. Mr. Vega was confined at two facilities before he was transferred to ADX.

101.     Upon his arrival at ADX on April 5, 2004, Mr. Vega was placed in the Control Unit. Although the details of Mr. Vega's health care screening upon his arrival at ADX are presently unknown, the screening, such that it was, apparently failed to reveal that he had a serious mental illness. However, upon information and belief, in December 2004, approximately

eight months after Mr. Vega arrived at ADX, BOP psychologist Marie Bailey diagnosed Mr. Vega with Paranoid Schizophrenia.

102.     In March 2005, Mr. Vega was referred to MCFP Springfield for a mental health evaluation, which revealed that Mr. Vega had "a history of depression and antisocial personality disorder." Mr. Vega remained at MCFP Springfield for approximately one year. Upon information and belief, the BOP only allows prisoners with Mr. Vega's security classification to remain at MCFP Springfield for as long as a year of mental health treatment in cases of severe mental illness.

103.     In 2006, the BOP transferred Mr. Vega back to ADX, in violation of the BOP's written procedures, which clearly state that "prisoners currently diagnosed as suffering from serious psychiatric illnesses should not be referred for placement at … ADX." BOP Program Statement 5100.08, "Prisoner Security Designation and Custody Clarification," Chapter 7, p.18.

104.     Upon information and belief, Defendant did not send Mr. Vega to the Mental Health Program Coordinator for a thorough assessment of his mental health, as required under BOP regulations. BOP Program Statement 6340.04, "Psychiatric Services," § 9(a). Such a review would have shown that Mr. Vega needed mental health treatment.

105.     Instead, upon Mr. Vega's return to ADX, Defendant placed Mr. Vega back in the Control Unit, and prevented him from receiving medication or other treatment for his serious mental illness.

106.     Upon information and belief, ADX staff members repeatedly chained Mr. Vega unnecessarily, sometimes for periods of ten days or more, to control behavior provoked by Mr. Vega's untreated mental illness.

107.     Upon information and belief, Mr. Vega told other prisoners that he believed the ADX correctional officers were poisoning his food and spraying things into his vents. Upon information and belief, certain ADX correctional officers frequently taunted and provoked Mr. Vega, and then punished him when he responded.

108.     On May 1, 2010, Mr. Vega was found dead in his cell in the Control Unit at ADX. The coroner's report summarizing Mr. Vega's autopsy reports that Mr. Vega died as a result of hanging. It also states that information received from the ADX health administrator indicated that Mr. Vega "had a long psychiatric history."

109.     Upon information and belief, Defendant failed to prevent the abuse of Mr. Vega by certain ADX staff members, failed to ensure that Mr. Vega was adequate fed and safely housed, failed to implement adequate suicide prevention programs at ADX, and otherwise failed to address Mr. Vega's serious, chronic and growing mental illness. As a result, Mr. Vega's mental deterioration continued, and ultimately resulted in his death.

110.     Robert Knott hanged himself at ADX on September 7, 2013. At the time of his death he was 48 years old.

111.     Like most of the other ADX prisoners who committed suicide, Mr. Knott had been diagnosed and treated by the BOP for severe mental illness, and therefore should never have been at ADX in the first place.

112.     Specifically, public records make clear that at the time of his 1988 conviction for kidnapping, and subsequent life sentence, Mr. Knott had been diagnosed with Schizophrenia. *See United States v. Knott,* 894 F.2d 1119, 1121 (9th Cir. 1990) ("The parties agree that [Knott's] schizophrenia is a serious mental disease that satisfies the first prong of [the statutory test for the

insanity defense.]"). Schizophrenia is a major mental illness that is characterized by serious thought disruptions and often by hallucinations, delusions, and severe paranoia. Schizophrenia patients also often exhibit bizarre behavior.

113.     It is clear that the DOJ did not dispute Mr. Knott's Schizophrenia diagnosis in 1988, and the limited records now available to Plaintiffs suggest that at no time since Mr. Knott entered BOP custody in 1988 has anyone seriously denied the nature or severity of his mental illness. Indeed, an April 19, 2002 psychological report filed in court by the DOJ stated, "Throughout his incarceration in the Federal Bureau of Prisons, Mr. Knott has been diagnosed with schizophrenia and antisocial personality disorder". Nevertheless, in April 1995 the BOP transferred him to the ADX.

114.     Thereafter, excepting only the periods of time when he was hospitalized for mental illness at MCFP Springfield, it appears that Mr. Knott remained at the ADX for the entirety of the 18 1/2 years between his first arrival there in April 1995 and his death in September 2013.

115.     The circumstances of Mr. Knott's symptoms and treatment are detailed in two mental health evaluations filed in the U.S. District Court for the Western District of Missouri in 2002, in connection with a petition by the DOJ to have him civilly committed so he could be involuntarily medicated. In the evaluation submitted with the government's petition, a BOP doctor noted:

> Robert G. Knott is a 37-year-old, single, white man who was admitted from ADX Florence for a mental health evaluation. He is currently serving a life sentence for Kidnapping. According to referral information, Mr. Knott's mental condition has substantially deteriorated during the past several months. His speech and writings reflect severe disorganization of his thoughts. His behaviors are also disorganized; he frequently refuses to wear clothes. He has been only sporadically compliant with his regimen of psychiatric medications. He was admitted to the Diagnostic and Observation Service to assess his need for inpatient mental health treatment.

116.    Later, after discussing Knott's background, including his six prior hospitalizations at Springfield, his history of bizarre, psychotic behavior (particularly his obsessive refusal to wear clothing), and his up and down cycles of psychological functioning as he moved back and forth between prisons and BOP medical facilities, the BOP psychologist concluded in the following terms that Mr. Knott had a "severe psychotic disorder" that at that time "preclude[ed] his ability to function adequately in a regular Bureau of Prisons facility":

> **OPINION AND RECOMMENDATIONS**
>
> It is my opinion that Mr. Knott has schizophrenia, undifferentiated type, a severe psychotic disorder. His symptoms clearly preclude his ability to function adequately in a regular Bureau of Prisons facility at this time. He has refused to cooperate with mental health treatment at this time. As a result, he is not an appropriate candidate for voluntary admission to the Mental Health Treatment Unit. He is presently suffering from a severe mental illness, for which he needs custody for care and treatment in a suitable facility. He needs inpatient mental health treatment, which should include the administration of antipsychotic medications. A commitment for such treatment under the provisions of Title 18, U.S. Code, Section 4245, is recommended.
>
> *Richart E. Other, Ph.D.*
> Richart L. DeMier, Ph.D.
> Clinical Psychologist
> Board Certified in Forensic Psychology
> American Board of Professional Psychology

117.    After the DOJ sought to civilly commit him, Mr. Knott was appointed counsel, who secured a second opinion from another psychologist. That opinion noted that Mr. Knott had refused to participate in an evaluation, making it impossible for the psychologist to render an independent diagnostic opinion. But the report also describes in detail the then-existing BOP records relating to Mr. Knott, which include references to a pre-incarceration mental health

hospitalization for symptoms of severe depression and "command hallucinations," and recount a series of bizarre or otherwise worrisome incidents involving Mr. Knott while in BOP custody:

- In 1992, staff members at USP Marion found him hanging from his cell bars in an effort to protect his body from "white bugs;"

- In 1995 he was transferred from Marion to Springfield following a suicidal gesture;

- In August 1996 he was sent from ADX to Springfield after cutting himself;

- In 1998 he was again transferred from ADX to Springfield because he was uncommunicative and refusing medication. A later report by Springfield staff is summarized as saying that upon his arrival at Springfield, he was "withdrawn, evasive, and impulsive." In the following months, he "refused to maintain proper nutrition, was labile, frequently covered the window in his cell, and engaged in yelling and screaming."

- In 1999 he was again transferred from ADX to Springfield "after command hallucinations to kill himself."

118.    Even after the 2002 Springfield admission during which Mr. Knott was civilly committed and involuntarily medicated (his _seventh_ trip to Springfield for mental problems), the BOP again violated its own policies by sending him back to the ADX. Plaintiffs presently have little information about his condition from that point until early September 2013. But Plaintiffs' recent interviews of prisoners who lived near Mr. Knott during the last week or so of his life confirm that shortly before his suicide Mr. Knott again went off his medications, again decompensated, again started yelling and screaming, again became incoherent, wrote "Heaven" on the wall of his cell, and finally, during the evening of Saturday, September 7, hanged himself from a sheet attached to his cell bars.

119.    In short, Mr. Knott had severe mental illness, never belonged at ADX, and died when and as he did because of the BOP's patent, inexcusable disregard of his serious medical needs. His illness was obvious to anyone who looked. That he was sent back to the ADX over

and over and spent years there was in and of itself a violation of BOP policy. And that he died as he did, with the signs and symptoms of psychosis everywhere, can mean only one of two things: either (1) the BOP simply doesn't care that it has an Eighth Amendment duty to care for ADX prisoners with mental illness; or (2) the BOP is incapable at a fundamental level of diagnosing and treating mental illness in men assigned to ADX. In either case, Knott's life and death reveal in searing detail the fundamental constitutional problems that this lawsuit aims to correct. That would have been true whenever Knott died. That he died 15 months after this lawsuit was filed, and six months after the Court denied the BOP's Motion to Dismiss, when the BOP knew that Plaintiffs and the Court were watching, puts an exclamation point on the urgency of the persistent problems at ADX and on the reality that the half-measures instituted by the BOP since the lawsuit was filed are not nearly enough.

> **(3)** **At least 14 Separate Pro Se Lawsuits Filed by ADX Prisoners in the Nine Years Prior to this Lawsuit Put Defendant on Notice of the Catastrophic Deficiencies in the ADX Mental Health Care System**

120. Since 2003, prisoners at ADX have filed at least 14 separate lawsuits against various BOP officials that sought, in whole or part, treatment for serious mental illnesses. For example, current ADX prisoner Dawane Mallett has alleged in at least four separate lawsuits that he has mental illness and that prisoners with mental illness housed at ADX are deprived of proper treatment. *See Mallett v. Davis*, No. 11-01567 (D. Colo. 2011) (dismissed for lack of prosecution); *Mallett v. Davis*, No. 10-00085 (D. Colo. 2010) (two claims were dismissed as repetitive of 09-03013, and the remaining claim was dismissed as an improper claim under § 2241 and for lack of standing); *Mallett v. Davis*, No. 09-03013 (D. Colo. 2009) (dismissed for failure to exhaust BOP administrative-remedy procedure); *Mallett v. Davis*, No. 09-01823 (D.

Colo. 2009) (dismissed for failure to cure deficiencies, in particular to submit a Prisoner's

Motion and Affidavit for Leave to Proceed Pursuant to 28 U.S.C. § 1915).

121.    Former ADX prisoner Peter Georgacarakos filed three separate lawsuits raising

similar issues, including a claim that ADX's Control Unit conditions violate the Eighth

Amendment because the facility houses prisoners without regard for their psychological health.

*See Georgacarakos v. Wiley*, No. 05-02207 (D. Colo. 2005) (dismissed for failure to pay filing

fee); *Georgacarakos v. Watts, et al.*, No. 09-01648 (D. Colo. 2009) (dismissed for failure to file

an amended pleading on the Court's Prisoner Complaint form); *see also Georgacarakos v. Wiley,

et al.*, No. 07-01712 (D. Colo. 2007) (claiming that ADX prisoners in isolation are denied the

prescription and administration of psychotropic drugs, and that isolation causes such mental

illness).

122.    In *Thirkield v. No Defendants Named*, No. 10-02193 (D. Colo. 2010), former

ADX prisoner DeAndre Thirkield's allegations included apparent delusions that he is being

subjected to psychological torture of the brain by electronic sources. Upon information and

belief, Mr. Thirkield is actively and chronically psychotic and his medical condition is or should

be obvious to anyone who spends more than a few minutes with him. Sometime after the

initiation of this lawsuit, the BOP transferred Mr. Thirkield to MCFP Springfield.

123.    Likewise, in *Baxter v. Manspeaker, et al.*, No. 10-01086 (D. Colo. 2010), ADX

prisoner David Baxter (whose legal name is Richie Hill) noted several times that he has mental

illness. He also alleged that he was refused a mental health evaluation and repeatedly attempted

suicide and self-mutilated. Like Mr. Thirkield, Mr. Baxter, upon information and belief, has

severe mental illness. He resided in the ADX SHU for years, and has engaged in horrific self-

harm, including slashing himself with sharp objects, swallowing razor blades and sharp pieces of metal, and carving a large circular design covering most of the left side of his face, apparently using a staple or other sharp object to gouge out pieces of skin. The BOP moved Mr. Hill to MCFP Springfield in late 2012, and later to the High Security Mental Health Step-Down Unit at USP Atlanta, where for the first time in years he is receiving some mental health care. Whether he will remain in the Mental Health Step-Down Unit at USP Atlanta or be returned to ADX remains to be seen.

124.     Former ADX Control Unit resident Raheem Davis filed at least three lawsuits pleading for help with his untreated serious mental illness. *See Davis v. Warden Daniel, et al.*, 10-cv-00395 (D. Colo., filed Feb. 23, 2010); *Davis v. United States of America*, 11-cv-00429 (D. Colo., filed Feb. 17, 2011); and *Davis v. No Defendant Named*, 11-cv-02249-LTB (D. Colo., filed Sept. 21, 2011). Mr. Davis has, and for years obviously has had, psychosis. He was housed in the ADX Control Unit for several years. Although BOP policies mandate that Control Unit prisoners meet monthly with a team of institution staff personnel, including a member of the psychology department, upon information and belief, between October 2011 and May 2012 Mr. Davis never left his cell. During that time he did, however, rant, rave, bang on his cell walls, and generally live in squalor. He has since been moved to a BOP residential mental health care unit at which, upon information and belief, he continues to receive constitutionally inadequate care.

125.     Current ADX prisoner Mikeal Stine sued a member of the ADX staff in 2009 for, among other things, denying him mental health treatment. *See Stine v. Blanke,* 09-cv-01527 (D. Colo., filed June 30, 2009).

126.     In 2003, former ADX Control Unit resident Ernest Shaifer sued the BOP and a number of its employees, including members of the medical staff at ADX, for failing to treat his Bipolar Illness. *See Brown v. Federal Bureau of Prisons*, 03-ES-1648 (D. Colo., filed October 17, 2003). On July 20, 2005, the complaint was dismissed for failure to exhaust administrative remedies.

127.     Even though the foregoing 14 lawsuits and, upon information and belief, a number of others, alleged persistent deficiencies in the ADX mental health system, no meaningful changes were made to that system. Instead, each time the BOP was sued, it set out only to defeat the prisoners' legal claims, generally on procedural grounds. The BOP failed to address and remedy the substantive issues raised by the lawsuits or to respond to the cries for help from its population of charges with mental illness, whose conditions continued to deteriorate as the BOP focused on ways to dismiss their complaints.

**G.     Defendant's Actions to Date Relating to Claims Raised in This Lawsuit Are Insufficient to Fully Address Plaintiffs' Claims of Constitutionally Inadequate Mental Health Care**

128.     As illustrated by facts set forth in this Second Amended Complaint, and others to be proven at trial, Defendant has long been aware of the systematic failures in the ADX mental health system. Prior to this lawsuit the BOP had done little or nothing to correct those failures. Defendant has shown deliberate indifference to the needs of ADX prisoners who have serious mental illnesses.

129.     Since the filing of this lawsuit the BOP has taken some steps to ameliorate its deficient policies and practices concerning mental health treatment of prisoners at ADX. To the extent these new policies are followed more consistently than the BOP's prior policies, they

represent positive steps in addressing the constitutional inadequacies documented in this Second

Amended Complaint. However, upon information and belief, like the BOP's old policies, these

new policies are not followed consistently and in good faith, making them largely ineffective for

the majority of Plaintiffs and class members. Moreover, Defendant has failed to implement, or

even draft, all of the necessary policies to ensure that Plaintiffs and subclass members receive

constitutionally adequate mental health care. Defendant's failure to implement all of the

necessary policies regarding treatment of mental illness at ADX and ensure that all of its current

policies are being followed and carried out in good faith, especially in light of the evidence

established through this litigation, contributes to the continued deliberate indifference to the

ongoing constitutional violations identified in this case.

### (1)    Defendant Has Instituted Three New Policies Relating to Some of Plaintiffs' Claims

130.    On May 1, 2014, Defendant issued Program Statement 5310.16, entitled

"Treatment of Inmates with Mental Illness" ("Program Statement"). The May 2014 Program

Statement describes the "policy, procedures, standards, and guidelines for the delivery of mental

health services to prisoners with mental illness" in all BOP facilities, including ADX. The policy

outlines procedures for screening and diagnosis of mental illness, enacts a set of treatment "care

levels" to harmonize some of the treatment of prisoners diagnosed with mental illness or serious

mental illness, excludes from placement at ADX most prisoners diagnosed with a serious mental

illness, and revises certain former policies that fundamentally interfered with the delivery of

mental health treatment.

131.    On October 31, 2014, Defendant issued ADX Institution Supplement FLM

5324.08A, entitled "Suicide Prevention Program." The Suicide Prevention Program is drafted

specifically for implementation at ADX and provides policies for assessing the risk of, and preventing, suicide, and self-harm. This institution-specific policy is intended to accompany the BOP's general "Suicide Prevention Program," dated March 15, 2007.

132.    On November 10, 2014, Defendant issued USP Florence Institution Supplement FLP 5330.11(1), entitled "Secure Steps Towards Awareness Growth and Emotional Strength (STAGES) Program." The High Security STAGES Program is currently in effect at USP Florence and is expected to provide mental health services and treatment to enrolled prisoners, many of whom were previously housed at ADX.

### (2)    Defendant's New Policies Are Insufficient On Their Own to Provide Constitutionally Adequate Mental Health Care to Plaintiffs

133.    Without additional policies and guarantees that the policies will be followed, the BOP's enactment of three new policies and opening of new high security facilities for treatment of prisoners diagnosed with serious mental illness are insufficient to resolve the constitutional violations at issue in this litigation. The BOP also must enact policies relating to the mental health of prisoners at ADX and must be monitored to ensure that, unlike in the past, it actually follows these new policies.

134.    The May 2014 Program Statement is a starting point for addressing some of the systemic problems surrounding the BOP's diagnosis and treatment of mental illness, but ADX is unique and requires additional policies and procedures adapted specifically to the challenges of that facility. The BOP must draft and enact an appropriate institution supplement for ADX that specifically addresses the treatment and care of prisoners with mental illness at ADX. Such a policy would recognize the unique needs of prisoners with mental illness at ADX, and would require, among other things, additional mental health preventative care measures and additional

mental health programming, including incentive programs, for implementation at ADX to counteract the ill effects of solitary confinement. An ADX-specific policy would also lay out guidelines on appropriate use of force, especially in the context of prisoners with a history of mental illness.

135.    Importantly, even a complete set of perfect policies would be insufficient at this juncture to conclude that the BOP is taking seriously the mental health needs of prisoners at ADX. The BOP has a documented history of ignoring its own policies as well as federal regulations relating to screening, diagnosis, and treatment of prisoners in its custody who have mental illness, especially at the ADX. Moreover, the BOP already has failed to fully comply with its newly revised policies in the few months since those policies were implemented.

**(3)     Defendant Has a Documented History of Ignoring and Violating Its Own Policies Relating to Treatment of Prisoners With Mental Illness and Has Begun to Repeat This Pattern with Its New Policies**

136.    The BOP has repeatedly violated its own policies relating to mental health treatment in the past, as described in more detail in Section VI.C above. For instance, the psychiatric screening required upon arrival at ADX became a perfunctory checklist task rather than a true screening for mental health issues. Similarly, Defendant routinely ignored its policies that prisoners with mental illness were not to be housed in the Control Unit at ADX. Ongoing management of mental health treatment and monitoring of prisoners with mental illness has also been ignored and is not meaningful at ADX. Finally, until only recently, the BOP repeatedly denied that any prisoners with mental illness were being held at ADX, despite wide recognition of the falsity of such a statement and the mental health treatment concerns plaguing prisoners at ADX.

137.     The BOP also has violated its newly enacted policies and is not consistently and in good faith following those policies. For example, the BOP's new policies require transferring all but a select few prisoners with serious mental illness from ADX to appropriate inpatient treatment facilities, such as the High Security Mental Health Step-Down Unit at USP Atlanta. To date, the BOP has not transferred all eligible prisoners with serious mental illness out of ADX, despite being aware for months of their diagnoses by BOP personnel of serious mental illness. Moreover, on information and belief, the BOP has undertaken a covert effort to revise and downgrade the diagnosis of certain subclass members to avoid transferring those prisoners out of the ADX. The failure to transfer all eligible prisoners with serious mental illness is a clear violation of the BOP's own exclusion policy and the attempt to adjust the diagnosis of certain prisoners to avoid transferring them exhibits the BOP's failure to implement these new policies in good faith.

138.     Nor is the BOP following in good faith its new policy regarding treatment of prisoners with serious mental illness. As described above, some eligible prisoners with serious mental illness have not been transferred to different facilities, and Plaintiffs are unable to determine at this time whether such individuals are receiving constitutionally adequate mental health treatment at ADX. Many prisoners have been transferred to other facilities in accordance with the BOP's new exclusion policy, but upon transfer to the new facility, those prisoners have not received constitutionally adequate treatment for their serious mental illnesses. Finally, on information and belief, the BOP is attempting to evade this lawsuit by simply transferring prisoners with serious mental illness to facilities other than ADX, but is refusing to provide constitutionally adequate mental health treatment at these facilities.

**(4)     Defendant's Decision to Exclude Prisoners With Serious Mental Illness from ADX Does Not Absolve Defendant of the Responsibility to Provide Those Prisoners With Constitutionally Adequate Mental Health Care**

139.     The BOP's voluntarily revision of its exclusion policy is intended to result in exclusion from ADX for all but a handful of prisoners if they are diagnosed by the BOP with a serious mental illness. The BOP chose to exclude those prisoners from ADX and transfer them to other BOP facilities, rather than provide constitutionally-adequate mental health treatment to them at ADX.

140.     In September 2013, Defendant opened the High Security Mental Health Step-Down Unit at USP Atlanta that it intends to utilize to provide mental health treatment in a secure atmosphere. This unit was opened following the initiation of this lawsuit as a facility to which the BOP can send prisoners with serious mental illness who have been housed at ADX. The unit currently houses 20 prisoners, 18 of whom were transferred directly from ADX. Defendant has publically stated that it intends to open a similar mental health treatment facility at USP Lewisburg.

141.     The High Security Mental Health Step-Down Unit at USP Atlanta and the planned high security mental health unit at USP Lewisburg were created at least in part to house prisoners with serious mental illness who would have otherwise been confined at ADX but for the policies enacted by the BOP in responses to this lawsuit.

142.     Despite its revised policies and creation of these facilities, the BOP has not transferred all prisoners designated for exclusion from ADX. Moreover, those who have been transferred have not all received the constitutionally adequate mental health treatment called for in the policies the BOP created in response to this lawsuit.

143. The BOP's exclusionary policy only is an effective and constitutionally adequate method of treating prisoners with serious mental illness if that policy provides for appropriate mental health treatment at the facility to which those prisoners with serious mental illness are transferred. Transferring prisoners with serious mental illness out of ADX and not providing proper treatment at the transferee facility does not resolve the constitutional violations at issue in this litigation and does not absolve the BOP of its Eighth Amendment responsibilities. The BOP must be required to adequately treat Plaintiffs and subclass members regardless of where it elects to place them.

## VII.   ALLEGATIONS RELATING SPECIFICALLY TO PLAINTIFFS

144. Plaintiffs are currently, or have previously been, incarcerated at ADX and each has a mental illness. Several also have severe functional impairments connected to their mental illnesses, which severely limits their ability to attend to their personal needs. Defendant's failure to implement adequate programs of mental health screening and treatment has violated their constitutional rights, exacerbated their mental illnesses, and subjected them to harm and injury, and serious risk of future harm.

### A.   Harold Cunningham

145. Harold Cunningham is 45 years old. Before his incarceration, he lived in the Washington, D.C. area. Mr. Cunningham is serving a life sentence plus 380 years and was housed in the Control Unit at ADX from 2001 through 2014. Mr. Cunningham has a serious mental illness that has been variously diagnosed as Paranoid Schizophrenia, Psychotic Disorder Not Otherwise Specified ("NOS") and Personality Disorder NOS. As detailed below, the BOP

has demonstrated deliberate indifference to his mental health needs. A photograph of

Mr. Cunningham is attached hereto as Exhibit 8.

146.    Mr. Cunningham has been incarcerated on and off since he was 11 years old. He

was admitted to a juvenile facility at age 16 for assault with a dangerous weapon. Within five

months, he attempted suicide. Thereafter, he was transferred to St. Elizabeth's Hospital, a public

psychiatric hospital. At the time, Dr. James Smith diagnosed Mr. Cunningham with Conduct

Disorder, Under Socialized Aggressive Needs, and Major Depression.

147.    In 1988, Mr. Cunningham, then 17 years old, was arrested for cocaine possession,

sentenced to five years, and sent to Maryland's high security prison in Baltimore. At the time, he

refused all psychological and psychiatric treatment because he was told by other prisoners that if

he received any mental health treatment or accepted any psychotropic medication, the

Department of Corrections could keep him past his release date.

148.    Mr. Cunningham was released in 1993. Within months, he and two other men

(including one with a serious mental illness who also has been housed at ADX) committed a

series of crimes in Washington, D.C. and Maryland. At his trial, Mr. Cunningham chose to

represent himself. On July 15, 1996, Mr. Cunningham attacked and stabbed a witness with a

homemade knife as she was leaving the witness stand and while in full view of the judge and

jury. After the judge denied a mistrial, Mr. Cunningham was convicted and sentenced to a term

of life in prison plus 380 years.

149.    Mr. Cunningham subsequently was indicted for attempted murder based on the

courtroom stabbing. He asserted an insanity defense and was examined by Dr. Carol Kleinman,

who was board-certified in psychiatry and a member of the American Board of Psychiatry and

Neurology. Dr. Kleinman diagnosed Mr. Cunningham with the following psychiatric disorders:

Paranoid Schizophrenia, Antisocial Personality Disorder, Borderline Intellectual Functioning,

History of Attention Deficit Disorder with Hyperactivity ("ADHD"), along with various forms of

drug and alcohol abuse. She opined that Mr. Cunningham was not competent to stand trial and

recommended that he be placed on appropriate psychotropic medications.

150.    In early 1999, a hearing was conducted to determine whether Mr. Cunningham

was competent to stand trial. Dr. Kleinman, however, revised her diagnosis at the hearing, and

the Court found that Mr. Cunningham was competent to stand trial. A few months later, the

government dismissed all charges against Mr. Cunningham without explanation. He was sent to

the USP Marion and placed in long-term isolation.

151.    At USP Marion, Dr. Ray Anderson conducted a mental status examination of

Mr. Cunningham and concluded that he had Psychotic Disorder NOS and the effects of

hallucinogen abuse. Mr. Cunningham was given antidepressants and antipsychotic drug therapy.

He claimed he heard voices and saw things that were not there.

152.    While imprisoned at USP Marion, Mr. Cunningham was examined about once a

month to coordinate psychological counseling with psychiatric treatment. A consulting

psychiatrist met with Mr. Cunningham to monitor his medications and to identify potential issues

that might aggravate or modify the severity of his symptoms.

153.    In May 1999, as part of this process, Dr. James E. Adams conducted a mental

status examination of Mr. Cunningham. Dr. Adams diagnosed Mr. Cunningham as having

Psychotic Disorder NOS, in full remission, and Personality Disorder NOS. He prescribed the

antipsychotic medication Risperdal (Rispiridone) and the antidepressant Prozac for

Mr. Cunningham.

