IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

HAROLD CUNNINGHAM, PERCY BARRON,  )
ALPHONSO BLAKE, JABBAR CURRENCE,   )
CARLTON DUNBAR, SCOTT FOUNTAIN,    )
SEAN GILLESPIE, CHARLES HIPPS,     )
RONNIE HOUSTON, JOHN LAMB,         )
HERBERT PERKINS, JOHN POWERS,      )
ARNELL SHELTON, MARCELLUS          )
WASHINGTON, CENTER FOR LEGAL       )     1:12-cv-01570-RPM-MEH
ADVOCACY,                          )
                                   )
            Plaintiffs,            )
                                   )
      vs.                          )
                                   )
FEDERAL BUREAU OF PRISONS,         )
                                   )
            Defendants.            )
_____

STATUS AND DISCOVERY CONFERENCE
TRANSCRIPT OF PROCEEDINGS
_____

Proceedings held before the HONORABLE RICHARD P.

MATSCH, U.S. District Judge for the District of Colorado,

beginning at 1:56 p.m. on the 30th day of July, 2015, in

Courtroom A, the United States Courthouse, Denver, Colorado.

APPEARANCES

For the Plaintiffs:        Edwin Packard Aro, Esq.
                           Arnold & Porter LLP-Denver
                           370 Seventeenth Street
                           Suite 4400
                           Denver, CO  80202-1370

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APPEARANCES (Continued)

For the Plaintiffs:   Maurice Abraham Leiter, Esq.
          Arnold & Porter LLP-Los Angeles
          777 South Figueroa Street
          44th Floor
          Los Angeles, CA  90017-5844

For the Defendant:   Amy L. Padden, Esq.
          U.S. Attorney's Office-Denver
          1225 17th Street East
          Suite 700
          Denver, CO  80202

          Jacob Licht-Steenfat, Esq.
          U.S. Attorney's Office-Denver
          1225 17th Street East
          Suite 700
          Denver, CO  80202

          Karl L. Schock, Esq.
          U.S. Attorney's Office-Denver
          1225 17th Street
          Suite 700
          Denver, CO  80202

1                    P R O C E E D I N G S

2         (At 1:56 p.m. on July 30, 2015, in the United States

3    District Court at Denver, Colorado, before the HONORABLE

4    RICHARD P. MATSCH, U.S. District Judge, with counsel for the

5    parties present, the following proceedings were had:)

6         THE COURT:  So you brought in some reinforcements.

7         MS. PADDEN:  I have.

8         THE COURT:  How do you do?

9              Well, a couple of things preliminarily, that is, on

10   your joint status report and the question about:  What about

11   discovery disputes and so forth?  I will handle all aspects

12   of this case personally, with a couple of exceptions.

13             If there is some dispute about electronic discovery

14   and the use, you know, Sedona Principles and all that stuff,

15   I will send that to somebody who can handle it with some

16   adequate background and knowledge of the technology that I

17   don't have and never intend to have, although it's getting

18   harder to stay away from it.

19             And I have read with interest the plaintiffs'

20   complaint--amended--second amended complaint and the answer

21   and the motion to strike.  And I paid particular attention to

22   the objectives of the litigation aspect of the second amended

23   complaint.  And I think we need to talk about that a little

24   bit right in the beginning of our conference here.

25             You know, confronting a matter of this type, which

1   is out of the ordinary, as an old man I try to think back to

2   what might be comparable in terms of the way I have

3   approached the situations comparable to this in the past.

4   And I think the most comparable one is Keyes v. Board of

5   Education.  And my efforts--I hope this doesn't take 20

6   years, but that did to comply with the Supreme Court mandate

7   to the mandate being first to desegregate the Denver Public

8   Schools root and branch.  And then as time goes on--not in

9   the Keyes case in particular but in other litigation--the

10  Supreme Court talks about achieving unitary status and all of

11  that.

12          The reason that's comparable is that we start in

13  this case with the Eighth Amendment.  That's the legal

14  premise of the case.  And we deal with what has the Supreme

15  Court of the United States said about the Eighth Amendment

16  with respect to those who are incarcerated.  And all we have

17  are the Estelle v. Gamble, deliberate indifference to serious

18  medical needs.  We don't really have anything in the area of

19  mental health from the Supreme Court of which I'm aware.

20          And as I look at your objectives as stated in the

21  second amended complaint, this is a case in which the

22  plaintiffs are attempting to define what is an adequate

23  approach, both with respect to a diagnostic evaluation and,

24  second, to treatment.

25          Now, there is a difference, of course, between what

1    would violate the Constitution and what would be not an ideal

2    or even a good approach to the conditions.  Given that, we

3    are not just dealing with a prison.  We are dealing with a

4    unique prison with unique requirements.

