IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

HAROLD CUNNINGHAM, PERCY BARRON,       )
ALPHONSO BLAKE, JABBAR CURRENCE,       )
CARLTON DUNBAR, SCOTT FOUNTAIN,        )
SEAN GILLESPIE, CHARLES HIPPS,         )
RONNIE HOUSTON, JOHN LAMB,             )
HERBERT PERKINS, JOHN POWERS,          )
ARNELL SHELTON, MARCELLUS              )
WASHINGTON, and CENTER FOR LEGAL       )    1:12-cv-01570-RPM-MEH
ADVOCACY,                              )
                                       )
                Plaintiffs,            )
                                       )
        vs.                            )
                                       )
FEDERAL BUREAU OF PRISONS,             )
                                       )
                Defendant.             )
_____

ORAL ARGUMENT
TRANSCRIPT OF PROCEEDINGS
_____

Proceedings held before the HONORABLE RICHARD P.

MATSCH, U.S. District Judge for the District of Colorado,

beginning at 9:56 a.m. on the 26th day of October, 2015, in

Courtroom A, the United States Courthouse, Denver, Colorado.

APPEARANCES

For the Plaintiffs:        Maurice Abraham Leiter, Esq.
                           Arnold & Porter LLP-Los Angeles
                           777 South Figueroa Street
                           44th Floor
                           Los Angeles, CA  90017-5844

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APPEARANCES (Continued)


For the Defendant:          Amy L. Padden, Esq.
                            U.S. Attorney's Office-Denver
                            1225 17th Street East
                            Suite 700
                            Denver, CO  80202

                            Marcy Elizabeth Cook, Esq.
                            U.S. Attorney's Office-Denver
                            1225 17th Street East
                            Suite 700
                            Denver, CO  80202

                            Karl L. Schock
                            U.S. Attorney's Office-Denver
                            1225 17th Street East
                            Suite 700
                            Denver, CO  80202

1                          P R O C E E D I N G S

2          (At 9:56 a.m. on October 26, 2015, in the United States

3   District Court at Denver, Colorado, before the HONORABLE

4   RICHARD P. MATSCH, U.S. District Judge, with counsel for the

5   parties present, the following proceedings were had:)

6          THE COURT:  Please be seated.  Good morning.  We're here

7   in 12-cv-1570, Harold Cunningham and others against the

8   Federal Bureau of Prisons.  And we're here on the plaintiff's

9   motion for partial summary judgment concerning the role of

10  the Center for Legal Advocacy doing business as Disability

11  Law Colorado.

12              So our appearances, Mr. Leiter.

13          MR. LEITER:  Good morning, Your Honor, Maury Leiter for

14  the plaintiffs.  With me is Mark Ivandick of the Center of

15  Legal Advocacy.

16          THE COURT:  All right.  And for the Government, Mr.

17  Schock and Ms. Padden.

18          MS. PADDEN:  Good morning, Your Honor, Karl Schock will

19  be arguing the motion.  Amy Padden, Marcy Cook, and Caitlin

20  Turner from the Bureau of Prisons appearing on behalf of the

21  defendant.

22          THE COURT:  All right.  Well, I should begin perhaps by

23  explaining that what appears to be a .32 caliber entry hole

24  in my forehead is not.  But is the work of a dermatologist

25  trying to remedy many years of Colorado sunshine, the effects

1    of Colorado sunshine.

2           So anyway you filed a lot of briefing on this and

3    just preliminarily my understanding of it is that this entity

4    is a designated state agency, designated way back by Governor

5    Richard Lamb pursuant to the Federal Statute, Protection and

6    Advocacy for Mentally Ill Individuals, which I would

7    pronounce PAIMI, but wonder about that.  And to the fulfill

8    the congressional purposes that have been articulated by the

9    Congress.

10          Also as I understand it the defendant is accepting

11   the declaration that no federal money has been or is being

12   used to support the--this litigation.  So that aspect of the

13   briefing is no longer a matter of concern as I understand it.

