IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

```
HAROLD CUNNINGHAM, PERCY BARRON,   )
ALPHONSO BLAKE, JABBAR CURRENCE,   )
CARLTON DUNBAR, SCOTT FOUNTAIN,    )
SEAN GILLESPIE, CHARLES HIPPS,     )
RONNIE HOUSTON, JOHN LAMB,         )
HERBERT PERKINS, JOHN POWERS,      )
ARNELL SHELTON, MARCELLUS          )
WASHINGTON, and CENTER FOR LEGAL   )    1:12-cv-01570-RPM-MEH
ADVOCACY,                          )
                                   )
              Plaintiffs,          )
                                   )
         vs.                       )
                                   )
FEDERAL BUREAU OF PRISONS,         )
                                   )
              Defendant.           )
```
_____

STATUS CONFERENCE
TRANSCRIPT OF PROCEEDINGS
_____

Proceedings held before the HONORABLE RICHARD P.

MATSCH, U.S. District Judge for the District of Colorado,

beginning at 1:55 p.m., on the 21st day of September, 2016,

in the Conference Room, the United States Courthouse, Denver,

Colorado.

APPEARANCES

For the Plaintiffs:        Edward Packard Aro, Esq.
                           Arnold & Porter LLP-Denver
                           370 Seventeenth Street
                           Suite 4400
                           Denver, CO  80202-1370

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APPEARANCES (Continued)

For the Plaintiffs:          Mark J. Ivandick, Esq.
                             Disability Law Center
                             455 Sherman Street
                             Suite 130
                             Denver, CO  80203


For the Defendant:           Amy L. Padden, Esq.
                             U.S. Attorney's Office-Denver
                             1225 17th Street East
                             Suite 700
                             Denver, CO  80202

```
 1                    P R O C E E D I N G S

 2        (At 1:55 p.m. on September 21, 2016, in the United

 3   States District Court at Denver, Colorado, before the

 4   HONORABLE RICHARD P. MATSCH, U.S. District Judge, with

 5   counsel for the parties present, the following proceedings

 6   were had:)

 7        THE COURT:  Hi.

 8        MR. ARO:  Good afternoon, Your Honor.

 9        MS. PADDEN:  Good afternoon.

10        THE COURT:  Come in.  Hi.

11        MR. IVANDICK:  Good afternoon, Your Honor.

12        THE COURT:  I've got all this pro se stuff, objections

13   to settling and now I just go a new one by a transgender

14   woman.

15        MR. ARO:  That's (Inaudible) McBee (phonetic).

16        MS. PADDEN:  Yes.

17        THE COURT:  Yeah, who is now unique.

18        MR. ARO:  (Inaudible).

19        THE COURT:  Yeah.  Who was never a named plaintiff.

20        MR. ARO:  That's correct.

21        THE COURT:  Right.

22        MS. PADDEN:  She's not in FOP custody anymore I don't

23   think.  Was she in local?

24        MR. ARO:  I--I know that the letter came from the jail I

25   think in Kentucky and our understanding is that the federal
```

1   sentence ran out in--last summer some time.

2         MS. PADDEN:  Yeah, that's right.

3         THE COURT:  Say what?

4         MR. ARO:  I said McBee's federal sentence ran out last

5   summer and I'm not sure why she was transferred to state

6   custody but she's coming from a jail at this point.

7         THE COURT:  Yeah, Campbell County Detention Center,

8   Newport, Kentucky.

9         MR. ARO:  Right.

10        MS. PADDEN:  Yeah, I don't know if there was a state

11  detainer on her or not.

12        THE COURT:  Well, what am I going to do with this?  Do

13  you have all these filings?

14        MR. ARO:  We have filings--whether--it doesn't appear

15  that we are getting everything that may be received by the

16  Court.

17        THE COURT:  All right.  Well, I've got them all mixed up

18  here.  So I think there are copies here for you.

19        MS. PADDEN:  These are for us?

20        THE COURT:  Yeah.

21        MS. PADDEN:  Okay.

22        THE COURT:  I think that double--you know--

23        MS. PADDEN:  I just need--

24        THE COURT:  --make sure you've got everything here so--I

25  think there should be two.  And I thought maybe you'd be

1    accompanied by a co-counsel but that's fine.

