1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLORADO

3     Case No. 12-cv-01570-RPM-MEH

4     _____

5     HAROLD CUNNINGHAM, individually, et al.,

6          Plaintiffs,

7     vs.

8     FEDERAL BUREAU OF PRISONS,

9          Defendant.

10    _____

11            Proceedings before RICHARD P. MATSCH, United

12    States Senior District Judge, United States District Court

13    for the District of Colorado, commencing at 8:59 a.m.,

14    December 15, 2016, in the United States Courthouse, Denver,

15    Colorado.

16    _____

17            WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

18    ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

19    _____

20                     APPEARANCES

21            DEBORAH M. GOLDEN, EDWIN P. ARO and MARK J.

22    IVANDICK, Attorneys at Law, appearing for the plaintiffs.

23

24    _____

25                 FAIRNESS HEARING - DAY 1

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 2

 1                    APPEARANCES (cont'd)

 2          AMY L. PADDEN, United States Assistant Attorney,

 3   appearing for the defendant.

 4                  P R O C E E D I N G S

 5          (Whereupon, the within electronically recorded

 6   proceedings are herein transcribed, pursuant to order of

 7   counsel.)

 8          THE COURTROOM DEPUTY:  All rise.  Court is in

 9   session.

10          THE COURT:  Please be seated.  Good morning.

11          UNIDENTIFIED SPEAKER:  Good morning.

12          THE COURT:  We are convened in civil 12-cv-1570,

13   Harold Cunningham and other named plaintiffs, and the Center

14   for Legal Advocacy doing business as Disability Law of

15   Colorado against the Federal Bureau of Prisons.  We're here

16   to review the settlement that has been proposed, and we're

17   here pursuant to the order entered on November 17th granting

18   preliminary approval of the settlement terms and notice to

19   class.

20          So appearances, please enter, Mr. --

21          MR. ARO:  Good morning, Your Honor.  Ed Aro of

22   Arnold & Porter on behalf of plaintiffs.

23          THE COURT:  Well, we have others also.

24          MS. GOLDEN:  Sorry.  (Inaudible) Deb Golden with

25   the Washington Lawyers' Committee for Civil Rights and Urban

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 3

1    Affairs, also for the plaintiffs.

2            THE COURT:  Ms. Golden.

3            MR. IVANDICK:  Mark Ivandick with -- with the

4    Disability Law of Colorado --

5            THE COURT:  Yes.

6            MR. IVANDICK:  -- CLM.

7            THE COURT:  All right.  Ms. Padden.

8            MS. PADDEN:  Good morning, Your Honor.  Amy Padden

9    from the US attorney's office on behalf of the Federal Bureau

10   of Prisons.  With me at counsel table is Kaitlin Turner who

11   is an attorney who's with the Federal Bureau of Prisons.

12           THE COURT:  Thank you.  Now, the -- I have --

13   well, what is to be done today is a consideration, pursuant

14   to Rule 23, of the terms and conditions of the settlement

15   agreement.  And that involves a determination with respect to

16   the formation of a class and a subclass of persons as has

17   been defined in the agreements, and a determination of

18   whether the terms and conditions are reasonable, fair, and

19   adequate as required by Rule 23.  And in that regard, the

20   word "adequate" I think has to be considered.  I don't intend

21   at this hearing to determine adequacy in terms of the

22   diagnosis and treatment as a medical question because that's

23   beyond my competence.  And I don't believe that's the issue.

24   Also, I am not determining the underlying question of

25   constitutionality or unconstitutionality of the practices

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 4

 1   which have been described in the amended pleadings filed by

 2   the plaintiffs.  I do want to discuss jurisdiction of the

 3   Court in -- particularly with respect to enforcement

 4   provisions.

 5            Now, I have reviewed, as I'm sure you expected me

 6   to, the motion, again, for preliminary approval and the

 7   exhibits that were attached which are, I think, 13 in number,

 8   that essentially define what the agreement is.  And I'm

 9   recognizing that the Bureau of Prisons is not admitting any

10   violations of the Eighth Amendment which, of course, this

11   case is based on.  And I am, again, reflecting on that there

12   was in the initial pleading a motion to dismiss challenging

13   jurisdiction which I denied to permit the case to go forward.

14   So I also have received and acknowledge the plaintiffs'

15   appendix of declarations regarding attorney's fees and costs

16   that were -- that are a part of the settlement agreement

17   terms.  I also acknowledge that there have been a number of

18   pro se filings in this case, and with -- particularly Harold

19   Cunningham being one as the named plaintiff.  And there have

20   been -- one of the named plaintiffs.  And he has made a

21   number of filings with some objections.  And there's others

22   who have filed objections.  There's been a motion to strike

23   some of them, and I'm granting that as a procedural matter.

24   But I'm not unmindful of the objections.  And I'm sure that

25   they will be addressed here.  But most of what I've read, you

Page 5

 1  know, they're striking these, but I read these filings,

 2  they're concerned they're not getting any money out of that.

 3  But I will also pay some attention in this pleading -- in

 4  this hearing to the effects on individuals here in terms of

 5  the -- what they're waiving.  And as I understand it, and

 6  we'll talk about it, they're not waiving any individual

 7  rights to relief or particular incidents or circumstances if

 8  they have such a claim for damages.  This is injunctive

 9  relief, and I think I'm limited to injunctive relief in this

10  litigation.

11          So I just make these preliminary observations so

12  that you know what I think the focus of our attention should

13  be this morning or today.

14          So, Mr. Aro, you're up.

15          MR. ARO:  Thank you, Your Honor.  As the Court is

16  aware, the fundamental question that we're here to talk about

17  is whether the proposed settlement is fair and reasonable and

18  adequate.  And the Tenth Circuit in the Rudder (phonetic)

19  case has laid out a framework to analyze those issues that

20  really touches four central ideas.  The first being whether

21  the proposed settlement was fairly and honestly negotiated.

22  The second, whether the -- whether serious questions of law

23  and fact exist that place the ultimate outcome of the case in

24  doubt.  Number three, whether the value of an immediate

25  recovery outweighs the mere possibility of future relief

Page 6

 1   after protracted and expensive litigation.  And number four,

 2   the judgment of the parties that the settlement is fair and

 3   reasonable.  And we are going to focus on those ideas, but in

 4   a slightly different format and order than the Rudder case

 5   contemplated.  Specifically we're going to organize our

 6   presentation around six central concepts.

 7          Number one, at the outset of this dispute in 2011

 8   the mental health system at the ADX was constitutionally

 9   deficient in many respects.  And we're going to spend most of

10   the time today talking about that issue as a way to framing

11   the way in which the settlement addresses the issues that led

12   to the lawsuit.

13          Number two, the policies that are encompassed by

14   the proposed settlement, the documents that the Court alluded

15   to, fairly and reasonably and adequate -- adequately address

16   those deficiencies with policy prescriptions and enforcement

17   mechanisms to ensure that the -- the BOP does what those

18   policies require.

19          Number three, that if the BOP doesn't do those

20   things, the Court does have the jurisdiction ability under

21   the -- the proposed settlement terms to compel that

22   compliance.  And we intend to address the Court's question

23   about jurisdiction --

24          THE COURT:  Yeah.

25          MR. ARO:  -- quite directly.

Page 7

```
 1              Number four, we are going to talk quite a bit
 2     about the idea that the settlement was fairly and honestly
 3     negotiated following a careful investigation by myself and my
 4     colleagues on behalf of the plaintiff.
 5              Number five, we're going to talk discretely about
 6     the attorney fee and cost question.
 7              And, lastly, we're going to address directly
 8     Mr. Cunningham's and other concerns that have been expressed,
 9     both in the testimony that you're going to hear as well as
10     the submissions that have been received by the Court, and
11     explain to you that while we understand and are sensitive to
12     those concerns, we nevertheless believe that the Court should
13     approve the proposed settlement.
14              Ms. Padden and I have worked together to organize
15     how to get a lot of information before the Court in a
16     relatively short timeframe given the scope of the issues.
17     The way that we have conceived this, with the Court's
18     indulgence, is Ms. Padden is going to make some opening
19     framing remarks and then we're going to proceed with a series
20     of primarily videotape driven submissions of evidence to the
21     Court, which I'll explain a little bit more as we go through
22     that.
23              Before I sit down and let Ms. Padden make her
24     preliminary remarks, there are two points that I want to make
25     very clear before we launch into a -- what I think is going
```

Harold Cunningham, individually, et al. vs.                    Fairness Hearing - Day 1
Federal Bureau of Prisons                                          December 15, 2016

Page 8

1    to be a fairly painful series of submissions of evidence for

2    everybody in the courtroom.  The first is that the settlement

3    that we've proposed, and I think you're aware of this based

4    on your knowledge of how this proceeded, is really the

5    product of an extraordinary effort that was propelled forward

6    by Magistrate Judge Hegarty and by a number of the lawyers

7    and other personnel at the Department of Justice and the

8    Bureau of Prisons.  You're going to hear a lot of criticism

9    voiced by the inmates and by me about things that they have

10   done.  But it's important to acknowledge out of the box that

11   this is -- this was a hard process that was facilitated by

12   the cooperation and the integrity of representatives of the

13   Department of Justice.  And I want that clear before we

14   launch into the negative side of that coin.

15          The other thing I want to say is, and you're going

16   to see this, I think, very clearly in the testimony that

17   we're going to present, the ADX is a very different place

18   than it was in 2011.  You're going to hear a lot of testimony

19   about things that were done to people and were in place six

20   years ago when we first got involved in this case.  And I

21   think, importantly, you're going to see how this case has

22   shifted the direction of the way mental health services are

23   provided.  And it has made a huge difference to the inmates

24   that we represent.  And while we remain critical of the

25   number of things that the Bureau of Prisons does and the way

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 9

1   that they do them, it's very fair to acknowledge that even

2   before the approval of the settlement, before any order by

3   the Court compelling them to do anything, the Bureau of

4   Prisons has made very significant steps in the correct

5   direction to address the problems that existed when this case

6   began.

7           So unless the Court has any preliminary questions

8   for me, I'm going to sit down and let Ms. Padden make her

9   remarks --

10          THE COURT:  No.

11          MR. ARO:  -- and then move forward.

12          THE COURT:  I do want to go back to this adequacy

13  however.  As I said in the beginning, I don't think that I am

14  in a position to evaluate the medical treatment, diagnosis

15  and treatment as adequate or inadequate.  That I don't think

16  is a matter before me or a matter on which I have any

17  competence, even listening to expert testimony, so --

18          MR. ARO:  Without commenting on the Court's

19  competence on those issues, we agree that we're not asking

20  you to address those issues.

21          THE COURT:  Okay.

22          MR. ARO:  The way the case has been framed is BOP

23  personnel are responsible for making diagnostic decisions --

24          THE COURT:  Right.

25          MR. ARO:  -- treatment decisions under the

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 10

1    framework of a set of policies that facilitates doing those

2    things the right way.

3              THE COURT:  Yeah.  And one of the reasons that I

4    emphasize that too is I understand and -- if any particular

5    event should occur which an inmate is deemed -- considers

6    himself deemed to have been mistreated and in violation of

7    the Eighth Amendment, I don't see that the settlement

8    agreement excuses possible misconduct.  So I -- I -- I don't

9    think that this is a shield that would exclude the

10   possibility that some treatment provider violates the

11   constitution.

12             MR. ARO:  We agree with that, Your Honor.

13             THE COURT:  Okay.  And the -- with respect to

14   Magistrate Judge Hegarty, you know, I assigned this case --

15   referred the case to him early on.  I have not had any direct

16   involvement in the negotiations here.  I have not received

17   reports from him as to what is happening, where things are

18   with a couple of exceptions, one being administratively.

