```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLORADO

 3    Case No. 12-cv-01570-RPM-MEH

 4    _____

 5    HAROLD CUNNINGHAM, individually, et al.,

 6         Plaintiffs,

 7    vs.

 8    FEDERAL BUREAU OF PRISONS,

 9         Defendant.

10    _____

11              Proceedings before RICHARD P. MATSCH, United

12    States Senior District Judge, United States District Court

13    for the District of Colorado, commencing at 8:30 a.m.,

14    December 16, 2016, in the United States Courthouse, Denver,

15    Colorado.

16    _____

17              WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

18    ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

19    _____

20                        APPEARANCES

21              DEBORAH M. GOLDEN, EDWIN P. ARO and MARK J.

22    IVANDICK, Attorneys at Law, appearing for the plaintiffs.

23

24    _____

25                   FAIRNESS HEARING - DAY 2
```

Harold Cunningham, individually, et al. vs.                                    Fairness Hearing - Day 2
Federal Bureau of Prisons                                                      December 16, 2016

```
 1                    APPEARANCES (cont'd)

 2              AMY L. PADDEN, United States Assistant Attorney,

 3    appearing for the defendant.

 4                    P R O C E E D I N G S

 5              (Whereupon, the within electronically recorded

 6    proceedings are herein transcribed, pursuant to order of

 7    counsel.)

 8              THE COURTROOM DEPUTY:  All rise.  Court is in

 9    session.

10              THE COURT:  Please be seated.  Good morning.

11    Everything -- everybody in working order this morning?

12              MR. ARO:  Barely, but, yes.

13              THE COURT:  Okay.  Well, let's proceed.

14              MR. ARO:  Thank you, Your Honor.  By way of

15    follow-up to yesterday's presentation and in response to some

16    of the Court's questions, I have three preliminary things I

17    want to deal with fairly quickly just to clarify some things

18    we talked about yesterday.

19              The first, at the request of Ms. Padden, you'll

20    recall Mr. Powers testified in her cross-examination, the

21    testimony from back in 2013 about his positive feelings

22    towards the sequence of people who were not really identified

23    in terms of who they were or how they fit into the whole

24    scheme of things.  He listed a number of doctors --

25              THE COURT:  Yeah.
```

Page 87

 1            MR. ARO:  -- one of whom, Daniel Severn was a

 2   psychiatrist at the ADX back in 2011/12 timeframe.  There

 3   were a series of psychologists also who he expressed positive

 4   feelings about.  And he referred also to Michael Nally who at

 5   that time was the BOP's regional director for the region that

 6   encompasses the BOP.  So that's who those folks were.

 7            The second thing that I wanted to speak briefly to

 8   was the ADX step-down program.  Several witnesses yesterday

 9   referred to "the program."  Mr. Currence in particular talked

10   about his experience being kicked out of "the program."  And

11   there -- I neglected when I did my ADX tour to explain what

12   that's about and how it fits into this case.  You're also

13   going to hear more about that today.

14            The ADX houses a unit that is intended as sort of

15   a transitional unit to prepare inmates who have maintained

16   clear conduct for a period to move on to a lower security

17   environment.  And the way it generally works is after you've

18   maintained clear conduct and otherwise satisfied the BOP's

19   concerns about whatever behavior got you to the ADX in the

20   first place, you can be approved for placement in a unit

21   that -- folks call it J unit.  It's the first phase of this

22   sort of decompression process.

23            If you'd put up for me, Dan, Exhibit 1055.  This

24   is an image, Your Honor, of the layout of this unit.  And you

25   notice that it's quite a bit different than what we saw

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 88

1   yesterday.  The cells are located on either side of this open

2   sort of flats area.  And there are also cells on the second

3   level that are configured the same way.  Inmates in this

4   program are grouped in what they call rec groups, maybe three

5   or four or five people who live on the same part of the tier,

6   so maybe the lower left-hand side of the picture.  And those

7   folks come out together for a few hours every day for group

8   recreation.  They have the opportunity to -- to take showers

9   in the showers that you see at the end of the unit there.

10  Those are the cage doors at the far end of this picture.  And

11  they can congregate a little bit and get used to being around

12  people again for a period of time.  And if they do well in

13  that unit, they're moved progressively through stages of

14  additional freedoms.  The next portion of which happens at

15  the US penitentiary, which is across the street from the ADX

16  where they have a dedicated unit that these inmates live

17  together enduring the last period in the step-down program

18  before they're eligible to be transferred to a US

19  penitentiary someplace else in an open compound prison.  This

20  pro- --

21          THE COURT:  Now, where -- an inmate newly assigned

22  to ADX, where does he go?

23          MR. ARO:  Typically, historically, the inmate

24  arrives and spends a little time in the SHU, the disciplinary

25  unit, before being assigned to a general population unit.

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 89

1    That's the ordinary path.

2            THE COURT:  So not to the control unit?

3            MR. ARO:  Inmates who have been reviewed and

4    approved for the control unit would go straight into the

5    control unit.

6            THE COURT:  Yeah.

7            MR. ARO:  Everybody else would go into a general

8    population unit --

9            THE COURT:  Okay.

10           MR. ARO:  -- where they would stay for however

11   long it is before they are eligible to move into the

12   step-down program and ultimately back into an open population

13   prison.  One of the concerns that we've had throughout this

14   case, and Mr. Dunbar in portions of his testimony that are

15   not going to be played in -- in Court this morning, is a

16   great example of this.  He went back and forth to this

17   step-down program several times.  The last time he was there

18   he successfully completed the program and was transferred to

19   a penitentiary where he got in trouble literally the first

20   day that he got off the bus.  The second to the last time he

21   was there he was attacked and stabbed in the back of the head

22   by another inmate and got kicked out of the program and had

23   to spend another, roughly, year at the ADX.  And the worry

24   that we've had from the outset of this case has been these

25   folks who have psychological problems have a very difficult

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 90

 1  time reintegrating into any environment, much less an
 2  environment like this where they're with other prisoners who
 3  may not look at the world the same way that they do.  And
 4  historically inmates with mental illness have had a really
 5  hard time getting through this program.
 6          Percy Barron, you're going to hear testimony from
 7  today, was removed from this program when he was nearly
 8  through it for masterbating in his cell and being observed by
 9  a staff member.  That cost him credit for an extended period
10  of good conduct.  He was sent back to the ADX, and shortly
11  thereafter attempted suicide by swallowing pills.  So a part
12  of the formulation of these new high-security mental health
13  units essentially is to substitute for this traditional
14  step-down program by allowing inmates to step down to lower
15  security levels in an environment where they have
16  psychological help.  They have access to psychiatry.  And
17  they don't have to deal with, quote, unquote, normal inmates
18  as they're going through this decompression process.
19          THE COURT:  Okay.
20          MR. ARO:  The last thing that I wanted to address
21  was the Court's questions concerning Mr. Hill's --
22          THE COURT:  Yes.
23          MR. ARO:  -- presentence evaluation report.
24  Candidly, we hadn't intended to litigate that set of issues
25  here because whatever the situation was back in 2003, by the

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 91

```
 1   time he was sent back --

 2              THE COURT:  Well --

 3              MR. ARO:  -- there in 2006 it was different,

 4   but --

 5              THE COURT:  -- I don't think of it as litigating

 6   an issue.  I inquired about it as to was there something I

 7   missed --

 8              MR. ARO:  Sure.

 9              THE COURT:  -- when I sentenced him?  It's more of

10   a personal question here because, you know, I had him -- I

11   was responsible for him at one time.

12              MR. ARO:  Totally understand the concern and

13   appreciate very much that you have that concern, Your Honor.

14   And I've got the documents that will at least answer the

15   question and -- and tell you what the record shows about this

16   set of issues.  So you should have a blue book in front of

17   you that looks like this.

18              THE COURT:  Supplemental?

19              MR. ARO:  It says Supplemental Hill Exhibits.

20              THE COURT:  Yeah.  Yes.

21              MR. ARO:  So what we did -- if you look at the

22   last tab, it's Exhibit 733.  There's a timeline of the

23   documents that will help you keep track of what I'm going to

24   tell you here actually is represented in the documents.

25              You go back to -- if you'd put up Exhibit 733 for
```

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 92

 1   me, please, Dan.

 2            Now, the -- the first date on the timeline is

 3   November 22nd of 2002.  That's the date that Mr. Hill entered

 4   his plea in this court.  And the citation for that is

 5   Exhibit 732, which is actually the presentence evaluation or

 6   investigation report itself provided to you in connection

 7   with this proceeding.  The PSI was issued on January 10th of

 8   2003.  And with respect to the Court's question, whether it

 9   was accurate, I think the -- our position, and I'll explain

10   why as we go along here, is that it was accurate as far as it

11   went, but there was important information that was not

12   included.

13            The mental health history -- and, Dan, if you'd

14   put up Exhibit 732 for me.

15            The mental health history is -- this starts on

16   page 15 of the document.  And there are four paragraphs.

17   Cull out just the first one, Dan, so that we can see them a

18   little bit more clearly.

19            The first paragraph talks about the visits to

20   Springfield that Mr. Hill had -- had had before this

21   sentencing process.  And it accurately sets forth that there

22   were medical records reflecting evaluations in May of 2000,

23   December of 2000, and February 1 of 2002.  It accurately

24   states that the first two of those evaluations diagnosed him

25   with no mental disorder.  And it accurately reflects that the

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 93

 1    third diagnosis in February of 2002, so roughly one year

 2    before you sentenced him, was a diagnosis of psychosis not

 3    otherwise specified.  It also speaks to the question of

 4    antisocial personality disorder and talks a little bit about

 5    the self-inflicted eye injuries that you heard a little bit

 6    about in the testimony yesterday.

 7             Now, what this doesn't include is two facts that

 8    we think at least matter.  Number one, back in -- in October

 9    of 2000 he was sentenced to Springfield, and he spent nearly

10    16 months there in a locked psychiatric ward, which is

11    unusual in our experience looking at these records.  That's a

12    long stay in that sort of a unit.  And the fact that it was

13    not mentioned that he had been in this locked psychiatric

14    ward for that extended period of time is seriously concerning

15    to us.

16             The other thing that's not mentioned is that in

17    July of 2001 the BOP for the first time subjected him to

18    involuntary medication because he was refusing to take

19    antipsychotic medication.  And you see that, Your Honor, in

20    Exhibit 60 which is also in the book that you have in front

21    of you.  That's a -- the form that they had to go through

22    back in the summer of 2001 to justify the involuntary

23    administration of medication on Mr. Hill.  At this point they

24    had not filed a petition for a commitment to allow them to

25    essentially treat him against his will over an extended

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 94

1   period.  This is an emergency situation where they determined

2   that without any Court intervention they needed to administer

3   medication because of his conduct and his refusal to accept

4   the medication.  There's no mention of this incident or the

5   circumstances that led to it in the presentence investigation

6   report.

7           The next -- and if I'm going too fast here, Your

8   Honor --

9           THE COURT:  No.  Go ahead.

10          MR. ARO:  The next paragraph in the presentence

11  evaluation report is paragraph 65.  If you'd bring that up

12  for me, Dan.

13          And this paragraph details at some length

14  Mr. Hill's self-harm and aberrant behavior, including

15  oppositional behavior, as well as, if you look at the last

16  clause there, it talks about him drinking cleaning fluid,

17  threatening to kill himself, lacerating his arm and cutting

18  out stitches and causing a self-inflicted trauma to his eye,

19  as you heard him testify to about yesterday.  As far as we're

20  aware, Your Honor, this was accurate at the time that it was

21  provided and doesn't omit material details that -- relating

22  to that particular subject.

23          The next paragraph is paragraph 66 which talks

24  about the medication that he was taking at that time and

25  concludes or states that all three of the psychological

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 95

1  reports that had been referred to above concluded that his

2  self-inflicted injuries were voluntary, manipulative, and

3  driven by his personality disorder.  So essentially the

4  doctors were concluding that the behaviors that were being

5  seen were not caused by a major mental illness.  It was a

6  character pathology that in their view at least was -- was

7  driving his behavior.

8            Now, you sentenced him on February 14 of 2003.

9  That sentencing order is attached to Exhibit 7, excuse me,

10  Exhibit 90, which is actually the petition to commit him

11  which was filed on (inaudible) 20, 2003.  The sentencing

12  order is the fourth page of that document and reflects that

13  he had pled guilty to voluntary manslaughter.  And the

14  sentence that was imposed on the next page was 10 years

15  consecutive to his existing sentence or 120 months.  And the

16  presentence evaluation report, I'm not an expert in

17  calculating sentences, but it reflects that that 10-year

18  sentence was the maximum permitted by the statute under which

19  he entered his plea.

