```
 1              IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF COLORADO

 3    Case No. 12-cv-01570-RPM-MEH

 4    _____

 5    HAROLD CUNNINGHAM, individually, et al.,

 6         Plaintiffs,

 7    vs.

 8    FEDERAL BUREAU OF PRISONS,

 9         Defendant.

10    _____

11              Proceedings before RICHARD P. MATSCH, United

12    States Senior District Judge, United States District Court

13    for the District of Colorado, commencing at 9:03 a.m.,

14    December 19, 2016, in the United States Courthouse, Denver,

15    Colorado.

16    _____

17              WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

18    ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

19    _____

20                         APPEARANCES

21              DEBORAH M. GOLDEN, EDWIN P. ARO and MARK J.

22    IVANDICK, Attorneys at Law, appearing for the plaintiffs.

23

24    _____

25                    FAIRNESS HEARING - DAY 3
```

Page 167

```
 1                    APPEARANCES (cont'd)

 2              AMY L. PADDEN, United States Assistant Attorney,

 3    appearing for the defendant.

 4                    P R O C E E D I N G S

 5              (Whereupon, the within electronically recorded

 6    proceedings are herein transcribed, pursuant to order of

 7    counsel.)

 8              THE COURTROOM DEPUTY:  All rise.  Court is in

 9    session.

10              THE COURT:  Please be seated.  Good morning.

11              MR. ARO:  Good morning, Your Honor.

12              THE COURT:  Mr. Aro, you're in your PowerPoint.

13              MR. ARO:  Not yet.  Ms. Padden and I have talked

14    over the weekend about how to get done with what we both

15    think we need to do.  And I think the open items that we have

16    are, number one, we obviously need to talk about the remedies

17    and enforcement issue.  Both of us have some record

18    completing that we need to do.  Both of us have PowerPoints,

19    because we want to do it as quickly as possible, and that's

20    by far the fastest way to get through what we need to get

21    through.  Do you have a preference about where we start?

22              THE COURT:  No.

23              MR. ARO:  All right.  I think perhaps the thing

24    that makes the most sense is for me to finish where we left

25    off on Friday.
```

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 168

1           THE COURT:  Yes.

2           MR. ARO:  And that is to finish the positions of

3    the plaintiffs with respect to the settlement and play a

4    couple of video clips that are typical of the views that

5    these folks have.  There are three of them.  They're

6    relatively short.  One of them is from the only plaintiff who

7    gave video testimony whom you have not heard from.  His name

8    is Alphonso Blake.  And I omitted the testimony concerning

9    his background and treatment at the ADX, most of it, because

10   a lot of it is duplicative of what you've heard from other

11   inmates.  So he gives you a little bit of biographical

12   background and then goes straight to how he feels about the

13   settlement.

14           The second person I want to play is Sean Gillespie

15   who is -- you heard from before.  He articulates, I think,

16   pretty clearly the view of the group of plaintiffs who object

17   to the absence of compensation and the fact that there is an

18   attorney fee award notwithstanding that there's no

19   compensation.  His clip is a little less than 20 minutes.

20           The third person is Marcellus Washington who has

21   some difficulty understanding some of the complexities here.

22   And I cut down to a little bit less than 20 minutes the

23   effort that I, and later on cross Ms. Padden, make to try to

24   make sure he understood what was up.  And I just want you to

25   understand from a comprehension standpoint, and you mentioned

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 169

1    competency standpoint on Friday, the way that some of these
2    folks come at it.  So if it's okay with the Court, I'll start
3    with that, and then quickly clip through the other --
4              THE COURT:  Okay.
5              MR. ARO:  -- the other plaintiffs.  Would you play
6    the Blake excerpt?  Actually, before you do that, Dan, I also
7    have little -- those transcript excerpts for Your Honor if
8    those are helpful to you.  I can pass those up to the
9    Court --
10             THE COURT:  All right.
11             MR. ARO:  -- the excerpts of what we're going to
12   play.
13             UNIDENTIFIED SPEAKER:  (Inaudible.)
14             MR. ARO:  Okay.  They already are in your book at
15   the very end, Your Honor.  Blake, Gillespie, and -- and
16   Washington.
17             THE COURT:  Which book?  Okay.  Yeah.  I see it.
18   Yeah.
19             MR. ARO:  Yes, Your Honor.
20             THE COURT:  Yeah.
21             (Video deposition of Alphonso Blake played.)
22             MR. ARO:  Your Honor, what he's talking about here
23   is you -- you heard about the psychology groups down at the
24   space in the gym.  Recently they've also created an
25   opportunity for inmates to get out and go out to the

Page 170

1    recreation enclosures outside, and not necessarily talk about

2    psychology issues, but about current events or other issues,

3    primarily as an effort to get them outside, to get them

4    away -- out of their cells, get them additional socialization

5    time.  It was something that they just started doing this

6    fall.  He's one of the inmates who's participated in this --

7    this effort, which I think is a good idea, a good way of

8    reducing the isolation that these guys experience at the --

9    the prison.  It's a one day a week, 8 or 10 or 12 group

10   discussion outside that's facilitated by a psychologist using

11   those outside rec enclosures.

12            THE COURT:  Okay.

13            (Video deposition of Alphonso Blake played.)

14            MR. ARO:  The inevitable moment of the PowerPoint

15   has arrived, Your Honor.  So this is Mr. Blake.  Obviously

16   you heard what he had to say.  Just to be clear about some of

17   his background, he has been at the ADX since February of

18   2011.  He has a current release date in November of 2028 when

19   he'll be 50 years old.  His sentence is a DC, quote, unquote,

20   state sentence for homicide.  And his diagnostic record is

21   like a lot of these guys, kind of confused.  BOP has

22   diagnosed him with a variety of conditions over time.  Right

23   now they're dealing with him as having an antisocial

24   personality disorder as opposed to a major mental illness.

25   But he is prescribed and has been taking pretty strong

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 171

1  antipsychotic medication.  And he was medicated at the time

2  he gave that testimony.

3           You heard earlier from Percy Barron who's at USP

4  McCreary.  His basic position with respect to the settlement

5  and what he testified to was he has no problem with the

6  settlement as it relates to the ADX, but he's no longer at

7  the prison.  He is having difficulty getting psychiatric

8  treatment where he is now.  And he also has -- you may recall

9  me saying that he got a cornea transplant that creates

10  persistent eye pain.  And he's -- that ties into his

11  depression.  And he's having problems getting that dealt with

12  as well.  So most of his testimony about his reaction to the

13  settlement was, It doesn't do me any good anymore because I'm

14  not at the ADX any longer.

15           Herbert Perkins had a similar view.  He's at the

16  United States Penitentiary at Tucson.  He had been both at

17  the Atlanta mental health program and at the Secure STAGES

18  program in Florence.  He's now in -- in the SHU at Tucson.

19  And his view was the settlement is fine.  And those

20  high-security mental health units are good, but they're not

21  doing me any good now because there's no monitoring and

22  there's no enforcement vis-a-vis the policies as they apply

23  to me at this time.  So basically the same position that

24  Mr. Barron has.

25           THE COURT:  Was he in the SHU because of some

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 172

1   discipline?

2          MR. ARO:  As I understand it, Your Honor, he got

3   into an altercation with another inmate when he got down to

4   Tucson.  I don't know the details.

5          THE COURT:  Okay.

6          MR. ARO:  Mr. Hipps, who is at Allenwood now,

7   had -- his basic view of the Allenwood program is it's a

8   great program for some folks, but it's not really very

9   well suited to him.

10          THE COURT:  Yeah.  We heard him talk --

11          MR. ARO:  That's right.

12          THE COURT:  -- about that.

13          MR. ARO:  That's right.  His two substantive

14   concerns about the settlement are, number one, he is very

15   concerned that the monitoring is not longer than it is.  He

16   understands, because we've talked about it a lot, the PLRA

17   limitations.  He recognizes that the settlement provides for

18   a longer period of monitoring than typically would be

19   allowed, but he still is worried about backsliding.  He also

20   is concerned about the absence of independent overseers for

21   the psychologists who are running these high-security mental

22   health units because he believes that while there's some very

23   good things about them, that a lot of what they do is trial

24   and error.  And he would prefer to have somebody who's

25   actually run these kind of programs advising the people who

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 173

 1   are actually in charge of the program where he lives today.

 2   But those are the two reservations that he voiced about the

 3   settlement.  And he doesn't have an objection to its

 4   approval.

 5           Mr. Shelton is still at the ADX.  He met with

 6   Judge Hegarty and I down there to talk about the settlement.

 7   He also believes that the monitoring period should be longer,

 8   and for the same reasons other inmates have voiced that

 9   concern.  He also is very concerned about the delays between

10   the identification of the need of an inmate at the ADX for

11   transfer to a new facility and how long it takes them to get

12   there.  He believes that he could have and should have been

13   sent to one of these high-security mental health programs

14   sometime ago, and is worried about deterioration and problems

15   that happen between when somebody is picked to go and when

16   they actually leave.  With those two exceptions, he's

17   comfortable with the settlement.

18           Jabbar Currence is also at the ADX.  He had seven

19   problems, even though he recognizes positive changes and the

20   values of the settlement.  Number one, he's very animated

21   about the absence of any admission of liability or finding of

22   liability on the part of the government.  Number two, he is

23   concerned that the settlement does not deal more broadly with

24   solitary confinement and the effect that solitary confinement

25   has on all inmates, whether or not they have mental illness.

Page 174

```
 1   Number three, he believes that the criteria identifying
 2   inmates who can't be at the ADX because of mental illness are
 3   too narrow.  In other words, he believes that a broader
 4   category of illnesses ought to qualify somebody or disqualify
 5   somebody from being at the ADX.  Number four, he's worried
 6   about the ease with which diagnoses can be changed by BOP
 7   staff members in a way that could manipulate their
 8   eligibility to be at the ADX.  Number five, he does not
 9   believe that there's adequate protection in the settlement
10   against inmates being disciplined for conduct that is the
11   result of or contributed to by their mental illness.  Said a
12   different way, he doesn't think that enough account is made
13   of mental illness in the discipline process.  Number six, he
14   is getting pretty close to his release date, and he is
15   concerned that he and others are not being adequately
16   prepared to return to society after extended periods in
17   isolation.  And, lastly, he recognizes that the monitors are
18   experienced experts, but he also believes that more
19   independent oversight of psychology services within the ADX
20   is necessary to protect inmates.  So he is -- I don't know if
21   ambivalence is exactly the right word, but he believes that
22   there are substantive shortcomings in the policies that we
23   negotiated on the issues I just identified.
24            Ronnie Houston feels that for the class as a whole
25   the settlement is appropriate and feels like it's best for
```

Page 175

1    both sides to get it resolved.  But he feels that he has been

2    warehoused at the ADX.  He's, as you heard in his clip,

3    extremely frustrated about how services have been provided to

4    him.  And so he sort of separates out his general support of

5    the settlement from his view that he has been mismanaged or

6    his illness has been mismanaged.

7            Sean Gillespie, I have a video clip from, as I

8    mentioned earlier.  He's got concerns about compensation, the

9    attorney fee award.  So would you play that clip for us, Dan?

10           (Video deposition of Sean Gillespie played.)

11           MR. ARO:  So Mr. Powers, as you know, filed

12   several filings with the Court.  He's essentially got the

13   same views as Mr. Gillespie does.  Ms. Padden and I had

14   several conversations with them around the time of this

15   testimony concerning Monell (phonetic) and the limitations of

16   the Monell case as they might be applied to the federal

17   government as opposed to a state or local government.  But

18   they both steadfastly believe that they should have counsel

19   appointed.  And they believe that because they're no longer

20   at the ADX they are not members of the proposed settlement

21   class, and that whether the Court approves the settlement or

22   not, they should be able individually to continue the claims

23   that have already been asserted in this clays -- case as

24   those claims relate to them and seek the remedies that you

25   heard Mr. Gillespie speak to.  That's the point of Mr. --

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 176

 1   Mr. Powers' motion to sever is preserving his own claims

 2   under this same docket number.

 3              Harold Cunningham is the lead named plaintiff.  He

 4   was offered but refused the opportunity to provide a video

 5   statement.  As of today, he's 46.  He's from Washington, DC.