154.    On June 2, 2000, Mr. Cunningham was examined by Dr. Richard Urbanik, chief

psychologist at USP Marion. Dr. Urbanik found that "Cunningham's current mental status,

emotional expression, and behavior suggest significant mental health problems." Dr. Urbanik

noted that, based on Mr. Cunningham's history, existing conditions, and other information

available at the time of review, the current potential for Mr. Cunningham to harm others was

high. Dr. Urbanik further noted that Mr. Cunningham was refusing all psychotropic medication.

155.    In fact, Mr. Cunningham told the staff that he could not digest the medication

when it was in liquid form, because it made him sick. Additionally, Mr. Cunningham was

concerned that the cups of liquid had materials floating on the surface, for which no explanation

was given to him.

156.    Dr. Urbanik conducted another examination of Mr. Cunningham on June 30,

2000. Again, Dr. Urbanik concluded that Mr. Cunningham's current mental status, emotional

expression, and behavior suggested significant mental problems, and Mr. Cunningham's

potential to harm others was high. Dr. Urbanik further noted that Mr. Cunningham complained

about the form of his medication (liquid), and was noncompliant.

157.    Mr. Cunningham was transferred to ADX in December 2001. While at ADX, Mr.

Cunningham had multiple unproductive contacts with the mental health staff. His initial

psychological assessment at ADX stated that he was a "very antisocial individual who is

probably prone to misinterpret the actions and motivations of staff members . . . ." The staff

psychologists (Dr. Watterson and Dr. Morrison) concluded that "mental illness . . . can certainly

not be conclusively ruled out at this point." Nevertheless, Dr. Morrison suggested that Mr. Cunningham try to go without his medication (Risperdal and Prozac), and promised that if he did so and experienced any problems Dr. Morrison would put him back on better psychotropic medication. Upon information and belief, Dr. Morrison intentionally tricked Mr. Cunningham into giving up his medication so that Mr. Cunningham could be placed in the ADX Control Unit, where policy prohibited administering such medication. After accomplishing that goal Dr. Morrison abandoned Mr. Cunningham, who from December 2001 until at least 2013 was denied any form of psychiatric medication for his mental illness.

158.    Without his medications, Mr. Cunningham's behavior predictably worsened over the next several years. Mr. Cunningham was cited for, among other things, refusing to leave his cell, refusing to submit to restraints, possession of weapons, and assault on corrections officers. Mr. Cunningham was held in an isolation cell in the Control Unit from 2002 to 2007. During this time, he was assaulted by corrections officers and frequently shackled to his bed, sometimes for days or weeks at a time.

159.    Mr. Cunningham received no significant mental health treatment at ADX, even though he requested such treatment at least eight times.

160.    On March 23, 2004, Mr. Cunningham filed a Central Office Administrative Remedy Appeal for a request for psychiatric treatment. On April 30, 2004, the Central Office responded that an examination via telepsychiatry indicated no mental illness. For this putative psychiatric evaluation, Mr. Cunningham was placed in a room, handcuffed from behind with shackles on his legs, and surrounded by corrections officers. A psychiatrist from MCFP Springfield, viewing him through a make-shift video screen, asked Mr. Cunningham questions

about his mental health issues, as if the answers received in such an environment were open and adequate to gauge a psychological or psychiatric problem. On June 15, 2004, Mr. Cunningham filed a Central Office Administrative Remedy Appeal for, among other things, denial of psychiatric treatment. His appeal was denied.

161.    On August 10, 2004, Mr. Cunningham filed another Central Office Administrative Remedy Appeal for being denied mental health medication. Mr. Cunningham specifically requested an investigation into why he was taken off Risperdal and Prozac. In his appeal, Cunningham wrote "I am in pain everyday that makes me act out in uncontrollable [sic] ways . . . . Records show that when I'm taking my medication I can function without pain or suffering or incident." In response, the BOP argued, among other things, that "[i]t is evident you have received prompt, professional medical care consistent with reasonable community standards and Bureau of Prisons' policy." Mr. Cunningham's appeal was denied yet again.

162.    The extent of Mr. Cunningham's treatment for his mental illness during his first 11 years at ADX consisted of therapy classes on an educational channel on television, and two workbooks: "Breaking Barriers" and "Cage Your Rage." In 2013 and 2014, he received minimal mental health interventions, and a prescription for psychotropic medication. Even then, his mental health care remained constitutionally deficient.

163.    He remained at ADX until the spring of 2014, when BOP transferred him to the "Challenge Program" at USP Hazleton in West Virginia. Since that time, he has not been given access to a psychiatrist, has not received a psychological evaluation, and his mental health care has consisted of involvement in approximately four group therapy sessions that, while helpful, were wholly inadequate to meet his needs or constitutional standards. He has requested

additional psychological services repeatedly, but those requests have been denied. As a result, he continues to have serious mental illness, and remains essentially untreated.

**B.     Percy Barron**

164.     Percy Barron is 46 years old. He has been housed at ADX since 2003 and is serving a life sentence. Before his incarceration he was a resident of Washington, D.C. A photograph of Mr. Barron is attached hereto as Exhibit 9.

165.     Mr. Barron has mental illness and may have serious mental illness. At various times, he has been diagnosed with Major Depression, Depressive Disorder Not Otherwise Specified, Adjustment Disorder, Anti-Social Personality Disorder, Alcohol Use Disorder, Cannabis Use Disorder, and Phencyclidine Use Disorder. He also has a history of self-injury and has attempted suicide at least four times. At least one psychiatrist who evaluated him in 2014 concluded that he meets all criteria for a Major Depression diagnosis and is at risk for suicide. As detailed below, the BOP has demonstrated deliberate indifference to his mental health needs.

166.     In August 2014, the BOP diagnosed him with recurrent Adjustment Disorder with Depressed Mood and assigned him care level CARE2-MH. Accordingly, the BOP, at that time, determined that Mr. Barron requires routine outpatient mental health treatment and/or brief, crisis-oriented mental health treatment of significant intensity, e.g. placement on suicide watch or behavioral observation status.

167.     Mr. Barron began to use alcohol, marijuana, cocaine, and phencyclidine ("PCP") as a teenager. As a result of his cocaine and PCP use, he developed severe paranoia. He later participated in a 60 day residential drug treatment program, though he relapsed on PCP shortly after being discharged. He was first jailed at age 16 for possession of PCP.

168.     In 1993, Mr. Barron was arrested for participating in a series of violent robberies. While jailed pending trial, he attempted suicide by hanging, and set his cell on fire. He reported experiencing disturbing auditory hallucinations and depression while withdrawing from PCP. Mr. Barron was subsequently transferred from the jail to St. Elizabeth's Hospital, a public psychiatric facility. While at St. Elizabeth's, Mr. Barron was prescribed a regimen of antipsychotic and antidepressant medication for a presumed psychotic depression. His psychotropic medications were continued for some time following his return to jail.

169.     The criminal case against Mr. Barron went to trial in 1996. Prior to his trial, one evaluator determined that Mr. Barron was incompetent to stand trial, but a second found him competent to proceed. In July 1996, Mr. Barron was convicted of various offenses, including armed robbery, felony murder, and assault with intent to murder. In February 1997, he was sentenced to life in prison and incarcerated at USP Terre Haute.

170.     In 2000, Mr. Barron was transferred to USP Leavenworth. During his incarceration there, he was diagnosed with Keratoconus (*i.e.*, an abnormally shaped cornea that causes visual distortions) of his left eye. He received a corneal transplant in 2002 at MCFP Springfield.

171.     In 2003, Mr. Barron was accused of assaulting a corrections officer at USP Leavenworth and was transferred to ADX. After arriving at ADX, he attempted to hang himself in his cell, but was cut down before losing consciousness and placed on suicide watch.

172.     During his incarceration at ADX, Mr. Barron has experienced a number of ongoing health concerns that have contributed to and exacerbated his psychological distress. Most significantly, complications following Mr. Barron's eye surgery left him with chronic pain

in his left eye from retained sutures. Mr. Barron's medical records detail numerous written requests to staff, administrative remedy documents, and advocacy letters from attorneys and the American Civil Liberties Union written over several years, all addressing his eye pain. One year after his corneal transplant, two loose sutures were removed from Mr. Barron's eye. On March 24, 2004, eleven additional sutures were removed from his eye. In December 2004, a contract ophthalmologist examined Mr. Barron and recommended that the three remaining sutures be removed because he remained in pain. The sutures were not removed as recommended, however, and Mr. Barron continued to request medical assistance for significant pain. His pain was not addressed other than a recommendation for taking nonsteroidal anti-inflammatory drugs, despite Mr. Barron's documented renal failure. In 2006, distressed about his lack of treatment from Health Services, Mr. Barron made another hanging attempt in front of staff. He was prescribed the antidepressant Celexa.

173.    Mr. Barron's interactions with mental health staff at ADX have been unsatisfactory. In January 2010, while entering into his eighth year of experiencing "stabbing pain" in his left eye, Mr. Barron was seen by a staff psychologist for "mental distress and physical suffering." The psychologist "yielded the decision that there was no need (for Mr. Barron) to see a psychiatrist since his stress was situational in nature and he did not have symptoms warranting medication." In 2011, Mr. Barron's Celexa was abruptly discontinued because he failed to sign an "informed consent" document to continue the antidepressant while housed in the SHU.

174.    Despite contending with multiple medical problems and associated psychological distress, Mr. Barron maintained clear conduct for an extended period and was approved for

placement in the ADX Step-Down Program in 2008, the first of his three step-down placements to date. His first step-down placement ended after about a week when, after a fight between other prisoners, the BOP removed Mr. Barron from the program. In approximately 2011, he returned to the Step-Down Program where he maintained clear conduct for several years. During this period, however, Mr. Barron continued to struggle with chronic mental illness.

175.    After submitting multiple requests for mental health assistance, Mr. Barron was psychiatrically evaluated on January 11, 2012. He reported that he had been symptomatic since August 2011 and that his medical concerns, inability to have contact with his family members, and commissary restrictions were causing him to be depressed. He disclosed that he had been prescribed Sinequan (Doxepin) at the Washington, D.C. jail. The evaluating psychiatrist perceived Mr. Barron to have "low frustration tolerance and many situational stressors." He reported that Mr. Barron "does not appear to have a major depression" and prescribed a low dose of Zoloft.

176.    Later that month, Mr. Barron engaged in hunger strikes in protest of his removal from the Step-Down Program. On March 28, 2012, he was seen briefly by a psychiatrist to continue his Zoloft at the same dosage. On April 4, 2012, it was noted that Mr. Barron continued to contend with multiple issues related to his incarceration "and surroundings that cause him to be depressed." That same day, Mr. Barron wrote a letter to Congresswoman Diane DeGette, asking her to help him get needed medical care. Mr. Barron finally received the surgical correction he required for his left eye on October 30, 2012, ten years after his initial transplant surgery.

177.     On November 13, 2012, Mr. Barron requested to speak with a psychiatrist. BOP records noted that because "his concerns are not in any way emergent and as there is no psychiatrist present for (the Federal Correctional Center) this may take a considerable time period."

178.     In January 2013, while participating in the third and final phase of the Step-Down Program, Mr. Barron learned from the prison Chaplain that his mother had passed away. According to Mr. Barron, because he had already lost his grandmother and father, this news was "so hard on me. I ached inside. I got more depressed." A few days later, Mr. Barron was observed in his cell masturbating. As a result, he received an incident report and was again removed from the Step-Down Program. He described this as "the biggest blow. I was almost through the program."

179.     On February 10, 2013, he was placed in the SHU. On February 22, 2013, Mr. Barron became acutely suicidal. At approximately 4:00 PM, he alerted a corrections officer that he was suicidal, but was ignored. After waiting for at least three hours for mental health assistance, Mr. Barron described feeling hopeless and ingested all of the medication in his possession, including approximately 100 tablets of Zoloft, medication for hypertension and high cholesterol, and other over-the-counter tablets. Mr. Barron was then transported to a local emergency room. He later was discharged after several hours of monitoring and intravenous fluids delivery, with paperwork that instructed him to "Please avoid this type of behavior in the future."

180.     Following his return to ADX, Mr. Barron was placed in a dry cell (i.e., a cell without a toilet or other plumbing). During a Suicide Risk Assessment, he continued to express

suicidal ideation, which he indicated had increased following his mother's death. He was despondent over the fact that some of his property, including photographs of his mother, had not been returned to him. The evaluator assessed Mr. Barron at "medium" risk for suicide and noted that he had engaged in a "potentially lethal suicide attempt with no obvious secondary gain." Because he also had recently swallowed a razor, "the diagnosis of Depressive Disorder Not Otherwise Specified was offered as a rule out diagnosis."

181.     On February 27, 2013, Mr. Barron was issued a disciplinary incident report for his suicide attempt. This report was eventually expunged after his attorney contacted the Warden.

182.     In March 2013, Mr. Barron engaged in another hunger strike because he had not received information from a nephrology consultation. He also swallowed another razor blade. On March 30, 2013, he was seen by a psychologist. The psychologist described Mr. Barron's mental status as normal, even though he was observed to be loud and anxious, reporting stress, insomnia, anguish, sadness, and a continuing preoccupation with suicide. The psychologist determined these symptoms were related to situational stressors and documented that Mr. Barron did not meet criteria for Major Depression or Depressive Disorder.

183.     On May 10, 2013, October 29, 2013, and again in April 2014, Mr. Barron requested telepsychiatry evaluations. No telepsychiatry appointment was scheduled.

184.     On August 17, 2014, Drs. Melissa Klein and Sally Johnson, experts designated by the BOP, evaluated Mr. Barron. Mr. Barron remained on Zoloft but had not seen a psychiatrist for over one year. During his evaluation, Mr. Barron described the antidepressant as partially helpful, but reported continuing feelings of depression. Drs. Klein and Johnson diagnosed Mr. Barron with an Adjustment Disorder with Depressed Mood, Recurrent, which "has occurred

multiple times." They opined that Mr. Barron's condition did not rise to the level of serious mental illness and assigned him care level CARE2-MH, which could be provided within the confines of ADX. This diagnosis ignores the applicable diagnostic criteria and is an apparent effort to minimize Mr. Barron's chronic Major Depression.

185.   By October 2014, Health Services declared that Mr. Barron's psychiatric problems had "resolved." Nevertheless, his symptoms of depression persist, as does the BOP's neglect of his mental health care needs. In particular, despite his continuing prescription for antidepressants, he rarely is able to consult with a psychiatrist.

186.   Mr. Barron has mental illness and may have serious mental illness. The conditions of his confinement at ADX have caused or contributed to a wide range of psychiatric conditions that, unless treated, will lead to further deterioration, and may result in suicide. Although the BOP has provided him with some mental health services as a result of this lawsuit, his care remains constitutionally deficient, and his condition is, as a result, deteriorating. The BOP's continued neglect of Mr. Barron's mental health needs violates BOP policy and the Eighth Amendment.

## C.   Alphonso Blake

187.   Alphonso Blake is 37 years old. He has been housed at ADX since February 2011. Before his incarceration, he was a resident of Washington, D.C. His current BOP release date is February 21, 2029. A photograph of Mr. Blake is attached hereto as Exhibit 10.

188.   Mr. Blake has mental illness and may have serious mental illness. At various times, Mr. Blake has been diagnosed with various mental disorders, including Mood Disorder, Antisocial Personality Disorder, Anxiety Disorder, and Adult Antisocial Behavior. He has

engaged in self-injury and has been actively homicidal and suicidal, both before and after arriving at ADX. As detailed below, the BOP has demonstrated deliberate indifference to his mental health needs.

189.   After Mr. Blake's parents divorced, he lived with his mother and began to "act out." He was also severely beaten by a close relative on three separate occasions, and dropped out of school in the 11th grade.

190.   In December 2000, Mr. Blake was found guilty of second-degree murder, and was sentenced to 30 years in prison. Mr. Blake began his sentence at USP Pollock and attempted suicide by hanging while confined there. On November 6, 2002, while housed in the SHU at USP Pollock, Mr. Blake requested to be restarted on the antidepressant Sinequan, which had helped him in the past, and a BOP clinician agreed.

191.   In October 2002, Mr. Blake was transferred from USP Pollock to USP Beaumont, which at the time was widely known as "Bloody Beaumont" because of frequent inmate assaults and murders. On December 28, 2002, Mr. Blake ingested a large quantity of Sinequan and had a Generalized Tonic-Clonic Seizure. Thereafter, he was diagnosed with Anxiety Disorder.

192.   At various times between August 4, 2003 and July 2006, while incarcerated at USP Beaumont, Mr. Blake reported experiencing anxiety, depression, paranoia, insomnia, suicidal thoughts and auditory hallucinations. He was diagnosed with Generalized Anxiety and Anxiety Disorder. Mr. Blake was treated with either Sinequan, Risperdal, or both, except for a period beginning in August 2004 when, inexplicably, he was determined to have no "Axis I" disorder (i.e. a principal disorder that needs immediate attention), and his treatment plan was terminated. By October 2004, Mr. Blake was again receiving Sinequan but not Risperdal.

193.   During his incarceration at Beaumont, Mr. Blake was placed on suicide watch on several occasions. In addition to the incident previously described, he attempted to commit suicide by hanging twice in the month of April 2004.

194.   Mr. Blake was transferred to USP Florence at the end of July 2006. On July 21, 2006, while at the Oklahoma Federal Transfer Center, Mr. Blake's "long history of mood disorder with previous suicide attempt" was noted. He reported auditory hallucinations and feeling depressed, and was placed on suicide watch. Mr. Blake was then diagnosed with Mood Disorder NOS, and further evaluation was suggested to confirm or rule out a diagnosis of Schizoaffective Disorder, Depressive Type. A few days later, his request to see a psychologist was rejected. Thereafter, he made superficial cuts on his arm with a razor and threatened to slash his cellmate.

195.   When Mr. Blake arrived at USP Florence, he was screened and deemed appropriate for the general population with no mental health treatment. Two months later, he was placed in the SHU. In February 2007, Mr. Blake was placed on suicide watch after he reported that he "didn't feel right and wanted to hurt himself." Following the suicide watch, he was placed on a razor restriction, and later that month, was diagnosed with malingering and Personality Disorder NOS.

196.   Mr. Blake was transferred to USP Hazelton at the end of October 2007. While incarcerated there, he continued to report depression, insomnia, poor appetite and auditory hallucinations, and was reported as having suicidal thoughts on several occasions. In January 2008, despite these symptoms, an evaluator noted that "he shows no psychotic signs whatsoever" and in May 2008 was described as having "made a reasonable adjustment to being in lockdown."

197.   On November 4, 2008, Mr. Blake was transferred to USP Lee. He continued to complain of depression, loss of appetite, inability to sleep, tension, and frustration. During his incarceration at USP Lee, Mr. Blake was told that unless his medication was discontinued he would have to be transferred again, because certain issues could not be treated at USP Lee. A subsequent plan was made to discontinue his medication "based on inmate's self-report of no psychosis and no observed psychosis." However, on November 10, 2008, his BOP clinician prescribed Wellbutrin in an "effort to manage his stress and anxiety, and with the goal of reducing" self-injury.

198.   On Wellbutrin alone, Mr. Blake reported sleeping better but staff noted that he started destroying property and accruing fines for his behavior. Later in 2008, Mr. Blake was charged with assault with intent to commit a felony and possessing contraband in prison. The indictment was later dismissed. On December 23, 2008, Mr. Blake voiced suspicion about a change in the color of his Wellbutrin tablets, which he refused to take. His Wellbutrin was then discontinued.

199.   In April 2009, Mr. Blake was transferred to the Special Management Unit at USP Lewisburg. In May 2009, when he was psychiatrically evaluated, the evaluator wrote, "he malingers mental illness and makes suicidal gestures of low lethality for secondary gain." Mr. Blake was diagnosed with Antisocial Personality Disorder but viewed as a low risk for suicide. In December 2009, Mr. Blake requested medication again for depression. He again reported poor appetite and experiencing auditory hallucinations. On January 14, 2010, he was seen by a doctor via telepsychiatry. The doctor noted that Mr. Blake had "neurovegetative" symptoms commonly associated with Major Depression.

200.   On April 7, 2010, Kim Turner, PhD, at USP Lewisburg, conducted a psychological evaluation on Mr. Blake to determine whether or not he was a candidate for placement in the ADX Control Unit. She noted that he had received 175 incident reports for various prison infractions including fighting, refusing to obey an order, interfering with staff, being possession of a dangerous weapon, destroying property, and insolence. She also noted that Mr. Blake had had 14 suicide risk assessments and numerous suicide watches for cutting, overdosing, and making hanging attempts, all of which she described as "a social strategy to garner a perceived advantage." She diagnosed Adult Antisocial Behavior and found "nothing to preclude his Control Unit Placement."

201.   In January 31, 2011, while Mr. Blake was on holdover at FTC Oklahoma and on route to ADX, his mental health was again evaluated. While Mr. Blake reported feeling "stressed, depressed, hopeless, and with auditory hallucinations," and requested Risperdal, his mental status was described as normal.

202.   During his intake screening interview at ADX in February 2012, Mr. Blake was diagnosed to have an "unspecified mood disorder." Mr. Blake's limited mental health treatment at ADX has not been effective in addressing his mental illness.

203.   Mr. Blake filed an administrative remedy complaint against an ADX psychologist, whom he said he did not trust because she shared confidential information about him with another prisoner and "tries to play me against other prisoners." Since filing that complaint, he has been denied further treatment. In August 2014, Mr. Blake attempted to hang himself in the ADX SHU after his request to speak with a psychologist was refused.

204.   Between October 2013 and November 2014, Mr. Blake reports having been on suicide watch at least ten times. Mr. Blake is currently prescribed Risperdal.

205.   On August 17, 2014, Mr. Blake was evaluated by two BOP evaluators. During the evaluation, he stated that he felt homicidal toward ADX staff because they put him on a suicide watch in an unsanitary cell. The BOP diagnosed Mr. Blake with Antisocial Personality Disorder and assigned him care level CARE2-MH, determining that Mr. Blake requires outpatient care for mental health concerns. BOP also suggested that Mr. Blake would benefit from psychiatry consultation regarding his medication concerns. Despite that recommendation he has not received any outpatient care in the more than nine months since this evaluation.

206.   In sum, Mr. Blake has mental illness and may have serious mental illness. The conditions of his confinement at ADX have caused or contributed to a wide range of psychiatric conditions that, unless treated, will lead to further deterioration and may lead to suicide. BOP's continued neglect of Mr. Blake's mental health needs violates BOP policy and the Eighth Amendment.

### D.     Jabbar Currence

207.     Jabbar Currence is 34 years old. He has been housed at ADX since January 2008. Before his incarceration he was a resident of Richmond, Virginia. His current BOP release date is December 25, 2018. A photograph of Mr. Currence is attached hereto as Exhibit 11. [1]

208.     Mr. Currence has mental illness and may have serious mental illness. At various times, he has been diagnosed with Borderline Personality Disorder, Post-Traumatic Stress

---

[1] Mr. Currence's preferred spelling of his first name is used herein. BOP records may spell it "Jabar".

Disorder, and Antisocial Personality Disorder. At least one psychiatrist who evaluated him in 2014 suggested further analysis to confirm or rule out a diagnosis of Bipolar Disorder. He also has a history of suicidal gestures and self-mutilation. As detailed below, the BOP has demonstrated deliberate indifference to his mental health needs.

209.    In August 2014, the BOP diagnosed him with Antisocial Personality Disorder and Borderline Personality Disorder and assigned him care level CARE2-MH. Accordingly, the BOP, at that time, determined that Mr. Currence requires routine outpatient mental health care and/or brief, crisis-oriented mental health care of significant intensity, e.g. placement on suicide watch or behavioral observation status.

210.    Mr. Currence was born in Gastonia, North Carolina. He spent his early childhood in an environment of drug use, prostitution, and routine violence. At the age of six years, his parents lost custody of their children due to neglect.

211.    When Mr. Currence was seven years old, he and his brother were adopted by a distant cousin who lived in Richmond, Virginia. His adoptive family was dysfunctional in every way. Harsh discipline was routine, including frequent corporal punishments. Within a year of his adoption and for several years thereafter, Mr. Currence was severely abused by several of his adoptive relatives, who later repeatedly threatened to kill him.

212.    Mr. Currence began acting out at the age of eight or nine and was first arrested at age ten. He was later sent to a psychiatric treatment center for children for eight months.

213.    Mr. Currence was diagnosed with and treated for ADHD in childhood. He was later court-ordered to receive treatment at the Virginia Treatment Center for Children ("VTCC"). At that time, he was estimated to have a "low average intelligence" and possibly some "mild,

organic" (i.e. brain injury/affliction) problems. He received Ritalin for ADHD and was also diagnosed with Dysthymia and Oppositional Defiant Disorder. While Mr. Currence did not evidence psychosis at this treatment center, he was characterized as having a "repressed affect" and as "a very serious and chronically emotionally disturbed child." Mr. Currence also was diagnosed with depression as a child and made his first suicide attempt at age 13. Prior to incarceration, he was prescribed Haldol and Prozac in adolescence.

214.    After being discharged from VTCC, Mr. Currence was referred to outpatient treatment. He remained in treatment until 1993 when he encountered additional legal problems and was again admitted to VTCC. While there, he was diagnosed with "mild depression associated with being abandoned by his natural parents." He reportedly was combative and uncooperative, and his coping was described as "avoidance" and "denial of feelings." He was diagnosed with ADHD and a Conduct Disorder.

215.    Mr. Currence was hospitalized again in 1996 at the Norfolk Psychiatric Institute in Virginia. He was then hospitalized in 1997 at the Cumberland Hospital for Children due to aggressive behavior. He was admitted to a residential treatment program in 1997 at the Charter Westbrook Hospital, but later discharged due to aggressive behavior.

216.    Mr. Currence's incarceration began in 2000, at age 19, after a conviction for conspiracy to possess crack cocaine with intent to distribute. He was sentenced to 13 years in federal prison. Mr. Currence began his sentence in a medium security facility, but in July 2002 was transferred to USP Beaumont.

217.    In 2003, Mr. Currence was sent to MCFP Springfield, a BOP medical facility, and was treated with anti-anxiety medications. In February 2003, he bit a correctional officer on the

shoulder while being escorted to his cell. During his ensuing prosecution for assaulting a federal employee, his mental competence was questioned, but a BOP psychiatric evaluation deemed him competent to stand trial. He pled guilty and received a five year and three month sentence to run consecutively with his previous sentence.

218.    On March 22, 2007 while housed in the SHU at USP Atlanta, Mr. Currence reported suicidal ideation. His history of previous suicide attempts was noted as was his history of psychiatric treatment. Mr. Currence was prescribed Depakote and Risperdal with a provisional diagnosis of Bipolar Disorder. A week later, when Mr. Currence was evaluated for injuries sustained in a fight with his cellmate, he was prescribed the same medication for a presumed diagnosis of Schizoaffective Disorder.

219.    On January 4, 2008, Mr. Currence was a holdover in the FTC Oklahoma City on his way to ADX. A suicide risk assessment was requested during the holdover due to a prior overdose. During that evaluation, his extensive history of disruptive behavior and self harm was noted, as was his medication: Carbamazipine. This medication was discontinued prior to his ADX transfer with no documented rationale.

220.    On January 24, 2008, Mr. Currence had an intake screening at ADX. The screening noted his psychiatric commitments and diagnoses during childhood, as well as his prior prescriptions for Haldol and Risperdal.

221.    Since arriving at the ADX, Mr. Currence has had multiple unproductive contacts with the mental health staff. In February 2008, shortly after his transfer to ADX, Mr. Currence requested psychological programming materials and assistance with anger management. He was provided the book, "Cage Your Rage." In September 2008, Mr. Currence displayed symptoms of

poor concentration, poor attention, anxiety, and insomnia and requested a psychiatric evaluation for depression. The evaluator concluded that he did not meet criteria for Major Depression and encouraged Mr. Currence to use other coping skills to manage his symptoms. On December 24, 2010, Mr. Currence requested to see a mental health professional and also asked for reading material ("self help handouts") to address his inability to relax. Two days later, he was evaluated by a psychologist for suicide risk and was found with a noose.