5             And so I have to think about--we have to think

6    about what is the Court's right role here.  And I have to

7    tell you that your definitions, I think, both with respect to

8    what the Bureau of Prisons has been doing and what the

9    plaintiffs are talking about, is a great deal of reliance on

10   the Diagnostic Statistical Manual V now.  And here again I

11   have to say that I have had considerable experience with the

12   Diagnostic Statistical Manual IV in other litigation.  And,

13   you know, as you look at that and as I have experienced it, I

14   think everybody here could be diagnosed at one time or

15   another with one of the conditions specified.  Certainly I

16   could.

17            And so it's difficult, I think, to try to get this

18   case into a focus where I'm acting in my role and given the

19   constraints, which includes the problem of the Prison

20   Litigation Reform act as well as Rule 65, as to what is a

21   mandatory injunction.

22            But that gets me back to the school case, because

23   what happens there is that after getting through busing

24   people all over the City and County of Denver, given the plus

25   and minus 15 per cent minority/majority, all that stuff,

1    finally, you know, the resolution of the case came about by

2    action of the school board, as the resolution of this case

3    will ultimately come about with the action of the Bureau of

4    Prisons.

5         But it is more like--and here's where--you know,

6    this is my thinking, and I've given a lot of thought to it--

7    this is like we're--as the case goes forward, there may be--

8    there already have been a lot of changes in what's going on

9    down there, as you've described it here.  And there may be,

10   instead of defining in a final judgment, this is what you

11   will do; this is what your staffing will be and all that; you

12   have a plan that is acceptable.

13        Now, that's not like, say, well, this is a

14   settlement case, and therefore what you've been doing with

15   Magistrate Judge Hegarty you'll continue to do.  I told you

16   before, I think you've exhausted that approach, but now

17   you're with me, and it's time for us to do the adjudicatory

18   function.  But it seems to me that's more the end result than

19   it is, Here it is.  And you have some definition of what you

20   want the judgment to say already in your second amended

21   complaint.  Whether that flies or not, we'll find out.

22        Oh, one other thing I should mention.  If it is

23   necessary for us to use some of the technology that is not

24   available in this courtroom, we'll go to a different

25   courtroom in a different building to take care of that, as

1    for example taking testimony from inmates or anything like

2    that.  So we're not going to be limited by this.  As it

3    happens recently, I have a new case involving, under the ADA,

4    a place of public accommodation, access to wheelchairs.  This

5    building doesn't provide access to wheelchairs itself, a

6    matter I have taken up with the lords of this building before

7    to no avail.  But I am moving to that other courthouse, newer

8    courthouse, for purposes of handling that case, so we're not

9    limited by the constraints here.

10          Anyway, these are my preliminary thoughts.

11          Now, turning to what you've got in your report

12   here, on the motion to strike I think there are a couple of

13   things.  I agree with some of it.  But I want to give the

14   caution, I don't give out gag orders.  Well, I have, but not

15   in this case.  But I think we need to be careful and

16   plaintiffs need to be careful about public discussion of the

17   case.  I like to do everything in this case in the courtroom,

18   because the public ought to know what's happening in all

19   cases for that matter.  But I'm doing this in the conference

20   room, because we are not doing anything here today but

21   planning, and I am not making rulings here.

22          But, you know, I used to talk about how lawyers

23   talk to the press.  But that's passé now.  There hardly is

24   any press.  The days of beat reporters are gone, and print

25   press is almost gone.  But we have blogs, and I assume Arnold

1   & Porter has a blog or some kind of newsletter or whatever

2   it's called.  And I'm sure that your, what's it called, the

3   Center--not the Center for Legal Advocacy, but what's this

4   Washington, D.C, group?

5        MR. ARO:  The Washington Lawyers' Committee.

6        THE COURT:  Yeah, yeah.  They probably do.  And I want

7   to caution about discussing this case publicly.  So we'll

8   get--I think that'll take care of some of your concerns in

9   the motion to strike.

10          Now, this is a public document today, isn't it?  We

11  didn't seal this (inaudible)?

12       MR. ARO:  (Inaudible.)

13       THE COURT:  I'm a little concerned about--I've mentioned

14  this before.  There is information or there are allegations

15  in the second amended complaint that deal with medical

16  condition, and I don't know quite how to deal with that.  I'm

17  not an expert on the privacy aspects of HIPAA, but I'm

18  concerned about that.

19       MR. ARO:  It may assuage those concerns to know that

20  everybody who is mentioned with personally identifying

21  information or names has consented to and reviewed what was

22  said about them in that filing, and so they have approved

23  what's been said--

24       THE COURT:  All right.

25       MR. ARO:  --and we're not disclosing facts about people

1    who didn't--

2         THE COURT:  Including non-plaintiffs?

3         MR. ARO:  That's true.

4         THE COURT:  Okay.  Well, that does help, because I read

5    this and I thought, ohmigod, that's all out there.  Well, I'm

6    pleased--and we have to be concerned with that as we go

7    through the next stages.

8            Now, we have, I guess, this question of what is the

9    authority of the Center for Legal Advocacy to represent

10   persons who are not actually named plaintiffs that was

11   briefed to some extent.  At that time I was hoping we might,

12   because of that, be able to avoid classification, which

13   apparently by your joint status report you're considering

14   supplementing that argument both ways.  But I doubt that we

15   will avoid class certification.  I think we'd better go

16   forward with that.  I don't want to risk all of this effort

17   on your part and mine and then have some people down the hall

18   disagreeing.