14          So we'll hear from plaintiffs' counsel.  And I--you

15   know, I've searched for exactly what is this entity; it's

16   described as a state agency, it's described as a not for

17   profit, nowhere do I see what it exactly is.  Is it formed as

18   a Colorado nonprofit corporation?

19        MR. LEITER:  Yes, Your Honor.  And actually its

20   existence predates the--I think it's called the PAIMI Act--or

21   at least that's how we refer to it.  It was first established

22   in 1977 under the Federal Developmental Disabilities Act,

23   which is 42 U.S.C. 15041.

24        THE COURT:  Yeah, that predates this--

25        MR. LEITER:  Right.

1     THE COURT:  --this statute.

2     MR. LEITER:  So--

3     THE COURT:  So that when it says in this statute

4  eligible system refers back to that previous statute.

5     MR. LEITER:  Yes.

6     THE COURT:  Yeah.

7     MR. LEITER:  So the--so CLA existed prior to the PAIMI

8  Act.  The PAIMI Act provides it with federal funds and also

9  with the additional powers enumerated in the act.

10     THE COURT:  Right.

11     MR. LEITER:  But the organization has an independent

12  existence.  And as we argue in our papers we believe it

13  satisfies both the constitutional and the prudential

14  requirements of Hunt.

15     THE COURT:  Yeah, but what--what is it, what kind of

16  organism is it?  Is it a Colorado nonprofit corporation?

17     MR. LEITER:  Yes, it is, Your Honor.

18     THE COURT:  And so it can receive donations, private

19  donations?

20     MR. LEITER:  It can receive private donations, it can

21  also receive funding from state government--

22     THE COURT:  Right.

23     MR. LEITER:  --as well as the federal funding it

24  receives under the--under the PAIMI Act.

25     THE COURT:  Okay.  And one of the things that I noted

1    in--in looking at this is that under the purposes and

2    actually definitions of use and I was wondering--this hasn't

3    been addressed, but whether this C--CLA is limited to the 8th

4    Amendment.  It hasn't been argued of course.

5         MR. LEITER:  Yes.

6         THE COURT:  But to prevent abuse of mentally ill persons

7    in custody would suggest that you've got some paragraphs

8    about abuse in your amended complaint and I think there's--

9    that was subject to a motion to strike which I deferred, but

10   one of the issues in this case of course is the scope of the

11   8th Amendment which is the primary claim of the--of the case.

12        MR. LEITER:  Right.  We believe, Your Honor, that CLA's

13   role encompasses all deprivations of mental health care and

14   treatment.  We have framed that of course as 8th Amendment

15   violations in this case.  But the powers of CLA are to

16   address any deprivation of--

17        THE COURT:  Yeah.

18        MR. LEITER:  --proper treatment.

19        THE COURT:  So if some of those paragraphs--which I went

20   back and looked at--were to be factually supported, it could

21   suggest that that's abuse under the federal statute and that

22   the CLA has the power to address it.

23        MR. LEITER:  Yes, Your Honor.

24        THE COURT:  I don't know, are you making that claim?

25        MR. LEITER:  We are making the claim that CLA's powers

1    extend not only to abuse--but to ensure it I'm looking for

2    the precise language.

3         THE COURT:  I mean clearly it would cover the 8th

4    Amendment--

5         MR. LEITER:  It would cover the 8th Amendment.

6         THE COURT:  --deliberate indifference.

7         MR. LEITER:  Yes.  And it would cover under

8    10805(a)(1)(b) pursuing legal and other appropriate remedies

9    to ensure the protection of individuals with mental illness

10   were receiving care or treatment.

11        THE COURT:  Yeah.  Well, I just want to--you know, I

12   just was thinking out loud about that, but this is an 8th

13   Amendment case, is that where we're are?

14        MR. LEITER:  Yes, Your Honor.

15        THE COURT:  You're not asserting anything beyond that?

16        MR. LEITER:  That's correct, Your Honor.

17        THE COURT:  Okay.  That's good.

18        MR. LEITER:  And I won't reargue of course everything

19   that's been in the extensive briefing.

20        THE COURT:  Yeah.

21        MR. LEITER:  And so let me just briefly highlight the

22   one what I believe is the key issue here.  We believe that of

23   course the constitutional standards of Hunt are not really at

24   issue here.