2         MS. PADDEN:  Just me, Your Honor.

3         THE COURT:  You can handle it.  But--so Cunningham has

4    filed, Powers has filed twice, and there's another--yeah,

5    there's Cunningham, Powers, and--well, Powers too--don't we

6    have another guy?

7         MR. ARO:  Cunningham, Powers, and McBee appear to be the

8    ones that we have here.

9         THE COURT:  Cunningham--are two from Cunningham?

10        MS. PADDEN:  I have two from Powers.

11        THE COURT:  And two from Cunningham I guess.

12   Cunningham--

13        MR. ARO:  Correct.

14        THE COURT:  Anyway you--according to this status report

15   have been going around talking to these people.

16        MR. ARO:  That's right.  I was down there Monday and

17   yesterday in Florence and have seen each of these folks

18   recently.  I was with Powers yesterday morning.

19             If I might start with where we are in the

20   settlement process and then come down to what we are thinking

21   about and then solicit the Court's view about what the Court

22   would like us to do if that makes sense.

23        THE COURT:  Yeah.  I'm a little uncomfortable with it

24   because, you know, I'm not attempting the settlement so--

25        MR. ARO:  Sure.  So as of the beginning of July the

1   Government and we had settled this which is mostly policies
2   they agreed to implement.  There are two agreements that
3   contain the commitments to follow those policies and remedies
4   if they choose not to follow those policies as well as
5   monitoring that will be provided by two monitors who have
6   been selected by the agreement of the parties.
7          We sent these documents out in early August to the
8   clients with them wanting explanation about where we were.
9   And this wasn't news to them because I had been meeting with
10  them regularly to tell them what we were up to conceptually.
11         At that point I started to get letters directed to
12  me and then there were some filings made by the Court, I
13  think many of the individual objections--I'm not speaking to
14  McBee's concerns because he's got--or she--it's a whole
15  separate set of issues.
16      THE COURT:  Yeah, that's why I--
17      MR. ARO:  And I'll explain in just a minute.  But with
18  respect to Powers and Cunningham and a couple of the other
19  plaintiffs, I think it's fair to say that their objections
20  fall into three buckets.  Bucket number one is Cunningham
21  wants money.
22      THE COURT:  Right.
23      MR. ARO:  He understands it's not a money case but he
24  wants money.
25      THE COURT:  Right.

1       MR. ARO:  And he's very unhappy that he's not going to

2  get money under the terms of the settlement.  Cunningham and

3  I would say probably half of the other plaintiffs are very

4  exercised about the duration of the monitoring, enforcement

5  of the language in the agreement because they're concerned

6  that as soon as the monitoring ends things will revert to

7  where they were before.

8            And so I had explained to them limits imposed by

9  the PLRA; I've explained to them how we've addressed this in

10  our negotiations with the Government, but they have a latent

11  and probably understandable concern that frankly we cannot

12  address because of the language of the PLRA, the limits the

13  Court's authority in this area and they're going to continue

14  to object on the basis that they're worried about the

15  duration--that there's nothing really--either injunction that

16  you might enter or the settlement that we can do about that.

17            The third bucket--and this I think is probably--

18  Powers is the best example but there are a couple of other

19  folks who have similar concerns has to do--not--they don't

20  object to the terms of the settlement as it relates to the

21  class but they have personal concerns about things that have

22  happened to them that they would like to have addressed

23  separately and more robustly.  Some of it it's a money thing.

24  Powers his biggest concerns is that he believes as a result

25  of his mental illness he damaged some government property, he

1    has various debts to the government, I think they total about

2    $2,600.  He is not able to utilize money in his prison

3    account to buy things and he believes that he ought to have

4    some dispensation concerning that obligation.