19   I've authorized him to travel and do things that are

20   different from the ordinary work of a magistrate judge.  And,

21   secondly, I have responded to a couple of questions with

22   respect to procedures on setting hearings.  But with respect

23   to the actual substance of the negotiations, because I always

24   anticipate that settlement procedures will fail and trial

25   will result and -- I always want to keep myself prepared for

Page 11

 1   trial without any pre-conditioning in any respect.  So it

 2   should be made clear that I've not been encouraging or

 3   discouraging the settlement negotiations.  And I'm still

 4   prepared for trial if necessary, so --

 5              MR. ARO:  Fair enough.

 6              THE COURT:  All right.  Ms. Padden.

 7              MS. PADDEN:  Thank you, Your Honor.

 8              THE COURT:  Good morning.

 9              MS. PADDEN:  Your Honor, Mr. Aro is correct when

10   he says that the ADX is a different place than it was in

11   2012.  And that is in part because of this lawsuit.  But it's

12   also in large part because of the dedicated work that

13   individuals at the Bureau of Prisons have done, both at the

14   ADX and in central office, to improve the lives and treatment

15   of the men that are housed at that institution.  So we're

16   obviously here to approve a settlement that's been negotiated

17   extensively and at arm's length.  And I just want to

18   highlight for the Court what I plan to cover because

19   typically the defense counsel's role is somewhat limited in a

20   fairness hearing.  So what we -- I discussed with Mr. Aro and

21   what we plan to show to the Court is to highlight what the

22   Bureau of Prisons' defenses would have been had the case gone

23   to trial.  So that will allow the Court to make a

24   determination as to the risks that the plaintiffs would have

25   faced had they continued to litigate the case and take it to

Page 12

```
 1   trial.  And that will allow the Court to determine whether
 2   the Court believes that the settlement is fair and reasonable
 3   and adequate under those circumstances.
 4           But I would like to highlight, Your Honor, I -- we
 5   are going to see some testimony that's very difficult to
 6   listen to here today.  We obviously don't agree with a lot of
 7   this evidence.  That's not the purpose of this hearing.  If
 8   we had gone to trial we would have vigorously contested much
 9   of what you see here today.  Instead, I'm just going to
10   highlight some examples of the evidence that we might have
11   presented had we gone to trial and discuss our legal
12   defenses.  But I want to make clear to everyone in the
13   courtroom that this settlement contains no admission of
14   guilt.  And we do have disputes as to the factual evidence
15   we're about to see.  In some cases there is some
16   cross-examination of these witnesses, but in other cases
17   there is not.  So I want to make that clear for the record.
18   And I believe with that, we could -- we could start with
19   Mr. Aro's presentation.
20           THE COURT:  Yeah.  Well, it is clear to me,
21   Ms. Padden, and among other things, you know, we have at
22   times had conferences anticipating trial.
23           MS. PADDEN:  Yes.
24           THE COURT:  And a part of those conferences have
25   included the logistical difficulties of presenting the
```

Page 13

 1   evidence in the case.

 2              MS. PADDEN:  Correct.

 3              THE COURT:  And that includes, of course, the

 4   conditions of confinement of plaintiffs and members of the

 5   class now, if we do certify the class.  But also I continue

 6   to be aware, and this is one of the things I want to discuss

 7   when we come to enforcement, of the limitations of the Prison

 8   Litigation Reform Act --

 9              MS. PADDEN:  Correct.

10              THE COURT:  -- and also the contours of the Eighth

11   Amendment.

12              MS. PADDEN:  Correct.

13              THE COURT:  They're not clearly defined.  And we

14   don't have precedential authority that -- in my awareness, at

15   any rate, that are really adequate for a Court to follow as

16   to what is necessary to -- you know, this goes beyond the

17   cruel and unusual punishment aspect.

18              MS. PADDEN:  Mm-hmm.

19              THE COURT:  And what I have read here -- and you

20   mentioned essentially good faith of the Bureau of Prisons

21   personnel.  You know, the adversary process is not well

22   designed to consider a matter of this type because what we're

23   really talking about here, I think, is recognizing that we

24   have on the one hand the societal interest in confinement --

25              MS. PADDEN:  Correct.

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 14

1          THE COURT:  -- and whether we're talking about it,

2     you know, in all of the terms of what is the purpose of

3     prison.  But there are very substantial problems in

4     attempting to satisfy the public interest in safety and

5     protection versus the humanity and the individual dignity of

6     the persons the law confines.  And it strikes me in looking

7     through these papers that I have that identify what you're

8     agreeing to, your client is agreeing to, I'm pleased to see

9     that there is a recognition that we are -- all of these

10    people continue to be human beings.  And while they may be

11    tortured souls, they still have souls.  So I recognize that

12    at the outset.

13          MS. PADDEN:  And I appreciate it, Your Honor.

14    And, frankly, I've seen that over and over and over again

15    dealing with this client.  And the situation is even more

16    unique because we're not just talking about some

17    run-of-the-mill, you know, penitentiary or correctional

18    institution.

19          THE COURT:  Right.

20          MS. PADDEN:  We're talking about the ADX that

21    houses such a small percentage of the Bureau's population,

22    and that, frankly, are some of the most dangerous men in the

23    world.  And it's a very hard balance to strike.  And the

24    Bureau has really stepped up to the plate to address the

25    issues that Mr. Aro and his colleagues have identified.

Page 15

```
 1              THE COURT:  Yeah.

 2              MS. PADDEN:  And I think Your Honor will find that

 3    it does so in a fair, reasonable, and adequate way, in a way

 4    that humanely treats the men down there.

 5              THE COURT:  Yeah.  I also recognize, you know,

 6    this is not the first time I have had litigation dealing with

 7    prisons.  And I recognize that it's a difficult task for

 8    those who are the personnel who are in day-to-day contact

 9    with people who are in prison under these conditions.

10              MS. PADDEN:  Mm-hmm.

11              THE COURT:  So, you know, this isn't -- this isn't

12    like a legal puzzle.

13              MS. PADDEN:  Right.

14              THE COURT:  This is a -- well, it's a human

15    struggle.

16              MS. PADDEN:  Yes.

17              THE COURT:  All right.  Thank you.

18              MS. PADDEN:  Okay.  Thank you, Your Honor.

19              THE COURT:  All right.  Mr. Aro.

20              MR. ARO:  Your Honor, we want to move a number of

21    exhibits into evidence right out of the gate --

22              THE COURT:  Okay.

23              MR. ARO:  -- pursuant to the stipulation.  We have

24    provided the Court's staff, and I think you have a copy as

25    well, of an exhibit list that is marked --
```

Page 16

 1              THE COURT:  There's a lot of exhibits here.

 2              MR. ARO:  -- with -- we skip a lot of numbers.  So

 3    it's fewer than it looks like there are, but there are a lot

 4    of documents.  Some of them are referred to during the

 5    testimony you're going to hear.  Others are things that we're

 6    going to talk about in the course of the -- what I'm going to

 7    think of --

 8              THE COURT:  All right.  Well, there --

 9              MR. ARO:  -- as the legal argument.

10              THE COURT:  The way it looks, are none of them

11    opposed?

12              MR. ARO:  There are a few that are not marked as

13    stipulated, Your Honor.  There's a column that has a little

14    box saying Stipulated or Non-stipulated.

15              THE COURT:  Yes.

16              MR. ARO:  And what we propose to do is move all of

17    the exhibits that are identified as stipulated into evidence

18    at this time.  There's one that I'm going to speak to

19    directly in a little bit that is a -- being admitted for a

20    limited purpose.  That is Exhibit 582.  And I'll explain what

21    that limited purpose is when we get to that document.

22              THE COURT:  Oops.  Excuse me.

23              MR. ARO:  But the rest of the documents that have

24    been identified as stipulated we've shared with Ms. Padden.

25    The government's exhibits are also included on this joint

Page 17

```
 1   exhibit list.  And we've stipulated to the admission of all
 2   the government's proposed exhibits.  So at this point we'd
 3   formally move for admission of the exhibits marked as
 4   stipulated on the exhibit list provided to the Court.
 5            THE COURT:  They're all numbered and numbered --
 6   is that right?  So these numbers include defendant's
 7   exhibits?
 8            MR. ARO:  That's correct, Your Honor.
 9            THE COURT:  Okay.  Well, instead of reciting them
10   all, we'll receive them in accordance with the fairness
11   hearing exhibit list that has been submitted.
12            MR. ARO:  Thank you, Your Honor.  I'm going to get
13   into the video in just a second.  But I want to set the table
14   for that by explaining some things you're going to hear about
15   during the course of the testimony so that we don't have to
16   pause and explain it at that point.  We have, at the Court's
17   request, cut down the videos to I think the barest bones we
18   could cut them.  And part of the stuff that we cut was
19   explanatory material about who certain people are, what
20   certain issues are, what locations there are.  And in
21   particular we've cut out almost all of the description about
22   what exactly ADX looks like and how it operates and the
23   conditions in which these inmates live.  So I'd like to begin
24   by essentially taking you on a quick tour of the places that
25   you're going to hear inmates describe.  Starting with
```

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 18

 1    Exhibit 636, Dan.

 2            THE COURT:  I might mention that I'm aware that

 3    there was at one time -- the Bureau of Prisons invited judges

 4    of this Court to tour ADX.  Some did.  I never did because of

 5    this litigation obviously.

 6            MR. ARO:  So the Court, just so I understand, the

 7    Court has not been through the prison before, but --

 8            THE COURT:  I have not.  I've -- in 1976 I went

 9    through every prison west of the Mississippi, but --

10            MR. ARO:  This is a little newer than that.

11            THE COURT:  ADX wasn't there at that time.

12            MR. ARO:  The ADX was opened in the early 1990s.

13    The first --

14            THE COURT:  Yeah.

15            MR. ARO:  -- inmates arrived there in December

16    of --

17            THE COURT:  Yeah.

18            MR. ARO:  -- 1994.

19            THE COURT:  So I just, you know, to make it clear,

20    I didn't accompany whoever went down there for that tour

21    because I thought it would be inappropriate.  So you're going

22    to give me a virtual tour?

23            MR. ARO:  A quick tour.

24            Could you bring up 636, Dan?

25            UNIDENTIFIED SPEAKER:  (Inaudible.)

Harold Cunningham, individually, et al. vs.                    Fairness Hearing - Day 1
Federal Bureau of Prisons                                            December 15, 2016

Page 19

 1              I'm told that we need to turn the monitors on, but

 2     I'm not sure what I need to do to do that.

 3              THE COURT:  Well, don't ask me how the equipment

 4     works.

 5              MR. ARO:  This is one of the challenges with

 6     technology.  It's wonderful when it works and not so great

 7     the rest of the time.

 8              THE COURT:  You're talking to a technophobe, so --

 9              MR. ARO:  While we're waiting to solve for that

10     problem, Your Honor, I'd also note that there are -- there's

11     a rack with all of the exhibits behind you.  To the extent

12     you want to consult any of the papers, those are available to

13     you and correlated to the list that you have.

14              THE COURT:  Okay.  I hope I don't have to read

15     every page of all those notebooks.

16              MR. ARO:  Your Honor, can you see the exhibit

17     that's on your screen up there?  Because it appears that this

18     is the only one that's not working right now.  Can you all

19     see?

20              THE COURT:  I don't have anything on the screen.

21     Well, maybe we need to call for the cavalry from IT.

22              MR. ARO:  Apparently this was working about

23     20 minutes ago and has decided now that it doesn't want to

24     cooperate.  Do you have a projector here?

25              THE COURT:  We'll take a short recess to see if

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 20

 1   somebody can fix it.

 2           MR. ARO:  We appreciate that, Your Honor.  Sorry

 3   for the delay.

 4           THE COURT:  All right.

 5           (Recess from 9:29 a.m. to 9:46 a.m.)

 6           THE COURTROOM DEPUTY:  All rise.  Court is in

 7   session.

 8           THE COURT:  Be seated, please.  All right.

 9           MR. ARO:  We're back in business, Your Honor.

10           THE COURT:  I'm glad to hear it.

11           MR. ARO:  Thank you for your patience.  So where

12   we left off is the beginnings of the tour of the ADX just so

13   you have a reference point for some of the testimony you're

14   going to hear.

15           THE COURT:  Okay.

16           MR. ARO:  We've got it on your screen.  We've got

17   it up here.  This is an overhead view of the ADX.  You see

18   the perimeter and gun towers around the outside.  And the

19   prison itself is organized in a --

20           THE COURT:  Yeah.

21           MR. ARO:  -- triangle.

22           THE COURT:  You want a pointer?

23           MR. ARO:  I do have one.

24           THE COURT:  Oh, you have it.  Okay.

25           MR. ARO:  So these areas over here are the housing

Page 21

```
 1   units that you will hear referred to in the testimony as the
 2   general population units.  Every unit, with a couple of small
 3   exceptions, at the ADX consists of housing that is single
 4   celled.  In your cell almost all the time except when you're
 5   out for recreation or to see the doctor.  So general
 6   population we consider to be a bit of a misnomer because in
 7   most prisons it means walking around with folks.  Here it
 8   means being by yourself all the time.
 9              You're going to hear some testimony about a unit
10   that the inmates refer to as the SHU.  That's over here.
11   That unit is an internal disciplinary unit where inmates who
12   break the rules at the ADX are sent typically for short
13   periods of time.  And the operation of that unit has changed
14   over -- over time, but at the time that most of the testimony
15   you're going to hear was taken that was where many of the
16   inmates who you're going to see were housed on a continuous
17   basis because they got in trouble every day and sometimes
18   every hour.  This unit over here is the control unit.  That
19   is a -- essentially a prison within a prison.  Typically
20   the --
21              THE COURT:  Could you point to that again?
22              MR. ARO:  It's right here.
23              THE COURT:  Okay.
24              MR. ARO:  And that is a unit in which inmates are
25   held for longer periods of time.  Typically at least five
```

Harold Cunningham, individually, et al. vs.                          Fairness Hearing - Day 1
Federal Bureau of Prisons                                              December 15, 2016

Page 22

 1    years typically for offenses that they commit at other

 2    institutions.  So if they attack a staff member or if they

 3    murder another inmate, in addition to whatever criminal

 4    charges they may receive, they are sentenced on an

 5    administrative basis to a term in the control unit at the ADX

 6    where the rules are a little tighter, the security is a

 7    little heavier.  There's a bit more isolation.  And many of

 8    the folks we know who have been in this control unit, and

 9    you're going to hear from several inmates who served a long

10    time in that unit, when they leave that unit they move to a

11    general population or another unit at the ADX where the rules

12    are a little bit more lax.