20            So that was the record as of the time that he was

21  sentenced.  What is troubling to us and the basis of what I

22  alluded to yesterday, that we aren't sure that you received

23  accurate information at the time of the sentencing, starts

24  with Exhibit 61, which is a report that was drafted by a

25  psychologist at the BOP named Michael Morrison dated

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 96

 1   March 20, 2003.  And that's, of course, roughly five weeks

 2   after you sentenced him.  And what this report is, is a

 3   request for consultation with doctors at Springfield

 4   concerning the deterioration of Mr. Hill's psychiatric

 5   condition, and asking for assistance with evaluating what his

 6   needs were, whether he needed additional psychiatric help.

 7   This refers to Risperdal which is an antipsychotic medication

 8   that Mr. Hill had refused to take.  It talks about the

 9   potential for suicidal ideation, and it talks at the bottom

10   of the main -- the big paragraph in the middle of this report

11   in the following terms.  And I'll just quote it.  Despite the

12   refusal of medication, he has done nothing thus far that

13   would warrant placing him back on suicide watch or referring

14   him to a medical center for possible treatment on an

15   involuntary basis.  So he's saying here, We've seen

16   deterioration, but at this point I don't think that he needs

17   to be referred for further evaluation.

18           The next document that matters in this timeline is

19   five days later.  It's Exhibit 62.  And what that document

20   is, is an application essentially to have Mr. Hill

21   transferred to Springfield on an urgent basis for psychiatric

22   care.  And if you take the time to read this document, what

23   the -- the punch line here is that he was refusing to take

24   his medication.  He was deemed to be medically stable, and

25   yet they were concerned about his deteriorating condition and

Harold Cunningham, individually, et al. vs.          Fairness Hearing - Day 2
Federal Bureau of Prisons          December 16, 2016

Page 97

 1  belief that he needed to be sent to Springfield for further

 2  evaluation and treatment.

 3          One of the things that is a head-scratcher about

 4  this document is at the bottom of page 62.  Sorry.  Next

 5  page, Dan.  Page 2 of Exhibit 62, the last full paragraph.

 6          What the -- the doctor who prepared this report,

 7  his name is Eric Hutchinson.  He was a psychologist in

 8  Florence at that time.  What he wrote was, Clinical

 9  assessment of this inmate is mixed.  It is the writer's

10  opinion that the inmate is not mentally ill, but is feigning

11  symptom psychosis for secondary gain, an avoidance of

12  possible death penalty.  What he doesn't appear to have

13  understood at that point was that Mr. Hill had already been

14  sentenced in connection with this homicide.  He wasn't facing

15  the death penalty.  There was no secondary gain that could

16  possibly have been conceived at that point.  And this

17  reflects at a minimum that the doctors weren't talking to the

18  folks who provided you the information that you relied on in

19  sentencing him.  And it raises real questions about the care

20  with which Dr. Hutchinson was evaluating the situation

21  because he's dismissing in this document Mr. Hill's medical

22  needs as being feigned because of a motivation that at this

23  point no longer exists.

24          The next document that we see in this timeline is

25  Exhibit 63, which is a psychological report dated May 30,

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 98

1    2003, that was prepared by a psychi -- or psychologist, staff

2    psychologist at Springfield that goes through Mr. Hill's

3    history.  It talks about the fact that Mr. Hill was

4    readmitted to Springfield on April 22, 2003.  Speaks -- at

5    the bottom of page 2, if you'd cull up the bottom paragraph

6    there, Dan.

7            Although he initially appeared rational, Mr. Hill

8    quickly began to decompensate.  For the Court's

9    clarification, that's a clinical term.  It refers to the

10   emergence of psychiatric and particularly psychotic symptoms.

11   He became extremely hostile towards staff members, threw a

12   tube of toothpaste, injured his hand by punching a hole in

13   the wall, and speaks to pretty uncontrollable behavior as you

14   continue on with that paragraph on the next page.  The doctor

15   then gives him a diagnosis of a psychotic disorder and speaks

16   to -- in the opinion and recommendation section on the bottom

17   of page 3 of the report, it says, Mr. Hill is once again

18   suffering from an atypical mental disorder with features of

19   both a mood and thought disorder.

20           Now, that is a textbook description of

21   schizoaffective disorder which is ultimately what the BOP has

22   decided that he suffers from.  And it talks about the serious

23   potential for self-harm.  He talks about the threat to others

24   even before he was mentally ill.  And in the last sentence he

25   says, Based on this information, it is my opinion Mr. Hill is

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 99

1   presently suffering from mental disease or defect for the

2   treatment of which he is in need of custody and care or

3   treatment in a suitable facility.  This is a precursor, Your

4   Honor, to the commitment petition, which is Exhibit 90, and

5   was filed on June 11, 2003.  This is the first of two such

6   petitions that were filed concerning Mr. Hill between 2003

7   and 2006.  And as a result of this, the judge entered an

8   order requiring that Mr. Hill receive involuntary medication

9   and treatment at Springfield where he continued to reside for

10  a period before he was sent back to the ADX.  It is -- I

11  wasn't there at the time that this was all happening

12  obviously.  And it certainly is possible that when the

13  probation department prepared the PSR and you sentenced him,

14  he was not exhibiting signs of mental illness.  And within

15  five weeks later he was on his way to Springfield for a

16  psychiatric evaluation that resulted in his involuntary

17  commitment.

18          I think the record is also susceptible to an

19  inference, and this is what I was alluding to yesterday, that

20  the Bureau of Prisons was selective in the information that

21  it chose to provide to the probation department about the

22  condition of Mr. Hill at that time he was sentenced.  And I

23  think it is reasonable to infer, since we're talking about

24  motives here being imputed to folks, that perhaps part of the

25  concern was the Department of Justice didn't want to

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 100

```
 1   complicate the prosecution by surfacing the fact that
 2   Mr. Hill was melting down psychologically.  I can't prove
 3   that.  I have no idea what they were doing at that time.  But
 4   when I looked at these records back when, I was very
 5   concerned about the fact that he was presented to you as
 6   malingering a mental illness, and that within weeks after
 7   this he was being -- the same government agency that was
 8   prosecuting him in this court was going to court to have him
 9   involuntarily medicated and committed for mental health
10   reasons.  So there's --
11           THE COURT:  Ms. Padden -- Ms. Padden is -- has an
12   objection.
13           MS. PADDEN:  Yes.  Your Honor, may I address that?
14   I'm -- that's a very concerning allegation that Mr. Aro just
15   made.
16           THE COURT:  Well, let me say before we go any
17   farther, what I was most concerned about yesterday was
18   whether this was a voluntary and intelligent plea agreement
19   and plea of guilty because I'm not aware that anybody raised
20   competence in the proceeding before me.  And that -- you
21   know, there are two things.  One, did I miss something and
22   accept a plea that I shouldn't have accepted?  And the other
23   is, if I had known more I would have made the recommendation
24   that he go to Springfield.  But those recommendations are, of
25   course, often not followed.
```

Page 101

```
 1             MR. ARO:  So there's -- there's -- if I may,
 2   there's one other point that I want to make that is important
 3   and I think mitigates what I said earlier, and that is,
 4   symptoms of disorders like schizoaffective disorder often
 5   emerge in late teenage years, early twenties.  That's exactly
 6   how old Mr. Hill was as this was happening.  And it's
 7   entirely possible that really good doctors looking at him at
 8   that point could have been confused about his presentation
 9   because this is somebody who had a history of aberrant
10   behavior --
11             THE COURT:  Well --
12             MR. ARO:  -- had been treated before.  I'm not --
13   as I said when I began this, I was not there at the time.
14   But when I alluded yesterday to my concerns about the record,
15   this is the timeline that I was concerned about.
16             THE COURT:  But, you know, even a person can have
17   psychotic behavior and have mental competence for purposes of
18   the McNaughton rule, knowing and understanding the charges
19   and the consequences of pleading.
20             MR. ARO:  That's true.  And I think it's also a
21   fair observation that my impression of Bob Pepin is he's an
22   excellent lawyer.
23             THE COURT:  Yeah.
24             MR. ARO:  And I have talked with many lawyers
25   who've represented many defendants in this situation who are
```

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 102

 1   more concerned about an indefinite commitment than they are

 2   about a relatively short sentence.

 3          THE COURT:  I understand.

 4          MR. ARO:  And there may have been a strategic

 5   decision made.

 6          THE COURT:  Okay.  Well, Ms. Padden.

 7          MS. PADDEN:  And, Your Honor, that really segues

 8   in the point I was going to make.  Mr. Pepin is a very

 9   experienced defense counsel.  Mr. Hill was represented

10   throughout every stage of the proceeding before Your Honor.

11   Mr. Pepin presumably had access to all his Bureau of Prison

12   records.  Again, the presentence report is drafted and

13   prepared by the probation department.  The Bureau of Prisons

14   doesn't write that.

15          THE COURT:  Yeah.

16          MS. PADDEN:  There's absolutely zero reason to

17   believe that the Bureau of Prisons intentionally withheld any

18   records from the probation department.  It's very disturbing

19   that Mr. Aro made that allegation.  And had there been

20   information that Mr. Pepin thought that the probation office

21   should have had, he most certainly could and I would assume

22   would have provided that information.

23          THE COURT:  Yeah.  And this was also in a time

24   when sentencing guidelines were mandatory.

25          MS. PADDEN:  Correct.

Harold Cunningham, individually, et al. vs.                       Fairness Hearing - Day 2
Federal Bureau of Prisons                                   December 16, 2016

Page 103

```
 1              THE COURT:  So -- all right.  Well, I
 2   appreciate -- and I assume the writing that's on these
 3   documents is some -- somebody from your office?
 4              MR. ARO:  So when you're speaking about writing --
 5              THE COURT:  The inmate presentence report.
 6              MR. ARO:  -- I believe, Your Honor, that's
 7   Exhibit 90.  For the record, that's the form in which it came
 8   to us.  And I believe that that's material from Mr. Pepin's
 9   office.  I don't know if it's his handwriting --
10              THE COURT:  Oh.
11              MR. ARO:  -- or somebody else's.
12              THE COURT:  Oh.  I thought you were getting the
13   presentence -- oh, I see.  He was releasing his copy of the
14   presentence report.
15              MR. ARO:  That's correct, Your Honor.
16              THE COURT:  Oh, okay.  Now I understand.
17              MR. ARO:  So these exhibits that we just clipped
18   through were not among the stipulated exhibits yesterday
19   marked on your exhibit list.  We have provided an updated
20   exhibit list to the Court and --
21              THE COURT:  Yeah.  But I don't know what it goes
22   to actually, except to my concern about my own conduct.
23              MR. ARO:  Because we had the colloquy that we had,
24   if the Court does not object, and I believe counsel doesn't
25   object to their stipulation into evidence, we'd prefer that
```

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 104

 1   they be included in the record.

 2              THE COURT:  Do you want to make a formal

 3   objection?

 4              MS. PADDEN:  I don't object to these coming into

 5   evidence.

 6              THE COURT:  Okay.

 7              MS. PADDEN:  I just want to make the clarification

 8   for the record.

 9              THE COURT:  All right.

10              MR. ARO:  So the --

11              THE COURT:  So how is it designated now?

12              MR. ARO:  It's Exhibits 60 --

13              THE COURT:  Oh, yeah.  The tabs are designated.

14   Yeah.  Okay.

15              MR. ARO:  60, 61, 62, 63, 90 --

16              THE COURT:  All right.

17              MR. ARO:  -- 732 and 733.

18              THE COURT:  Okay.  Well, I appreciate the -- this

19   additional information.

20              MR. ARO:  You're welcome, Your Honor.

21              THE COURT:  I guess it's of some small comfort.

22              MR. ARO:  The next witness whose testimony we

23   offer, Your Honor, is Carlton Dunbar who is one of the

24   plaintiffs in the case.

25              THE COURT:  Okay.  When I say "small comfort," I

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 105

1    mean to me.

2                    MR. ARO:  I understand, Your Honor.

3                    (Video deposition of Carlton Dunbar played.)