 6   He's serving a life sentence for convictions in the same case

 7   as Percy Barron.  They were codefendants in a case that arose

 8   from a series of violent robberies back in 1993 in the DC

 9   area.  He was at the ADX from 2001 to 2014.  Almost all of

10   that time he spent in the control unit.  He has a long

11   history going back before ADX of mental health issues and

12   treatment for those issues within the BOP.  Was -- when he

13   left the ADX he went to a United States Penitentiary in West

14   Virginia where he lived for roughly a year in what's called

15   the Challenge program which is a -- I can get you more

16   details if -- if you need it, but it's essentially sort of an

17   honor unit within a BOP penitentiary in which there are

18   supplemental educational and psychology programming

19   available.  So he went to lunch with quote, unquote, typical

20   inmates at that institution, but had special programming

21   available to him within the institution.  He was there for

22   awhile and did pretty well I think by all accounts.  Got into

23   trouble, was originally slated to go to the Lewisburg United

24   States SMU program.  That's a special management unit program

25   at the Lewisburg USP in Pennsylvania.  But an alert BOP staff

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 177

1    member noted in his paperwork his psychology history and he

2    was diverted to the Allenwood program for a short period of

3    time.  I think he was there for three or four months.  Had a

4    lot of issues when he was there.  And ultimately was

5    transferred to the US Penitentiary at Terre Haute in -- in

6    Indiana where he is receiving treatment for psychology issues

7    as well as for a medical problem that he has with his foot.

8    He had his foot partially amputated years ago and he

9    continues to have troubles with that.

10            He -- the last time that we spoke with him was

11   when Magistrate Judge Hegarty went to see him, and Mr. Hipps,

12   and Mr. Washington at Lewisburg USP in August of 2016.  He --

13   it was pretty much focused solely on the question of

14   compensation at that time, and was very animated about that.

15   And has since that conversation, and actually a little bit

16   before that as well, filed his own pleadings in this case.  A

17   slightly different theory I think than Mr. Powers and

18   Mr. Gillespie on the compensation issue.  He believes that he

19   was promised compensation during the settlement meeting back

20   in 2014 between Mr. -- Judge Hegarty and myself and a series

21   of inmates.  And is extremely upset that compensation for

22   inmates is not part of the -- the deal.  He also is very --

23   he has a very elaborate view about how there should be

24   compensation and how that compensation should be distributed

25   primarily to himself and a few other inmates who spent a long

Harold Cunningham, individually, et al. vs.                Fairness Hearing - Day 3
Federal Bureau of Prisons                                December 19, 2016

Page 178

 1    time in the control unit, and how even other plaintiffs in

 2    the case should be compensated less and differently from him.

 3    So that's his -- his position with respect to all of this.

 4              The final plaintiff whose -- whose views I want to

 5    present is Marcellus Washington.  And I have a video clip

 6    from him in which the punch line is he also believes that

 7    there should be compensation.  He also requests that -- that

 8    the Court enter certain orders concerning conditions of

 9    confinement at Allenwood where he currently lives.  And I'm

10    presenting this material for two reasons:  One, on the

11    question of comprehension, what the inmates understand about

12    the settlement because it is complicated even for the lawyers

13    involved, and, number two, he has filed an awful lot of

14    paper, Your Honor.  I don't know how many have reached you.

15    I know that there was another one that just came in, I think,

16    to you last week that I just found out about recently.  And

17    he sent me a copy of.  His pleadings are earnestly prepared,

18    but a little raw in terms of their -- how they track.  And

19    when you hear his testimony you're going to hear him talking

20    about a particular provision of the agreement that I just

21    want to point out to you so you understand what he's talking

22    about when he's talking about it because it's not entirely

23    clear.

24              There's a, as you know, a side agreement

25    concerning the way in which we will have the right to raise

Page 179

```
 1   problems we have with Allenwood and Atlanta.  That -- those
 2   programs are not subject to monitoring under the agreement.
 3   And we negotiated an agreement to give us some ability to
 4   raise concerns in a formal way and try to get those concerns
 5   addressed.  That's Exhibit 612 among the stipulated exhibits.
 6   And that particular agreement to which he is a personal
 7   party, it's structured as an agreement between the inmates
 8   Hipps, Washington, and Cunningham who were at Allenwood at
 9   the time, and Mr. Fountain, who's down in -- in Atlanta,
10   those four folks and the Bureau of Prisons agreed to this
11   process.  That agreement has a provision that I've got up on
12   the screen.  It's paragraph 5.  No waiver of rights or
13   claims.  Nothing in the agreement shall waive, release or
14   otherwise affect in any way any right of any participant in
15   either of the programs to seek any legal remedy to which he
16   or she may be entitled under -- he is or may be entitled
17   under applicable law.  The idea behind this was that since
18   these folks are no longer part of the class at the ADX, they
19   don't have protections with respect to monitoring and so
20   forth, they ought not to be foreclosed from asserting
21   independent claims in Pennsylvania or wherever for what
22   happens at that prison.  He has developed an elaborate view
23   about exactly what this provision means that you're going to
24   hear about in just a minute.  So with that, would you play
25   Mr. Washington's video, please?
```

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 180

```
 1                (Video deposition of Marcellus Washington played.)
 2                MR. ARO:  We're getting pretty close to done with
 3    this clip, Your Honor, but I wanted to explain what he's
 4    talking about here.  There's a provision at the end of the
 5    settlement agreement for this case that allows us to apply
 6    for attorney's fees if we have to come back to you and seek
 7    enforcement of the government's obligations.  And he saw that
 8    language.  And we go through here the explanation of how that
 9    works.  But he had a misunderstanding about what it applies
10    to that muddies the beginning of this transcript.
11                (Video deposition of Marcellus Washington played.)
12                MR. ARO:  Your Honor, when we appeared for a
13    status conference, Ms. Padden and I back in September, we
14    talked about this compensation issue at some length.  And I
15    explained to you that we had discussed this with our clients
16    at great length.  And you said something to the effect that
17    perhaps they needed to hear it from you.  And I know you're
18    contemplating how the findings are framed around this set of
19    issues.  We understand the deal we cut.  And for reasons that
20    I'll explain a little more in detail next, we think that
21    we -- as a fiduciary matter with respect to the members of
22    the class, the deal is a fair and adequate one without
23    compensation.  I want to make that very clear.  But you've
24    heard and seen many requests like this one from
25    Mr. Washington, some of which are perhaps based on an
```

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 181

1   incomplete understanding of the law, but all of them are

2   driven not by a desire to live in luxury, but by a really

3   fervent conviction that these folks were abused and that

4   somebody ought to be held accountable for that.  And we'd

5   request that however the Court chooses to address those

6   claims, it do so in terms that somebody like Mr. Washington

7   will understand when he reads the Court's order.  We'll do

8   our best to explain whatever you write, but there is a

9   comprehension issue here that we'd ask the Court to take

10  special note of.

11          THE COURT:  Now, this Washington, you know, I

12  can't remember.  Did you hand this to me or --

13          MR. ARO:  I'm sorry, Your Honor?

14          THE COURT:  I've got a -- this memorandum of facts

15  from Washington.  And it looks like it's dated 11/28/2016.

16          MR. ARO:  That I think is the most recent

17  submission.  I just got it in the mail recently.  I think

18  Ms. Padden also received a copy of it.  And I believe that

19  was sent directly to the Court.

20          THE COURT:  Yeah.  But it has never been

21  docketed --

22          MR. ARO:  That's correct.

23          THE COURT:  -- as a --

24          MR. ARO:  As far as we know.

25          THE COURT:  Right.  So I'm not sure.  This is --

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 182

1   you've got one that is an exhibit?

2           MR. ARO:  That's correct, Your Honor.

3           THE COURT:  An earlier one which is referred to in

4   his testimony.

5           MR. ARO:  That's correct.

6           THE COURT:  This one is still -- is hanging out

7   here.

8           MR. ARO:  That's correct, Your Honor.

9           THE COURT:  And it seems to me we ought to make it

10  an exhibit too rather than docket it into the ECF filing.

11          MR. ARO:  Okay.  That's fine with us, Your Honor.

12          THE COURT:  So --

13          MR. ARO:  What's our next in order?

14          THE COURT:  So --

15          UNIDENTIFIED SPEAKER:  (Inaudible.)

16          MR. ARO:  So the next exhibit that we haven't used

17  is 736, Your Honor.

18          THE COURT:  Okay.

19          MR. ARO:  And we'd offer it --

20          THE COURT:  Here it is.

21          MR. ARO:  -- without objection as Exhibit 736.

22          THE COURT:  All right.  So we'll receive it now.

23          MR. ARO:  The last two folks whose comments I want

24  to refer to are two inmates who are -- were longtime

25  residents of the ADX who are not plaintiffs.  And both of

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 183

```
 1   them wrote letters that I won't take the time to read in

 2   court, but I would request that the Court review them because

 3   they -- these guys are among the more articulate and careful

 4   thinkers among the inmates who were impacted by this.  Both

 5   of them were at the prison for a long time.  And I think what

 6   they say about the settlement is important for the Court to

 7   understand as context.  I'm happy to read them, but I didn't

 8   think I'd take the time in open court to do so unless --

 9              THE COURT:  No.  We're --

10              MR. ARO:  -- the Court wishes that I would.

11              THE COURT:  We're running out of time.

12              MR. ARO:  Okay.  The first is an inmate named

13   Shane McMillan.  Mr. McMillan is 42.  He's a Texan from

14   Carthage, Texas.  Is serving -- he originally came into the

15   BOP for a drug conspiracy and has since received additional

16   time for assaulting a staff member and another inmate.

17   Arrived at the ADX back in 2007.  And was there until 2015

18   when he was sent to the Allenwood USP program you've heard

19   about.  He is the first graduate of that program and just

20   arrived back in Colorado this weekend to be begin

21   participation in the Secure STAGES program at USP Florence.

22   He has mental health issues that touched on both the

23   programming available in Allenwood and the programming

24   available here.  His diagnosis is posttraumatic stress

25   disorder and borderline personality disorder which come out
```

Page 184

 1   of a ghastly childhood akin to what you've heard about from

 2   Mr. Houston.  And the exhibit that he wrote is Exhibit 528.

 3   It's in the book behind you.

 4           The last inmate whose comments I'm going to

 5   specifically call out is Randy Gometz.  He is 61 years old,

 6   grew up in Jacksonville, Florida.  Has been in BOP custody

 7   since 1974.  Is now serving -- he originally went to prison

 8   as a bank robber, but he's now serving a life sentence for

 9   his involvement in a series of assaults in BOP custody as

10   well as his complicity or involvement in the murder of a BOP

11   corrections officer named Merle Clutts who was killed in the

12   fall of 2000 -- excuse me, 1983 at USP Marion.  Somewhat

13   ironically, a lot of people say it was the murder of Officer

14   Clutts that precipitated the creation of the ADX.  The

15   primary defendant was an inmate named Thomas Silverstein, who

16   you might have heard the name of.  And Mr. Gometz was a

17   codefendant of his in that prosecution.  He was one of the

18   first three prisoners ever to arrive at the ADX.  He got

19   there in the winter of 1994 before the prison was even really

20   being populated.  And he stayed there until 2013 when he was

21   transferred to the USP Atlanta program that you've heard

22   about.  His diagnosis is a pretty consistent major depressive

23   disorder diagnosis, but he also has posttraumatic stress

24   disorder driven in part by childhood experiences but also by

25   some violence that he experienced following Officer Clutts'

Page 185

 1   murder.  And his letter concerning the settlement is

 2   Exhibit 529.

 3            One of the things that we looked at, Your Honor,

 4   and I'd be happy to address if you'd like us to, is the law

 5   concerning the duty of a lawyer in my position when a group

 6   of his clients in this case objects strenuously to a sent- --

 7   to a settlement that counsel is urging on the Court.  Is that

 8   something you'd like me to address briefly?

 9            THE COURT:  Well, I think I understand that.  And

10   what I contemplate is that I asked Ms. Padden, the

11   government, to provide a memorandum of law with respect to

12   why the money remedy is not available in this case.  So, you

13   know, I'm not -- your duty is to support the plaintiffs in

14   their contentions.  But it seems to me that I don't need

15   further legal argument with respect to your obligation in the

16   case.  What -- the things that are still necessary, I think,

17   are the legal reasons of why money remedy is not available

18   other than the fact that it wasn't in the second amended

19   complaint.  So -- and as I said before, the class action

20   aspect of the case, apart from the legal issues about the

21   PLRA and, I don't know, addressing the statute of

22   limitations, but the -- as I mentioned last week, I don't

23   think we could meet the commonality requirement if this were

24   a 23(a) class action.  Each of these persons has had a

25   different experience.  And if we were awarding damages for

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 186

```
 1    injury each of them would be different.
 2              MR. ARO:  I think that's right, Your Honor.
 3    There's two related issues that you heard alluded to in the
 4    testimony.  The first being differentiating between the
 5    plaintiffs and other class members because all of the folks
 6    you've heard of -- heard on this issue are very focused on a
 7    compensation remedy for them personally that would not extend
 8    to most of the members of the class.
 9              THE COURT:  Right.
10              MR. ARO:  The second issue is, you heard both
11    Mr. Gillespie and Mr. Washington talk about, there's a
12    conviction, notwithstanding that we've talked about it quite
13    a bit, that if the government gives money to Arnold & Porter,
14    it has nothing to say about what we do with that money.  And
15    as the Court is aware in a class action, there are strict
16    limitations --
17              THE COURT:  Yeah.
18              MR. ARO:  -- on our ability to provide benefits to
19    people --
20              THE COURT:  Well --
21              MR. ARO:  -- who are -- that are different than
22    what class members as a whole receive.
23              THE COURT:  What I'm -- you know, as of the moment
24    there is no class --
25              MR. ARO:  Correct, Your Honor.
```

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 187

 1          THE COURT:  -- or subclass.  What I've been trying

 2   to say is, the only way in which I think a class can be

 3   certified in this case is for settlement.  That if this case

 4   had been brought for a class action with more than injunctive

 5   relief, it wouldn't have happened.