222.    The BOP has repeatedly disciplined Mr. Currence for conduct that is a manifestation of his mental illness, aggravated by long periods of solitary confinement. For example, on January 8, 2011, Mr. Currence attempted to hang himself. The following day he continued to express suicidal ideation and on January 10, 2011 he placed a noose around his neck. He was subsequently placed in four-point restraints.

223.    On September 19, 2012, Mr. Currence was placed on suicide watch after a hanging attempt. He said "I'm at a breaking point" and requested Cognitive Behavioral Therapy ("CBT"). On September 24, 2012 he was visited by a female psychologist while in indoor recreation. The psychologist focused her discussion on his history of acting out, after which Mr. Currence made a lewd remark toward her. He was again placed on suicide watch on October 26, 2012 when he was in possession of a razor and threatening to cut himself. After being placed in a dirty cell the next day, he again expressed suicidal ideation. In November 2012, he requested CBT again and on November 15, 2012, he was again assessed for suicide after expressing dangerous ideation and complaining about the smell and noise emanating from other prisoners nearby. He was intermittently evaluated for suicide risk for the remainder of November 2012 and ultimately diagnosed with both Borderline and Antisocial Personality Disorder traits.

224.    On January 4, 2013 Mr. Currence met with an ADX psychologist who reviewed a dated psychological evaluation of him. The evaluation provisionally diagnosed him with Post Traumatic Stress Disorder ("PTSD") and Major Depression, with Anxiety Disorder, Malingering, and Intermittent Explosive Disorder listed as diagnoses to be ruled out after further testing.

225.    In March 2013, Mr. Currence broke a sprinkler, made a noose out of sheets, and threatened suicide. This occurred at a time he had not heard from his family and his requests for therapy to specifically address his problems were denied: he was told that he would need to master better coping skills before delving into his past. A few days after this conversation, he threatened to "slice" his jugular vein and then swallowed a razor. An evaluating psychologist noted, "His behavior has worsened over time" and planned to create a formal behavior management plan for Mr. Currence.

226.    On April 5, 2013 he had a lengthy individual therapy session. In a telepsychiatry interview on April 17, 2013, Mr. Currence shared that he had experienced insomnia for one year, was having mood swings, and had been prescribed Haldol in the past. The psychiatrist prescribed Prozac for a depressive disorder. On April 25, 2013, Mr. Currence was presented with the Behavioral Management Plan that had been developed for him. He rejected it and expressed anger that the only diagnosis mentioned on the plan was Antisocial Personality Disorder. A few days later, a note by psychology staff acknowledged that his threats of suicide had increased in the last year.

227.    In May 2013 Mr. Currence was depressed, irritable, making vague threats to commit suicide after having had no recent contact with family members, and sensed that the

"walls are closing in on him." That same month he ingested ten aspirin tablets. He was then provided with some drawing materials in his cell to help him cope.

228.    On June 6, 2013, Mr. Currence received a one hour counseling session during which he expressed a need for treatment for his behavioral issues. However, the psychologist meeting with him thought his request was for secondary gain and discontinued his treatment altogether alleging that he was "unwilling and unmotivated" for treatment, recommending that his behavioral management be custodial (i.e., the use of progressive restraints and chemical munitions would address his issues). He continued to request specialized therapy, and expressed frustration with his lack of contact with mental health professionals.

229.    In July 2013 Mr. Currence received 15 credit hours for completing "Functional Thinking – Taking Charge of Your Life" reading material.

230.    In September 2013, Mr. Currence was housed in the cell next to Robert Knott, a prisoner with Schizophrenia who hanged himself. Mr. Currence was profoundly affected by the suicide resulting from Mr. Knott's mental illness.

231.    In October 2013, Kristin Moody, PsyD interviewed Mr. Currence on three occasions and reviewed his BEMR[2] and PDS[3] records. She concluded that he met criteria for Antisocial Personality Disorder and Borderline Personality Disorder. She also recommended instruction in interpersonal boundaries, stress tolerance, CBT, and group therapy. However when the recommendations were presented to Mr. Currence he complained that the plan was "too superficial" and became disruptive and threatening, leading to the termination of his individual

---

[2] An acronym for "Bureau Electronic Medical Record."

[3] An acronym for "Psychology Data Services."

therapy, which was then assessed to be "contraindicated." He continued to engage in parasuicidal and disruptive behavior in the months of October and November 2013. He reported "stress" and "depression" and made several suicide gestures. Mr. Currence filed a grievance alleging that the ADX staff were "playing games with me. I have serious mental issues that need to be worked on." He received at least three incident reports during this time.

232.     In December 2013 Mr. Currence threw feces and threatened to hang himself. He requested to have his Prozac changed to a different medication to "keep a cap" on his emotions. He continued on Risperdal. He was diagnosed with Depressive Disorder, NOS.

233.     In January 2014, Mr. Currence was upset that the timing of his Risperdal medication changed. He also received a Buspar trial at that time for his complaints of anxiety. In February 2014 Mr. Currence refused his Risperdal because of the dosing schedule. In March 2014 he requested to have Risperdal restarted because he was depressed and anxious and reported to experience command auditory hallucinations to kill himself or others.

234.     Mr. Currence was in and out of the SHU in spring 2014, and force, including oleoresin capsicum gas (pepper spray), was used to subdue him into the SHU. With ongoing suicidal and parasuicidal behavior, Mr. Currence was frequently placed in a dry cell rather than rigid restraints for behavioral management purposes, where he had no access to property such as reading materials or television.

235.     On April 2, 2014 Mr. Currence was again assigned the diagnosis Depressive Disorder NOS. He reported severe anxiety and "erratic" mood and low energy to the evaluator. His suicide threats continued.

236.     In June 4, 2014 Mr. Currence was evaluated by a psychiatrist new to ADX, Kate

Erwin, MD. She diagnosed him with Anxiety Disorder, NOS and Antisocial Personality

Disorder. She prescribed the anti-anxiety drug Buspar.

237.     In July 2014 Mr. Currence continued to exhibit poor distress tolerance as

evidenced by frequent threats of suicide, breaking property, and swallowing objects. He was

provided with a written anger management instructional module. The psychology staff observed

that in recent years, the number of Suicide Risk Assessments for Mr. Currence had increased

considerably (in excess of 70 events, 45 at ADX alone), but interpreted this behavior as

manipulative with the goal of controlling the conditions of his environment.

238.     Dr. Hanna Ong, an expert designated by the BOP, evaluated Mr. Currence on

August 21, 2014 with two additional BOP designated experts observing. Mr. Currence provided

his psychosocial history and expressed concern about being released from prison without having

been treated for his disorder. He also told Dr. Ong that he struggled with anger management and

poor impulse control, experienced both depressed and (short-lived) euphoric moods, and chronic

suicidal and sometimes homicidal ideation. He told Dr. Ong that his depression "gets severe

enough at times that if he had a gun he would kill himself" and that his illness had gotten "worse

in the SHU." Dr. Ong opined that he met criteria for both Antisocial Personality Disorder and

Borderline Personality Disorder, conditions that she opined did not rise to the level of serious

mental illness. She recommended care level CARE2-MH, which could be provided within the

confines of ADX.

239.     Mr. Currence has mental illness and may have serious mental illness. The

conditions of his confinement at ADX have caused or contributed to a wide range of psychiatric

conditions that, unless treated, will lead to further deterioration, and the potential for suicide. The BOP's continued neglect of Mr. Currence's mental health needs violates BOP policy and the Eighth Amendment.

### E.    Carlton Dunbar

240.    Carlton Dunbar is 31 years old. Before his incarceration, he lived in Arlington, Virginia. He was imprisoned at ADX for more than five years and is currently imprisoned at USP Florence, serving a sentence of over 18 years for various offenses. His current BOP release date is July 21, 2021. Mr. Dunbar currently has a serious mental illness, which has been variously diagnosed as Schizophrenia, Bipolar Disorder, and Major Depressive Disorder, Recurrent with Paranoid Features. A photograph of Mr. Dunbar is attached hereto as Exhibit 12. As detailed below, the BOP has demonstrated deliberate indifference to his mental health needs.

241.    Mr. Dunbar was born in Arlington, Virginia. His childhood was marked with depression and mental illness. At the age of four, Mr. Dunbar received his first outpatient mental health treatment for depression and hyperactivity. In April 1996, Mr. Dunbar was committed to a mental hospital in Virginia. His records reflect, as follows, the reason for the commitment:

> Carlton is a 12-year-old male admitted for his first psychiatric hospitalization for acute suicidal ideation with plan and gestures. He is depressed and wants to die. He has threatened to kill himself several times over the past three weeks. He tried to jump out of a window at school two times, he put a plastic bag over his head in the school nurse's office, and he put a plastic strap around his neck. He has been asking his grandmother if he died would he go to heaven. He has been particularly depressed over the past three months. At school, he put a boy's belt around his neck.

During his hospitalization he told the doctors he heard voices arguing in his head. The attending psychiatrist diagnosed Mr. Dunbar with Major Depression. Sometime after his discharge, he was

removed from public school and placed in an alternative therapeutic school for seriously disturbed children.

242.     Depression and mental instability carried over into his adulthood. In 2003, Mr. Dunbar was detained in Virginia pending prosecution in Washington D.C. He spent much of his pretrial incarceration in a locked psychiatric unit. While there, a doctor with the Virginia Department of Corrections diagnosed Mr. Dunbar with Major Depression and gave him a treatment plan that included counseling and a heavy regimen of psychotropic drugs that included Depakote, Risperdal, Paxil, Haldol, Ativan, Trazodone, and Buspar. In addition to Major Depression, Mr. Dunbar also complained of auditory hallucinations and sleeplessness.

243.     In 2005, Mr. Dunbar pled guilty to voluntary manslaughter and carrying a pistol without a license. During pretrial, the court placed Mr. Dunbar in a halfway house, Hope Village, in Southeast Washington D.C. On November 25, 2004, Thanksgiving Day, Mr. Dunbar left the facility without permission and checked himself into a hospital in Arlington, Virginia. At the hospital, Mr. Dunbar complained of severe depression. Because he was suicidal, the hospital admitted him for inpatient psychiatric treatment. He was hospitalized for one week, during which time he was prescribed Wellbutrin, Risperdal, and Trazodone. His attending doctor diagnosed him with Major Depressive Disorder, Recurrent with Paranoid Features. On the day the hospital discharged him, Mr. Dunbar turned himself in to authorities at the D.C. Jail. As a result of his leaving the halfway house, Mr. Dunbar received an additional charge of, and pled guilty, to escape.

244.     The resulting presentence report highlighted Mr. Dunbar's struggles with depression and mental instability, and recommended that he receive mental health counseling. The court sentenced Mr. Dunbar to ten and a half years imprisonment.

245.     The BOP is very familiar with Mr. Dunbar's serious mental health issues. Before he was transferred to ADX, BOP psychologists and psychiatrists met with Mr. Dunbar numerous times. During these visits, Mr. Dunbar repeatedly complained that he heard voices and that a foul odor emanated from his face. He told one psychologist that he had not slept for years, that his mind just races and that his mental condition was getting to him. He also repeatedly spoke of staff "playing mind games" with him and trying to contaminate his food and medications.

246.     Mr. Dunbar also made numerous threats against staff, and also repeatedly threatened to take his own life. In 2006, for instance, he complained that he worried about death "all day long." That same year, he attempted suicide by ingesting over 30 aspirin tablets.

247.     BOP records describe Mr. Dunbar as exhibiting "significant mental health problems," displaying psychotic symptoms, and experiencing paranoia, depression, and panic attacks. BOP psychiatrists and psychologists offered a litany of working diagnoses for Mr. Dunbar, including Schizoaffective Disorder, Bipolar Disorder, Psychotic Disorder NOS, Major Depressive Disorder With Psychotic Features, and Anxiety Disorder NOS.

248.     Having untreated depression, psychosis, paranoia, and anxiety, Mr. Dunbar has engaged in numerous violent acts while in BOP custody. In January 2007, Mr. Dunbar assaulted another prisoner, and then the following month he assaulted a corrections officer. Both incidents occurred at USP Big Sandy. Rather than treat Mr. Dunbar's underlying mental health issues, the BOP chose to transfer him to USP Allenwood. In October 2007, he assaulted his new cellmate.

The BOP responded again by transferring Mr. Dunbar to another penitentiary, this time to USP Lewisburg.

249.    Predictably, given the BOP's decision to designate Mr. Dunbar to a mainline prison rather than a facility that could provide him with needed mental health treatment, trouble continued to find Mr. Dunbar. Most notably, in March 2008 he was involved in an incident that added yet more time to his sentence and resulted in his transfer to ADX. On March 19, 2008, he was walking with a Lieutenant at USP Lewisburg to the Lieutenant's office. When he asked the Lieutenant to stop disrespecting him by cursing at him, the Lieutenant intensified his cursing and was soon joined by another officer. When the two officers advanced in a manner that Mr. Dunbar felt was threatening, he punched the Lieutenant in the head, knocking him unconscious. When the other officer intervened, Mr. Dunbar punched him as well. Eventually Mr. Dunbar was subdued, restrained, and taken to the Lieutenant's office, where out of view of surveillance cameras staff members viciously beat him while he was still wearing restraints. He was later charged with assaulting the Lieutenant. He was convicted and sentenced to an additional 96 months. Thereafter, the BOP referred him for placement at ADX.

250.    In July 2008, in the course of the process for determining whether to transfer Mr. Dunbar to ADX, he was examined by a BOP psychiatrist. Mr. Dunbar related the same symptoms he had experienced most of his life: severe depression, auditory hallucinations, paranoia, anxiety, and sleep disturbance. Even though he had experienced and complained of these symptoms since adolescence and had been treated for them while in BOP custody, the psychiatrist questioned the authenticity of the reported symptoms because Mr. Dunbar's

presentation was "immature." The psychiatrist thus concluded that Mr. Dunbar did not have a mental disorder that would preclude his referral to ADX.

251.    On January 7, 2009, the BOP held a hearing on whether to transfer Mr. Dunbar to ADX. The hearing officer asked Mr. Dunbar if he considered himself dangerous. He responded that he was not but that he had "psychological problems." Disregarding his nearly lifelong history of serious mental illness -- which had been repeatedly diagnosed and treated by the BOP -- the BOP transferred Mr. Dunbar to ADX on February 25, 2009.

252.    Since then, Mr. Dunbar's mental health has deteriorated due to both the lack of adequate treatment and the conditions of confinement at ADX. He has filed multiple Central Office Administrative Remedies appealing his placement at ADX and the BOP's failure to provide him adequate mental health treatment.

253.    As alleged above, in early April 2013 a knife wielding prisoner attacked Mr. Dunbar in Joker Unit at the ADX. Mr. Dunbar defended himself, in the process nearly beating the other prisoner to death with his hands. For months, he sat in the SHU, facing administrative sanctions and possible prosecution for defending himself against an attack that the ADX staff knew about in advance, failed to prevent, and then prolonged for nearly 15 minutes by standing behind bars watching as Mr. Dunbar literally fought for his life against a larger man armed with a knife. As is true for all SHU residents, he spent his time sitting in an empty cell with nothing to occupy his time, smelling the feces other prisoners had smeared on their walls. He also is haunted by his chronic and severe mental illness, and by the dark, persistent trauma of being subjected to an unprovoked and potentially fatal attack, and by being forced to nearly kill another man with his bare hands merely to save his own life.

254.     In 2014 and 2015, Mr. Dunbar has moved back and forth between ADX and USP

Florence, but throughout that time has been in the ADX Step-Down Program. He continues to

have a serious mental illness. The conditions of his confinement at ADX and in the Step-Down

Program have caused or contributed to a wide range of psychiatric conditions that, unless treated,

will lead to further deterioration, and the potential for suicide.

**F.      Scott Fountain**

255.     Scott Fountain is 55 years old. He was imprisoned at ADX for nearly 19 years and

in early 2014 was transferred to the Secure Mental Health Step-Down Program (SMH-SDP) at

USP Atlanta. Before his incarceration he was a member of the United States Navy. He is serving

a life sentence. A photograph of Mr. Fountain is attached hereto as Exhibit 13.

256.     Mr. Fountain has serious mental illness. At various times, he has been diagnosed

with Schizophrenia, Schizoaffective Disorder, Major Depressive Disorder with Psychotic

Features, Antisocial Personality Disorder, Anxiety Disorder NOS, Personality Disorder NOS,

and several Substance Abuse Disorders. He has also attempted suicide at least three times.

257.     In May 2014, BOP diagnosed him with Major Depressive Disorder, Moderate

with Psychotic Features. He was also diagnosed as having Antisocial Personality Disorder and

several mild Substance Abuse Disorders (Alcohol, Marijuana, Cocaine, and Amphetamines) in

sustained remission, in a controlled environment. Shortly before Mr. Fountain's transfer to

SMH-SDP from ADX, he was assigned care level CARE3-MH. This assignment was confirmed

during his May 2014 evaluation. Accordingly, the BOP, at that time, determined that Mr.

Fountain requires enhanced outpatient mental health treatment and/or residential mental health

treatment, e.g. weekly mental health interventions or placement in a residential treatment

program. As detailed below, BOP has demonstrated deliberate indifference to his mental health needs.

258.    Mr. Fountain's parents divorced when he was two years old, and his mother subsequently married three additional times. Mr. Fountain's first stepfather committed suicide shortly after his marriage to Mr. Fountain's mother. Mr. Fountain was subject to frequent physical abuse by his mother and his second stepfather throughout the duration of their marriage. As a teenager, Mr. Fountain was also abused by several adults he resided with and near, and he attempted suicide on at least two occasions.

259.    Mr. Fountain also has a family history of suicide. His mother had a severe mental illness and as a result was volatile and violent. She committed suicide when Mr. Fountain was 22.

260.    Mr. Fountain's extensive history of substance abuse dates back to his teenage years. He started using marijuana at age 12 and alcohol at age 13, in an attempt to self-medicate the effects of his unstable home life. He eventually progressed to daily use of marijuana and alcohol, and later began using amphetamines and unknown pills, cocaine, PCP, LSD, and heroin. He dropped out of high school before his junior year due to his alcohol and drug use, and he developed severe paranoia as a result of his PCP use.

261.    Mr. Fountain first began experiencing symptoms of and receiving treatment for mental illness at a young age. He experienced visual and auditory hallucinations throughout his adolescence. He began "hearing songs" in his head at the age of nine, and continues to hear songs on a regular basis. While in juvenile detention, he was prescribed psychotropic medications for the first time, with which he has intermittently been treated throughout his life.

262.    In 1979, Mr. Fountain joined the United States Navy. That same year, he reported seeing a UFO near a military base, which he believed was evidence of the government working with aliens. In 1981, after Mr. Fountain was discovered "crawling around like a cow making cow noises with food on his face," he was hospitalized for psychiatric evaluation and treatment. He was diagnosed with Paranoid Schizophrenia. Around this time, Mr. Fountain attempted suicide for a third time.

263.    By 1981, Mr. Fountain's Navy career began to unravel as a result of his mental illness. For a time, he was incarcerated in a naval brig, charged for being AWOL, committing four assaults, and a lewd act. He ultimately was sentenced to four years of hard labor. He experienced disciplinary issues while in naval prison, and he was subsequently transferred into federal custody to serve the remainder of his sentence. He was initially committed to FCI El Reno, and later received a disciplinary transfer to FCI Oxford.

264.    In January 1984, approximately six months before his scheduled release date, Mr. Fountain was involved in the murder of a correctional officer at FCI Oxford. In August 1986, he was convicted by a jury of first-degree murder and conspiracy to commit murder. He was sentenced to life, plus 150 years.

265.    Following his sentencing, Mr. Fountain was transferred to USP Marion, which at that time was the most secure facility operated by the BOP. On February 13, 1987, he was reassigned to the Control Unit, where he remained in solitary confinement for over four and a half years. During this time he received 26 incident reports. On August 12, 1991, Mr. Fountain was transferred to USP Lewisburg. In 1992, Mr. Fountain received a disciplinary transfer back to USP Marion.

266.     In 1994, Mr. Fountain had a "breakdown" following the death of his sister, persistent legal problems, and other circumstances. He experienced auditory hallucinations, was unable to sleep, and described his "personality [breaking] up into different parts." He was sent to MCFP Springfield for psychiatric treatment and evaluation, where he remained for several months. He was diagnosed with Paranoid Schizophrenia and prescribed psychotropic medication for the first time since entering federal custody. Mr. Fountain was transferred back to USP Marion, where his paranoia intensified and he ceased taking his medication for fear that if heavily medicated he would be unable to defend himself if attacked.

267.     ADX opened in November 1994. Less than six months later, on March 15, 1995, and barely a year after the BOP diagnosed him with Schizophrenia, Mr. Fountain arrived at ADX. BOP policy classifies Schizophrenia as serious mental illness, so this diagnosis should have precluded the BOP from housing him at ADX. Mr. Fountain was not taking psychotropic medications at that time.

268.     Throughout Mr. Fountain's incarceration at ADX, he was diagnosed with various mental illnesses and prescribed a variety of psychotropic medications. After his arrival, he was diagnosed with Psychotic Depression and prescribed Risperdal.

269.     In 2004, Mr. Fountain filed a series of administrative remedy requests, claiming that the step-down program discriminated against those with mental illness and challenging the adequacy of mental health treatment at ADX. Two of these requests were fully exhausted on June 15, 2004, and February 10, 2005, respectively. However, the BOP did nothing to address Mr. Fountain's mental health needs.

270.     In 2008, he was prescribed the antidepressant Wellbutrin. However, the drug exacerbated Mr. Fountain's psychotic symptoms, and he discontinued taking it in February 2009.

271.     At various times throughout 2011 and 2012, Mr. Fountain was diagnosed with a Mood Disorder, Unspecified Psychosis, Anxiety Disorder, Antisocial Personality Disorder, and Borderline Personality Disorder, and prescribed Zyprexa, Geodon, Effexor, and Buspar.

272.     On May 16, 2012, Mr. Fountain was placed on suicide watch after emailing staff that he was experiencing recurrent suicidal thoughts and nearing a psychotic break. An ADX staff psychologist assessed his suicide risk as low and scheduled a psychiatric evaluation.

273.     On July 2, 2012, Mr. Fountain was again placed on suicide watch after repeatedly informing staff that he would kill himself if they did not remove him from his cell. He was then strip searched and placed in an observation cell with nothing but a paper smock open at the back. Lacking a mattress or pillow, he slept on a bare concrete platform.

274.     Mr. Fountain's severe paranoia inhibited his ability to maintain his physical and mental health throughout his placement at ADX. On multiple occasions, Mr. Fountain reported discontinuing his medications or requesting a lower dosage because "I'm so afraid someone will kill me and I'll be too doped up to try to protect myself." These fears were understandably exacerbated in late 2011, when a staff member accidentally opened the inner and outer doors of Mr. Fountain and another inmate's cells at the same time. Mr. Fountain also frequently refused to leave his cell for recreation time or accept cleaning supplies, which would have required allowing staff members to open his cell doors. In May 2012, he discontinued his Geodon pills in favor of monthly Haldol injections so that he could avoid the pill line. He feared that "someone could get to him" if ADX staff left both cell doors open again.

275.     As a result of this lawsuit, BOP established the SMH-SDP at USP Atlanta, which began receiving prisoners in late 2013. On January 8, 2014, Mr. Fountain was transferred to the SMH-SDP. In May 2014, he was evaluated by SMH-SDP staff psychologists, the results of which were reported on November 7, 2014. During this evaluation, Mr. Fountain reported continued feelings of paranoia and the persistent belief that others are trying to harm him. He reported many symptoms of depression, including depressed mood for most of the day, tearfulness, sleep disturbance, feelings of worthlessness, suicidal ideation, fatigue, and loss of pleasure in activities. He also described being "'Haldoled' to the point where I'm steady and can go long periods without having to say anything to someone." The evaluators diagnosed Mr. Fountain with Major Depressive Disorder, Moderate with Psychotic Features, Antisocial Personality Disorder, and several mild Substance Abuse Disorders (Alcohol, Marijuana, Cocaine, and Amphetamines), in sustained remission, in a controlled environment. The evaluators confirmed Mr. Fountain's classification as a CARE3-MH inmate and recommended individual and group cognitive-behavioral psychotherapy, with primary focuses on mood management, fostering hope and a sense of purpose, and developing social skills.

276.     While Mr. Fountain's condition has improved since his transfer out of ADX, his care was constitutionally deficient at ADX and remains so at the SMH-SDP. In particular, he remains in profound isolation despite years of acceptable conduct, remains subject to unnecessary and psychologically damaging security procedures, does not have adequate access to programming or psychiatric consultation, and continues to receive inadequate care for his medical issues, which exacerbate the symptoms of his mental illness. He also remains at risk of

sudden cessation of the treatment his is receiving, should BOP decide, in its discretion, to terminate the SMH-SDP, or transfer him to another facility.

**G.    Sean Gillespie**

277.    Sean Gillespie is 31 years old. He has been housed at ADX since August 7, 2008. Before his incarceration, he was a resident of Spokane, Washington. His current BOP release date is April 26, 2039. A photograph of Mr. Gillespie is attached hereto as Exhibit 14.

278.    Mr. Gillespie has mental illness and may have serious mental illness. As detailed below, the BOP has demonstrated deliberate indifference to his mental health needs. At various times, Mr. Gillespie has been diagnosed with various mental disorders, including ADHD, Bipolar Disorder, Mood Disorder, Antisocial Personality Disorder, and Depressive Disorder NOS. He engaged in self-injury and made several suicide attempts before his arrival at ADX.

279.    Mr. Gillespie was abused as a child and hated his father for not preventing the abuse. His mother was in and out of his life. She was addicted to methamphetamine for a time and made a living from internet pornography.

280.    Mr. Gillespie started getting into trouble at the age of ten. He fought with others at psychiatric hospitals, escaped juvenile detention, and spent months living in the woods. At 15, he began using drugs, such as heroin and methamphetamine. While living on the streets, he became associated with local skinheads. In his mid teens, Mr. Gillespie spent time at an Aryan Nations compound in Idaho. He identified himself as a member of the Aryan Nations by the time he was 17, and thereafter was an adherent of the Christian identity movement. Mr. Gillespie twice attended Army basic training, at the ages of 18 and 19, but was dismissed each time due to behavioral problems.

281.   Mr. Gillespie has a lengthy juvenile record. At the age of ten, he was charged multiple times with assault. When he was 17, he was arrested for shouting racial slurs at a Martin Luther King Jr. Parade.

282.   Mr. Gillespie was placed in various mental facilities and juvenile detention facilities beginning at age nine. From ages nine through 21, Mr. Gillespie was prescribed many psychotropic medications for depression and mood disorder, including Wellbutrin, Zoloft, Paxil, and Tegretol. He has received diagnoses of ADHD, Bipolar Disorder, and other mood disorders from at least ten different mental health professionals.

283.   On April 1, 2004, Mr. Gillespie used a Molotov cocktail to firebomb the Temple B'nai Israel in Oklahoma City, Oklahoma. Mr. Gillespie committed the arson only after he could not locate his original intended target, a person he thought was Jewish based on a name he randomly selected from a phone book.

284.   Despite causing little damage to the synagogue, Mr. Gillespie was convicted of using a firearm (the Molotov cocktail) in connection with a violent crime, maliciously attempting to do damage by fire or explosive to a building involved in interstate commerce, and possessing an unregistered firearm.