19           So the safe thing is to go forward with class

20   certification, and you have a class and--I don't know whether

21   you've got a class and a sub-class or two classes here

22   dividing up the two claims with diagnosis and treatment.  Is

23   that how you--are you looking at that as a class/sub-class or

24   two classes?

25        MR. ARO:  Class and sub-class.  Everybody in the sub-

1    class would be in the class, but not everybody in the class

2    would be in the sub-class.  The idea is, everybody who is

3    there has a right to diagnostic services, and then people who

4    are diagnosed by the BOP with certain conditions then qualify

5    for membership in the sub-class.

6         THE COURT:  And apparently, from what I've read, you've

7    got some--the Bureau of Prisons has some classification for

8    diagnosis now; is that right?

9         MS. PADDEN:  Yes, for what qualifies as serious mental

10   illness.  Is that what your question--

11        THE COURT:  Yeah.

12        MS. PADDEN:  Yes.

13        THE COURT:  And is that an agreed matrix or whatever

14   we're going to--template or something?

15        MR. ARO:  So the defendants, about this time last year,

16   presented us with a draft new policy that contains--

17        THE COURT:  Yeah.

18        MR. ARO:  --some of these categories, and our doctors

19   looked at them.  I would say conceptually we agree with it.

20   There is some disagreement about how it's being interpreted

21   and applied, but it may be a problem--

22        THE COURT:  Okay, yeah.  So--

23        MR. ARO:  --(inaudible) saw it and (inaudible).

24        THE COURT:  Yeah, because one of the things is, who

25   knows what's a serious mental illness?  And if there is

1  some--if you've already decided there is some workable

2  definition of that, that eliminates one of the problems.

3      MR. ARO:  It does.

4      THE COURT:  Okay.  Now, let's see, you talk here about--

5  well, going back, do you still want to pursue this Center for

6  Legal Advocacy issue with respect to whether unidentified

7  people are represented.

8      MR. ARO:  We do, Your Honor.

9      THE COURT:  Okay.

10      MR. ARO:  Because--well, for several reasons, including

11  the fact that somebody down the hall might also disagree with

12  determinations on class certification, and we think these are

13  two different analytically (inaudible).

14      THE COURT:  All right.  So, let's see, I think you've

15  suggested the timing on that; did you?

16      MS. PADDEN:  We did.

17      THE COURT:  Okay.  Well, we'll do that, page--or

18  paragraph 5, huh?  Yes.  But the motion for class

19  certification is now going to be different, isn't it?

20      MR. ARO:  It's going to be somewhat different mostly as

21  to the facts.  And what I mean by that is that, if you

22  recall--and I don't know how closely the Court studied it,

23  because we didn't--we briefed it--

24      THE COURT:  No, I didn't--I mean, I've got it.  I pulled

25  this stuff out to look at it again, but study is a different

1   thing.

2       MR. ARO:  There are a number of declarations that were

3   attached to the original class certification motion.  Some of

4   the declarants are no longer at BOP (inaudible)--

5       THE COURT:  Right.

6       MR. ARO:  --we've added new people to the complaint.

7   And our concern was that even though the essential issues and

8   facts remained 90 per cent what they were before, the record

9   would be better and clearer if we resolved it based on the

10  declarations of the people who are now asking or seeking to

11  serve as class representatives.

12      THE COURT:  Okay.  Now, does it add the sub-class?

13      MR. ARO:  No, it just deals with the class.

14      THE COURT:  Yeah.  So obviously you have to file

15  something for the sub-class.

16      MR. ARO:  That's right.  But we conceive that as a

17  separate motion.  And we've talked at various points, I

18  think, including one of our very early status conferences two

19  summers ago, about when exactly that made the most sense to

20  do and--

21      THE COURT:  Yeah, I'm not sure it ought to be done

22  separately, though.

23      MR. ARO:  Separately from?

24      THE COURT:  Well, you said a separate motion.  It seems

25  to me that we ought to deal with Rule 23(a) and (b)(2) with

1   respect to both.

2        MR. ARO:  So a couple of reflections about that.  One,

3   the certification of the class is, from a factual standpoint,

4   a completely separate exercise than certification of the

5   sub-class; same rules, same basic legal principles, but we're

6   dealing with different facts, different problems to be

7   solved.

8             And I think the second issue is, there has been a

9   desire on the part of the government and us, frankly, to get

10  a class certified.  But the amount of work that will go into

11  the sub-class certification motion is significantly greater.

12  If you wanted us to do them together, we'd need to push that

13  timeline back (inaudible).

14       THE COURT:  Well, that's all right with me to push it

15  back.  But I'm having trouble thinking about doing this

16  separately.