25        THE COURT:  Right.

1      MR. LEITER:  That we've satisfied them and the

2  Government has by and large conceded that.   The prudential

3  requirement we've argued two ways, that the CLA satisfies it

4  on the undisputed facts, that this is not a case in which

5  each individual constituent would need to actively

6  participate in the case for CLA to achieve injunctive

7  perspective relief on behalf of all inmates.

8          We also have argued that Congress abrogated the

9  prudential requirement in Section 10805.  We think either way

10  is sufficient to determine that CLA has established

11  prudential standing.

12          The Government's principal objection of course is

13  10804.  And I submit, Your Honor, that you can resolve that

14  question just on the plain language of the statute.  Read

15  even in the best possible light for the Government all

16  10804(c) purports to do is place a limit on what CLA can do

17  with its federal funds.

18      THE COURT:  Right.

19      MR. LEITER:  The Government is making a different

20  argument that somehow the statute does something else, that

21  it also restricts what CLA can do with its private funds.

22          There's nothing in the statute that says that.  If

23  Congress--even if arguably Congress had the ability to

24  restrict what CLA did with its private funds, if it wanted to

25  try to enact that provision it could have, it didn't.

1          We're not sure we agree with the Government on its

2   reading of 104--10804 as limiting even use of federal funds

3   to inmates who represent and not associational standing but

4   that's not really at issue here because--

5          THE COURT:  Right.

6          MR. LEITER:  --there are no federal funds involved.

7          THE COURT:  Which also covers this regulation, agency

8   regulation.

9          MR. LEITER:  Exactly, Your Honor.

10         THE COURT:  Because that goes towards--as I read it--to

11  how to write the checks.

12         MR. LEITER:  That's exactly--

13         THE COURT:  It's not--

14         MR. LEITER:  --that's exactly correct.  The regulation

15  is very clear that it's implementing how the federal funds

16  are used.

17         THE COURT:  Right.

18         MR. LEITER:  Put simply, if Congress wanted to try to

19  restrict CLA's use of its private funds it could have said so

20  in the statute, it didn't.  And the Government's attempt to

21  rewrite the statute to say something it doesn't is

22  unsupported.

23          And very simply, Your Honor, you can resolve this

24  on the plain language of the statute.

25         THE COURT:  Right.  Okay.

1      MR. LEITER:  Thank you.

2      THE COURT:  All right.  Mr. Schock?  I'm right that you

3  accept that there are no federal funds being spent?

4      MR. SCHOCK:  We have accepted that as a factual matter.

5      THE COURT:  Right.

6      MR. SCHOCK:  We don't accept what they believe the

7  conclusion that flows from that.

8      THE COURT:  Problems from that, yeah.

9      MR. SCHOCK:  I'll start with the issue of prudential

10  standing because that's where the parties have focused their

11  briefs but I do want to come back to the constitutional

12  standing issue because I don't think that issue is beyond

13  dispute and we've raised that issue in our supplemental brief

14  and they addressed it in their response as well.

15      THE COURT:  Yeah, but I don't understand your position.

16      MR. SCHOCK:  So our--our position there is that what's

17  required for purposes of the constitutional prong of the Hunt

18  test where--where an organization does not--is not a

19  traditional membership organization; that organization must

20  show that the constituents that it seeks to represent have

21  the indicia of membership.

22          And the CLA focus on the indicia of membership of

23  people with mental--mental illness generally but it does not

24  focus on whether the ADX constituents have that indicia of

25  membership.

1    THE COURT:  So would you say that this provision then is

2  meaningless?  That this organization couldn't sue a state

3  facility or anybody.

4    MR. SCHOCK:  You're referring to 10805?

5    THE COURT:  Yeah.

6    MR. SCHOCK:  I don't think that 10805 abrogates

7  prudential standing the way that the CLA--

8    THE COURT:  You're saying constitutional standing.

9    MR. SCHOCK:  Right.

10    THE COURT:  You're saying that this organization when it

11  goes to a facility as it is described in the statute to seek

12  records, to seek preventive measures for mentally ill people

13  in there can't do it.