5        THE COURT:  Where is he now?

6        MR. ARO:  He's at one of the high security mental health

7    units down in Florence; he's in what they call the secure

8    stage--

9        THE COURT:  It's a new--

10       MS. PADDEN:  Right.

11       THE COURT:  --a new facility?

12       MR. ARO:  There are three programs that have been opened

13   and existing BOP facilities, they're mostly filled with

14   inmates who had that at the ADX and have served slightly

15   different mental health purposes and he's in one of those

16   three programs.  Most of the plaintiffs by this point have

17   been moved into one of those units.

18       So I spent a long time--Mark and I did yesterday

19   with Mr. Powers talking through these issues with him.  We

20   talked to him about our expected timeline for this admission

21   of an application to approve the settlement.  We talked to

22   them about the--and this has been true of everybody we've

23   met--how they can go about making their views about the

24   settlement known to the Court.

25       Some of the plaintiffs are adamantly in favor of

1   the settlement and want to know how to tell you that they're

2   very satisfied with it.  Others are happy with some things,

3   not other things.  Some of them don't care about anything

4   other than one issue--

5       THE COURT:  Well, who are we--are we talking about the

6   named plaintiffs now?

7       MR. ARO:  All the folks I'm talking about are named

8   plaintiffs.

9       THE COURT:  Just named plaintiffs?

10      MR. ARO:  That's correct.  There are other class members

11  who have sent us all kinds of letters and--

12      THE COURT:  Well, we don't have a class.

13      MR. ARO:  That's right.  Punitive class members.  Folks

14  who are also constituents of the CLA.  And Mr. Ivandick also

15  has a--or his organization as a plaintiff obviously has a--

16      THE COURT:  What--what are the plaintiffs giving up?

17      MR. ARO:  They are giving up the ability to seek

18  injunctive relief around mental health care at the ADX beyond

19  that afforded by this settlement with one exception and that

20  is that we've never litigated in this case the question of

21  individual diagnoses and to the extent that there's a dispute

22  they believe that they're being misdiagnosed.  The release

23  carved those disputes out and they can deal with those

24  through whatever process they choose outside the scope of

25  this, but they can't get different policies concerning mental

1   health care at the ADX then is--or specified by the

2   documents.

3           They have--they preserve their rights, any

4   monetary--

5       THE COURT:  Okay.  They can pursue--they can have a

6   Bitterman's claim?

7       MR. ARO:  That's right or an FDCA claim.

8       MS. PADDEN:  FDCA claim, yes.

9       MR. ARO:  Those are specifically exempted from the

10  release.

11      THE COURT:  Okay.

12      MR. ARO:  As are claims that don't have anything to do

13  with mental health.  As are claims that arise in substantial

14  part after--

15      THE COURT:  Yeah.

16      MR. ARO:  --the monitoring is--

17      THE COURT:  Well, now are you contemplating for me the

18  class?

19      MR. ARO:  For purposes of the--

20      MS. PADDEN:  Yes.

21      MR. ARO:  --settlement, yes.

22      THE COURT:  And what does it consist of?

23      MR. ARO:  It is--essentially it's defined in our

24  original complaint, there's a class of everybody who is

25  confined at the ADX for the purposes of the diagnostic and

1  evaluative process and then a subclass of people who are

2  diagnosed by BOP has having a mental illness or serious

3  mental illness and that subclass is the recipient of the

4  treatment rights that are provided for in the policy.

5       THE COURT:  All connected to ADX?

6       MR. ARO:  That's right.

7       THE COURT:  Only?

8       MS. PADDEN:  Yes.

9       THE COURT:  And again look at this Third Circuit case,

10  Richardson that just came out in July--you know that case?

11       MS. PADDEN:  I'm not familiar with that case, Your

12  Honor.

13       THE COURT:  Well, this is dealing with the question of

14  moving out plaintiff and whose seeking a class certification

15  but Bureau of Prisons transferred him and so the issue is did

16  that moot out the case and the Third Circuit says no that

17  doesn't change it; that he, while individually, he may not

18  benefit from it he can be representative of a class and they

19  cite a Tenth Circuit case unrelated, Lucero v. Bureau of

20  Collection Recovery, which they cite as 639 F.3d 1239, 639

21  F.3d 1239, a Tenth Circuit 2011 case, as being consistent to

22  what they call the relation back factor.