13             One of the -- the relatively few conditions of

14    confinement differences between the control unit and the SHU

15    on the one hand, and the general population unit, has to do

16    with recreation.  And you're going to hear testimony about

17    this.  If you look at the general population units, they're

18    organized in a sort of cross pattern.  And in-between these

19    units there, and there, and there, and there are clusters of

20    cages in which inmates recreate.  They're a little bit bigger

21    than cells.  They're next to each other.  So inmates are

22    physically separated from one another during recreation but

23    they can see each other.  They can talk to one another

24    between the cage bars or the -- sort of like thick chain link

25    fencing.  In the control unit in the SHU you don't have those

Harold Cunningham, individually, et al. vs.                    Fairness Hearing - Day 1
Federal Bureau of Prisons                                         December 15, 2016

Page 23

1   cages.  What you've got are these little black enclosures.

2   And I'm going to point to them with my finger so you can see

3   them a little better.  Here and up here.  These -- I'll show

4   you a picture of one in just a minute.  But they are

5   essentially open to the sky but have concrete walls all the

6   way around them.  So when inmates are recreating, they're

7   outdoors.  They can look up through a screen and see the sky,

8   but there's no ability to interact face to face even through

9   a barrier.

10             Would you bring up Exhibit 10 for me, Dan, please?

11             What you see over here is a little bit squished.

12  Oh, that's much better.  Thank you, Dan.

13             This is a diagram of the ADX control unit.  This

14  is the prison within a prison that I mentioned a minute ago.

15  It is different in many respects from the general population

16  unit.  But they all have relatively similar physical

17  features.  On three of the wings you have housing units where

18  inmates' cells are located.  The --

19             THE COURT:  Oops.  Excuse me.

20             MR. ARO:  The fourth wing is essentially a

21  services area.  There's a corridor that has offices and --

22  and certain other facilities.  There's a control bubble in

23  the middle of the unit that you'll hear referred to from time

24  to time.  And because this is the control unit, you can see

25  the recreation enclosures that are sort of clustered around

Page 24

 1   that central area.

 2              Would you bring up for me, Dan, Exhibit 637?

 3              Dialing this a little bit further down, this is a

 4   very simplistic diagram of a typical housing range at the

 5   ADX.  And the cells are configured -- most of the cells are

 6   configured in this manner, although there's a little

 7   variation between the units.  What you've got is cells up one

 8   side of the corridor positioned side by side.  Across this

 9   corridor are several individual indoor recreation enclosures.

10   And I'll show you a picture of that in a second.  It's

11   essentially a big cell where inmates are enabled to spend an

12   hour or two hours a few days a week stretching their legs.

13   Each range also features an electronic law library which is

14   essentially a cell-sized room that has a modified computer

15   terminal in it where inmates can access electronic legal

16   materials.  And they have some paper materials in there as

17   well.  So the inmates live in these cells all the time.  The

18   staff members will come through a grate -- a grate and move

19   up and down the hallway to deliver food, to deliver

20   medication.  You're going to hear about the process in which

21   staff members make rounds by walking -- essentially walking

22   down the range going door to door and generally speaking

23   through -- with folks through one or both of the doors to

24   each cell closed.  And except when there's a staff member on

25   the range or somebody in one of the rack enclosures, what you

Page 25

1    have is 12 folks in cells by themselves next to each other

2    and not much else happening on that -- on that wing.

3                Would you go for me to Exhibit 1016, Dan?

4                This is a picture of a typical ADX cell from the

5    hallway.  What you see is an exterior solid steel door that

6    slides open and closed.  So this door would move this way to

7    close.  Inside the -- the slide or the solid steel door,

8    there's a small seal part that's probably about 3 feet

9    across, and then an internal sliding bar door.  So it's

10   possible for a staff member to open the outside door and

11   still have a physical barrier between the staff member and

12   the inmate in the cell.  There's a window in the doorway.

13   And in a second we'll see another picture that has another

14   window that looks into the cell that's behind the sliding

15   door in this photograph.  So it's possible for staff members

16   to see into the cells, and inmates can see out of the cells

17   through the windows but only whatever is right in front of

18   their cell.  They don't really have an ability to see

19   anything else aside from what happens directly across from

20   them.

21                Each of these cells also has a vertical window

22   that's -- I think the measurement is about 4 feet high and

23   about 6 inches wide.  It's situated on the opposite side from

24   the door.  There are very few cells at the ADX from which you

25   can see anything other than another wall.  You can look out

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 26

 1   and you'll see the inside of a physical barrier or you can

 2   see into a recreation yard, but as I understand it, there are

 3   only about four cells where you can see over the wall and see

 4   in this case a view of Pikes Peak.  So you might imagine that

 5   those are fairly highly sought after cells.  Inside the cell

 6   there's the solid steel shower that you're going to hear a

 7   lot of testimony about people banging on incessantly.

 8   There's a bed as well over by the window.  And the reason we

 9   have a cell and a bed and a television, which you're going to

10   hear the government talk some about, is so the inmates have

11   to be removed from their cells as little as possible.  They

12   don't have to leave to shower.  They don't have to leave to

13   eat.  They don't have to leave to receive programming through

14   their television sets.  That's what facilitates the

15   continuous confinement of folks in these cells.  And while

16   inmates are generally offered recreation out of the cell for

17   a few hours five days a week, some of the folks who we

18   represent literally lived in these cells for years without

19   ever going outside or leaving the cell other than to move

20   because every -- periodically, it depends on the unit, but

21   every 30 or 60 or 90 days inmates are compelled to move to

22   the cell, generally the cell next to them.  They rotate

23   inmates through these cells for security reasons.  So when

24   you hear about folks moving behind someone, what they're

25   saying is, I was next to a guy.  We were both rotated, so we

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 27

1   both moved one cell down.  I moved into his cell behind and

2   essentially dealt with whatever conditions he left behind.

3            Would you bring up Exhibit 1018, Dan?

4            This is an image of the inside of a cell standing

5   with one's back to the shower facing towards the door.  You

6   see a concrete pillar that's a little stool, a desk.  This is

7   a shelf on the wall.  Up here is a small television set.

8   There's a control panel over here on the wall that has a

9   duress button that allows an inmate to push a button and

10  reach somebody down in the control bubble that I showed you a

11  little bit on an intercom system.  There also is a toilet and

12  sink combination here.  There's a mirror on the wall.  And

13  this is the interior view of that sliding bar door that we

14  talked about a little bit ago.

15           The interior of these cells is about 7 by 12 feet,

16  so roughly the size of a bathroom.  And you can see, as I

17  said a second ago, this is a window that is right in this

18  picture covered by the sliding door.  So you can't see

19  through it.  But this is the larger window that inmates have

20  to look out of into the corridor and that staff members have

21  to look into the inmate's cell.

22           Would you bring up Exhibit 641, please, Dan?

23           This is another image of an ADX cell.  You're

24  going to hear testimony from inmates about being, what they

25  refer to, as four-pointed, chained down to various horizontal

Page 28

1  surfaces.  This bed is fitted with metal rings that are used

2  by correctional officers to handcuff folks hand and foot.

3  And particularly back in the day at the time the case began,

4  it was commonplace at the ADX to chain folks down for what we

5  believe the evidence shows is an excessive period.  And in

6  many cases, including in the case of an inmate named Arnell

7  Shelton, who you're going to hear about, folks were chained

8  down and their food was delivered to them in a paper bag, but

9  was placed on this little desk over here out of their reach.

10  So they were left without food even though the food had been

11  served to them because they were chained down and couldn't

12  reach it.

13         I mentioned a second ago the recreation

14  enclosures.  Dan, would you bring up Exhibit --

15         THE COURT:  The question is, are those points for

16  handcuffing on every sleeping surface?

17         MR. ARO:  They are on many sleeping surfaces, but

18  as I understand it, they're not on every sleeping surface.

19         THE COURT:  Okay.

20         MR. ARO:  Some -- some units have -- and as a

21  matter of fact, if you go back to Exhibit 1016, Dan, this is

22  one of the government's exhibits that we got yesterday.  You

23  can see or maybe you can see this bed has those rings fitted

24  in it.  And in the control unit, the prison within a prison,

25  as I understand it, most, if not, all of the cells are fitted

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 29

 1   with these rings, and other units fewer cells are.

 2             THE COURT:  Okay.

 3             MR. ARO:  There also are rooms, we don't have a

 4   picture of one that is -- that is clear enough to project

 5   here, that are used as observation cells, but also as

 6   restraint cells in which the bed is not a bed that looks like

 7   this.  It's a 4 by 8 concrete or metal surface in the middle

 8   of an otherwise empty room that has metal rings fixed into

 9   it.  And it's used for inmates, sometimes suicidal, sometimes

10   discipline problems.  And our clients often were chained down

11   in those facilities as well.

12             Would you go to 643, please, Dan?  And rotate it

13   for me.

14             So this is a picture of some of those outside

15   recreation enclosures that I referred to earlier.  In a

16   general population unit you'll see there are, in this

17   picture, three enclosures side by side with a single door.

18   There's this heavy wire mesh around -- on all sides,

19   including between these enclosures.  The only thing inside

20   the enclosures, and you can't really see it very well on

21   these pictures, it's right up here, is a pull-up bar that

22   folks can pull themselves up by, but there's no other

23   equipment or anything for them to do.  And many of the

24   inmates run around in circles or do their various exercises

25   with their workout partners.  But a lot of times these

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 30

1  enclosures are really more sort of social enclosures where

2  folks stand and chat with the people that they live with

3  through the mesh.

4         One of the good things from our perspective that

5  has begun to happen at the ADX is an effort to attempt to get

6  folks out of their cells a little bit more other than just to

7  be put in these and left to their own devices.  This fall

8  they started a program in which inmates were offered the

9  opportunity to come out of their cells for a focused

10  conversation about something that was led by a psychologist.

11  So they bring six or eight guys out, and the psychologist

12  spends an hour or two talking with them, not necessarily

13  about psychological issues, but current events or other

14  issues in a structured way to try to get some socialization

15  for these folks.  And we certainly encourage that because we

16  think that out of cell time is absolutely essential even for

17  the health -- the mentally healthy inmates at this prison.

18  And I think it's -- it's a sign of what Ms. Padden referred

19  to earlier.  The ADX is looking at a lot of these issues and

20  trying to use at least some of the existing facilities down

21  there for -- for purposes of solving some of the problems

22  that have been identified by this case.

23         Would you bring up Exhibit 644 for me, please,

24  Dan?

25         This is a picture of one of these individual

Page 31

```
 1   recreation enclosures that I mentioned earlier in the SHU or
 2   control unit.  I'm not sure which one this one was taken in.
 3   But you can see these high vertical concrete walls all the
 4   way around.  That's a pull-up bar apparatus that is in many
 5   of the rec enclosures down there.  And as I said earlier, you
 6   can see to the sky through a mesh, but other than looking
 7   back through this window into the internal area in the
 8   prison, there's no way to see another person or to speak with
 9   them other than by yelling over the walls when you're in one
10   of these rec enclosures.
11            I want to close the little tour with two
12   developments that we believe this case is directly
13   responsible for, and, again, are constructive changes at the
14   institution.  The first is Exhibit 647.  This is a picture of
15   some treatment modules or treatment enclosures that were
16   installed in a gymnasium down at the ADX a couple of years
17   ago following a meeting in which our experts spoke at length
18   with the then warden of the ADX about how to provide group
19   therapy to people without creating safety issues for staff or
20   the inmates.  This is an array of five cells that are fitted
21   with chairs.  They have little ports on the front where the
22   inmates can stick their hands through to get handcuffed
23   before they're released.  And this is a table and chair out
24   here where the psychologist or whoever is presenting
25   programming can sit and interact with the inmates in these --
```

Harold Cunningham, individually, et al. vs.   Fairness Hearing - Day 1
Federal Bureau of Prisons   December 15, 2016

Page 32

 1   these enclosures.  When we get to the question of the

 2   settlement negotiations and the visits that Judge Hegarty had

 3   with inmates at the ADX, generally this was the setting in

 4   which we did that.  We went down to the gymnasium.  The

 5   plaintiffs were in these enclosures.  Judge Hegarty and I

 6   were sitting at this table or walking in front of them

 7   speaking with the inmates as a group in this facility.  And

 8   they're using this set of enclosures at this point primarily

 9   for psychological programming.  But, again, we think

10   constructively, there's a discussion right now about using it

11   for art groups and literature groups and other things to get

12   people out of their cells and give them an opportunity to

13   interact in a constructive way.