4                    MR. ARO:  Just as a quick bit of linkage,

5    Mr. Dunbar worked his way through a series of BOP

6    institutions before he came to the ADX.  He arrived there as

7    a result of a serious assault on a lieutenant at the US

8    Penitentiary in Lewisburg, Pennsylvania.  And we're going to

9    pick up after that assault and -- as his intake at the ADX

10   process.

11                   (Video deposition of Carlton Dunbar played.)

12                   MR. ARO:  Your Honor, I want to pause briefly and

13   show you what this form looks like because he's going to talk

14   through -- several other folks have referred to this.  If

15   you'd bring up Exhibit 500, Dan.

16                   These are the evaluations we were talking about

17   yesterday, Your Honor.  He said it was court ordered.  In

18   fact, it was something the parties agreed to, but we were

19   making you aware of.  And for each of these inmates, there

20   was a team of two doctors, an outside contract psychiatrist

21   who was selected by the BOP and a BOP psychologist from an

22   institution other than the ADX who came in and met with these

23   inmates in one of those private rooms that I showed you

24   yesterday.  And they went through a standard form.  The first

25   page of which is a consent form where the inmate was informed

Page 106

 1   what the purpose of this was and agreed to go through this

 2   process.  This is about a 22- or 3-page long document that

 3   for each of these folks includes a very detailed history,

 4   some of which it appears the doctors collected from records

 5   they reviewed before the evaluation.  And then there's a

 6   questionnaire that they went through with each inmate asking

 7   about your family, about your medical history, about your

 8   medications and so forth.

 9          And then at the end if you'd go to page 15, Dan.

10   I think it's 15.  Go back up one more page.  There you go.

11   So cull out for me the -- nope.  I'm sorry.  14, 15, go to

12   16, please.  There we go.  So cull up the bottom half under

13   Diagnostic Impressions.

14          Each of these forms concludes with a Diagnostic

15   Impressions section in which the doctors concluded what they

16   thought this individual's situation was.  This is

17   Mr. Dunbar's.  And in his case they diagnosed him with

18   bipolar disorder, current episode mania.  And they recite the

19   reasons that they think that is so.  He appears to have a

20   clear and lengthy history of mood instability that does not

21   appear occurred for -- or accounted for by a personality

22   disorder alone.  Instead, in such childhood -- excuse me.

23   Instead, and since childhood, he appears to have alternative

24   episodes of significant depression, mania.  And they describe

25   what those symptoms are.  And they talk about how that

Page 107

1   correlates to this bipolar disorder diagnosis.  Below that in

2   paragraph 42 the question is asked, Does the inmate have a

3   serious mental illness?  And in this particular case they

4   determined, We believe, consistent with BOP policy, that

5   Mr. Dunbar did meet the criteria set forth in the program

6   statement for having a serious mental illness which with rare

7   exceptions would mean that he was ineligible to be housed at

8   the ADX.

9          And then on the following page, if you'd go one

10   more in, Dan, cull out the top half of the page.  They assign

11   the inmate a care level.  1 essentially being no need for

12   mental health services.  2 essentially meaning that the

13   illness can be managed with outpatient treatment as opposed

14   to any kind of residential treatment.  3 being residential

15   treatment, which a rough analogy for which would be like a

16   nursing home setting where you're not in a hospital but you

17   have very regular and close access to mental health

18   professionals.  And a care 4 is an inpatient hospitalization

19   sort of designation.  And then they often, and in this case,

20   did offer specific recommendations about the treatment or

21   programming that might be available for particular inmates.

22          The way I understand this process works, and this

23   understanding is from the fact that both Dr. Metzner and

24   Dr. Johnson, who were the parties' lead forensic psychiatry

25   experts in the case, were present for these evaluations.

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 108

1    There was a whole bunch of them going on at the same time.

2    And at the end of the day each day people got together and

3    talked about and tried to reconcile their feelings about

4    diagnoses before they signed off on their conclusions.  So

5    that's what the process looks like.  And he's going to now

6    talk a little bit about that format.  I just wanted you to be

7    familiar with it.

8              THE COURT:  All right.  Thank you.

9              (Video deposition of Carlton Dunbar played.)

10             MR. ARO:  Your Honor, we've got the

11   cross-examination and redirect for only about a minute and a

12   half long.  Would you (inaudible)?

13             THE COURT:  Okay.

14             (Video deposition of Carlton Dunbar played.)

15             MR. ARO:  The next inmate whose testimony we're

16   going to offer is Herbert Perkins.  His runs 17 minutes

17   altogether.

18             THE COURT:  Let's go ahead with it.

19             MR. ARO:  Okay.

20             THE COURT:  I mean, if it's all right with

21   everybody else.

22             MR. ARO:  It's all right.

23             THE COURT:  All right.

24             (Video deposition of Herbert Perkins played.)

25             THE COURT:  Okay.  So I suggest we take our

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 109

1    morning recess.

2              MR. ARO:  Absolutely.  Just one quick point.

3    Mr. Perkins, as you might have gathered from that last piece,

4    is, I think -- he has the distinction of being the only

5    person who's been in two of the three programs that were

6    established because of this case.  And as you heard, he had

7    pretty good things to say about both of them.

8              The next witness is going to take long enough, I

9    think this is a great place for a break.

10             THE COURT:  Yeah.  Do I understand, I thought he

11   referred to his sentence as being life.

12             MR. ARO:  That's correct.  He was sentenced I

13   think in 2008 for a -- essentially an armed career criminal

14   charge out of Albuquerque.  And is a little unusual in the

15   sense that he's one of the relatively few -- what they call

16   direct from sentencing inmates down there.  He did not go to

17   another BOP facility before the ADX.  He was sent directly

18   there within a day or two after the sentence was imposed and

19   stayed there until he left to go to Atlanta.

20             THE COURT:  Was that at a judge's direction?

21             MR. ARO:  It's a little murky to me how that all

22   happened, Your Honor.  I don't have the documents --

23             THE COURT:  Yeah.

24             MR. ARO:  -- about that.  It's my understanding

25   that there was some situation involving potentially the

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 110

 1   introduction of firearms into the courthouse when he was

 2   being sentenced that had something to do with that, but I

 3   don't know the details.

 4            THE COURT:  Well, it's not that important.  All

 5   right.  15 minutes.

 6            MR. ARO:  Thank you, Your Honor.

 7            THE COURTROOM DEPUTY:  All rise.  Court is in

 8   recess.

 9            (Recess from 10:17 a.m. to 10:34 a.m.)

10            THE COURTROOM DEPUTY:  All rise.  Court is in

11   session.

12            THE COURT:  Please be seated.

13            MR. ARO:  Your Honor, the government asked me to

14   clarify two points relating to the colloquy we had concerning

15   Mr. Hill earlier.  And I want to do that for the Court so

16   there's no misunder -- apprehension about what I said or what

17   I meant.

18            The first thing they asked me to clarify or

19   confirm is that they -- they don't want there to be any

20   lingering insinuation in the record that I was accusing Greg

21   Goldberg or Dave Connor, both of whom I am familiar with, and

22   I've known Greg Goldberg for many years, of misconduct in any

23   way, shape or form in connection with the prosecution of

24   Richie Hill.  I have no information.  And, frankly, I

25   wouldn't believe it if I had information saying that

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 111

```
 1   Mr. Goldberg or Mr. Connor came into this court and tried to
 2   cover anything up from the Court.  And I want to make it
 3   clear that I have as much respect for them as Ms. Padden and
 4   the Bureau of Prisons do.  And so there was no intended
 5   or meant -- insinuation that they'd done anything wrong.
 6             THE COURT:  All right.
 7             MR. ARO:  The other point is -- has to do with the
 8   first document that I showed you that -- the comparison
 9   between the presentence evaluation report and the medical
10   records or mental health records that were made available to
11   the probation department in connection with the preparation
12   of that presentence evaluation report.  What we know from the
13   record is that Mr. Hill was, in fact, at Springfield for a
14   long time, not that long before he was sentenced.  We also
15   know that he'd been involuntarily medicated during that time.
16   And we know that those two facts weren't in the probation
17   prepared PSR.  What we don't know is exactly what information
18   the probation department received from the Bureau of Prisons.
19   We know that today the practice would be for the Bureau of
20   Prisons to provide the entire psychological and psychiatry
21   file to the probation department for their review in
22   preparing whatever they wanted to for the Court.  We don't
23   know whether that happened at that time.  We don't know
24   whether the Bureau of Prisons omitted something.  We don't
25   know whether the probation department omitted something.  We
```

Page 112

 1   don't know whether the probation department didn't understand

 2   something.  All we know is that information that we say, that

 3   plaintiffs say would have been pertinent at that time didn't

 4   make its way into the PSR.  And whether that's the probation

 5   department's fault, the BOP's fault, or somebody else's

 6   part -- or fault, we don't have the information in court

 7   today to make that determination.

 8           THE COURT:  And the probation officer preparing

 9   the report is long gone from --

10           MR. ARO:  I think that's probably right.

11           THE COURT:  He retired.  All right.  Let's move

12   forward.

13           MR. ARO:  The next witness is Sean Gillespie.

14           (Video deposition of Sean Gillespie played.)

15           MR. ARO:  So we're going to jump way forward, Your

16   Honor, through a bunch of his history.  The very short

17   version of that is he was living on the street and going to

18   school during the time he was living under a bridge for a

19   good part of that time, graduated from high school, had a

20   couple of short stints in the National Guard, the Army

21   National Guard, both of which ended when he was kicked out

22   for fighting.  During this period when he was in high school

23   he also spent an extended period at the Aryan Nation's

24   compound up in Idaho where he was sort of drawn in with some

25   skinhead people he was running with.  And this was the

Page 113

1    beginning of an involvement with the sort of white

2    nationalist, white racist movement that ultimately led him to

3    the crime that he'll tell you about in a second that -- for

4    which he's serving time at this point.

5              THE COURT:  Thank you.  So in the transcript

6    where -- where are you going ahead to?

7              MR. ARO:  We're picking up on (inaudible).  This

8    would be clip 2 in your book.  It's on page 25, line 22, Your

9    Honor.

10             THE COURT:  Okay.

11             (Video deposition of Sean Gillespie played.)

12             MR. ARO:  The next section we're going to skip is

13   his recitation of the -- the time he spent before he arrived

14   at the ADX.  He went through several penitentiaries, was

15   involved in all kinds of violent misconduct, and ultimately

16   ended up at USP Coleman in Florida where he attacked a staff

17   member with a knife or a razor.  And that was the last straw

18   that got him transferred to the ADX.

19             THE COURT:  Were his other behavior, were they

20   part of race gangs in prison?

21             MR. ARO:  Some of them were.  He has, as you'll

22   hear a little bit about, he has renounced that membership.

23   And one of his psychological issues now is he has racist

24   tattoos all over him.  And he's trying to figure out how to

25   get them off.  And he's now started to try to cut them at

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 114

```
 1   various points.  But early in his BOP career in particular he
 2   was running with those folks and got involved in a race riot
 3   and some other incidents that were definitely driven by that.
 4             THE COURT:  All right.  Okay.
 5             (Video deposition of Sean Gillespie played.)
 6             MR. ARO:  What he's talking about here, Your
 7   Honor, when he refers to SMR is a suicide risk management
 8   protocol which is something that is part of the policies that
 9   have been dealt with here and is otherwise used in the BOP.
10   And it's sort of an intermediate form of suicide intervention
11   where they put them on a plan where they might leave them in
12   their cell, but they remove their property.  And many of the
13   inmates very strongly dislike these plans because they end up
14   with nothing to do.  And so what he's saying here essentially
15   is these doctors were trying to work with him to avoid the
16   negative connotations of being put on one of these plans
17   while at the same time addressing his behavior at that point.
18             THE COURT:  Okay.
19             (Video deposition of Sean Gillespie played.)
20             MR. ARO:  I hope it's helpful to keep providing
21   guidance, Your Honor.
22             THE COURT:  Yes.
23             MR. ARO:  Just to tie this together, the
24   individual he was referring to by the name Gotti (phonetic)
25   was Jose Vega.  That was his prison nickname.
```

Page 115

```
 1              THE COURT:  Okay.
 2              (Video deposition of Sean Gillespie played.)
 3              MR. ARO:  So Mr. Gillespie is one of the folks
 4   who's in the Secure STAGES program right now, this program we
 5   talked about yesterday.  And has been diagnosed with
 6   borderline personality disorder and removed from the ADX on
 7   the basis of that serious mental illness.  So he's now going
 8   to talk a little bit about that program.
 9              THE COURT:  All right.
10              (Video deposition of Sean Gillespie played.)
11              MR. ARO:  Two very quick clarifications before we
12   proceed to the cross-examination.  The first is Dr. Seaton
13   (phonetic) whose name you just heard for the first time, was
14   the initial program coordinator, so the head psychologist in
15   that unit until she left a few months ago.  And they're --
16   they haven't yet named her replacement.  And the very last
17   reference was to an inmate named Auganaga (phonetic) who
18   committed suicide in that unit about a month ago.
19              THE COURT:  Okay.
20              (Video deposition of Sean Gillespie played.)
21              MR. ARO:  Your Honor, that last reference you're
22   going to hear more about when we talk about his,
23   Mr. Gillespie's objection to the settlement.  He has a pretty
24   detailed theory of liability that he wants pursued for money
25   damages in this case that is based on the Monell (phonetic)
```

Page 116

1    case.  And -- and testified about that before Ms. Padden

2    asked those questions.  So she was just trying to clarify

3    with him that maybe he was misunderstanding the applicable

4    law that might govern one of his claims for damages.