 6          MR. ARO:  I understand that, Your Honor.

 7          THE COURT:  Because there wouldn't be an ability,

 8   first of all, to certify the class because of the lack of one

 9   aspect, commonality.  And the other is going to be the relief

10   requested if the relief requested had been for money damages.

11          MR. ARO:  We understand.

12          THE COURT:  Now, we ought to talk about the

13   enforcement.

14          MR. ARO:  Would you like to do that at this moment

15   or do you want to take a break?  I know that it's --

16          THE COURT:  I want to take a break, but --

17          MR. ARO:  Okay.

18          THE COURT:  -- can we get that done by noon?

19          MR. ARO:  I think we can, Your Honor.  Ms. Padden

20   and I are both concerned that we make sure that there are

21   things in the record particularly around the issue of the

22   arm's length nature of the negotiations because of some

23   suggestions made in some quarters at the prison.  And I can

24   go through that very quickly when we get back.  But we're

25   prepared to talk about the enforcement.  And I also have some

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 188

1   supplemental authorities, including a Ninth Circuit case from

2   this spring that may be very helpful to the Court.  I passed

3   it to the clerk.  You might want to take a quick look at

4   those over the break.

5           THE COURT:  A quick look?

6           MR. ARO:  So there are four materials in there,

7   Your Honor.  There's a -- there's a District Court opinion

8   and a Ninth Circuit opinion in a case in which there was a

9   dismissal with prejudice subject to a reservation of

10  jurisdiction.  And the District Court opinion enforces the

11  settlement terms by means of a contempt order.  That order

12  was then taken up on appeal and affirmed by the Ninth Circuit

13  citing Kokkonen.  And I know you've had some unease about the

14  41(a) mechanism that's been proposed in this case.  Those are

15  two opinions in which courts faced with important -- imposing

16  or enforcing a prison-related settlement under Kokkonen found

17  that the power did exist and did exercise that power.

18          THE COURT:  Yeah, except it doesn't -- it doesn't

19  against a sovereign entity --

20          MR. ARO:  That's true, Your Honor.

21          THE COURT:  -- which is what concerns me the most.

22          MR. ARO:  We understand, Your Honor.

23          THE COURT:  Let's take a 15-minute break.  But I

24  do have matters this afternoon that --

25          MR. ARO:  We understand, Your Honor.

Page 189

 1            THE COURT:  -- I have to use the courtroom for.
 2    And we'll see where it goes.
 3            MR. ARO:  Thank you, Your Honor.
 4            THE COURT:  The Court's in recess.  15.
 5            THE COURTROOM DEPUTY:  All rise.  Court is- --
 6            (Recess from 10:36 a.m. to 10:51 a.m.)
 7            THE CLERK:  All rise.  Court is in session.
 8            THE COURT:  Be seated, please.  You know, there's
 9    another aspect to this in the -- listening to these inmates.
10    They're all assuming liability and that there is an Eighth
11    Amendment violation.
12            MR. ARO:  That's clearly true.
13            THE COURT:  And, of course, that's a risk in the
14    case.  The government is not admitting a violation and --
15    expressly in the stipulation.  And the deliberate
16    indifference standard may be hard to meet in the case.  Now,
17    I'm not suggesting that you couldn't do it, but it's a risk
18    of trial.  And I don't think these people recognize the risk
19    of trial as well as, of course, you know, we've talked before
20    about the logistics of the difficulty.  But the deliberate
21    indifference standard is not as clear when you're talking
22    about a deliberate indifference to a serious medical need.
23    And this case could be more like a negligence case or more
24    like a failure to appreciate and adequately adjust to serious
25    mental -- medical needs when the medical needs are

Page 190

```
 1   psychological, mental health, because that -- anyway, I think
 2   it has to be addressed.  I will address it as part of the
 3   consideration of why the case should be settled.
 4              MR. ARO:  We appreciate that, Your Honor.  I want
 5   to very quickly address an issue.  And this is purely making
 6   the record, Your Honor.  I understand that you understand the
 7   background, but it's important that the record from both the
 8   government's standpoint and ours reflects a few facts about
 9   how the settlement came together.  I'm just going to go
10   through that very quickly --
11              THE COURT:  All right.
12              MR. ARO:  -- if the Court's okay with that.
13   There's sort of two dimensions to this.  One, are we properly
14   informed?  Do we know enough to actually be able to recommend
15   a settlement?  And, secondly, was this an arm's length, fair,
16   vigorous negotiation?  For the record, we began our work in
17   this case in April 2011 primarily by looking at legal issues,
18   including the one that the Court just referred to around what
19   the standard of proof would be in this kind of a case.  We
20   began interviewing inmates in August of 2011.  And by the
21   time we closed our negotiations with the government in July,
22   we had interviewed more than 200 inmates at the prison, many
23   of them more than once, and quite a number dozens or more
24   times.  We also early in the case filed dozens of Freedom of
25   Information Act requests.  Those are summarized and the
```

Page 191

```
 1   responses thereto in trial Exhibit 591.  And after the

 2   responses were not forthcoming, we filed a separate FOIA

 3   lawsuit in the District of Columbia seeking to compel the BOP

 4   to produce records in response to those FOIA requests because

 5   we had gotten nothing in many months of waiting for those

 6   responses.

 7          Throughout this process we reviewed tens of

 8   thousands of documents, both that were received from the

 9   government.  I don't know how many pages the government's

10   produced, but many, many pages of records, as well as many

11   records that we received from our clients, from family

12   members, from their lawyers in their criminal cases.  We also

13   hired and relied heavily on some of the leading correctional

14   and mental health experts in the country.  They are

15   identified by name in the motion for preliminary approval

16   that we filed.  You're familiar certainly with --

17          THE COURT:  Yes.

18          MR. ARO:  -- Dr. Metzner.  And in addition,

19   particularly in the course of the latter stages of the

20   settlement, we consulted with and relied on some of the

21   leading prison litigators in the country, including a woman

22   named Margo Schlanger who's a former Department of Justice

23   civil rights division attorney who now is at the University

24   of Michigan law school, and who has devoted most of her

25   academic career to understanding remedies in cases like this.
```

Page 192

 1    And she was a tremendous resource to us in understanding

 2    this.  Obviously this is our work, not her work, but I wanted

 3    the Court to be aware that this wasn't done in a vacuum by

 4    civil lawyers who don't -- don't manage prison cases very

 5    much.  Ms. Golden and her organization also are vastly

 6    experienced in this area.  All totaled, we put 25,000 hours

 7    of time into this case before agreeing to the settlement

 8    terms in fact and the legal investigation and related work.

 9            In terms of the history of the settlement, this is

10    as vigorous a settlement process as I've ever been involved

11    in in my career.  Shortly after we filed the complaint, we

12    sent Exhibit 531 to the general counsel of the Bureau of

13    Prisons saying, We think there's a serious problem and we

14    need to talk about trying to resolve this without further

15    litigation.  That in treaty was not successful.  And we

16    didn't really have any settlement conversations until after

17    the Court denied the motion to dismiss.

18            Ms. Padden and I began discussing in the summer of

19    2013 the possibility of getting Judge Hegarty involved in

20    this case.  And you'll recall us coming to you and asking for

21    your consent to that.  Our first settlement conference was in

22    September of -- excuse me, October of 2013, literally the day

23    after our scheduling conference in this case.  We went to see

24    Judge Hegarty and talked about how we might approach the

25    process.  Shortly thereafter we provided the government with

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 193

 1    Exhibit 610 which is the detailed multipage memorandum that
 2    outlined the critical items that would need to be included in
 3    any settlement.  And it set forth a structure for how we
 4    approached those items.  And if you compare that memorandum
 5    to where we ended up, you will see that we obtained almost
 6    everything we asked for and -- in terms of those issues being
 7    addressed.  And on the most important issues, such as
 8    diagnosis and treatment, what was achieved in the settlement
 9    tracked closely what we'd originally set out to -- to
10    accomplish.

11              We also had a total of 32 formal settlement
12    conferences, two of which spanned several days.  So 34 days
13    of settlement conferences that were recorded in minute orders
14    that were entered by Judge Hegarty that -- there's a summary
15    of those conferences in Exhibit 594.  I will also tell you
16    that counsel and Judge Hegarty and the principals and the
17    experts had literally hundreds of additional conversations,
18    emails, letters, other kinds of communications about various
19    aspects of the settlement.  In general, we negotiated the
20    policies first.  And some of those went into effect long
21    before the settlement was finalized.  Every time we were
22    doing policies, they were removed -- excuse me, they were
23    reviewed and approved by experts for both sides.  And once we
24    got the policy matrix taken care of, we then moved to the
25    enforcement mechanisms.  Those were the last issues that we

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 194

 1   dealt with.  We declined pointedly to negotiate anything

 2   having to do with fees or costs until we had resolved all the

 3   other material issues.  And those -- the fee and cost issues

 4   are really literally the last thing that we resolved last

 5   summer.

 6           The negotiations broke down in early 2015.  The

 7   primary issue there was enforcement terms.  We had been

 8   insisting on a consent decree.  The government was not

 9   willing to agree to that.  And so until we came to this

10   compromise position that's been presented to the Court, we

11   were really at an impasse on how the Court's enforcement

12   powers were going to be structured and what rights the

13   government would have and the plaintiffs would have in the

14   event of a dispute.  We were in particular adamant that we

15   were not going to accept a private settlement agreement

16   within the rubric of the PLRA because of the limitations that

17   that imposed on enforcement.

18           Once we came to this mechanism, the 41(a)

19   dismissal, subject to retention of jurisdiction from

20   Kokkonen, that really was the key to getting this thing done.

21   That issue first surfaced I want to say late 2015, and was

22   sort of developed in the spring of 2016 as a way to do this.

23   Where that came from quite candidly, Your Honor, is -- it

24   came from Margo Schlanger, at least on our side.  She -- we

25   were trying to figure out if there was another way to get

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 195

1   this done.  And we reached out to this person who spent

2   basically her entire career trying to understand remedies in

3   cases like this.  And one of the materials I passed up to you

4   before the last break was an article she wrote dealing with

5   the remedies in civil rights prison cases, including the

6   41(a) dismissal.  We talked to her about it and a raft of

7   other folks about this.

8            We also, and Ms. Padden can address when it's her

9   turn, we spoke with a gentleman named Jonathan Smith, who's

10  in an interesting position in this case.  For a long time he

11  headed the civil rights division at the Department of

12  Justice, and in that connection was involved in cases like

13  this brought by the US government against state and local

14  correctional systems, and negotiated many settlements of

15  those kinds of cases.  Mr. Smith is now the executive

16  director of the Washington Lawyers' Committee for civil

17  rights.  We can't talk to him about this because he talked to

18  the government when he was a government lawyer about this

19  case.  And so Ms. Padden spoke with the executive director of

20  the Washington Lawyers' Committee about this set of issues

21  recently and about his views concerning this mechanism.  And

22  obviously you don't have to defer to experts out there.  I

23  just want you to understand that a lot of smart people have

24  thought really hard about this issue.  And if all of us

25  weren't comfortable with it we would not have put it before

Page 196

 1    you.

 2              As we thought about it -- and I'm going to get to

 3    the guts of the enforcement in just a second.  As we thought

 4    about this issue last spring, we were confronted with a

 5    tension that ultimately we resolved in accepting whatever

 6    risk is associated with this enforcement mechanism.  And what

 7    I mean by that is, last Christmas Eve there was another

 8    suicide at the prison.  It was of an inmate named Boyd

 9    Higginbotham, who was the first one of the folks down there

10    who we knew at the time of his suicide.  He was a seriously

11    mentally ill inmate.  We had been identified back in 2014 as

12    meeting the exclusion criteria for the ADX.  He was not

13    removed.  He had his diagnosis changed by a doctor at the BOP

14    who had not had much exposure to him, had multiple serious

15    suicide attempts in the spring of 2015, and ultimately

16    overdosed on his psychology medication medicine called

17    doxepin last Christmas.  And at first -- I'd seen him a week

18    before he died.  At first I didn't know what had happened

19    because the last time I saw him he appeared content.  With

20    the benefit of hindsight, I understand now that he had -- was

21    content because he had decided that that was -- he was done.