285.   On August 30, 2005, Mr. Gillespie was sentenced to 468 months (39 years) imprisonment. In its Judgment, the sentencing court wrote:

> The Court finds this case presents unusual features that merit specific findings. Sean Gillespie's past behavior indicates he may have sustained organic brain injury as a result of his exposure to and use of alcohol and illicit substances. The Court finds there is evidence indicating that Mr. Gillespie may have a cognitive and/or behavioral disorder that places him at extreme risk of exploitation if confined in a general population facility. The Court strongly recommends Mr. Gillespie be designated to an appropriate facility

> capable of evaluating, diagnosing, and providing treatment to Mr.
> Gillespie. The Court recommends the submission of this case to the
> Medical Designator for determination of an appropriate facility. The
> Court recommends designation to the Federal Medical Center in
> Rochester, Minnesota.

The sentencing court also recommended that Mr. Gillespie participate in a Residential Drug

Abuse Program, and while incarcerated, mental health counseling.

286.   The BOP ignored the sentencing Court's strong recommendation, designating Mr.

Gillespie to serve his sentence at USP Florence, a general population, maximum security facility

located in the same four-prison complex as ADX. Mr. Gillespie was housed at USP Florence

from October 2005 through October 2007.

287.   In 2005, Mr. Gillespie was prescribed Risperdal and Zyprexa for depression and

mood control. Both of these were later discontinued because he attempted suicide by overdosing.

288.   On November 7, 2007, Mr. Gillespie was transferred to USP Coleman I after he

stabbed another inmate. While confined at USP Coleman I, Mr. Gillespie mutilated himself by

cutting.

289.   Mr. Gillespie was sent to ADX on August 7, 2008 to serve an extended sentence in

the Control Unit for the problems that he caused at USP Coleman I, including attempting to slash

a guard through the food slot.

290.   Since arriving at ADX, Mr. Gillespie has renounced his past involvement in racist

organizations and activities by, among other things, publishing antidiscrimination and antiracism

narratives and reconciling with the leadership of the synagogue he firebombed. With a

supporting recommendation of a BOP psychiatrist, he also sought removal of his prominent

racist tattoos. To date, the BOP has refused to assist him with the tattoo removal. That refusal has contributed to the pronounced deterioration of his mental health during his incarceration at ADX.

291.   In recent years, certain other ADX prisoners have frequently threatened and ostracized Mr. Gillespie due to, among other things, his open renunciation of his past involvement in racist activities. At times he is threatened every day. He rarely leaves his cell because of the abuse and threats he receives, and at times has been driven to the brink of suicide.

292.   On September 30, 2013, Mr. Gillespie requested an administrative remedy claiming he did not receive proper psychiatric treatment. His request was fully exhausted with the BOP Central Office.

293.   On December 6, 2013, Mr. Gillespie was placed in an observation cell after he put a plastic garbage bag over his face until he passed out.

294.   On March 27, 2014, Mr. Gillespie inserted the tip of a pen into his left forearm and removed an oval shape of abrasion (approximately 15cm x 8cm) of the top layer of his skin, in an effort to remove a tattoo. In May 2015, he made a further attempt to remove the racist tattoos on his hand and thigh by cutting. Staff acknowledged the resulting wounds but Mr. Gillespie received no treatment for them.

295.   On August 20, 2014, the BOP evaluated Mr. Gillespie and described him as depressive, angry, impulsive, and agitated, and also reporting insomnia. The BOP diagnosed him with Depressive Disorder NOS, Antisocial Personality Disorder, aspects of Borderline Personality Disorder, and suggested additional assessment to confirm or rule out Persuasive Depressive Disorder. He was designated care level CARE2-MH, meaning that the BOP determined Mr. Gillespie requires outpatient mental health care and/or brief, crisis-oriented

mental health care of significant intensity, e.g., placement on suicide watch or behavioral observation status.

296.   On November 5, 2014, while Mr. Gillespie was in the SHU, he attempted suicide by placing a noose around his neck . He later reported that he had wanted to die because he was not receiving treatment for his mental illness. Two days later, he tried to break a meal tray on the ceiling of his cell, injuring his thumb and breaking a sprinkler. He reported that a razor blade fell out of the sprinkler, which he then swallowed, along with several pieces of the broken sprinkler head. Although he was given ibuprofen for his pain, his mental illness was not addressed. Staff refused to summon medical help when he began to bleed from his rectum from swallowing these sharp metal objects. He also received an incident report for throwing urine on a correctional officer who had taunted him about his suicide attempt.

297.   Mr. Gillespie's August 2014 diagnosis was largely confirmed during another ADX Diagnostic Interview on March 19, 2015, during which the BOP diagnosed Mr. Gillespie with Antisocial Personality Disorder and Borderline Personality Disorder, and again assigned him care level CARE2-MH. At that time, the BOP withdrew his previous diagnosis of Depressive Disorder despite his frequent suicidal thoughts and self-harm.

298.   In sum, Mr. Gillespie has mental illness and may have serious mental illness. The conditions of his confinement at ADX have caused or contributed to a wide range of psychiatric conditions that, unless treated, will lead to further deterioration, and may lead to suicide. Although the BOP has provided him with some mental health services as a result of this lawsuit, his care remains constitutionally deficient, and his condition is, as a result, deteriorating. That deterioration has been magnified by the BOP's insistence that he remain in the extremely

isolated and austere conditions in the ADX Control Unit, for which prisoners with mental illness are particularly ill-suited. BOP's continued neglect of Mr. Gillespie's mental health needs violates BOP policy and the Eighth Amendment.

## H.     Charles Hipps

299.     Charles Hipps is 41 years old. He has been housed at ADX since January 2008. Before his incarceration he was a resident of Murphysboro, Illinois. His current BOP release date is October 22, 2039.

300.     Mr. Hipps has mental illness and may have serious mental illness. At various times, he has been diagnosed with Major Depressive Disorder, Bipolar Disorder, Antisocial Personality Disorder, Anxiety Disorder, and Alcohol Use Disorder. At least one psychiatrist who evaluated him in 2014 suggested further analysis to confirm or rule out a diagnosis of Bipolar Disorder. He also has a history of suicidal ideation and has attempted suicide at least twice.

301.     In August 2014, the BOP diagnosed him with Major Depressive Disorder, in partial remission, and Alcohol Use Disorder. BOP policy recognizes Major Depression as a serious mental illness that precludes BOP from housing Mr. Hipps at ADX. Nonetheless, BOP assigned him to care level CARE2-MH. Accordingly, the BOP determined that Mr. Hipps requires routine outpatient mental health care and/or brief, crisis-oriented mental health care of significant intensity, e.g. placement on suicide watch or behavioral observation status. As detailed below, BOP has demonstrated deliberate indifference to his mental health needs.

302.     During childhood, Mr. Hipps experienced significant neglect by his mother and physical and verbal abuse by several adult relatives. He was hyperactive and began to

experiment with alcohol and marijuana at age nine. At age 12, he was hospitalized and treated for Bipolar Disorder with the powerful antipsychotic medications Thorazine and Mellaril.

303.     Mr. Hipps was first incarcerated in Arkansas in 1994 for theft and breaking and entering. While incarcerated, Mr. Hipps attempted suicide and received psychiatric care on at least four occasions. Mr. Hipps attempted suicide again five years later while having marital problems.

304.     After his release from Arkansas state prison, Mr. Hipps's mental health continued to deteriorate. He experienced severe insomnia, paranoia, and visual hallucinations, and sometimes went two to three days without sleeping. In January 2000, Mr. Hipps participated in a residential substance abuse treatment program, where he was diagnosed as having symptoms of Bipolar Disorder. Seven months later, he entered a different treatment program and was again diagnosed with Bipolar Disorder.

305.     In January 2001, Mr. Hipps was hospitalized in a state facility after threatening to kill his girlfriend and himself. He was once more diagnosed with Bipolar Disorder, as well as Cyclothymia and Antisocial Personality Disorder. He was treated with Lithium, Zyprexa, and Sinequan.

306.     On February 6, 2001, Mr. Hipps was discharged. Around that time, he underwent an additional psychiatric evaluation, which revealed diagnoses of Major Depression (with agitation) and Bipolar Affective Disorder. At a follow-up psychiatric evaluation conducted in May 2002, he was diagnosed with Bipolar Disorder and Antisocial Personality Disorder.

307.    In 2003, he was charged and found guilty of drug crimes. He was sentenced to a term of 130 months and incarcerated at FCI Oxford. Subsequently, he was transferred to USP Terre Haute in 2005 and then to USP Atwater in 2006.

308.    While in an intoxicated state on October 31, 2007, Mr. Hipps and another inmate took an officer hostage at USP Atwater in an attempt to be transferred to another institution. As a result, Mr. Hipps received an additional 360 months to run consecutively to his previous sentence. The Presentence Investigation Report prepared following his conviction detailed Mr. Hipps's extensive history of psychological problems, including at least six diagnoses of Bipolar Disorder over a period of 16 years and a variety of treatments with psychotropic medications, which should have precluded the BOP from housing him at ADX. Nonetheless, he was transferred to ADX in early 2008, and the portion of his Presentence Investigation Report documenting his serious mental illness was retained by ADX staff psychologists.

309.    On January 18, 2008, Mr. Hipps was placed in the SHU and remained there for the next 18 months. BOP records reflect that Mr. Hipps was evaluated every 30 days at cell front, but these evaluations consisted of an ADX staff psychologist walking through the housing unit and speaking only to those prisoners who spoke to him first. Thus, it is unsurprising that Mr. Hipps's evaluations describe him as declining psychology services and not appearing distressed.

310.    On December 27, 2009, Mr. Hipps was accused of spitting on a staff member and placed in the SHU again, where he remained for several months.

311.    On December 1, 2012, Mr. Hipps was returned to the SHU for making jailhouse liquor in his cell. Due to his desire to stay sober, he requested individual counseling and met with a counselor on December 18, 2012. Mr. Hipps recounted his lengthy history of alcohol problems

and discussed his struggle to remain sober. He "posited the possibility of being bipolar," but the counselor concluded that the history provided by Mr. Hipps was more consistent with unipolar depression. The counselor also noted that a plan to address Mr. Hipps's Alcohol Use Disorder would be formulated. As of November 2014, this had not yet occurred.

312.    While meeting with an ADX psychologist on February 14, 2013, Mr. Hipps expressed his desire to get out of the SHU. BOP records reflect that Psychology Services "brainstormed programs with inmate in order to develop a treatment plan to more assertively address his alcohol dependence."

313.    On February 26, 2013, Mr. Hipps received a disciplinary incident report and was returned to the SHU. Three weeks later, on March 18, 2013, he was evaluated at cell front by an ADX psychologist. Mr. Hipps, who had recently threatened suicide, expressed frustration about his living environment and said he felt like he was reaching his "breaking point." The psychologist conducted a suicide risk assessment, opined that his acute risk for suicide was low, and assigned Mr. Hipps a rule out diagnosis of Depressive Disorder, with a planned telepsychiatry appointment.

314.    Mr. Hipps attended his requested telepsychiatry appointment on March 20, 2013. He discussed his prior psychiatric hospitalizations and reported previously being prescribed Lithium, Zyprexa, Sinequan, and Prozac. Finally, he reported that his depression had worsened and that he had problems sleeping. The psychiatrist prescribed him a trial of Zoloft for a depressive disorder.

315.    In early April 2013, Mr. Hipps was transferred to a regular ADX housing unit.

316.     On May 10, 2013, he met with another staff psychologist. Mr. Hipps expressed a desire to try new medication because the Zoloft made him feel manic. The Zoloft was discontinued when he met with a telepsychiatrist on June 12, 2013, and he was then prescribed Celexa. While Mr. Hipps reported "some improvement" at that time, he also complained of sleep problems.

317.     On August 27, 2013, he met with staff psychologist for an individual session. Mr. Hipps expressed distress that his father, with whom he had recently become close, had had a stroke. He reported that the Celexa was not addressing all of his symptoms, and his dosage was increased.

318.     On December 11, 2013, Mr. Hipps was prescribed Abilify, an antipsychotic, to augment his existing antidepressant. The Abilify was also intended to reduce his reported paranoia, anxiety, and poor sleep.

319.     Mr. Hipps was seen emergently on December 30, 2013. In a note to a staff psychologist he wrote, "Please come see me [as soon as possible.] I am feeling some crazy stuff and having suicidal thoughts that are hard to ignore, plus I can hardly sleep at night. Please don't talk to me in my cell. . . . Please come and call me out." He reported that since starting the Abilify he had developed suicidal thoughts and could not sleep. In addition to insomnia and suicidal ideation, he reported night sweats, visual hallucinations, and that he had considered overdosing on Tylenol. He was tearful in this exchange and requested to discontinue the Abilify. The psychologist diagnosed Mr. Hipps with Depressive Disorder and Anxiety Disorder, Not Otherwise Specified, requested a new mediation evaluation, and recommended that he be allowed to move to the upper tier where he had friends with whom he could exercise.

320.    Throughout January 2014, Mr. Hipps expressed frustration and agitation over not being moved. On February 10, 2014, he was sent the book "Draw Real People" from the psychology self-help library. In June 2014, he reported increased appetite and weight, paranoia, exhaustion, excessive sleep, lack of motivation, and "not feeling right."

321.    Following another psychological evaluation, it was recommended that Mr. Hipps discontinue Celexa and begin taking Effexor XR. While Mr. Hipps reported that he was diagnosed with Bipolar Disorder in 2007, the evaluator noted, "His symptoms do not appear to fit that diagnosis without any episodes even approaching mania." Noting that he was chronically suicidal, the evaluator diagnosed Mr. Hipps with a depressive disorder and anxiety disorder. She reported his Alcohol Use Disorder to be in remission.

322.    Drs. Meredith Cary and Jessica Virzi, experts designated by the BOP, evaluated Mr. Hipps on August 19, 2014. During this evaluation, Mr. Hipps reported being stabilized on Effexor XR , but also told Drs. Cary and Virzi that he struggled with depression, hopelessness, a lack of motivation, and sleep and appetite issues. He noted that he "[thought] about dying rather than doing the time." Drs. Cary and Virzi opined that he met criteria for both Major Depressive Disorder, in partial remission, and Alcohol Use Disorder, conditions which they opined did not rise to the level of serious mental illness. They assigned him to care level CARE2-MH, which could be provided within the confines of ADX, even though his primary diagnosis of Major Depression precludes the BOP from housing him at ADX.

323.    Mr. Hipps's symptoms of depression persist, as does the BOP's neglect of his mental health needs. On December 31, 2014, and again on January 7, 2015, Mr. Hipps reported that his medication was no longer effective. He described his mental state as "much worse" and

complained of decreased energy, increased need for sleep, agitation, irritability, poor concentration, and loss of interest in activities. On January 12, 2015, he attended a telepsychiatry appointment and was prescribed Wellbutrin, another antidepressant. He requested an increased dosage one month later, as he continued to feel irritable and hopeless, and was having trouble sleeping.

324.    On March 24, 2015, Mr. Hipps underwent a suicide risk assessment after emailing staff, "I have reocurrent [sic] suicidal thoughts with extreme paranoia" and expressing a need for mental health treatment. He later explained to the evaluator that he was not having active suicidal thoughts, but was experiencing suicidal thoughts more often. The evaluator determined that suicide watch was not warranted.

325.    On April 24, 2015, Mr. Hipps was seen by ADX staff psychologist Kristen Moody for a Restrictive Housing Mental Health Evaluation, during which she determined that a diagnostic reconciliation was needed. However, Mr. Hipps's records do not reflect a discrepancy in his diagnoses, and Dr. Moody herself reported on December 1, 2014 that there was "no discrepancy between this writer's clinical opinion, psychology documentation in [Mr. Hipps's records,] and the [August 2014 evaluation.]" Nonetheless, Dr. Moody dismissed Mr. Hipps's August 2014 diagnosis of Major Depressive Disorder, and opined that Mr. Hipps instead has Persistent Depressive Disorder. She concluded that this diagnosis was more appropriate because his depressive symptoms, which were noted as worsening significantly since his placement in restrictive housing, were present more days than not and persisting for at least two years. Unlike Major Depressive Disorder, Persistent Depressive Disorder is not classified as a serious mental illness under BOP policy. Dr. Moody also diagnosed Mr. Hipps with Antisocial Personality

Disorder, a disorder which the BOP considers to be untreatable. Notwithstanding her rejection of Mr. Hipps's previous diagnoses, Dr. Moody confirmed that Mr. Hipps requires at least care level CARE2-MH, meaning that he requires routine outpatient or crisis-oriented mental health care.

326.     Upon information and belief, Mr. Hipps's April 2015 evaluation was intended to minimize the appearance of his mental illness by eliminating his diagnosis with a disorder that, under BOP policy, precludes him from being housed at ADX.

327.     Mr. Hipps has mental illness and may have serious mental illness. The conditions of his confinement at ADX have caused or contributed to a wide range of psychiatric conditions that, unless treated, will lead to further deterioration, and may result in suicide. Although the BOP has provided him with some mental health services as a result of this lawsuit, his care remains constitutionally deficient, and his condition is, as a result, deteriorating. BOP's continued neglect of Mr. Hipps's mental health needs violates BOP policy and the Eighth Amendment.

**I.     Ronnie Houston**

328.     Ronnie Houston is 44 years old. He was first sent to ADX in 2008, and was returned there in 2013 after being transferred to California to stand trial on assault charges. Before his federal incarceration he was a resident of Grand Saline, Texas. His current BOP release date is June 3, 2032. A photograph of Mr. Houston is attached hereto as Exhibit 15.

329.     Mr. Houston has serious mental illness. In August 2014, the BOP diagnosed Mr. Houston as having Bipolar Disorder Type 1, as well as Antisocial Personality Disorder and Mild Neurocognitive Disorder due to Traumatic Brain Injury, and assigned him care level CARE3-MH. Accordingly, the BOP determined that Mr. Houston requires enhanced outpatient mental

health care (i.e., weekly mental health interventions); or residential mental health care (i.e.,

placement in a Residential Treatment Program). As detailed below, the BOP has demonstrated

deliberate indifference to his mental health needs.

330.    Mr. Houston was born in Norwalk, California. As a child, he was physically

abused by his parents. For example, at age four, he suffered third degree burns after scalding

water was thrown on him, and at age five or six, his father broke his nose. Both parents had

problems with alcohol, and after his parents divorced, Mr. Houston's father was largely absent

during his childhood. At age 11, Mr. Houston became a ward of the state due to neglect. Mr.

Houston stopped attending school altogether by eighth grade.

331.    Mr. Houston has a history of substance abuse beginning at age 12. By age 13, he

had used methamphetamines, which he began injecting at age 14. He was a heavy

methamphetamine user during much of the time he was not incarcerated.

332.    In 1989, at age 18, Mr. Houston was arrested on state burglary charges in Texas.

He was convicted and sentenced to a ten-year prison term.

333.    After release from state prison, Mr. Houston was arrested on federal charges for

possession of unregistered firearms. Mr. Houston pled guilty and received a ten-year sentence.

After unsuccessfully attempting to withdraw his guilty plea, Mr. Houston appealed his

conviction and lost.

334.    While serving his federal prison term at USP Victorville, Mr. Houston was

involved in assaults on two prisoners in the SHU recreation cages in December 2007 and

February 2008, resulting in further criminal charges. As a result of the assaults, he was

transferred to ADX, where he was housed in a general population unit.

335.     Mr. Houston maintained clear conduct at ADX until 2010, when he was transferred back to California to stand trial on the assault charges. A jury acquitted Mr. Houston of assault with intent to kill, but convicted him on all other charges. The court sentenced Mr. Houston to a total of 276 months in prison, and the sentencing judge recommended that he be sent to MCFP Springfield to receive psychological and/or psychiatric evaluation, treatment, and counseling.

336.     Mr. Houston has had mental health issues since the age of nine. As a child, he was treated for ADHD and depression. He also had psychotic episodes and attempted to commit suicide by shooting himself. In 1990, while in state prison, Mr. Houston again attempted to commit suicide using a sheet.

337.     Mr. Houston has been hospitalized multiple times for mental health treatment, and has been treated at various times with Ritalin, Elavil, Haldol, Lithium, Depakote, Celexa, and Trazodone for depression and anxiety, among other things.

338.     Mr. Houston also has a history of head trauma. In 1989, he was in a car accident during which his head went through a windshield; in 1994, he was knocked out in bull riding incident; and in 2004, a fellow inmate at FCI Beaumont hit him in the head with a brick and knocked him unconscious. Mr. Houston experiences forgetfulness, and the BOP has identified him as having Mild Neurocognitive Disorder due to Traumatic Brain Injury and recommended that he could benefit from neuropsychological testing to assess for cognitive disorders.

339.     Mr. Houston has a history of cutting himself, beginning with his time in juvenile detention. He has been hospitalized at least three times for cutting and drug abuse. Mr. Houston has engaged in other forms of self-harm as well, including inserting AA batteries into his urethra.

340.     In April 2012, Mr. Houston was sent to USP Florence. In June 2012, while in the SHU at that facility, Mr. Houston was involuntarily taken off of Elavil, an anti-depressant he had been taking. He subsequently destroyed his cell and engaged in other destructive behavior, including smearing himself with feces and setting his cell on fire. He was returned to ADX in April 2013 and placed in the Control Unit.

341.     On November 20, 2013, Mr. Houston's mother, who had a history of depression and psychotic episodes, committed suicide. After her suicide, Mr. Houston underwent a suicide risk assessment due to noose found in his cell.

342.     Dr. Hannah Ong, an expert designated by the BOP, evaluated Mr. Houston on August 18, 2014, with two additional BOP-designated experts observing. During this evaluation, Mr. Houston provided his psychosocial history described above. He reported that he experiences frequent recurrent depressive episodes accompanied by suicidal thoughts and described multiple incidents of destroying his cell due to anxiety. Dr. Ong opined that Mr. Houston meets criteria for a diagnosis of Bipolar Disorder and recommended that he be assigned care level CARE3-MH, specifically, residential care for chronic serious mental illness.

343.     Under the BOP's revised policies, the BOP's diagnosis of Mr. Houston with a serious mental illness and assignment of him to care level CARE3-MH precludes the BOP from housing Mr. Houston at ADX. Nevertheless, he remains at ADX, in the Control Unit, receiving some psychotropic medication but otherwise remaining largely untreated.

344.     Mr. Houston has serious mental illness. The conditions of his confinement at ADX have caused or contributed to a wide range of psychiatric conditions that, unless treated, will lead to further deterioration, and may result in suicide. Although the BOP has provided him

with some mental health services as a result of this lawsuit, his care remains constitutionally deficient, and his condition is, as a result, deteriorating. His continued assignment to ADX and neglect of his mental health needs violates BOP policy and the Eighth Amendment.

**J.      John Lamb**

345.     John Lamb is 50 years old. He has been housed at ADX since February 2011. Before his incarceration he was a resident of Camas, Washington. His current BOP release date is July 4, 2046. A photograph of Mr. Lamb is attached hereto as Exhibit 16.

346.     Mr. Lamb has mental illness and may have serious mental illness. At various times, he has been diagnosed with Depression, Persistent Depressive Disorder, and Antisocial Personality Disorder. As detailed below, the BOP has demonstrated deliberate indifference to his mental health needs.

347.     In August 2014, the BOP diagnosed Mr. Lamb with Mild Persistent Depressive Disorder and Antisocial Personality Disorder. He was assigned care level CARE2-MH. Accordingly, the BOP, at that time, determined that Mr. Lamb requires routine outpatient mental health treatment and/or brief, crisis-oriented mental health treatment of significant intensity, e.g. placement on suicide watch or behavioral observation status.

348.     Mr. Lamb was born in Escondido, California. He has one brother, who is currently incarcerated in a prison mental health facility in Soledad, California and receiving treatment for Bipolar Disorder.

349.     Mr. Lamb was not in trouble with the law until his late 20s, when he developed an addiction to methamphetamine. That addiction led to burglaries, including one during which he

murdered the resident of a home that he had broken into. In December 1995 Mr. Lamb pled

guilty to first-degree murder. He was sentenced to 50 years in prison.

350.     Mr. Lamb attempted to escape from the Washington State Penitentiary in July

1996. The following year, he succeeded in escaping from the Washington State Penitentiary's

Intensive Management Unit, a "supermax prison," although he was recaptured within a few

hours. Thereafter, he was transferred into federal custody. In September 1999, he arrived at USP

Marion. In August 2006, after several years of clear conduct, Mr. Lamb was transferred to USP

Victorville.

351.     In 2007, Mr. Lamb was diagnosed with depression. He began receiving the

antidepressants Prozac and Zoloft. When those medications failed to alleviate his symptoms, he

was prescribed Wellbutrin, another antidepressant. Mr. Lamb reported experiencing immediate

relief as a result of this medication.

352.     In 2008, Mr. Lamb developed a contracture on his right ring finger. A contracture

is the permanent contraction, or shortening, of a muscle or tendon, which causes the affected

tissue to remain in a persistent state of tension. In Mr. Lamb's case, the contracture causes the

ring finger of his dominant (right) hand to remain bent towards his palm at a 45 degree angle. It

is painful and significantly interferes with his daily activities, including exercise. Since Mr.

Lamb developed the contracture, at least two doctors have recommended surgical treatment, and

Mr. Lamb has filed at least nine administrative remedy requests between December 2009 and

June 2014 challenging the BOP's failure to treat his finger. Two of these requests were fully

exhausted on July 27, 2010 and November 13, 2014, respectively. Additionally, During Mr.

Lamb's mental health evaluation by the BOP in August 2014, the evaluators concluded that

"medical attention to [Mr. Lamb's] contracted finger would likely help both his anger and depressive symptoms." Nonetheless, as of May 2015, his contracted finger remains untreated.

353.    In March 2009, Mr. Lamb was involved in a riot on the exercise yard at USP Victorville. He was subsequently transferred to the Special Management Unit at USP Lewisburg, where he remained until February 2011. Mr. Lamb's Wellbutrin dosage was increased while at Lewisburg, which allowed him to be in a "steady mood all day."

354.    In early 2010, the medical staff at USP Lewisburg changed its practice for administering psychotropic medication, and began crushing the pills given to Mr. Lamb, who previously had received his medication in whole form. Because the crushed medication caused Mr. Lamb to gag when he tried to swallow it, he began wrapping the powder in a ball of toilet paper every morning, in front of the officer, and then swallowing the toilet paper ball while the staff member was still standing there watching him. Every day for at least three months, Mr. Lamb took his medication the same way, with no problems or disciplinary issues.

355.    In June 2010, Mr. Lamb was involved in an altercation with another prisoner, which precipitated his transfer to ADX. Sometime after that, he began receiving Interferon for his Hepatitis C. Every day, the staff brought him several large Interferon capsules, which he was supposed to swallow whole. At the same time, he received his crushed Wellbutrin, which he wrapped in toilet paper and swallowed.

356.    On July 9, 2010, Mr. Lamb was evaluated for Control Unit placement at ADX by a staff psychologist at USP Lewisburg. Mr. Lamb reportedly was unaware of the purpose of the evaluation and, because he suspected the evaluator of attempting to elicit incriminating information from him, refused to speak to the evaluator. The evaluator noted Mr. Lamb's

prescription for psychotropic medication and his diagnosis of Depressive Disorder, NOS. Nonetheless, the evaluator "did not identify mental health concerns that would preclude [Mr.] Lamb's placement in a Control Unit setting." On November 2, 2010, the BOP requested an "updated mental status . . . as part of [Mr. Lamb's] ADX referral," during which Mr. Lamb's Wellbutrin prescription was again noted.

357.    On January 14, 2011, a substitute physician's assistant broke Mr. Lamb's Interferon capsules open and mixed the medicine with his Wellbutrin. The two argued when Mr. Lamb protested that the medication was not supposed to be taken that way. Soon afterwards, Mr. Lamb was given a disciplinary incident report for wrapping his Wellbutrin in toilet paper, and the medication was abruptly discontinued. The recommended practice for discontinuing Wellbutrin is to taper off usage because abrupt discontinuation can result in both withdrawal symptoms and a relapse of depression.

358.    BOP policy prevents prisoners who receive psychotropic medications from being housed in the Control Unit. Upon information and belief, Mr. Lamb's potential placement at ADX was a factor in the BOP's decision to discontinue his Wellbutrin approximately one month prior to his ADX transfer.