17       MR. ARO:  If you go back to, again, our early status

18  conferences, one of the ideas that was discussed was, because

19  so many of these sub-class certification issues overlap with

20  the merits (phonetic) evidence, there was a suggestion--the

21  Court didn't rule on it, but you seemed predisposed toward it

22  to resolve those issues--actually resolve the--

23       THE COURT:  Yeah.

24       MR. ARO:  --the sub-class certification in connection

25  with the merits trial instead of having two separate

1   proceedings that deal with a lot of the same evidence.

2       THE COURT:  Well, I've re-thought that, too, given

3   Walmart.  You know, I went back and read Shook, that is, the

4   two appellate opinions in Shook.  Be careful here, I'm

5   telling myself.  I have to be careful about demonstrating

6   appropriate respect.

7           But given what the Supreme Court did in Walmart and

8   said, it seems to me this whole idea of formulaic approaches

9   to Rule 23 and you can't touch the merits is gone, because I

10  think Walmart changed the game considerably, as it did with

11  plausibility.  I think you look at plausibility of the

12  allegations, but you also look at--and this is where I also

13  come back to, well, what-can-I-do-about-it thinking, because,

14  you know, when I did that in Shook, as you know, I said,

15  well, all this may be true, but I can't do what you ask me to

16  do.

17          I'm not suggesting doing the same thing here, but I

18  think that the approach to your motions will include

19  consideration of what kind of an order on the 23(b)(2) can be

20  entered, because that's where--you know, that's the end game.

21          So I don't know if you agree with what I've just

22  said on that, but sometime along the way we've got to get rid

23  of this formula stuff where everything is analyzed on some

24  kind of a formula or template, and if you don't set these--

25  it's like going back to code pleading or something, you know,

1    or common-law writs.  I don't go back quite that far.  But,

2    at any rate, I think we should be disabused of those

3    limitations in the past.

4         MR. ARO:  So is it your thought that you want to take up

5    both certification issues, both the class and the sub-class,

6    simultaneously and substantially in advance of filing the

7    merits?

8         THE COURT:  Yes.

9         MR. ARO:  Is that what you're thinking?

10        THE COURT:  Yeah.

11        MR. ARO:  So the starting point for the status report

12   and the schedule that we put together is having the case

13   ready to try in about a year (inaudible)?

14        THE COURT:  Yeah, well, I don't know.  You know, again,

15   that's not going to restrict our thinking.

16        MR. ARO:  So--

17        THE COURT:  You've probably looked at it, you know, and

18   thinks of, well, we'd like to get this done before Matsch

19   dies, but--

20        MR. ARO:  Never (inaudible).

21        THE COURT:  Yeah, well, it's entered my thoughts.  But--

22        MR. ARO:  Part of it, candidly, Your Honor, was the

23   caution that you gave us in April when we were before you and

24   you were politely anxious to get this case moving forward.

25   And so we tried to present you with something that would suit

1   that objective--

2        THE COURT:  Yeah.

3        MR. ARO:  --and tried to do something that was

4   comprehensive.  I'd have to think a little bit about how long

5   we would need to actually, in practice terms, be able to put

6   the right kind of comprehensive class cert motion before you

7   and how that would affect the rest of the schedule.

8        THE COURT:  Well, we're not making any decisions here

9   today.  I'm not.  And I'm just opening this up for

10  discussion; I'm giving you some of my thoughts; and I expect

11  you to work with each other and develop some program to

12  approach it, because you may disagree with what I'm saying.

13            But, you know, contrary to the approach that seems

14  to be most prevalent in the Federal Courts these days, I

15  think lawyers ought to have the freedom to practice law in

16  their cases; and the Court shouldn't be mandating everything

17  and putting unrealistic timetables out and deadlines.

18            We need to move.  You all are interested in moving

19  forward.  And I'm interested in devoting myself to the case,

20  not to the exclusion of everything else, but this is a very

21  important case, and it requires whatever attention is

22  necessary so that we can--I think we go forward from today

23  with your discussing what I'm talking about and thinking

24  about, okay, what do we do, and then come back to me with

25  that.

1      MR. ARO:  In the ordinary course, would you expect to

2  want an evidentiary hearing or just a legal argument on

3  (inaudible).

4      THE COURT:  I doubt that an evidentiary hearing is

5  necessary.  You're going to have declarations and affidavits,

6  and I think that's all we need, unless there's something that

7  I don't know about.  But, you know, I have a concern--I've

8  expressed this before--what is the competence to testify of

9  some of these people?  If they are suffering from conditions

10 that so much affect their in-the-moment cognitive capacity, I

11 don't know whether we can take testimony from them.

12     MR. ARO:  It depends on the day, and it depends on the

13 person.

14     THE COURT:  Yeah, I know.  But there is an issue there.

15 And, you know, there's hallucinatory moments, I'm sure, and

16 there's fantasy; there are all those things that ordinarily

17 have to be considered if we're declaring a witness competent

18 to give testimony.