14    MR. SCHOCK:  It could do things that are separate from

15  filing a lawsuit and as the 2nd Circuit noted in a case that

16  we cited in our briefs, there are ways that a P&A--P&A

17  organization can pursue administrative, legal, and other

18  remedies.

19    THE COURT:  Well, what other remedies are there?

20    MR. SCHOCK:  So they're--so for example one of the ones

21  that we have here that we've conceded is that they can

22  represent individuals who request representation.

23    THE COURT:  No, you're--

24    MR. SCHOCK:  In that--in that situation--

25    THE COURT:  --you're arguing constitutional standing.

1   You're arguing, as I understand it, for constitutional

2   standing that they can't represent people who are not members

3   of the association organization under <u>Hunt</u> and all that.

4        MR. SCHOCK:  Right.

5        THE COURT:  But if we follow that then it stands to

6   reason that mentally ill people can't be represented by them

7   in a lawsuit.

8        MR. SCHOCK:  I--I would disagree, individuals who

9   request representation--

10       THE COURT:  Well, wait a minute--

11       MR. SCHOCK:  --may have the indicia--

12       THE COURT:  --they are not members, are they?

13       MR. SCHOCK:  Well, they may have the indicia of

14   membership.  If they request representation and they're

15   influencing the organization--

16       THE COURT:  Your argument is not persuasive, don't waste

17   my time.

18       MR. SCHOCK:  Okay.  On the issue of association--of

19   prudential standing, we don't even need to get to the issue

20   of whether Congress precluded associational standing unless

21   they can first show that--first show that it would otherwise

22   have standing in the first place either because it satisfies

23   the third prong of associational standing or because Congress

24   has abrogated it and it's our position that they can't show

25   either.

1          In order to satisfy the third prong, associational

2    standing, they have to show that neither the claims asserted

3    nor the relief requested requires the participation of

4    individual members.

5          THE COURT:  Right.

6          MR. SCHOCK:  And the only claims here are 8th Amendment

7    claims.  And as this Court has noted at least in the class

8    certification context in Shook--and I think it applies in

9    this context as well--8th Amendment claims like these are

10   highly individualized and fact dependent.

11         In order to prove those claims they're going to

12   have to show a serious deprivation of medical need and

13   delivered indifference on the part of prison officials.

14         Those claims can't be shown in the abstract, they

15   require a specific showing of such things as the medical

16   condition that--that an inmate has, what treatment was

17   required, what treatment was provided.

18         THE COURT:  All right.  They do that from the records.

19         MR. SCHOCK:  And I would argue that--that those records

20   aren't going to get them what they need without the

21   participation of individual members and the testimony.  And I

22   would say that their approach to this litigation would

23   suggest that they agree with that.

24         I mean they've spent--I mean they've identified

25   more than 100 inmates as possible deponents in this case.

1   They're seeking the medical records of every ADX inmate, and

2   under the statute in order to get those records--for the CLA

3   to get those records, they actually need authorization of

4   each of those individuals, so they at least require

5   participation in that way.

6       THE COURT:  Well, I'm not sure you're right about that.

7       MR. SCHOCK:  That it requires part--that it requires

8   authorization?

9       THE COURT:  Yeah, we have a Motion to Compel still

10  outstanding here.

11      MR. SCHOCK:  Sorry, I--

12      THE COURT:  We have a Motion to Compel that is still--

13      MR. SCHOCK:  Right.

14      THE COURT:  --outstanding here.

15      MR. SCHOCK:  Right.  And what--what we focused on in

16  that Motion to Compel is whether the plaintiffs have the

17  right to those--to those records.

18          I would say with respect to the CLA referring to

19  Section 10805--a subsection in 10805 that I can find in a

20  minute--10805(a)(IV) it says very clearly that a P&A system

21  has records--or has access to records of any individual if

22  such individual or their legal representative has authorized

23  the system to have such access.

24      THE COURT:  Well, where are you looking at?

25      MR. SCHOCK:  Section 10805(a)(IV).

1      THE COURT:  10805(a)--okay.

2      MR. SCHOCK:  Okay.  And so at least with respect to

3  getting those records the participation of the inmates is

4  required.  And for them to say that those requests are--are

5  relevant to their claims it's at least relevant to that

6  purpose.