23       So I saw that in Law Week and I got it out because

24  that takes care of one thing that I was worried about early

25  on in this case that some of these people being transferred.

1     MR. ARO:  We have people who remain at the ADX and we

2   have added them as plaintiffs particularly for this reason.

3     THE COURT:  Yeah, Cunningham is gone, isn't he?

4     MR. ARO:  That's right.

5     THE COURT:  And aren't some of the others gone?

6     MR. ARO:  Yes, the--

7     THE COURT:  Yeah.

8     MR. ARO:  --plaintiffs who remain at the ADX today are

9   Blake, Currence, Houston, Lamb, and Shelton.

10     THE COURT:  Okay.  So you've still got quite a few.  And

11   I'm not sure whose being represented who isn't a named

12   plaintiff by the Center.

13     MR. ARO:  So the way that that was positioned, Your

14   Honor, was anybody who had requested assistance from the

15   Center--

16     THE COURT:  Right.

17     MR. ARO:  --and we had a dispute--

18     THE COURT:  We had--

19     MR. ARO:  --with the Government over whether--he could

20   represent constituents who had not--

21     THE COURT:  Right.

22     MR. ARO:  --specifically made that request.  Which you

23   resolved in--

24     THE COURT:  A long time ago.

25     MR. ARO:  --December of '14 I think.

1       THE COURT:  Right.  So I'm not sure how that plays out

2   but--does that mean you can represent all--everybody down

3   there?

4       MR. IVANDICK:  There's a distinction between using

5   private funds which means we can represent--

6       THE COURT:  Right, yeah, I remember the issue but--

7       MR. IVANDICK:  Yeah.

8       THE COURT:  --because you were citing you can't spend

9   government money suing the government.

10      MR. IVANDICK:  Right.

11      THE COURT:  So--but it doesn't make a difference I

12  suppose when we're talking about class certification.

13      MR. ARO:  That's right.

14      THE COURT:  So are you suggesting the class

15  certification and the settlement all at the same time?

16      MR. ARO:  Yes.

17      THE COURT:  And the reason that I ask whether they've

18  given up is that one of the things you put down here is what

19  do you do about notice.

20      MR. ARO:  Right.

21      THE COURT:  And 23(e) talks about notice--you know, this

22  would be a (b)(2) class.

23      MR. ARO:  That's right.

24      THE COURT:  And it talks about direct notice in a

25  reasonable manner to all class members who would be bound by

1  the proposal which is why I was asking about whether they

2  gave it up.

3      MR. ARO:  Right.  We have worked out a pretty detailed

4  and we think pretty comprehensive notice process.  We've got

5  a formal notice that's been agreed to, we've got an agreement

6  about how that's going to be distributed to people at the ADX

7  and what they can do if they have questions.  And we believe

8  that it covers the issues very thoroughly.

9      THE COURT:  So--so it would go to everybody who is in--

10 been affected by this is at ADX?

11     MR. ARO:  It effectively goes to every inmate down there

12 because they all--

13     THE COURT:  Okay.

14     MR. ARO:  --or at least the diagnostic class.

15     THE COURT:  All right.  And then to main plaintiffs who

16 are in other facilities?

17     MR. ARO:  That's right.

18     THE COURT:  That's the way you've done it?

19     MR. ARO:  That's how we intend to do it.

20     THE COURT:  Okay.  That works I think.  So what's

21 unsettled?

22     MR. ARO:  As far as the lawyers are concerned nothing is

23 unsettled.  I've gone through this process with my clients of

24 meeting with them face-to-face, explaining them that,

25 answering their questions, explaining how they're going to

1   have the opportunity to object if they choose to do so.  Ms.

2   Padden can address where the government is in its process but

3   what we are contemplating is assuming that final approval is

4   secured from the Department of Justice we file a motion, an

5   unopposed motion for approval of the settlement which

6   encompasses a stipulated entry of a class certification

7   order.

8           And we wanted to talk to you today about how you

9   want us to approach providing you with an evidentiary record.