14           The last picture I'm going to show you at this

15   point is Exhibit 648.  When we started working on this case

16   we heard over and over that the only individual opportunity

17   inmates had to speak with a psychologist was through the two

18   doors that we saw earlier, which was a problem for a lot of

19   obvious reasons and was one of the first things that we began

20   to voice concerns about.  To its credit, the Bureau of

21   Prisons has constructed in each unit down there now, using an

22   existing facility that they modified, a room for private

23   conversations with inmates that can be conducted in a secure

24   way.  The -- what they did was take a room that had this

25   table existing in it before and they built this glass

Page 33

```
 1    partition, glass and masonry partition.  The inmate comes in
 2    through this door, can sit on one side of the glass.  The
 3    psychologist or whoever can sit on this side of the door and
 4    interact with the inmate who's not -- doesn't need to be
 5    restrained, can sit in a comfortable chair, and they can have
 6    a confidential conversation without other folks overhearing.
 7    You're going to hear testimony about some evaluations that
 8    were done back in the summer of 2014 by an outside
 9    psychologist and psychiatrist, again, as part of this case.
10    These are the rooms that were used for that purpose.  And
11    they're used quite frequently now for one-on-one counseling
12    sessions between inmates and their therapist.
13             So you can bring that down, Dan.
14             Because of the isolation in which these folks
15    live, the ADX has been described by a lot of different terms.
16    One publication referred to it shortly after it opened as one
17    of the most psychologically debilitating places on Earth.
18    And we think it's because of that fact and a recognition by
19    the Bureau of Prisons of that fact that from the very
20    earliest days of the ADX there was a policy in place that you
21    will hear about much in our presentation that prohibited the
22    placement of inmates at the ADX if they had serious mental
23    illness.  The earliest that we -- edition of that policy that
24    we have is Exhibit 117.
25             If you'd bring up the first page of that, Dan.
```

Page 34

 1              This is a Bureau of Prisons program statement that
 2    is dated as of 1999.  When you see BOP policies, and you will
 3    see several of them as we go along, you'll see a number.
 4    This one is number 5100.  And typically it's followed by a
 5    dot something.  And the dot something is the version of that
 6    policy.  This is the seventh iteration of that policy issued
 7    as of September of 1999.  And this particular program
 8    statement, which is a national level BOP policy, deals with
 9    the subject Security Designation and Custody Classification
10    Manual.  This is where they set forth the rules for who goes
11    where and how they classify inmates.
12              If you'd go to the second page, Dan, and cull out
13    the second to last paragraph on the page.
14              This policy back in 1999 contained the language,
15    Inmates currently diagnosed as suffering from serious
16    psychiatric illnesses should not be referred for placement at
17    either ADX Florence or USP Marion, which at that point was
18    essentially the second most secure facility in the Bureau of
19    Prisons.  This language survives in various forms through
20    later versions of this policy.  And we believe that it was in
21    place even before the ADX was opened, although we don't have
22    an earlier version of the policy.  We think that this policy
23    recognizes a couple of things that you're going to hear us
24    talk quite a bit about.
25              First, the impact that the conditions of

Harold Cunningham, individually, et al. vs.                    Fairness Hearing - Day 1
Federal Bureau of Prisons                                         December 15, 2016

Page 35

1  confinement at a place like ADX have on inmates and a

2  recognition that those conditions of confinement impose

3  significant strains on the mental health of inmates.  We also

4  believe that this policy is a recognition of how fragile

5  people with serious mental illness are.

6          You're going to see testimony in just a little bit

7  from a prisoner named Ronnie Houston who has serious mental

8  illness.  There's no argument about that.  And who, as we

9  speak this morning, is sitting in this cell by himself down

10 at the ADX.  Mr. Houston's child was murdered just a few days

11 before we took his testimony.  And when I found that out the

12 day before as I met with him to prepare, I suggested to him

13 that he either defer or not give his testimony because I was

14 concerned about the impact it would have on him to deal with

15 these issues at the time he was dealing with that issue.  He

16 refused to do that.  And told me in his words that his

17 opportunity to address you directly in this case was, quote,

18 his last chance.  And you're going to see how he explains his

19 experience at the ADX.  And you're going to see how people

20 get to be like Ronnie Houston in his testimony.  It's my

21 belief, and I can't prove it, of course, that had he found

22 out about the death of his child at any time other than when

23 he did, knowing I was coming to see him, knowing that he was

24 going to give this testimony, that he would have taken his

25 own life.  Thankfully he didn't.  Thankfully since his

Harold Cunningham, individually, et al. vs.          Fairness Hearing - Day 1
Federal Bureau of Prisons                           December 15, 2016

Page 36

 1   testimony, the Bureau of Prisons has reconsidered his

 2   situation and designated him to a new program that was

 3   created as a result of this case, and he should be headed

 4   there not too long from now.  But we think program statement

 5   5100 says what it says because people who are hanging out by

 6   the barest of threads like Ronnie Houston, because of their

 7   serious mental illness should not and we don't think

 8   constitutionally can be locked in a concrete box for 23 hours

 9   a day year after year.

10           The evidence is clear, however, that

11   notwithstanding the policy that the Bureau of Prisons put in

12   place years ago, the BOP has housed serious and mentally ill

13   inmates in violation of that policy for years.  And by the

14   time we came into the picture back in 2011 we think it's also

15   beyond controversy that the ADX was packed with inmates who

16   showed obvious signs and symptoms of serious mental illness.

17           The way this case started, and we think that it's

18   important to note how it got going and the course of the case

19   from the very beginning, was a series of letters from inmates

20   to Deb Golden's organization, the Washington Lawyers'

21   Committee, back in 2009.  The first I want to show you of

22   which is Exhibit 690.  This is a letter that's dated

23   October 12th -- or 13th, 2009, to Phil Fornaci, who at that

24   time was the head of the -- the DC prisoners project of the

25   Washington Lawyers' Committee.  And the author of this letter

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 37

 1   was the original named plaintiff in this case, Michael

 2   Bacote.  He got frustrated with the pace of things and

 3   withdrew as a plaintiff in the case back in 2013.  At this

 4   time, however, he was one of a number of inmates who were

 5   down in the SHU, on a particular range in the SHU, and who

 6   somehow came to the understanding that the policy of the BOP

 7   prevented them from being at the ADX.  And letters started to

 8   pour out to the Washington Lawyers' Committee asking for

 9   help.  This one was written by another inmate for Mr. Bacote

10   because Mr. Bacote has an IQ in the low 50 -- the 60s, excuse

11   me, and is illiterate.  And so when he writes letters to

12   people he tells people what he wants to say and trusts that

13   they will write down what his words are.  So he signed it.

14   But it was actually written by another inmate.

15          If you go to the second page, Dan, and cull out

16   the -- excuse me, the third page, and cull out the last chunk

17   of text.  And I want to focus on the last five lines.

18          He is talking about the violation of his rights by

19   being sent there without a due process hearing, but also

20   being held there despite his mental illness.  And closes his

21   letter, I need some help because I have facts,

22   psychological -- psychological reports and psychological

23   reports from the courts saying that I'm mental retarded.

24   Please help me.  Thank you.

25          At the same time Mr. Bacote was writing, one of

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 38

 1   the other plaintiffs in the case, Carlton Dunbar, wrote

 2   Exhibit 532 primarily advocating on behalf of Mr. Bacote who

 3   everybody at that prison knew didn't belong there and who

 4   nevertheless is still there today, and who was affectionately

 5   known to other inmates as Rags.  Mr. Dunbar will describe why

 6   he wrote this letter in the testimony that you're going to

 7   hear and talk about his own experience of somebody who's been

 8   diagnosed with a variety of serious mental illnesses over the

 9   years at the ADX back in 2009 and '10, and explain how it was

10   that they decided to reach out to the Washington Lawyers'

11   Committee.

12           In the same timeframe inmates were filing lawsuits

13   against the Bureau of Prisons, including an inmate named

14   Dawane Mallett.  I'm going to refer for the record purposes

15   to his complaints, but I'm not going to look at them at this

16   point.  His complaint was Exhibit 572.  This goes back to

17   2009.  And over and over Mr. Mallett sued.  And at least

18   twice the Bureau of Prisons responded to lawsuits that he

19   filed, complaining about the placement of seriously and

20   mentally ill inmates at the prison, yet there's no evidence

21   that the BOP did anything in response to those complaints

22   other than seek their dismissal.

23           The other complaint that I want to briefly --

24           THE COURT:  And they were dis- -- they were

25   dismissed, right?

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 39

 1              MR. ARO:  They were, Your Honor.

 2              THE COURT:  Yeah.

 3              MR. ARO:  The other complaint I want to put up is

 4   the exhibit that I mentioned earlier had been stipulated into

 5   evidence for a limited purpose.  There's no evidence that the

 6   BOP was ever served with this complaint, and so we're not

 7   offering it for purposes of knowledge or deliberate

 8   indifference, but, rather, to show you what it looks like

 9   when somebody who has untreated schizophrenia tries to reach

10   out to a judge for help.  The inmate who wrote this complaint

11   is Deandre Thirkield.  The complainant (sic) is number -- or

12   Exhibit 582.

13              And if you'd go to the second page, Dan.

14              This is a form pleading that he tried to fill out

15   in his own handwriting and listed a whole bunch of folks as

16   potential defendants.  It is undisputed that Mr. Thirkield

17   has schizophrenia.  He's housed today at one of the specialty

18   high-security mental health units that was established

19   because of this case.  I saw him a few weeks ago there.  And

20   can tell you from my own observation the difference between

21   the guy that I met back in 2011 who did this and what I see

22   today, you cannot concede that they're the same person.

23              If you'd go to page 5 for me, Dan.

24              This is his effort to state his complaint.  And it

25   continues on to page 6.  And as you might imagine, the Court

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 40

 1   receiving this complaint had no idea what he was talking

 2   about.  And I'll tell you, I don't have any idea what he was

 3   talking about either.  But I received dozens of letters from

 4   him like this trying to explain what was going on in his

 5   mind.  And watching when I visited him down at the ADX,

 6   looking at me through the glass that separated us, seeing his

 7   image in the glass and actively hallucinating as I was

 8   talking to him based on what he thought was a ghost looking

 9   at him as he saw his own reflection in the glass.

10           With that introduction, I want to get to the

11   videos quickly, but I want to give you a little bit of a

12   primer about some of the things that you're going to hear

13   because there's a lot of jargon.  Some of these folks are

14   developmentally disabled and speak in pretty imprecise terms.

15   And I want to also explain to you that Ms. Padden and I

16   worked together to put these videos together.  They contain

17   testimony that was designated by the government.  They

18   contain anything that they asked us to play from these

19   videotapes.  And they're edited in a way that emphasizes the

20   important stuff.  So we took out a lot of sections that are

21   explanatory.  We're going to do this in segments.  So I will

22   play a segment, and then I will explain what happened between

23   segment one and segment two just so we can move through this

24   a little bit more quickly.  And I will be faithful to what is

25   said in the testimony in providing those -- those summaries.

Page 41

1   The entire transcripts are included among the exhibits that

2   have been admitted in the case.  There will also be a couple

3   of places where I pause to explain things in the video in

4   several instances at Ms. Padden's request to make sure

5   there's not a misapprehension about a fact that one can infer

6   from the video.

7           I want to apologize for a couple things in

8   advance.  These guys have lived, most of them, in prison for

9   a long time.  And even though I specifically asked them to

10  watch their language, they didn't always comply with that

11  request.  And there's no effective way for us to bleep that

12  out.

13          THE COURT:  I'm not concerned about that.

14          MR. ARO:  I also want to give you a couple of

15  definitions up-front that you're going to hear in terms of

16  shorthand.  They refer often to SHU or the hole, the

17  discipline unit where they're sent if they break the rules.

18  You hear lots of discussion about shots, getting a shot.

19  That's a disciplinary incident report to cite them.  It's

20  like a traffic ticket --

21          THE COURT:  Okay.

22          MR. ARO:  -- citing them for a violation of the

23  rules.  You will also hear many references to something

24  called a cop out.  Cop out in this context means a request to

25  staff.  It's asking the staff to do something for them.

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 42

 1            You also will hear, without any explanation of who

 2    they are, references to two psychologists who worked at the

 3    ADX back in 2011 when this case started.  Paul Zahn

 4    (phonetic) was the chief psychologist at that time.  You will

 5    see documents that he signed.  You will hear inmates talk

 6    about the extent to which he disregarded their -- their

 7    rights and their obvious need for treatment.

 8            You will also hear testimony about a doctor named

 9    Jennifer Coulter (phonetic) who's sometimes also referred to

10    as Jennifer Kach (phonetic) or Coach.  That was a married

11    name that she had.  She was the second-in-command

12    psychologist at the time this case started.  These are the

13    two doctors who were in charge of psychology services at the

14    ADX at the time that this lawsuit was filed.

15            I also, before I start the tapes, want to

16    recognize the challenge of sitting through almost nine hours

17    of videotape over today and tomorrow morning.  Every one of

18    our clients would have preferred to be here in person, but we

19    obviously were sensitive to the logistics and security

20    concerns that the Court voiced.  And the one piece of good

21    news is I can tell you in advance exactly how long every

22    single piece of testimony is going to last.