5              The next witness is about a 20-minute examination

6    of a plaintiff named Percy Barron.  Mr. Barron completed the

7    step-down program at the ADX in August or September of 2016.

8    He met with Judge Hegarty and I down at the prison in -- down

9    at USP Florence where the last phase of the step-down program

10   is located in I believe it was September of this year.  And

11   within a few days thereafter was transferred to a mainline

12   Bureau of Prisons penitentiary in Kentucky called USP

13   McCreary which is where this testimony was recorded.

14             THE COURT:  Thank you.

15             (Video deposition of Percy Barron played.)

16             MR. ARO:  This is going to be the first place

17   where he talks about this sort of interlocking situation

18   between a physical problem he's got and his emotional state.

19   He had -- while in BOP custody he had a corneal transplant

20   that has caused him persistent discomfort for a long time and

21   has complicated his psych issues.  And he talks about pain

22   and the depression sort of interchangeably.

23             (Video deposition of Percy Barron played.)

24             MR. ARO:  And then there were three, Your Honor.

25   The next witness is Arnell Shelton.  His testimony runs about

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 117

```
 1   45 minutes.  We can start it and stop it at a place if you'd
 2   like to do that, or we can play it all through, or we can
 3   break early.
 4              THE COURT:  I suggest we break now.
 5              MR. ARO:  Okay.
 6              THE COURT:  And so where are we overall?
 7              MR. ARO:  I think we're basically where we talked
 8   about being yesterday, Your Honor.  By the middle of the
 9   afternoon we're going to be talking about the settlement
10   process and how the enforcement mechanisms came about.  And
11   Ms. Padden and I talked at some length about that last night
12   about how we may address that situation so that it's out
13   there and -- and you understand our thinking on that today in
14   great detail.  So I expect we'll be at that point by the
15   midafternoon break.
16              THE COURT:  By when?
17              MR. ARO:  By the midafternoon break.
18              THE COURT:  Okay.  So how about we break till
19   1:10.
20              MR. ARO:  That would be fine, Your Honor.
21              THE COURT:  Okay.  Recess.  1:10.
22              THE COURTROOM DEPUTY:  All rise.
23              (Recess from 11:54 a.m. to 1:09 p.m.)
24              THE COURTROOM DEPUTY:  All rise.  Court is in
25   session.
```

Page 118

```
 1              THE COURT:  Please be seated.  All right, Mr. Aro.
 2              MR. ARO:  Plaintiffs call Arnell Shelton who is
 3   currently at the ADX and has been there for a number of
 4   years.  He's not in any of these programs that we've talked
 5   about.
 6              THE COURT:  All right.
 7              (Video deposition of Arnell Shelton played.)
 8              MR. ARO:  So I'm going to suspend this clip here
 9   because the rest of what he testifies about is duplicative of
10   what you've heard from other inmates already.  And we're
11   going to move to Ms. Padden's cross-examination.
12              THE COURT:  All right.
13              (Video deposition of Arnell Shelton played.)
14              THE COURT:  What is this sexual assault he's
15   talking about?
16              MR. ARO:  I have -- I can tell you what I
17   understand about it which is not much.
18              THE COURT:  He didn't go into it with you?
19              MR. ARO:  He -- I've tried to understand what it
20   is.  It -- from what I gather from what he's told me, he had
21   an interaction with a staff member at the ADX who did
22   something to him that he felt violated him sexually.  But
23   every time he tries to talk to me about it he breaks apart
24   and so I try not to press it --
25              THE COURT:  Okay.
```

Page 119

1              MR. ARO:  -- because he is pretty chronically on

2     the edge.

3              THE COURT:  Yeah.

4              MR. ARO:  So I'm sorry.  I can't tell you more

5     specifically.

6              THE COURT:  Well, it seems to be something of a

7     tipping point with him.

8              MR. ARO:  It's something that didn't emerge for a

9     long time in our discussions.  And you're exactly right.  I

10    think it's -- it's, A, if not the biggest problem that he

11    has.

12             THE COURT:  Okay.

13             MR. ARO:  The next witness is Marcellus

14    Washington.  And as you will see in his testimony, he has a

15    pretty obvious confluence of issues that impair his ability

16    to talk really clearly about a lot of things.  He -- if you

17    look through his records, he's got a pretty significant

18    developmental disability.  He has a pretty significant

19    personality deformity from some terrible things that happened

20    to him when he was a child.  And he also has significant

21    symptoms of some form of depression that influenced the way

22    he thinks about things.  And so what I'd like to do is play

23    about 10 minutes of his tape so that you get a sense for him

24    as a person.  And then I'm going to explain a little bit more

25    about his -- his background and situation.

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 120

1          THE COURT:  All right.

2          (Video deposition of Marcellus Washington played.)

3          MR. ARO:  So the situation that brought

4    Mr. Washington to the -- to the ADX was an incident at a

5    penitentiary down in Pennsylvania called Pollock in which he

6    was having some psychological problems, some suicidal

7    feelings.  And he -- he went to see a psychologist and tried

8    to get help from the psychologist.  The psychologist did not

9    do a suicide evaluation.  And he was put onto a list for some

10   later -- later consultation.  And after a couple of days he

11   got into an altercation with a staff member in the kitchen

12   where he was assigned to work.  Another officer intervened.

13   And he was ultimately charged with attempted murder for the

14   assault that -- that proceeded.  Was sent to the ADX back in

15   2000 -- that incident happened in April of 2002.  And I

16   believe he got to the ADX in 2004 where he was placed in the

17   control unit and remained in the control unit until he was

18   moved to a general population unit.  I believe it was in the

19   fall of 2012.  I had known him for a little while when that

20   happened.  And continued to reside in the -- the control unit

21   until he was moved to the Allenwood program.  Excuse me.

22   That's not right.  He was in the step-down program before he

23   was moved to Allenwood.  He had been in the step-down program

24   for a period of time and was functioning very highly at that

25   time, was not getting into any trouble, was doing what was

Page 121

 1   expected of him.  And while he was in that unit he was

 2   approached about the possibility of going to Allenwood.  And

 3   he and I had a lot of conversations about that because he

 4   didn't want to go backwards in terms of his security

 5   restrictions.  For the first time in years he was out around

 6   other inmates.  He was able to recreate with them.  And I had

 7   been told by the BOP and he had been told by the BOP that he

 8   would have to go back to a higher security lockdown,

 9   restraints, when you're out of your cell, sort of sitting for

10   a period if he chose to go to Allenwood.  And he and I were

11   both assured that that would be a temporary thing.  And that

12   if he did what he was supposed to be doing at Allenwood, he

13   could progress quickly back to a status where he could be

14   around people again.

15          He got to Allenwood about a year ago.  And has, I

16   think by all measures, done exactly what's been asked of him.

17   He's programming well.  He looks a lot better than he did

18   when he was at the ADX.  But he is still on a status where he

19   is restrained when he's out of his cell.  He's not allowed to

20   be around other people.  He for a very short period was able

21   to recreate with one other inmate in a -- in a joint

22   enclosure, a larger rec enclosure where the two of them could

23   interact.  And there was a verbal altercation that put an end

24   to that.  So he is -- his feelings -- and I'm going to want

25   to play part of his discussion of the settlement terms when

Page 122

```
 1   we get to that part where he expresses some of the
 2   frustration he has about the -- what he believes was
 3   noncompliance by the BOP with the understanding that he had
 4   with them about how long he would have to be locked down when
 5   he got to Allenwood.  So that's the -- the summary of his --
 6   his situation.  And from our perspective, at least, Allenwood
 7   is a terrific place for him, and we were very grateful when
 8   the BOP elected to place him there.  The last --
 9              THE COURT:  And Allenwood is the program that
10   developed during the course of this -- these discussions?
11   And it's described in the settlement agreement?
12              MR. ARO:  That's right, Your Honor.
13              THE COURT:  Okay.
14              MR. ARO:  There was a question when they -- the
15   BOP decided to move people with these conditions out of the
16   ADX, the question was where do you put them?
17              THE COURT:  Right.
18              MR. ARO:  The first program that they opened of
19   this sort was down in Atlanta.  That was opened up back in
20   2013.  Mr. Perkins, who you saw earlier today, was one of the
21   first inmates down there.  The Allenwood program is run on a
22   very similar programmatic basis in the sense that it's
23   intended for the same basic group of inmates.
24              THE COURT:  Yeah.
25              MR. ARO:  People who have schizophrenia, bipolar
```

Page 123

1   disorder, those sorts of conditions.  And I think it's

2   appropriate at some point, so I'll just do it right now, to

3   say that of the programs that have been established, it's our

4   view that that's really the shining star so far.  The people

5   in that unit are terrific.  And you really see it in the way

6   that these inmates are responding.  The last person whose

7   testimony I'm going to play actually is another inmate.

8           THE COURT:  Well, why is it that he's being

9   restrained in Allenwood?  Do you have any understanding of

10  that?

11          MR. ARO:  It's not clear to me why he is still

12  being restrained because as far as I'm aware of, he's not

13  done anything that would cause him to be set back.  I think

14  it was -- when they first opened the Atlanta program this was

15  a concern we had, and we voiced it.  And they have started to

16  move people more quickly to a place where they can be around

17  each other.  And my impression is, and I'd welcome the BOP's

18  perspective on this, is that when you open a new unit like

19  this, everybody is nervous.  They don't want something bad to

20  happen, and so they tend towards the conservative when it

21  comes to management of custody issues.  And as they get more

22  comfortable with the inmates, they're allowing people to move

23  a little bit more into these -- these freer environments.

24  From our perspective we wish they did it more quickly.  But

25  we certainly share their concern that if somebody gets hurt

Page 124

1    in one of these units, that's a problem for everybody and we

2    don't want that to happen.  When we get to the settlement

3    discussion or the views of the inmates, you'll -- I'm going

4    to read a letter to you from an inmate named Shane McMillan

5    (phonetic) who's the first -- he's kind of the star pupil of

6    the Allenwood program.  He's actually been selected to come

7    back to Colorado and be a companion in the STAGES program

8    here.  And his letter I think speaks very eloquently to what

9    that -- this program has meant to him and how good Allenwood

10   has been.

11           The next witness that we're going to see is

12   Charles Hipps who's another Allenwood inmate.  It's the last

13   one I'm going to play in this sort of segment.  And he --

14   most of the reason I'm playing his testimony is so that he

15   can tell you how the Allenwood program has affected the lives

16   of some of the inmates who are there.  Mr. Hill is there now.

17   Several other folks you've heard passing references to are

18   there now.  And it's really a night and day sort of thing.

19   And Mr. Hipps I think does a good job describing what that

20   program is about, what it looks like, and how it's helped

21   people.

22           THE COURT:  All right.

23           (Video deposition of Charles Hipps played.)