22    And we were essentially saying goodbye at our last meeting

23    without me knowing that that's what was happening.  And that

24    spring, about a month after he died, I got a letter from him

25    that he clearly had mailed outside of the prison before his

Page 197

```
 1    suicide and had mailed to me by somebody on the outside once
 2    it was confirmed that he had passed away.  I'm not going to
 3    read it.  It's Exhibit 632.  But the point of the letter
 4    essentially is, I can't just sit and wait to die in this
 5    place.  It's been more than a year since I was told I was
 6    going to leave, and I can't do this anymore.  And we know
 7    very well that we cannot make decisions on behalf of the
 8    class based on one individual's experience.  And we also
 9    understand that the Bureau of Prisons has been very, very
10    aggressive in dealing with a lot of the issues that we've
11    raised by the lawsuit.  And I don't want to undermine or
12    criticize that progress.  But there's still issues at that
13    prison today.  There's still people down there who don't
14    belong there.  There's still people there who are not being
15    treated properly.  And so a very strong imperative for us was
16    getting monitoring in effect so that professional independent
17    monitors hold the staff down there accountable, and, frankly,
18    perhaps help teach them how to deal with these issues in a
19    way that will protect the people who are members of the class
20    and who still remain at the ADX.  And so as we were balancing
21    the need to try to get the most secure outcome we could
22    against the risks of further litigation, and the fact that
23    literally one of our clients had died because his situation
24    was not, in our view, dealt with the way that it should have,
25    we came to the conclusion that the enforcement mechanism
```

Page 198

1   that's been presented to the Court was a fair and adequate

2   and reasonable way to resolve this issue.

3           In terms of the legal mechanism here, obviously --

4   may I assume that the Court has had a chance to review

5   Kokkonen or would you like me to go through --

6           THE COURT:  Yes.

7           MR. ARO:  So obviously Justice Scalia's words in

8   that opinion are dicta.

9           THE COURT:  Yes.

10          MR. ARO:  And that was a concern for us right out

11  of the gate.  A second concern was that until one of my very

12  capable young associates found the cases that I forward -- or

13  gave you today, we had not been able to find a single federal

14  court opinion that applied Kokkonen in implementing an

15  enforcement remedy following the stipulation to dismiss with

16  prejudice of a case like this.  And we were concerned about

17  that fact.  And obviously, as the Court articulated right

18  before leaving the bench, there's -- we don't have a case

19  against the Bureau of Prisons, although we do have one

20  against Mr. Chertoff in his capacity as a federal actor, the

21  other case that I handed you.

22          From our perspective, Your Honor, the -- and this

23  is having consulted with a lot of people who spend their

24  whole careers doing this, the 41(a) Kokkonen mechanism works

25  because the failing in the Kokkonen case was a failure of the

Page 199

```
 1   Court to retain jurisdiction to do anything.  And once that
 2   case was dismissed, the Court's jurisdiction was terminated.
 3   At -- attaching conditions and retention of jurisdiction with
 4   respect to enforcement of the settlement we believe becomes
 5   the enforcement mechanism the Court -- the Court requires
 6   going forward.  In other words, by saying in an order, I'm
 7   dismissing the case with prejudice but retain jurisdiction to
 8   enforce the obligations of the government under this
 9   agreement, we believe that you retain the continuing power,
10   subject to the terms and conditions that the parties have
11   agreed to, to compel compliance with anything in the
12   settlement agreement that is not addressed through the
13   extensive -- I'm going to call them alternative dispute
14   resolution mechanisms that we also negotiated.  We understand
15   that there's no certainty about that model because we don't
16   have a case against the Bureau of Prisons approved by the
17   Supreme Court.  But if we did not have a high level of
18   confidence in the efficacy of this mechanism and the legal
19   basis for it, we would not have proposed it to the Court.
20           THE COURT:  But it's retaining jurisdiction within
21   some limitations?
22           MR. ARO:  That's correct, Your Honor.
23           THE COURT:  So, you know, ordinarily if a case is
24   dismissed by a settlement agreement subject to the Court's
25   continuing jurisdiction, the parties on either side could
```

Page 200

```
 1   come in and -- say, with a petition ordinarily for contempt.

 2            MR. ARO:  That's right.

 3            THE COURT:  And then -- although there could be

 4   other remedies besides contempt -- contempt depending upon

 5   what the settlement agreement provided.  In this case there's

 6   a retention of jurisdiction, but it has to go through these

 7   preliminary steps, as I understand what you're agreeing to.

 8            MR. ARO:  That's correct, Your Honor.

 9            THE COURT:  So that involves the efforts to

10   mediate.  Then it involves a magistrate judge.  And although

11   Judge Hegarty is named, it applies to any successor --

12            MR. ARO:  That's right.

13            THE COURT:  -- whoever that might be.  And, of

14   course, it would apply to any successor to me as well, I

15   assume.  But then the -- assume that the mediation effort

16   fails.  The efforts by the magistrate judge fails.  Then what

17   is the Court enabled to do?

18            MR. ARO:  We believe that in that circumstance --

19   and let me back up to the beginning of that daisy chain.  So

20   we understand and the settlement contemplates that the

21   Court's enforcement power really would be focused on material

22   noncompliance, substantial noncompliance, big things, as

23   opposed to Joe didn't get his medication --

24            THE COURT:  Right.

25            MR. ARO:  -- on Tuesday.
```

Harold Cunningham, individually, et al. vs.               Fairness Hearing - Day 3
Federal Bureau of Prisons                                 December 19, 2016

Page 201

1      THE COURT:  Yeah.

2      MR. ARO:  And so the idea would be if through

3  whatever mechanism it surfaces that there's an area of

4  noncompliance, the conversation starts with myself and Chris

5  Synsvoll, who's sitting in the front row back there, who's

6  the head lawyer down at the ADX --

7      THE COURT:  Right.

8      MR. ARO:  -- with whom I've developed what I

9  regard as an exceptionally good working relationship.  He is

10  a good guy who is honest, and has done some things in

11  connection with this case that you don't know about that are

12  really extraordinary that I want to mention before we

13  conclude today.

14      He and I have worked out a lot of things together.

15  And I have a confidence level that Chris and I are going to

16  be able to work out most problems.  If that doesn't work for

17  whatever reason, the next step of this process is the

18  escalation that you see in the agreement which ultimately

19  goes through the process of Magistrate Judge Hegarty.  Given

20  the extensive involvement that Judge Hegarty has had with

21  this, and, again, I understand, he might not be the guy two

22  or three years from now.

23      THE COURT:  He may -- and you might not be the guy

24  either.

25      MR. ARO:  One would hope we'll all be here to see

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 202

1   this thing to the end.

2           THE COURT:  Well, you know --

3           MR. ARO:  But it's a possibility certainly.

4           THE COURT:  Yeah.  Well, we're all expendable.

5           MR. ARO:  We'd -- we'd try to work it out with the

6   judge.  And if that doesn't work, we come to you.  And we

7   have the ability to apply to you for an order compelling them

8   to comply with whatever obligation we say has not been

9   complied with.  There was -- and this gets into sort of the

10  making of the sausage, Your Honor.  And I don't know how much

11  of this you want to know.  But there was a discomfort on the

12  government's part about the ability we would have under a

13  consent decree to run to you every single time there was a

14  little thing.  And so they wanted to place some bumpers

15  around that.  So the idea would be I'd come to you and I'd

16  say, They have fallen behind -- below their required staffing

17  levels.

18          THE COURT:  Right.

19          MR. ARO:  They need to have X number of doctors.

20  You order them to meet that standing -- or that staffing

21  requirement.  If thereafter they fail to do so, then you

22  would have a full set of equitable powers to compel

23  performance with the order that you entered in the initial

24  proceeding.  That's the way that this is intended to

25  function.  I think it's cumbersome, but in a way that is

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 203

1   intended to keep anybody from precipitously applying for an

2   order that may not be fully required.

3          THE COURT:  Well, does that include contempt?

4          MR. ARO:  We believe that the equitable powers of

5   the Court include a contempt citation if they fail to comply

6   with the first order that you enter.

7          THE COURT:  Yes.  Understood.  Well, you know, I

8   have to assume that there may be hostility to this settlement

9   on the part of the government later on.

10         MR. ARO:  As do we, Your Honor.

11         THE COURT:  And I am not making any judgment about

12   that.  But there's certainly every indication that law

13   enforcement may take a different approach as a result of the

14   new administration.  So I guess -- and that's why I'm a

15   little troubled that this is an agreement instead of a

16   consent order.  If it's a consent order, nobody can change it

17   except coming to the Court for a change.  I'm not sure that

18   it has the same effect here.

19         MR. ARO:  Were it up to us, you would have been

20   presented with a contempt order.

21         THE COURT:  I know.

22         MR. ARO:  But we -- we are absolutely convinced

23   that this was the only way a settlement was going to get

24   done.  And so we looked at this -- whatever risk is

25   associated with this remedial regime the same way we looked

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 204

1    at the risk associated with going forward.

2           THE COURT:  A trial.  Okay.  Well, I don't -- you

3    know, I don't want to be misunderstood about this.  I'm not

4    going to assume what I just said because I would hope that

5    anybody in charge of the Bureau of Prisons would recognize

6    the humanity of what's involved here.  And I'm not going to

7    assume that somebody wouldn't.  But it seems to me that its

8    obligation -- my obligation here is to do the best I can to

9    make sure that people do what they say they're going to do,

10   and particularly, it's not only a question of agreeing with

11   what their present administration has agreed to here, but

12   there's also the question of funding because, you know,

13   Congress has to appropriate the money necessary to carry out

14   these rather ambitious programs.  So that's another risk.  I

15   mean, I can't require the government to fund the Bureau of

16   Prisons.  I can't require the Congress to fund the Bureau of

17   Prisons.  So it has to be understood by everybody that there

18   are those risks.  And I'm sure you understand that.

19          MR. ARO:  We do, Your Honor.

20          THE COURT:  I don't think your clients would

21   understand it, but --

22          MR. ARO:  We've done our best to help them

23   understand it, but those are complicated conversations.

24          THE COURT:  Yeah.  Well, it's -- they're also

25   complicated concepts.  All right.  Well, let me hear from

Harold Cunningham, individually, et al. vs.                                    Fairness Hearing - Day 3
Federal Bureau of Prisons                                                            December 19, 2016

Page 205

 1    Ms. Padden who is the government lawyer.  So -- and I
 2    don't -- you know, Ms. Padden, I -- I know about your good
 3    faith and I'm sure the good faith of those who authorized you
 4    to proceed with this.  But, you know, I haven't been here all
 5    this time without generating a considerable cynicism about
 6    everything, including government.  Okay.
 7              MS. PADDEN:  And I understand that, Your Honor, so
 8    I'll -- I'd just like to make a couple points about the --
 9    this consent decree versus settlement agreement issue.
10              THE COURT:  Right.
11              MS. PADDEN:  First of all, as Mr. Aro indicated,
12    this was key for my client to be able to move forward with
13    the settlement negotiations.  There's lots of downsides
14    for -- to a consent decree for a correctional system to enter
15    into one, including, first, just the negative connotations
16    that carry on with the consent decree.  But also as Mr. Aro
17    represented, that we could be held in contempt in the first
18    instance if there's any sort of violation at all.  But, you
19    know, I think this settlement agreement is -- it gave the
20    Bureau a lot of comfort.  It allowed the Bureau to agree to
21    do a lot more than it would have been able to agree if it was
22    willing to agree -- to enter into a consent decree in the
23    first place, which it was not willing to do.  But -- so, for
24    example, the agreement could last up to four years, whereas a
25    PLRA would automatically allow a defendant to move to

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 206

1    terminate in two years.  And, you know, the manner in which

2    the settlement agreement was reached is that we eventually

3    ended up agreeing on the policies and then incorporating

4    essentially provisions of those policies into the agreement

5    itself.  We really don't think that would have been workable

6    in the context of a consent decree, again, even if the Bureau

7    was willing to agree to it, and they were not, because -- for

8    several reasons.

9              First, you know, as we've been discussing here,

10   and as -- I want to, you know, give the Court a little more

11   evidence so it's in the record in a few minutes, you know,

12   we're talking about the ADX.  This is the most important

13   institution to the federal system.  And it houses a small

14   percentage of men that are the most dangerous men in the

15   world.  And the settlement agreement allows the Bureau of

16   Prisons flexibility to change its policies which was critical

17   when we're dealing with this type of prison population as

18   long as they don't diminish the level of services being

19   provided.  So, you know, that was a key issue as far as

20   getting approval from the folks back in Washington, DC as

21   well, that the Bureau can continue to manage its facility.