359.    On February 11, 2011, Mr. Lamb arrived at ADX. During his intake screening, Mr. Lamb was not asked a single mental health question. He was housed in the SHU for approximately two and a half weeks, and did not receive a psychological evaluation during that time.

360.    Mr. Lamb was subsequently placed in the ADX Control Unit, after which he requested mental health care. In response, an ADX staff psychologist told Mr. Lamb that

psychotropic medications were not available to prisoners housed in the Control Unit, but offered him a book on depression. His subsequent contacts with the mental health staff at ADX have been similarly unproductive. Between early 2011 and late 2013, Mr. Lamb made written requests for Wellbutrin on at least six occasions. In May 2013, after one such request, an ADX staff psychologist opined that Mr. Lamb might benefit from psychotropic medication treatment and subsequently referred him to a psychiatrist. On June 6, 2013, the psychiatrist concurred that Mr. Lamb appeared depressed. During a follow-up evaluation, the referring psychologist noted that Mr. Lamb was still not receiving any type of medication, was reporting a continued depressed mood, and had a blunted affect. She contacted the psychiatrist to "again [emphasize] her clinical opinion that [Mr. Lamb's] depressive symptoms may be benefited by medication intervention." On August 7, 2013, the psychiatrist spoke with Mr. Lamb for less than 30 minutes. Based on this encounter and a review of Mr. Lamb's records, he refused to prescribe psychotropic medication, noting, "I seriously doubt inmate's subjective symptoms." Following this encounter, Mr. Lamb continued to report symptoms of depression and submit requests for treatment.

361.    In September 2013, after he was contacted by an attorney regarding this lawsuit, Mr. Lamb's Wellbutrin was restored for the first time since his arrival at ADX. He was evaluated by a telepsychiatrist for approximately ten minutes and prescribed Wellbutrin.

362.    On August 17, 2014, Drs. Hannah Ong and Jay St. Amant, experts designated by the BOP, evaluated Mr. Lamb. Mr. Lamb remained on Wellbutrin but had not seen a psychiatrist for nearly one year. During his evaluation, Mr. Lamb described the antidepressant as partially helpful, but reported continuing feelings of depression and anger. He requested an increased dose of his Wellbutrin and complained about his contracted finger remaining untreated. Drs. Ong and

St. Amant diagnosed Mr. Lamb with mild Persistent Depressive Disorder and Antisocial Personality Disorder ("ASPD"). Despite his reports of continuing problems and recognition of his "anger and depressive symptoms," they concluded: "Mr. Lamb's symptoms of Persistent Depressive Disorder are stable on current antidepressant and are not impairing his functioning." They opined that Mr. Lamb's condition did not rise to the level of serious mental illness and assigned him to care level CARE2-MH, meaning that they believed his mental health needs could be met within the confines of ADX. Mr. Lamb's symptoms of depression persist, as does the BOP's neglect of his mental health care needs. In particular, despite his continuing prescription for antidepressants, he rarely is able to consult with a psychiatrist.

363.    On April 28, 2015, Mr. Lamb was evaluated for the ostensible purpose of reconciling his prior diagnoses. Mr. Lamb refused to participate in this evaluation, as he had refused a psychological evaluation on at least three occasions in the preceding months. His records reflect that Psychology Services had been unable to conduct a mental status examination—a critical component of proper psychological assessment—since February 4, 2015. The evaluator proceeded based on Mr. Lamb's BOP records alone, and dismissed Mr. Lamb's August 2014 diagnosis of Persistent Depressive Disorder, noting that "since August 2013 providers have noted no evidence of depressive symptoms, and [Mr. Lamb's] only reported symptoms are 'sleep issues.'" The evaluator then diagnosed Mr. Lamb with Cannabis Use Disorder, Stimulant Related Disorders (Amphetamines), and ASPD. One of the criteria for an ASPD diagnosis is evidence of a conduct disorder before the age of 15, but no such evidence exists in Mr. Lamb's records. Importantly, the BOP considers ASPD to be untreatable, and generally does not provide meaningful treatment to prisoners whose primary, or only, diagnosis

is ASPD. The evaluator downgraded Mr. Lamb's care level to CARE1-MH, meaning that Mr. Lamb requires no significant mental health care and has consistently demonstrated appropriate help-seeking behavior in response to any reemergence of symptoms of mental illness. This determination is plainly unreasonable, especially in light of Mr. Lamb's maintenance on psychotropic medication and his refusal to interact with psychology staff.

364.    Upon information and belief, Mr. Lamb's April 2015 evaluation was ordered not to reconcile a discrepancy between proposed diagnoses, but to minimize Mr. Lamb's mental illness and assign him a diagnosis with a disorder the BOP considers to be non-treatable.

365.    Mr. Lamb has mental illness and may have serious mental illness. The conditions of his confinement at ADX have caused or contributed to a wide range of psychiatric conditions that, unless treated, will lead to further deterioration. Although the BOP has provided him with some mental health services as a result of this lawsuit, his care remains constitutionally deficient, and his condition is, as a result, deteriorating. BOP's continued neglect of Mr. Lamb's mental health needs violates BOP policy and the Eighth Amendment.

**K.    Herbert Isaac Perkins**

366.    Herbert Isaac Perkins, also known as "Pee Wee," is 39 years old. Before his incarceration, he lived in Albuquerque, New Mexico. Mr. Perkins is serving a life sentence for armed robbery. Mr. Perkins has serious mental illness, which has at various times been diagnosed as Major Depression, Anxiety Disorder, and Antisocial Personality Disorder. He also exhibits signs and symptoms of PTSD and may be experiencing the long term effects of serious closed head injuries. During his incarceration at ADX, Mr. Perkins twice attempted suicide. As

detailed below, the BOP has demonstrated deliberate indifference to his mental health needs. A photograph of Mr. Perkins is attached hereto as Exhibit 17.

367.    Mr. Perkins grew up in Albuquerque, New Mexico, in a poor Latino neighborhood known as "the War Zone," so named because of the area's conditions of abject poverty, drug accessibility, and perpetual violence. He was recruited into a gang at the age of nine. His mother abused drugs, and shared cocaine with him repeatedly from the time he was 12 years old.

368.    When Mr. Perkins was 14 or 15 years old, his father committed suicide by shooting himself in the head while on the telephone with Mr. Perkins. As a teenager, Mr. Perkins was frequently in juvenile detention and he did not finish high school. It was during this period that he first was treated for mental illness.

369.    When properly treated, Mr. Perkins' Major Depression is controllable and relatively benign. At the time of his sentencing and for several months thereafter, Mr. Perkins was housed at a federal detention center in Albuquerque, New Mexico. During that period, he had uninterrupted access to proper medication and was largely asymptomatic. On July 17, 2008, however, he was moved to the Federal Transfer Center in Oklahoma City. Unbeknownst to him, he was en route to ADX. While at Oklahoma City his medication was abruptly discontinued. When he asked that it be restored, he was told that the BOP had no record of a prescription for him for psychotropic mediation.

370.    Mr. Perkins arrived at ADX on July 25, 2008. At that time he was enduring the effects of the sudden discontinuation of his medication. He was also going through withdrawal from heroin, to which he was addicted and which he had been able to obtain while in federal

detention during his trial and sentencing proceedings, but not while at ADX. In addition, within a few weeks after his arrival at ADX, his wife left him and cut off communication between Mr. Perkins and his young children.

371.    Shortly after his arrival at ADX Mr. Perkins informed BOP officials that he was experiencing depression and asked to see a psychologist or psychiatrist. He also asked for his medication to be restored. Upon information and belief, an ADX correctional officer also reported his depressed state and sought psychological intervention. BOP officials, however, refused to take action. Mr. Perkins's interactions with the correctional and mental health staff at ADX have not adequately addressed his mental illness.

372.    Upon information and belief, in August 2008, about a month after Mr. Perkins arrived at ADX, an ADX correctional officer noted his extreme depression and sought intervention by a psychologist, but was ignored. A few days later, on August 17, 2008, Mr. Perkins used a razor to slice open a blood vessel in his neck. He was taken to Parkview Hospital in Pueblo, Colorado, where he underwent emergency surgery.

373.    When he returned from the hospital to ADX, Mr. Perkins was weak and disoriented from blood loss and the stress of surgery. Upon his arrival at ADX, a BOP psychologist told him that he was being placed back in the same cell, in which he had just attempted to kill himself. Mr. Perkins responded that he would not be there long, because he was again going to try to kill himself. Rather than placing him on suicide watch or transferring him to a BOP medical center, ADX officials returned Mr. Perkins to the same cell, which was still awash with his own blood from the suicide attempt; the razor he had used to slash his throat was still sitting on his sink. While most of the prisoners on the tier objected loudly that Mr. Perkins

should be sent to MCFP Springfield, ADX staff expressed amusement at Mr. Perkins' first suicide attempt, brought him a pail of plain water to clean up the blood in his cell, and later removed the razor. The following day, Mr. Perkins made good on what he told a BOP psychologist upon his return the previous day from the hospital. Specifically, he smashed the television in his cell, swallowed some of the broken glass, slashed his wrist, and attempted to tear open the earlier wound on his neck. Again, his bodily wounds were dressed, and again, he was returned to his cell.

374.    Belatedly, Mr. Perkins was treated with Zoloft; which ADX personnel later withdrew without explanation. After that, Mr. Perkins received no meaningful mental health care at ADX until late 2011 or early 2012, after he began to communicate with Plaintiffs' counsel. Only then did BOP officials finally prescribed Prozac and Sinequan for Mr. Perkins' depression. However, Mr. Perkins still was not provided with regular access to mental health services. As a result, while his condition improved somewhat due to the belatedly prescribed medication, in 2012 and 2013 he remained chronically depressed and at risk of suicide.

375.    Upon information and belief, following his introduction to Plaintiffs' counsel, Mr. Perkins was subjected to a pattern of harassment and retaliation by BOP officials. Such harassment has included, among other things, the supposed "loss" of his personal belongings including family photographs, frequent loss, delay, or misdirection of legal and personal mail, improper interception and opening of legal mail, and false accusations of misconduct against Mr. Perkins by staff with resulting disciplinary sanctions. Staff also confiscated medical records relating to Mr. Perkins's 2008 suicide attempt, which, upon information and belief, were

confiscated merely because they contain information that will embarrass the BOP when it surfaces in this lawsuit.

376.    ADX staff members also have insinuated to Mr. Perkins that they have taken or will take revenge on him for his involvement in this litigation by, for example, contaminating his food trays, spreading false rumors among other prisoners that he is a "rat," and otherwise compromising his well-being. As a result of these veiled threats and the BOP's prior disregard for his safety, Mr. Perkins has increased anxiety, insomnia, and hyper vigilance.

377.    On January 29, 2013, Mr. Perkins requested an administrative remedy claiming he was experiencing depression and suicidal ideation and that he did not get proper treatment. His request was fully exhausted with the BOP Central Office.

378.    On October 30, 2013, Mr. Perkins was transferred to USP Atlanta from ADX to participate in the Secure Mental Health Step-Down Program, which was developed to treat male prisoner with serious mental illness (now designated as CARE3-MH). Mr. Perkins' access to therapists and certain programming improved somewhat following this transfer, but remained constitutionally deficient. In particular, despite BOP policy promising access to stepped-down security for prisoners who like Mr. Perkins followed the rules and participated in the offered programming, he remained in solitary confinement throughout his time in Atlanta, and was afforded neither the necessary care for his mental illness nor even the care that the BOP itself recommended. He also was placed on "suicide watch" for disciplinary reasons, at a time when he was not suicidal and did not need or request observation. He also for a period was assigned to a cell with no heat.

379.   In February 2014, while Mr. Perkins was incarcerated in Atlanta, the BOP diagnosed him with Borderline Personality Disorder, Conduct Disorder, Antisocial Personality Disorder, and Sedative Use Disorder, Mild. The BOP ignored his history of chronic depression, however, and also failed to recognize that his acknowledged history of exposure to violence, along with his acknowledged symptoms, also easily meet the diagnostic criteria for PTSD.

380.   As a result of the serious programming and other deficiencies at Atlanta, Mr. Perkins began to deteriorate. He lost at least 27 pounds during his time at USP Atlanta, and his depression deepened.

381.   On March 19, 2015, the BOP transferred Mr. Perkins to USP Florence to participate the Secure STAGES Program, which like the Atlanta program was created in direct response to this lawsuit and which was designed for prisoners who have been assigned CARE3-MH. It is unclear, at this time, whether Mr. Perkins will have access to constitutionally adequate treatment in the Secure STAGES Program, which opened in late 2014. However, upon information and belief that program is plagued by serious unresolved problems, as a result of which at least one participant has withdrawn his consent to participate in the program, and which may result in the program's unraveling before its potential is evaluated or realized.

382.   In sum, Mr. Perkins has serious mental illness. The conditions of his confinement at ADX caused or contributed to a wide range of psychiatric symptoms. Although he has been assigned to several other programs since leaving ADX, those programs did not provide constitutionally adequate access to mental health treatment.

**L.**     **John Jay Powers**

383.     John Jay ("Jack") Powers is 53 years old. He grew up in upstate New York and lived in Florida immediately before his incarceration. Mr. Powers is serving a sentence for bank robbery and a prison escape, with a release date of July 16, 2030. Mr. Powers resided in the "General Population" Unit at ADX after being held in the Control Unit for nearly ten years. A photograph of Mr. Powers is attached hereto as Exhibit 18.

384.     Mr. Powers has serious mental illness, including severe Complex PTSD and a Personality Disorder with Narcissistic, Borderline, and Antisocial Features. While in the custody of the BOP, Mr. Powers has engaged in severe self-mutilation over the past ten years, amputating his own fingers, testicle, scrotum, and earlobes, cutting his Achilles tendon, and trying to kill himself on several occasions. He has not been provided with proper medication or treatment for his serious mental illnesses despite the obvious physical harm Mr. Powers has inflicted upon himself. As detailed below, the BOP has demonstrated deliberate indifference to his mental health needs.

385.     Mr. Powers entered the custody of the BOP in 1990. At that time, he had never exhibited, nor been treated for serious mental illness.

386.     On July 21, 1994, Mr. Powers witnessed the murder of Eddie Wong, another prisoner at USP Atlanta. Three prisoners, whom Mr. Powers believed were members of a prison gang known as the Aryan Brotherhood, stabbed the victim thirteen times. After the attackers left the victim's cell, Mr. Powers sought to assist him, carrying him down a flight of stairs to the ground floor of the prison. The victim was taken to the hospital but died as the result of his injuries. Following this murder, Mr. Powers was moved to USP Atlanta's segregation unit

because, as a witness to the attack, prison officials determined that his safety was compromised. While in segregation, Mr. Powers was threatened by a prisoner he believed to be a senior Aryan Brotherhood member.

387. Mr. Powers subsequently agreed to testify against the three men who had been charged with killing Mr. Wong. He testified twice (the first trial resulted in a hung jury), and the prisoners were convicted. Mr. Powers was transferred to FCI Allenwood, where he was threatened periodically by members of the Aryan Brotherhood as a result of his testimony. Because of the threats, Mr. Powers was placed in protective custody to segregate him from those threatening to kill him. At around the same time, he began to experience symptoms of PTSD, a severe anxiety disorder that can develop after exposure to an event that results in psychological trauma. Mr. Power's initial symptoms included insomnia and anxiety attacks.

388. In 1997, a BOP psychologist determined that Mr. Powers had PTSD. Thereafter, in January 1999, Mr. Powers was transferred to a medium security prison, where he remained in protective custody. Shortly after his transfer to that facility, Mr. Powers learned that the BOP planned to move him from segregated housing to a general population unit where he was more likely to encounter prisoners who would seek to harm him as a result of his 1995 testimony. He also learned that the U.S. Attorney's Office would not seek to obtain the sentence reduction as promised in exchange for his testimony. In May 1999, fearful for his own life and safety and suffering increasingly from PTSD, Mr. Powers escaped. After two days he was apprehended and returned to prison. In June 2001, Mr. Powers was tried and convicted of escaping and sentenced to additional imprisonment.

389.    In October 2001, Mr. Powers was transferred to ADX and placed in the Control

Unit, where he had been ordered to serve a 60-month term as a result of the escape. Upon

entering the ADX Control Unit, Mr. Powers was immediately threatened by individuals he

believes to be members of the Aryan Brotherhood, many of whom are housed at ADX. Those

threats, and the continuing effects of his untreated PTSD, caused Mr. Powers to slowly descend

into madness and horrific self-harm.

390.    In July 2002, seven months after arriving at ADX, Mr. Powers rammed his head

into the metal door jamb of his cell. Two weeks later, he was transferred to MCFP Springfield

for a psychiatric evaluation. BOP records relating to that transfer confirm the belief by clinicians

at ADX that while at ADX Mr. Powers "has experienced a great deal of verbal abuse and threats

from prisoners in adjacent cells due to their belief that he is an informant." Mr. Powers spent a

month at MCFP Springfield, during which time his PTSD diagnosis was reaffirmed, and he was

treated with medication. However, upon his return to the ADX Control Unit in August 2002, his

medication was suddenly discontinued. Almost immediately, his self-harm and mutilation began,

resulting in disciplinary incident reports for self-mutilation in October 2002, October 2004, and

February 2005.

391.    On October 13, 2005, he was again transferred to MCFP Springfield after

severely lacerating his scrotum with a piece of sharp plastic. His PTSD diagnosis was again

confirmed by BOP doctors, and he was again stabilized with medication. But in December 2005

the BOP again returned him to the ADX Control Unit and again abruptly discontinued his

medication.

392.     In April 2006, following a meeting with a BOP psychologist, Mr. Powers returned to his cell to discover that his possessions had been moved to a new cell located on a different range. The new range housed Aryan Brotherhood members, who immediately began to threaten Mr. Powers. Mr. Powers broke the glass on his television set, which he used to cut himself. Defendant's "response team" intervened and placed Mr. Powers in leg irons, handcuffs and a belly chain, which he wore in his cell for several days.

393.     On July 18, 2006, Mr. Powers amputated his testicle.

394.     In or around 2006, Mr. Powers attempted to commit suicide by ingesting a large quantity of aspirin.

395.     On September 6, 2007, Mr. Powers bit off his finger.

396.     On April 1, 2008, Mr. Powers inserted a staple into his forehead.

397.     In December 2008 he amputated one of his fingers, tore out the stitches used to close the wound, and then swallowed a toothbrush.

398.     On February 2, 2009, Mr. Powers cut a triangular flap of skin out of his face and inserted several staples into it.

399.     On July 6, 2009, Mr. Powers cut his wrist, bled all over his cell, and was found unconscious and unresponsive by ADX staff members. Several weeks after the suicide attempt, in July 2009, the BOP again transferred Mr. Powers to MCFP Springfield. This time, however, he was not medicated. Rather, despite the BOP's own multiple prior diagnoses of serious mental illness and the manifest physical evidence of profound mental illness reflected in Mr. Power's disfigured body, a BOP psychologist determined:

"Inmate is not in need of custody for care or treatment. He does not have an active mental disorder. He does not require any further evaluation in an inpatient psychiatric facility.

Considerations that he has some form of psychosis, thought disorder, or mental illness are unfounded."

400.     Accordingly, in August 2009 Mr. Powers was again returned to ADX and again placed in the Control Unit with no mental health treatment.

401.     Four months later, on December 3, 2009, Mr. Powers bit off his pinkie.

402.     In 2009 and 2010 Mr. Powers covered most of his body with tattoos that he calls "Avatar Stripes," which are visible in the photograph attached as Exhibit 18. He created his tattoos by slicing thousands of tiny slits into his skin with a razor blade and rubbing carbon paper dust into the slits.

403.     On December 20, 2010, Mr. Powers amputated his scrotum and attempted to suture the wound himself.

404.     In March 2011, Mr. Powers completed his term in the Control Unit. Although his original 60-month Control Unit term would have expired in 2006 had he earned credit for each month he served there, because of his serious mental illness he was unable to comply with the strict requirements governing earning credit for time served in the Control Unit. In many instances, he was denied credit for time served because he had mutilated himself. Thus, the ravages of his untreated serious mental illness both caused his permanent disfigurement and extended his term in the Control Unit, where he was housed among and tormented by members of the gang he testified against, pursuant to the directive of the same DOJ for which he provided that testimony.

405.     Following his transfer from the Control Unit into the ADX general population, Mr. Powers continued to receive no meaningful mental health care and continued to endure the grotesque symptoms of his mental illness.

406.     On January 12, 2012, Mr. Powers sliced off his earlobes, using pencils as tourniquets.

407.     On March 21, 2012, Mr. Powers sawed through his Achilles tendon with a sharp piece of metal, nearly severing it. The injury was surgically repaired and covered with a hard cast. Mr. Powers soon removed the cast and began supporting the injured ankle with a splint he made from a sock.

408.     In May 2012, after Mr. Powers had again mutilated his genitals, and only a few weeks after the BOP became aware that he was being evaluated by a psychiatrist retained by his counsel, the BOP began treating him with the powerful antipsychotic medication Haldol. However, he still has no access to psychological counseling or other mental health care, and still remains at ADX, rarely leaving his cell, thinking of suicide daily, and often slashing or cutting himself.

409.     In early 2013, Mr. Powers further mutilated his face.

410.     As of May 2013 Mr. Powers was being held at MCFP Springfield for evaluation. He remained there until October or November, 2013, when the BOP transferred him to USP Tucson. This transfer appears to have been well intentioned, and many BOP staff members attempted to help Mr. Powers following his arrival. However, the BOP underestimated the ravages of Mr. Powers' mental illness and decade in solitary confinement, with quite unfortunate consequences.

411.     Upon his arrival at USP Tucson, Mr. Powers was assigned, with no transition, to an open housing unit, where prisoners are given significant freedom of movement during the

day. Having spent 15 years in solitary confinement, he found it very difficult to be around other prisoners, and spent most of his time alone in his cell.

412.    In December 2013 he had a verbal disagreement with a staff member. A number of other staff members immediately surrounded him, which caused a fight or flight reaction that resulted in his striking a staff member with his hand. He was subdued and placed back in solitary confinement, where his mental health rapidly disintegrated.

413.    Around the same time, his prescription for psychotropic medication was abruptly discontinued. The medication he was taking, Neurontin, is an anti-seizure medication that should never be discontinued abruptly, because of a risk of serious complications including the inducement of seizures. BOP personnel did not heed that risk, and thus exposed Mr. Powers to a serious risk of harm.

414.    After a few months more of solitary confinement, Mr. Powers again began to injure himself. In the spring of 2014, he drilled a hole in his scalp with a hollowed out battery, exposing his brain. He was evacuated back to MCFP Springfield on an emergency airlift, and stabilized, although he refused restorative surgery. In the following months, he inserted shards of metal into the hole in his skull, such that they became lodged in his brain.

415.    He remained at MCFP Springfield until early 2015, when he was transferred to the newly created Secure STAGES program at USP Florence, although in May 2015 he withdrew his consent to continued treatment in the program due to problems with the delivery of mental health care there.

416.    Mr. Powers was making some progress in the Secure STAGES program. That abruptly ended in the early morning hours of June 5, 2015, when representatives of the United

States Marshals Service removed him from USP Florence and transported him to a private prison in Florence, Arizona that is operated by Corrections Corporation of America ("CCA"). Mr. Powers was then placed in a holding cell in which he believed he was not safe. Mr. Powers asked a staff member to place him in another cell. When the staff member refused, Mr. Powers panicked and was able to escape from the holding cell. He was subdued with chemical munitions, and placed in another cell. CCA staff members then discontinued his psychotropic medication, including gabapentin, an anticonvulsive agent prescribed for his severe neuropathic pain and for his PTSD. Gabapentin should never be discontinued abruptly because of a well-known risk of inducing seizures. Mr. Powers is aware of that risk because of previous episodes in which BOP personnel have abruptly discontinued the medication. Given this history, the discontinuation of Mr. Powers' gabapentin, combined with the trauma of being placed in a cell with prisoners whom he reasonably believed posed a serious risk to his safety, put Mr. Powers into a state of severe psychological distress. As a result, when left alone in a cell Mr. Powers secured several pieces of metal and pushed one deep into his brain (through the hole in his skull referred to above) and at least two others into his abdomen. His condition was unknown at the time this pleading was filed.

417.    The DOJ, of which both the BOP and the Marshals Service are a part, exhibited nearly total disregard of Mr. Powers' serious medical needs by removing him without warning from a residential mental health treatment program, allowing his placement in a holding cell in which he did not believe himself to be safe, failing to inform its agents at CCA of Mr. Powers' tortured history and care needs, and failing to ensure his continued access to necessary psychotropic medication.

418.    The BOP has made some efforts to treat Mr. Powers' profound mental illness. However, those efforts do not meet constitutional standards, particularly when coupled with the BOP's continued insistence on housing Mr. Powers in near-total isolation, which exacerbates his symptoms and interferes with meaningful treatment.

**M.    Arnell Shelton**

419.    Arnell Shelton is 33 years old. He has been housed at ADX since August 2006. Before his incarceration, he was a resident of Washington, D.C. His current BOP release date is September 6, 2018. A photograph of Mr. Shelton is attached hereto as Exhibit 19.

420.    Mr. Shelton has mental illness and may have serious mental illness. As detailed below, the BOP has demonstrated deliberate indifference to his mental health needs. At various times, Mr. Shelton has been diagnosed with various mental disorders, including Histrionic and Antisocial Personality Disorders, Exhibitionism, Adjustment Disorder, and Major Depressive Disorder. He has engaged in self-injury and has a history of suicide attempts preceding his ADX placement.

421.    At the age of five or six, Mr. Shelton sustained a closed head injury when he was hit by a car. He lost consciousness as a result and was hospitalized for three days.

422.    Mr. Shelton has a family history of alcoholism and drug abuse in several relatives, including an uncle who was hospitalized for a psychiatric disorder. Beginning at age eight, Mr. Shelton started using alcohol and marijuana. He subsequently dropped out of the seventh grade and supported himself by selling crack cocaine. Mr. Shelton was first evaluated for mental health issues as a juvenile when he was detained in a juvenile detention center.

423.     At the age of 17, his then 22-year-old girlfriend became pregnant. After his daughter was born, he worked as an electrical assistant to support his family. His spouse and daughter reside in Maryland. The last visit he had with his daughter was in 2004.

424.     In January 2001, Mr. Shelton was tried in Washington, D.C. for charges related to a drive-by shooting. While in pre-trial detention, he attempted to hang himself. His first trial resulted in a hung jury, but after a second trial, Mr. Shelton was convicted on all counts: assault with intent to kill while armed, aggravated assault while armed, two counts of possession of a firearm during a crime of violence, carrying a pistol without a license, and malicious destruction of property.

425.     Mr. Shelton began his sentence at FCI Cumberland in 2001, and was then transferred to USP Beaumont.

426.     In March 2005, while incarcerated at USP Beaumont, Mr. Shelton threw urine and feces on a correctional officer. He pled guilty to charges of forcibly assaulting and/or impeding a correctional officer in the performance of his duties. He was sentenced to 36 months and transferred to USP Marion, where he was confined with a number of prisoners with a history of severe mental illness.

427.     In August 2006, the BOP repurposed USP Marion and transferred approximately 70 prisoners, including Mr. Shelton, to ADX. Many of the transferred prisoners had a mental illness, in violation of the BOP's written policy prohibiting housing of prisoners with mental illness at ADX. Like many other prisoners with mental illness, Mr. Shelton's multiple interactions with the mental health staff at ADX have not addressed his mental illness effectively.

428.    In May 2009, Mr. Shelton reported increased irritability, depressive symptoms, anhedonia, and irregular sleep. The following month, he was diagnosed with Depressive Disorder NOS and prescribed Prozac. Due to side effects, this medication was subsequently changed to Zoloft.