19     MR. ARO:  And I think, speaking quite candidly about

20 this issue, from the beginning of this case we've been

21 dealing with a range of inmates who are, some of them, quite

22 lucid, quite competent, and nevertheless quite ill, all the

23 way to people who are literally virtually catatonic or

24 completely psychotic all the time.  And we have tried really

25 hard to find folks who were sick enough to make the case, if

1   you will, but stable and competent enough to both be deemed

2   competent to testify and to be able to show up and actually

3   say what happened to them.

4        THE COURT:  Yeah.

5        MR. ARO:  And one of the things that we are for sure

6   going to need to talk about before we get to a trial would be

7   how much of the contextual facts about the kind of people at

8   the really psychotic end of the spectrum does the Court

9   require as part of the evidentiary showing, because I think

10  if the issue is the application of policies and procedures

11  and the way that those are enforced within the system, not

12  much of that contextual information is important.

13            If the issue is we need to persuade you that there

14  was a fundamentally constitutionally-flawed system that was

15  obviously so to anybody who bothered to look, then I need to

16  put in front of you people who would really, in all honesty,

17  would be displaying to you somebody like--

18       THE COURT:  Yeah.

19       MR. ARO:  --you'd see somebody in the zoo, because they

20  don't even know where they are.

21       THE COURT:  Well, that's the--and maybe a demonstrative

22  exhibit, I guess.  But--well--

23       MR. ARO:  And I don't know that we need to decide that--

24       THE COURT:  No, we don't need to decide that today.

25  This is a thinking-out-loud session.  And I invite you to

1    think out loud as well here, because this is, you know, a

2    cooperative effort to try to get the issues into an

3    adversarial proceeding and ordinary litigation.  There may be

4    an aspect of your case that's almost like a mandatory

5    injunction:  Okay, you've got these policies, but you're not

6    following them.

7           And that sort of gets me to Watts against Hadden

8    and when I had the Bureau of Prisons and the Youth

9    Corrections Act where, you know, we had a whole institution

10   out there in Englewood designed for Youth Corrections Act.

11   We had people in there who were entitled to Youth Corrections

12   Act, but they just changed the game on them and put them in

13   as ordinary federal prisoners.  That went on for a while.

14          But that's a different aspect of this case:  Okay,

15   your policy may be good, but why don't you follow it?  I

16   don't know.  That's what you're alleging in part in the

17   second amended complaint.

18       MR. ARO:  That's true.

19       THE COURT:  And that's particularly, of course, with

20   respect to putting people in ADX in the first place when

21   they've already come out of Springfield or somewhere.

22          Now, that's another thing.  Are we talking about

23   the Control Unit?  Are we talking about ADX as a whole?  I

24   don't know.  What are you talking about?

25       MR. ARO:  So a central feature of the case is the ADX--

1   which the Control Unit is one of, I think, nine subject

2   housing.

3        THE COURT:  Yeah, you specified what they all are.

4            Well, you know, I'm well aware there are different

5   levels of security required because of, A, adjudicated

6   criminal conduct; B, we're not talking about the SAMs, as I

7   understand it.

8        MR. ARO:  And, Judge, all the same policies and any sort

9   of remedy would apply to the inmates in that SAMs unit, yes.

10       THE COURT:  I don't know that I can touch SAMs.

11       MR. ARO:  So this is an issue that we are just sticking

12   our toe into the pool.  We have concerns about some of the

13   inmates in that unit.  There obviously are restrictions on

14   who even can communicate with people in that unit.

15       THE COURT:  Yeah, you know, I've already been down that

16   road with one, <u>Youssef</u>.

17       MR. ARO:  And I think--I can give you the comfort that

18   the people who provide mental health services to inmates in

19   that unit are the same people who provide health services

20   elsewhere in the institution.  They are operating under the

21   same policies.  The inmates, at least by policy, are afforded

22   the same sets of rights.

23           And so in terms of the ability--if the Court were

24   to order that services are going to be provided in a certain

25   way or at a certain level within that institution, that would

1   include SAMs; and it wouldn't necessarily require, with one

2   exception I'll mention in just a second, any communications

3   that would touch any of the administrative measures.  The

4   exception to that is monitoring and whether--

5        THE COURT:  Yeah.

6        MR. ARO:  --a court-appointed monitor could communicate

7   with those folks.  When we were discussing the potential of a

8   settlement with Magistrate Judge Hegarty, the concept that

9   was on the table--and I think had been agreed to by the

10  parties--was that Judge Hegarty, if the Court approved it,

11  would serve as a monitor, because it's the judicial officers

12  who can communicate with inmates without having to modify

13  their SAMs.  And--

14       THE COURT:  I'm not sure that's true.  As I understand

15  SAMs, nobody communicates except the Attorney General

16  approves on recommendation of the FBI and the United States

17  Attorney for the appropriate district, either Southern or

18  Eastern New York.  I think most of them are in there under

19  their orders.

20       MR. ARO:  Or Los Angeles Central District.

21       THE COURT:  Or Los Angeles, yes.  But, you know, as I

22  understand the SAMs since I learned about it in Ramzi

23  Youssef, it's the Attorney General who decides who can

24  communicate and does so on the basis of classified

25  information.  And that's been held to be constitutional.