7      THE COURT:  Well, what do you have to say about this

8  10th Circuit case that I called your attention to?

9      MR. SCHOCK:  So that case deals with records--or with

10  access to certain peer review records.

11     THE COURT:  Right.

12     MR. SCHOCK:  And first of all unless I'm missing

13  something from your perspective I don't see that it has

14  anything to say about the associational standing issues here.

15     THE COURT:  I'm not talking about that, I'm talking

16  about access to records.

17     MR. SCHOCK:  Right.  And so in that case the Court

18  specifically cited that statute that I just said that

19  required individuals to authorize the use and so in that case

20  whether the Court addressed it or not there was at least an--

21     THE COURT:  Well, I don't see that it required

22  authorization.

23     MR. SCHOCK:  So I--

24     THE COURT:  I mean the case dealt with the trumping,

25  preempting a Colorado statute that says you can't look at

1  those records.  And these are not the records of the

2  individual as such but they're the peer review records and I

3  don't know.

4       MR. SCHOCK:  Right.  But in that 10th Circuit case the

5  Court quoted from that statute that I was just citing about

6  requiring access by an individual or their legal

7  representative.

8            And so in that case that was not an issue

9  presumably because the individuals had authorized the use or

10 had authorized the access, but beyond that if we're talking

11 about whether there is the right to access, once an

12 individual has authorized it--

13      THE COURT:  Well, anyway that doesn't involve their

14 individual participation just to sign a consent, does it?

15      MR. SCHOCK:  Well, we would submit that--that given the

16 --given the factually dependent nature of these claims it's

17 going to be highly difficult for them to prove that--I would

18 argue impossible, but impossible to prove these claims

19 without some involvement of the individual ADX inmates.  It's

20 not going to be possible--

21      THE COURT:  Well, look--

22      MR. SCHOCK:  --for them to prosecute these claims--

23      THE COURT:  --there's--take a hypothetical, here is an

24 individual who is a prisoner, who has been diagnosed by the

25 appropriate persons in the Bureau of Prisons as having mental

1  illness and he's housed in the control unit.  Now, it seems

2  to me that that on paper establishes if that person is not

3  receiving treatment a violation.

4       MR. SCHOCK:  Well, again, we're going to need what

5  mental illness they have, what treatment is required--

6       THE COURT:  Well, that's according to your own records.

7       MR. SCHOCK:  --what treatment--okay.  And we're going to

8  need to know what prison officials were aware of.

9       THE COURT:  No, this is not individual liability.

10       MR. SCHOCK:  No, but in order to establish the 8th

11  Amendment claim there's a subjective component of deliberate

12  indifference.

13       THE COURT:  I'm not sure there is in this case.  This is

14  a unique case.

15       MR. SCHOCK:  Well, I--I--I haven't--I haven't seen any

16  case law--

17       THE COURT:  Well, anyway I have your argument--

18       MR. SCHOCK:  --that gets rid of the subjective component

19  in that context.

20       THE COURT:  --and--I have your argument.  Yeah.

21       MR. SCHOCK:  I would also refer the--refer the Court to

22  the 10th Circuit case that we cited, Kansas Healthcare

23  Association, it is not a PAIMI case.

24       THE COURT:  So what good is it?

25       MR. SCHOCK:  It deals with a case where the involvement

1   of the individuals were necessary to prove claims that

2   otherwise might appear to be a categorical claim.

3       THE COURT:  Well, I'm not persuaded by it.

4       MR. SCHOCK:  Okay.  Turning to Section 10804(c), even if

5   they could establish that the satisfied the third prong,

6   Congress made clear that any right they had given these

7   organizations to sue, it does not extend to individuals in

8   federal facilities.

9           And--and we've already spoken about this statute.

10  And this statute distinguishes this case from the 9th and 11th

11  Circuit cases that they've cited because none of those cases

12  involved individuals in federal facilities.