10  Do you want to conduct a hearing that has live testimony,

11  would you like declarations, do you want to--

12      THE COURT:  I don't know yet; that's to be discussed,

13  but one of the things that's in mind is--when you talk about

14  duration this is something the Department of Justice agrees

15  through--through the Attorney General; is that right?

16      MS. PADDEN:  You mean the ultimate approval of--

17      THE COURT:  Yes.

18      MS. PADDEN:  --the term of this agreement?  I actually

19  believe under the regulations that apply here it's either

20  going to go to the Associate Attorney's General's Office or

21  the Deputy Attorney General.

22      THE COURT:  Yeah, but it has to be ultimately the

23  Attorney General of the United States has to be onboard.

24      MS. PADDEN:  Ultimately, yes.

25      THE COURT:  So as of January 29th or thereabouts a new

1  Attorney General will soon appear upon the scene.  And what

2  happens if that Attorney General is a nontraditional Attorney

3  General--I'm trying to phrase this politically.

4      MS. PADDEN:  I understand, Your Honor.  I am nearly

5  certain we will have a final answer within the next couple to

6  few weeks and so I think we can easily have the approval

7  process completed and Your Honor can conduct the fairness

8  hearing but--well before the end of the year.  So--so I don't

9  think that will be an issue.

10     THE COURT:  What I'm thinking about--I guess we could

11  have litigation about it if a new Attorney General says the

12  hell with this I'm not going along with it.

13     MS. PADDEN:  Yes.

14     THE COURT:  A possibility, but I don't know how we can

15  deal with that.  Or it will be a court order against an

16  executive order.

17     MR. ARO:  Right.  And I'm sure we'd apply ourselves to

18  that, come back and explain how we think we can deal with

19  that but we're hoping that that doesn't happen and that's

20  our--as Ms. Padden said it's our expectation that if

21  everything goes as it appears to be going we could be ready

22  for a fairness hearing as soon as you're ready to receive us.

23         So while they're going through their approval

24  process we want to talk to you about what you thought you

25  might want to receive so that we can start working on getting

1    that information together so we can proceed as quickly as

2    possible.

3        THE COURT:  I don't think that an evidentiary hearing is

4    necessary.  If it were I don't know what it would be.  I mean

5    you're not admitting--I assume in the agreement you're not

6    admitting violation of the constitution.

7        MS. PADDEN:  That's correct.

8        THE COURT:  So I don't know to what extent the

9    settlement agreement recites the background.

10       MR. ARO:  It recites the background at a fairly high

11   level of detail including what the government has done in

12   response to the case.

13       THE COURT:  Yeah.

14       MR. ARO:  We address in what we think is a pretty

15   thorough way the PRLA's predicates and fit the remedies

16   pretty specifically to what the PLRA requires we model the

17   agreement off of, agreements that have been approved in

18   comparable cases elsewhere in many respects.

19           So we're--I don't think anything we're doing is

20   going to strike you as novel.  And I will also tell the Court

21   that this process as you're aware from somewhat at a distance

22   has been an attenuated one; it's been extremely involved--

23       THE COURT:  Yeah.

24       MR. ARO:  --with some of the smartest people in the

25   country on these issues and experts on both sides trying to

1  figure out how to deal with these issues given this

2  population.

3          And we had a very high conviction that this is a

4  fair and appropriate conclusion, but we--to the extent you

5  have any concerns about things that weren't addressed or

6  you're going to get letters for sure from other folks.

7          THE COURT:  Well, yeah.  You've got attorney's fees in

8  it?

9          MR. ARO:  We do.

10          THE COURT:  They'll object to that.

11          MR. ARO:  I'm sure.

12          THE COURT:  And normally I don't approve that.  Normally

13  I separate those out, but if it's part of the settlement it

14  is what it is.

15          MR. ARO:  That was I think the very last issue that was

16  dealt with, it was dealt with independently of the--the terms

17  of the agreement, meaning there's no sort of horse trading

18  attorney's fees for--for other relief.  And it really wasn't

19  negotiated, we provided them with a full statement of what

20  our fees and cost were and the amount provided for in the

21  agreement works out to about 18 percent of what was invested

22  in the case, so it's--it's certainly not a windfall to

23  anybody.