23            I want to thank the Court and express our

24    gratitude for its willingness to receive this extensive

25    videotape.  It's going to be difficult to watch, but we think

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 43

1   it's critical for two reasons:  The first, as I alluded to

2   earlier, is the idea that you have to understand what the

3   problem was before you can assess whether we have addressed

4   it in a fair and reasonable way.  The second is that it's

5   critical to the people who we represent that their

6   experiences are heard and that the BOP does not escape some

7   form of public reckoning for what it did to them.  And you

8   will hear in their testimony about this settlement that one

9   of their primary concerns -- that some of them talk about

10  money.  All of them have talked to me about the fact that the

11  BOP isn't admitting anything.  They're not being called on

12  the carpet.  And in a very small measure what you're going to

13  see now is an effort to at least assure them that their

14  stories have been heard in court.  And we appreciate your

15  willingness in a public forum to receive testimony in this

16  form.

17          If you don't have any questions for me at this

18  point, the first witness whose testimony we'd like to present

19  is Ronnie Houston.  He's the inmate I referred to a little

20  bit earlier.  I note it's 10:20.  I know we took a break

21  earlier.  But this is -- the first clip is a 50-minute

22  running clip.  We can pause it at any time the Court prefers.

23          THE COURT:  Okay.  I think we can go forward with

24  it.

25          MR. ARO:  Okay.  Would you play Houston clip 1?

Page 44

 1    And if it's okay with Your Honor, I plan to have a seat

 2    during these longer things and just pop up if I need to.

 3                  THE COURT:  You may do so.

 4                  MR. ARO:  Thank you.

 5                  (Video deposition of Ronnie Houston played.)

 6                  THE COURT:  Turn it down a little.

 7                  MR. ARO:  Your Honor, the other thing I should

 8    mention is, we have provided you and Ms. Padden with a

 9    notebook that has the excerpts of the testimony from each of

10    these individuals in the order in which these clips are going

11    to be played.

12                  THE COURT:  Oh, okay.

13                  MR. ARO:  And the testimonies also for each of

14    them is going to scroll at the bottom of the screen.

15    Mr. Houston is from Oklahoma and he has a pretty distinctive

16    accent.  If you have trouble understanding it, we were hoping

17    that the transcripts might help with the translation.

18                  THE COURT:  I'm familiar with Oklahoma accents.

19                  (Video deposition of Ronnie Houston played.)

20                  MR. ARO:  So, Your Honor, we have two more fairly

21    short clips.  There's a cross-examination clip and a redirect

22    clip that run a little less than 10 minutes together.  Do you

23    want to play those now?

24                  THE COURT:  Yes.

25                  MR. ARO:  Okay.

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 45

 1              THE COURT:  Yes.

 2              (Video deposition of Ronnie Houston played.)

 3              THE COURT:  A couple of questions.  Do you know if

 4   Mr. Houston was on medication at the time of this deposition?

 5              MR. ARO:  He was on a -- I believe that the answer

 6   to that question is no, but there's somebody in the courtroom

 7   who could answer that more knowingly.

 8              THE COURT:  Well, we can --

 9              MR. ARO:  Do you mind if I ask her?  The chief

10   psychologist for the ADX is sitting behind us.

11              THE COURT:  Well, you can -- yeah.  You can do

12   that during a break.

13              MR. ARO:  Okay.

14              THE COURT:  And the other thing is, what type of

15   razor is issued here?

16              MR. ARO:  As I understand it, it's a safety razor

17   that's designed for use in prisons.  If the specifics matter

18   there --

19              THE COURT:  Is it a closed-blade razor?

20              MR. ARO:  As I understand it, it's a classic

21   break-resistant razor.  And when they are collected, they

22   actually have a device that is designed to make sure the

23   metal is still in it.  It's a magnetized device.  So that

24   they give the razor to the inmate.  They come back an hour

25   later.  They pick --

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 46

1          THE COURT:  Yeah.

2          MR. ARO:  -- the razor up, and they test to make

3   sure the metal is still in it.

4          THE COURT:  Well, it's not a -- I presume it's not

5   a razor from which you can remove the blade ordinarily.

6          MR. ARO:  It's not supposed -- it's not supposed

7   to be, Your Honor, but inmates are very innovative --

8          THE COURT:  Yeah.  I understand.

9          MR. ARO:  -- with things like that.

10          THE COURT:  Okay.  Well, what do you have next?

11          MR. ARO:  We have about a 35-minute clip of an

12   inmate named Richie Hill that we're prepared to play if you'd

13   like to proceed or we can a break.  It's your choice.

14          THE COURT:  We can take about -- how about a

15   10-minute break?

16          MR. ARO:  That would be fine, Your Honor.

17          THE COURT:  And then we'll complete that.  And

18   then we'll take the lunch break.

19          MR. ARO:  Terrific.

20          THE COURT:  All right.  10 minutes.

21          THE COURTROOM DEPUTY:  All rise.  Court is in

22   recess.

23          (Recess from 11:23 a.m. to 11:33 a.m.)

24          THE COURTROOM DEPUTY:  All rise.  Court is in

25   session.

Page 47

```
 1              THE COURT:  Be seated, please.  The name Richie
 2    Hill sounds familiar to me for -- other than just seeing his
 3    name in the pleading.  I did -- was there a time when some
 4    special accommodation or authorization was required?
 5              MR. ARO:  So there are two places in his life that
 6    you have touched bases with him.
 7              THE COURT:  All right.
 8              MR. ARO:  And I'll talk about one of them a little
 9    bit in -- in linking the two clips you're going to see
10    together.  But you actually were the trial judge in a case in
11    which he was prosecuted for a homicide at a prison.
12              THE COURT:  Oh.
13              MR. ARO:  You saw him again or you saw the name
14    again in the summer of 2013 when we asked you to authorize us
15    to take the depositions of two inmates --
16              THE COURT:  Okay.
17              MR. ARO:  -- who at that time were at the US
18    medical center for federal prisoners in Springfield,
19    Missouri.  And so what you're going to see now is --
20              THE COURT:  So when did I -- I sentenced him?
21              MR. ARO:  You sentenced him back in 2003.
22              THE COURT:  All right.
23              MR. ARO:  And that set of circumstances is
24    actually part of the daisy chain that -- that led him to the
25    ADX.  And I'll explain that a little bit in-between --
```

Page 48

```
 1              THE COURT:  All right.

 2              MR. ARO:  -- these two clips.

 3              THE COURT:  Well --

 4              MR. ARO:  Two prefatory things about Mr. Hill's

 5   testimony.  First, he is -- I want to make it clear.  He's

 6   the only non-plaintiff --

 7              THE COURT:  Right.

 8              MR. ARO:  -- who's going to be testifying -- whose

 9   testimony is going to be offered.  Most of the testimony

10   you're going to see was taken recently in the last few weeks.

11   Mr. Hill was taken back in the summer of 2013 in Missouri, as

12   I just mentioned.

13              The other prefatory thing is that during the

14   course of the testimony I asked him about a number of

15   documents.  And it's awkward and distracting to put the

16   documents up on the screen.

17              THE COURT:  So I have them here?

18              MR. ARO:  That's in the order in which we're going

19   to use them.  And there are only two documents that I want to

20   put up excerpts from as he's talking about them because you

21   can see them and understand them quickly on the screen.  But

22   to the extent the Court wants to review the documents as he's

23   speaking, you have them there.

24              THE COURT:  All right.

25              MR. ARO:  Would you please play the first
```

Page 49

1    (inaudible)?

2                    (Video deposition of Richie Hill played.)

3                    MR. ARO:  Your Honor, Ms. Padden asked that I

4    clarify something he's about to say and talking about right

5    now just so there's no misapprehension.  Mr. Leggette

6    (phonetic) was another ADX inmate who had mental health

7    issues who did go to Springfield and he did have a missing

8    leg that he used a prosthetic for.  But the leg amputation in

9    his case had nothing to do with deficient medical care or

10   mental healthcare.  He was shot.  And it was removed I think

11   before he came into prison.  So we just wanted to make it

12   clear that --

13                   THE COURT:  All right.

14                   MR. ARO:  -- we're not talking about an exactly

15   parallel situation.

16                   THE COURT:  Thank you.

17                   (Video deposition of Richie Hill played.)

18                   MR. ARO:  This is another clarification the

19   government asked me to make and I'm happy to make.  He, in

20   fact, weighed about 160 pounds when he arrived.  And he has

21   it in his head that it's a different number.  We just didn't

22   want you to think he was skinnier than he actually was.  He

23   was down about 50 pounds.

24                   THE COURT:  Okay.

25                   (Video deposition of Richie Hill played.)

Page 50

1           MR. ARO:  So, Your Honor, this is the first place

2      that I'm going to substitute for a whole lot of testimony

3      with a short explanation of -- of his history before he got

4      to Springfield.

5           THE COURT:  All right.

6           MR. ARO:  And I'm going to use for that purpose a

7      timeline that we prepared and have marked as Exhibit 58.

8           And if you'd put up -- that up on the screen for

9      us, Dan.  And rotate it.

10          This exhibit was used during his deposition and is

11     a summary of the combination of his testimony and records

12     that we received from the Bureau of Prisons concerning his

13     history.

14          THE COURT:  What -- what exhibit number is it?

15          MR. ARO:  It's number 58, Your Honor.

16          THE COURT:  Which is not in --

17          MR. ARO:  And I apologize.  It's not in your book.

18          THE COURT:  It's not in that book.  Okay.

19          MR. ARO:  It's in the book behind you if you'd

20     like to follow or --

21          THE COURT:  Well, I can see it on the screen here.

22          MR. ARO:  Okay.  So as I said, this is a summary

23     both of BOP records and things he testified to during his

24     testimony.  He came into the Bureau of Prisons back in 1998

25     for a car -- a violent carjacking down in Florida.  And

Page 51

```
 1    arrived in Colorado at the United States Penitentiary, the
 2    maximum security prison, not the ADX, in October of 1999.
 3    About six months later his cellmate was murdered, a gentleman
 4    named Martin, who our information indicates also had a
 5    serious mental illness, and was placed in a two-man cell with
 6    Mr. Hill and another inmate.  So there were three of them in
 7    a -- in a two-man space.  Mr. Martin died on October 6, 2000.
 8    The same day was the first time that Mr. Hill was transferred
 9    to the ADX.  They moved him to the ADX the day of that
10    incident.  And when that incident happened, he had already
11    been scheduled to come to Springfield for his first visit to
12    Springfield.  So he was on the schedule when the murder
13    happened.  And he was sent to Springfield on May 2nd of 2000
14    for his first stay there.  That one lasted about 16 days,
15    according to the records.  And we weren't able to see
16    anything in the records that indicated that the BOP told the
17    staff at Springfield that he had just committed a homicide.
18            One of the concerns that we have had throughout
19    this case, and it was true of Mr. Francisco, whose name
20    Mr. Hill raised, and you'll recall Jonathan Francisco as
21    somebody who was the subject in an emergency motion that we
22    filed back in the fall of 2013.  We requested a preliminary
23    injunction ordering that he be transferred to a medical
24    facility.  And that motion was actually filed the day before
25    our scheduling conference, our initial scheduling conference.
```

Page 52

1   And we discussed it with Ms. Padden, yourself, and me.  And

2   the BOP did transfer Mr. Francisco a couple of weeks later.

3   But in Mr. Hill's case, in Mr. Francisco's case, and in many

4   other cases we've seen, there is a violent act, a homicide or

5   an assault.  The inmate is ultimately charged for that.  And

6   even though there are clear signs and symptoms of psychiatric

7   problems, there appears to be a reticence on the part of the

8   Department of Justice to recognize those issues at the time

9   the person is being considered for prosecution for a crime.

10             And so Mr. Hill, who had just committed a murder a

11  month earlier, is sent to Springfield, stays there for

12  16 days, and then is transferred back to ADX on May 18 of

13  2000.  The next time he was at Springfield was the following

14  fall when he arrived for what turned into a 16-month stay.

15  And during that time he was diagnosed with no mental disorder

16  by a doctor at Springfield, according to one of their

17  records.  Nevertheless, during that same stay, about six

18  months after one of the BOP's doctors said there was nothing

19  wrong with him, the Bureau of Prisons subjected him for the

20  first time to involuntary psychiatric medication which can

21  only be done in cases of pretty dire need and with the very

22  specific authorization of doctors who believe that this -- an

23  inmate's psychiatric condition demands immediate intervention

24  without a Court's involvement.  Shortly after that in

25  February of 2002 he's diagnosed with what was termed at that

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 53

 1   time a psychotic disorder not otherwise specified.