24           MR. ARO:  I'm going to skip a long section of his

25   testimony concerning his background.  The -- the high points

Harold Cunningham, individually, et al. vs.                                    Fairness Hearing - Day 2
Federal Bureau of Prisons                                                      December 16, 2016

Page 125

```
 1   are that for a time he had served time in an Arkansas
 2   Supermax called the Tucker Max that you'll hear referred to
 3   very obliquely a couple of times.  And was released directly
 4   from that program to the street having received no treatment
 5   of any kind, and some -- served some pretty hard time that he
 6   described when he was there.  When he got out he was --
 7             THE COURT:  Was that a federal facility?
 8             MR. ARO:  It's a state facility.
 9             THE COURT:  Yeah.
10             MR. ARO:  It's the state of Arkansas.
11             THE COURT:  Okay.
12             MR. ARO:  He returned to his home stomping grounds
13   which is southern Illinois.  And I asked him if he felt he
14   had changed in Tucker, and he said no, but other people told
15   him he had.  And he described a series of incidents of
16   bizarre and at least planned violence involving threats
17   against other people and admissions to psychiatric hospitals,
18   and taking medications, and all sorts of other things.  And
19   so the history in the records of that are pretty well
20   developed about a descent into pretty aberrant behavior, most
21   of which happened after he got out of that Tucker Max prison.
22             THE COURT:  Okay.
23             (Video deposition of Charles Hipps played.)
24             MR. ARO:  This is also one of the folks who was
25   evaluated and diagnosed with a disorder that was a major
```

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 126

1    mental illness or a serious mental illness in those

2    August 2014 evaluations.  And there was a -- following that,

3    there was a dispute about whether he did or did not qualify,

4    that ultimately was resolved in favor of sending him off to

5    Allenwood about a year after those evaluations.

6            THE COURT:  How does he get access to wine?

7            MR. ARO:  He makes it.

8            THE COURT:  How?

9            MR. ARO:  As I understand the process, they use

10   bread as a yeast source, and they use fruit juice as a sugar

11   source.  And they put it in a plastic bag and keep it warm.

12   And after a few days they have something that you and I

13   probably wouldn't recognize as wine, but it works for them.

14           THE COURT:  Okay.

15           MR. ARO:  And we have one more clip where he talks

16   about some of the programming and people at Allenwood.

17           THE COURT:  Yeah.

18           MR. ARO:  And then we're done.  We've got about

19   20 minutes left.

20           THE COURT:  All right.

21           (Video deposition of Charles Hipps played.)

22           MR. ARO:  There's a very short cross and redirect.

23   It runs about nine minutes.  Do you want to just finish that?

24           THE COURT:  All right.  Yes.  Let's go through it.

25           (Video deposition of Charles Hipps played.)

Page 127

```
 1              MR. ARO:  That concludes our presentation of the

 2    vid- --

 3              THE COURT:  I'm a little --

 4              MR. ARO:  Say again?

 5              THE COURT:  -- confused about his saying things

 6    are not going to get better than they are now.

 7              MR. ARO:  So what I think he's referring to is,

 8    he's one of a number of inmates who haven't necessarily

 9    objected to the settlement, but express concerns about the

10    period of monitoring.

11              THE COURT:  Yeah.

12              MR. ARO:  And the idea that -- that practices may

13    regress once that monitoring is over.

14              THE COURT:  I see.

15              MR. ARO:  And we explained to him that the

16    negotiated agreement actually provides for more monitoring

17    than you would typically be able to impose under the PLRA.

18    And I think that's what that reference was about.

19              THE COURT:  Okay.

20              MR. ARO:  It's not going to get any better than

21    we've negotiated is what he's saying.

22              That concludes the presentation of the information

23    about the -- the background of the case.  And I really

24    appreciate the Court's indulgence in allowing us to do that,

25    and to submit the testimony in full for the record that these
```

Page 128

```
 1   inmates have given.
 2           We have -- I want to make a few remarks when we
 3   come back from break presumably about the way the settlement
 4   came together in this case so you understand the evidence on
 5   the question that this was certainly a fairly negotiated
 6   deal.  And then spend the rest of our time this afternoon
 7   talking about the enforcement provisions.  It is our
 8   impression that you have read and don't have a lot of
 9   questions about the policies and the sort of medical
10   procedures.
11           THE COURT:  Right.  And, you know, how do I
12   evaluate that?  I don't have the skill, the competence, the
13   learning.  I rely on the people you relied on.
14           MR. ARO:  That -- all that we really have to say
15   about that, Your Honor, is that the experts, Dr. Johnson on
16   behalf of the government, Jeff Metzner on our side, were
17   involved literally from the first probably month of the
18   settlement negotiations, and they negotiated these policies,
19   they reviewed them, and --
20           THE COURT:  Yeah.  I saw that in your motion.
21           MR. ARO:  And they were prepared to a degree that
22   Dr. Metzner on behalf of the plaintiffs has indicated that he
23   is -- is satisfied with.  And if he's satisfied, we're
24   satisfied.
25           THE COURT:  Yeah.
```

Page 129

```
 1          MR. ARO:  So certainly we're prepared to address
 2   any questions, but that's -- that's really the fundamentals
 3   on the policies.  Are there other questions other than the
 4   way that this enforcement mechanism works that you'd like us
 5   to be prepared to address up-front when we return?
 6          THE COURT:  Well, I suppose what we've just talked
 7   about goes to this adequacy.  You know, adequacy is --
 8   ordinarily in a class action settlement we look to whether
 9   the relief is adequate to the complaint or the violation.
10   And in this case I don't think we measure adequacy quite in
11   that way.  It is more of a matter of -- it -- what I'm
12   thinking about is you're not -- the settlement and all of
13   that is not going to in and of itself remedy the difficulties
14   that are involved with the people who come into this system
15   with the security needs as well as their human needs.  And
16   I -- as I listened to all of this and I think back to all the
17   people I've put in prison over all these years, and complied
18   with guidelines when they were strict, I just wonder, I have
19   to admit, how much our penological -- our criminal justice
20   system has changed.  And there's very little in the criminal
21   justice system now that there was before sentencing
22   guidelines and Sentencing Reform Act where individual
23   characteristics of a person convicted of a crime can be
24   considered by a judge.  I -- well, I think there's an
25   awareness that I was one of those, along with Judge Kane on
```

Page 130

1    this Court, who thought the whole thing was unconstitutional.

2    But the Supreme Court yielded, and it just -- when I hear

3    some of these sentences, like 30 years for throwing a Molotov

4    cocktail at a Jewish temple, I just wonder.

5              MR. ARO:  I think that our impression, Your Honor,

6    and this is a little bit afield, but I think it's important

7    to acknowledge that the -- the Bureau has an exceptionally

8    challenging job dealing --

9              THE COURT:  They do.

10             MR. ARO:  -- with mental illness broadly.  There

11   are amazing graphics showing that as the -- the

12   deinstitutionalization movement in the 1960s and 1970s began

13   to shut down state mental hospitals, the population --

14             THE COURT:  Right.

15             MR. ARO:  -- of the prison system exploded.  And

16   jails and prisons to a very large extent have become the

17   mental health resource of last resort for a lot of folks.

18   And, you know, we recognize, and have said to the government

19   many times, that the people that we represent are not

20   often -- often not easy to deal with.  There -- some of them

21   are very violent.  Some of them are very unstable.  We've

22   been exposed to some of the ramifications of that.  The

23   correctional officers and staff members are exposed to that

24   every day.

25             And when we set out to try to understand how this

Page 131

1   can be done, one of the first resources we looked to was a

2   guy by the name of Steve Cambra who is a California

3   corrections officer who was put in charge of the Pelican Bay

4   facility after the Madrid v. Gomez case that changed the way

5   that they were dealing with mental health out there.  And he

6   provided a lot of guidance to us and to Jeff Metzner, who he

7   worked with on that case, about how you deal with psychotic

8   dangerous inmates like we're talking about, and how you

9   conceive a system where they can get the care that they need

10  and have their humanity respected while protecting staff

11  members as well.

12          And we did not set out in this case necessarily to

13  force the Bureau to create programs of the sort that you've

14  heard about.  The case essentially said, Wherever you choose

15  to house these people you have to provide adequate treatment.

16  And when they made the decision to create these programs and

17  develop them and staff them with the people they selected, we

18  obviously were gratified by that.  You heard Mr. Hipps talk

19  about Dr. Malice (phonetic) Feeney (phonetic).  She's the

20  program coordinator at Allenwood.  And she's extraordinary.

21  And the initial program coordinator in Atlanta is a --

22  Dr. Diana Sheller (phonetic) was her name then.  She's now

23  taken a married name, Dr. Hamilton.  Extraordinary, decent,

24  compassionate person who made a huge difference when given

25  the resources and the physical plant to deal with these

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 132

 1   folks.  And so we would be terribly remiss if we didn't

 2   acknowledge the challenge.

 3            And part of it is what you said, Your Honor.  The

 4   sentences are difficult.  And judges have less discretion

 5   than perhaps they want or need.  But the failings of our

 6   society to deal with the mental illness that some of our

 7   citizens suffer from, and the fact that we --

 8            THE COURT:  As children.

 9            MR. ARO:  From -- I mean, you heard the stories.

10            THE COURT:  That's --

11            MR. ARO:  Most of these guys never had a chance

12   from almost --

13            THE COURT:  Right.

14            MR. ARO:  -- the moment of conception.  And it's

15   not all that much of a surprise that they do things that they

16   do given the histories, so --

17            THE COURT:  Well, these things are beyond my role

18   here, but I can't help but reflect on the enormous problem

19   that we have as a society.

20            All right.  We'll take 15 minutes.

21            MR. ARO:  Thank you, Your Honor.

22            THE COURTROOM DEPUTY:  All rise.  Court is in

23   recess.

24            (Recess from 3:30 p.m. to 3:43 p.m.)

25            THE COURTROOM DEPUTY:  All rise.  Court is in

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 133

 1   session.

 2            THE COURT:  Be seated, please.  We need to talk

 3   about the objections, don't we?

 4            MR. ARO:  I think we do, Your Honor.  What we were

 5   planning to do was deal with the remedies and the questions

 6   about the jurisdiction and enforcement issue this afternoon.

 7   And to the extent we have time after that, talk about the

 8   remedies.  I'm sorry.  Talk about the objections.  And the

 9   way I propose to do that, if it's okay with the Court, is

10   there are a couple of specific objections that you've alluded

11   to before.  Some people want money.  There are other --

12            THE COURT:  Right.

13            MR. ARO:  -- certain group objections that I want

14   to speak to.  And there's one inmate in particular who if

15   you're interested in hearing his views about the

16   compensation, the history of that, I have video that is

17   specific to that issue as representative of the rest of these

18   inmates.  And this is a huge issue for a number of them as it

19   relates --

20            THE COURT:  Of course.

21            MR. ARO:  -- to money generally and as it relates

22   to the attorney fee award and how that's being utilized.  I

23   also have a couple of letters from two plaintiffs who have --

24   who declined to give video statements, but have written

25   letters to me that they asked that I read to you so they

Page 134

1   understand -- you understand their views.  And I've got

2   letters from two other inmates who I think speak for a broad

3   group of inmates out there that I'd like to read to the Court

4   as well as part of that process.

5              THE COURT:  Well --

6              MR. ARO:  It's our view, as you know, that the

7   Court should approve it over those objections.  But I also

8   told all of our clients that I was going to make it very

9   clear to you what their issues are and --

10             THE COURT:  Well, I -- I need to hear that.

11             MR. ARO:  You bet.

12             THE COURT:  And I would rather do that now.

13             MR. ARO:  Okay.

14             THE COURT:  And come to this fresh Monday to

15  discuss the legal aspects of the settlement, including

16  enforcement mechanism.

17             MR. ARO:  Okay.

18             THE COURT:  Because to be candid, I'm somewhat

19  exhausted emotionally.  I mean, even judges have emotions.

20  And --

21             MR. ARO:  That -- there's a rumor to that effect,

22  Your Honor.

23             THE COURT:  Yeah.  And what I've heard the last

24  two days is just disturbing on a human level as well as a

25  legal level.  So I would like to hear more about -- hear from

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 135

1    the objections and be a lot fresher on Monday to discuss what

2    we do here.

3               MR. ARO:  That's fine with me, Your Honor.  I

4    actually have prepared a PowerPoint presentation that allows

5    me to walk through what those objections look like, if that's

6    all right with you.

7               THE COURT:  Oh, I hate PowerPoint, but it may

8    help.

9               MR. ARO:  You'll --

10              THE COURT:  I mean, the technology.  It sounds

11   like -- it always sounds like a sales meeting.

12              MR. ARO:  Well, I'll try not to make it too much

13   of a -- of a sales meeting.  And the -- the first person I

14   want to -- to -- actually, before I do this, there are, I

15   think, two big concerns that have been voiced by groups of

16   inmates that are -- that concern matters that I don't think

17   the Court has the ability in this case to deal with.  One is

18   the compensation issue.