22   It just cannot lower the level of services available to it.

23   And this Kokkonen type of dismissal is, frankly, used

24   frequently within the federal system.

25             So as Mr. Aro indicated, I did talk to Mr. Smith.

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 207

 1   He was the head of the special litigation section in civil

 2   rights.  And that's pretty much all they do is prison

 3   litigation.  He says he's -- he had entered into many

 4   settlement agreements like this with state systems, which

 5   that's not a federal sovereign, but, you know -- and

 6   obviously it involves the United States being on the other

 7   side of the V.  And he had absolutely no hesitation that this

 8   was an acceptable method, and it would be enforceable.  And I

 9   do want to clarify.  I didn't talk to him about this lawsuit

10   in particular because of any sort of conflicts issue.  I just

11   talked about them, the general principles of how to -- how to

12   move forward with this.

13             THE COURT:  Yes.

14             MS. PADDEN:  I believe this does come up in the

15   employment context quite a bit, frankly.  And it's my -- I

16   have been informed that it's both the civil division of the

17   Department of Justice as well as the Office of the Solicitor

18   General's position that these types of agreements with a

19   Kokkonen dismissal are enforceable in the same way a consent

20   decree is enforceable.  And if Your Honor would -- like I

21   said, I tried to find some in the employment context.  I --

22   you know, we -- we didn't really find any that were

23   directly -- obviously there aren't any about the BOP.  This

24   is something kind of new for the BOP to be entering into.

25   But there may very well be cases out there in the employment

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 208

 1   context because often there's things that the defendant

 2   agrees to do such as, you know, back pay or things like that.

 3            THE COURT:  I -- I don't -- I wouldn't be

 4   persuaded by the employment context.

 5            MS. PADDEN:  Okay.

 6            THE COURT:  This is a much different thing.  This

 7   is, you know, the sovereign power of the United States

 8   government.

 9            MS. PADDEN:  Right.  But that sovereign immunity

10   is already waived by the lawsuit being brought in the first

11   instance.  And so the problem in Kokkonen is that there was

12   just a straight-out dismissal with the Court --

13            THE COURT:  Yeah.

14            MS. PADDEN:  -- not retaining jurisdiction.

15            THE COURT:  I know.

16            MS. PADDEN:  So, you know, I think the sovereign

17   immunity is waived with the claims being asserted in the

18   first place.  And then when the Court issues the Rule 41

19   dismissal and retains jurisdiction to enforce the agreement,

20   then that's the basis for jurisdiction to -- for the Court to

21   move forward if we do end up in that circumstance, which

22   hopefully we will not.

23            THE COURT:  I'm not remembering, looking at all of

24   these exhibits attached to the motion for preliminary

25   approval, as to changes that may become appropriate.  You

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 209

1    know, we are learning more about the mental health and about

2    the human behavior I think as we go along.  There's a lot of

3    research being done in this area.  And so there could be

4    desirable changes that everybody agrees to, and then there

5    could also be changes that may become necessary because of

6    changes of condition.  I don't know, you know.  This is a

7    dynamic circumstance.  So what is provided here is to how

8    changes may be made in some of these explicit policies?

9            MS. PADDEN:  Yeah.  I mean, it's in the settlement

10   agreement.  I do have a -- just bear with me for a moment,

11   Your Honor.

12           THE COURT:  What are you --

13           MS. PADDEN:  I'm looking at the settlement

14   agreement itself.  It's in the settlement agreement itself.

15   I'm sorry, Your Honor.  I'm not being able to --

16           THE COURT:  Well, maybe Mr. Aro can --

17           MS. PADDEN:  Maybe if Mr. Aro could look while I'm

18   still talking to the Court, if that's okay.

19           MR. ARO:  I'll find it quickly.

20           MS. PADDEN:  Okay.  But, again, that was very

21   important for dealing with this specific institution and the

22   specific patient population.  But, again, Mr. Aro will find

23   the exact language probably more quickly than I can.  But it

24   expressly provides that the Bureau of Prisons can't diminish

25   the level of services with respect to the issues covered in

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 210

 1   the settlement agreement.

 2          THE COURT:  Well, what I'm thinking about is maybe

 3   it should be diminished in some aspect because of new

 4   learning or new conditions.  That's of some concern to me.

 5   Here we are -- as I said in the beginning, I don't know

 6   whether this is -- some of these programs are adequate in the

 7   sense of treatment, appropriate treatment.  And it may well

 8   occur that in the implementation there are good reasons to

 9   change it.  And so when we talk about the level, I don't know

10   what for sure that means.

11          MS. PADDEN:  Thank you.  Okay.  Yes.  So Mr. Aro

12   found it.  It's at paragraph 8 which is on page 8 of the

13   agreement.  And it says, Nothing in this addendum prevents

14   the defendant from modifying the above-referenced policies.

15   Defendant maintains its right to amend the policies without

16   approval of the plaintiffs, however, during the compliance

17   period the defendant agrees that any modifications to these

18   policies will not diminish the standards for screening or the

19   standards for services and treatment provided in the

20   policies.

21          THE COURT:  Okay.

22          MS. PADDEN:  And, I mean, obviously, Your Honor,

23   that's something we're going to have to deal with as it -- as

24   it comes up.  But that was --

25          THE COURT:  Yeah.

Page 211

1           MS. PADDEN:  -- an important provision to my

2    client, and to the department generally, that we retain

3    flexibility about how to deal with inmates at this

4    institution.

5           THE COURT:  Okay.  Well, you know, yeah, we

6    can't -- in programs such as this we can't set it in stone,

7    what I'm trying to say.

8           MS. PADDEN:  Right.

9           THE COURT:  And so there's got to be some room for

10   modification.  And hopefully if that occurs, there can be

11   agreement about it.

12          MS. PADDEN:  Mm-hmm.  That would be our hope as

13   well, Your Honor.

14          THE COURT:  Yeah.  Well, you wanted to put

15   something additional in the record, did you say?

16          MS. PADDEN:  I do, Your Honor.  And I apologize.

17   I'm going to use a PowerPoint, but it's only to show some

18   exhibits pretty quickly without having to cull them up all

19   individually.

20          THE COURT:  Okay.

21          MS. PADDEN:  And I -- the reason I want to do

22   this, Your Honor, is to have in the record some specific

23   examples of the evidence we'd put on at trial.  So I'm not

24   going to go point by point and rebut, you know, each piece of

25   testimony that you heard.  But needless to say, we have

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 212

 1    issues with a number of the facts that the plaintiffs

 2    testified to.

 3                THE COURT:  Of course.

 4                MS. PADDEN:  We have contradicting evidence for a

 5    number of those.  We would lodge attacks on their

 6    credibility, as Your Honor recognized last week.  But I do

 7    have a few pieces of evidence.  There -- for example, the --

 8    there were three former psychologists who were deposed.

 9    Those were the only BOP officials deposed before we --

10                THE COURT:  Yeah.  Whose conduct is being referred

11    to by these inmates?

12                MS. PADDEN:  Some of them, yes.  And so they -- I

13    would like to show you portions of their testimony.  Their

14    deposition transcripts have already been admitted into

15    evidence.  But I'd just like to highlight some portions that

16    explain their view of, you know, the treatment they were

17    providing and things like that.

18                THE COURT:  Sure.

19                MS. PADDEN:  So -- and before I get started, I

20    just want to make very few quick points.  But -- and we

21    listened to some very painful testimony yesterday.  And it

22    was very hard to listen to for everybody in the room.  But,

23    again, the point here today is not to pick apart at every

24    instant that was testified about in a point by point manner.

25    And so I'm just going to highlight a few things here.

Page 213

 1              But, you know, I've been representing the Bureau
 2    of Prisons for 10 years now.  And I -- what I have seen is,
 3    you know, I've seen wardens that really care about that
 4    institution.  I've seen doctors trying to do the best job
 5    that they could -- can under, you know, very difficult
 6    situations with very dangerous inmates who have committed
 7    acts of murder in correctional settings sometimes and have
 8    killed staff members, for example.  And, you know, I've seen
 9    correctional officers that are just trying very hard to do
10    their job every single day under, frankly, some very
11    difficult circumstances.

12              So the first point I wanted to stress, Your Honor,
13    and you mentioned this on, I believe, Thursday or Friday.  I
14    was glad you did because it really is the proverbial elephant
15    in the room.  You know, the Bureau of Prisons is not a mental
16    health agency.  It's part of the Department of Justice, and
17    it runs prisons.  And unfortunately the operation of our
18    justice system has resulted in increasing numbers of mentally
19    ill inmates being incarcerated, yet that doesn't make it the
20    Bureau's job to provide a gold standard of care, although I
21    would submit that is what they are doing carefully, I mean,
22    at this point in time.  Nor is the constitution violated
23    every time a policy might be violated.  Instead, the
24    constitution only requires that the Bureau not be
25    deliberately indifferent to serious medical needs, which is a

Page 214

```
 1    very difficult standard for a plaintiff to meet.
 2            THE COURT:  Well, I would recognize too in the
 3    beginning, and alluded to it generally, but the safety of the
 4    public is the responsibility of the Bureau of Prisons --
 5            MS. PADDEN:  Correct.
 6            THE COURT:  -- in carrying out the sentences which
 7    have been imposed through the judicial process.
 8            MS. PADDEN:  Right.
 9            THE COURT:  So I recognize that.
10            MS. PADDEN:  Yes.  The second point is that mental
11    illnesses are extremely complex things to diagnose and treat
12    in the first instance.  And that's the case even if the
13    individual is not incarcerated or the individual is not
14    extremely violent.  So, Your Honor, if we had gone to trial
15    we'd have shown that, for example, in cases where diagnoses
16    were changed that doesn't necessarily mean there was some bad
17    intent there.  That might mean that the doctor is constantly
18    reviewing the case and trying to get the diagnosis correct.
19    And it's very difficult to do in this inmate population.  For
20    most of these mental illnesses these men are never going to
21    be cured.  You know, it's not like they have appendicitis
22    that can be cured by surgery or they've got a bacterial
23    infection that can be cured by medication.  And unfortunately
24    the Bureau has to deal with many instances of inmates
25    malingering or engaging in behavior for secondary gain or
```

Page 215

 1    engaging in behavior so that they can have the access to --
 2    the ability to access and harm other staff or inmates.  And
 3    so all those things have to be taken in consideration when
 4    the Bureau of Prisons' psychologists are doing their job.
 5    And moreover, no mental health provider, whether in a
 6    correctional setting or not, can prevent self-harm or
 7    suicide.  Those are very complicated behavioral patterns.
 8    They're very difficult to predict even in individuals who
 9    aren't incarcerated.  And, you know, those are just things
10    that for any mental professional, it's not possible to
11    accurately predict and prevent those in all circumstances.
12              So I -- I'll turn now just briefly.  I just want
13    to highlight a couple of things that weren't covered in the
14    past two days.  You know, obviously here is a photo of a cell
15    and a photo of one of the intermediate units.  And, again,
16    the reason I have these photos up here is, first, on the left
17    you can see, you know, that this -- this cell is bright.
18    It's got a window.  It's very different than the state
19    supermaxes that were described by some of the plaintiffs in
20    this case where they were housed and where they maybe didn't
21    have a window.  They didn't have control of the lighting in
22    their cell.  You know, they weren't given anything to do
23    during the time they were sitting and serving their sentence.
24    The picture on the right is of one of the intermediate
25    step-down units.  And, again, when inmates work their way

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 216

 1   through the step-down program they can come out and, you
 2   know, sit at these tables, play games.  They're allowed to
 3   have meals there, so --
 4           THE COURT:  Yeah.  It's a dayroom.
 5           MS. PADDEN:  Essentially, yes.  And so, you know,
 6   the Bureau is constantly doing things to make incarceration
 7   at the ADX less isolating for these men.
 8           So I have a couple pictures of the outdoor
 9   recreation.  I'll just go through these really quickly.  But
10   I have these in here to show -- I mean, Mr. Aro had some
11   older photos that were kind of gray and grainy.  And I wanted
12   to show how -- that the inmates here have access to direct
13   sunlight.  We sometimes see reports in the press that the
14   inmates don't have access to sunlight.  And that's simply not
15   true.  They do have direct access to sunlight.  They are in
16   the sun when they're at outdoor recreation.  Again, this is
17   something very different than what you heard about in the
18   state supermaxes.  They have televisions in their -- sorry.
19   Televisions in their cells.  They have 52 channels of
20   DirecTV.  You heard Mr. Dunbar get very animated about that.
21   They also have various programming on there.  Psychology.
22   There's religious service programming.  And I've put these up
23   here just to show, you know, these are efforts by the Bureau
24   to make the -- the housing of the men there less isolating,
25   and to give them things to do to fill their time.