429.    In July 2009, Mr. Shelton was placed on suicide watch after ingesting 35 tablets of Zoloft. While on suicide watch, Mr. Shelton told staff that "there will be no reason for going on living" unless he were transferred to a facility closer to his spouse and young daughter.

430.    In August 2009, Mr. Shelton filed a Motion for Writ of Mandamus, alleging a Fifth Amendment Due Process violation and a violation of the Eighth Amendment's prohibition against cruel and unusual punishment for being housed at ADX while he experienced severe depression. Mr. Shelton's motion was dismissed without prejudice for failure to cure pleading deficiencies and failure to prosecute.

431.    In a September 2009 court filing, Mr. Shelton complained of severe depression, for which he was being medicated. He claimed that he had attempted suicide on multiple occasions, both before and after arriving at ADX, and that he had received prescriptions for antidepressants while at ADX, but was often reluctant to ask for medication because he was afraid of later overdosing deliberately.

432.    In April 2010, Mr. Shelton, who had attempted to kill himself a few months earlier, was placed in the SHU after exposing himself and throwing milk at a corrections officer. Officers assigned Mr. Shelton to a cell that had just been vacated by another prisoner notorious for having chronic mental illness who had smeared feces on the floors, walls, bed, and mattress of the cell. Mr. Shelton was given no cleaning supplies, and was not issued a blanket, towel, or

sheet. He used the roll of toilet paper in the cell to try to wipe the feces off of a spot on the bare concrete floor that was large enough for him to lie down. He remained lying on that single "clean" space for two days. He then covered the Plexiglas wall in his cell with newspapers to block the view from the hallway and prepared to hang himself with his shoelaces. Before he succeeded in doing so, an "emergency response team," assembled, forcibly entered the cell, restrained him, and moved him to another cell. There, he was placed in four point restraints for 24 hours, during which time he was unable to reach the food left for him on the desk.

433.    Mr. Shelton was placed on suicide watch on May 5 and May 11, 2010, after letters to his family and others revealing plans for suicide were intercepted. Following the first suicide watch, Mr. Shelton's public defender filed an Emergency Motion for a Reduction of Sentence based on Mr. Shelton's mental state. After Mr. Shelton's sentencing judge contacted the BOP and learned that Mr. Shelton's working diagnoses at ADX were Exhibitionism and Antisocial Personality Disorder, the motion was denied. At the time of his second suicide watch, various mental health professionals described him as expressing hopelessness, being irritable and despondent with a flat affect and reiterating his intent to die. However, Mr. Shelton was not transferred to a medical center because, according to Dr. Zohn, "he has no evidence of a psychotic disorder to major mood disorder." His suicide watch was continued.

434.    On May 16, 2011, Mr. Shelton asked to speak with a psychologist because despite one year of good conduct, he was denied the opportunity to transfer to the step-down unit because of "poor rapport" with the staff.

435.    In November 2012, a week after his father passed away, Mr. Shelton swallowed a razor and hoped it would "cut him on the way down his throat." As a result, Mr. Shelton was

placed in the SHU and then in a dry cell. During that period, he began a hunger strike and refused to take his prescribed antidepressant.

436.     Mr. Shelton remained despondent over the fact that he had not been allowed to transfer to the step-down unit. In early 2013, the BOP diagnosed Mr. Shelton with Depressive Disorder NOS with "lower moods and increased disillusionment." In February 2013, Mr. Shelton remained "frustrated, angry and stressed" leading to a suicide risk assessment. He was also characterized as having "mild paranoia."

437.     In April 2013, Mr. Shelton continued to exhibit suicidal behavior and initiated another hunger strike. His documented diagnosis was Depressive Disorder NOS and Personality Disorder NOS with antisocial features. In May 2013, after he ingested several tubes of toothpaste, he was placed in the SHU with property restrictions, where he complained of difficulty sleeping due to the odor of urine around him.

438.     At the end of June 2013, he was provided with Dialectical Behavior Therapy material that he worked on and he agreed to participate in group therapy, but withdrew a few months later.

439.     On April 4, 2014, Mr. Shelton ingested an undetermined number of pills and was found unresponsive. When he was evaluated in the emergency room, it was discovered that he had ingested up to 100 tablets of Zoloft. Mr. Shelton received an incident report for this suicide attempt. On the same day, BOP records documented that he was diagnosed with Major Depression, Chronic, a serious mental illness that under BOP policy precludes housing him at ADX.

440.    On May 19, 2014, Mr. Shelton swallowed a razor and was placed on suicide watch in a dry cell. When staff refused to give him a vessel in which to relieve himself, he urinated on the floor. Some of the urine ran under the door, which staff members attempted to block with a jumpsuit. Mr. Shelton pulled the jumpsuit into his cell and fashioned a noose. The BOP responded by forcibly subduing Mr. Shelton.

441.    On May 20, 2014, Mr. Shelton complained of hearing voices and wanted to cut holes in his veins. He was assessed the next morning and disclosed that being alone with his thoughts, and a fear of failing his family, along with the conditions at ADX, were factors contributing to his suicidality.

442.    In July 2014, Mr. Shelton was mostly confined in the SHU. As part of his CARE2-MH status, he was evaluated on July 9, 2014. He appeared with an "agitated mood and restricted affect," and was reported to have poor insight and judgment but no suicidal ideation. That same day, he was evaluated for threatening to kill himself. Mr. Shelton again reported suicidal ideation later that month. He was diagnosed with Adjustment Disorder and Antisocial and Histrionic Personality Disorders

443.    In August 2014, Mr. Shelton was among more than 130 ADX prisoners selected, based on indicia of mental illness, for evaluation by the BOP. Mr. Shelton was diagnosed with Antisocial Personality Disorder and assigned care level CARE2-MH. At that time, BOP determined that Mr. Shelton requires outpatient care for mental health concerns. BOP also suggested that Mr. Shelton would benefit from a behaviorally-focused program, which is designed for personality dysfunction rising to the level of serious mental illness.

444.     In October 2014, Mr. Shelton went on an extended hunger strike, missing a total of 35 meals. He was placed on suicide watch at least twice that month. In January 2015, Mr. Shelton went on another hunger strike and missed a total of 16 meals. Prison staff initiated a calculated use of force and exposed him to a chemical munition before he surrendered to restraints.

445.     Mr. Shelton was seen in Health Services on February 6, 2015, and was described to have an erratic mood with moderate anxiety. He reported weight loss, appeared agitated and distressed, paranoid, guarded, and suspicious. He repeatedly requested to be transferred out of ADX. A psychiatric evaluation that month again diagnosed him with an Adjustment Disorder and Histrionic Personality Disorder.

446.     In sum, Mr. Shelton has mental illness and may have serious mental illness. The conditions of his confinement at ADX have caused or contributed to a wide range of psychiatric conditions that, unless treated, will lead to further deterioration, and may lead to suicide. Mr. Shelton continues to receive constitutionally inadequate mental health treatment. BOP's continued neglect of Mr. Shelton's mental health needs violates BOP policy and the Eighth Amendment.

## N.     Marcellus Washington

447.     Marcellus Washington is 43 years old. He spent most of his youth in New Jersey. He is serving a life sentence at ADX and is currently housed in the Control Unit. Mr. Washington has a serious mental illness, including a severe Mood Disorder and a Mixed Personality Disorder with Borderline and Antisocial Features. He also exhibits signs and symptoms of PTSD and is mentally disabled and functionally illiterate. As detailed below, BOP

has demonstrated deliberate indifference to his mental health needs. A photograph of Mr. Washington is attached as Exhibit 20.

448.    Since childhood, Mr. Washington has been treated on multiple occasions for mental illness. During the late 1970s and/or early 1980s, Mr. Washington was treated with Thorazine and Mellaril, two powerful antipsychotic medications. Early psychiatric and psychological evaluations showed that Mr. Washington had mood swings which stemmed, at least in part, from mental disability and massive parental deprivation. Mr. Washington was placed in his first group home when he was seven years old, because his mother, who had severe mental illness, could not care for him. He subsequently lived in, and ran away from, various foster homes, group homes, and residential facilities. In 1982, when he was ten, Mr. Washington was returned briefly to the care of his mother, who soon abandoned him with his siblings on a New York City park bench. Between 1977 and 1985, various child study teams affiliated with the New Jersey Board of Education and its school districts found deficiencies in Mr. Washington's emotional, social, and academic functioning. Specifically, these teams found that Mr. Washington has a neurological impairment, suffered the effects of environmental deprivation, and exhibited mood swings that ranged from a manic hyperactivity to a depressed lethargic mood. Prior to the age of 13, Mr. Washington spent time at the Jersey City Medical Center Community Mental Health Clinic and the Arthur Brisbane Child Treatment Clinic, a public psychiatric hospital for children.

449.    In 1996, during his trial for armed robbery and carjacking, Mr. Washington was housed in the Office of Interstate Services in New Jersey and was treated with high dosages of the antidepressant Sinequan. Upon his conviction, Mr. Washington was transferred to USP

Lompoc and, in October 2001, to USP Pollock. Based on his intake processing at USP Pollock, the BOP recognized that Mr. Washington experienced symptoms of depression and had suicidal tendencies. In 2001 and 2002, Mr. Washington received psychotherapy sessions for his depression.

450.    On April 8, 2002, Mr. Washington visited the psychology unit at USP Pollock and requested care urgently. He met with Dr. Gallagher, a BOP staff psychologist, and requested treatment for mental illness based primarily on his stress levels and his contemplation of suicide. Mr. Washington showed Dr. Gallagher five or six superficial cuts around his wrist and informed Dr. Gallagher that he did not think he was capable of killing himself, but he was considering provoking someone else to kill him. Dr. Gallagher did not conduct a full suicide assessment or psychological workup, but merely scheduled an appointment with Mr. Washington for the following week. Dr. Gallagher also failed to place Mr. Washington on suicide watch or refer him for a more complete psychiatric evaluation. Two days later, Mr. Washington assaulted a BOP administrator.

451.    In November 2002, in connection with his trial for the assault, Mr. Washington was evaluated by Drs. Kevin J. McBride and Anthony A. Jimenez at FMC Butner. This evaluation concluded that Mr. Washington had severe Antisocial Personality Disorder, has a mental disability, and has moderate congenital brain impairment. The report noted that Mr. Washington's prior records reveal that he has trouble adapting to the prison environment, is functionally illiterate, exhibits emotional, social, and academic deficits, and had been treated with various antipsychotic medications and antidepressants prior to his incarceration with the BOP. A second evaluation was conducted in June 2003 by Dr. Thomas Fain at USP Pollock,

during which Dr. Fain conducted various mental assessments of Mr. Washington. In the spelling

and reading subscales of the Wide Range Achievement Test-3, Mr. Washington performed in the

0.02 percentile. The Wechsler Adult Intelligence Scale-III indicated that Mr. Washington was

mentally disabled, and various other tests indicated the presence of a congenital brain

impairment.

452.    Since at least 2002, Mr. Washington has been observed engaging in self-harm,

often by cutting himself. Prior to his transfer to ADX, Mr. Washington attempted to commit

suicide by trying to hang himself in the USP Pollock SHU. The BOP staff took him to an

observation cell, where he was visited by Dr. Gallagher. Upon obtaining a promise from

Mr. Washington that he would not attempt to kill himself, Dr. Gallagher had Mr. Washington

returned to the SHU without further treatment. Following his transfer to ADX, an ADX

employee reported observing that Mr. Washington twice cut his wrist with a razor blade. The

Operations Lieutenant was notified of Mr. Washington's behavior, and Mr. Washington was

punished for his suicide attempt with a seven day loss of his television and radio privileges. He

did not receive any treatment for mental illness.

453.    In November 2011, Mr. Washington filed a Request for an Administrative

Remedy, complaining that the BOP ignored evidence of his mental illness, his history of

depression, and his suicidal tendencies when it referred him for placement in the Control Unit.

He also complained that he has never received adequate treatment for these conditions. His

request was denied, as were his appeals from that denial.

454.    In August 2014 Mr. Washington was evaluated by a psychiatrist and psychologist

selected by the BOP. They assigned him a care level CARE2-MH, a diagnosis of Antisocial

Personality Disorder, and suggested further analysis to confirm or rule out a diagnosis of

Borderline Intellectual Functioning. They also noted that Mr. Washington "needs [an]

individualized plan to address the above noted concerns." The BOP thus acknowledges that Mr.

Washington has mental illness that requires care. Yet as of May 2015 he continues to be denied

meaningful access to even basic mental health services in violation of BOP policies and the

Eighth Amendment.

## VIII.   ALLEGATIONS RELATING SPECIFICALLY TO THE INTERESTED INDIVIDUAL

455.   At relevant times, Interested Individual David Shelby was incarcerated at ADX.

He has a serious mental illness. ADX's failure to implement adequate programs of mental health

screening and treatment has violated his constitutional rights, exacerbated his serious mental

illnesses, and subjected him to harm and injury.

456.   Mr. Shelby requested, in various ways, mental health care at ADX. Because of his

impairment, however, it is not clear whether he was able to complete every action necessary to

exhaust administrative remedies to the extent required by the PLRA.

457.   Counsel's inability to ascertain the Interested Individual's exhaustion status stems

from several factors. First, Mr. Shelby has mental illness, and that illness impairs his ability to

recall and report every effort he may have made to exhaust administrative remedies.

458.   Second, the BOP's mismanagement of the care and custody of prisoners at ADX

with serious mental illness is exacerbated by the absence of any effective mechanism for those

prisoners to address concerns or complaints they have about inadequate medical treatment or

staff misconduct towards prisoners with mental illness and others. Although the BOP ostensibly

maintains an "administrative remedy" process that allows prisoners to complain about various

issues, the administrative remedy process is itself a kangaroo court that throws bureaucratic roadblocks at prisoners' feet and that is wholly inadequate as a means of addressing serious concerns, including complaints about constitutionally inadequate mental health care services at ADX.

459.   Upon information and belief, and by way of illustration only, ADX staff members deny prisoners access to forms that the BOP requires prisoners to use to submit complaints, "lose" administrative remedy paperwork or delay its submission so that prisoner appeals are deemed "untimely," fail to adequately investigate prisoner complaints, and fail to remedy obvious problems brought to the BOP's attention by means of those prisoner complaints that do evade the impediments imposed by the BOP itself.

460.   In addition, prisoners have no effective access to a "watchdog" to investigate and address misconduct by correctional staff. Specifically, at the time this action was filed all corrections functions at ADX were the responsibility of Captain Russell Krist, a veteran BOP correctional officer. Like most other BOP facilities, ADX also employs a Special Investigative Agent ("SIA") whose responsibilities include investigating allegations of misconduct by ADX staff. Accordingly, at least in theory, the SIA's presence at ADX gives prisoners on-site access to a BOP official with the power to investigate and initiate remedies for staff mistreatment of prisoners, including those with mental illness. As of the time this action was filed, that theoretical access was, for ADX prisoners, a cruel hoax.

461.   Specifically, the BOP destroyed any semblance of an effective watchdog function at ADX by assigning the SIA role to Dianna Krist, who is the wife of Captain Russell Krist.

Thus, at ADX, the watchdog was married to the person whose staff the watchdog is responsible for investigating.

462.    The BOP's own written policy specifically prohibits its employees from involvement in "situations where their official actions affect or appear to affect their private interests, financial or non-financial." BOP Program Statement OCG 3420.09 § 20. The same policy prohibits BOP employees from "taking official action on matters that affect the financial interests of the employee [or] a spouse." BOP's employment of Mrs. Krist as ADX's SIA violated the letter and spirit of Program Statement OCG 3420-09 and fatally compromised the ADX process for resolving the staff misconduct alleged in this lawsuit.

463.    In December 2012, approximately seven months after this lawsuit was filed, Capt. Krist and Mrs. Krist were both removed from their positions at ADX. Upon information and belief, their removal resulted from the exposure of the conflict of interest identified in the Complaint. Although the Krists have both been replaced, intervening events make clear that their removal has not restored any effective watchdog function to the ADX. And, more importantly, the corrupt legacy of their tenure has significantly impaired the ability of Class Plaintiffs and other ADX prisoners to utilize the SIA's watchdog process to remedy staff misconduct.

464.    Particularly when considered in combination with the wholly ineffective administrative remedy process described above, the ineffective SIA function at ADX contributes substantially to an atmosphere in which ADX staff can and do abuse and neglect ADX prisoners with mental illness, including the Interested Individual, without any effective oversight or prisoner recourse.

465.    As detailed above, for years ADX prisoners have been begging for adequate mental health treatment, through administrative filings and lawsuits, among other means. That the ADX mental health system remains in shambles is plain evidence that no real remedy is available through further administrative filings.

466.    A third reason that Plaintiffs' counsel has been unable to ascertain the exhaustion status of Mr. Shelby is that despite counsel's best efforts to assist him to exhaust available remedies, the conduct of certain ADX staff members has made it virtually if not actually impossible for him to complete the process. For example, Mr. Shelby was talked into signing some sort of agreement (he is not sure what it was) that allegedly resolves his administrative remedy request. It remains unclear what he signed or who talked him into signing it, but the circumstances strongly suggest the imposition of undue influence on a profoundly damaged person, and in any event Mr. Shelby apparently has not yet completed the administrative remedy process.

467.    Whether or not he fully exhausted available remedies, Mr. Shelby will remain involved in this case in some capacity, either as a Plaintiff or as a witness.

468.    David Shane Shelby is 50 years old. His current BOP release date is January 5, 2022. Immediately before his incarceration he lived in Utah. Mr. Shelby has a serious mental illness, Bipolar Disorder. A photograph of Mr. Shelby is attached hereto as Exhibit 21. As detailed below, the BOP has demonstrated deliberate indifference to his mental health needs.

469.    Mr. Shelby was housed at ADX from October 2000 until early 2014. He currently is serving a 24-year sentence for a 1996 conviction for making threats against the President, in

addition to other felonies, and a consecutive 80-month sentence resulting from his 1997 attempted "suicide by officer."

470.    Mr. Shelby was raised in a family wracked by extreme poverty and mental illness. He was raised by his mother, who had a serious mental illness. When Mr. Shelby was 16 years old, he attempted suicide through an overdose of sleeping pills and whiskey.

471.    In 1989, Mr. Shelby was sentenced to imprisonment at the Westville Correctional Center in Indiana. During his incarceration, Mr. Shelby attempted to burn another prisoner with a torch constructed from a mop stick. Mr. Shelby claimed that God had directed him to make the torch and burn the other prisoner.

472.    As a result of the incident, a mental status examination was performed in September 1989, during which Mr. Shelby stated that "he did not exactly hear voices; but more like -- heard feelings." The mental health examiner concluded that Mr. Shelby may have experienced an acute psychotic episode -- Schizophreniform Disorder in remission.

473.    Mr. Shelby was released on parole in 1992. In December 1994, Mr. Shelby mailed threatening letters to the President of the United States as part of a plan by Mr. Shelby to secure the release of Charles Manson from prison. A few weeks later, in January 1995, he was arrested in Ogden, Utah, while attempting to mail several packages. One of the packages was addressed to the President of the United States and contained a modified light bulb that had been filled with smokeless gunpowder, a pocket knife, and a note reading, "I think you are doing a good job and I am sending you the pocket knife as a gift and a light bulb so that you won't strain your eyes." A second package, addressed to Charles Manson, contained a revolver with a fork affixed to its end to be used as a bayonet, a straight razor, and two explosive devices.

474.    Mr. Shelby was charged with making threats against the President of the United States, illegal possession of firearms/destructive devices, and possession of a firearm. In a mental health evaluation conducted while at the Salt Lake County Jail, Mr. Shelby described how "voices" had instructed him to "Help Charlie [Manson]" and that "if Charlie was President, he could set me free."

475.    In connection with his prosecution and court-ordered mental health evaluation, Mr. Shelby was sent to MCFP Springfield, where he underwent a psychiatric evaluation for a period of approximately three months. While at MCFP Springfield, Mr. Shelby attempted to commit suicide by ingesting a mouthful of Lysol and later by ingesting a mouthful of Bon Ami cleanser. He stated that he attempted suicide because he "began to be concerned he might actually be mentally ill" and also reportedly stated that he "did not want to die, but if God wants me to do it, it's like a commandment." According to the subsequent forensic report, Mr. Shelby was treated with an antipsychotic medication and was diagnosed with alcohol abuse and Schizotypal Personality Disorder that is "not regarded as a mental disease or defect by most authorities."

476.    After Mr. Shelby returned to Salt Lake County Jail in August 1995, he voluntarily surrendered a knife constructed of wire and wrapped with a leather shoelace and reported to jail personnel that he had impulses to murder another prisoner. He reportedly told a mental health worker that "they tell me I'm not crazy . . . then the voice of God I hear, telling me to kill all the baby rapers, must be real. God told me to kill Ryan because he is the lowest of them all."

477.    In January 1996, Mr. Shelby was ordered to undergo a second mental health evaluation. The second evaluation concurred with the prior diagnosis of Schizotypal Personality

Disorder, noting that much of Mr. Shelby's psychotic illness "appears to be controlled with the medication."

478.    Mr. Shelby pled guilty to charges relating to his January 1995 arrest, and was sentenced to 288 months in the custody of the BOP. At his sentencing hearing, Mr. Shelby reportedly stated, "For quite some time in my life, I have been listening to voices in my head that I thought came from God . . . . The terrible crimes I have committed were because I believed they were commandments of God."

479.    Mr. Shelby spent approximately one year of his sentence as a prisoner at USP Florence. In June 1996, Mr. Shelby requested discontinuation of his medication, which at the time included the antipsychotic Navane and Cogentin, which helps reduce certain side effects of Navane. After his medication was discontinued, Mr. Shelby was given no other psychiatric or mental health treatment.

480.    In early 1997, Mr. Shelby was transferred to USP Atlanta. A few months after his arrival, Mr. Shelby took a staff member hostage in the institution's kitchen with a homemade knife, in an effort to provoke the prison staff to kill him -- a scenario known as "suicide by officer." Mr. Shelby was not killed in the incident, but rather was subdued and charged with assault of a U.S. penitentiary employee with a dangerous weapon. In a statement about the incident, Mr. Shelby reported:

> On July 23, 1997, while I was a prisoner at the United States Penitentiary in Atlanta, I held Ms. Ross, a prison staff person, hostage with a knife. It was never my intention to harm anyone. This was a suicide attempt. I did this in hopes that the staff would shoot me. I have problems with depression and I was not receiving the proper medication at the time of this incident.

481.    In May 1998, during his prosecution for assault of a U.S. penitentiary employee, the Court ordered a psychiatric evaluation of Mr. Shelby at USP Talladega. Upon information and belief, at the time of his evaluation, Mr. Shelby continued to have severe, chronic and untreated Bipolar Disorder. In the BOP evaluation, Mr. Shelby was diagnosed with Major Depressive Disorder, currently in remission; Alcohol Dependence in sustained, full remission in controlled environment; history of hallucinogen abuse; Personality Disorder NOS (schizotypal and antisocial traits); and history of head injury. Mr. Shelby was found competent to stand trial.

482.    Mr. Shelby also later again was evaluated at MCFP Springfield. At MCFP Springfield, Mr. Shelby was diagnosed with Major Depression, in full remission; Alcohol Dependence; Personality Disorder NOS (schizotypal and antisocial traits); and post mild closed head injury. Thereafter, Mr. Shelby pled guilty to charges stemming from his attempted "suicide by officer" and was sentenced to 80 months of confinement in BOP custody, to run consecutive to his original federal sentence. As part of the sentence, the court recommended that Mr. Shelby participate in a mental health treatment program during his incarceration.

483.    Mr. Shelby was transferred to ADX in 2000 and placed in the ADX general population. During his time at ADX, Mr. Shelby experienced continuing symptoms of Bipolar Disorder, as a result of which he engaged in a pattern of bizarre, erratic, and harmful behavior.

484.    In or about 2009, Mr. Shelby attempted suicide. Upon information and belief, at the time of this suicide attempt, Mr. Shelby was in the throes of psychosis caused by his as-yet untreated Bipolar Disorder. Mr. Shelby heard the Bob Dylan song "Knocking On Heaven's Door" playing on the radio and understood the song to be a message "calling him home." He responded by sitting down in a shower and severely cutting both arms, both legs, and his belly

using glass from a broken television. Sometime later, ADX staff discovered him bleeding and in a semi-coherent state. His wounds were bandaged at the ADX medical facility and he was returned to a standard ADX cell.

485.    After his suicide attempt, a BOP psychologist diagnosed Mr. Shelby as having Bipolar Disorder. He was thereafter prescribed the anti-manic medication Depakote and the antidepressant Zoloft. Although the medications have helped Mr. Shelby cope with his serious mental illness, they have not resolved his periodic psychotic episodes and his hallucinations.

486.    For example, later in 2009, Mr. Shelby heard a voice, which he took to be God's voice, commanding him to eat his finger. In response, Mr. Shelby amputated his left pinky finger approximately 1/2 inch from where the pinky joined his hand, and cut the finger into small pieces, which he added to a bowl of ramen soup and ate. ADX staff discovered him bleeding in his cell, and one ADX staff member asked him how his finger tasted.

487.    In early 2010, Mr. Shelby was transferred to the ADX Step-Down Program. He maintained clear conduct during stays in the Joker Unit and Kilo Unit, and was transferred to the final stage of the Step-Down Program, which is located at the USP Florence. In September 2011, while looking at a friend largely confined to a wheelchair, Mr. Shelby inexplicably saw what he believed to be "devil horns" on his friend's forehead. Mr. Shelby began choking his friend, and was subdued, restrained, and returned to ADX. After spending several months in disciplinary segregation in the SHU, Mr. Shelby returned to the General Population Unit, where he remained until his transfer to MCFP Springfield and then to FCI Butner, a special needs unit in North Carolina.

488.     Mr. Shelby has benefitted from treatment and kindness of many BOP staff

members in Springfield and Butner. His medication regimen has been stabilized, his conduct is

excellent, he has a job and great rapport with staff, and for the first time during his BOP

incarceration he is receiving constitutionally adequate mental health care. Indeed, he is a perfect

example of the reality that even dangerous prisoners can be safely treated by the BOP, where the

will to provide such treatment exists.

IX.     **ALLEGATIONS RELATING TO THE CENTER FOR LEGAL ADVOCACY**

489.     The Center for Legal Advocacy d.b.a. Disability Law Colorado ("CLA"), is a

non-profit corporation headquartered in Denver, Colorado. Plaintiff was designated in 1977 by

Governor Richard Lamm as Colorado's protection and advocacy system (P&A System) to

protect and advocate for the rights of persons with developmental disabilities under subtitle C of

the Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. §§ 15041 et

seq. Since 1986, CLA has received federal allotments-grants on an annual basis, and has

established and administered a P &A System in Colorado for individuals with mental illness

pursuant to 42 U.S.C. §§ 10803 and 10805 of the Protection and Advocacy for Individuals with

Mental Illness Act, (PAIMI Act). Since 1986, CLA has been and is currently the eligible P&A

System for individuals with mental illness in Colorado as defined at 42 U.S.C. § 10802(2).

490.     CLA has associational standing to bring this lawsuit. CLA is the functional

equivalent of a voluntary membership organization that was created by Congress to protect and

advocate for its Colorado Constituents, which include ADX prisoners with significant mental

illness or emotional impairment who are being abused, neglected and subject to civil rights

violations by being denied Constitutionally guaranteed necessary and appropriate mental health

treatment. CLA's Colorado Constituents possess many indicia of membership, to include influencing what issues CLA takes on in the performance of its federal mandate, some of which are alleged in the following paragraphs.

491.    CLA publishes the annual PAIMI Program Priorities and Objectives on its website inviting Constituents to comment on their relative importance to CLA's statutory charge to protect and advocate for individuals with mental illness.

492.    CLA has a governing board of directors, which is composed of members who broadly represent and who are knowledgeable about the needs of individuals with mental illness. CLA's board of directors includes members who have received or are receiving mental health services or family members of directors who have received or are receiving mental health services.