1      So, I don't know, we don't have to deal with that

2  necessarily right now, but I think that's an area that may be

3  separate and apart from this.

4      So these are just--all these things are something

5  we have to consider when we start marching forward with

6  litigation.

7      MR. ARO:  In terms of the schedule, now that we have

8  some insight from you, particularly on the class

9  certification issue, Ms. Padden and I can go back and put

10  together a revised schedule.  Would you envision having

11  another status conference or scheduling conference?

12      THE COURT:  For sure, yes.

13      MR. ARO:  Okay.

14      THE COURT:  After you, you know, try to come up with

15  something.  And I am operating on the assumption you won't be

16  able to agree on everything, you know.  I'm not suggesting--

17      MS. PADDEN:  We've had pretty good luck so far.

18      THE COURT:  What?

19      MS. PADDEN:  We've had pretty good luck so far with

20  deadlines and--

21      THE COURT:  Well, you know, this is a tough area to try

22  to agree on.  And you have clients who you have to deal with,

23  which--and on the government side that might be kind of

24  difficult for you.  I recognize that.

25      MS. PADDEN:  I can be (inaudible) when I need to.

1     MR. ARO:  I know that Ms. Padden is leaving town next

2  week for a few weeks.  I may be gone for a little bit as

3  well.  I think we all will be back in Denver after the 21st

4  of August.  Is that right?

5     MS. PADDEN:  Uh-huh.

6     THE COURT:  Well, I'm pretty flexible.  Everybody keeps

7  settling when I'm inviting them to trial, and it's getting to

8  be so I wonder what the hell am I doing here?

9          Let's see, there's something I noted here--oh,

10  what's going on outside the Court apart from your settlement

11  discussions?  You've referred to a GAO report.  I'm not sure

12  I'm aware of a GAO report or don't need to be, but what's

13  happening with that?

14     MR. ARO:  So there have been at least two, I'm going to

15  call them, audit reports, studies, whatever you want to call

16  it, at the Bureau of Prisons that touch issues in this case.

17  One of them was released in April of 2015, and the other one

18  was released--it's in the complaint--sometime in 2014.

19     THE COURT:  Yeah.

20     MR. ARO:  One of them was a study that was commissioned

21  by the Bureau of Prisons after a senatorial hearing back in

22  2012 about restricted housing units, and they brought in some

23  outside consultants who looked at restricted housing

24  throughout the Bureau of Prisons.

25          The other one deals with a number of issues,

1   including mental health services.  And I think Ms. Padden or

2   her client could tell you more about the information that

3   went into it, because all we have is actually the copies--

4       THE COURT:  Well, is there something going on as a

5   result of that?

6       MR. ARO:  Not that I'm aware of.

7       MS. PADDEN:  Not in particular.  The report is actually

8   posted on the BOP's website, so it's there.  And obviously

9   the BOP has been considering--there are recommendations made

10  in there, and some of those have been then forming changes

11  that have been made.

12      MR. ARO:  This is--

13      THE COURT:  Is there some congressional committee taking

14  an interest in the subject of isolation?

15      MR. ARO:  So the individual who was showing the most

16  interest back in 2012 and '13 was Senator Durbin, who at that

17  time was the chair of a subcommittee of the Judiciary

18  Committee, and he convened a hearing on the use of solitary

19  confinement--

20      THE COURT:  Yeah.

21      MR. ARO:  --back in June of 2012 right around when the

22  complaint was filed.  He then had a follow-on hearing in

23  January of 2014.

24      MS. PADDEN:  I think that's right.

25      MR. ARO:  And he has been deposed as the committee chair

1   because of the last election, and I'm not aware of any

2   ongoing senate initiative.  You may be aware that Justice

3   Kennedy ignited a bit of a firestorm a few weeks ago with a

4   concurring opinion in a case that deals with--essentially

5   solicited a case on the constitutionality of long-term

6   isolation.

7        THE COURT:  Yeah, I'm aware of what he said.

8        MR. ARO:  And--

9        THE COURT:  I'm not aware of the firestorm.  What I read

10  is the words--

11       MR. ARO:  Shortly after--

12       THE COURT:  --and Justice Breyer on the death penalty.

13       MR. ARO:  And shortly after that the president gave a

14  speech in which he indicated that he had directed the new

15  attorney general to take a look at the use of long-time

16  isolation.

17       THE COURT:  Oh.

18       MR. ARO:  So there's discussion of the topics in all

19  three branches, but whether there is actually any sort of

20  considerative policy shift is not clear.

21       THE COURT:  This branch will go forward.  So--

22       MR. ARO:  Might we come back and see you shortly after

23  the 21st for a scheduling conference?

24       THE COURT:  Sure.  And would you get the calendar--the

25  book calendar, please?

1          I'll tell you one thing that--and I don't mean to

2     prejudge the case, but one thing that bothers me is staffing

3     and psychological nurses and technicians and psychologists.