13      THE COURT:  Well, but--

14      MR. SCHOCK:  And it's--

15      THE COURT:  --the federal facilities thing only applies

16  to the use of federal funds.

17      MR. SCHOCK:  And I would disagree with that.  The--the--

18      THE COURT:  Well, I don't care whether you disagree with

19  it.  It's plain to me.

20      MR. SCHOCK:  So--so Section 10805, the statue that they

21  rely on to give them the right to sue in the first place says

22  that that statute applies to organizations that are

23  established pursuant to the Federal Allotment Statute.

24          So when they choose to act as a federally funded

25  entity and exercise the rights that are granted to federally

1    funded entities they are acting in that capacity and pursuant

2    to the Federal Allotment--

3        THE COURT:  You know, this is about protecting

4    individuals, that's what Congress is concerned about.  And

5    you don't seem to be concerned about it.

6        MR. SCHOCK:  I don't think it has anything to do with

7    what we have--

8        THE COURT:  I've heard your argument.

9        MR. SCHOCK:  Okay.

10       THE COURT:  I'm ruling against you.

11       MR. SCHOCK:  Okay.  Thank you, Your Honor.

12       THE COURT:  So--on those arguments.

13           Mr. Leiter, what is your position regarding

14   individual participation?

15       MR. LEITER:  Your Honor, the Government's argument is

16   essentially that participation of all of the individual

17   inmates would be required in the lawsuit.  And if that's the

18   case there could never been associational standing because

19   the very concept of associational standing is CLA is acting

20   on behalf of everybody.

21           This is an action challenging not just individual

22   circumstances of confinement, but the practices and the

23   policies of--of BOP at ADX.  And when we go to trial in this

24   matter we'll be proving that the practices and the policies

25   as a whole violate the 8th Amendment and that perspective

1   relief will be institution wide.

2       THE COURT:  Right.

3       MR. LEITER:  Some individual inmates will provide

4   evidence showing that the practices and the policies violate

5   the constitution; that's always been the case.  But the

6   Government makes a different argument that everyone's

7   individual participation is required and that's not the case.

8       THE COURT:  Because the relief you seek is not directed

9   towards individuals--

10      MR. LEITER:  That's correct.

11      THE COURT:  --but directed toward institutional reform.

12      MR. LEITER:  That's correct, Your Honor.

13      THE COURT:  All right.  Okay.

14      MR. LEITER:  Thank you.

15      THE COURT:  Well, I'll write an opinion so you have a

16  written order on this but I'm going to grant standing.

17          Now, where is this Motion to Compel, Ms. Padden,

18  you're on that I know, but I don't know where--what's

19  happening on it.

20      MR. LEITER:  After the last hearing, Your Honor, Mr.

21  Aro wrote a letter to Ms. Padden specifying some areas that

22  the Government might be able to satisfy for us in a less

23  intrusive way.

24          Ms. Padden has--and her team--have done some

25  investigating on that and she and I are going to meet after

1   this hearing to discuss that.  So we are hoping--if we can't

2   resolve all of it on our own we'll hopefully be able to

3   resolve much of it on our own.

4        THE COURT:  Right?

5        MS. PADDEN:  That's correct, Your Honor.

6        THE COURT:  Okay.  So I'll expect some form of status

7   report or request for hearing.

8        MR. LEITER:  Yes, Your Honor.

9        THE COURT:  Okay.  All right.  Thank you.  Recess.

10       MR. LEITER:  Thank you, Your Honor.

11       (10:20 a.m. - Whereupon, the proceedings were

12   concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

22

1                       <u>TRANSCRIBER'S CERTIFICATE</u>

2              I hereby certify that the foregoing has been

3    transcribed by me to the best of my ability, and constitutes

4    a true and accurate transcript of the mechanically recorded

5    proceedings in the above matter.

6              Dated at Aurora, Colorado, this 1st day of

7    November, 2015.

8

9

10                           <u>/s/ Theresa Ornelas</u>

11                           Theresa Ornelas

12                           Federal Reporting Service, Inc.

13                           17454 East Asbury Place

14                           Aurora, Colorado  80013

15                           (303) 751-2777

16

17

18

19

20

21

22

23

24

25