24          THE COURT:  Maybe it would be helpful--I'm just thinking

25  now--to have a declaration from somebody about the

1   reasonableness of the--

2       MR. ARO:  The reasonableness of the fees?

3       THE COURT:  Of your fees?

4       MR. ARO:  Sure.

5       THE COURT:  Instead of this just being you say so and

6   the government is not going to object.  So I think that would

7   be--that would help me and I would think it would help in

8   dealing with the objections that I don't get a damn dime and

9   you're getting a lot of money.  So this is already being

10  stated in these objections that I've got.

11      MR. ARO:  To the extent that it--I'm happy to get a

12  declaration and we'll sit down more and have a customary

13  review done of our billing statements--

14      THE COURT:  Right.

15      MR. ARO:  --by somebody who knows this kind of case.

16      THE COURT:  Yeah.

17      MR. ARO:  If it is of any comfort to the Court my firm

18  is not going to end up with a dime out of this other than our

19  cost reimbursement.  We've got almost a million dollars in

20  out-of-pocket expenses that are being reimbursed

21  dollar-for-dollar, everything is going to--for nonprofits

22  that do advocacy work for prisoners including Mr. Ivandick's

23  organization and the Washington Lawyer's Committee for Civil

24  Rights which depend entirely on--almost entirely on fee

25  (inaudible) so--

1     THE COURT:  Is that appropriate?

2     MR. ARO:  The--the way that it is structured is the fees

3 are being paid to my law firm's non for profit foundation and

4 then are being directed by the foundation to these third

5 parties and that's all been disclosed in detail to our

6 clients because we wanted them to understand--

7     THE COURT:  Yeah, that's--well, will it be disclosed in

8 the agreement?

9     MR. ARO:  It is--it's disclosed in overt details both in

10 the agreement and the notice of class--

11     THE COURT:  Okay.  Well, that may change this, I don't

12 know, you know.  Well, it's going to--yeah, okay.  I'm

13 thinking about these objections that you see in other

14 jurisdictions where the money goes complete--to somebody

15 completely different.

16     MR. ARO:  Sure.

17     THE COURT:  In CPRE type thing--

18     MR. ARO:  Right.

19     THE COURT:  --and then they say--appellate courts have

20 said they don't like that.  But this is in a different--this

21 is a different focus.

22     MR. ARO:  Would it help the Court--we've consulted with

23 both internal and external ethics experts on this to make

24 sure that we were on the right side of this issue, would you

25 like us to address the ethics around this direction of the--

1   the quell of funds in addition to the reasonableness of the

2   amount?

3       THE COURT:  Yeah, I think you can include that in a

4   declaration from some independent source.  So you're not

5   ready to file--to submit this until you get somebody signing

6   off in Washington?

7       MS. PADDEN:  Correct.

8       THE COURT:  And what's the status of that?

9       MS. PADDEN:  We're very close, we're in the last--I mean

10  it's gone through--as you can imagine many levels of review

11  and we're in the last probably two levels of very--I think

12  very close.  So once (inaudible) we can come back and see

13  Your Honor in about three weeks.  I think at that point we'd

14  probably be in a position to go ahead and set a date for the

15  fairness hearing and then we can work off of that if that's

16  acceptable to Your Honor.

17      THE COURT:  Well, and actually a filing of the

18  settlement.

19      MS. PADDEN:  Right.

20      THE COURT:  You have to have that filed.

21      MS. PADDEN:  Yes.

22      THE COURT:  And I don't know--is that the form of it?

23      MR. ARO:  This is the book that I've been carrying

24  around the country with me, but this is the agreement with

25  all of the attachments.

1       THE COURT:  Yeah, that's what would be filed?

2       MR. ARO:  I would be filing an unopposed motion for

3   approval of this group of documents.

4       THE COURT:  Yeah, but what goes in to the--in thinking

5   about the damn ECF.