 2            So this is a recognition in February of 2002 that

 3   he had a disorder that caused him to experience psychotic

 4   symptoms, but it wasn't specifically identified as

 5   schizophrenia or some other disorder.  And about 26 days

 6   later with the psychotic disorder, and less than six months

 7   after he was involuntary medicated, they sent him back to the

 8   ADX where there was a policy in place saying you couldn't be

 9   there if you had a serious mental illness.  He stayed there

10   that time for about a year and two months, when he was sent

11   back to Springfield for a third stay that turned into a

12   13-month stay.  And we don't think it's a coincidence that

13   that stay happened about two months after you sentenced him

14   for his role in the homicide.

15            THE COURT:  There was a trial.

16            MR. ARO:  I don't believe that there was a trial

17   of his case.

18            THE COURT:  No?

19            MR. ARO:  I believe his codefendant --

20            THE COURT:  Went to trial.

21            MR. ARO:  -- went to trial.  He was offered a plea

22   to a -- I believe it was second degree murder.  And you

23   sentenced him to 10 years.

24            THE COURT:  I'm having a vague recollection.  Was

25   he -- you probably don't know.  But I think one of the

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 54

 1   persons accused was a lookout.

 2            MR. ARO:  I think it's a different homicide that

 3   you're thinking about.

 4            THE COURT:  Okay.  Well --

 5            MR. ARO:  This -- this was two -- two individuals

 6   in a cell.  The third person put in the cell.  The third

 7   person ends up strangled in the cell.  So there wasn't really

 8   a lookout scenario.

 9            THE COURT:  All right.

10            MR. ARO:  So he goes back to Springfield in April

11   of 20 -- 2003, stays there for 13 months.  And during that

12   stay in June of 2003 the Department of Justice files the

13   first court petition to have him civilly committed for

14   purposes of involuntarily medicating him.

15            THE COURT:  But let me go back a moment.  Was

16   there at his criminal case here a request for an evaluation?

17            MR. ARO:  Not that we're aware, Your Honor.

18            THE COURT:  I'm not remembering that, so -- all

19   right.

20            MR. ARO:  Not that we're aware of.

21            THE COURT:  All right.

22            MR. ARO:  So in June of 2003 the Department of

23   Justice goes to court in the Western District of Missouri and

24   successfully obtains a petition to involuntarily medicate

25   him.  About nine months later the BOP sent him back to ADX

Harold Cunningham, individually, et al. vs.          Fairness Hearing - Day 1
Federal Bureau of Prisons                                  December 15, 2016

Page 55

 1    for the now fourth time where he remained for about six

 2    months before he was transferred to Marion United States

 3    Penitentiary, which perhaps coincidentally is the only other

 4    BOP facility for which folks who have serious mental illness

 5    were precluded from placement by BOP policy.

 6              If you would flip to the next page, Dan.

 7              About a year later he goes back to Springfield for

 8    his fourth stay.  This time three months.  About a month and

 9    a half later the BOP went back to court in the Western

10    District of Missouri and, again, successfully obtained an

11    order allowing him to be involuntarily medicated.  He was

12    involuntarily medicated at that point.  And three months

13    later, three and a half months later he was returned to

14    Marion where policy still prohibited him from being housed if

15    he had a serious mental illness.  Shortly thereafter Marion

16    was -- was emptied of inmates as part of a repurposing.

17    They -- I don't really understand exactly what was done, but

18    the Bureau of Prisons changed the mission of that facility

19    and dispersed its inmate population to other BOP facilities.

20              Over the course of about four months we believe

21    between 70 and 100 of those inmates ended up at the ADX.  And

22    we think, Your Honor, that it was at this point that the dam

23    broke.  Prior to that time there were relatively few

24    seriously mentally ill inmates at the ADX, but a whole bunch

25    of these folks coming from Springfield, including Mr. Hill,

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 56

 1    had been treated for a serious mental illness, had been

 2    involuntarily medicated, had been hospitalized for

 3    psychiatric problems.  And many of them, including another of

 4    the plaintiffs who you'll hear from later, Arnell Shelton,

 5    arrived in August of 2006 as a group to the ADX.  Mr. Hill

 6    returned at that time and was at the prison, at the ADX,

 7    uninterrupted from that point until his emergency medical

 8    evacuation in 2012.

 9            While he was at the ADX, on November 21st, 2008,

10    is the first place that we see a medical record diagnosing

11    him with a disorder that I think most folks believe is his

12    correct diagnosis today, and that's the diagnosis of

13    schizoaffective disorder, which is, in very simplistic terms,

14    sort of a combination between the worst features of bipolar

15    disorder and schizophrenia.  It's -- it's a serious mood

16    disorder that also features psychotic symptoms.  He remained

17    at the ADX, notwithstanding that diagnosis, and fell into the

18    state of -- of being that you heard him describe before he

19    was sent here.

20            The stipulated exhibits include a number of

21    exhibits that describe his experience during that time.

22    They, in particular, include records from early in the summer

23    of 2012.  So six months before he was diagnosed with

24    malnutrition where he is submitting requests to staff, to the

25    medical staff for food because he was starving.  And they're

Harold Cunningham, individually, et al. vs.            Fairness Hearing - Day 1
Federal Bureau of Prisons              December 15, 2016

Page 57

 1   records from the BOP's SHU.  They reflect that during that

 2   summer he was on a status that required him to get up and go

 3   to the back of his cell in order to receive his food trays

 4   because he had a history of throwing feces and other

 5   substances at the staff.  And repeatedly over the course of

 6   that summer he was denied his meals because he wouldn't get

 7   up and go to the back of his cell.  And so the records of the

 8   BOP confirm what he told you in his testimony about the fact

 9   that they were not feeding him.  Over that period of time,

10   from roughly May of 2012 until the time he arrived at

11   Springfield, he lost roughly 50 pounds, according to the

12   records.  And arrived at Springfield in November with

13   systemic staph infections that required several months of

14   intravenous antibiotics and an emergency hospitalization

15   where he nearly died.  He was sent to an outside hospital, as

16   well as very intensive psychiatric interventions to get into

17   the place where you saw him on the videotape.

18           We had met him in the fall of 2011.  And, in fact,

19   he was the second inmate I ever saw at the prison.  I saw him

20   there the first day I was there.  And I've learned a lot

21   about mental illness in this case and have gotten pretty good

22   for an armchair psychologist of understanding folks.  I had

23   no idea what I was seeing the first day that I saw him.  But

24   to an untrained eye he was a desperately ill person who

25   anybody who spent any time with him would have recognized was

Harold Cunningham, individually, et al. vs.                                    Fairness Hearing - Day 1
Federal Bureau of Prisons                                                             December 15, 2016

Page 58

1   in need of serious help.  We intended initially to include

2   him as a plaintiff in the case because we developed a rapport

3   with him pretty early on, but his condition destabilized in

4   the early part of 2012 when we were putting the complaint

5   together, and he stopped communicating with us.  And so as

6   this all was playing out, you just heard, we were getting

7   letters from other inmates and hearing people talking about

8   the desperate situation that he was in but weren't able to

9   reach him.  And he was not cooperative in any way with us.

10   And so he ended up at Springfield and thankfully was restored

11   to health.  The way that we got reconnected with him was --

12   actually it was a response that he made to a Christmas card

13   that we sent to him when he was in the state that you just

14   saw.

15            THE COURT:  You're getting a little off the

16   microphone.

17            MR. ARO:  Sorry about that, Your Honor.  Shortly

18   after he arrived at Springfield we sent him a Christmas card.

19   And didn't hear back from him for a long time.  And a few

20   months later we got a letter from him thanking us for the

21   card and telling us that he was back in a condition that he

22   wanted to talk to us again, which led us to come to you and

23   ask to take the videotape of this person so you could see

24   what somebody in that situation looked like.

25            So that's an exact summary of information about

Harold Cunningham, individually, et al. vs.                    Fairness Hearing - Day 1
Federal Bureau of Prisons                                       December 15, 2016

Page 59

1    what happened between his -- the beginning of his

2    imprisonment and what you heard.

3               I want to play another clip that runs about

4    32 minutes that is a list of -- or a discussion of the many,

5    many, many, many times that he asked for help from the ADX.

6    We don't go through all of them, but we go through a half a

7    dozen of them that -- that included the ways in which and the

8    people to whom he was reaching out trying to get them to help

9    him.

10              THE COURT:  It's how long?

11              MR. ARO:  It's about 32 minutes.

12              THE COURT:  Yeah.  Well, we'll take a break before

13   that.  But I want to go back to when he was sentenced here.

14   What -- what year was that?

15              MR. ARO:  I believe he was sentenced in the first

16   or the second month of 2003.

17              THE COURT:  2003.  So referring to the Exhibit 49

18   where there's a reference to his serving 360 months for a

19   carjacking and a kidnapping, and then 120 months consecutive

20   for voluntary manslaughter, aiding and abetting, I assume

21   that's my sentence?

22              MR. ARO:  That's correct, Your Honor.

23              THE COURT:  And I guess I'm now somewhat disturbed

24   that I don't recall any mental health issues, competency,

25   coming up at that time.

Page 60

```
 1                MR. ARO:  We are as well, Your Honor.
 2                THE COURT:  Yeah.  Well, you didn't sentence him.
 3    I don't know whether there's anything in the probation
 4    report.  I don't have a memory of that, except I do remember
 5    the name.  And I now am refreshed with respect to the
 6    incident that caused him to be charged.  But I guess that's
 7    the trouble with having had a lot of experience.
 8                Well, I propose we recess until 1:30.  Is that
 9    going to work?
10                MR. ARO:  That's fine with us, Your Honor.
11                THE COURT:  Okay.  And I will have to recess at
12    4:30 --
13                MR. ARO:  Okay.
14                THE COURT:  -- because of the carpool arrangement.
15                MR. ARO:  One of the things that Ms. Padden and I
16    were discussing earlier this morning is schedule.
17                THE COURT:  Yeah.
18                MR. ARO:  There's a lot of information here.  And
19    we promise we're not trying to prolong it, but it's important
20    that you hear what these folks have to say and that they know
21    that what they have to say has been heard.  The total running
22    time of all of the videotape, including all the government
23    designations and so forth, is a shade less than nine hours.
24    I -- there's one other place in the presentation where I'm
25    going to do what I just did and kind of give you a little
```

Harold Cunningham, individually, et al. vs.  
Federal Bureau of Prisons

Fairness Hearing - Day 1  
December 15, 2016

Page 61

 1  narrative to try to speed things along.  But most of the rest

 2  of it is just videotape and videotapes, so it will move.  But

 3  I think we're going to be in a place where -- in part because

 4  of what happened with the technology this morning, where

 5  we're going to be done with this part of the presentation

 6  late morning, early afternoon tomorrow.  Ms. Padden and I

 7  will be addressing the rest of the issues, almost exclusively

 8  talking to you about them here.

 9              THE COURT:  Yeah.

10              MR. ARO:  We are going to play some videotape

11  concerning the objections the people have as a representative

12  sample of why people think what they think.  I think that

13  it's possible though, unlikely, that we could get done by

14  close -- close of business tomorrow.  And I know that

15  Ms. Padden and I are available to continue Monday if that's

16  something that we can contemplate doing.  But I did want to

17  raise it with the Court so we can think about scheduling.

18              THE COURT:  Yeah.  Well, I want to make sure that

19  we have time to address -- I realize you've made a commitment

20  to these people that they will be heard.

21              MR. ARO:  I did, Your Honor.

22              THE COURT:  And I'm prepared to honor that

23  commitment within reason.

24              MR. ARO:  We appreciate that.

25              THE COURT:  But I am, of course, primarily

Page 62

```
 1    concerned -- and I've already reviewed the agreement, and --
 2    as it's been provided to me.  And I also, as I said, have the
 3    declarations concerning fees and costs as provided in the
 4    agreement.  But my primary concern is enforcement and the
 5    provisions regarding enforcement and jurisdiction with
 6    respect to that.  My understanding is that this is being
 7    submitted as an agreement.  We have to, of course, certify
 8    the classes for settlement.  I understand there's no real
 9    dispute about that.
10              MR. ARO:  That's right.
11              THE COURT:  So -- and then this is to be a
12    conditional dismissal.  So -- but then there's a provision
13    for a magistrate judge to act as mediator in the event during
14    the term of the agreement there are some disputes with
15    respect to compliance.  And then ultimately there can be
16    Court's involvement directly.  So, you know, anticipating
17    that there will be different people exercising policy
18    judgments under Article II in the near future, I -- I want to
19    be -- do the best I can to be clear that there -- the
20    agreement can be enforced.
21              MR. ARO:  We agree with that, Your Honor,
22    obviously.
23              THE COURT:  So that means some discussion at some
24    point in this proceeding.
25              MR. ARO:  That -- it's our expectation that that
```

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 63

 1   would be a big chunk of what we do tomorrow.

 2            THE COURT:  All right.  Because I'm a little

 3   uncertain about that.