19              THE COURT:  Right.

20              MR. ARO:  And the other issue is there -- there

21   have been, I don't know, maybe a half a dozen inmates who in

22   various ways have spoken to their desire that the Court grant

23   them additional specific injunctive relief that relates to --

24   to two items.  One is the good time credit that they lost for

25   incidents that they believe and, frankly, in some cases we

Page 136

```
 1   believe were precipitated by untreated mental illness, where

 2   they got in trouble, lost good time and, therefore, extended

 3   their sentences because of the things that we've talked about

 4   here.

 5            Another issue that particularly Mr. Powers feels

 6   very strongly about is compensation that covers fines and

 7   encumbrances for breaking cells and other damage to

 8   government property that was precipitated by the same set of

 9   circumstances.

10            THE COURT:  Yeah.  Remind me about good time

11   credits.  You know, I've been out of the criminal side for a

12   while, but my recollection is that under the law you can earn

13   good time credits up to 54 days a year but it's discretionary

14   with the Bureau of Prisons.

15            MR. ARO:  My understanding, and I may be the worse

16   situated person in the room to do this, but my understanding

17   is that they can earn around 50 days per year against their

18   sentence.

19            THE COURT:  Right.

20            MR. ARO:  And that as a general proposition to

21   qualify for that they have to avoid any kind of serious

22   misconduct.

23            THE COURT:  Yeah.

24            MR. ARO:  Is that --

25            THE COURT:  But I don't think --
```

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 137

1          MR. ARO:  -- basically right?

2          THE COURT:  I don't think it's possible to -- for

3    a judge to order the application of good time credits

4    contrary to the decision of the warden or the committee or

5    whoever does that.

6          MR. ARO:  So --

7          THE COURT:  I think that's --

8          MS. PADDEN:  May I address that, Your Honor?

9          THE COURT:  You know, I had this issue come up

10   when I was very active on the criminal side.

11         MS. PADDEN:  Right.  It's my understanding, the

12   inmates can appeal through the administrative remedy process

13   if they're not happy with the result.  They could file a

14   habeas petition, and that would be the right way to ask the

15   Court to --

16         THE COURT:  Yeah.  But I don't --

17         MS. PADDEN:  -- reinstate the good time credits,

18   but --

19         THE COURT:  I don't think I've ever seen a habeas

20   case granting good time credit.

21         MS. PADDEN:  It's a very hard standard to meet.

22   It essentially has to -- they have to show there's no

23   evidence to support the underlying charge.

24         THE COURT:  Yeah.  Okay.

25         MS. PADDEN:  But we do see these cases from time

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 138

1    to time.

2            THE COURT:  All right.

3            MR. ARO:  So those are two broad categories.  And

4    then there are inmates who run the entire gamut of other

5    types of relief that are specific to those individuals --

6            THE COURT:  Yeah.

7            MR. ARO:  -- such as Mr. Washington, the inmate

8    with the orange hat that testified only very briefly.  I

9    would like very much either this afternoon or on Monday to

10   play a short excerpt from his testimony where he and I went

11   around and around on the extent to which the terms of the

12   settlement limit the Court's ability to grant injunctive

13   relief that relates to certain issues.  And I will tell the

14   Court that I think, based on many conversations with him, and

15   I'm not a psychological expert, but I'm not sure he has the

16   capacity to understand a lot of the legal issues that he is

17   concerned about.  And he is very concerned, as you've seen in

18   the many filings that he's made in the case, pro se filings,

19   including one that I believe you received in the last week or

20   so called a memorandum of fact.  It has not shown up on the

21   docket.  I have a copy of it if Your Honor would like to --

22           THE COURT:  Yeah.  I don't -- I don't think we did

23   docket that, did we?  But some of these things that have come

24   in I didn't send over to be docketed that were directed to me

25   because I've been uncertain as to whether the author is fully

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 139

1    aware of the public access to these submissions, you know.

2    I'm not sure they understand.  Well, I don't expect them to

3    understand the PACER system.

4              MR. ARO:  I think it's fair to say that in the

5    case of the inmates such as Mr. Cunningham and Powers who

6    filed things that were styled as pleadings --

7              THE COURT:  Yeah.  They're --

8              MR. ARO:  -- they understand and desire a public

9    hearing on these issues.

10             THE COURT:  I do --

11             MR. ARO:  I think you're probably right that other

12   inmates may not fully understand the implications of a public

13   filing.  And we appreciate your --

14             THE COURT:  Yeah.

15             MR. ARO:  -- discretion around those issues.

16             THE COURT:  Okay.

17             MR. ARO:  The history of the compensation issue is

18   a tortured one in this case.  Briefly, at the outset of the

19   case we were concerned that any effort to involve a monetary

20   damages claim, because we heard a lot about that in our

21   interactions --

22             THE COURT:  I'm sure.

23             MR. ARO:  -- would create all kinds of problems.

24   And so from the very outset we told folks in our interviews

25   and in our engagement letters that this was not a money case,

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 140

1    that we didn't anticipate a money remedy.  And that was a
2    constant incantation.  That didn't mean that people, the
3    inmates, accepted it, but that was our side of the story.
4              THE COURT:  That was my view of the case at the
5    time of the motion to dismiss.
6              MR. ARO:  I think you asked that question.
7              THE COURT:  Yeah.
8              MR. ARO:  Back in the spring of 2014 we had the
9    first settlement conference down at the prison, at the ADX
10   that was presided over by Judge Hegarty.  He and I were down
11   there.  And Mr. Cunningham was there.  Mr. Powers was present
12   by video I think from Springfield, but he might have been in
13   Tucson at that time.  Mr. Shaffer was also on video.  He was
14   in a prison in Florida.  He's a now -- no longer a plaintiff
15   because he's been released from BOP custody.  And there were
16   several other inmates there.  Mr. Narducci, who was also a
17   plaintiff before, and who's also been released.  And in the
18   course of that meeting Mr. Cunningham raised with everyone a
19   very strident request for compensation.  And without getting
20   too far into the weeds, the -- there was a discussion of
21   whether there was a way to divert or to set aside an attorney
22   fee award to create some kind of a compensation pool.  And at
23   that time I didn't have any idea whether there was even a
24   mechanical way to do that.  And I raised questions about the
25   ethics of that.  And I raised questions about the need for

Page 141

 1    Court approval of anything that would happen along those

 2    lines.  And following those discussions, we made a formal

 3    proposal, as part of the back and forth with the government

 4    over the settlement terms, that they consent to the

 5    establishment of a compensation pool to be divided in some

 6    respect among the inmates who had been identified by name in

 7    the complaint because there's case law suggesting that even

 8    in a class action if the plaintiffs or some subset of the

 9    class suffered a unique, distinct harm from the other class

10    members, separate compensation or benefit may appropriate for

11    those people.  And the government declined to consent to that

12    compensation idea.  And because there was no claim in the

13    case that would enable the Court to grant a monetary remedy,

14    and because we had not been able to -- to negotiate what had

15    been requested by our clients, we went back to them and

16    explained to the ones who were concerned about

17    compensation -- and by no means is that all of them.

18    Mr. Houston, as a really good example, in the testimony he

19    gave concerning the settlement several times volunteered,

20    This has never about -- been about money.  I've never talked

21    to you about money once.  I'm not interested in money.  And

22    it's never been the thing for him or most of these other

23    inmates.  But for Mr. Gillespie and Mr. Cunningham and

24    Mr. Powers, in particular, it's become a very significant

25    issue.  And in the case of Mr. Cunningham, it's become, as I

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 142

1   understand it now, his only issue.  We tried to schedule

2   videotape testimony like we did for the other inmates and he

3   declined to communicate with us about that.  He is very angry

4   and feels that back in 2014 he was promised money.  And I

5   think he had had it in his mind that that was just going to

6   happen even though we were very surgical and precise about

7   what was -- what was and what was not necessarily possible.

8   And he has now stepped outside of our direct representation.

9   He's asked -- asked to represent himself.

10             THE COURT:  Right.

11             MR. ARO:  He wants to pursue a monetary claim in

12  this case.  And just to tie this idea off, one of the very

13  heavily negotiated provisions of this agreement was the

14  release language and the exclusions from the scope of the

15  release for inmate claims for monetary damages.

16             THE COURT:  Yeah.

17             MR. ARO:  To preserve any claims that those folks

18  have.  We also --

19             THE COURT:  Well, you know, there's statute of

20  limitations problems.

21             MR. ARO:  That's exactly right.

22             THE COURT:  And in addition to that, I'm imagining

23  that some of these people have financial obligations by an

24  order of restitution and fines.

25             MR. ARO:  Many of them do.  And in our

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 143

1   discussions -- I'm glad you raised this because in our

2   discussions with the government before saying no, the

3   government said, If this ever were possible we would need the

4   money to go into their inmate accounts so any claims or any

5   liabilities they have --

6           THE COURT:  Right.

7           MR. ARO:  -- are satisfied.

8           THE COURT:  Right.

9           MR. ARO:  And we had no objection to that idea.

10  So I think the way I would -- would summarize the

11  compensation objection is that many of these folks, some a

12  long time ago, some recently, were injured in ways that

13  potentially may give rise to a claim for damages against

14  individuals or against the government.

15          THE COURT:  Well --

16          MR. ARO:  And they feel very strongly about that.

17  Another objection --

18          THE COURT:  Well, I don't think they -- you know,

19  they may have some Bivens claims against individuals, but

20  that's way beyond what we can do here.

21          MR. ARO:  Well, I think that's right.  And for

22  some of these guys it really is a financial issue.  For some

23  of them it's an accountability issue.  And I recently

24  received a letter from Carlton Dunbar, the inmate who told

25  you that he would have loved to have seen you at trial, just

Page 144

 1   as a reminder of who we're talking about --

 2              THE COURT:  Yeah.

 3              MR. ARO:  -- who said he initially supported the

 4   settlement.  Judge Hegarty and I had gone to see him.  We

 5   talked to him.  And he was supportive of it.  He wasn't happy

 6   about it, but he understood what we were doing.  And he wrote

 7   me a letter two weeks ago or 10 days ago saying that he now

 8   opposes the settlement.  And the reason he opposes it is

 9   because he doesn't believe the government is being held

10   accountable for anything.  He believes that -- and if Your

11   Honor will permit, I will actually -- can read the letter to

12   you because I think it speaks quite eloquently --

13              THE COURT:  Go ahead.

14              MR. ARO:  -- of his feelings about this.

15              THE COURT:  Somebody will probably think some of

16   these government people ought to be in prison with them.

17              MR. ARO:  That's true, Your Honor.  Would you put

18   up Exhibit 734, please?  And, Amy, before that comes up, I --

19   this is one that we sent over to you late.  It was

20   inadvertently omitted from our -- from our binder.  Do you

21   have any objection to me offering it as --

22              MS. PADDEN:  No.  That's fine.

23              MR. ARO:  Okay.  So we'd offer Exhibit 734 by

24   stipulation.