Page 217

```
 1              This is something a lot of people don't know
 2   about, but the inmates can participate in hobby craft.  They
 3   can crochet.  They can make jewelry.  These are some
 4   samples -- recent samples of just some things that the
 5   inmates have done as part of the hobby craft program.
 6              THE COURT:  And what level is this?
 7              MS. PADDEN:  This is all at ADX.
 8              THE COURT:  Pardon?
 9              MS. PADDEN:  This is -- these are all at ADX.  And
10   I believe they're --
11              THE COURT:  Yeah.  But not in the control unit.
12              MS. PADDEN:  I believe they are.  I know they're
13   permitted to do it in H unit.  Could I consult with
14   Mr. Synsvoll?  Control unit?  They're allowed to do --
15   participate in the control unit as well, in these types of
16   activities.  Painting is also permitted.  And here's just
17   kind of a collage of various artwork that inmates at the ADX
18   have done.  Inmates also have access to a leisure library.
19   Now, they don't physically go to this library, but they have
20   the ability to check books out from there so that they can
21   read these books in their cells and, again, have something to
22   do with their time.
23              The inmates have a weekly bingo game.  This is
24   very popular among the inmates.  The numbers are called out
25   over the intercom system.  And the inmates who win bingo
```

Page 218

 1   might get a candy bar or a Butterfinger.  They have access to

 2   religious services, including books and programming that's

 3   played over the TVs.

 4              THE COURT:  Is there a Christian naturalist

 5   program?

 6              MS. PADDEN:  I don't believe that there is.

 7              This is a photo of the commissary.  Again, the

 8   inmates don't physically go in the commissary, but they can

 9   order things from here.  Right now the inmates will be

10   getting holiday gift bags throughout the entire complex with

11   some additional treats and snacks for them over the holidays.

12   And there also is a number of educational programming.  You

13   heard some things about that such as GED programming.

14   There's a more comprehensive list provided to the Court.  It

15   is Exhibit 1044.

16              And, so, again, the Bureau is constantly striving

17   to improve the quality of life of the men down there, to

18   provide them with productive things to do with their time.

19   And you heard how the inmates interact with each other.  You

20   heard how Jack Powers invented a game that he would play with

21   inmate Vega.  You heard that Charles Hipps played chess with

22   Eric Rudolph.  And so if we'd gone to trial we would have

23   shown that these conditions weren't really isolate --

24   isolation at all.  So as --

25              THE COURT:  Yeah.  But they were doing it by -- I

Page 219

```
 1   never did understand it.  Draining the water pipes so that
 2   they could communicate through it.  That's not an approved
 3   thing, is it?
 4              MS. PADDEN:  It does occur.  It absolutely --
 5              THE COURT:  Yeah.  I know.  But it isn't
 6   designed --
 7              MS. PADDEN:  It's not designed.
 8              THE COURT:  -- to occur.
 9              MS. PADDEN:  No, but it absolutely does occur.
10   And so this is a deposition of one of the former
11   psychologists, Dr. Marie Bailey.  I think you heard
12   Mr. Powers testify about her.  Again, I'm not going to play
13   you any clips.  I just wanted to highlight, you know, that
14   she agreed that the inmates had social networks, that they
15   played chess with each other.  They could converse with one
16   another.  They're not held in some sort of stark isolation.
17              The same thing with -- with Dr. Morrison, another
18   former ADX psychologist.  You know, again, the inmates are
19   talking.  They're playing chess.  They're socializing.
20   Dr. Bailey also testified that some of these -- well, many of
21   these things were available prior to the initiation of this
22   lawsuit.  Dr. Bailey, herself, had a yoga program.  She had a
23   meditation program when she was there.  She also pulled
24   Mr. Powers out for private counseling sessions, as you heard.
25   Even though he was housed in the control unit, she was able
```

Page 220

```
 1   to do that at that time.  And that's at pages 30 and 31 of
 2   her deposition.  Dr. Morrison attempted to do group therapy
 3   long before this lawsuit was filed.  Unfortunately it was not
 4   successful because the inmates didn't want to contribute.
 5   So, you know, even prior to this lawsuit being filed, and
 6   even when the staffing levels were much less than what they
 7   are now, the doctors down there were looking for ways to make
 8   the conditions -- improve the conditions and enhance access
 9   to therapy.
10          You heard several inmates testify that they didn't
11   receive screening when they came in.  All three of the
12   psychologists testified that was not true, that every inmate
13   when they arrived, they would receive screening.  And, in
14   fact, they said that because there was a small number of
15   inmates arriving at any single time, they had the luxury to
16   be more familiar with the inmate's case when he arrived and
17   do a more thorough screening.  So we hear this from
18   Dr. Waterstone, from Dr. Bailey, and from Dr. Morrison.
19          THE COURT:  But what about the circumstances where
20   an inmate arriving at ADX has a record of having been in a
21   medical -- having a diagnosis and having been at one of the
22   facilities that provide treatment?  That's one of the issues
23   that plaintiff -- the plaintiff class relies on.
24          MS. PADDEN:  Right.  And are you talking about
25   the --
```

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 221

```
 1              THE COURT:  They should never have been in ADX in
 2    the first place.
 3              MS. PADDEN:  In the ADX in the first place.  Yes.
 4    So actually that really segues -- oh, let me skip through
 5    these and get to the next policy.  So this is the policy that
 6    Mr. Aro showed you before.  This is the 2009 policy --
 7              THE COURT:  Right.
 8              MS. PADDEN:  -- that -- it said that inmates
 9    currently -- currently diagnosed and suffering from serious
10    psychiatric illnesses should not be referred to placement at
11    USP Marion or ADX Florence.  But Mr. Aro didn't show you
12    this -- this paragraph below which says, Inmates with severe
13    or chronic behavior patterns that cannot be addressed at
14    other bureau institutions should be referred to the ADX
15    general population setting.  So that refers to what had been
16    historically viewed as an Axis II type diagnosis.  So I'm
17    sure Your Honor is familiar under the old DSM-V, we had Axis
18    I, which are the mood disorders --
19              THE COURT:  Right.
20              MS. PADDEN:  -- like major depression, things like
21    that.  The Axis II are more of the personality disorders.
22    And, frankly, most of the plaintiffs would fall within this
23    category.  That would include the plaintiffs that are
24    currently at this STAGES program.
25              THE COURT:  I think that would apply to anybody
```

Page 222

 1   who's been convicted of a crime.

 2            MS. PADDEN:  Well, yes.  Unfortunately that may

 3   very well be true.

 4            THE COURT:  Yeah.

 5            MS. PADDEN:  But the STAGES program is designed

 6   to -- to work with those inmates.  And it's an extremely

 7   diff- -- difficult inmate population to work with.  So that's

 8   our first point on this one.

 9            The second point would be that simply because

10   there was, you know, allegedly a violation of BOP policy

11   doesn't mean it was a constitutional violation.

12            THE COURT:  Oh, of course.

13            MS. PADDEN:  The third issue would be that, you

14   know, at the time really the only option -- you know, if we

15   have an extremely dangerous inmate that needs the security

16   and controls at ADX, the Bureau's only option would either be

17   to send them to ADX or to send them to Springfield.  But

18   everybody can't be at Springfield for an indefinite period of

19   time.  You know, those beds are in very high demand.  And

20   they need to be reserved for the sickest of the sick inmates.

21            But to get back to Your Honor's point, that

22   information would be available to the (inaudible) when they

23   were conducting the screening in the first place.  Now, this

24   policy has been changed moving forward.  And, you know, that

25   was a very important point I think for the plaintiffs.  That

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 223

1   now it's more clear that the exclusion will also apply to

2   inmates that have a personality type disorder unless there

3   are extraordinary security concerns that can't be addressed

4   in another institution.

5            And so while we're on the issue of policy, I'll

6   just back up for a little bit.  But you heard a lot about the

7   control unit policy, that inmates in the control unit were

8   not to receive psychotropic medications.  Again, all three of

9   the psychologists had a differing interpretation than the

10  inmate testimony that you heard about those policies.  They

11  said they would give the inmates the option to either go into

12  the control unit and serve their time and come off their

13  medication or to continue their medication, be housed in the

14  general population unit, and defer serving their control unit

15  time.  So, again, just for the record, we've got all three of

16  their testimony on that.

17            I do want to talk a little bit about Mr. Hill.

18            THE COURT:  Yeah.

19            MS. PADDEN:  And, you know, Dr. Bailey, again, a

20  former ADX psychologist, was familiar with Mr. Hill from her

21  time there, you know.  And she -- she testified that there

22  was nowhere else for the Bureau to house Mr. Hill at that

23  time.  Now that we have these new programs, Mr. Hill was

24  housed in Atlanta.  Unfortunately while he was in Atlanta he

25  threw a cup of scalding hot water on a nurse who was trying

Page 224

1    to give him medication and she was severely burned.  He

2    eventually was taken out of the program in Atlanta and placed

3    in the program at Allenwood.  But he's an extremely

4    challenging case.  You know, he's a very violent individual.

5    If -- you know, if Your Honor had a chance to go back and

6    look at the PSR, his underlying conviction before he entered

7    the Bureau of Prisons was that he had carjacked a young lady,

8    made her drive around all night, beat her very severely with

9    the back end of a hammer.  She almost passed out from the

10   blood loss.  She was very scared.  So he has -- and he has a

11   long history of other violent acts before he got into the

12   Bureau of Prisons custody, and then when he was involved in

13   the murder of his cellmate.  I mean, obviously at that point

14   in time it wouldn't be safe for the Bureau to keep him in the

15   general population setting.  And so he was someone who needed

16   the security and controls at the ADX, but, again, provides a

17   very challenging clinical picture.  You know, even if he

18   wasn't a violent person and wasn't incarcerated, it still

19   would be very challenging for someone to correctly diagnose

20   and treat an individual with that type of schizophrenia.  And

21   I did just quickly put together a timeline so Your Honor

22   would better understand what happened in the fall of 2012

23   because, I mean, obviously --

24           THE COURT:  Well, going back to Mr. Hill a moment.

25           MS. PADDEN:  Yes.

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 225

 1            THE COURT:  You know, I've reflected on that a

 2   little after looking again at the presentence report and

 3   thinking about it.  You know, I guess I could have made a

 4   recommendation that he go to Springfield, but obviously he

 5   wouldn't be going to Springfield.  The Bureau of Prisons

 6   would not have followed that recommendation I'm sure.

 7            MS. PADDEN:  Well --

 8            THE COURT:  So, you know, I look back to think

 9   whether I could have done something to assist in that.  And

10   as I look back on it, I don't think I could have.  And there

11   was the issue of was he competent to enter into the plea

12   agreement?  And I'm -- that's done.

13            MS. PADDEN:  Right.

14            THE COURT:  So --

15            MS. PADDEN:  And, Your Honor, the Bureau does

16   consider referrals such as that.

17            THE COURT:  Well, I know, but --

18            MS. PADDEN:  But they have to --

19            THE COURT:  -- although I've had disagreements

20   with them over time.

21            MS. PADDEN:  Right.  And it's a challenge because

22   they're trying to balance the needs of every --

23            THE COURT:  Well --

24            MS. PADDEN:  -- institution within the system.

25            THE COURT:  -- you don't need to go there.

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 226

1        MS. PADDEN:  Okay.

2        THE COURT:  They also have guidelines which I have

3   been known to say don't look at the individual adequately.

4   But that's long gone.

5        MS. PADDEN:  Right.

6        THE COURT:  We're here with what we're here on.

7        MS. PADDEN:  Okay.  And so this was about what

8   happened to Mr. Hill in October of 2012.  And, I mean,

9   obviously he was very sick by the time he did go to

10  Springfield.  But it's important to note, the first thing the

11  ADX did is they sent him out to an outside doctor.  They sent

12  him out to Parkview Hospital.  He had blood tests taken.

13  They were normal.  He had a chest xray.  It was normal.  And

14  he had blood cultures taken.  And then he was seen pretty

15  regularly by the psychologist and other individuals at the

16  institution until the blood cultures came back, and they were

17  negative.  So he didn't have any infection at that point.  He

18  was still seen here throughout.  And then, you know,

19  unfortunately, for reasons that we don't know, he wasn't

20  transferred to Springfield until November of -- the end of

21  November of 2012.

22        But further, during that time, for example, one of

23  the exhibits in the record is the SHU log during that time.

24  And the SHU log shows that, you know, he was constantly

25  being, you know, observed by the correctional officers.  They

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 227

1  were recording whether or not he was taking his meals.  They

2  were recording whether or not he was taking -- going and

3  having a shower.  They were recording whether or not he was

4  going out to rec.  So it wasn't that, you know, he was locked

5  away and that everyone was ignoring him.  He was being

6  constantly monitored and -- and checked on, but, you know,

7  unfortunately, you know, hindsight is always 20/20, we had

8  the unfortunate result that we did.  But luckily the doctors

9  at Springfield were able to treat him and were able to save

10 his legs.