493.    CLA has established a PAIMI Advisory Council which advises the P&A System on the policies, priorities and objectives designed to protect and advocate for the rights of CLA's Constituents - individuals with a significant mental illness or emotional impairment.

494.    The PAIMI Advisory Council includes attorneys, mental health professionals, members of the public who are knowledgeable about mental illness, a provider of mental health services, and individuals who have received or are receiving mental health services or who have family members who have received or are receiving mental health services. Over sixty percent (60%) of CLA's PAIMI Advisory Council consists of members who have received or are receiving mental health services or who have family members who have received or are receiving mental health services.

495.    CLA's PAIMI Advisory Council is chaired by an individual who themselves or a family member has received or is receiving mental health services. CLA's PAIMI Advisory Council chairperson and one council member are also members of CLA's governing board of directors. Together, CLA's board of directors and CLA's PAIMI Advisory Council with assistance of PAIMI Program staff develop the annual priorities and objectives of the P&A System.

496.    CLA's PAIMI Advisory Council meets six times per year. At these meetings, the Advisory Council discusses issues that concern abuse, neglect and rights violations, as well as the delivery of mental health treatment, to CLA's Constituents throughout Colorado. These meetings are attended by members of the public who are interested in mental health issues, CLA's PAIMI program staff, its Legal Director and Executive Director. At these meetings PAIMI program staff report on priority casework and recent developments concerning abuse, neglect and rights violations involving CLA's Constituents.

497.    Prior to the April 2013 PAIMI Advisory Council meeting, a meeting reminder notice was sent to interested members of the public and all council members that included links to the "SuperMax ADX" litigation. Everyone who received the notice was encouraged to read the information provided at these websites to facilitate discussions at the Council meeting.

498.    At the April 2013, PAIMI Advisory Council meeting PAIMI staff reported on the lack of mental health treatment for prisoners at the U.S. Bureau of Prison's ADX facility in Florence, Colorado. It was reported to attendees and the PAIMI Advisory Council that the denial of necessary mental health treatment to a federal prisoner, diagnosed with a significant mental illness or emotional impairment can be a violation of the Eighth Amendment's cruel and unusual

punishment clause, a serious matter that CLA needed to address. The council members and

attendees were also informed by PAIMI staff that reports had been received about prisoners with

mental illness who had committed suicide, engaged in self-harming behaviors, were catatonic in

their cell, were smearing feces about themselves and their cells and some were screaming out at

all hours of the day and night. The PAIMI Advisory Council was shocked by these revelations

and thought that something should be done to remedy the situation.

499.    Following the April PAIMI Council meeting a new PAIMI Program Priority was

circulated to and adopted by both the PAIMI Advisory Council and CLA's governing board.

Program Priority 4 directs CLA to investigate and monitor complaints and reports of abuse,

neglect and rights violations from PAIMI eligible individuals confined in the ADX facility.

Program Priority 4 further directs CLA to take appropriate action, including litigation, to correct

any abuse, neglect, or rights violations involving ADX prisoners.

500.    As of June 15, 2015, CLA has received requests for representation from or on

behalf of six current or former ADX prisoners.  Five of those prisoners, James Cole, William

Harris, David Hearne, William Sablan, and James Van Noy have personally requested DLC's

assistance. The mother of prisoner Jonathan Francisco requested assistance on his behalf, as his

attorney in fact.

501.    Each request for representation indicates that the Constituent has a significant

mental illness or emotional impairment and calls upon CLA to take action to ensure these

prisoners receive necessary and appropriate mental health treatment.

502.    CLA has established a grievance procedure for Constituents and prospective

Constituents, which allows individuals with mental illness and family members of such

individuals to assure themselves that CLA and the PAIMI Program are operating in compliance with the provisions of the PAIMI Act. The Legal Services Committee of CLA's governing board makes the final decision on Constituent grievances.

503.     CLA is sufficiently identified with its Constituents and subject to their influence, which is demonstrated by CLA's actions, after receiving reports of abuse, neglect, and rights violations at ADX. CLA adopted a new PAIMI Program Priority by joint action of the PAIMI Advisory Council and governing board to address the reports of abuse, neglect, and rights violations occurring at ADX. CLA has allocated its limited resources, both personnel and financial-using only nonfederal funds, to investigate and file this lawsuit to stop the abuse, neglect, and rights violations experienced by all PAIMI eligible ADX prisoners. CLA staff traveled from Denver to Florence, Colorado, spending two days interviewing Constituents at the ADX. CLA staff have also spent numerous hours reviewing the pleadings in the *Cunningham* and *Vega* cases; attending partner conferences where prisoner complaints and case strategy are discussed; attending numerous settlement conferences negotiating policy changes and settlement terms; reviewing prisoner letters reporting or complaining about ongoing abuse, neglect, and rights violations at ADX; reviewing media reports about ADX's treatment of prisoners with significant mental illness or emotional impairment; conducting legal research; and drafting portions of the First and Second Amended Complaints.

504.     When CLA's Constituents are abused, neglected, and their Constitutional right to receive necessary and appropriate mental health treatment is violated, CLA has the authority to pursue administrative, legal, and other appropriate remedies to ensure the protection of these vulnerable individuals. This lawsuit seeks to remedy the abuse, neglect, and rights violations

inflicted on CLA's Constituents at the ADX facility and elsewhere by agents of the U.S. Bureau

of Prisons. Specifically CLA's authority to sue the U.S. Bureau of Prisons for the relief sought is

conferred by federal law. See 42 U.S.C. §10804(c); 42 U.S.C. §10805(a)(1)(A) & (B); and 42

U.S.C. §10807.

505.    CLA is not required to exhaust the Bureau of Prisons "Administrative Remedies

Program" (ARP) under the PLRA, 42 U.S.C. §1997e(a). CLA has met its exhaustion burden

concerning administrative remedies, under 42 U.S.C. §10807, based on the following facts: (1)

Administrative remedies are not appropriate in this case, because there are no administrative

remedies available. The U.S. Bureau of Prison's "Administrative Remedies Program" prohibits

anyone from submitting a request or appeal on a prisoners' behalf, see 28 C.F.R § 542.16; (2)

CLA is exempt from the exhaustion requirement because this legal action is intended to prevent

or eliminate imminent serious harm to ADX prisoners with mental illness; and (3) Requiring

CLA to seek administrative remedies at this time (three years after the initial complaint was

filed), is not appropriate and would most likely be a futile exercise. The abuse, neglect, and

rights violations inflicted on ADX prisoners with mental illness has not abated since the filing of

the *Cunningham* and *Vega* complaints, some three years ago. Given the fact that the filing of a

lawsuit has not caused Defendant to correct all deficient practices at ADX, no administrative

action by CLA is likely to change this picture. Also, the current posture of the *Cunningham* case

leads CLA to believe there will be lengthy pretrial delays while class certification, settlement

talks, and discovery proceed. Thus CLA has determined this lawsuit will not be resolved within a

reasonable time, when the reasonableness of delay is measured by the ongoing suffering of ADX

prisoners with mental illness. Requiring CLA to make an administrative remedies request prior

to filing this lawsuit would unnecessarily delay the ultimate disposition of this case causing ADX prisoners with mental illness to endure more suffering.

506.     CLA has the authority and standing to represent all inmates at ADX with significant mental illness or emotional impairment, even those who have not requested representation by CLA, since CLA is not using its federal allotment to provide representation to any ADX constituents, in accordance with 42 U.S.C. §10804(c); 42 U.S.C. §10805(a)(1)(A) & (B); and 42 U.S.C. §10807.

## X.     ALLEGATIONS RELATING TO SOME OF CLA's CONSTITUENTS.

### A.     James Cole

507.     James Cole is 36 years old. He has a seventh grade education. Before Mr. Cole's incarceration, he lived in Mississippi. Currently, Mr. Cole is serving a sentence for assaulting a staff member at the USP Pollock. He was at ADX from August 2011 through 2013 and has a scheduled release date of January 11, 2047. Mr. Cole has a severe mental illness that has been diagnosed as Schizophrenia. He also has significant cognitive impairments and may be mentally disabled. As detailed below, BOP has demonstrated deliberate indifference to his mental health needs. A photograph of Mr. Cole is attached hereto as Exhibit 22.

508.     Mr. Cole has been treated for severe mental illness since he was a child. Among other mental health facilities, he has resided at East Mississippi State Hospital, a state mental hospital in Meridian, Mississippi, a mental health unit at the East Mississippi Correctional Center, and (twice) at MCFP Springfield.

509.     The signs and symptoms of Mr. Cole's mental illness and developmental disabilities are profound and obvious. He freely expresses wild delusions about people he knows

and places he has been. During normal conversation, he frequently (and completely unconsciously) begins speaking in tongues, and then just as abruptly returns to normal speech. He has great difficulty understanding and following simple instructions. Not even a cursory mental health examination would fail to detect his mental illness.

510.    The BOP has treated Mr. Cole's Schizophrenia with periodic injections of a powerful antipsychotic medication, but otherwise has not provided him with any meaningful mental health treatment.

511.    Mr. Cole lacks the mental capacity to even attempt to advocate for himself through the ADX administrative remedy process, and as a result was largely ignored by the ADX medical and mental health staff during his time at ADX.

512.    In 2013 Mr. Cole was transferred to the High Security Mental Health Step-Down Program at USP Atlanta, where he has somewhat better access to mental health care, but where his care remains constitutionally inadequate, particularly with respect to his continued housing in nearly continuous solitary confinement.

**B.      Jonathan Francisco**

513.    Jonathan Francisco is 31 years old. Before Mr. Francisco's incarceration he lived in Tennessee. He is currently serving extended sentences for unlawful weapons possession and murdering a fellow prisoner at USP Pollock. He has a release date of September 10, 2040. Mr. Francisco has a serious mental illness. Because of the circumstances described below, his current diagnosis is unknown to Plaintiffs' counsel. As detailed below, the BOP has demonstrated deliberate indifference to his mental health needs. A photograph of Mr. Francisco is attached hereto as Exhibit 23.

514.     Mr. Francisco arrived at ADX in late 2011. Shortly after his arrival, other prisoners in the ADX SHU began to notice his bizarre behavior. Among other things, he did not speak a word to anyone in the approximately two years he was housed at ADX; rather, he spent all day, every day, staring at the wall of his cell. He frequently defecated on the floor of his cell or on a food tray, and smeared his feces on himself, his cell, or his other surroundings. He ignored other prisoners' attempts to help him, did not communicate with staff, and made no effort to maintain his health or hygiene. As a result, he lived in squalor, rarely ate, and showered only when ADX staff members forced him into a shower enclosure.

515.     Plaintiffs' counsel learned about Mr. Francisco from other prisoners in late 2011, and began investigating his background. A review of court filings revealed a letter that his mother sent to his original sentencing judge in 2010 noting that when she visited Mr. Francisco on March 7, 2010, his hair was matted, he was "very underweight," he appeared to be "over medicated," he "couldn't talk," his balance was "unstable," and he "appeared unable to recognize [his mother] and his little sister [S]halina." When contacted by Plaintiffs' counsel, Mr. Francisco's mother provided a power of attorney signed by Mr. Francisco before his incarceration, and pursuant to that power of attorney signed an engagement letter with Plaintiffs' counsel's firm and a Privacy Act waiver authorizing counsel to request a copy of Mr. Francisco's BOP file pursuant to the Freedom of Information Act ("FOIA"). Counsel repeatedly requested that file, but the BOP initially refused to acknowledge Mr. Francisco's power of attorney and has so far produced only limited information from his files.

516.     Mr. Francisco has also failed to respond to counsel's requests for an interview, upon information and belief because he no longer comprehends even simple correspondence.

517.     Under the circumstances, although the overwhelming evidence suggests that Mr. Francisco is in profound and obvious psychiatric distress that is being completely ignored by the BOP and ADX staff, Plaintiffs' counsel has not, as yet, secured access to the records necessary to assist him, other than to put the BOP on notice of his obvious distress.

518.     Upon information and belief, Mr. Francisco lacks the mental capacity to even attempt to advocate for himself through the ADX administrative remedy process. He was transferred to MCFP Springfield in October 2013, where he has somewhat better access to mental health care, but where his care remains constitutionally inadequate, particularly with respect to his continued housing in nearly continuous solitary confinement.

**C.     William Harris**

519.     William J. "Billy" Harris is 39 years old. Before his incarceration he lived in the Phoenix, Arizona area. He is a member of Salt River Pima-Maricopa Indian Community, a Native American sovereign tribe located in the metropolitan Phoenix area. He is currently serving extended sentences for assaulting a federal officer and Assault Resulting in Serious Bodily Injury. His BOP release date is January 21, 2021. A photograph of Mr. Harris is attached hereto as Exhibit 24.

520.     Mr. Harris was at ADX from 2011 through late 2013. He currently has a serious mental illness, which has been diagnosed as Schizophrenia. He also has significant cognitive impairments, including brain damage caused by years of substance abuse, including huffing paint. As detailed below, the BOP has demonstrated deliberate indifference to his mental health needs.

521.    Mr. Harris reports experiencing significant psychiatric and cognitive symptoms since at least early in his teenage years. The records of his prosecution for a 2004 homicide provide significant indicia of his profound mental illness. Specifically, in 2005 and 2006 he was evaluated and treated at least twice at FMC Butner. A March 16, 2006 filing by his attorney reflects that before that date he had been evaluated and treated at FMC Butner and found incompetent to stand trial. His BOP treating physician requested four months to attempt to restore him to competency, as the treating physician's efforts to that time had been unsuccessful.

522.    Thereafter, and apparently before competency was restored, Mr. Harris was transported back to Arizona, where he was held in a private prison in Florence, Arizona, operated by the Corrections Corporation of America ("CCA Florence"). Before arriving at CCA Florence, Mr. Harris was receiving daily doses of the potent antipsychotic medication Risperdal, but during his return trip to Arizona he received only one or two doses of his medication, and after he arrived at CCA Florence he was given an entirely different antipsychotic, Thorazine. As a result, the court filing describes him as "incompetent and psychotic." His lawyer also noted that one clear physical manifestation of Mr. Harris' mental illness and brain damage -- habitual rocking back and forth -- was worse than before his initial transport to FMC Butner.

523.    Mr. Harris was later returned to FMC Butner and after extended treatment was restored to competency. He then pled guilty to assault and was sentenced to 108 months. The BOP them promptly shipped him to ADX, where he was only periodically lucid, persistently rocking back and forth, and deteriorating due to the extreme isolation in which he existed. Although he received daily psychotropic medication at the ADX, he received no other

meaningful mental health care. Because of his mental illness and cognitive issues, he is incapable of advocating for himself generally, or of requesting the care his condition requires.

524.     In late 2013 Mr. Harris was transferred to the High Security Mental Health Step-Down program at USP Atlanta, where he has somewhat better access to mental health care, but where his care remains constitutionally inadequate, particularly with respect to his continued housing in nearly continuous solitary confinement.

**D.     David Hearne**

525.     David Hearne is 36 years old. He has a seventh grade education. Before Mr. Hearne's incarceration, he was a resident of Washington, D.C. Currently, Mr. Hearne is serving a fifteen year sentence for assaulting two corrections officers. He has a release date of October 26, 2025. Mr. Hearne has a serious mental illness that has been diagnosed at various points as Bipolar Disorder, Conduct Disorder, Manic Episodes, Depression, Anti-Social Personality Disorder, and Borderline Intellectual Functioning. As detailed below, the BOP has demonstrated deliberate indifference to his mental health needs. A photograph of Mr. Hearne is attached hereto as Exhibit 25.

526.     Mental illness runs in Mr. Hearne's family. When Mr. Hearne was six months old, his father, a paranoid schizophrenic, killed his wife (not Mr. Hearne's mother) by stabbing her 16 times. Subsequently, Mr. Hearne's father was institutionalized at St. Elizabeth's Hospital, a public psychiatric facility. After his release from St. Elizabeth's, Mr. Hearne's father stabbed a man in a wheelchair. He was then sent back to St. Elizabeth's.

527.     As a child, Mr. Hearne was extraordinarily aggressive and physically abused his mother. At age six, Mr. Hearne began exhibiting symptoms of Paranoid Schizophrenia. Since

1992, from approximately age 13, Mr. Hearne has resided almost continuously in restrictive mental hospitals or correctional facilities.

528.    In 1992, Mr. Hearne was institutionalized at St. Elizabeth's, the same facility where his father had been institutionalized. At St. Elizabeth's, Mr. Hearne was diagnosed with Major Depressive Episode With Psychotic Features, Brief Reactive Psychosis, Bipolar Disorder, And Attention Deficit/Hyperactivity Disorder. Mr. Hearne spent approximately one year at St. Elizabeth's Hospital before he jumped out of a window and escaped. In 1993, Mr. Hearne was again hospitalized at St. Elizabeth's where he was, at that time, diagnosed with Bipolar Disorder. In December of 1994, after his mother passed away, Mr. Hearne was seen at Greensville Emporia Counseling Services in Virginia and diagnosed with Conduct Disorder.

529.    Due to aggressive behavior, most of Mr. Hearne's teenage years were spent at Beaumont Learning Center. Mr. Hearne was also hospitalized at Popular Spring Hospital and Central State Hospital and diagnosed with Bipolar Disorder at both facilities. While at Popular Spring Hospital in February 1995, Mr. Hearne underwent intelligence testing and achieved a full-scale I.Q. score of 66, placing him in the mentally disabled range. Subsequently, Mr. Hearne was hospitalized in 1996 and again in 1997 at Central State Hospital after being involved in detention center assaults. During his hospitalizations at Central State Hospital, Mr. Hearne was diagnosed each time with Bipolar Disorder. Later, in March of 2000, Mr. Hearne underwent intelligence testing through the Marion Correctional Treatment Center in Marion, Virginia, and received a full-scale I.Q. score of 72, placing him in the "borderline" range.

530.    After being released from a Washington, D.C. detention center in January 2003, Mr. Hearne became affiliated with Green Door, a community agency providing regular

psychiatric examinations and medications. By February of 2004, however, Mr. Hearne started refusing medications and had a verbal altercation with a staff member. Mr. Hearne was then asked to leave the facility.

531.    On February 8, 2004, Mr. Hearne was arrested on federal firearms charges after boarding a city bus in Washington, D.C. with a gun. Believing that people were following and trying to kill him, Mr. Hearne fired the gun out of the moving bus. He did not hit anyone.

532.    After Mr. Hearne's arrest, Dr. Janet Fay-Dumaine, a clinical psychologist, evaluated Mr. Hearne while he was incarcerated at FCI Butner awaiting trial and concluded that "mental health factors substantially impair Mr. Hearnes' [sic] factual and rational understanding of the proceedings against him . . . ." Dr. Fay-Dumaine recommended that Mr. Hearne be "transferred to a mental hospital for further examination and treatment."

533.    Shortly thereafter, in May of 2004, Mr. Hearne was remanded to a Washington, D.C. jail. There, Dr. Lawrence Oliver, another clinical psychologist, examined Mr. Hearne and noted that Mr. Hearne's condition was "deteriorating from what it was when he left" FCI Butner, where Mr. Hearne had been diagnosed with "Bipolar Disorder, Manic without Psychotic Features, Cannabis Abuse, Anti-Social Personality Disorder, Borderline Intellectual Functioning, and Borderline Hypertension." Dr. Oliver made the following observation: "Although it was recommended by the staff at Butner FCI that Mr. Hearne[] continue on his medication regimen to assure continued competency, according to Mr. Hearne[], this apparently did not happened [sic]. This may be the reason why his condition has deteriorated since his return to the District." Dr. Oliver concluded that Mr. Hearne was "not mentally competent to understand the

proceedings against him or to assist in the preparation of his defense. Mr. Hearne[] should be transferred to a mental hospital for further examination and treatment."

534.     Notwithstanding the conclusions of two separate clinical psychologists that Mr. Hearne was incapable of understanding the proceedings against him, Mr. Hearne was permitted to enter a guilty plea to the federal firearms charges only three months later on August 3, 2004. The Court sentenced Mr. Hearne to 100 months (over eight years) incarceration on one count and five years' incarceration on the second count, to be served concurrently. After sentencing Mr. Hearne, the Court ordered that he "be transported forthwith to the Correction Treatment Facility and . . . receive the psychotropic medications he was prescribed by [sic] treatment team at the D.C. Department of Mental Health."

535.     After his conviction on federal firearms charges, Mr. Hearne displayed agitation, hyperactivity, pressure of speech, and bizarre and assaultive behavior while housed in a penitentiary in Coleman, Florida. In October of 2005, Mr. Hearne was transferred to a medical center, where he was diagnosed with Bipolar Disorder and treated with antipsychotic medications (Seroquel, Haldol, and Cogentin). In April 2006, Mr. Hearne was discharged and reportedly doing well on a locked unit. Later, however, while at USP Victorville, Mr. Hearne was again referred to a medical center and admitted to in-patient treatment in January and May of 2007. In July 2007, Mr. Hearne was discharged from treatment and thereafter received out-patient treatment at USP Big Sandy and later at USP Terre Haute. During this time, Mr. Hearne was periodically non-compliant with his medication.

536.     Despite Mr. Hearne's well-documented and extended history of mental illness, the chief psychologist at USP Terre Haute concluded that Mr. Hearne was "not considered to have

problems that require chronic care." Nevertheless, Mr. Hearne was put on "psych alert" at USP

Terre Haute, which is a designation made to put psychologists on guard for disruptive behavior.

537.    On November 7, 2008, while at USP Terre Haute, Mr. Hearne assaulted two

correctional officers. At the time of these assaults, Mr. Hearne was not being provided his proper

medications. As a result of this incident, Mr. Hearne was charged with two counts of assaulting a

federal officer.

538.    In April 2009, Mr. Hearne's attorney filed a motion to determine Mr. Hearne's

mental competency after he began manifesting symptoms of severe psychosis. The Court granted

the motion and later found that Mr. Hearne was "suffering from a mental disease or defect

rendering him mentally incompetent" to stand trial. The Court ordered that Mr. Hearne be

hospitalized for treatment.

539.    In January 2010, doctors at MCFP Springfield performed a psychiatric evaluation

of Mr. Hearne, after which they prescribed him psychotropic medications including Haldol

Deconate, Haloperidol Lactate, Trazodone, and Trihexphenidyl. After receiving the prescribed

treatment, Mr. Hearne's condition improved dramatically. Doctors at MCFP Springfield reported

that Mr. Hearne was alert and fully oriented, able to stay on topic and provide appropriate

responses, and had thoughts that were clear, rational, and organized. Reports from MCFP

Springfield also indicated that Mr. Hearne's previous manic behavior seemed resolved, he did

not present with pressured speech, no delusional ideation was evident, he denied suicidal and

homicidal ideation or intent, and he was not judged to be at risk for imminent self-harm.

540.    In March 2010, after Mr. Hearne had received the prescribed medication, the

Court found Mr. Hearne mentally competent to stand trial, and in June of 2010, Mr. Hearne pled

guilty to charges arising from his assault of two correctional officers at USP Terre Haute. The court sentenced Mr. Hearne to 15 years imprisonment, but recommended that Mr. Hearne "be designated to a medical facility."

541.    Despite the sentencing Court's recommendation that Mr. Hearne be designated to a medical facility, Mr. Hearne was transferred to ADX sometime in 2010. On March 14, 2011, Mr. Hearne filed a handwritten document entitled "Suggestion Of Death Upon The Record Under Rule 25(a)(1)" and dated December 10, 2010, in the court where he pled guilty to the federal assault charges. In the document, Mr. Hearne stated that he would commit suicide by January 1, 2011 "in a private location outside the view of 'normal vision' only in the eyes of (GOD) [sic] I shall be set free with all liberties restored."

542.    Despite his extended history of mental illness, Mr. Hearne, upon arriving at ADX, received palpably inadequate and perfunctory mental health screening. When Mr. Hearne arrived at ADX, he ran into a staff psychologist and staff psychiatrist in the hallway. They asked Mr. Hearne if he took any over the counter medications, but failed to ask whether Mr. Hearne took any other medications. Mr. Hearne was then placed in a suicide cell with no mattress. From approximately March 2011 to January 2012, Mr. Hearne did not receive any medication at ADX. He has experienced 10-11 month periods at ADX where doctors did not visit him.

543.    On or around January 6, 2011, Mr. Hearne filed a written request to ADX prison officials stating that he was being held at ADX without a hearing or psychiatric meeting (the form he submitted actually says: "Why am I over here at the ADX with out a hearing or psy meat ton"). The BOP's response asserted that Mr. Hearne had made "no specific request for relief."

544.     On or around February 16, 2011, during an ADX General Population Hearing, Mr. Hearne told the hearing administrator that he was "not getting the medical care and medication I want." The hearing administrator responded by stating that the hearing "was not the appropriate avenue for [Mr. Hearne] to address this subject and [Mr. Hearne] should contact his Unit Team or Medical Services."

545.     On or around July 19, 2012, Mr. Hearne again submitted a written request to ADX prison officials requesting treatment for his mental illness. The BOP did not provide treatment.

546.     Subsequently, on or around August 16, 2012, Mr. Hearne submitted a Request For Administrative Remedy to ADX prison officials requesting treatment for his mental illness. The BOP's response (which, curiously, refers to an Administrative Remedy dated September 25, 2012) stated that "there is no evidence to support [Mr. Hearne's] contention that [he] ha[s] a serious mental illness."

547.     Mr. Hearne submitted a Regional Administrative Remedy Appeal to ADX prison officials on or around December 4, 2012, again requesting treatment for his mental illness. The BOP did not provide treatment.

548.     On or around March 5, 2013, Mr. Hearne submitted a Central Office Administrative Remedy Appeal to the BOP's central office in Washington, D.C., requesting treatment for his mental illness. The BOP rejected Mr. Hearne's appeal.

549.     Mr. Hearne's sister died unexpectedly in early 2013. Since her death, Mr. Hearn's condition has rapidly deteriorated, as has his conduct. After an extended period of good conduct in 2012, he spent most of spring 2013 in the SHU and descended rapidly into florid psychosis,

and yet was largely ignored by the BOP's medical and mental health staff. In the absence of prompt and effective treatment, upon information and belief he was at high risk for self-harm or possibly suicide.

550.     Mr. Hearne is a current client of Arnold & Porter LLP, which requested CLA's assistance on his behalf on May 16, 2013, after the ADX staff denied counsel's request to visit Mr. Hearne because he was in psychiatric crisis and had been approved for emergency transport to MCFP Springfield, where he spent several months.

551.     In 2014 Mr. Hearne was transferred to the High Security Mental Health Step-Down program at USP Atlanta, at which he has somewhat better access to mental health care, but where his care remains constitutionally inadequate, particularly with respect to his continued hosing in nearly continuous solitary confinement.

**E.     William Concepcion Sablan**

552.     William Concepcion Sablan is 50 years old. He is originally from Saipan, in the United States Commonwealth of the Northern Mariana Islands. He is currently serving a sentence of life without the possibility of parole. Mr. Sablan has a serious mental illness that has been diagnosed at various points as Psychotic Disorder NOS, Major Depressive Disorder, PTSD, Cognitive Disorder NOS, Posttraumatic Brain Injury, and severe Personality Disorder. As detailed below, the BOP has demonstrated deliberate indifference to his mental health needs. A photograph of Mr. Sablan is attached hereto as Exhibit 26.

553.     Mr. Sablan was the thirteenth of 15 children. As a child, Mr. Sablan and his siblings were subject to harsh and frequent beatings from their father. They were kicked, slammed into walls, beaten with fan belts, and choked. Mr. Sablan manifested anti-social

behavior while in middle school, including excessive absenteeism, failing school work, and suspensions. Mr. Sablan never completed the eighth grade, dropping out of school in 1979, when he was 15. At a young age, he began abusing drugs, including methamphetamine, marijuana, and alcohol.