4     I don't see a full-time psychiatrist there.  And I have a--

5     I'm trying to be careful in explaining this without

6     suggesting that it's a bias, but I have a great deal of

7     skepticism about the work of psychologists using tests like

8     the MMPI and a lot of these others.

9          I have had considerable experience, of course, with

10    hearing conflicting testimony about those tests and about

11    this--I can't remember the name of it now, but a test on

12    supposedly determining the level of falsification or

13    malingering in disability cases and that kind of thing.  I

14    have to go with what the science is, but, unfortunately, this

15    is a science without a lot of objective scientific

16    principles.

17         So I just have a lot of trouble separating out

18    people who express opinions based on these tests versus

19    people who, in addition to knowing something about human

20    behavior, are also doctors, MDs, because I have kind of a

21    holistic view of the human condition.  I don't think it's

22    easy to separate behavior from all of the rest of the human

23    organism, including, you know, basic health, endocrine--all

24    those--hormonal--all that stuff works together, and I think

25    I've learned.  And so I'm surprised--I supposed it's

1  difficult to get somebody who is a qualified psychiatrist to

2  live in or work in a place like ADX.

3       But I am concerned about staffing, and I think

4  that's something--that is something that the Court could

5  require.

6       MS. PADDEN:  Your Honor, there is a position down there

7  for a full-time staff psychiatrist, which, unfortunately, we

8  have been trying to fill very desperately.  But we have been

9  filling that with either psychiatrists from other

10  institutions coming in or--for close to a year there was a

11  full-time tech there on a contract basis, and that's--we have

12  a new contract that's coming up.  I think there are going to

13  be two people sharing that contract.  I think I'm right

14  (inaudible).

15       THE COURT:  (Inaudible) this video of psychiatry.

16       MS. PADDEN:  We've used that when there is nothing else

17  available.

18       THE COURT:  I'm not ruling, you know--

19       MS. PADDEN:  Right.

20       THE COURT:  --I'm not.  And I understand how tough it

21  would be for a really competent person to want to do this.

22  On the other hand, there are a few people in this world who

23  are altruistic and who see a need and believe they can

24  dedicate themselves to meet the need.  I hope there are still

25  such people, but I don't think you'll find them on-line.

1      MS. PADDEN:  We've been doing much more than that, Your

2   Honor.  We've been actually going to CU and trying to

3   recruit, you know, recent graduates to come work for us,

4   but--

5      THE COURT:  Yeah, but you need more than a recent

6   graduate.

7      MS. PADDEN:  Right, yes.

8      THE COURT:  You need somebody who has been in the

9   street, that is, whose clients have been in the street,

10  because this isn't like dealing with people who come out of

11  the library.  I'm not unmindful of past behavior of some of

12  the people down there.  There are people down there as a

13  result of my order, so--oh, that reminds me, what am I going

14  to do about these pro se people?  You've got two more of them

15  here now.  I'm sort of ignoring them at the moment.

16     MS. PADDEN:  We were planning to respond to that motion.

17  I think our response is due next week.

18     THE COURT:  I think there are two of them, aren't there?

19     MS. PADDEN:  I believe so.  Is it Bruce and Clinton

20  (phonetic)?  Yes.

21     THE COURT:  Well, anyway, I've got to do something.  And

22  is Pinson still--

23     MS. PADDEN:  Pinson?

24     THE COURT:  --in?  They removed him.

25     MS. PADDEN:  Right.  Well, he removed himself from the

1   case, I think.  He asked to be--

2        THE COURT:  Did he?  Okay.

3        MS. PADDEN:  --removed from the case, yes, sir.  He is

4   no longer--

5        THE COURT:  I can't keep track of the pro se stuff.

6        MR. ARO:  We apologize, but we have limited ability to

7   control these (inaudible).

8        THE COURT:  Oh, I know, I know.

9        MR. ARO:  (Inaudible) in particular are challenging.

10        THE COURT:  No, I--you know, it must be difficult for

11   you to get in this institution and your assistants.

12        So have we talked about everything you've got in

13   this report?

14        MS. PADDEN:  I think so.

15        MR. ARO:  I think so.  I mean, we're obviously going to

16   need to rethink some of the dates, but--

17        THE COURT:  Right.

18        MR. ARO:  --if we could kind of see and maybe the week

19   of the 24th, which I think is the first week you're back in

20   the office--

21        THE COURT:  Yeah, well, how about later in the week when

22   you're reoriented?

23        MS. PADDEN:  Yeah, a little time to recover (inaudible).

24        THE COURT:  Yeah.  Well, I hope you have fun whatever

25   you're doing, and I'm not asking any questions.

1        MS. PADDEN:  Okay.

2        THE COURT:  How about the 28th?

3        MR. LEITER:  Would it be possible, Your Honor, to do it

4    the 26th or the 27th?  I am in another court on the 28th.

5        THE COURT:  The 27th would be--I've got a big anti-trust

6    case ending on the 26th, a summary judgment.  So the 27th?