6       MR. ARO:  Understand.  It would be--essentially a cover

7   submission for this.  And what I would expect to do some time

8   between that filing and the date of the hearing is make a

9   supplemental submission of the two declarations that we've

10  talked about today--

11      THE COURT:  Yeah.

12      MR. ARO:  --and then whatever else Your Honor wants--

13      THE COURT:  But are we going to--you're going to file

14  that one ECF?

15      MR. ARO:  Yes.

16      THE COURT:  The settlement agreement.

17      MR. ARO:  Yes.

18      THE COURT:  Okay.  Well give me one on paper.

19      MR. ARO:  Yeah, me too.

20      THE COURT:  So I don't have to print it off--because I

21  don't read those damn screens, you know.

22      MS. PADDEN:  No.

23      MR. ARO:  Other things, Your Honor, that I was

24  contemplating possibly being helpful to you would be

25  declarations from any of this correctional health or mental

1  health experts who have worked on similar cases who

2  understand how this has been done in other situations who

3  have been involved in negotiations, who can explain how all

4  these things all fit together and address the issues that

5  were raised by the complaint would that be of value to you?

6       THE COURT:  I don't think so.

7       MR. ARO:  Okay.  What about submissions from the

8  plaintiffs and this is the--this is a little bit complicated,

9  several of these guys don't object to the merits but they

10 feel very strongly that they have not been heard.  They would

11 like me--and the Government has agreed--to receive what in

12 effect is deposition testimony for submission to the Court.

13           I'm not committed that the Court will consider all

14 of it or read all of it but--

15      THE COURT:  Yeah, you can do that.  I don't--I'm not

16 going to bring them here and I don't want to do Skype type

17 thing--

18      MR. ARO:  Understood.

19      THE COURT:  --I don't think because I think that

20 presents problems for the Bureau--

21      MR. ARO:  I agree.

22      THE COURT:  --that I don't want to put them through.

23      MR. ARO:  Okay.  We talked about this at some length and

24 I think we have a process, I just wanted to make sure that

25 you were okay with us submitting their views.

1      THE COURT:  Actually, you know, they could also tape it.

2      MR. ARO:  That's what we're doing.

3      THE COURT:  Yeah.

4      MR. ARO:  That's what we plan to do.

5      THE COURT:  Right.  Yeah.  Okay.  So when you say

6  depositions you're talking about video?

7      MR. ARO:  We were going to provide both a video

8  transcript or disc as well as a--as a printed transcript.

9      THE COURT:  Yeah, okay.  Well, I'm surprised that some

10  of these people--they must have access to some guardhouse

11  lawyers here, I mean some of these things I wouldn't expect

12  to come from people with their diagnoses.

13      MR. ARO:  I think Cunningham has got a lot of help.

14  Powers is--I think anybody who has ever met this guy will

15  tell you that he is a completely unique person and he's done

16  all this stuff on his own.  He's very smart and he's very

17  meticulous and he's very strong willed and--

18      THE COURT:  What was--what is his diagnosis?

19      MR. ARO:  It has shifted a little bit but I think the

20  primary concern they have is Post-Traumatic Stress Disorder,

21  but there's also a--what is referred to as borderline

22  personality disorder which is sort of a character

23  neurological problem--

24      THE COURT:  I know what it is, yeah.

25      MR. ARO:  --that comes from trauma and that that's what

1   causes him to do the terrible things that he does to himself.

2   We saw him yesterday morning and he had just tattooed another

3   big section of his face for no apparent reason.  And if you

4   close your eyes and had a conversation with this guy you

5   would think he's--he's this bright-eyed young lawyer as

6   you'd want to meet and you'd open your eyes and look at him

7   and it's just hard to reconcile it too.

8        THE COURT:  And who has the--who was it who was a

9   witness against the Aryan Brotherhood?

10       MR. ARO:  That was Powers.

11       THE COURT:  That was Powers.  And he complains he never

12   got what he bargained for when he agreed to testify?

13       MR. ARO:  That's--that's his absolute conviction.

14       THE COURT:  Yeah.  Well, I have some familiarity with

15   that organization.  So I guess, you know, we've got to get

16   this done at the very end of the year.