 4            All right.  1:30.

 5            MR. ARO:  Thank you, Your Honor.

 6            THE COURTROOM DEPUTY:  All rise.  Court's in

 7   recess.

 8            (Recess from 12:29 p.m. to 1:30 p.m.)

 9            THE COURTROOM DEPUTY:  All rise.  Court is in

10   session.

11            THE COURT:  Please be seated.  My secretary pulled

12   out for me that on August 29th of 2011, I -- Mr. Pepin, who

13   represented Richie Hill, filed a motion to get his

14   presentence report released to you.

15            MR. ARO:  That's correct, Your Honor.

16            THE COURT:  Did you get it?

17            MR. ARO:  I do have -- I believe that I do have

18   that.  Yes.  I don't have it here with me today, but I

19   believe I have that.

20            THE COURT:  Well, my only interest in it was

21   whether anybody called my attention to his mental health.

22            MR. ARO:  I will pull it down and bring it

23   tomorrow.

24            THE COURT:  Okay.

25            MR. ARO:  I had answers to the questions you asked

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 64

 1    about Mr. Houston's situation.

 2            THE COURT:  Yes.

 3            MR. ARO:  At the time that his testimony was taken

 4    he was not on any psychotropic medication.  He had been in an

 5    unsatisfactory dialog with the psychiatrist down there.  They

 6    had offered him one thing.  He was desiring -- he wanted a

 7    mood stabilizer.  They'd offered him an antidepressant.  So

 8    he wasn't taking anything at that time.  Since that time he's

 9    met with a psychiatrist.  They've started him on a trial of a

10    medication that treats nightmares which is one of the

11    problems he has because he can't sleep.  And it is their

12    expectation, I think, if that medication -- if he settles in

13    with it well, to introduce additional medications after they

14    understand what the first one does.  It's possible that

15    before that happens he'll be in one of these high-security

16    psychiatry or psychology units and they'll deal with the

17    medication issues then.

18            THE COURT:  Yeah.  Well, he seemed in his

19    testimony to be so up on his medications that a suggestion of

20    addiction, but --

21            MR. ARO:  Most of the drugs he's taking are not

22    happy drugs, Your Honor.  They're -- they don't make you feel

23    good.  They just keep you --

24            THE COURT:  Yeah.

25            MR. ARO:  -- on an even keel.

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 65

```
 1              THE COURT:  Well --
 2              MR. ARO:  I'm sorry.
 3              THE COURT:  -- let's go.
 4              MR. ARO:  The other question you asked was about
 5   the razors.  The razors that they use --
 6              THE COURT:  Oh, yeah.
 7              MR. ARO:  -- are essentially miniature versions of
 8   BIC disposable razors.  And the captain -- complex captain
 9   informed me that at this point they aren't using -- are not
10   using the magnetic device I talked about, rather, the razors
11   when they're returned by the inmates are being --
12              THE COURT:  They just --
13              MR. ARO:  -- inspected by the staff.
14              THE COURT:  -- check them.  And it also looked
15   like Mr. Hill was in restraints.
16              MR. ARO:  He was.  All -- all of them were
17   restrained.  I believe the only inmate whose testimony you're
18   going to see who is not wearing a belly chain, black box
19   handcuffs, and leg irons is -- let me think.  Mr. Barron, I
20   think, is the only one who we saw who was not wearing
21   significant restraints.
22              THE COURT:  Okay.  Well, let's proceed.
23              MR. ARO:  So we'll continue with a clip from
24   Mr. Hill's testimony concerning the requests he made for
25   assistance.  This is where you might find the little booklet
```

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 66

1    of exhibits I gave you use -- useful because he's going to be

2    speaking --

3              THE COURT:  Okay.

4              MR. ARO:  -- about those documents.

5              THE COURT:  All right.

6              (Video deposition of Richie Hill played.)

7              MR. ARO:  The next witness we're going to present,

8    Your Honor, is John -- he goes by Jack Powers.  We're going

9    to play a very short clip where he introduces himself to the

10   Court.  I'm going to summarize in three minutes what it took

11   him 25 minutes to talk about, and then we'll play a little

12   bit longer clip of his testimony.

13             THE COURT:  Yes.  He's written to me.

14             MR. ARO:  Many times.

15             THE COURT:  Yes.

16             (Video deposition of John Powers played.)

17             MR. ARO:  Picking up the story, at this point if

18   you'd put up Exhibit 2 for me, Dan, the first page.

19             Again, this is a timeline that was prepared when

20   we took Mr. Powers' testimony back in 2003 around the same

21   time that we took the testimony of Mr. Hill.

22             And if you'd go to the second page for me, Dan.

23             His file contains a number of photographs that

24   annotate this so you can sort of see the progression of his

25   situation as his incarceration continued.  When he got to

Page 67

 1   Atlanta in 1994 he very shortly thereafter tried to intervene
 2   in a gang homicide where three members of the Aryan
 3   Brotherhood prison gang tried to extort and then murdered
 4   ultimately Eddie Wong, the inmate he was just speaking about.
 5   Mr. Powers intervened at the time, carried Mr. Wong down to
 6   where their staff was available.  And unfortunately Mr. Wong
 7   expired.  Mr. Powers -- the staff didn't know what was
 8   happening, whether he had done this stabbing to Mr. Wong or
 9   somebody else, so they put him in the SHU down in Atlanta.
10   And shortly after he reached the SHU he was threatened by the
11   so-called shot collar to the head, AD, Aryan Brotherhood
12   member in Atlanta, that he needed to keep his mouth shut.
13   Jack is not really good at being threatened and typically
14   doesn't respond to that well.  And decided at that point or
15   shortly thereafter to cooperate with the government in the
16   prosecution of these murders, and did so ultimately
17   testifying in two federal trials down in Atlanta that
18   resulted in the conviction of the people involved in that
19   homicide.
20           Thereafter Jack began to experience signs and
21   symptoms of posttraumatic stress disorder from his own
22   exposure to this stabbing incident and probably some other
23   things that had happened to him early in his life, because
24   like many of the people at the ADX, he also had a pretty
25   difficult childhood.  And ultimately he begins to be treated

Page 68

 1    for posttraumatic stress disorder by the Bureau of Prisons in
 2    Pennsylvania during the time that this prosecution was going
 3    on and he was testifying.  He ultimately was placed into the
 4    prisoner witness security program where cooperating witnesses
 5    who are in danger can be placed.  Was in two WITSEC units on
 6    the East Coast.  And over time became frustrated with some
 7    things about those units, began to communicate with the media
 8    about those incidents.  And as a result of those
 9    communications was threatened with expulsion from the witness
10    security program and transferred to a regular penitentiary
11    where he would have been in grave danger.
12              Along the way he also had been in communication
13    with the US attorney's office in Florida that he had been
14    opposed to when he was prosecuted for the bank robbery
15    because when he cooperated he was told that a motion to seek
16    a departure, a downward adjustment of his sentence would be
17    filed.  And, ultimately, although the attorneys who
18    prosecuted the murder case in which he cooperated fully
19    supported that application, the people who had prosecuted
20    Jack years before did not support it and refused to file it,
21    even though it had been prepared by the lawyers who Jack had
22    helped.  So Jack is left in a WITSEC unit, concerned that
23    he's going to be expelled from the program, and having been
24    denied what he believed to be a promised reduction in his
25    sentence for the cooperation.

Page 69

```
 1              He escapes from the WITSEC unit, is out on the
 2   street for a couple of days, and then is returned to custody
 3   in New York, and ultimately returned and tried and convicted
 4   for that escape.  It was that event, the escape, that
 5   resulted in his transfer to the ADX where he was very quickly
 6   placed into the control unit in and among the Aryan
 7   Brotherhood members who he had testified against and their
 8   friends.
 9              And what we see on the timeline, before I sit down
10   and let him explain what happened next, the sort of
11   progression of Jack.  The color pictures is what he looked
12   like the day he was recaptured.  And after a couple of years
13   in isolation at the MDC in Philadelphia, primarily where he
14   was starting to experience pretty significant problems and
15   was getting into a lot of trouble, he started to get thinner
16   and less stable and was in that condition that you see in the
17   lower right-hand corner of the picture when he arrived at the
18   ADX in the fall of 2001.  So it's at that point that we can
19   pick up his -- his testimony.
20              THE COURT:  I'm recalling in his --
21              MR. ARO:  Forgive me, Your Honor.
22              THE COURT:  I'm recalling in letters to me his
23   experience with respect to the investigation of the murder
24   and his experience with the government.  And I'm recalling
25   that he wrote to me because he read something about me --
```

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 70

 1              MR. ARO:  He had --

 2              THE COURT:  -- as I had no other contact with him

 3    before.

 4              MR. ARO:  We actually heard about that, Ms. Padden

 5    and I, during his monolog at the prison.  And we asked him --

 6    I asked him what it was.  And he'd seen coverage of the

 7    Oklahoma City case --

 8              THE COURT:  Yeah.

 9              MR. ARO:  -- and about you in that connection.

10    That's why he decided to write to you.

11              THE COURT:  That's what I'm remembering.  Yes.

12    All right.

13              (Video deposition of John Powers played.)

14              MR. ARO:  He's going to talk a little bit more

15    about that, in fact, the last few minutes of the clip.  But

16    just for the record, I wanted to make a couple of notes.  The

17    first relates to Exhibit 527, which is the first letter that

18    Jack ever wrote to us back in August of 2011.  We'd heard

19    about him from other inmates because of the notoriety in the

20    facility of what he was doing to himself.  And he describes

21    at some length in that exhibit what he had done and the

22    hopelessness that he felt, even with lawyers involved in the

23    case by that point, about whether anything could be changed

24    at the ADX.

25              The other two exhibits I want to make reference to

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 71

 1   are Exhibit 2 and Exhibit 31, which are the timeline that we

 2   just looked at before and another form of summary of the

 3   things that Jack has done to himself, according to the

 4   medical records.  Most of this I've never heard about from

 5   him because he has a hard time talking about it and I haven't

 6   pressed the issue.  But the extent of the injuries that are

 7   reflected in the BOP's medical records are shocking by any

 8   measure.  And in consultation with our experts, they say this

 9   happens from time to time with inmates who are held in

10   isolation.  They do engage in self-harm.  But folks who have

11   been involved in correctional mental health for decades tell

12   us this is the worst case of mutilation over a long period

13   that they've ever seen.

14            After Jack was moved into the Secure STAGES

15   Program just about two -- two years and a couple months ago,

16   he has had a rocky experience there which is the subject of

17   his last excerpt which runs about four minutes.  And then

18   there's a very short cross-examination that Ms. Padden did

19   when we saw Jack a few weeks ago.  And she also designated

20   about 17 minutes of testimony that she took from him in

21   Springfield back in the summer of 2013 that touches on some

22   of these same issues.  So with your permission, we'll just

23   clip through these.

24            THE COURT:  All right.  Now, this STAGES Program

25   is something that was instituted during the course of this

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 72

 1  litigation?

 2          MR. ARO:  That's right, Your Honor.  And it's one

 3  of three units that are currently operational.

 4          THE COURT:  And it's referred to as -- in the

 5  settlement agreement?

 6          MR. ARO:  That's right.  And it's actually the one

 7  of these new programs that's actually subject to monitoring

 8  under the settlement agreement.

 9          THE COURT:  Yeah.  But it started when?

10          MR. ARO:  The first inmates were received there in

11  October or November of 2014, in that time, the fall of 2014.

12          THE COURT:  All right.  Okay.  Thank you.

13          (Video deposition of John Powers played.)

14          MR. ARO:  Would you pause, please?

15          Your Honor, I want to show you a picture of what

16  he's describing.  It's Exhibit 654.

17          THE COURT:  I -- I assumed that that was this

18  thing you've shown before.

19          MR. ARO:  It's a similar thing.  But the one I

20  showed you before was at the ADX.  This one is in the unit

21  that he lives in now and it's a little bit different.

22          THE COURT:  Oh.

23          MR. ARO:  What you see in -- can you just put it

24  up so it's the whole screen, Dan?  There you go.

25          THE COURT:  Oh, I see.

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 73

 1              MR. ARO:  What you see is, in -- in this unit it's

 2    designed so that there are inmates who are on essentially a

 3    secure side and other inmates who live on the other side.

 4    And so when they have a community meeting like this, the

 5    inmates who are on the secure side sit in these little

 6    individual booths.  And the other folks outside are staff

 7    members, participants who are at a higher level in the

 8    program as well as companions of the inmates, meaning inmates

 9    who live in the unit.  They're paid by the BOP to assist in

10    the therapeutic process, but they're actually serving

11    sentences at the same time.

12              THE COURT:  Yeah.  I saw the companion program

13    referred to in the documents submitted, so -- all right.

14              (Video deposition of John Powers played.)

15              MR. ARO:  Rather than playing his testimony, I'll

16    just tie a couple of loose ends up here.  You'll recall the

17    name Vega as the --

18              THE COURT:  You -- move a little closer to the

19    microphone.