25              THE COURT:  All right.  Received.

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 145

```
 1              MR. ARO:  And his handwriting is a little bit
 2    squirrelly, so I'll -- I'll read it for you.  Attorney at
 3    Law, Edwin P. Aro, Hello, counselor.  I received your recent
 4    legal mail containing the letter and the copy of the proposed
 5    settlement.  I read your letter several times.  I'm very
 6    happy and proud that some of my -- or that my co-plaintiffs
 7    strongly oppose the settlement and want a trial.  Without
 8    compromising privilege, I had informed folks that there was a
 9    difference of opinion about the advisability of a settlement.
10              I'm very happy and proud to be -- excuse me.
11    Although I had initially felt that the settlement proposal
12    was nice, however, I never felt content with ADX officials
13    not being held accountable, liable for their many deliberate
14    violations of all of our constitutional rights.  We came --
15    or -- oh, we've come too far in this landmark demonstration
16    case to just throw in the towel without a fight.  I do
17    apologize for my indecisiveness in regards to the settlement
18    proposal, but I have changed my mind and would like you to
19    disregard my October 25 deposition for settlement.  I do not
20    want to settle and -- out and give the government a pass to
21    escape accountability.  I want to go forward with a trial in
22    front of the Honorable Judge Matsch so the law can decide who
23    is right or wrong based on evidence presented.  I don't care
24    how long the trial take (sic).  I don't care about the
25    penalties -- or politics and logistics about our case.  We
```

Page 146

```
 1   want fair justice under law.  Who -- your trial expertise and
 2   our evidence together makes us a favorite to win at trial,
 3   and the appeal issue -- as well, I think he says, or the
 4   appeal -- the appeal level.  I also don't really care if we
 5   don't get everything we ask for at trial because many of the
 6   things offered in the settlement would not benefit the actual
 7   plaintiffs anyway because most would be transferred.  If this
 8   case was about monetary damages, their --
 9            MS. PADDEN:  Negotiations?
10            MR. ARO:  -- negotiations could be entertained and
11   considered.  This case is about justice, and make sure the --
12   those who are responsible for their unlawful behavior towards
13   us are held accountable.  Please inform all of my
14   co-plaintiffs that I strongly oppose the settlement and will
15   not accept it -- will only accept a trial from the
16   government.  Landmark cases as monument as this must be
17   litigated at trial because we can set a legal precedent if we
18   win, but most importantly, we will have a very rare
19   opportunity to expose these federal thugs in front of the
20   world.  I have absolutely no remorse for the feelings of the
21   defendants or the US attorney because I know they really
22   don't care about me at all.  I'm going to trial, Ed.  I've
23   already notified Judge Matsch of my new decision here.  I'm
24   not happy at USP Lee in the SHU.  I'm being taunted and
25   harassed and retaliated against by federal officials in SHU.
```

Page 147

 1    And he signs it, Original plaintiff, Carlton Dunbar.

 2              What he and others have said to me over and over,

 3    and, frankly, it rings true to me, Your Honor, is that every

 4    single thing these guys do, they are held very strongly

 5    accountable for.  When they break a rule, they go to the SHU.

 6    They get their property taken away.  They get additional

 7    time.  They're charged with crimes.  And without ascribing a

 8    criminal motive to the people at the BOP, you've heard

 9    evidence in the last couple days of things that, as you

10    describe them, are deeply disturbing.  And Mr. Dunbar feels

11    very strongly that nobody at the BOP is held accountable.

12    Inmates know that when he left the ADX back -- not too long

13    after this case was filed, he was just moved across the

14    street to the United States penitentiary where at least for a

15    period he continued to work.  I don't know if he's still

16    there today.  But from their perspective, nobody got fired,

17    nobody got disciplined, nobody got investigated, nobody got

18    anything in terms of the government employees who did what

19    they did being held responsible.  And to me it's one thing to

20    say, I want money, money, money, money to -- from a personal

21    greed standpoint.  But I do have, even though I have not

22    advocated for and don't support a monetary remedy in this

23    case for the plaintiffs, I do have a great deal of empathy

24    for their view that given the extent to which the Bureau of

25    Prisons has held them accountable for years, the fact that

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 148

1    literally nobody was held accountable for what happened to

2    the guys that you've seen testifying is very distressing to

3    them, and they feel that at a very, very deep level.

4            THE COURT:  Yeah.

5            MR. ARO:  I will also tell you that Mr. Dunbar, in

6    the letter we just read, was focused on the plaintiffs, and

7    what the plaintiffs' rights are.  My fiduciary obligation is

8    to the class members.  And I have a very grave set of

9    concerns around the interests and rights of the class members

10   that I have to balance against the desires of the plaintiffs,

11   whether it's for money or any other remedy.  And without

12   getting too far into the weeds on that, I think it's

13   important to say that even though we recognize and appreciate

14   the many improvements that have been made at the ADX, there's

15   still serious problems there.  Ronnie Houston is down there

16   today still.  Now, he's headed to another prison we believe

17   relatively soon which we think is good.  But more than two

18   years ago outside experts that they picked identified him as

19   somebody who didn't belong there, and the fact that he's

20   still there means something was not working correctly.

21           There's another inmate down there.  His name is

22   Erwin Villatoro.  There are records in the stipulated

23   exhibits concerning Mr. Villatoro who was diagnosed a year

24   and a half ago with a serious mental illness, bipolar

25   disorder.  Nothing happened.  Recently the BOP put him

Page 149

```
 1    through a -- part of the process that actually came from this
 2    lawsuit.  When an inmate has been diagnosed with a serious
 3    mental illness they are to be excluded from the ADX unless
 4    they present extraordinary security concerns that can't be
 5    met at another institution.  They've set up a process which
 6    we, from what we can tell, has worked pretty well to figure
 7    out who the people are, who they have to keep at the ADX
 8    because of these special high security concerns.  And they
 9    put Mr. Villatoro through that process.  There's a memo in
10    the exhibits that refers specifically to the fact that he has
11    a serious mental illness.  And they determined that he is
12    not -- he doesn't present extraordinary security concerns,
13    which ordinarily the way the policy would work requires his
14    transfer.  Shortly after he received that memo, he got into a
15    disagreement with a psychologist who remains at the ADX and
16    who, in our view, is one of the major remaining problems at
17    that institution.  And shortly after this confrontation he
18    was delivered another memo saying, Oops, we made a mistake.
19    You don't have a serious mental illness.  He received that
20    memo three weeks ago.  So all of a sudden we've got a doctor,
21    Dr. Moody, who we've talked about extensively, saying, You
22    have bipolar disorder.  You're disqualified from being here.
23    We've got the administrative review process to transfer him
24    saying he doesn't present extraordinary security concerns.
25    He gets into it with a psychologist and his diagnosis
```

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 150

1   apparently, based on the paper we have, is changed.  That's a

2   problem.  We believe that that kind of thing is much less

3   likely to happen with monitors who actually hold --

4           THE COURT:  Yeah.

5           MR. ARO:  -- these people accountable.

6           THE COURT:  Well, that's -- you know, two things.

7   One is, I believe that it is a part of this process to pay

8   attention to the alternative, a trial, and the risks of

9   trial.

10          MR. ARO:  Absolutely.

11          THE COURT:  That's part of the law.  It's part of

12  what the concern is here.  And I'm sure that some of these

13  people are unaware of the difficulties at trial of this case

14  if this were to go forward with a class action trial or

15  individual plaintiffs trial because there's a problem with

16  class action for purposes of trial, and that's commonality

17  and represen- -- representivity.  Those are requirements

18  under 23(a).  And I don't know that the plaintiffs could meet

19  that.  So the first thing is, it's questionable whether there

20  could be class certification for trial.  The second thing is,

21  the risks attendant upon a trial with respect to outcome.

22  And, you know, this is an Eighth Amendment case.  And the --

23  there is the issue of deliberate indifference, and there is

24  also the issue of the security.  You know, these people who

25  are here, they're in prison for a reason.  And there's some

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 151

 1   very serious criminal conduct here.  And there's a very
 2   legitimate reason for a -- well, an absence of trust with
 3   respect to the conduct of an inmate under these circumstances
 4   with these records.  So a part of the question of approval or
 5   disapproval of the settlement does include some record of the
 6   alternative.
 7         MR. ARO:  We agree with that.  We also would agree
 8   that the PLRA presents a series of challenges.  We also
 9   recognize that the Court's ruling concerning the
10   associational standing of the disability law of Colorado, we
11   think it was right, but --
12         THE COURT:  But it hasn't been affirmed.
13         MR. ARO:  Yeah.  That doesn't mean the Tenth
14   Circuit would agree with us.
15         THE COURT:  Yeah.
16         MR. ARO:  And --
17         THE COURT:  We also remember Vega.
18         MR. ARO:  We do.  And we are very mindful of those
19   risks.  And as we were thinking about this process, and --
20   and, you know, I should add that during this -- this
21   settlement process we were advised and were consulting not
22   just with psychiatrists and correctional experts, but also
23   with some of the smartest prison litigators in the country.
24   We were talking to the head of the ACLU's National Prison
25   Project.  We were talking with a woman named Margo Schlanger,

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 152

1  who you'll hear more about when we talk about this remedy

2  structure, who spend their whole lives doing this work and

3  trying to understand what's enough, and how do you position

4  this case to maintain the gains that you have achieved, and

5  about some of the risks of litigation that you're speaking

6  to.  So we are as mindful as people in our position could be

7  about those issues.  And this is also from -- we just talked

8  about the legal challenges.  The factual challenges in this

9  case are significant.  There's a lot of information.  It's --

10 a lot of it is in a very difficult form to present.  It's

11 complicated.  These people have complicated stories.  They

12 are unstable, many of them, not all, but many.  The --

13 managing the relationships with these folks long enough to

14 get through a trial without some sort of a fracture is a real

15 cause for concern, so --

16        THE COURT:  There could be issues with respect to

17 the competence of a witness.  And there are certainly issues

18 with respect to credibility.

19        MR. ARO:  Yep.

20        THE COURT:  And, you know, I know that you are

21 aware of this as I am, but I think we need to show it in a

22 way that at least it can be shown to the objectors.  I'm

23 talking about a record and an order that makes findings with

24 respect to these points.

25        MR. ARO:  I think that's true.  I am sure that I

Page 153

```
 1   will receive requests for the transcript from this hearing
 2   which will be read with meticulous interest.  And I -- I
 3   think, as I said earlier, I think that these concerns are
 4   serious.  You know, you at a status conference that we had, I
 5   think it was the one we saw you for in October, you asked us
 6   about a letter that you'd received from an inmate -- a former
 7   BOP inmate named Richard McBee who raised questions about
 8   whether the settlement addressed to a sufficient extent
 9   concerns around transgender, treatment for gender
10   dysphoria --
11            THE COURT:  Yeah.
12            MR. ARO:  -- and -- and his -- his situation.  And
13   there are a whole lot of reasons why I think that's beyond
14   the scope of this case.  Mr. McBee, as I understand it, is no
15   longer in federal custody.  That would be one reason that
16   he -- that what we do here doesn't necessarily impact him
17   individually.  He also is concerned about an economic remedy.
18   And as we've talked about, he's not precluded from pursuing
19   that, but that doesn't mean his concerns aren't valid and
20   appropriate.  And we -- we welcome the -- the Court's
21   attention to them -- to all of them.  The -- there are
22   comments that have been submitted to the Court that are quite
23   supportive and appreciative of what's been achieved here.
24   And I think those comments are worthy of consideration as
25   well.
```

Page 154

```
 1              There are -- going back to Mr. Washington, and I
 2   don't know how exactly you'd like me to do this because I
 3   know we're -- it's late in the day today.  But to your
 4   question about competence that you just raised, and on the
 5   question of the extent to which we have tried to make a
 6   complicated thing comprehensible to people who sometimes have
 7   a hard time understanding complicated ideas, there is a
 8   section of his testimony that I'd like to play I think Monday
 9   because I want to cut it down to just really the key so you
10   can see how the -- the minds of the folks who are submitting
11   all this paperwork to you work because he's -- he's -- he's
12   not the only one who thinks about these things that way.
13              So with that, I think I can quickly clip through
14   the positions of the individual plaintiffs just so they're on
15   the record --
16              THE COURT:  Right.
17              MR. ARO:  -- and you understand how each of them
18   come at this.
19              THE COURT:  All right.
20              MR. ARO:  This is the -- the one plaintiff who
21   testified, Alphonso Blake is his name.  He's the one
22   plaintiff who testified -- made a statement whose video you
23   have not seen.  The reason for that is what he said is
24   largely duplicative of other inmates' testimony.  And I
25   didn't want to take up the time to just add more of the same.
```

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 155

1    I have a short bit of video that I'd like to show at some

2    point to you so you get a sense of who he is as a person.

3    His basic concern about this -- the settlement is he's

4    worried -- he wants to fight.  He wants to go to trial.  He's

5    a lot like Dunbar in the sense that he just doesn't believe

6    that the BOP is being held accountable in a meaningful way.

7    And he also is just somebody who's prone to want to argue

8    everything.

9              THE COURT:  Or fight.

10             MR. ARO:  He will tell you.  Yeah.

11             THE COURT:  Yeah.

12             MR. ARO:  He's -- he just likes to fight.

13             THE COURT:  Right.

14             MR. ARO:  But I think he recognizes that a lot of

15   good has come out of the case and the settlement.  And

16   it's -- he also says that this whole process has been -- he's

17   been worn down by it.  It's hard on him to be part of this

18   process.  And I think he's -- he's resigned to the idea that

19   he'd rather fight, but he accepts the terms of the settlement

20   as far as they go.

21             Scott Fountain is one of the two -- one of the

22   three named plaintiffs who did not record videotape.

23   Mr. Fountain is in the unit down in Atlanta, USP -- the

24   high-security mental health step-down unit.  He's 57 years

25   old.  He grew up in suburban Phoenix, in Florence, Arizona.