11        And if you look at Exhibit 1045, which is

12 Mr. Hill's disciplinary history, that has the incident that I

13 referred to where he threw hot water on the nurse at Atlanta.

14 He continued to have disciplinary shots while at Allenwood.

15 And, again, that just highlights what a difficult case he is

16 or inmates like him are because even though he's in this very

17 intensive dedicated treatment program, it's not going to cure

18 him, and we're going to continue to have issues of misconduct

19 and unfortunately issues of violence.  And it's very

20 important that the Bureau be able to address the security

21 needs.  And just for the record, Exhibit 88 is the SHU log

22 that I was referring to.

23        Just a couple things on Mr. Powers.  Dr. Morrison

24 believed that Mr. Powers had a personality disorder.  And

25 he's at the STAGES program, which means he was not excludable

Page 228

 1   from ADX under the old policy.  But I think -- I've talked to

 2   Mr. Powers many times.  I think Your Honor could tell, he's

 3   very intelligent.  He's very articulate.  He's a very

 4   complicated person though.  And so, again, no clear path as

 5   to how to treat him.  He has been in the STAGES program.  You

 6   heard that he doesn't particularly like it right now.  And

 7   I'm going to show you a few pictures of the STAGES program in

 8   a second.  But it's been -- it's been beneficial to him.

 9   It's helped him.  He's had far fewer incidents of self-harm.

10   Again, those are never going to be completely eliminated.

11   But unfortunately he's decided to check himself out of the

12   program.  And so we're -- the Bureau is trying to figure out

13   where they're going to place him.

14             This is a note that he sent to me last year where

15   he indicated his appreciation for the things that I had done.

16   And, you know, also noted that there were inmates in that

17   program who were causing difficulty, which is always going to

18   be the case.  Again, that's a very difficult inmate

19   population to treat.  So here are a few photos of the STAGES

20   program.  See, they've got it decorated with nice murals.

21   It's very bright and light.  The inmates who can come out to

22   the nonsecure side, they can play ping-pong.  Again, they

23   have outdoor recreation with abundant sunshine.  And this is

24   an art project that Mr. Powers, himself, actually made I

25   believe with popsicle sticks.  So they have lots of

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 229

1    opportunity for recreation in addition to the -- the

2    programming that they receive.

3            You heard a little bit about Mr. Perkins and his

4    suicide attempt.  If you'd look at Exhibit 1049, that makes a

5    couple things clear that contradict what his testimony was.

6    He indicated that attempt was very serious.  It was only

7    assessed as being moderate.  And he was very upset over --

8    his marriage was breaking up.  He was serving a life

9    sentence.  And his marriage was breaking up and he

10   understandably got quite despondent.  And that's when he made

11   that suicide attempt.  So it wasn't -- I mean, it was about

12   part of his incarceration, but it wasn't, you know, caused by

13   the conditions at ADX.  He's unfortunately quite a

14   manipulative inmate.  And there was a concern that the

15   suicide note he had written was actually dated the day before

16   he made the suicide attempt, and it was viewed that he may be

17   engaging in acts of manipulation.

18           You know, you haven't heard much about the

19   underlying criminal offenses from any of the individuals.  I

20   told you about Mr. Hill, which the Court's already aware.

21   But Mr. Cunningham and Mr. Barron engaged in 139-day crime

22   spree in Washington, DC in 1993.  They committed a number of

23   armed robberies at public markets and liquor stores.  They

24   killed, I believe, two individuals during that spree,

25   although I think they were only convicted of one of those two

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 230

 1   murders.  And then when Mr. Cunningham came to trial, and I
 2   personally remember this because I was clerking in that Court
 3   at that point, in the US District Court for the District of
 4   Columbia, he had managed to have a weapons smuggled into
 5   Judge Kessler's courtroom.  And when the witness was
 6   testifying against him at trial, he retrieved the weapon and
 7   tried to kill her in open court.  So, again, that just
 8   highlights how dangerous and how difficult these individuals
 9   are and why, you know, the Bureau always has to be focused
10   first on safety.
11             You heard some testimony about alleged
12   retaliation, however, Mr. Powers pretty adamantly said that
13   he had never been retaliated against.  And moreover, that's
14   not a claim in this case, but it's obviously -- it's very
15   concerning.  I will tell, Your Honor, that both myself and
16   Mr. Synsvoll has -- have repeatedly told Mr. Aro if he
17   becomes aware of reports of retaliation, we want to know
18   about it.  The Bureau takes those very seriously.  A number
19   of those reports have been referred to the Office of Internal
20   Affairs or even to DOJ's office OIG, the Office of Inspector
21   General.  And they're -- they're investigated.  You know, at
22   the same time, you know, these employees, they have rights.
23   They have rights, you know, not to be disciplined based on
24   unfounded or unsubstantiated allegations and, therefore, it's
25   very important that we go through this process where there is

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 231

```
 1   a report of -- of any retaliation or things like that.

 2            The next thing I'd just like to highlight is the

 3   Bureau is always looking for ways to make things better at

 4   ADX.  And I think you've seen that, even independent of this

 5   litigation.  So one thing that they've done is they've taken

 6   the K unit which is one of those units with the open dayroom

 7   that I showed Your Honor, and they've developed an adult

 8   alternative living program where older inmates with no

 9   history of serious institutional violence can -- can be

10   housed there.  And they get more opportunities to come out of

11   their cell and interact with one another.  So Terry Nichols

12   is housed in that unit.  And I know he's well familiar to the

13   Court.  And as you'll see, he's -- he's sent notes of

14   appreciation to one of the officers there saying how much he

15   appreciates his ability to be in that unit.  It's been a very

16   effective unit.  Ted Kaczynski is there as well.  And the

17   inmates are interacting and coming out of their cells more.

18   There is another --

19            THE COURT:  I take it his problem was solved about

20   moving him around.  You know, he complained at one time about

21   moving from a cell to another cell.  And, of course, some of

22   these other people have complained that they were moved into

23   dirty cells.

24            MS. PADDEN:  Right.

25            THE COURT:  But I haven't heard from Mr. Nichols
```

Page 232

```
 1    lately --

 2              MS. PADDEN:  That's good.

 3              THE COURT:  -- except to acknowledge that the

 4    money did get applied --

 5              MS. PADDEN:  Yes.

 6              THE COURT:  -- to his obligations.  Yes.

 7              MS. PADDEN:  Correct.  Correct.  One other exhibit

 8    that I've included in the notebook is Exhibit 1051.  It's a

 9    report that the Department of Justice issued in January of

10    2016 by something called the Restrictive Housing Working

11    Group.  And the president had asked the Attorney General to

12    have the Bureau of Prisons look at ways to reduce restrictive

13    housing within the entire system.  And so I included that for

14    a couple reasons.  First, it highlights some of the issues

15    that have already been identified about the Bureau has

16    continually been called upon to house mentally ill

17    individuals.  And that report recommends that the department

18    and the federal government generally look at ways to divert

19    those individuals from the criminal justice system in the

20    first place.  And that's found at page 121 to 123.  It also

21    shows the Bureau's and the department's dedication to trying

22    to improve the conditions for the men and women that they

23    house.  And then finally, it gives a detailed description of

24    the ADX and programming opportunities.  That's at pages 38 to

25    45.
```

Page 233

1              And then finally I'd just like to talk briefly

2     about the litigation risks.  Your Honor has identified most

3     of them, but I have a couple more.  You know, first of all,

4     obviously the PLRA puts a lot of restrictions on the type of

5     relief that the Court could order.  And we think that the

6     Court -- if we had gone to trial and if the Bureau was not

7     willing to settle, we think it's highly unlikely that the

8     Court could order this type of comprehensive relief as is

9     found in the settlement agreement, you know, that could

10    withstand an appeal, frankly.  I mean, I think it's the

11    narrowest -- you have to show it's the narrowest way to

12    address the federal right.  You have to show first there's an

13    underlying violation of federal right.  That it's narrow,

14    that it's needed.

15              THE COURT:  Right.

16              MS. PADDEN:  And it's least intrusive.  And those

17    are very hard standards to meet.  The Court's already talked

18    about the difficulty with getting a class certified.  Another

19    issue that compounds that is that if a class were -- well,

20    regardless of what way the Court rules -- ruled on the class

21    certification issue, there would be a right of an immediate

22    appeal by either side.

23              THE COURT:  Right.

24              MS. PADDEN:  We've already talked about the CLA

25    standing.  That's a relatively novel issue, I think, one of

Page 234

1    first impression.  And then Your Honor talked about this a

2    little bit today.  I want to talk a little more about the

3    Eighth Amendment standard.  And this was raised in our motion

4    to dismiss.  But, you know, obviously there are two

5    components to the Eighth Amendment standard.  There's the

6    objective and the subjective.

7              THE COURT:  Right.

8              MS. PADDEN:  In the motion to dismiss we made

9    challenges on both prongs.  We made challenges that many of

10   these individuals, while they may have a mental illness, they

11   haven't alleged -- they haven't alleged facts to show that

12   illness rose to a serious medical need.  And there really

13   aren't cases -- there's no case from the Supreme Court

14   applying that standard, the serious medical need standard to

15   a mental health claim.

16             THE COURT:  Right.  They're all physical

17   infirmities.

18             MS. PADDEN:  Correct.  There are also cases out

19   there from this circuit saying that as long as there's some

20   treatment being provided, the Eighth Amendment is not

21   violated.  And you heard lots of testimony from my cross that

22   nearly all of these men were getting at least some treatment.

23   They were getting medication.  They might not have been happy

24   about how the counseling was being conducted, but they were

25   provided with counseling.  For example, Mr. Houston testified

Page 235

1   that he was taking Elavil from 2009 to 2011.  So that would

2   be all challenges that the plaintiffs would face on the

3   objective component.

4            And then the subjective component, frankly, is

5   even more difficult to meet.  And I know Your Honor has

6   expressed -- or expressed some question as to whether the

7   subjective component applies in an injunctive relief case

8   like this as opposed to an individual capacity claim for

9   damages.  But Farmer v. Brennan was an injunctive relief

10  case.  It was a failure to protect Eighth Amendment case.

11  But in that case when the Supreme Court remanded it, it

12  directed the trial court -- that it needed to determine the

13  subjective component at the time of trial.  So, again, that's

14  another risk that the plaintiffs would face is if they had to

15  prove that subjective component at the time of trial.  And,

16  frankly, many of them had good things to say about the

17  wardens, about the doctors who had treated them.  And, you

18  know, it would be very difficult, we submit, for the

19  plaintiffs to show that someone in the Bureau of Prisons was

20  acting with deliberate indifference towards them.  I've

21  already talked about the fact that policy violations don't

22  amount to a constitutional violation.

23           Another thing that we haven't talked about yet is

24  mootness.  You know, Your Honor made quite clear that we

25  would not be moving individuals out of ADX to moot the case,

Page 236

 1   and we did not.  We moved them for treatments.  But obviously

 2   that's an issue moving forward.  Both -- that the Bureau is

 3   already doing the things that the plaintiff has asked them to

 4   do.  You know, there's good law under Jordan v. Sosa in the

 5   Tenth Circuit that those claims could be found to be moot.

 6          And then, let's see, I've already talked about the

 7   plaintiffs, some of their criminal histories.  Those would

 8   obviously be issues at trial.  Your Honor raised some

 9   challenges about prescribing medication, you know, that

10   inmates could be engaging in drug-seeking behavior.  It could

11   be indicative of addiction.  You know, we also have issues

12   with inmates hoarding medication.  We have issues with

13   inmates who maybe were exhibiting signs of a mental illness

14   before they were incarcerated, but it was because they were

15   taking drugs on the street.

16          So, for example, Mr. Barron testified that he was

17   hearing voices when he first came into custody, but then he

18   admitted that those voices stopped once he went through the

19   PCP withdrawal because he had been taking PCP every day on

20   the street prior to that.

21          We have issues of side effects.  Some inmates,

22   even though they've been prescribed medication, they want to

23   discontinue those medications because of side effects.  And

24   unfortunately in some cases there's no way to avoid that.  We

25   do have -- unfortunately, inmates continue to find ways to

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 237

1    make alcohol even at ADX and that compounds the clinical

2    picture.  I know Your Honor was surprised, but that

3    unfortunately does happen quite frequently.  Pretty much

4    anything containing sugar, they can figure out a way to make

5    alcohol out of it.

6              And finally, we would have some -- another PLRA

7    defense that hasn't been discussed yet would be exhaustion

8    issues.  You know, we'd have to look at what specific issues

9    have been exhausted prior to the filing of the lawsuit.

10             And so those are the points I wanted to highlight

11   with the Court, unless you have any further questions for me.