554.    Mr. Sablan has been in and out of prisons since 1984. Between 1984 and 1997, Mr. Sablan pled guilty or was convicted of six felonies and was arrested at least 15 other times.

555.    Two incidents in 1995 precipitated the serious deterioration of Mr. Sablan's mental health. His daughter Mae was killed in a hit and run accident and the perpetrator was never caught. Mr. Sablan, traumatized by her death, became intensely paranoid and obsessed with finding the driver. He disappeared into the jungle for days at a time, claiming to be looking for her killer. Mr. Sablan claimed to see his dead daughter walking around his house. In public, he became extremely aggressive when he saw adults being mean to children.

556.    In September 1995 Mr. Sablan sustained serious head trauma when he was attacked by several men, one of whom hit Mr. Sablan in the head with a machete. He received a five centimeter laceration of the posterior scalp that shaved off a three centimeter disc of the external table of his skull, and another five centimeter laceration on his right anterior scalp. After the machete attack, Mr. Sablan's demeanor and mood changed. He began to misunderstand events and lose track of conversations, but would become furious if anyone asked him about his changed behavior. Mr. Sablan began harboring delusions that the someone was after him and would burst into flight when he thought someone was pursuing him. He would climb coconut trees and stare into the jungle all night, looking for his imaginary pursuers.

557.    While in custody in 1997, prison medical officials prescribed Mr. Sablan the antimanic agent Depakote and the powerful antipsychotic medication Haldol. He also received a mental health screening on these occasions from Dr. Marc Herbst. Though Mr. Sablan denied any history of psychotic symptoms, Dr. Herbst diagnosed him with PTSD and Post-Traumatic Brain Injury, possibly temporal lobe Epilepsy.

558.    While incarcerated in 1999, Mr. Sablan and others participated in a prison riot and escape. For his role in these actions, Mr. Sablan was sentenced to 252 months imprisonment and transferred to prison in the continental United States.

559.    Despite his psychiatric diagnoses and history of medication, as well as transfer paperwork that suggested a detailed psychiatric examination be conducted upon arrival, Mr. Sablan was only given a perfunctory screening when he arrived at USP Florence. The entire examination consisted of the physician's assistant merely asking Mr. Sablan if he had any mental issues. The BOP also failed to review his psychotropic medication upon his arrival, despite a written BOP file entry directing such a review. Mr. Sablan then was placed in a two person cell with his distant cousin Rudy Sablan and a third prisoner, Joey Estrella. Under the BOP's own rules, the mental health staff at ADX should have followed up his initial processing with an evaluation within 24 hours of Mr. Sablan's arrival. The staff at USP Florence failed to do so. The staff also failed to provide Mr. Sablan with his psychotropic medication.

560.    On October 10, 1999, only three days after arriving at ADX, Mr. Sablan and his cousin killed Mr. Estrella. Mr. Sablan was charged with murder and his defense counsel sought to have him found incompetent to stand trial due to his psychiatric illnesses. The BOP claimed, however, that Mr. Sablan did not have mental illness and was merely malingering.

561.    In July 2001, Dr. Laura Post examined Mr. Sablan, and diagnosed him with PTSD and a Psychotic Disorder Due to Manic Episode. She prescribed him the potent antipsychotic Haldol. Also in July 2001, Dr. Rose Manguso conducted a neuropsychological evaluation of Mr. Sablan. She concluded that he exhibited neuropsychological deficits which stemmed from the brain damage caused by prior head trauma and prior emotional or psychological disturbances. She concluded that these neuropsychological deficits could easily exacerbate the symptoms of Mr. Sablan's PTSD and his Mood Disorder with Psychotic Features.

562.    In September 2001, Drs. James Jacobson and Todd Robert Poch evaluated Mr. Sablan for over 25 hours, and concluded that he had an Anxiety and Mood Disorder with Psychotic Features. They suggested that Mr. Sablan receive the antimanic drug Tegretol and the antipsychotic drug Risperdal. Dr. Poch noted Mr. Sablan's fanciful delusions, including claims that he was the chief of the Chamorros (his indigenous tribe on Saipan), that had the psychic ability to determine the outcome of his own trial, and that he knew the location of Amelia Earhart's plane. Dr. Poch also reported that Mr. Sablan had received a Full Scale IQ of 77 on the intelligence test he had been administered.

563.    In September 2003, psychiatrist Dr. Frank G. Fortunati examined Mr. Sablan. Dr. Fortunati observed Mr. Sablan experiencing auditory hallucinations of three different people talking to each other, that Mr. Sablan claimed he could hear via a satellite connection and a computer located in his brain. Mr. Sablan also claimed that the government could hear all the thoughts of everyone in the world through the use of satellite connections. Dr. Fortunati concluded that Mr. Sablan was in a floridly psychotic state.

564.     In May 2004, Dr. Ruben Gur conducted a Quantitative Functional Brain Imaging Consultation based on MRI images of Mr. Sablan's brain. Dr. Gur indicated that the abnormalities in low grey matter were consistent with parenchymal loss caused by head injury, and that the behavioral consequences of such abnormalities could be severe, potentially causing intensified aggressive urges and an impaired ability to control emotional output.

565.     Based on these findings, on June 10, 2004, Judge Wiley Y. Daniel found that Mr. Sablan had a mental disease or defect rendering him mentally incompetent to assist properly in his defense. Judge Daniel ordered that Mr. Sablan be hospitalized and treated for up to four months to determine whether he could attain the capacity for the trial to proceed. Mr. Sablan was transferred to FMC Butner.

566.     While at FMC Butner, Mr. Sablan was floridly delusional. He made a series of claims about Amelia Earhart and her plane, including that he found her plane 20 years ago and that Earhart's spirit had been pursuing him ever since, trying to get him to solve the mystery. He relayed his claim in a letter to the Amelia Earhart Foundation. Mr. Sablan also spoke frequently about brain interference from satellites and his continuing frustration that his daughter's killer had never been caught. BOP physicians Drs. Byron Herbel and Robert Cochrane expressed doubt that Mr. Sablan's condition was the result of malingering, and hypothesized that he could have Delusional Disorder or Late Onset Schizophrenia. They prescribed him a cocktail of drugs consisting of antimanic drug Depakene, antipsychotic drug Risperdal and antidepressant Remeron.

567.     BOP officials were unable to render Mr. Sablan competent for trial within the four

month time limit ordered by Judge Daniel. Upon the BOP's request, Judge Daniel ordered an

additional 120 days of attempts to render Mr. Sablan competent.

568.     In January 2005, after many months of this extensive regimen of psychotropic

drugs and constant psychiatric treatment and therapy, the evaluators at FMC Butner concluded

that Mr. Sablan was competent to stand trial. Nonetheless, Mr. Sablan continued to endorse the

same delusions, only slightly diminished, and with a sense of embarrassment. In April 2005,

Mr. Sablan was still claiming that he had found Amelia Earhart's plane, but admitted that the

plane he found would require verification to prove its origin. He also admitted that he was still

receiving interference from the satellites, but said that watching television helped him ignore it.

569.     Dr. Herbel's final report at FMC Butner diagnosed Mr. Sablan with Psychotic

Disorder NOS; Major Depressive Disorder, Single Episode, Moderate; Cognitive Disorder NOS;

Antisocial Personality Disorder; and addictions to various illicit drugs. Dr. Herbel also noted that

Mr. Sablan's increased depression was a common outcome after patients with Schizophrenia

become medicated and become aware that their beliefs are merely delusions.

570.     In April 2005, Judge Daniel found that Mr. Sablan had recovered sufficiently to

stand trial. At trial, the issue of Mr. Sablan's mental competence was extensively litigated. Dr.

Gur testified that scans of Mr. Sablan's brain showed that even the least damaged areas were

abnormal. Dr. David Lovejoy, a neuropsychologist, testified that Mr. Sablan had a Traumatic

Brain Injury, Psychotic Disorder, and PTSD.

571.     The jury found Mr. Sablan guilty of murder. Judge Daniel thereafter sentenced

Mr. Sablan to life imprisonment without the possibility of parole. Judge Daniel also

recommended that "the Bureau of Prisons continue, on an uninterrupted basis, with a regimen of medicines (previously referred to as psychotropic medications) and other therapeutic treatment (including art supplies) currently in place to provide the defendant with the maximum ability to serve his life sentence with minimal disruptions to himself or others."

572.    Mr. Sablan was thereafter returned to ADX. From the time Mr. Sablan arrived at ADX, the BOP completely ignored Judge Daniel's recommendations concerning Mr. Sablan's mental health care. Although Mr. Sablan received psychotropic medication, the BOP refused to give Mr. Sablan any psychological or other therapeutic treatment in accordance with Judge Daniel's sentencing order.

573.    Mr. Sablan attempted to exhaust administrative remedies concerning his access to mental health care at ADX, but despite the active involvement of counsel in that process was unable to complete the process due to his severe mental illness and cognitive issues. No administrative remedy is, therefore, available to him.

574.    In 2014 Mr. Sablan was transferred to the High Security Mental Health Step-Down program at USP Atlanta, at which he has somewhat better access to mental health care, but where his care remains constitutionally inadequate, particularly with respect to his continued housing in nearly continuous solitary confinement.

F.    **James Van Noy**

575.    James Van Noy is 52 years old. Before his incarceration he lived in Alabama. He has been incarcerated continuously since 1985. He is currently serving a 63 month sentence for making threats against the President of the United States while incarcerated in Alabama, and a consecutive 51 month sentence for biting a BOP correctional officer. His BOP release date is

December 31, 2015. He currently has a serious mental illness, for which he has received a variety of diagnoses. He is currently being treated with anti-depressant medication. He also exhibits obvious signs and symptoms of serious and debilitating cognitive problems. As detailed below, the BOP has demonstrated deliberate indifference to his mental health needs. A photograph of Mr. Van Noy is attached as Exhibit 27.

576.    Mr. Van Noy has a fourth grade education. The records of his two prosecutions for federal offenses provide significant indicia of his profound mental illness.

577.    In September 2004, while Mr. Van Noy was incarcerated in a state facility in Alabama, he wrote a letter threatening then-President George W. Bush, for which he was prosecuted. Information developed during the course of that prosecution revealed that in approximately 1975, at the age of ten, Mr. Van Noy was committed to the Searcy State Mental Hospital, an Alabama residential state mental health facility. He remained there until approximately 1986, when he was 22 or 23 years old. Since then, he has been confined in jails and prisons almost continuously. A forensic psychologist who examined Mr. Van Noy in the course of his prosecution for threatening the President concluded that he had a serious mental illness that is manifested by severe impairments in impulse control, attention problems, mood variability, and periods of psychosis. Based on those findings, the court determined that before it could complete a competency determination more intensive examination and evaluation was required. After a series of examinations by various government doctors, Mr. Van Noy was found to have mental illness but deemed competent to stand trial. Shortly thereafter, he pled guilty to both counts of his indictment. On January 17, 2007, he was sentenced to 63 months in federal custody. In sentencing Mr. Van Noy, the court recommended to the BOP that Mr. Van Noy be

placed "in a facility where [he] can receive appropriate mental health treatment and therapy." The BOP ignored this recommendation, instead assigning Mr. Van Noy to a Federal Correctional Institute and then, following a series of incidents between Mr. Van Noy and other prisoners, to a succession of mainline United States Penitentiaries.

578.     Two and a half years later, in September 2009, Mr. Van Noy was confined in the SHU of a United States Penitentiary. A corrections officer noticed an object in Mr. Van Noy's hand and attempted to retrieve it, resulting in a scuffle during which Mr. Van Noy bit the officer's arm. He was indicted for assaulting the officer. Again, his competency was assessed. Again, he was found to have mental illness but also found competent to be tried. Again, he pled guilty, this time receiving a sentence of 51 months, to run consecutively to his earlier federal sentence. Again, his order of judgment and commitment reflects his mental illness, this time requiring him to complete a mental health treatment program following his release from prison. And again, rather than sending Mr. Van Noy to a facility that designed and operated to accommodate those with serious mental illness , the BOP designated him to a facility -- this time ADX -- that lacks the capacity to do so.

579.     Mr. Van Noy remains at ADX today. He receives antidepressant medication but is given no other mental health care.

## XI.     CLASS ACTION ALLEGATIONS

580.     Class Plaintiffs bring the causes of action identified below on behalf of themselves and all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23. For those causes of action, Plaintiffs seek injunctive and declaratory relief applicable to members of the Class and Subclass, as defined below.

581. Plaintiffs bring this action on behalf of the following class and subclass:

<u>Prisoner Class</u>

> All persons who were, as of the filing date of the original complaint in this case, or are now, or will be in the future, confined to the custody of the United States Bureau of Prisons at the United States Penitentiary Administrative Maximum in Florence, Colorado.

<u>Mental Illness Subclass</u>

> All persons who were, as of the filing date of the original complaint in this case, or are now, or will be in the future, confined to the custody of the United States Bureau of Prisons in the United States Penitentiary Administrative Maximum in Florence, Colorado and have been diagnosed by the United States Bureau of Prisons or its representative personnel with a "Serious Mental Illness" or a "Mental Illness," requiring treatment under one or more of the BOP's CARE levels as set forth in Program Statement 5310.16, dated May 1, 2014.

> (a)     "Serious Mental Illness" is a group of diagnoses that exist on a continuum of the broader category of mental illness. The BOP, in its Program Statement, defines certain diagnoses as Serious Mental Illness, and others as Mental Illness. An individual's diagnosis and treatment needs may vary over time. While the BOP has determined that individuals with a Serious Mental Illness should be excluded from ADX, and individuals with Mental Illness may be housed at ADX, its policies acknowledge that individuals diagnosed with a either a Serious Mental Illness or Mental Illness require treatment. For purposes of this class definition,

"Serious Mental Illness" means a diagnosis of one of the disorders listed in said Program Statement as those "generally classified as serious mental illness," *i.e.,* Schizophrenia Spectrum and Other Psychotic Disorders, Major Depressive Disorder (all types), or Bipolar and Related Disorders, or a diagnosis of those disorders listed in said Program Statement as "often classified as serious mental illness," that result in significant functional impairment, *i.e.,* Anxiety Disorders, Obsessive-Compulsive and Related Disorders, Trauma and Stressor-Related Disorders, Intellectual Disabilities and Autism Spectrum Disorders, Major Neurocognitive Disorders, and Personality Disorders, regardless of the CARE level assigned to that individual for treatment purposes;

(b)     "Mental Illness" are other illnesses recognized by BOP in its Program Statement as existing in the continuum of diagnosed conditions requiring mental health treatment. For purposes of this class definition, "Mental Illness" means a diagnosis of a mental disorder defined in the Program Statement as "a syndrome characterized by clinical significant disturbance in an individual's cognition, emotion regulation, or behavior that reflects a dysfunction in the psychological, biological, or developmental processes underlying mental functioning [and is] usually associated with significant distress or disability in social, occupational, or other important activities" that requires mental health services pursuant to CARE levels CARE2-MH, CARE3-MH or CARE4-MH, as set forth in said Program Statement.

(c)     "CARE levels" means the mental health care levels used by the BOP to classify prisoners based on their need for mental health services; levels CARE1-MH through CARE4-MH are described in detail in the May 1, 2014 Program Statement.

## A.     Prisoner Class

582.    Class action status for the Prisoner Class in this litigation is proper because:

(a)     The Prisoner Class is so numerous that joinder of all members is impractical. Upon information and belief, the total number of class members is more than four hundred men currently confined at ADX and an unknowable number of current and future BOP prisoners who are designated for confinement at ADX;

(b)     There are questions of law and fact common to the class, including without limitation: whether class members are subject to harm as a result of Defendant's practices that fail to provide constitutionally-adequate initial and periodic mental health evaluations at ADX; whether Defendant violates its own written policies and procedures by refusing to provide initial and periodic mental health evaluations to class members at ADX; whether Defendant's failure to maintain an adequate program for initial and periodic mental health evaluations at ADX leads to a failure to properly diagnose prisoners who have mental illness; and whether Defendant's failure to maintain an adequate program for initial and periodic mental health evaluations at ADX leads to a failure to provide constitutionally adequate mental health treatment to prisoners with mental illness;

(c)     Plaintiffs' claims are typical of the claims of the class, in that each Plaintiff is incarcerated at ADX, did not receive a prompt mental health evaluation upon transfer

to ADX, has not received continued periodic mental health evaluations during the time they have

been incarcerated at ADX, and currently has claims that, like the claims of the class, arise from

the same policies, practices, and procedures implemented by Defendant at ADX;

(d)     Plaintiffs and all members of the class have been similarly affected by

Defendant's common course of conduct;

(e)     Plaintiffs will fairly and adequately protect the interests of the class as

there is no conflict between Named Plaintiffs and the other class members; and

(f)     Plaintiffs can adequately represent the interests of the class members and

have retained counsel experienced in class action litigation.

583.    Defendant has acted and/or refused to act on grounds generally applicable to the

class, thereby making final declaratory and injunctive relief appropriate with respect to the class

as a whole under Federal Rule of Civil Procedure 23(b)(2).

**B.     Mental Illness Subclass**

584.    Class action status for the Mental Illness Subclass ("Subclass") in this litigation is

proper because:

(a)     The Subclass is so numerous that joinder of all members is impractical.

Due to the nature of the facility at issue and the mental health afflictions known to Plaintiffs and

their counsel, upon information and belief, the total number of subclass members is dozens, if

not more than one hundred men;

(b)     There are questions of law and fact common to the Subclass, including

without limitation: whether Defendant's failure to maintain an adequate program for appropriate

mental health evaluations at ADX leads to a failure to provide constitutionally adequate mental

health treatment to prisoners with mental illness; whether Defendant violates its own written policies and procedures by a practice of placing s prisoners with serious mental illness at ADX, and within the Control Unit and SHU at ADX; whether Defendant violates its own written policies and procedures by failing to adequately instruct unit officers and detail supervisors in recognizing and reporting symptoms of mental illness; whether Defendant violates its own written policies by a practice of taking inappropriate disciplinary actions against prisoners with mental illness; whether Defendant violates its own written policies by failing to maintain an adequate program to diagnose prisoners with mental illness at ADX; whether Subclass members are subject to harm as a result of Defendant's practices that fail to provide adequate treatment for prisoners diagnosed with a mental illness, including a serious mental illness; and whether Defendant's repeated violations of numerous mental health policies have placed members of the Subclass at risk for increased psychological and/or physical harm;

(c)     Plaintiffs' claims are typical of the claims of the Subclass, in that each Named Plaintiff has at least one mental illness, often a serious mental illness, for which he has not received appropriate treatment, and Plaintiffs' claims and the claims of the Subclass arise from the same policies, practices, and procedures implemented by Defendant at ADX;

(d)     Plaintiffs and all members of the Subclass have been similarly affected by Defendant's common course of conduct;

(e)     Plaintiffs will fairly and adequately protect the interests of the Subclass as there is no conflict between Plaintiffs and the other Subclass members; and

(f)     Plaintiffs can adequately represent the interests of the Subclass members and have retained counsel experienced in class action litigation.

585.    Defendant has acted and/or refused to act on grounds generally applicable to the Subclass, thereby making final declaratory and injunctive relief appropriate with respect to the class as a whole under Federal Rule of Civil Procedure 23(b)(2).

## XII.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of the Eight Amendment to the United States Constitution - Failure to Diagnose
### (Asserted by Plaintiff Prisoner Class and CLA)

586.    Plaintiffs incorporate by reference the foregoing paragraphs of this Second Amended Complaint as though fully set forth herein.

587.    As described herein, by its policies and practices, Defendant subjects Plaintiffs and class members to a substantial risk of serious harm and injury by failing to establish and maintain a program and/or practices to adequately screen and diagnose prisoners at ADX for mental illnesses, both during their initial assignment to ADX and periodically thereafter. Defendant has been deliberately indifferent to this substantial risk of serious harm to Plaintiffs and class members.

588.    Defendant has been and is aware of all the deprivations complained of herein, and has condoned or been deliberately indifferent to such conduct, and to Plaintiffs' and class members' serious medical needs.

589.    Defendant's policies and practices are the proximate cause of the Plaintiffs' and class members' deprivation of rights under the Eighth Amendment.

**SECOND CLAIM FOR RELIEF**
**Violation of the Eighth Amendment of the United States Constitution - Failure to Treat**
**(Asserted by Plaintiff Subclass and CLA)**

590.    Plaintiffs incorporate by reference the foregoing paragraphs of this Second

Amended Complaint as though fully set forth herein.

591.    As described herein, by its policies and practices, Defendant subjects Plaintiffs

and Subclass members to a substantial risk of serious harm and injury by failing to establish and

maintain a program to provide adequate mental health treatment to Plaintiffs and Subclass

members.

592.    Defendant has been and is aware of all the deprivations complained of herein, and

has condoned or been deliberately indifferent to such conduct, and continues to exhibit deliberate

indifference to Plaintiffs' and Subclass members' serious medical needs.

593.    Defendant's policies and practices are the proximate cause of the Plaintiffs' and

Subclass members' ongoing deprivation of rights under the Eighth Amendment.

## XIII.   PRAYER FOR RELIEF

Plaintiffs therefore respectfully request that this Court grant the following relief:

1.    Certify the proposed Prisoner Class and Subclass;

2.    Enter an injunction directing that Defendant implements a program of mental

health screening and diagnosis for the benefit of all Prisoner Class members. This program shall

include the staffing of mental health professionals at ADX to provide the screening and diagnosis

services required hereby. The program shall provide, at a minimum, the following:

(a)     a mental health examination prior to transfer to ADX or immediately upon arrival at ADX, to determine the presence or absence of a Mental Illness or Serious Mental Illness, as defined in this Second Amended Complaint;

(b)     an annual mental health examination, and regular mental health rounds by a mental health professional, to facilitate early detection and treatment of a Mental Illness or Serious Mental Illness as defined in this Second Amended Complaint;

(c)     a program of training ADX staff members on detection of symptoms of Mental Illness and Serious Mental Illness; and

(d)     a procedure for plaintiff class members who dispute the diagnosis by the BOP or its representative personnel for review of that diagnosis by a mental health provider independent of the BOP.

3.     Enter an injunction directing that Defendant implements a program of treatment for each Mental Illness and Serious Mental Illness for the benefit of members of the Subclass. That program shall provide treatment at the various treatment settings, or levels of care, described in Paragraph 17, above, and shall require that, to the extent a level of care cannot be provided at ADX, a Subclass member requiring such a level of care be timely transferred to a facility where such care can be provided. The program of treatment also shall include, at a minimum, the following:

(a)     staffing of mental health professionals at ADX in sufficient numbers to administer the program of mental health treatment;

(b)     bi-weekly access to out-of-cell private psychotherapy;

(c)     monthly access to confidential psychiatry sessions;

(d)       access to at least 5-10 hours per week of out-of-cell therapeutic activity;

(e)       access to at least 10 hours per week of out-of-cell recreational activity that allows for socialization with other prisoners;

(f)       regular and scheduled receipt of all prescribed medication;

(g)       not housing prisoners who are prescribed medication in Control Units, or in any unit in which medications are not provided;

(h)       treatment planning team meetings three times annually; and

(i)       implementation of policies and procedures to provide Subclass members a reasonable opportunity to program their way out of the ADX.

4.       Enter an injunction directing that Defendant implements a program of suicide and self-harm prevention, including at a minimum, regular and reliable access for Subclass members to suicide prevention and mental health crisis intervention services with trained professionals.

5.       Enter an injunction directing that Defendant implements a program of placement of Subclass members at ADX including, at a minimum, making available to all Subclass members the option of housing in a unit dedicated to prisoners with Mental Illness or Serious Mental Illness that is segregated from other prisoners, staffed by medical and correctional officers specially trained to deal with mental health issues, and operated so that prisoners with a Mental Illness or Serious Mental Illness may receive consistent and accurate doses of prescribed psychotropic medication together with other psychiatric and psychological care;

6.       Enter an injunction directing that Defendant adopts and complies with written policies on the safe and humane treatment of Subclass members who become disruptive.

7.      Enter an injunction directing the implementation of a program of preventative care to prevent the development of mental illness as a result of housing prisoners in the unique conditions at ADX, including the elements set forth in Paragraphs 21-22, above, and ensure that signs and symptoms of mental illness that do develop are timely identified and addressed.

8.      Enter an injunction directing Defendant to grant to a court-ordered monitor regular access to ADX and its records for the monitoring of Defendant's compliance with any injunctions entered herein.

9.      Enter an injunction directing Defendant to grant to a court-ordered monitor regular access to any facilities to which Subclass members have been transferred and those facilities' records to ensure Defendant's compliance with the requirements of the Eighth Amendment in providing mental health treatment to the members of the Subclass.

10.      Declare that the diagnosis and treatment of prisoners at ADX who have mental illness violates the standards set by the federal government and the BOP in their own regulations, as well as the Eighth Amendment to the United States Constitution;

11.      Grant an award of attorneys' fees; and

12.      Grant such other relief as this Court deems just and proper.

Dated: June 15, 2015

Respectfully submitted,

**ARNOLD & PORTER LLP**

By _____/s/ Edwin P. Aro_____

     Edwin P. Aro
     James E. Scarboro
     370 Seventeenth Street
     Suite 4400
     Denver, CO  80202-1370
     Telephone:  +1 303.863.1000
     ed.aro@aporter.com
     james.scarboro@aporter.com

     Maurice A. Leiter
     777 S. Figueroa Street
     44th Floor
     Los Angeles, CA  90017
     Telephone:  +1 213.243.4000
     maury.leiter@aporter.com

     Veronica E. Rendon
     Keri L. Arnold
     399 Park Avenue
     New York, NY  10022
     Telephone:  +1 212.715.1000
     veronica.rendon@aporter.com
     keri.arnold@aporter.com

     Nancy L. Perkins
     555 Twelfth Street, NW
     Washington, D.C. 20004
     Telephone:  +1 202.942.5000
     nancy.perkins@aporter.com

**WASHINGTON LAWYERS' COMMITTEE
FOR CIVIL RIGHTS AND URBAN AFFAIRS**


By     /s/  Deborah Golden
             Deborah Golden
             11 Dupont Circle, NW
             Suite 400
             Washington, D.C. 20036
             Telephone:  +1 202.319.1000
             deborah_golden@washlaw.org

Attorneys for Plaintiffs

Addresses of Prisoner Plaintiffs:

Percy Barron, Reg. #04710-000;
Alphonso Blake, Reg# 08083-007;
Jabbar Currence, Reg# 36530-083;
Sean Gillespie, Reg# 23278-009;
Charles Hipps, Reg# 06181-025;
Ronnie Houston, Reg# 04012-063;
John Lamb, Reg# 99917-011;
Arnell Shelton, Reg# 31513-007;
Marcellus Washington, Reg# 19015-050
U.S. Penitentiary - ADX
P. O. Box 8500
Florence, CO  81226

Carlton Dunbar, Reg# 32660-007;
Herbert Perkins, Reg# 40172-051;
John J. Powers, Reg# 03220-028
U.S. Penitentiary Florence - High
P.O. Box 7000
Florence, CA  81226

Harold Cunningham, Reg# 04685-000
U.S. Penitentiary Hazelton
P.O. Box 2000
Bruceton Mills, WV  26525

Scott Fountain, Reg# 02158-090
U.S. Penitentiary Atlanta
P.O. Box 150160
Atlanta, GA  30315


Address of Plaintiff  The Center for Legal
Advocacy, dba Disability Law Colorado:
455 Sherman Street
Denver, CO 80203

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 15th day of June, 2015, the foregoing **SECOND AMENDED COMPLAINT** was filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record as follows:

Amy L. Padden
U.S. Attorney's Office - Denver
1225 Seventeenth Street, Suite 700
Denver, CO  80202
amy.padden@usdoj.gov

Marcy E. Cook
U.S. Attorney's Office - Denver
1225 Seventeenth Street, Suite 700
Denver, CO  80202
Marcy.cook@usdoj.gov

/s/ Linda J. Teater