7        MR. LEITER:  The 27th would be good.

8        MS. PADDEN:  That works for me, Your Honor.

9        MR. ARO:  Sometime in the middle of the day as well.

10    (Inaudible) trial, we're here, and go home the same day,

11    maybe 1:00 o'clock or 2:00 o'clock?

12        THE COURT:  2:00 o'clock is better for me.

13        MS. PADDEN:  That works for me.

14        THE COURT:  Is that good?

15        MS. PADDEN:  Yes.

16        THE COURT:  Okay.

17        MR. ARO:  And would you like us to submit a proposed

18    amended scheduling order, or would you like a status report

19    like this?  In what format would you like to get what we--

20        THE COURT:  Whatever is appropriate.  I mean, it depends

21    on what you've done.  If you've done a scheduling--I think--a

22    scheduling order if you can do it.  A status report is

23    probably more realistic.  And what I'm looking for is your

24    reaction to what I've been talking about, my comments, not

25    specifically, but, you know, thinking about what's the proper

1   role of the Court at the end of the day and what kind of

2   relief is--assuming there is relief needed.

3            And then--oh, I do want to get back to this matter

4   of people who aren't there anymore and you're moving them out

5   and the issue of mootness.  We have this stipulation, and I'm

6   focusing on that a little, because I just had the Department

7   of Corrections of the State of Colorado in here with respect

8   to First Amendment rights of inmates who receive material

9   that was mailed to them that came downloaded from the

10  internet in the Sterling facility.  And since the lawsuit and

11  since I went forward and denied a motion to dismiss, they

12  changed their policy and now say it's moot.

13           And I hope we don't get that in this case.

14      MR. LEITER:  Your Honor, on the date, I apologize, I

15  misspoke.  The 28th would be good.  It's the 27th that is not

16  good.

17      THE COURT:  All right.

18      MR. LEITER:  I apologize for that.

19      MS. PADDEN:  That would be--

20      THE COURT:  The 28th is okay?

21      MR. ARO:  So 2:00 o'clock on the 28th?

22      THE COURT:  Yeah, still.

23      MR. ARO:  So we will endeavor to get you an amended

24  scheduling order; and if that doesn't work for some reason,

25  we'll file a status report.

1       THE COURT:  Yeah, you know, I don't like it saying

2    "Amended Scheduling Order."  It's "Scheduling Order Number

3    Two," or whatever it is.  Every time you look at "Amended,"

4    you think, well, what's been amended?  So "Scheduling Order

5    Number Two."

6           As I said, or attempted to say at any rate, I'm

7    flexible.  I think this is one of those where, as the case is

8    new, we must think anew and all that and not be bound by some

9    sort of a set formula or template or whatever the word is

10    that everything has to fit within this box.  We're dealing

11    here with a very human problem and a very intractable one in

12    terms of seeking an ideal.  There's no ideal solution to

13    this.  We're talking about the failures of the human

14    condition.

15           And some of what you've got in this amended

16    complaint suggests excessive force claims.  And, you know, as

17    I read this and as I read your motion to strike, it comes to

18    mind, if an employee of the prison goes home and his kids

19    ask, "Who did you beat up today?" that would be pretty

20    difficult to live with.  And you're accusing some of these

21    people of brutality and malicious beating.  We have to be

22    careful about that.

23           So there are real people on both sides of the gate

24    down there, and I am not inconsiderate of what life is like

25    for the people who are in the employ of the Bureau of

1    Prisons.

2         MS. PADDEN:  It's a difficult job.

3         THE COURT:  Very.  And, you know, I have often wondered

4    what kind of these same things like have happened--I've got

5    so many jail cases any more of excessive force and police

6    cases that you wonder whether there is some need for a

7    profile of people who are qualified to do this work; and if

8    there was one I'd like to see it, because how many of you

9    would want to do it?

10             So there are two sides to the case.  I am not

11   ignoring that.  I am not going to equate it with zookeepers,

12   but we do have people in here that some people would consider

13   to be dangerous animals.  And that's life.

14             Okay, I've done enough preaching and open-minded

15   discussion here; and I am not going to put anything in the

16   minutes about the discussion, because it's recorded, but I am

17   not putting it out there so it could misinterpreted by

18   somebody.  So you don't need to do all that in there.

19             It's a tough case, but that's why I'm still going,

20   I think.  I kind of like this sort of--kind of like playing

21   Ohio State; okay?

22             All right, we'll see you on the 28th.

23        (2:49 p.m. - Whereupon, the proceedings were concluded.)

24

25

34

1                    TRANSCRIBER'S CERTIFICATE

2          I hereby certify that the foregoing has been

3    transcribed by me to the best of my ability, and constitutes

4    a true and accurate transcript of the mechanically recorded

5    proceedings in the above matter.

6          Dated at Aurora, Colorado, this 6th day of August,

7    2015.

8

9

10                         /s/ Sylvia Besel

11                         Sylvia Besel

12                         Federal Reporting Service, Inc.

13                         17454 East Asbury Place

14                         Aurora, Colorado  80013

15                         (303) 751-2777

16

17

18

19

20

21

22

23

24

25