17       MR. ARO:  Agreed.

18       MS. PADDEN:  Yes.

19       THE COURT:  Given again the possibilities of the

20   election.  So I'm in pretty good shape for--I've got--I need

21   that calendar--thanks--I think we ought to be working back

22   from a hearing though.

23       MR. ARO:  I--I agree.  I think there's a concern about

24   setting a hearing date before the Government has received

25   final approval, but Amy and I have talked directionally about

1  the end of October, beginning of November being a time when

2  we could get you things in enough time for you to review them

3  and be prepared to conduct a hearing, but we can really do

4  this on your schedule.

5       THE COURT:  Yeah, well we won't wait for the signature

6  we'll assume that it will happen.  So how about December

7  24th?

8       MR. ARO:  My wife would divorce me if I did that.

9       THE COURT:  Well, we'll probably be in December though.

10       MS. PADDEN:  I think that's probably right to give

11  sufficient time to prepare all the documentation and have

12  Your Honor review them.  I'm pretty wide open other than the

13  last week in December.

14       THE COURT:  I'm sorry what did you say?

15       MS. PADDEN:  I said I'm pretty wide open other than the

16  last week in December.

17       MR. ARO:  I'm leaving the country on December 22nd not--

18       THE COURT:  How about the end of November?  What do you

19  think?

20       MS. PADDEN:  Out for a chunk of time at the end of

21  November it's my wedding anniversary, but I could do--any

22  time the first--

23       THE COURT:  Well, about early in December then?

24       MR. ARO:  That would be fine with us.

25       MS. PADDEN:  That would be fine with me.

1       THE COURT:  So we could probably do it in a day.

2       MR. ARO:  I would think so if you don't want testimony I

3  would think it would be presentations of counsel and then

4  addressing questions the Court has and I think probably not

5  more than--

6       MS. PADDEN:  That's works.

7       THE COURT:  Well, let's talk about December 1st.

8       MS. PADDEN:  Okay.

9       THE COURT:  And I'll keep the 2nd open too in case.

10      MR. ARO:  Should we start at nine on the 1st?

11      THE COURT:  Yeah.

12      MS. PADDEN:  Okay.

13      THE COURT:  So we'll pencil that in as they say.  And,

14  you know, as soon as you can get the stuff the sooner the

15  better.

16      MR. ARO:  Well, submit things as we complete them once

17  the motion is on file.  And if the Court wants to do some

18  sort of a prehearing hearing to tell us about other things

19  you would like us to prepare I'm happy to do that.

20      THE COURT:  Okay.  Yeah.

21      MR. ARO:  Or you can just enter an order telling us I

22  also want you to address acts and we'll do it.

23      THE COURT:  Yeah, you know, I need to see the stuff--

24      MS. PADDEN:  Right.

25      THE COURT:  --before I can--

1        MR. ARO:  Correct.

2        THE COURT:  --respond to that.  So the earlier you can

3    get it to me the better.  I do have a trial scheduled so--in

4    the fall so--I'll let you know.

5        MS. PADDEN:  Okay.

6        MR. ARO:  I would be remiss also, Your Honor, if I

7    didn't say something about Judge Hegarty, I know you know

8    he's been involved in the case and I know he's talked to

9    you--

10        THE COURT:  Yeah--

11        MR. ARO:  --at various junctures.

12        THE COURT:  --we probably--we can be off the record for

13    this I think.

14        MR. ARO:  Okay.

15        THE COURT:  Well, you maybe want it on the record.

16        (2:27 p.m. - Whereupon, the proceedings were concluded.)

17

18

19

20

21

22

23

24

25

1                    TRANSCRIBER'S CERTIFICATE

2          I hereby certify that the foregoing has been

3   transcribed by me to the best of my ability, and constitutes

4   a true and accurate transcript of the mechanically recorded

5   proceedings in the above matter.

6          Dated at Aurora, Colorado, this 26th day of

7   September, 2016.

8

9

10                       /s/ Theresa Ornelas

11                       Theresa Ornelas

12                       Federal Reporting Service, Inc.

13                       17454 East Asbury Place

14                       Aurora, Colorado  80013

15                       (303) 751-2777

16

17

18

19

20

21

22

23

24

25