20              MR. ARO:  You may recall the name Vega --

21              THE COURT:  Yes.

22              MR. ARO:  -- from his testimony.  This was an

23    inmate who he became quite close with in the control unit who

24    committed suicide in 2010.

25              THE COURT:  Right.  I recall the litigation.

Page 74

 1              MR. ARO:  That's right.  And Mr. Powers in his
 2     testimony describes that situation in some detail, and also
 3     speaks to the deterioration of Mr. Vega in his appearance --
 4              THE COURT:  Yes.
 5              MR. ARO:  -- in the time shortly before his
 6     passing.
 7              The next person whose testimony we're prepared to
 8     play is plaintiff Jabbar Currence.
 9              THE COURT:  Well, we're going to take a break
10     before that.
11              MR. ARO:  That would be fine.
12              THE COURT:  But a couple of questions.
13              MR. ARO:  Yes, sir.
14              THE COURT:  What we just saw and heard was from
15     July of 2013?
16              MR. ARO:  That's correct.
17              THE COURT:  And the -- Mr. Powers looked very
18     fragile at that time, very different physical appearance from
19     the -- 2016.
20              MR. ARO:  I think that's right.
21              THE COURT:  And he also -- it looked like he had a
22     bruise on his right cheek.  I don't know whether he did or
23     not.  It might have been a shadow from the --
24              MR. ARO:  He, for most of the time that I have
25     known him, has intermittently tried to cut the --

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 75

 1              THE COURT:  Oh.

 2              MR. ARO:  -- tattoos off his face.  And I believe,

 3    I'm not positive, but I believe that he had tried to do that

 4    relatively recently, and there was some abrasion on the side

 5    of his cheek.

 6              THE COURT:  And the tattoos on his head, were

 7    those there before he came into custody, do you know?

 8              MR. ARO:  They were not.  And actually if you --

 9              THE COURT:  So it's something he did in prison?

10              MR. ARO:  He did.  If you would put up, Dan,

11    Exhibit 2, which is the timeline that I --

12              THE COURT:  Yes.

13              MR. ARO:  -- mentioned earlier.  And if you'd clip

14    through -- so the first picture you see there is what he

15    looked like in 1994.  So this is roughly five years after he

16    entered custody --

17              THE COURT:  Okay.

18              MR. ARO:  -- of the Bureau of Prisons.  At that

19    time he would have been about -- I'm trying to do the math

20    quickly in my head.  He would have been in his mid 30s at

21    that point.  And if you click through to the next page, the

22    color photograph there is --

23              THE COURT:  Okay.

24              MR. ARO:  -- from 1999, so 16, 17 years ago.  And

25    then you see two from 2000, 2001.  If you click to the next

Page 76

1    page, Dan, the picture in the lower left was from -- taken in

2    2001 or '02, about six months after he got to the ADX, so in

3    the same timeframe when he described hitting his head on the

4    doorjamb of his cell.  And then you see pictures in 2004 and

5    2005 during the period when his mutilations were starting to

6    accelerate pretty rapidly.

7              If you'd go to the next page, Dan.

8              You see that even -- this is 2006.  And the

9    progression of the photographs to my eye, at least, it

10   alludes to the thing that you were talking about earlier.  He

11   gets progressively more frail as he's there.  By 2009 he

12   looked like this.  This is about the time that he cut the

13   vein in his arm and was sent to Springfield in that

14   timeframe.

15             And then lastly, if you'd go to the last page,

16   somewhere between 2009 and 2011 he applied these tattoos to

17   himself by taking a shard of razor blade that he had and

18   cutting hundreds of little slits on his head and rubbing

19   carbon paper dust into his skin.  This is what he looked like

20   when I first saw him.  And the first medical records I think

21   referring to the tattoos were in the spring of 2010.  And at

22   this point he's covered, not his whole body, but his arms,

23   his legs, and what you see in his head, he's got other self

24   done tattoos on various parts of his chest as well.  And you

25   also see -- and really all that I knew about the mutilations

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 77

1    for most of the time we were dealing with him is the things

2    that I could see with my own eyes.  And he's missing both of

3    his pinkies from different incidents where he bit or --

4             THE COURT:  Yeah.

5             MR. ARO:  -- cut them off.  And shortly after this

6    picture was taken he cut off the bottom half of his ears.  So

7    he kind of doesn't have earlobes anymore.  He also, as he

8    testified, has -- you couldn't really see it very well in the

9    pictures, but he's got a significant scar on his head where

10   he bothered a head through his skull and then started to

11   put -- I'm trying not to be too graphic here.

12            THE COURT:  Yeah.

13            MR. ARO:  But started to introduce foreign matter

14   into his skull.  And ultimately in 2015 he had surgery in the

15   Bureau when they closed that wound and put some sort of

16   barrier, I think it's a metal plate or something over the

17   hole in his skull to try and prevent that from happening

18   again.

19            THE COURT:  Well, it's an accomplished tattoo.

20   I'm somewhat surprised at its quality.

21            MR. ARO:  He refers to it as his avatar stripes.

22            THE COURT:  Okay.  15 minutes.

23            MR. ARO:  Thank you, Your Honor.

24            THE COURTROOM DEPUTY:  All rise.  Court is in

25   recess.

Page 78

```
 1              (Recess from 3:21 p.m. to 3:37 p.m.)

 2              THE COURTROOM DEPUTY:  All rise.  Court is in

 3    session.

 4              THE COURT:  Be seated, please.  All right.

 5    Mr. Aro.

 6              MR. ARO:  So our next witness is Jabbar Currence

 7    who's also a plaintiff in the case who currently is down at

 8    the ADX.  And just for scheduling purposes, his entire

 9    testimony runs just a shade over 45 minutes.  So we should be

10    finishing in --

11              THE COURT:  All right.

12              MR. ARO:  -- good time.

13              THE COURT:  Please proceed.

14              (Video deposition of Jabbar Currence played.)

15              MR. ARO:  The next section of his testimony goes

16    through some of his history within the BOP.  He was sentenced

17    into a medium security or he was designated to a medium

18    security facility, but within a couple of years had ended up

19    at a maximum security penitentiary in Beaumont, Texas, after

20    he stabbed a correctional officer in the medium.  At that

21    time Beaumont was known, at least by inmates, as Bloody

22    Beaumont because of the frequency of the assaults and

23    stabbings and other mayhem that was going on at that time.

24    He got caught up in that, ended up in a -- the -- the middle

25    of a riot, an inmate gang riot at that time.  And it was that
```

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 79

1   event that caused him to be transferred to the ADX back in

2   2000 -- 2008 eventually, so --

3            THE COURT:  So is that a racial riot?

4            MR. ARO:  I --

5            THE COURT:  -- or do you know?

6            MR. ARO:  I believe that it was one group of black

7   prisoners and another group of black prisoners, but I don't

8   recall the details for sure.

9            THE COURT:  Okay.

10           (Video deposition of Jabbar Currence played.)

11           THE COURT:  Okay.

12           MR. ARO:  So that concludes Mr. Currence's

13  testimony.  It's 4:25.  I know that you need to depart.  I

14  know that you want us to address specifically the

15  jurisdictional and enforcement issues, and Ms. Padden and I

16  are fully prepared to do that.  Are there other specific

17  things that have come up today that you want to make sure we

18  are extra prepared to address?

19           THE COURT:  No.  Remind me though.  This

20  evaluation is being referred to --

21           MR. ARO:  Uh-huh.

22           THE COURT:  -- in some of the testimony.  There

23  was -- that was done pursuant to an order, wasn't it?

24           MR. ARO:  It was not done pursuant to an order of

25  the Court.  Essentially what happened back in the fall of

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 80

1    2013, we began to discuss settlement in earnest.  And there

2    was a disagreement at that point about the number of folks

3    who were still there who had serious --

4              THE COURT:  Right.

5              MR. ARO:  -- psychiatric issues.  We requested a

6    onetime process where the BOP reviewed the records of

7    everybody there to see if there were any indicia of any kind

8    of mental health issues, suicide attempts, medication, that

9    kind of thing.  And then they sent in teams of outside

10   psychiatrists and psychologists from other BOP

11   institutions --

12             THE COURT:  Yeah.

13             MR. ARO:  -- to do evaluations of something like

14   130 inmates who had some marker in their record.  And in that

15   group they identified a fairly significant number who had an

16   identified serious mental illness, of whom Mr. Houston was

17   one and several others that you're going to hear from.  So

18   that was done by agreement of the parties --

19             THE COURT:  Yeah.

20             MR. ARO:  -- and the experts for both sides were

21   involved in structuring how that was going to happen.

22             THE COURT:  What I'm remembering now is that some

23   of the subjects communicated objections to that thinking that

24   it was done without approval.

25             MR. ARO:  There were a lot of people who were

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 81

 1   confused by and concerned by that process.

 2         THE COURT:  Right.  And it seemed to me I did

 3   something to communicate that this was pursuant to an

 4   agreement, but I -- maybe it's a response that I gave.  I

 5   don't remember.

 6         MR. ARO:  I don't recall the Court entering any

 7   orders about that.

 8         THE COURT:  No.  I don't think it was an order.

 9         MR. ARO:  I know that this was something that we

10   discussed with you during --

11         THE COURT:  Yeah.

12         MR. ARO:  -- the course of the proceedings.

13         THE COURT:  Okay.  Well, where are we?

14         MR. ARO:  We are significantly more than halfway

15   through the videotapes.  And it's going to go faster because

16   most of the rest of the inmates are much shorter.  They're

17   20 minutes as opposed to an hour.

18         THE COURT:  All right.  So it's your expectation

19   that we can talk about the -- these issues tomorrow

20   afternoon?

21         MR. ARO:  That is my most earnest hope and desire,

22   and I think it's realistic.  Yes, Your Honor.

23         THE COURT:  Okay.  Well, I need to know if I need

24   to clear some time Monday.  I do have some things scheduled,

25   so --

Page 82

```
 1            MR. ARO:  Do you have no time Monday or do you
 2   have some time and you just are pondering how much time you
 3   might need to have?
 4            THE COURT:  Yeah.  Well, I'm trying to move a
 5   summary judgment into the afternoon.
 6            MR. ARO:  Okay.
 7            THE COURTROOM DEPUTY:  And -- and, Your Honor,
 8   Ginger notified me that your 11:00 hearing has been moved to
 9   3:00.
10            THE COURT:  Okay.  All right.  So I should be --
11   have some time in the morning.
12            MR. ARO:  Terrific.  Thank you for accommodating
13   us, Your Honor.
14            THE COURT:  Okay.  Well, should we start at 8:30?
15            MR. ARO:  I think that would be terrific.
16            THE COURT:  All right.  Great.
17            MS. PADDEN:  That's fine with me, Your Honor.
18            THE COURT:  All right.  We'll be in recess.  8:30
19   tomorrow morning.
20            MR. ARO:  Thank you.
21            THE COURTROOM DEPUTY:  All rise.  Court is in
22   re- --
23   (Audio ends abruptly.)
24            (Whereupon, the within hearing was then in
25   conclusion at 4:30 p.m.)
```

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 83

```
 1            I certify that the foregoing is a correct

 2    transcript, to the best of my knowledge and belief (pursuant

 3    to the quality of the recording) from the record of

 4    proceedings in the above-entitled matter.

 5

 6

 7

 8    /s/ Laurel S. Tubbs                    January 26, 2017

 9    Signature of Transcriber               Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 1
December 15, 2016

Page 84

```
 1                         INDEX

 2                                              PAGE

 3   Preliminary Remarks by Mr. Aro                  5
     Preliminary Remarks by Ms. Padden             11
 4
     RONNIE HOUSTON (By Video)
 5   Direct Examination by Mr. Aro                 44
     Cross-Examination by Ms. Padden              45
 6   Redirect Examination by Mr. Aro              45

 7   RICHIE HILL (By Video)
     Direct Examination by Mr. Aro            49, 66
 8   Cross-Examination by Ms. Padden              66
     Redirect Examination by Mr. Aro              66
 9
     JOHN POWERS (By Video)
10   Direct Examination by Mr. Aro      66, 70, 72, 73
     Cross-Examination by Ms. Padden              73
11   Redirect Examination by Mr. Aro              73
     Recross-Examination by Ms. Padden            73
12
     JABBAR CURRENCE (By Video)
13   Direct Examination by Mr. Aro            78, 79
     Cross-Examination by Ms. Padden              79
14
                       EXHIBITS
15
                                              PAGE
16
     Exhibit Numbers 2, 31 through 33,           17
17              47, 49, 50, 52, 58,
                60 through 63,
18              65 through 70,
                72 through 76,
19              81, 84 through 91, 93
                117, 500 through 502,
20              504 through 532,
                556, 558, 560 through 563,
21              568, 569, 572 through 579,
                582 through 632,
22              636 through 648,
                650 through 671,
23              683 through 736,
                1001 through 1055
24

25
```