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 156

 1   And he's serving life in prison for his involvement in the

 2   murder of a BOP correctional officer named Boyd Spikerman in

 3   January of 1984 at a medium security BOP facility up in

 4   Oxford, Wisconsin.  He was one of the earliest inmates to

 5   arrive at the ADX back in 1995 and spent a very long time

 6   there.  His diagnosis is the same as Richie Hill's.  He

 7   suffers from schizoaffective disorder which is pretty well

 8   controlled on medication.  And he's been a -- I don't know if

 9   model inmate is exactly the right word because he does get

10   grumpy from time to time, but he is complying with the rules.

11   He's one of the most -- he's advanced the furthest in the

12   pro- -- the -- the program, and is now allowed out of his

13   cell to have lunch with other inmates and is able to function

14   very well around other folks.  When I met him he had a hard

15   time even coming out of his cell because of his intense

16   paranoia.  And he will be the first to tell you that this

17   case has made a huge difference to him.  He's one of two

18   inmates who's written a letter.  And I'd like to read that to

19   you just for the record.

20            THE COURT:  All right.

21            MR. ARO:  If you'd put that up.  It's 528, Dan.

22            When he declined, Your Honor, to make a videotape

23   statement, I at least asked him to write this letter so you

24   understood how he felt about this.  It runs for several

25   pages.  But I'd like to have it in the record.

Page 157

```
 1              THE COURT:  All right.
 2              MR. ARO:  To Honorable Judge Matsch.  Sir, I was
 3    asked by counsel to submit a letter to you setting forth my
 4    position regarding the settlement agreement.  I am happy to
 5    do so.  I'm 56 years old and was at the ADX from 1995 to
 6    2014.  I was sent from US Lewis -- USP Lewisburg,
 7    Pennsylvania, to USP Marion, Illinois, in 1992 over my
 8    participation in a work stoppage.  While at Marion in 1994 I
 9    had a mental breakdown and was hospitalized in the mental
10    health unit at FMCP (sic) Springfield, MO, Missouri, where I
11    was diagnosed as suffering from paranoid schizophrenia.
12    Eventually I was sent back to Marion where I had another
13    psychotic episode in early 1995.
14              In March of 1995 I was transported to the ADX,
15    transferred to the ADX to build the population.  While at the
16    ADX I was diagnosed by a psychiatrist, Doctor -- I think it's
17    pronounced Ruey (phonetic), and later Dr. Severn as suffering
18    from psychotic depression.  I've been on and off psychotropic
19    medications since I was 10 or 11 years old.  For a time I was
20    in the Navy where I also had a psychotic break and was
21    hospitalized.  My illness moves in a cycle from better to
22    worse.  At best, I am depressed.  At worst, I suffer from
23    psychotic delusions of a persecutory nature, and sometimes
24    have audio hallucinations.  At the ADX I also at times had
25    what is known as Capgras delusion where I believe certain
```

1   staff, as well as my own son, had been replaced by aliens.

2   Most of the time I live in a world of depression and paranoia

3   where others are seemingly plotting to kill me.  The ADX was

4   a hostile environment for a mentally ill inmate.  Such

5   inmates were often ostracized by other inmates and often

6   taunted by correctional staff.  When the two of my friends

7   who were mentally ill com- -- while there two of my friends

8   who were mentally ill committed suicide.  I often

9   contemplated suicide myself, and was placed on suicide watch

10   twice.  Such inmates often spend long periods of time, even

11   years, remaining isolated in their cells, not going out for

12   recreation.

13          For most of the time I was at the ADX there were

14   two psychologists working there, but not the same two.  Also,

15   there was a contract psychiatrist who visited the prison.

16   One did not see either the psychologist or the psychiatrist

17   very often.  Visits with psych staff took place at the cell

18   with no real privacy.  Later there were tele --

19   tele-psychiatric sessions.

20          Did you follow that testimony, Your Honor, about

21   tele-psych, or would it be helpful --

22          THE COURT:  Yes.

23          MR. ARO:  Okay.  I'd like to say Dr. Severn was a

24   good doctor and he tried to do his job.  I remember one

25   occasion when a psychologist who was with him on a session at

Page 159

 1   my cell did not like something I said, and he told
 2   Dr. Severn, We're done here, and he, the prison psychologist,
 3   terminated the session.  The contract psychiatrists were
 4   always accompanied by the prison psychologist.  Some of the
 5   psychologists were somewhat hostile.  As a result of the
 6   lawsuit, I saw some positive changes taking place at the ADX.
 7   More psychology staff and later psych -- and better
 8   psychology staff were hired.  A private room was set up in
 9   the unit for psychology sessions and the sessions were made
10   more often.  Tele-psych was initiated more often and easier
11   to get.  Psych staff walked the tier more often.
12           In 2014 I was transferred to the secure mental
13   health step-down program at USP Atlanta, which they use the
14   acronym SMHU for.  At the SMHU we have a group therapy
15   program.  There are groups in social skills, emotional
16   self-regulation, mental illness management and recovery, and
17   criminal behavior.  I currently have my one-hour groups -- I
18   currently have nine one-hour groups a week.  I'm offered
19   recreation up to five days a week.  And I get out of my cell
20   at other times to do an assigned job that I have.  We have a
21   modified therapeutic community, and we all participate in a
22   newsletter.  We have a lunch room for inmates who have
23   progressed far enough in the program.
24           We also have what's called a token economy system
25   whereby we earn points daily for such things as going to

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 160

1    group, going to recreation, call, cell sanitation, personal

2    cleanliness, activities such as in cell walking, music,

3    meditation, stretching, reading, writing, and other

4    activities.  Every Friday our points for the week are totaled

5    and we are allowed to shop at the unit point store by

6    submitting an order form.  The point store has drinks and

7    snacks and art supplies and so on.

8            Regarding the terms of the settlement, I am

9    generally satisfied.  I'm a little disappointed not to

10   receive any money, but counsel did inform me in the

11   representation agreement that money was not likely, and I

12   know this was not a personal capacity lawsuit.  I've read the

13   settlement agreement and the attached program statement and

14   policy statements.  The policy statements substantially

15   conform to the terms of the agreement set forth in paragraph

16   5c1 through 32.  I sincerely believe that the ADX will be a

17   far better place regarding the identification and treatment

18   of mental illness as a result of the settlement.  The BOP

19   itself is now taking a much more serious approach to mental

20   illness as a result of the lawsuit.  It is my personal belief

21   that our representation in the case has been exemplary and

22   attentive.  Sincerely, Scott Fountain, USP Atlanta,

23   August 20, 2016.

24           THE COURT:  Okay.

25           MR. ARO:  The other plaintiff who I have a letter

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 161

1    from who declined to give a video statement is John Lamb who

2    remains at the ADX today.  He's 53 years old, is from Camas,

3    Washington, the southern part of Washington state.  And he is

4    serving a 50-year sentence for murder and two consecutive

5    27-month sentences for attempted escape and escape.  He's a

6    Washington state prisoner who escaped from a supermax unit in

7    the Washington state system and was transferred to the Bureau

8    of Prisons following his recapture from that escape.

9             His release date is currently July 4 of 2026 at

10   which point he will be 81 years old.  That can't be right.

11   '46.  2046.  He's been at the ADX since February of 2011, and

12   has been diagnosed at various points with different forms and

13   types of depression and is receiving medication for his

14   depression.  Bear with me for a second while I get the

15   citation for you, Your Honor.  686, Dan.

16            So he addressed it to me.  It's dated 12/5/2016.

17   Dear Ed, good day to you.  You said I should write and

18   express my concerns about the settlement.  I really only have

19   two.  One, that they will go right back to the way they were

20   after three years.  They did a pretty bad trick to take me

21   off my depression medication before I came here to the ADX.

22   They said I was going -- or doing something funny with my

23   meds, and took me off so that I could come to the ADX.  I

24   never had a problem until about a month before I came here,

25   so I expect more of the same in the future.

Page 162

1          The second thing I -- is I have noticed they are

2    taking everything from disinfectant, to food, to writing

3    materials, whether it's to save money to pay the settlement

4    or to give us a message as to what we will get for

5    embarrassing them.  Probably a little of both.  Surely we

6    will get far worse than three years.  Ed, those are my

7    concerns.  Thank you, Ed, and all the others who've helped us

8    with this matter.  Respects, John Lamb.

9          This is another concern that has bubbled up from

10   time to time and has been expressed in various ways by

11   inmates.  They don't necessarily expect any kind of

12   retaliatory behavior towards them during the period of when

13   the monitors are in effect, but a number of them have

14   expressed a concern that when we are gone and don't have the

15   ability to address issues that the people who put their name

16   to this lawsuit are going to be --

17          THE COURT:  Yeah.

18          MR. ARO:  -- subject to retribution.

19          THE COURT:  Well, I have a similar concern and

20   will address -- discuss that Monday as part of the

21   enforcement and the jurisdiction.

22          MR. ARO:  Now, I note that we're at 4:25.  I'd be

23   happy to proceed with more discussion of this.  I -- I

24   just --

25          THE COURT:  It's 4:28.  You're slow.

Page 163

1          MR. ARO:  My watch is slow apparently.

2          THE COURT:  Yeah.  We'll recess till 9:00 Monday.

3          MR. ARO:  Thank you very much, Your Honor.

4          THE COURT:  All right.  And, you know, one of the

5    things that has surprised me is how articulate these people

6    are, most of them.  Given all that we know about them,

7    they're really articulate and fluent.  And I didn't expect

8    that.

9          MR. ARO:  I will tell you, Your Honor, that if you

10   had asked me before we started interviewing inmates what the

11   risks of this case were, my biggest worry coming into this

12   was how I was going to humanize people who were in prison for

13   doing the things they'd done.

14         THE COURT:  Right.

15         MR. ARO:  And I was astonished from the very first

16   days I spent at the prison, not just at the articulateness,

17   but of the humanity that these people -- many of them, not

18   all of them, but many of them exuded, not just their own

19   personal sort of dignity, but the way that they treated each

20   other.  There were countless stories about people trying to

21   take care of other inmates who were in trouble in a way that

22   I was very surprised by, and the worry about how to present

23   these people as humans and as people deserving of some

24   dispensation faded really quickly.

25         THE COURT:  All right.  Well, Monday, 9:00.

Page 164

1            MR. ARO:  Thank you, Your Honor.

2            THE COURT:  Recess.

3            THE COURTROOM DEPUTY:  All rise.  Court is --

4    (Audio stopped abruptly.)

5            (Whereupon, the within hearing was then in

6    conclusion at 4:29 p.m.)

7

8

9            I certify that the foregoing is a correct

10   transcript, to the best of my knowledge and belief (pursuant

11   to the quality of the recording) from the record of

12   proceedings in the above-entitled matter.

13

14

15

16   /s/ Laurel S. Tubbs                  January 26, 2017

17   Signature of Transcriber            Date

18

19

20

21

22

23

24

25

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 2
December 16, 2016

Page 165

```
 1                        INDEX

 2                                             PAGE

 3   CARLTON DUNBAR (By Video)
     Direct Examination by Mr. Aro             105, 108
 4   Cross-Examination by Ms. Padden                108
     Redirect Examination by Mr. Aro                108
 5
     HERBERT PERKINS (By Video)
 6   Direct Examination by Ms. Golden               108
     Cross-Examination by Ms. Padden                108
 7   Redirect Examination by Ms. Golden             108

 8   SEAN GILLESPIE (By Video)
     Direct Examination by Mr. Aro       112, 114, 115
 9   Cross-Examination by Ms. Padden                115

10   PERCY BARRON (By Video)
     Direct Examination by Mr. Aro                  116
11   Cross-Examination by Ms. Padden                116

12   ARNELL SHELTON (By Video)
     Direct Examination by Mr. Aro                  118
13   Cross-Examination by Ms. Padden                118
     Redirect Examination by Mr. Aro                118
14
     MARCELLUS WASHINGTON (By Video)
15   Direct Examination by Mr. Aro                  120

16   CHARLES HIPPS (By Video)
     Direct Examination by Mr. Aro       124, 125, 126
17   Cross-Examination by Ms. Padden                126
     Redirect Examination by Mr. Aro                126
18

19                       EXHIBITS
20
                                              PAGE
21
     Exhibit Numbers 60, 61, 63, 90, 732, 733,   104
22   Exhibit Number 734                            144

23

24

25
```