12             THE COURT:  No.  I think I understand these

13   things.  And this could be a contentious trial.

14             MS. PADDEN:  Yes.

15             THE COURT:  Okay.  Thank you.

16             MS. PADDEN:  Okay.  Thank you.

17             MR. ARO:  I promise I'm almost done, but there are

18   a couple things.  I just want to make sure we've addressed

19   any questions you have about them.  I'm prepared, Ms. Golden

20   is prepared, and Mr. Ivandick are prepared to talk to the

21   issue of fees or costs to the extent that you don't have

22   adequate information about that.

23             THE COURT:  I've got these declarations.

24             MR. ARO:  Okay.

25             THE COURT:  And I will rely on them.

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 238

```
 1              MR. ARO:  Okay.  The other issue that Mr. Ivandick
 2    was prepared to address if you had questions about it was the
 3    CLA has been assigned a role by the settlement documents as a
 4    repository of complaints.  And if you had questions for him
 5    about that, he's prepared to speak to that issue.
 6              THE COURT:  No.  I'm assuming that they will
 7    handle those as filed.
 8              MR. ARO:  Okay.  Two housekeeping things.  When I
 9    filed --
10              THE COURT:  And I'm assuming that it continues to
11    get funding other than from government funding to perform
12    that function.
13              MR. IVANDICK:  Yes, Your Honor.  We can take part
14    in that.  And --
15              THE COURT:  Yeah.  So we don't have that issue
16    that you're using government money inappropriately.  Okay.  I
17    made that assumption, and I'm glad you affirmed it.
18              MR. ARO:  Two housekeeping items.  The first is
19    that when we filed the motion for preliminary approval we did
20    not have final copies signed by the wardens of two of the
21    policies that went into place, so we submitted draft copies.
22    The exhibits behind you contain the final versions of all the
23    settlement documents.  And just so the record is clear, I'd
24    like to read the numbers of those exhibits so we all know
25    what we are asking you to approve.
```

Page 239

```
 1            THE COURT:  Well, aren't we talking about 1
 2    through 13?
 3            MR. ARO:  So, yes, but two of those documents were
 4    drafts, and we've included all of the finals as hearing
 5    exhibits beginning with number 611.  May I give you the list
 6    or should --
 7            THE COURT:  Yes.
 8            MR. ARO:  Okay.  611 is the signed addendum, which
 9    is actually the guts of the settlement agreement.  Number 613
10    is the program statement for the Bureau of Prisons concerning
11    the care and treatment of inmates with mental illness.  614
12    is the ADX institution supplement regarding treatment and
13    care of inmates with mental illness.  That was one of the two
14    that we only had in draft form before.  615 is the Secure
15    STAGES institution supplement, which is the other one that we
16    only had in draft form before.  616 is the program statement
17    concerning suicide prevention which is the same as you
18    received earlier, Your Honor.  That's dated 3/15/2007.
19    Exhibit 617 is the December -- excuse me, October 31st, 2014,
20    ADX institution supplement concerning suicide prevention.
21    618 is the January 15, 2005, program statement concerning
22    psychiatric services.  And 619 is the August 12, 2011,
23    program statement regarding psychiatric evaluation and
24    treatment.  So it's the combination of those documents that
25    we're asking the Court to approve to resolve the case.  The
```

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 240

1    other housekeeping item is that since we originally tendered

2    the exhibit list that had all the stipulations on it, we've

3    added some additional exhibits by stipulation that you've

4    heard us refer to in court.  Did you have a chance to look

5    through that?

6            MS. PADDEN:  Yes.  But some of (inaudible)

7    portions are missing.

8            MR. ARO:  Okay.

9            MS. PADDEN:  So I think we need a new one

10   probably.

11           MR. ARO:  So if we might, Your Honor, Ms. Padden

12   and I can finalize that and tender to the Court after the

13   hearing with all of the exhibits that were admitted by

14   stipulation marked clearly so the record is clear about

15   what's in the record.  Is that acceptable?

16           THE COURT:  Yes.

17           MR. ARO:  The last thing that I would like to do,

18   Your Honor, is conclude with a couple of remarks about people

19   who were involved in this process whose involvement hasn't

20   really been apparent to the Court.  And I think that given

21   the nature of the case, it's important that they be

22   acknowledged in the courtroom for some of the things that

23   have facilitated the settlement here.  Starting with

24   Ms. Padden and Ms. Turner, the two of them have, since we

25   began to engage in this settlement process back in 2013, I

Page 241

1    think it's fair to say they've born the brunt of the

2    day-to-day blocking and tackling of trying to deal with many

3    demands and requests that we've made.  And they've done so

4    with good humor and integrity.  And it's because of the

5    relationship that we have with them and, frankly, our

6    recognition of their good faith that we were able to get past

7    a lot of things that otherwise would have ended up in front

8    of Your Honor.

9            Another person who has been critical to this going

10   backwards and will be critical going forward I referred to

11   earlier as Chris Synsvoll.  And you've heard a little bit

12   about his involvement.  And he is going to be a critical

13   player going forward.  But Chris did something in this case

14   that is truly extraordinary.  I cannot comprehend or -- I

15   can't believe that any other lawyer in the country would have

16   done something that he did and put himself into grave

17   potential for conflict with his own organization.  And I want

18   you to know about it because it was such a decent and gutsy

19   thing to do.

20           As we were negotiating the settlement of this

21   case, we received word that some prosecutors from the

22   Department of Justice in DC were in the middle of a capital

23   prosecution in the Western District of Missouri involving an

24   inmate with mental illness who had murdered another mentally

25   inmate at Springfield.  And in the course of that prosecution

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 242

 1   the Department of Justice was insinuating, if not outright

 2   arguing, that because of this lawsuit and because of the

 3   policies that were implemented as a result of this case,

 4   there was no place to safely and securely house the defendant

 5   and, therefore, the only option was a death sentence for that

 6   inmate.  I was asked to go to Missouri to testify by his

 7   defense lawyers to respond to that and explain actually that

 8   that was not a correct argument by the government.  I raised

 9   it with Amy and Chris, Amy Padden and Chris Synsvoll, who

10   were as furious as I was about the insinuation that was being

11   made because -- in our -- our view.  And I won't ascribe this

12   to them.  But it was -- in my view it was one of the most

13   cynical things I've ever heard a lawyer do.

14           Approvals were sought and received from John Walsh

15   to allow Mr. Synsvoll to travel to -- to Missouri on a -- as

16   a defense witness to show up and testify on behalf of the

17   mentally inmate that no matter what his condition, the Bureau

18   had the capacity to safely and securely house an inmate with

19   both violent propensities and mental illness.  And ultimately

20   that inmate was convicted and sentenced to death and is at

21   Terre Haute, not at one of these other programs.  But what

22   Mr. Synsvoll did I think reflects exceptionally well on his

23   integrity.  And it is another significant factor in why we

24   were willing to assume some of the risks that we're going to

25   have to assume around enforcement and compliance going

Page 243

1    forward.

2              The last person individually I want to acknowledge

3    is Judge Hegarty who I think is in the courtroom and I'm

4    going to embarrass.  I am 100 percent sure that there's never

5    been a case ever in the federal courts where a judge has done

6    more than he did to facilitate a settlement.  He did so with

7    incredible skill and good humor.  I know that you regard him

8    well based on things that you've said.  But if there's one

9    single player who was essential to this process, it's him.

10   And I think he ought to be acknowledged for that fact.

11             The last thing I want to say is that we think that

12   it says something important about our justice system that

13   somebody like Harold Cunningham or Jack Powers or Marcellus

14   Washington can come into federal court and bring his

15   government to account for its actions.  And part of that is

16   the decisions they made to get involved in the case.  Part of

17   it obviously is us.  But also part of it is you, Your Honor.

18   I want to thank you for your patience the last few days as

19   we've put the information we put into the record and your

20   indulgence in that period.  But I also want to thank you for

21   the time you've given us to work this thing out over time.  A

22   lot of judges would have pushed this harder and tried to

23   force it forward in ways that I think would have been very

24   counterproductive.  And I and I know Ms. Padden feel very

25   strongly that your willingness to allow us to work on this

Page 244

1    outcome was a critical factor in the fact that we got it

2    done.  So thank you very much for your involvement with that.

3              THE COURT:  There ought to be some recognition of

4    you and your firm as well, Mr. Aro, because I think your

5    dedication to this for the last four years or more is

6    exemplary.  And I've become somewhat cynical about the legal

7    profession, but you and your performance here has encouraged

8    me.

9              MR. ARO:  I appreciate you saying that, Your

10   Honor.  Thank you very much.  Is there anything else that we

11   can --

12             THE COURT:  Of course you had -- of course you had

13   good training once a long time ago.

14             MR. ARO:  I went to a fine law school, Your Honor.

15             THE COURT:  All right.

16             MR. ARO:  Is there anything else we can address

17   this afternoon?

18             THE COURT:  Yeah.  I'm going to approve the

19   settlement.  I'm going to do it with a memorandum and order.

20   And I'm going to ask you, counsel, to draft the order of

21   dismissal so that it gives me, you know, the benefit of your

22   work in making sure that we're doing the best we can to

23   retain jurisdiction.

24             I don't know what to do with all these exhibits.

25   The clerk's office doesn't want to keep exhibits.  But I

Page 245

1    think these exhibits -- I don't think we can just scan all of

2    these things into the electronic database.  Maybe we could.

3              MR. ARO:  We have electronic copies of everything,

4    Your Honor.

5              THE COURT:  You do?

6              MR. ARO:  Yes.  And if it would be easier for the

7    Court for us to deliver the entire body of the stipulated

8    exhibits on a disk or several disks, we can do that easily.

9              THE COURT:  All right.  Well, yeah.  Well, I'll

10   ask you to do that when we're done --

11             MR. ARO:  We will do so.

12             THE COURT:  -- so that I don't get the clerk's

13   office in rebellion that I'm ordering to keep all these

14   things in a (inaudible).

15             MR. ARO:  Would you like us to take with us the

16   Court's copies of --

17             THE COURT:  No.

18             MR. ARO:  -- these today or do you want us to

19   leave them with you for now?

20             THE COURT:  I want to have them as I write the

21   memorandum and order.

22             MR. ARO:  When that's concluded, we'll pick up the

23   paper ones and swap them for electronic ones.

24             THE COURT:  Right.

25             MR. ARO:  Okay.

Page 246

```
 1              THE COURT:  Well, I -- the matter will be under
 2  advisement technically on the -- on the electronic system,
 3  but you can be sure that I believe that this is -- not only
 4  meets the requirements of the Rule 23(e), but also is I think
 5  an extraordinary accomplishment by everybody involved.  And,
 6  you know, it would be easy to look at these people as wild
 7  animals that ought to be caged.  But what has happened here
 8  is that their humanity has been recognized.  And that's quite
 9  an accomplishment.
10              Now, do we need procedurally a separate order
11  forming these classes?
12              MR. ARO:  I think that the dismissal order
13  probably can encompass that, but Ms. Padden and I can work
14  together and figure out -- to make sure we do that correctly.
15              THE COURT:  Yeah.  I'm not sure procedurally.  And
16  I'll try to get this out soon, although I do have some other
17  pressing matters.  But it will be out before January 20th.
18              MR. ARO:  We appreciate that, Your Honor.
19              THE COURT:  All right.  Thank you.
20              MR. ARO:  Have a Merry Christmas, Your Honor.
21              THE COURT:  Court's in -- we'll have to clear
22  things out a little.  I've got a 2:00 in here.  All right.
23              MR. ARO:  Thank you.
24              THE COURT:  Court's in recess.
25              THE COURTROOM DEPUTY:  All rise.  Court is in
```

Page 247

1   recess.

2           (Whereupon, the within hearing was then in

3   conclusion at 12:14 p.m.)

4

5

6           I certify that the foregoing is a correct

7   transcript, to the best of my knowledge and belief (pursuant

8   to the quality of the recording) from the record of

9   proceedings in the above-entitled matter.

10

11

12

13  /s/ Laurel S. Tubbs                January 27, 2017

14  Signature of Transcriber           Date

15

16

17

18

19

20

21

22

23

24

25

Harold Cunningham, individually, et al. vs.
Federal Bureau of Prisons

Fairness Hearing - Day 3
December 19, 2016

Page 248

```
 1                        INDEX

 2                                            PAGE

 3    ALPHONSO BLAKE (By Video)          169, 170
      SEAN GILLESPIE (By Video)               175
 4    MARCELLUS WASHINGTON (By Video)         180

 5
      Argument by Mr. Aro                     190
 6    Argument by Ms. Padden                  205
      Argument by Mr. Aro                     237
 7

 8

 9

10

11                      EXHIBITS

12                                            PAGE

13    Exhibit Number 736                      182

14

15

16

17

18

19

20

21

22

23

24

25
```